**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Ave., 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
        lrosen@rosenlegal.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JUNG KYOON KONG, Individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>        v.<br><br>FIAT CHRYSLER AUTOMOBILES N.V., ROLAND ISELI AND ALESSANDRO BALDI AS CO-EXECUTORS OF THE ESTATE FOR SERGIO MARCHIONNE, MICHAEL MANLEY, and RICHARD K. PALMER,<br><br>        Defendants. | Case No:<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED |

Plaintiff Jung Kyoon Kong ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Fiat Chrysler Automobiles N.V. ("Fiat" or the "Company"),

1

and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Fiat securities from February 26, 2016 through November 20, 2019, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district, and the Company conducts substantial business in this district.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

6.      Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Fiat securities during the Class Period and was economically damaged thereby.

7.      Defendant Fiat, together with its subsidiaries, designs, engineers, manufactures, distributes, and sells vehicles, components, and production systems. Fiat is incorporated in The Netherlands and with principal executive offices located at 25 St. James's Street, London, SW1A 1HA, United Kingdom. The Company's stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "FCAU."

8.      Defendants Roland Iseli and Alessandro Baldi are Co-Executors of the Estate for Sergio Marchionne ("Marchionne"), who served as the Company's Chief Executive Officer ("CEO") until July 2018. Marchionne passed away on July 25, 2018.

9.      Defendant Michael Manley ("Manley") has served as the Company's CEO since July 21, 2018.

10.     Defendant Richard K. Palmer ("Palmer") has served as the Company's Chief Financial Officer ("CFO") throughout the Class Period.

11.     Defendants Marchionne, Manley, and Palmer are collectively referred to herein as the "Individual Defendants."

12.     Each of the Individual Defendants:

        (a)     directly participated in the management of the Company;

        (b)     was directly involved in the day-to-day operations of the Company at the highest levels;

        (c)     was privy to confidential proprietary information concerning the Company and its business and operations;

3

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

13.     Fiat is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

14.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Fiat under *respondeat superior* and agency principles.

15.     Defendants Fiat and the Individual Defendants are collectively referred to herein as "Defendants."

<u>**SUBSTANTIVE ALLEGATIONS**</u>
<u>**Materially False and Misleading Statements**</u>

16.     On February 29, 2016, the Company filed its annual report on Form 20-F for the year ended December 31, 2015 with the SEC (the "2015 20-F"). The 2015 20-F was signed by Defendant Palmer. The 2015 20-F contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Marchionne and Palmer attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

17.     The 2015 20-F stated the regarding the Company's collective bargaining agreement with

International Union, United Automobile, Aerospace and Agricultural Implement Workers of

America ("UAW"):

> In October 2015, FCA US and the UAW agreed to a new four-year national
> collective bargaining agreement, which will expire in September 2019. The
> provisions of the new agreement continue certain opportunities for success-based
> compensation upon meeting certain quality and financial performance metrics. The
> agreement closes the pay gap between "Traditional" and "In-progression"
> employees over an eight year period and will continue to provide UAW-represented
> employees with a simplified adjusted profit sharing plan. The adjusted profit
> sharing plan will be effective for the 2016 plan year and is directly aligned with
> NAFTA profitability. The agreement includes lump-sum payments in lieu of
> further wage increases of primarily $4,000 for "Traditional" employees and $3,000
> for "In-progression" employees totaling approximately $141 million (€126 million)
> that was paid to UAW members on November 6, 2015.

18.     The 2015 20-F stated the following regarding the Company's Code of Conduct:

> We have adopted a Code of Conduct, which applies to all of our employees,
> including our principal executive, principal financial and principal accounting
> officers. Our Code of Conduct is intended to meet the definition of "code of ethics"
> under Item 16B of Form 20-F under the Exchange Act. Our Code of Conduct is
> posted      on     our     website      at     http://www.fcagroup.com/en-
> US/governance/code_conduct/. If the provisions of our Code of Conduct that apply
> to our principal executive officer, principal financial officer or principal accounting
> officer are amended, or if a waiver is granted, we will disclose such amendment or
> waiver.

