**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| IN RE FIAT CHRYSLER AUTOMOBILES N.V. SECURITIES LITIGATION | : : : : : : : | 19-CV-6770 (EK) (VMS)<br><br>(Oral Argument Requested) |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR**
**MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT**

William B. Monahan
Thomas C. White
Joshua S. Levy
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Counsel for Defendants*

August 21, 2020

**TABLE OF CONTENTS**

*Page*

PRELIMINARY STATEMENT ................................................................................................ 1

ALLEGATIONS OF THE COMPLAINT ................................................................................. 6

    A.    FCA US's Termination of Messrs. Iacobelli's and Durden's Employment in June 2015—Prior to the Negotiation and Ratification of the 2015 CBA .......... 6

    B.    FCA's Disclosures Regarding the 2015 CBA ...................................................... 7

    C.    Government Indictments or Informations Beginning in July 2017 ....................... 8

    D.    GM's Suit Against FCA and Plaintiff's Follow-On Securities Action .................. 9

    E.    The Alleged Misrepresentations ........................................................................... 10

ARGUMENT ............................................................................................................................ 11

I.    PLAINTIFF DOES NOT ALLEGE PARTICULARIZED FACTS TO SUPPORT A COGENT AND COMPELLING INFERENCE THAT ANY DEFENDANT INTENDED TO DEFRAUD INVESTORS ........................................ 11

    A.    Plaintiff Has Not Alleged a Cognizable Motive To Commit Securities Fraud ..................................................................................................................... 11

    B.    Plaintiff Has Not Alleged a "Strong Inference" of "Conscious Misbehavior or Recklessness." ............................................................................ 13

        1.    Plaintiff's Speculation of Contrary Knowledge Based on the Individual Defendants' Positions Cannot Support an Inference of Scienter ...................................................................................................... 13

        2.    FCA US's Internal Investigation Rebuts Any Inference of Scienter ........ 14

        3.    Plaintiff's Allegations Based on "Anonymous Sources" Cannot Support an Inference of Scienter ............................................................ 17

II.    PLAINTIFF HAS NOT ALLEGED A MATERIAL MISREPRESENTATION ........................................................................................ 18

    A.    FCA's Disclosures Regarding the 2015 CBA and WCM System Were Accurate, and No Duty Required Disclosure of the "Omitted" Information ....... 18

    B.    Mr. Marchionne's September 2017 Statement to a Reporter Was Not Materially Misleading to Investors ...................................................................... 20

    C.    FCA's Opinion that "FCA US Was A Victim" Was Not Materially Misleading ........................................................................................................... 21

    D.    FCA's SOX Certifications Do Not Contain Any Material Misstatements .......... 23

**III.**   **PLAINTIFF DOES NOT ADEQUATELY PLEAD LOSS CAUSATION** ............... 23

    A.   GM's Complaint Was Not a "Corrective Disclosure" As a Matter of Law ......... 23

    B.   GM's Lawsuit Was Not a Materialization of Any Risk ....................................... 25

**CONCLUSION** ............................................................................................................... 25

## TABLE OF AUTHORITIES

*Page(s)*

### CASES

*Ashcroft* v. *Iqbal*,
    556 U.S. 662 (2009) .............................................................................................. 15

*In re AT&T/DirectTV Now*,
    2020 WL 4909718 (S.D.N.Y. Aug. 18, 2020) ...................................................... 19

*ATSI Commc'ns, Inc.* v. *Shaar Fund*,
    493 F.3d 87 (2d Cir. 2007) ........................................................................ 2, 11, 25

*In re Banco Bradesco*,
    277 F. Supp. 3d 600 (S.D.N.Y. 2017) .................................................................. 23

*Bd. of Trs.* v. *Mechel*,
    811 F. Supp. 2d 853 (S.D.N.Y. 2011) .................................................................... 6

*In re Centerline Holdgs. Co.*,
    678 F. Supp. 2d 150 (S.D.N.Y. 2009) .................................................................. 13

*Chill* v. *Gen. Elec. Co.*,
    101 F.3d 263 (2d Cir. 1996) ................................................................................. 13

*City of Brockton* v. *Avon Prod.*,
    2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014) ..................................................... 17

*City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*,
    752 F.3d 173 (2d Cir. 2014) ............................................................................. 4, 19

*Cortina* v. *Avanex Life Scis. Corp.*,
    2016 WL 7480415 (S.D.N.Y. Dec. 29, 2016) ..................................................... 14

*Dalberth* v. *Xerox Corp.*,
    766 F.3d 172 (2d Cir. 2014) ................................................................................. 24

*Das* v. *Rio Tinto*,
    332 F. Supp. 3d 786 (S.D.N.Y. 2018) .................................................................. 19

*Desai* v. *Gen. Growth*,
    654 F. Supp. 2d 836 (N.D. Ill. 2009) ................................................................... 23

*DeShetler* v. *FCA US LLC*,
    2018 WL 6257377 (N.D. Ohio Nov. 30, 2018) ..................................................... 9

*ECA, Local 134* v. *JP Morgan Chase*,
   553 F.3d 187 (2d Cir. 2009) ................................................................................ 12

*Foley* v. *Transocean*,
   861 F. Supp. 2d 197 (S.D.N.Y. 2012) ................................................................. 17

*Frederick* v. *Mechel OAO*,
   475 F. App'x 353 (2d Cir. 2012) ......................................................................... 14

*Gagnon* v. *Alkermes PLC*,
   368 F. Supp. 3d 750 (S.D.N.Y. 2019) ................................................................. 20

*Garber* v. *Legg Mason, Inc.*,
   347 F. App'x 665 (2d Cir. 2009) ......................................................................... 22

*Gen. Motors LLC* v. *FCA US LLC*,
   2020 WL 3833058 (E.D. Mich. July 8, 2020) .................................................... 10

*In re Gentiva*,
   971 F. Supp. 2d 305 (E.D.N.Y. 2013) ................................................................. 24

*In re ITT*,
   859 F. Supp. 2d 572 (S.D.N.Y. 2012) ................................................................. 18

*Jackson* v. *Abernathy*,
   960 F.3d 94 (2d Cir. 2020) .................................................................................. 15

*Janus Capital Grp.* v. *First Derivative Traders*,
   564 U.S. 135 (2011) ...................................................................................... 11, 21

*Kalnit* v. *Eichler*,
   264 F.3d 131 (2d Cir. 2001) ................................................................. 2, 3, 12, 13

*Lentell* v. *Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005) ................................................................................ 23

*Matrixx Initiatives* v. *Siracusano*,
   563 U.S. 27 (2011) ........................................................................................ 18, 19

*In re Merrill Lynch & Co.*,
   218 F.R.D. 76 (S.D.N.Y. 2003) ........................................................................... 24

*Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Dabit*,
   547 U.S. 71 (2006) ............................................................................................... 11

*Metzler Inv.* v. *Chipotle Mexican Grill*,
   --- F.3d ---, 2020 WL 4644799 (2d Cir. Aug. 12, 2020) .................................... 25

-iv-

*Miao* v. *Manhua, Inc.*,
  442 F. Supp. 3d 774 (S.D.N.Y. 2020) ................................................................ 17

*Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015) ................................................................................. 21, 22

*In re Omnicom*,
  597 F.3d 501 (2d Cir. 2010) .............................................. 5, 23, 24, 25

*In re Optimal*,
  2011 WL 4908745 (S.D.N.Y. Oct. 14, 2011) ........................................ 21

*Panther Partners* v. *Ikanos Commc'ns*,
  347 F. App'x 617 (2d Cir. 2009) .......................................................... 25

*In re PetroChina*,
  120 F. Supp. 3d 340 (S.D.N.Y. 2015) .................................................. 23

*In re Rockwell*,
  2018 WL 1725553 (S.D.N.Y. Mar. 30, 2018) ...................................... 14

*Rombach* v. *Chang*,
  355 F.3d 164 (2d Cir. 2004) ........................................................... 11, 25