19.     The Company's Code of Conduct, at all relevant times, has stated, in pertinent part,

the following regarding bribery:

> Compliance with Applicable Laws
>
> ***The FCA Group is committed to complying fully with all applicable laws,
> including anti-bribery, anti-money laundering, exports and sanctions, customs,
> competition and antiboycott laws.*** Please keep in mind that these laws are complex.
> The FCA Group including its subsidiaries wherever located must comply with these
> laws. All third parties including agents, consultants, representatives, joint venture
> partners, dealers, distributors, service centers, and other third parties that may do
> business with the FCA Group, are also expected to comply with subject laws in

5

connection with any activities or business these third parties conduct on the FCA Group's behalf.

Anti-Bribery and Anti-Corruption

The FCA Group is committed to the highest standards of integrity, honesty and fairness in all internal and external affairs and will not tolerate any kind of bribery. The laws of virtually all countries in which the FCA Group operates prohibit bribery.

***The FCA Group's policy is that no one - director, officer, or other employee, agent or representative - shall, directly or indirectly, give, offer, request, promise, authorize, solicit or accept bribes or any other perquisite (including gift or gratuities with the exception of commercial items universally accepted in an international context of modest economic value, permitted by applicable laws and in compliance with the Code and all applicable Practices and Procedures) in connection with their work for the FCA Group at any time for any reason.***

Anti-bribery and anti-corruption laws implementing the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, the OECD Guidelines, and laws such as the United States Foreign Corrupt Practices Act, United Kingdom Bribery Act and similar laws prohibit providing, directly or indirectly (such as through an intermediary), anything of value not only to domestic, but also to foreign government, political or military employees or officials, foreign political party officials or candidates; employees of foreign government owned or controlled entities; or representatives of international organizations (such as the United Nations and the World Bank); or to private entities/individuals for the purpose of obtaining or retaining business or securing any improper advantage.

The FCA Group's record keeping and internal accounting and control Practices and Procedures are designed to ensure integrity and accuracy in the recording and reporting of all business transactions.

(Emphasis added.)

20.     On February 28, 2017 the Company filed its annual report on Form 20-F for the year ended December 31, 2016 with the SEC (the "2016 20-F"). The 2016 20-F was signed by Defendant Palmer. The 2016 20-F contained signed SOX certifications by Defendants Marchionne and Palmer attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

21.     The 2016 20-F stated the regarding the Company's collective bargaining agreement with

UAW:

In October 2015, FCA US and the UAW agreed to a new four-year national collective bargaining agreement, which will expire in September 2019. The provisions of the agreement continue certain opportunities for success-based compensation upon meeting certain quality and financial performance metrics. The agreement closes the pay gap between "Traditional" and "In-progression" employees over an eight year period and will continue to provide UAW-represented employees with a simplified adjusted profit sharing plan. The adjusted profit sharing plan was effective for 2016 and was directly aligned with NAFTA profitability. The agreement included lump-sum payments in lieu of further wage increases of primarily U.S.$4,000 for "Traditional" employees and U.S.$3,000 for "In-progression" employees totaling approximately $141 million (€126 million) that was paid to UAW members on November 6, 2015.

22.     The 2016 20-F stated the following regarding the Company's Code of Conduct:

We have adopted a Code of Conduct, which applies to all of our employees, including our principal executive, principal financial and principal accounting officers. Our Code of Conduct is intended to meet the definition of "code of ethics" under Item 16B of Form 20-F under the Exchange Act. Our Code of Conduct is posted on our website at http://www.fcagroup.com/en-US/governance/code_conduct/. If the provisions of our Code of Conduct that apply to our principal executive officer, principal financial officer or principal accounting officer are amended, or if a waiver is granted, we will disclose such amendment or waiver.