*RSM Prod. Corp.* v. *Fridman*,
  643 F. Supp. 2d 382 (S.D.N.Y. 2009) .................................................... 5

*S. Cherry St.* v. *Hennessee Grp.*,
  573 F.3d 98 (2d Cir. 2009) ........................................................ 3, 12, 13

*In re Sanofi*,
  155 F. Supp. 3d 386 (S.D.N.Y. 2016) ............................................. 13, 16

*Schiro* v. *Cemex*,
  396 F. Supp. 3d 283 (S.D.N.Y. 2019) ............................................. 14, 20

*SEC* v. *Cohmad Sec. Corp.*,
  2010 WL 363844 (S.D.N.Y. Feb. 2, 2010) ........................................... 14

*Silsby* v. *Icahn*,
  17 F. Supp. 3d 348 (S.D.N.Y. 2014) .................................................... 12

*Slayton* v. *Am. Express*,
  604 F.3d 758 (2d Cir. 2010) ................................................................ 17

*Swanigan* v. *FCA US LLC*,
  2018 WL 4030815 (E.D. Mich. Aug. 23, 2018) ..................................... 9

*Teachers' Ret. Sys.* v. *Hunter*,
   477 F.3d 162 (4th Cir. 2007) ............................................................. 25

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ....................................................... 2, 11, 17, 18

*Thomas* v. *Shiloh Indus.*,
   2017 WL 1102664 (S.D.N.Y. Mar. 23, 2017) ..................................... 16

*Tongue* v. *Sanofi*,
   816 F.3d 199 (2d Cir. 2016) ............................................................ 22

*In re UBS*,
   2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012) ................................... 15

*United States* v. *Sun-Diamond*,
   138 F.3d 961 (D.C. Cir. 1998) ......................................................... 21

*Y-GAR Capital* v. *Credit Suisse Grp.*,
   2020 WL 71163 (S.D.N.Y. Jan. 2, 2020) ........................................... 13

*Zheng* v. *Pingtan Marine Enters.*,
   379 F. Supp. 3d 164 (E.D.N.Y. 2019) .............................................. 14

## STATUTES, RULE AND REGULATION

Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 *et seq.* .................................. *passim*

Securities Exchange Act § 10(b), 15 U.S.C. § 78j *et seq.* ................................................. 1, 11, 25

Fed. R. Civ. P. 9(b) ....................................................................................... *passim*

Securities Act Release No. 8238 ............................................................... 23

**PRELIMINARY STATEMENT**

On October 31, 2019, Fiat Chrysler Automobiles N.V. ("FCA" or the "Company") announced its intention to merge with Groupe PSA ("PSA").  The following month, FCA's U.S. subsidiary, FCA US LLC ("FCA US"), began negotiating a new collective bargaining agreement ("CBA") with the union (the "UAW").  On November 20, 2019, in a transparent attempt to disrupt the FCA-PSA merger and the CBA negotiations, General Motors ("GM") sued FCA and FCA US, alleging (i) that certain former FCA US employees bribed UAW officials years ago (starting in 2009), and (ii) that the alleged bribery affected CBA negotiations in 2011 and 2015, all as part of an elaborate plot to force GM into merging with FCA.  Last month, the U.S. District Court for the Eastern District of Michigan correctly dismissed GM's lawsuit in its entirety with prejudice.

Twelve days after GM filed its meritless lawsuit, Plaintiff filed this one.  Plaintiff cribs from GM's allegations to attempt to manufacture a securities fraud claim under Section 10(b) of the Securities Exchange Act (the "Exchange Act").  But Plaintiff never explains—let alone pleads with the particularity required by the Private Securities Litigation Reform Act ("PSLRA") or Fed. R. Civ. P. 9(b)—how allegations concerning collusion between UAW officials and a handful of former FCA US employees constitutes a fraud on FCA's shareholders.  From 2016 to 2019 (when FCA made all of the statements Plaintiff challenges), FCA made accurate disclosures regarding its financial reporting and the 2015 CBA.  Plaintiff nonetheless claims that, in addition to making accurate disclosures, FCA *also* needed to disclose the alleged bribery scheme.  But even if such a duty to disclose existed, Plaintiff cannot point to a single well-pled allegation in his Complaint that any FCA executive responsible for the Company's disclosures to investors was aware of any bribery scheme prior to July 2017, when the U.S. Department of Justice first unsealed its indictments and informations against the former FCA US and UAW employees.  Nor has Plaintiff alleged that the bribery affected the 2015 CBA negotiations, let alone to an extent that

would have required some sort of additional disclosure.  In fact, FCA US had terminated the employment of the two relevant individuals *before* negotiations of the 2015 CBA had even begun.

The Complaint should be dismissed in its entirety for three independent reasons:

**1.      *No Cogent and Compelling Inference of Scienter.*** Plaintiff does not allege any facts, let alone with the required particularity, to support a "strong inference" of scienter, which the Supreme Court has held must demonstrate a "cogent" and "compelling" inference of fraud "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).  Plaintiff was required to plead particularized facts (1) "showing that the defendants had both motive and opportunity to commit the fraud," or (2) presenting "strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, Inc.* v. *Shaar Fund*, 493 F.3d 87, 99 (2d Cir. 2007).  Plaintiff did neither.

Plaintiff's theory of "motive" is that Sergio Marchionne, FCA's now-deceased, former CEO, sought to merge FCA with GM beginning "in October 2012," because he believed a merger would "produce $5 billion in savings" and allow "a long-term future for Fiat," with him as CEO.  (Amended Complaint ("Compl.") ¶¶ 251-53, 255.)  But generic allegations that a CEO sought to save money for the company or to explore potentially favorable transactions for the company, all for the *benefit* of the shareholders, cannot support any intent to defraud as a matter of law.  *See*, *e.g., Kalnit* v. *Eichler*, 264 F.3d 131, 140 (2d Cir. 2001) ("Achieving a superior agreement . . . does not demonstrate defendants' intent to benefit themselves at the expense of the shareholders because the shareholders themselves would benefit from a superior transaction.").  In any event, the statements Plaintiff challenges were made between 2016 and 2019, but Plaintiff concedes that "[o]n April 14, *2015*, GM rejected" the proposed merger.  (Compl. ¶¶ 252-54.)

-2-

Lacking any cognizable motive theory, Plaintiff was required to allege "conscious recklessness—*i.e.*, a state of mind approximating *actual intent*," *S. Cherry St.* v. *Hennessee Grp.*, 573 F.3d 98, 109 (2d Cir. 2009), by "specifically alleg[ing] defendants' knowledge of facts or access to information contradicting their public statements," *Kalnit*, 264 F.3d at 142. Plaintiff relies on vague, group-pled allegations about the knowledge of "Defendants" (*e.g.*, Compl. ¶¶ 204, 227)—without specifying any particular FCA executive or how he or she learned facts contrary to a statement he or she made. Plaintiff next claims that the Individual Defendants—the Estate of Mr. Marchionne, Michael Manley (FCA's CEO since shortly before Mr. Marchionne's death in July 2018), and Richard Palmer (FCA's CFO)—had access to unspecified "adverse facts" through "their positions." (Compl. ¶¶ 44-46, 268, 274-78.) These allegations cannot survive the heightened pleading requirements of Rule 9(b) and the PSLRA. (*See infra* at 11.)

Plaintiff also alleges that FCA US conducted an internal investigation in June 2015 and ended the employment of two employees for "wrongdoing" (Compl. ¶ 11), but then goes on to speculate, from this fact alone, that (1) the internal investigation uncovered the alleged bribery of UAW officials (as opposed to other wrongdoing, such as the FCA US employees' theft of company funds to purchase a Ferrari and for home improvement (*id.* ¶ 135 n.77)); (2) the Individual Defendants learned in 2015 of the bribery scheme that the internal investigation supposedly uncovered, even though the Individual Defendants are or were the senior-most executives at the Company, and the Complaint does not plead they had any involvement in the investigation; and (3) the bribery materially impacted the 2015 CBA, even though these individuals' employment terminated before those negotiations had even started (*id.* ¶¶ 264-67). Plaintiff does not offer a single factual allegation to support this speculative chain of events.