23.     On June 26, 2017, the FBI filed an indictment against Fiat's former labor relations chief,

Al Iacobelli, for improperly funneling money to UAW officials that was intended for use at the

UAW-Chrysler National Training Center. The Company issued the following statement in

response:

***FCA US and the UAW were the victims of malfeasance by certain of their respective employees that held roles at the National Training Center (NTC), an independent legal entity. These egregious acts were neither known to nor sanctioned by FCA US.*** Upon learning of possible malfeasance in June 2015, the Company investigated the matter and, as a result, Mr. Iacobelli and Mr. Durden were promptly separated from the Company upon FCA US obtaining credible evidence of wrongdoing. The Company has also worked with the UAW to implement governance, auditing and structural reforms to improve the accountability and transparency of the NTC.

FCA US has cooperated fully with the U.S. Attorney's office in its investigation of

this matter. We remain committed to ensuring that the Company and its employees act in a manner consistent with high standards of legal compliance, ethics, integrity and quality.

The Company intends to pursue all potential legal remedies against Mr. Iacobelli and any other culpable parties. As the U.S. Attorney's investigation is ongoing, the Company cannot comment further.

(Emphasis added.)

24.     On February 20, 2018 the Company filed its annual report on Form 20-F for the year ended December 31, 2017 with the SEC (the "2017 20-F"). The 2017 20-F was signed by Defendant Palmer. The 2017 20-F contained signed SOX certifications by Defendants Marchionne and Palmer attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

25.     The 2017 20-F stated the regarding the Company's collective bargaining agreement with UAW:

In October 2015, FCA US and the UAW agreed to a new four-year national collective bargaining agreement, which will expire in September 2019. The provisions of the agreement continue certain opportunities for success-based compensation upon meeting certain quality and financial performance metrics. The agreement closes the pay gap between "Traditional" and "In-progression" employees over an eight year period and will continue to provide UAW-represented employees with a simplified adjusted profit sharing plan. The adjusted profit sharing plan was effective for 2016 and was directly aligned with NAFTA profitability. The agreement included lump-sum payments in lieu of further wage increases of primarily U.S.$4,000 for "Traditional" employees and U.S.$3,000 for "In-progression" employees totaling approximately $141 million (€126 million) that was paid to UAW members on November 6, 2015.

26.     The 2017 20-F stated the following regarding the Company's Code of Conduct:

The Company and all its subsidiaries refer to the principles contained in the FCA code of conduct (the "Code of Conduct") approved by the Board of Directors on April 29, 2015 and updated in January 2017.

The Code applies to all board members and officers of FCA and its subsidiaries, as well as full-time and part-time employees of FCA and any of its subsidiaries. The Code of Conduct also applies to all temporary, contract and all

other individuals and companies that act on behalf of FCA, wherever they are located in the world.

*     *     *

The Company closely monitors the effectiveness of and compliance with the Code of Conduct. Violations of the Code of Conduct are essentially determined through, among others: periodic activities carried out by Internal Audit of the Group according to the annual Audit Plan, approved by the FCA Audit Committee and the CEO, that is based on a group risk assessment process; allegations received in accordance with the "Ethics Helpline process"; and checks forming part of the standard operating procedures. Internal Audit investigates violations of the Code of Conduct also through specific Business Ethics Audits ("BEA"). On a regular basis the Chief Audit Executive (CAE) informs the Chief Executive Officer and the Audit Committee on the major findings. For all Code of Conduct violations, the disciplinary measures taken are commensurate with the seriousness of the case and comply with local legislation.

The Code of Conduct, including further information on its effectiveness and compliance, is available on the Governance section of the Group's website at https://www.fcagroup.com/en-US/group/governance/code_of_conduct/.