-3-

Finally, Plaintiff attempts to fill all the gaps in his scienter theory by alleging that in 2010, Mr. Marchionne gave a "watch with the Fiat logo on it" to a UAW official, and that a different "model of the watch retailed for $2,245." (*Id.* ¶ 71.) Plaintiff never explains how allegedly providing a promotional item *in 2010* somehow demonstrates scienter with respect to statements made *between 2016 and 2019*, let alone CBA negotiations that took place *in 2015*. The alleged provision of a promotional watch to one UAW official—when the alleged bribery scheme involved, as Plaintiff alleges, nearly a dozen UAW officials and "millions of dollars" of bribes (*id.* ¶¶ 76, 144-47)—also does not give rise to the cogent or compelling inference that providing the promotional item was somehow a bribe or intended to result in a hypothetical and improper benefit for FCA as part of CBA negotiations to happen five years into the future.

**2.     *No Material Misrepresentations.*** Plaintiff first attacks ordinary disclosures FCA made beginning in 2016 regarding the 2015 CBA, not based on any misstatement but on a novel "omissions" theory. According to Plaintiff, in addition to accurately describing the terms of the CBA, the Individual Defendants should *also* have, first, unearthed and, second, disclosed the alleged bribery scheme implicating almost a dozen UAW officials and two former employees, none of whom was charged until 2017 or later. (Compl. ¶¶ 203-18, 225-27.) Even assuming Plaintiff's speculation of the Individuals Defendants' knowledge prior to the 2017 indictments (a requirement to state a claim based on purported "omissions"), "disclosure is not a rite of confession, and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing." *City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014).

Plaintiff next challenges Mr. Marchionne's statement in the aftermath of the 2017 indictments and informations that the two former FCA US employees' misconduct had "nothing to do with the collective bargaining process." (Compl. ¶ 213.) But Plaintiff's own allegations

-4-

confirm the accuracy of that statement:  FCA US ended those employees' employment *before* the 2015 CBA negotiations.  (*Id.* ¶ 11.)  Plaintiff's speculation that FCA obtained undefined "benefits" through "good will" generated by "its bribery scheme" (*id.* ¶ 14) falls far short of the heightened pleading requirements of the PSLRA and Rule 9(b).

*Third*, Plaintiff challenges FCA's and FCA US's statements in 2017 and 2018 that they believed FCA US "was a 'victim' of the scheme" (*id.* ¶ 28), but concedes that the former FCA US employees *stole "FCA funds . . .* to purchase items for [themselves]," including "a Ferrari convertible" (*id.* ¶ 135 n.77).

*Finally*, Plaintiff points to routine certifications in FCA's SEC filings regarding its internal controls over financial reporting and auditors (*id.* ¶¶ 201, 205, 215, 224), but Plaintiff does not allege any inaccuracies in FCA's financial reporting, any inadequacies in its internal controls, or that any FCA employee concealed information from FCA's auditors.

**3.**      ***No Loss Causation.***  Plaintiff does not adequately plead that the purported "revelation" to the market of the "truth" caused his claimed losses.  (Compl. ¶¶ 286, 293.)  *First*, the *only* alleged "corrective disclosure" cited in the Complaint is the filing of GM's lawsuit on November 20, 2019.  (*Id.* ¶¶ 283-97.)  But "paragraphs in a complaint that are either based on, or rely on, complaints in other actions that have been dismissed," as here, cannot support loss causation "as a matter of law." *RSM Prod. Corp.* v. *Fridman*, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009), *aff'd*, 387 F. App'x 72 (2d Cir. 2010).  *Second*, GM's complaint was based entirely on information that had already been revealed in public indictments, court filings and press reports, starting in July 2017.  (*See* App'x A & B.)  Because GM's complaint did not reveal "any new information" "with regard to the specific misrepresentations alleged in the complaint," Plaintiff has failed to plead loss causation.  *In re Omnicom*, 597 F.3d 501, 511, 513 (2d Cir. 2010).

## ALLEGATIONS OF THE COMPLAINT[1]

### A.   FCA US's Termination of Messrs. Iacobelli's and Durden's Employment in June 2015—Prior to the Negotiation and Ratification of the 2015 CBA

In 2014, the U.S. Attorney's Office for the Eastern District of Michigan ("USAO") began investigating the potential misappropriation of funds from the National Training Center ("NTC") by certain UAW and FCA US employees. (Compl. ¶ 11.)[2] FCA US learned of potential misconduct relating to the NTC in June 2015, when the government informed FCA US that the NTC had purchased a Ferrari for Alfons Iacobelli, who was then Co-Chairman of the NTC's Board and a Vice President at FCA US. (*Id*. ¶¶ 11, 135 n.77, 141.) Plaintiff acknowledges that FCA US promptly conducted an internal investigation, removed Mr. Iacobelli from any role in the future 2015 CBA negotiations, and ended its employment relationship with Mr. Iacobelli and Jerome Durden, a former NTC officer and analyst at FCA US, in June 2015—a month before CBA negotiations began. (*Id.* ¶ 11.)

Between July and October 2015, FCA US and the UAW negotiated a CBA that the then-UAW President termed the "richest ever negotiated." (Ex. B.) On September 15, 2015, FCA US and the UAW announced an initial agreement on the 2015 CBA, which provided a $3,000 signing bonus for all workers, a wage increase for entry-level workers in assembly plants, and wage increases and bonuses for workers hired before 2007. (Compl. ¶¶ 17, 111; Ex. C.)  On

---

[1]   Citations to "Ex. _" and "White Decl. Ex. _" refer, respectively, to the exhibits to the Declarations of William B. Monahan and Thomas C. White, both submitted herewith.  On a motion to dismiss, the court may consider "(1) documents attached to or incorporated by reference in the complaint, (2) documents integral to and relied upon in the complaint . . . , (3) public disclosure documents required by law to be, and that have been, filed with the SEC, and (4) facts of which judicial notice properly may be taken." *Bd. of Trs.* v. *Mechel*, 811 F. Supp. 2d 853, 865 (S.D.N.Y. 2011), *aff'd*, 475 F. App'x 353 (2d Cir. 2012).  All emphasis is added and internal quotation marks are omitted unless otherwise indicated.

[2]   The NTC was established as part of the 1985 CBA as a separate legal entity to improve job skills and otherwise assist UAW workers at FCA US, and is funded entirely by FCA US.  (White Decl. Ex. 45 (June 8, 2018 Press Release).)

October 1, 2015, the UAW membership voted down the proposed agreement, which press reports attributed to a "proposal to form a health care cooperative that members feared would lead to higher health care costs."  (Ex. D.)  FCA US and the UAW returned to the negotiating table and, on October 8, 2015, reached a new agreement with even more favorable terms for UAW members, including eliminating the healthcare cooperative proposal and eliminating the pay gap between workers hired before and after 2007.  (Compl. ¶ 114; Ex. D.)  On October 22, 2015, 77% of the UAW membership voted to ratify the CBA.  (*Id.*)

### B.    FCA's Disclosures Regarding the 2015 CBA

Beginning with its 2015 annual report, filed with the SEC on Form 20-F on February 29, 2016 (the "2015 20-F"), FCA described the 2015 CBA as follows:

> In October 2015, FCA US and the UAW agreed to a new four-year national [CBA], which will expire in September 2019.  The provisions of the new agreement continue certain opportunities for success-based compensation upon meeting certain quality and financial performance metrics.  The agreement closes the pay gap between "Traditional" and "In-progression" employees over an eight year period and will continue to provide UAW-represented employees with a simplified adjusted profit sharing plan.  The adjusted profit sharing plan will be effective for the 2016 plan year and is directly aligned with NAFTA profitability.  The agreement includes lump-sum payments in lieu of further wage increases of primarily $4,000 for "Traditional" employees and $3,000 for "In-progression" employees totaling approximately $141 million (€126 million) that was paid to UAW members on November 6, 2015.