27. The 2017 20-F stated the following regarding the investigation into the UAW-Chrysler National Training Center:

In connection with an on-going government investigation into matters at the UAW-Chrysler National Training Center, the U.S. Department of Justice has brought charges against a number of individuals including two former FCA US employees and individuals associated with the UAW for, among other things, tax fraud and conspiring to provide money or other things of value to a UAW officer and UAW employees while acting in the interests of FCA US, in violation of the Labor Management Relations (Taft-Hartley) Act. ***We believe that FCA US was a victim of these acts and we continue to cooperate with this investigation***. Several putative class action lawsuits have been filed against FCA US in U.S. federal court alleging harm to UAW workers as a result of these acts. At this early stage, we are unable to reliably evaluate the likelihood that a loss will be incurred or estimate a range of possible loss.

(Emphasis added.)

28. On February 22, 2019 the Company filed its annual report on Form 20-F for the year ended

December 31, 2018 with the SEC (the "2018 20-F"). The 2018 20-F was signed by Defendant

Palmer. The 2018 20-F contained signed SOX certifications by Defendants Manley and Palmer

attesting to the accuracy of financial reporting, the disclosure of any material changes to the

Company's internal controls over financial reporting, and the disclosure of all fraud.

29.     The 2018 20-F stated the regarding the Company's collective bargaining agreement with

UAW:

> In October 2015, FCA US and the UAW agreed to a new four-year national collective bargaining agreement, which will expire in September 2019. The provisions of the agreement continue certain opportunities for success-based compensation upon meeting certain quality and financial performance metrics. The agreement closes the pay gap between "Traditional" and "In-progression" employees over an eight year period and will continue to provide UAW-represented employees with a simplified adjusted profit sharing plan. The adjusted profit sharing plan was effective for 2016 and was directly aligned with NAFTA profitability. The agreement included lump-sum payments in lieu of further wage increases of primarily U.S.$4,000 for "Traditional" employees and U.S.$3,000 for "In-progression" employees totaling approximately $141 million (€126 million) that was paid to UAW members on November 6, 2015.

30.     The 2018 20-F stated the following regarding the Company's Code of Conduct:

> The Company and all its subsidiaries refer to the principles contained in the FCA code of conduct (the "Code of Conduct") approved by the Board of Directors on April 29, 2015 and updated in January 2017.
>
> The Code applies to all board members and officers of FCA and its subsidiaries, as well as full-time and part-time employees of FCA and any of its subsidiaries. The Code of Conduct also applies to all temporary, contract and all other individuals and companies that act on behalf of FCA, wherever they are located in the world.
>
> *       *       *
>
> The Company closely monitors the effectiveness of and compliance with the Code of Conduct. Violations of the Code of Conduct are essentially determined through, among others: periodic activities carried out by Internal Audit of the Group according to the annual Audit Plan, approved by the  FCA Audit Committee and the CEO, that is based on a group risk assessment process; allegations received in

accordance with the "Ethics Helpline process"; and checks forming part of the standard operating procedures. Internal Audit investigates violations of the Code of Conduct also through specific Business Ethics Audits ("BEA"). On a regular basis the Chief Audit Executive (CAE) informs the Chief Executive Officer and the Audit Committee on the major findings. For all Code of Conduct violations, the disciplinary measures taken are commensurate with the seriousness of the case and comply with local legislation.

The Code of Conduct, including further information on its effectiveness and compliance, is available on the Governance section of the Group's website at https://www.fcagroup.com/en-US/group/governance/code_of_conduct/.

31.     The 2018 20-F stated the following regarding the investigation into the UAW-Chrysler National Training Center:

In connection with an on-going government investigation into matters at the UAW-Chrysler National Training Center, the U.S. Department of Justice has brought charges against a number of individuals including two former FCA US employees and individuals associated with the UAW for, among other things, tax fraud and conspiring to provide money or other things of value to a UAW officer and UAW employees while acting in the interests of FCA US, in violation of the Labor Management Relations (Taft-Hartley) Act. ***We believe that FCA US was a victim of these acts and we continue to cooperate with this investigation***. Several putative class action lawsuits have been filed against FCA US in U.S. federal court alleging harm to UAW workers as a result of these acts. At this early stage, we are unable to reliably evaluate the likelihood that a loss will be incurred or estimate a range of possible loss.