(Ex. E at 130; *see also* Ex. F (2016 20-F) at 125; Ex. G (2017 20-F) at 117; Ex. H (2018 20-F) at 23.)  Plaintiff does not allege that any of these statements was false.[3]

---

[3]    FCA also described FCA US's World Class Manufacturing ("WCM") System, explaining that "FCA US entered into a memorandum of understanding to supplement the existing [CBA] with the [UAW], and provide for a specific commitment to support the implementation of our WCM principles throughout FCA US's manufacturing facilities."  (Ex. E at 35; Ex. F at 34-35; *see also* Ex. G at 24 (discussing WCM System); Ex. H at 17 (same).)  Again, Plaintiff does not allege that any of this was false.

## C.       Government Indictments or Informations Beginning in July 2017

Beginning in July 2017, the USAO publicly brought criminal cases against at least eight UAW officials and Messrs. Iacobelli and Durden, all of which was subject to extensive press coverage, as set forth in Appendix A.  (White Decl. ¶ 3.)  On July 26, 2017, the USAO made public an indictment against Monica Morgan, the widow of UAW Vice President General Holiefield, an indictment against Mr. Iacobelli, and an information against Mr. Durden.  (Compl. ¶ 27; Exs I-J.)  From August 2017 to September 2019, the USAO made public indictments or informations against six UAW officials.  (*Id.* ¶¶ 157-61, 176-90; App'x A.)[4]

The criminal charges against Messrs. Iacobelli and Durden allege significant misconduct for their personal enrichment.  For example, the Iacobelli indictment alleges that he stole millions of dollars "in funds from the NTC to pay for," *inter alia*, "the purchase of a 2013 Ferrari 458 Spider automobile"; "solid gold limited edition Mont Blanc fountain pens"; "a swimming pool, outdoor kitchen and outdoor spa" at his home; "personal travel by private jet"; and "personal American Express credit card expenses."  (Ex. I at 29-33.)  The government also charged Mr. Iacobelli with tax violations for failing to report funds he had diverted from the NTC for his personal benefit, and with conspiring to "pay and deliver . . . money and things of value to officers and employees of the UAW."  (*Id.* at 6, 29-33.)[5]

The same day the government unsealed the charges against Messrs. Iacobelli and Durden (July 26, 2017), FCA US issued a press release:

---

[4]       On April 3, 2018, the government also charged Michael Brown, a former mid-level FCA US employee, with "providing misleading and incomplete testimony in the federal grand jury."  (White Decl. Ex. 41 (Brown Info) at 1-2.)  Plaintiff's Complaint barely references Mr. Brown, presumably because Mr. Brown is not alleged to have engaged in any theft or bribery.  (*Id.*)

[5]       Similarly, the information against Mr. Durden alleged that he prepared and filed false tax returns, including concerning thousands of dollars he received from the NTC to refurbish his home.  (Ex. J at 14.)

> FCA US and the UAW were the victims of malfeasance by certain of their respective employees that held roles at the [NTC], an independent legal entity. These egregious acts were neither known to nor sanctioned by FCA US. Upon learning of possible malfeasance in June 2015, the Company investigated the matter and, as a result, Mr. Iacobelli and Mr. Durden were promptly separated from the Company upon FCA US obtaining credible evidence of wrongdoing.

(Compl. ¶ 210; Ex. K (July 26, 2017 press release).) FCA and FCA US subsequently reiterated at various times thereafter that "[w]e believe that FCA US was a victim of these acts." (Compl. ¶¶ 219, 222; Ex. G at 34; Ex. L (Aug. 27, 2018 article).)

Messrs. Iacobelli and Durden both have pleaded guilty and been sentenced. (App'x A.) None of the charging documents or plea agreements asserts that Messrs. Iacobelli or Durden had any role in 2015 CBA negotiations. On August 23, 2019, an FCA US spokesperson stated to the press that "the conduct of these individuals—for their personal enrichment and neither at the direction nor for the benefit of the company—had no impact on the collective bargaining process," and instead "involved a small number of bad actors who stole training funds entrusted to their control." (Compl. ¶ 232; Ex. M (Aug. 23, 2019 article).)

## D. GM's Suit Against FCA and Plaintiff's Follow-On Securities Action

On November 20, 2019, less than one month after FCA and PSA announced they planned to merge (Ex. N)—and during negotiations of a 2019 CBA between FCA US and the UAW (Ex. O)—FCA competitor GM filed a lawsuit against FCA based entirely on publicly available information (Ex. P (GM's complaint)).[6] This action was initially filed a week and a half later. The Amended Complaint copies-and-pastes large portions of GM's complaint, claiming that

---

[6]     Prior to GM's complaint, additional lawsuits had also been filed by UAW members against FCA US stemming from the NTC scandal. *See DeShetler* v. *FCA US LLC*, 2018 WL 6257377 (N.D. Ohio Nov. 30, 2018) (dismissing all claims), *aff'd*, 790 F. App'x 664 (6th Cir. 2019); *Swanigan* v. *FCA US LLC*, 2018 WL 4030815 (E.D. Mich. Aug. 23, 2018) (dismissing all claims), *aff'd*, 938 F.3d 779 (6th Cir. 2019).

it "revealed" new information (Compl. ¶ 237).  Last month, the district court dismissed GM's complaint in its entirety with prejudice.  2020 WL 3833058 (E.D. Mich. July 8, 2020).

### E.     The Alleged Misrepresentations

Plaintiff alleges four categories of supposed misrepresentations:

- *First*, Plaintiff's omissions theory of securities fraud focuses on the single paragraph in FCA's 2015 annual report (quoted *supra* at 7)—which FCA repeated verbatim in its 2016, 2017 and 2018 annual reports—describing the outcome of the 2015 CBA negotiations. (Compl. ¶¶ 202, 206, 216, 225.)  Plaintiff does not allege that this disclosure was false in any respect.  Plaintiff theorizes, instead, that it was misleading because it "omitted" that "FCA received concessions from the UAW in exchange for the illegal bribes."  (*Id.* ¶¶ 204, 208, 218, 227.)

- *Second*, although conceding that the employment of Messrs. Iacobelli and Durden terminated prior to the 2015 CBA negotiations (*id.* ¶¶ 11, 28, 83, 264), Plaintiff challenges a statement to the press by Mr. Marchionne that the misconduct of Messrs. Iacobelli and Durden had "nothing to do with the collective bargaining process," and a statement by FCA US that it "had no impact on the collective bargaining process" (*id.* ¶¶ 213, 232; Exs. Q, M).

- *Third*, Plaintiff challenges various FCA or FCA US statements between July 2017 and February 2019 that they believed FCA US was a "victim" of its former employees' misconduct.  (Compl. ¶¶ 210-11, 219-20, 222-23, 232.)

- *Finally*, FCA's annual reports contain routine certifications under the Sarbanes-Oxley Act ("SOX") regarding FCA's financial reporting, internal controls over financial reporting, and disclosures to auditors and the audit committee.  Plaintiff makes no specific allegations regarding any of these topics, but nonetheless baldly alleges that they were misleading. (*Id.* ¶¶ 201, 204-05, 208, 215, 218, 224, 227.)

## ARGUMENT

To state a claim under Section 10(b) of the Exchange Act, Plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Janus Capital Grp.* v. *First Derivative Traders*, 564 U.S. 135, 140 n.3 (2011). Rule 9(b) and the PSLRA "insist[] that securities fraud complaints specify each misleading statement; that they set forth the facts on which a belief that a statement is misleading was formed; and that they state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Dabit*, 547 U.S. 71, 81-82 (2006).

## I. PLAINTIFF DOES NOT ALLEGE PARTICULARIZED FACTS TO SUPPORT A COGENT AND COMPELLING INFERENCE THAT ANY DEFENDANT INTENDED TO DEFRAUD INVESTORS.