(Emphasis added.)

32.     The statements contained in ¶¶16-31 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company employed a bribery scheme to obtain favorable terms in its collective bargaining agreement with UAW; (2) high-ranking Fiat official were aware of and authorized the

scheme; and (3) as a result, Defendants' statements about Fiat's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH BEGINS TO EMERGE

33.     On November 20, 2019, while the market was open, General Motors ("GM") filed a racketeering lawsuit against the Company in the Eastern District of Michigan styled as *General Motors LLC, et al. v. FCA US LLC et al.*, Case No. 2:19-cv-13429-PDB-DRG, for damages caused by a bribery scheme perpetuated by UAW and the Company.  According to the lawsuit, the illegal activity was authorized by the high-level officers of the Company, including Defendant Marchionne, and helped the Company win union acceptance of cost concessions in 2011 and 2015. The lawsuit also contended that Fiat executives bribed UAW leaders to pressure GM into a merger with Fiat.

34.     On this news, shares of Fiat fell $0.58 per share, or nearly 3.72%, to close at $15.00 per share on November 20, 2019, damaging investors.

35.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

36.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Fiat securities publicly traded on the NYSE during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Fiat, members of the Individual Defendants' immediate families and their legal representatives, heirs,

successors or assigns and any entity in which Officer or Director Defendants have or had a controlling interest.

37.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Fiat securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

38.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

39.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

40.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business Fiat;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused Fiat to issue false and misleading SEC filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and SEC filing

- whether the prices of Fiat' securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

41.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

42.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Fiat shares met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

- As a public issuer, Fiat filed periodic public reports with the SEC6;

- Fiat regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

14

- Fiat was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

43.    Based on the foregoing, the market for Fiat securities promptly digested current information regarding Fiat from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

44.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I
### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
### Against All Defendants

45.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

46.    This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

47.     During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

48.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Fiat securities during the Class Period.

49.     Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Fiat were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of Fiat, their control over, and/or receipt and/or modification of Fiat's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Fiat, participated in the fraudulent scheme alleged herein.

50.      Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Fiat personnel to members of the investing public, including Plaintiff and the Class.

51.     As a result of the foregoing, the market price of Fiat securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the

other members of the Class relied on the statements described above and/or the integrity of the market price of Fiat securities during the Class Period in purchasing Fiat securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

52.     Had Plaintiff and the other members of the Class been aware that the market price of Fiat securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Fiat securities at the artificially inflated prices that they did, or at all.

53.      As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

54.     By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Fiat securities during the Class Period.

### COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

55.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

56.     During the Class Period, the Individual Defendants participated in the operation and management of Fiat, and conducted and participated, directly and indirectly, in the conduct of Fiat's business affairs. Because of their senior positions, they knew the adverse non-public information about Fiat's misstatement of revenue and profit and false financial statements.

57.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Fiat's financial condition

and results of operations, and to correct promptly any public statements issued by Fiat which had become materially false or misleading.

58.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Fiat disseminated in the marketplace during the Class Period concerning Fiat's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Fiat to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Fiat within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Fiat securities.

59.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Fiat.

**PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)     declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)     awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)      awarding plaintiff and other members of the Class such other and further relief as

the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: December 2, 2019                    Respectfully submitted,

                                                                  **THE ROSEN LAW FIRM, P.A.**

                                                                  By:/s/Phillip Kim
                                                                  Phillip Kim, Esq. (PK 9384)
                                                                  Laurence M. Rosen, Esq. (LR 5733)
                                                                  275 Madison Avenue, 40th Floor
                                                                  New York, NY 10016
                                                                  Telephone: (212) 686-1060
                                                                  Fax: (212) 202-3827
                                                                  Email: pkim@rosenlegal.com
                                                                              lrosen@rosenlegal.com


                                                                  *Counsel for Plaintiff*