The heart of any securities fraud case is scienter—"a mental state embracing intent to deceive, manipulate, or defraud"—and the Complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with" such intent. *Tellabs*, 551 U.S. at 314, 319. To qualify as "strong," the inference "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 309. A plaintiff can establish scienter only by pleading particularized facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99.

### A. Plaintiff Has Not Alleged a Cognizable Motive To Commit Securities Fraud.

Plaintiff does not allege that "defendants sold stock or profited in any way during the relevant period." *Rombach* v. *Chang*, 355 F.3d 164, 177 (2d Cir. 2004). Instead, Plaintiff alleges generally that FCA had a corporate motive to "gain advantages over GM" and "force a

-11-

merger of the two companies," and that Mr. Marchionne sought "to fulfill his personal desire to be the CEO of the largest automaker in the world." (Compl. ¶¶ 30, 251.) But the Second Circuit has squarely held that such generalized allegations are insufficient to establish motive, because they do not "entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Kalnit*, 264 F.3d at 139, 141 ("[T]he desire to achieve the most lucrative acquisition proposal can be attributed to virtually every company seeking to be acquired. Such generalized desires do not establish scienter."); *see S. Cherry St.*, 573 F.3d at 109 ("[I]t is not sufficient to allege goals that are possessed by virtually all corporate insiders.").[7]

Plaintiff also concedes that Mr. Marchionne sought to *benefit* FCA's investors through the potential merger transaction, which he allegedly believed would "produce $5 billion in savings" and allow "a long-term future for Fiat." (Compl. ¶¶ 251-56.) But any motive that "actually benefits the shareholders" cannot support an inference of scienter as a matter of law. *ECA, Local 134* v. *JP Morgan Chase*, 553 F.3d 187, 198 (2d Cir. 2009); *see Silsby* v. *Icahn*, 17 F. Supp. 3d 348, 368 (S.D.N.Y. 2014) (alleged "schemes" were "intended to benefit" company's shareholders and "would have been beneficial to its shareholders"), *aff'd*, 616 F. App'x 448 (2d Cir. 2015). A desire to achieve a "superior agreement" does "not demonstrate defendants' intent to benefit themselves at the expense of the shareholders because the shareholders themselves would benefit from a superior transaction." *Kalnit*, 264 F.3d at 140.

In any event, as Plaintiff also concedes, Mr. Marchionne's statements concerning a potential merger with GM were made between 2012 and 2015, and GM rejected the proposal in

---

[7]     The Complaint also contains a single conclusory sentence fragment that Mr. Marchionne was "motivated to continue to conceal FCA's bribery scheme, which included his own illegal activity." (Compl. ¶ 263.) Even assuming Plaintiff pled facts showing Mr. Marchionne's participation in the scheme (and Plaintiff has not), allegations "that defendants were motivated to conceal" information "to protect" themselves "are too generalized to support scienter adequately." *Kalnit*, 264 F.3d at 140.

April 2015. (Compl. ¶¶ 253-54.) Plaintiff's allegations therefore cannot establish any motive to commit fraud between 2016 and 2019, *i.e.*, "*at the time . . . [FCA's alleged] misstatements were made.*" *In re Centerline Holdgs. Co.*, 678 F. Supp. 2d 150, 159 (S.D.N.Y. 2009).

**B.      Plaintiff Has Not Alleged a "Strong Inference" of "Conscious Misbehavior or Recklessness."**

Because Plaintiff has not pled a cognizable motive to commit securities fraud, Plaintiff must allege "*conscious recklessness—i.e.*, a state of mind approximating *actual intent*," where Defendants' conduct represented "an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *S. Cherry*, 573 F.3d at 109. Plaintiff must identify "circumstances indicating conscious behavior" by "specifically alleg[ing] defendants' knowledge of facts or access to information contradicting their public statements." *Kalnit*, 264 F.3d at 142. Accordingly, there is a "significant burden on the plaintiff in stating a fraud claim based on recklessness." *Chill* v. *Gen. Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996).

**1.      Plaintiff's Speculation of Contrary Knowledge Based on the Individual Defendants' Positions Cannot Support an Inference of Scienter.**

Plaintiff speculates that the Individual Defendants *must have known* unspecified "adverse facts" contrary to "FCA's corporate statements" because "of their positions and access to both public and material non-public information." (Compl. ¶¶ 268-69, 274-78.) Leaving aside that Plaintiff fails to identify any of these alleged "adverse facts," or alleged how they conflicted with "FCA's corporate statements," vague allegations that Individual Defendants acted with scienter "by virtue of their positions" "do not even meet Rule 9(b)'s requirement to plead the circumstances of fraud with specificity, much less create a strong inference of scienter." *Y-GAR Capital* v. *Credit Suisse Grp.*, 2020 WL 71163, at *9 (S.D.N.Y. Jan. 2, 2020); *see also In re Sanofi*, 155 F. Supp. 3d 386, 407 (S.D.N.Y. 2016) ("Scienter, however, cannot be inferred solely from the

fact that, due to the defendants' board membership or executive managerial position, they had access to the company's internal documentation as well as any adverse information.").[8]

### 2. FCA US's Internal Investigation Rebuts Any Inference of Scienter.

In relying on FCA US's "internal investigation in June 2015" as a basis for scienter (Compl. ¶¶ 11, 264-65), Plaintiff simply assumes each of the following: (1) the internal investigation unearthed the alleged UAW bribery (as opposed to flat-out theft of corporate funds by Messrs. Iacobelli and Durden); (2) the Individual Defendants—who are not alleged to have participated in the investigation—knew about the supposedly unearthed bribery before the USAO unsealed its charging documents in July 2017; and (3) the alleged bribery affected negotiations of the 2015 CBA, even though neither individual participated in those negotiations or was even employed by FCA US at the time. Plaintiff's assumptions "are precisely the sort of speculative leaps of logic that courts have rejected" as "too vague, speculative, and conclusory to contribute to an inference of scienter." *Schiro* v. *Cemex*, 396 F. Supp. 3d 283, 305 (S.D.N.Y. 2019); *see SEC* v. *Cohmad Sec. Corp.*, 2010 WL 363844, at *5 (S.D.N.Y. Feb. 2, 2010) (speculative "chain of inferences" insufficient to plead scienter).

---

[8]      Plaintiff also implies that Defendants *should have known* that unspecified statements were false because the alleged "fraud concerns the core of FCA's operations." (Compl. ¶ 271.) But "[t]he Second Circuit has questioned whether the core operation doctrine has survived the enactment of the PSLRA," *Zheng* v. *Pingtan Marine Enters.*, 379 F. Supp. 3d 164, 181 (E.D.N.Y. 2019) (Irizarry, C.J.) (citing *Mechel*, 475 F. App'x at 356), "and many courts have held that it is no longer valid," *Cortina* v. *Avanex Life Scis. Corp.*, 2016 WL 7480415, at *7 (S.D.N.Y. Dec. 29, 2016) (collecting cases). "[E]ven assuming that the core operations doctrine has continuing vitality as a legal doctrine," the operations must "constitute nearly *all* of a company's business before finding scienter." *In re Rockwell*, 2018 WL 1725553, at *14-15 (S.D.N.Y. Mar. 30, 2018). Here, Plaintiff claims that FCA US's former employees' conduct enabled it to reduce "its labor costs" for producing "vehicles for sale in the U.S. market." (Compl. ¶¶ 271-73.) But Plaintiff's own authority (*see id.* ¶ 272 n.156) establishes that "[l]abor costs represent *only about 5%* of the total cost of a vehicle" (Ex. O). And FCA sells automobiles in more than 150 countries, including Italy and China, not just the United States. (2016 20-F at 23, 47.) Because Plaintiff's allegations concern, at most, 5% of costs in 1 out of 150 countries, Plaintiff "cannot rely on the core operations doctrine to raise an inference of scienter." *Rockwell*, 2018 WL 1725553, at *14.

As a threshold matter, Plaintiff alleges only that FCA US "fired Iacobelli and Durden for *wrongdoing*" in June 2015. (Compl. ¶¶ 11, 264.) There are obviously many kinds of "wrongdoing" beyond the alleged bribery scheme involving almost a dozen UAW officials, including Messrs. Iacobelli's and Durden's theft of NTC funds for their own personal use to buy a Ferrari, flights on private jets and home improvements. (*Id.* ¶¶ 135 n.77, 147-49.) Plaintiff does not allege a single fact—not one—showing that the internal investigation uncovered the alleged bribery scheme. Nor does Plaintiff allege a single fact showing that the Individual Defendants, some of the senior-most executives at one of the largest automakers in the world, were aware of the investigation's findings at the time FCA made its (completely accurate) statements about the outcome of the 2015 CBA negotiations. *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (allegations fail where they "stop[] short of the line between possibility and plausibility").

Rather than pointing to well-pled factual allegations, Plaintiff engages in improper group pleading by referring generally to "*Defendants'* False and Misleading Statements" and the alleged failure of "*Defendants* . . . to disclose that FCA authorized and carried out the scheme." (Compl. at 46, ¶ 229; *see also*, *e.g.*, *id.* ¶¶ 204, 208, 218, 227, 233.) But Plaintiff "may not rely upon blanket references to acts or omissions by all of the defendants" to plead scienter; instead, Plaintiff "must state with particularity facts giving rise to a strong inference that *each defendant* acted with scienter." *In re UBS*, 2012 WL 4471265, at *9 (S.D.N.Y. Sept. 28, 2012), *aff'd*, 752 F.3d 173 (2d Cir. 2014). Because Plaintiff "provides no connective tissue between" the "alleged misstatements" and any FCA US employees actually involved in the internal investigation, Defendants can "only guess what role those employees played in crafting or reviewing the challenged statements and whether it would otherwise be fair to charge the Corporate Defendants with their knowledge." *Jackson* v. *Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020).

Plaintiff's assumptions about what the Individual Defendants must have known are insufficient as a matter of law.  In *In re Sanofi*, for example, after the company received a "whistleblower" tip that certain contracts were part of an alleged "illegal marketing and kickback scheme," "Sanofi allegedly commenced an internal investigation."  155 F. Supp. at 392-33.  The court rejected plaintiffs' allegations of scienter, because while "plaintiffs allege that [the CEO] *must* have received information detailing the internal investigation and its findings," plaintiffs "do not reference any specific report or statement that was produced as a result of any" investigation. *Id.* at 407.  Just like Plaintiff's unsupported assumption that FCA US's internal investigation uncovered the alleged bribery scheme, the *Sanofi* court found "unreasonable" plaintiffs' assumption that Sanofi "was silently clutching the results of an investigation" that contradicted its public statements. *Id.*; *see id.* at 400 (plaintiff did not "allege any facts evidencing any findings of the investigation," and his allegations of scienter therefore did not rise "beyond a speculative level").

*Second*, even if any of Plaintiff's speculation was supported by particularized pleading (it is not), Plaintiff admits that Messrs. Iacobelli's and Durden's employment with FCA US ended in June 2015—"one month *before* negotiations concerning the 2015 CBA were set to begin." (Compl. ¶¶ 11, 264.)  Thus, Plaintiff has not adequately pled the knowing omission of any relevant fact from FCA's disclosures regarding the outcome of the 2015 CBA negotiations, which was ratified by 77% of the UAW membership, let alone any relevant fact that contradicted FCA's entirely correct statements regarding the outcome of those negotiations.

*Third*, it is settled law that "an internal investigation" "demonstrates a pursuit of truth rather than reckless indifference to the truth," *Thomas* v. *Shiloh Indus.*, 2017 WL 1102664, at *5 (S.D.N.Y. Mar. 23, 2017), which "*undermine[s]* any inference of scienter." *City of Brockton*

v. *Avon Prod.*, 2014 WL 4832321, at *24 (S.D.N.Y. Sept. 29, 2014); *see also Foley* v. *Transocean*, 861 F. Supp. 2d 197, 214 (S.D.N.Y. 2012) ("[D]efendant's ordering of an internal investigation upon learning of the relevant problems weakened the inference of scienter." (citing *Slayton* v. *Am. Express*, 604 F.3d 758 (2d Cir. 2010))).

Finally, even if Plaintiff had pled a cognizable theory of scienter on any of the above theories, taken in isolation, that still would not be enough.  Under the PSLRA, "the inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and . . . at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.  "The inquiry is inherently comparative," and "a court must consider plausible, nonculpable explanations for the defendant's conduct."  *Id.*  Here, the more "plausible, nonculpable explanation" is that the senior-most executives of FCA responsible for running the Company did not participate in the internal investigation and were not aware of any alleged bribery scheme involving the UAW in 2015, which did not affect the 2015 CBA in any event because their employment ended before negotiations even started.

### 3. Plaintiff's Allegations Based on "Anonymous Sources" Cannot Support an Inference of Scienter.

Plaintiff's allegation that Mr. Marchionne "participated in the bribery scheme" relies upon a single 2018 press report based on "two sources[] who spoke under the condition of anonymity."  (Compl. ¶¶ 204, 266 n.154; Ex. R)  To begin with, anonymous sources who are not described in any way—such as their position, relationship with the Individual Defendants, or basis of knowledge—cannot support an inference of scienter as a matter of law.  *See Miao* v. *Manhua, Inc.*, 442 F. Supp. 3d 774, 799 & n.19 (S.D.N.Y. 2020) ("[C]ourts generally have not credited the statements of [confidential witnesses] who are insufficiently described or whose descriptions do not suggest that they had been in position to know the facts attributed to them." (collecting cases)).

-17-

In any event, the article does *not* demonstrate Mr. Marchionne's "involvement in the bribery scheme" or that he "lied to investigators." (Compl. ¶¶ 266-67 & n.154.) Rather, it states only that during his July 2016 interview, he "was asked by investigators whether he had given UAW leaders valuable items" and "said no." (Ex. R.) The natural "opposing inference of nonfraudulent intent," *Tellabs*, 551 U.S. at 314, is that Mr. Marchionne either forgot that he gave someone a promotional watch in 2010, *six years earlier*, or that he did not view the promotional watch as something "valuable." Either way, these allegations have nothing to do with public statements to investors beginning in February 2016. Nor does a promotional watch plausibly evidence participation in an alleged bribery scheme involving nearly a dozen UAW officials and *millions* of dollars of alleged bribes to UAW officials. (Compl. ¶¶ 144-46.)[9]

## II.   PLAINTIFF HAS NOT ALLEGED A MATERIAL MISREPRESENTATION.

Not only has Plaintiff failed to allege intent to defraud, Plaintiff has not alleged that Defendants made any material misstatement or omission, which also must be pled with particularity. *In re ITT*, 859 F. Supp. 2d 572, 574-75 (S.D.N.Y. 2012).

### A.   FCA's Disclosures Regarding the 2015 CBA and WCM System Were Accurate, and No Duty Required Disclosure of the "Omitted" Information.

Plaintiff does not contend that FCA's disclosures regarding the 2015 CBA, WCM System, and accompanying MOU with the UAW did not accurately describe those agreements. Instead, Plaintiff claims that FCA should have *also* disclosed its former employees' alleged participation in the "bribery scheme." (Compl. ¶¶ 204, 208.) But the securities laws do not create "an affirmative duty to disclose any and all material information." *Matrixx Initiatives* v.

---

[9]   Plaintiff's allegation that Messrs. Manley and Palmer knew "of Marchionne's involvement in the bribery scheme" based on this article (Compl. ¶¶ 266-67) fares no better. Even if the article demonstrated Mr. Marchionne's participation in bribery (which it does not), the article does not mention Messrs. Palmer or Manley at all, and Plaintiff has not alleged that either of them was aware of or even read the article.

*Siracusano*, 563 U.S. 27, 44 (2011).  Companies need only make additional disclosures both "when necessary to make statements made, in the light of the circumstances under which they were made, not misleading," and "there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information" available to the market.  *Id.* at 38, 44.  The Second Circuit has specifically emphasized that "[d]isclosure is not a rite of confession, and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing." *City of Pontiac*, 752 F.3d at 184.

In *Das* v. *Rio Tinto*, for example, plaintiffs alleged that Rio Tinto's statements concerning its work with the Government of Guinea regarding mining rights "omitted the fact that their success was made possible by a bribe."  332 F. Supp. 3d 786, 797-98, 808 (S.D.N.Y. 2018).  The court dismissed plaintiffs' claims, holding that "Defendants did not have a freestanding legal duty to disclose the bribery scandal, no matter how unseemly the scandal was and no matter how significant the scandal would have been to the market."  *Id.* at 808 (collecting cases).  "Instead, a company's statements become actionable" only "if the company attributes its success *to a particular cause* without also disclosing the unlawful activity that contributed to that success."  *Id.* (emphasis added).  So too here.  Because FCA simply described the terms of the CBA and WCM System, FCA had no duty to disclose the alleged bribery (even if any individuals responsible for FCA's disclosures were aware of it at the time).  *See In re AT&T/DirectTV Now*, 2020 WL 4909718, at *12 & n.19 (S.D.N.Y. Aug. 18, 2020) ("[F]ailure to disclose . . . isolated employee misconduct is not material." (collecting cases)).[10]

---

[10]    Plaintiff's allegations regarding the CBA ratified on December 11, 2019—after the close of the Class Period (Compl. ¶¶ 240-47)—are irrelevant.  The fact that FCA US and the UAW negotiated different CBAs in 2015 and 2019—in completely different economic environments—cannot demonstrate that FCA obtained "labor concessions" through "bribes" in 2015.  (*Id.* ¶ 247.)

The absence of a duty to disclose is even more apparent here, because Plaintiff has not adequately alleged that Messrs. Iacobelli's or Durden's participation in the alleged bribery even affected the 2015 CBA, since FCA US ended their employment *before* the CBA negotiations. Where "it is not at all clear whether the alleged bribe scheme played a role" in the CBA process, "courts have held that the duty to disclose does not arise." *Schiro*, 396 F. Supp. 3d at 297. Plaintiff's speculation that, despite the employment terminations, FCA "was able to reap the benefits of the 'good will' FCA had purchased from . . . UAW officials" (Compl. ¶ 14) falls far short of the heightened pleading standards of the PSLRA and Rule 9(b).

**B.      Mr. Marchionne's September 2017 Statement to a Reporter Was Not Materially Misleading to Investors.**

Plaintiff has not adequately pled that Mr. Marchionne's alleged statement to a reporter in September 2017—that the NTC "scandal had 'nothing whatsoever to do with the collective bargaining process' during UAW negotiations" in 2015 (Ex. Q; Compl. ¶ 213)—was materially false or misleading when made.  FCA US ended its employment relationship with Messrs. Iacobelli and Durden before CBA negotiations began, and the CBA was ratified by *77%* of the UAW membership.  Further, contrary to Plaintiff's allegation that FCA US "*obtain[ed]* concessions from the UAW during the 2015 CBA process" (Compl. ¶ 214), FCA US was in fact forced to *make* additional concessions to the UAW after the UAW membership rejected the initial CBA.[11]  Indeed, the UAW termed the 2015 CBA the "richest ever negotiated" (Ex. B) and did not

---

[11]      Plaintiff's allegation that Mr. Marchionne's statement was "false and misleading when made" *in 2017* because he allegedly "provid[ed] an illegal gift to Holiefield" *in 2010* (Compl. ¶ 214) is not plausible. Plaintiff offers no explanation of how an alleged gift in 2010 "allows any meaningful inferences to be drawn as to the veracity" of Mr. Marchionne's statements *seven years later*.  *Gagnon* v. *Alkermes PLC*, 368 F. Supp. 3d 750, 770 (S.D.N.Y. 2019).

need bribes to be enticed to "agree" to the most *union-friendly* CBA ever negotiated.[12]

### C.       FCA's Opinion that "FCA US Was A Victim" Was Not Materially Misleading.

Nor were FCA's various statements that it considered FCA US to be a "victim" of the misconduct of its former employees (Compl. ¶¶ 219, 222) misleading.[13]   "The reasonable investor understands a statement" by a company to investors "in its full context."  *Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 191 (2015).

*First*, FCA stated that FCA US was a "victim" of its former employees' misconduct *because* Messrs. Iacobelli and Durden "stole training funds entrusted to their control" "for their personal enrichment and neither at the direction nor for the benefit of the company."  (Compl. ¶ 232; *see also id.* ¶ 135 n.77 (Mr. Iacobelli stole "*FCA funds* that were meant for the NTC to purchase items for himself").)  To the extent Plaintiff claims that FCA US, as an entity, was a "perpetrator" on a *respondeat superior* theory (Compl. ¶ 48), even that theory is in no way inconsistent with FCA's belief that FCA US was *also* a "victim" of theft by its employees.  A corporation can be both a "victim" and a "perpetrator."  *See*, *e.g.*, *United States* v. *Sun-Diamond*, 138 F.3d 961, 970 (D.C. Cir. 1998) (company liable even though the facts made it "look more like the victim than a perpetrator," because while the employee's scheme came at "some cost" to the corporation, "it also promised some benefit").

---

[12]       For the same reasons, FCA US's August 23, 2019 statement that the NTC scandal "had no impact on the collective bargaining process" (Compl. ¶ 222)—which is not actionable against FCA in any event (*see infra* n.13)—also was not a misrepresentation.

[13]       FCA NV—a Netherlands corporation headquartered in London (Compl. ¶ 43)—cannot be liable for *FCA US's* July 26, 2017 press release—which states that it was issued by FCA US in Michigan—or FCA US's August 27, 2018 statement (*id.* ¶¶ 210, 222), because a company cannot be held liable for its subsidiary's statements where the parent was not "the maker of a statement."  *Janus*, 564 U.S. at 144; *see In re Optimal*, 2011 WL 4908745, at *2, *5 (S.D.N.Y. Oct. 14, 2011) (parent was not the "maker" of subsidiary's statement even where parent "owned one-hundred percent of the voting shares," could appoint and remove subsidiary's directors at will, and parent's CEO was a director of subsidiary).

*Second*, FCA's statements were made in the context of the *already public* NTC scandal (*see supra* at 8-9; App'x A), so no reasonable investor could have been misled into believing that FCA was denying that FCA US's former employees engaged in wrongdoing.  To the contrary, FCA and FCA US stated repeatedly that Messrs. Iacobelli and Durden engaged in misconduct, and they pleaded guilty to and went to prison for committing such misconduct.  (*Id.*) Because "the reasonable investor" has "constructive notice of the facts" "widely reported in readily available media," and "the court may take this into consideration in determining whether representations . . .  are materially misleading," FCA's statements were not misleading in context. *Garber* v. *Legg Mason, Inc.*, 347 F. App'x 665, 668 (2d Cir. 2009).

*Third*, FCA's statement that it "*believe[d]* that FCA US was a victim" is an opinion as a matter of law.  *See Omnicare*, 575 U.S. at 182-84 (phrases like "we believe" or "I believe" are "expression[s] of opinion").  An opinion statement is actionable only if (i) "the speaker did not hold the belief she professed"; (ii) "the supporting fact[s] she supplied were untrue"; or (iii) "though sincerely held and otherwise true as a matter of fact, . . . the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Tongue* v. *Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016).  Plaintiff does not allege facts demonstrating that FCA did not genuinely believe FCA US was a victim, or that FCA US was not a victim of its former employees' theft; Plaintiff alleges only that FCA's opinions "omitted material facts" (Compl ¶ 223).  But, as discussed above, investors were aware of the relevant facts from FCA's own disclosures and the widely publicized government investigation, and therefore could not have been misled.[14]

---

[14]    Plaintiff alleges that FCA's 2018 Form 20-F does not repeat verbatim the statement from its 2017 Form 20-F that it "believe[s] that FCA US was a victim of these acts," which, according to Plaintiff, somehow constitutes an "implicit[] acknowledg[ment]" that the statement was "false and misleading" when made in the 2017 Form 20-F. (Compl. ¶ 230.) Plaintiff's inferential leap simply does not make sense. As Plaintiff acknowledges in the very next paragraphs (*id.* ¶¶ 231-32), FCA stated repeatedly that it believed FCA US was a "victim," including on August 23, *2019*—well *after* FCA issued its 2018 Form 20-F.

**D.      FCA's SOX Certifications Do Not Contain Any Material Misstatements.**

To adequately plead misrepresentations in SOX certifications, Plaintiff must allege with particularity (i) fraud "directly related to the preparation of financial statements," *Desai* v. *Gen. Growth*, 654 F. Supp. 2d 836, 858 (N.D. Ill. 2009) (quoting Securities Act Release No. 8238); or (ii) that the "certifying officer concealed" fraud from the company's "auditors or audit committee," *In re Banco Bradesco*, 277 F. Supp. 3d 600, 654 (S.D.N.Y. 2017).

Plaintiff does not make any allegations regarding FCA's financial reporting, let alone with particularity.  Nor does Plaintiff allege that any certifying officers failed to disclose any fraud to FCA's auditors or audit committee.  Because "Plaintiff may not simply assume that [FCA's] certifying officers failed to disclose fraud to its auditors and audit committee," his claim based on FCA's SOX certifications must be dismissed.  *In re Banco Bradesco*, 277 F. Supp. 3d at 654; *accord In re PetroChina*, 120 F. Supp. 3d 340, 359 (S.D.N.Y. 2015).

**III.      PLAINTIFF DOES NOT ADEQUATELY PLEAD LOSS CAUSATION.**

"Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff."  *Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005).  In this Circuit, a plaintiff can plead loss causation only by (1) "a corrective disclosure to the market that reveals the falsity of prior" statements; or (2) "showing that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *In re Omnicom*, 597 F.3d at 511, 513.  Here, Plaintiff relies exclusively on the filing of "[t]he GM Complaint" and that day's "decline in the price of FCA stock" to allege loss causation (Compl. ¶¶ 34, 37, 283-97), which does not satisfy either requirement.

**A.      GM's Complaint Was Not a "Corrective Disclosure" As a Matter of Law.**

Plaintiff's allegation that "[t]he GM Complaint" constitutes a "Corrective Disclosure" (Compl. at 75) fails for two reasons.  *First*, an "alleged corrective disclosure[]" must

-23-

"contain[] *new* information that was *material*."  *Dalberth* v. *Xerox Corp.*, 766 F.3d 172, 188-89 (2d Cir. 2014).  But "Second Circuit case law is clear that paragraphs in a complaint that are either based on, or rely on, complaints in other actions that have been dismissed"—as here—"are, as a matter of law, *immaterial*."  *In re Gentiva*, 971 F. Supp. 2d 305, 322 (E.D.N.Y. 2013) (Spatt, J.); *see In re Merrill Lynch & Co.*, 218 F.R.D. 76, 78-79 (S.D.N.Y. 2003) (collecting cases, striking dozens of paragraphs from complaint "that refer to or rely on the SEC's complaints" in securities action, and dismissing the remaining allegations).

*Second*, a corrective disclosure must "reveal some *then-undisclosed* fact with regard to the specific misrepresentations alleged in the complaint."  *In re Omnicom*, 597 F.3d at 511.  GM's complaint, by contrast, was based *entirely* on information that was already in the public realm.  For example, GM's lawsuit relies heavily on Mr. Iacobelli's plea agreement, which was publicly filed in January 2018, nearly *two years* before GM filed its lawsuit.  (App'x A & B.) GM's lawsuit also makes much of Mr. Marchionne's provision of a promotional watch in 2010, but these allegations received extensive press coverage in August 2018, over *one year* before GM filed its lawsuit.  (App'x B.)  And FCA also disclosed that the "former FCA US employees and individuals associated with the UAW" who have pleaded guilty have "claimed in connection with those pleas that they conspired with FCA US in violation of the Taft-Hartley Act" (White Decl. Ex. 84 (2019 Form 6-K) at 54) in May 2019, over *six months* before GM filed its lawsuit.  (App'x B.)  A full list of the public information underlying GM's lawsuit is set forth in Appendix B. (White Decl. ¶ 4.)

Because GM's complaint "failed to demonstrate any new information," Plaintiff "has failed to show a price decline due to a corrective disclosure."  *In re Omnicom*, 597 F.3d at 513; *see also Teachers' Ret. Sys.* v. *Hunter*, 477 F.3d 162, 187-88, 194 n.11 (4th Cir. 2007)

-24-

(affirming dismissal of securities action where the alleged "corrective disclosure was a lawsuit," but facts alleged in the lawsuit "had already been disclosed in public filings, so their revelation . . . could not have caused [the company's] stock price to decline").

## B.     GM's Lawsuit Was Not a Materialization of Any Risk.

To adequately allege a "materialization of the risk" theory of loss causation, Plaintiff must show "that the loss was foreseeable" *and* "within the zone of risk concealed by the misrepresentations." *In re Omnicom*, 597 F.3d at 513.  It was not foreseeable that GM would file a meritless lawsuit, which has nothing to do with FCA's statements to investors and was widely described in the press as "unprecedented." *Id.* at 514 ("Firms are not required by the securities laws to speculate about distant, ambiguous, and perhaps idiosyncratic reactions by" competitors); White Decl. Exs. 111 & 112.  Nor did FCA conceal any risks because, as discussed above, "the facts were known" *before* GM filed its baseless suit.  *In re Omnicom*, 597 F.3d at 514.[15]

## CONCLUSION

The Court should dismiss the Amended Complaint with prejudice.[16]

---

[15]     Because Plaintiff fails to allege a primary violation of Section 10(b) of the Exchange Act, his derivative Section 20(a) claims against the Individual Defendants must also be dismissed.  *See*, *e.g.*, *Rombach*, 355 F.3d at 177-78.  Even if the Court permits some claims against FCA to proceed (and it should not), any claims against Mr. Palmer must be dismissed because he was responsible only for reviewing the *financial* portions of FCA's disclosures, while Plaintiff's allegations are limited to the *non-financial* portions. (Compl. ¶¶ 46-47.)  Mr. Manley cannot be held individually liable for statements made before he became FCA's CEO on July 21, 2018.  (*Id.* ¶ 45.)  Nor can he be held individually liable for the subsequent statements, because they simply repeat or reaffirm FCA's prior statements, so he was not "a culpable participant" in these statements, as required for "control person liability."  *ATSI*, 493 F.3d at 108.

[16]     Dismissal should be with prejudice.  "There is no general rule that just because the complaint is brought under the federal securities laws, a plaintiff will automatically receive leave to amend."  *Panther Partners* v. *Ikanos Commc'ns*, 347 F. App'x 617, 621 (2d Cir. 2009).  Plaintiff had *over six months to amend* prior to the time that he filed his Complaint and should not be granted a third bite, which would be futile in any event.  *See Metzler Inv.* v. *Chipotle Mexican Grill*, --- F.3d --- , 2020 WL 4644799, at *12 (2d Cir. Aug. 12, 2020) ("It seems to us to be self-evident that a plaintiff afforded attempt after attempt — and consequently, additional time to investigate — might one day succeed in stating a claim.  But the federal rules and policies behind them do not permit such limitless possibility.").

Respectfully submitted,


   */s/ William B. Monahan*
William B. Monahan
Thomas C. White
Joshua S. Levy
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

*Counsel for Defendants*


August 21, 2020

-26-