# Exhibit 1

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

# FORM 20-F

☐ **REGISTRATION STATEMENT PURSUANT TO SECTIONS 12(b) OR 12(g) OF THE SECURITIES EXCHANGE ACT OF 1934**

OR

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the Fiscal Year Ended December 31, 2014**

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

OR

☐ **SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission File Number 001-36085**

# Fiat Chrysler Automobiles N.V.

**(Exact Name of Registrant as Specified in Its Charter)**

**The Netherlands**

**(Jurisdiction of Incorporation or Organization)**

**25 St. James' Street**
**London SW1A 1HA**
**United Kingdom**
**Tel. No.: +44 (0) 20 7766 0311**
**(Address, Including Zip Code, and Telephone Number, Including Area Code, of Registrant's Principal Executive Offices)**

**Richard K. Palmer**
**25 St. James' Street**
**London SW1A 1HA**
**United Kingdom**
**Tel. No.: +44 (0) 20 7766 0311**
**(Name, Address, Including Zip Code, and Telephone Number, Including Area Code, of Company Contact Person)**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Name of Each Exchange on which Registered |
|---|---|
| Common Shares, par value €0.01 | New York Stock Exchange |
| Mandatory Convertible Securities due 2016 | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act: None**

**Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act: None**

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report: 1,284,919,505 common shares, par value €0.01 per share, and 408,941,767 special voting shares, par value €0.01 per share.

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☑

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Act of 1934. Yes ☐ No ☑

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). N/A

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐          Accelerated filer ☐          Non-accelerated filer ☑

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing: U.S. GAAP ☐ International Financial Reporting Standards as issued by the International Accounting Standards Board ☑ Other ☐

If "Other" has been checked in response to the previous question indicate by check mark which financial statement item the registrant has elected to follow: Item 17 ☐ or Item 18 ☐.

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☑

(APPLICABLE ONLY TO ISSUERS INVOLVED IN BANKRUPTCY PROCEEDINGS DURING THE PAST FIVE YEARS)

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Sections 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court. Yes ☐ No ☐

**SIGNATURES**

     The registrant hereby certifies that it meets all of the requirements for filing on Form 20-F and that it has duly caused and authorized the undersigned to sign this annual report on its behalf.

FIAT CHRYSLER AUTOMOBILES N.V.

*(Registrant)*

By:

/s/ Richard K. Palmer

Name: Richard K. Palmer

Title: Chief Financial Officer

Dated: March 5, 2015

176

**ACQUISITION OF THE REMAINING OWNERSHIP INTEREST IN FCA US**

As of December 31, 2013, FCA held a 58.5 percent ownership interest in FCA US and the VEBA Trust held the remaining 41.5 percent. On January 1, 2014, FCA's 100.0 percent owned subsidiary FCA North America Holdings LLC, ("FCA NA"), formerly known as Fiat North America LLC, and the VEBA Trust announced that they had entered into an agreement ("the Equity Purchase Agreement") under which FCA NA agreed to acquire the VEBA Trust's 41.5 percent interest in FCA US, which included an approximately 10 percent interest in FCA US subject to previously exercised options that were subject to ongoing litigation, for cash consideration of U.S.$3,650 million (€2,691 million) as follows:

- a special distribution of U.S.$1,900 million (€1,404 million) paid by FCA US to its members, which served to fund a portion of the transaction, wherein FCA NA directed its portion of the special distribution to the VEBA Trust as part of the purchase consideration; and

- an additional cash payment by FCA NA to the VEBA Trust of U.S.$1,750 million (€1.3 billion).

The previously exercised options for the approximately 10 percent interest in FCA US that were settled in connection with the Equity Purchase Agreement had an estimated fair value at the transaction date of U.S.$302 million (€223 million). These options were historically carried at cost, which was zero, in accordance with the guidance in paragraphs AG80 and AG81 of IAS 39 - *Financial Instruments: Recognition and Measurement* as the options were on shares that did not have a quoted market price in an active market and as the interpretation of the formula required to calculate the exercise price on the options was disputed and was subject to ongoing litigation. Upon consummation of the transactions contemplated by the Equity Purchase Agreement, the fair value of the underlying equity and the estimated exercise price of the options, at that point, became reliably estimable. As such, on the transaction date, the options were remeasured to their fair value of U.S.$302 million (€223 million at the transaction date), which resulted in a corresponding non-taxable gain in Other unusual income/(expenses). The Group has classified this item in Other unusual income/(expenses) because it relates to options held in relation to the acquisition of a non-controlling interest and is expected to occur infrequently.

The fair value of the options was calculated as the difference between the estimated exercise price for the disputed options encompassed in the Equity Purchase Agreement of U.S.$650 million (€481 million) and the estimated fair value for the underlying approximately 10 percent interest in FCA US of U.S.$952 million (€704 million). The exercise price for the disputed options was originally calculated by FCA NA pursuant to the formula set out in the option agreement between FCA NA and the VEBA Trust. The VEBA Trust disputed the calculation of the exercise price, which ultimately led to the litigation between the two parties regarding the interpretation of the call option agreement. The dispute primarily related to four elements of the calculation of the exercise price. During the ensuing litigation, the court ruled in FCA NA's favor on two of the four disputed elements of the calculation. The court requested an additional factual record be developed on the other two elements, a process that was ongoing at the time the Equity Purchase Agreement was executed and consummated.

The dispute between FCA NA and the VEBA Trust over the previously exercised options was settled pursuant to the Equity Purchase Agreement, effectively resulting in the fulfillment of the previously exercised options. Given that there was no amount explicitly agreed to by FCA NA and the VEBA Trust in the Equity Purchase Agreement for the settlement of the previously exercised options, management estimated the exercise price encompassed in the Equity Purchase Agreement taking into account the judgments rendered by the court to date on the litigation and a settlement of the two unresolved elements. Based on the nature of the two unresolved elements, management estimated the exercise price to be between U.S.$600 million (€444 million at the transaction date) and U.S.$700 million (€518 million at the transaction date). Given the uncertainty inherent in court decisions, it was not possible to pick a point within that range that represented the most likely outcome. As such, management believed the mid-point of this range, U.S.$650 million (€481 million at the transaction date), represented the appropriate point estimate of the exercise price encompassed in the Equity Purchase Agreement.

Since there was no publicly observable market price for FCA US's membership interests, the fair value as of the transaction date of the approximately 10 percent non-controlling ownership interest in FCA US was determined based on the range of potential values determined in connection with the IPO that FCA US was pursuing at the time the Equity Purchase Agreement was negotiated and executed, which was corroborated by a discounted cash flow valuation that estimated a value near the mid-point of the range of potential IPO values. Management concluded that the mid-point of the range of potential IPO value provided the best evidence of the fair value of FCA US's membership interests at the transaction date as it reflects market input obtained during the IPO process, thus providing better evidence of the price at which a market participant would transact consistent with IFRS 13 - *Fair Value Measurement.*

F - 35

The potential IPO values for 100.0 percent of FCA US's equity on a fully distributed basis ranged from $10.5 billion to U.S.$12.0 billion (€7.6 billion to €8.7 billion at December 31, 2013). Management concluded the mid-point of this range, U.S.$11.25 billion (€8.16 billion at December 31, 2013), was the best point estimate of fair value. The IPO value range was determined using earnings multiples observed in the market for publicly traded US-based automotive companies using the key assumptions discussed below. This fully distributed value was then reduced by approximately 15.0 percent for the expected discount that would have been realized in order to complete a successful IPO for the minority interest being sold by the VEBA Trust. This discount was estimated based on the following factors that a market participant would have considered and, therefore, would have affected the price of FCA US's equity in an IPO transaction:

- Fiat held a significant controlling interest and had expressed the intention to remain and act as the majority owner of FCA US. The fully diluted equity value, which is the starting point for the valuation discussed above, does not contemplate the perpetual nature of the non-controlling interest that would have been offered in an IPO or the significant level of control that Fiat would have exerted over FCA US. This level of control creates risk to a non-controlling shareholder since Fiat would be able to make decisions to maximize its value in a manner that would not necessarily maximize value to non-controlling shareholders, which Fiat had indicated was its intention.

- The fully distributed equity value contemplates an active market for Chrysler's equity, which did not exist for FCA US's membership interests. The IPO price represents the creation of the public market, which would have taken time to develop into an active market. The estimated price that would be received in an IPO transaction reflects the fact that FCA US's equity was not yet traded in an active market.

As the expected discount that would have been realized in order to complete a successful IPO represented a market-based discount that would have been reflected in an IPO price, management concluded it should be included in the measurement at the transaction date between a willing buyer and willing seller under the principles in IFRS 13.

The other significant assumptions management used in connection with the development of the fair value of FCA US's membership interests discussed above included the following:

- Inputs derived from FCA US's long-term business plans in place at the time the Equity Purchase Agreement was negotiated and executed, including:

  - An estimated 2014 Earnings before interest, tax, depreciation, amortization, pension and OPEB payments (EBITDAPO); and

  - An estimate of net debt, which is composed of debt, pension obligations and OPEB obligations of FCA US, offset by any expected tax benefit arising from payment of obligations and cash on hand; and

- An EBITDAPO valuation multiple based on observed multiples for other US-based automotive manufacturers, adjusted for differences between those manufacturers and FCA US.

The transaction under the Equity Purchase Agreement closed on January 21, 2014 and as a result, the Group now holds a 100.0 percent equity interest in FCA US.

Concurrent with the closing of the acquisition under the Equity Purchase Agreement, FCA US and UAW executed and delivered a contractually binding and legally enforceable Memorandum of Understanding ("MOU") to supplement FCA US's existing collective bargaining agreement. Under the MOU, the UAW committed to (i) use the best efforts to cooperate in the continued roll-out of FCA US's World Class Manufacturing ("WCM") programs, (ii) to actively participate in benchmarking efforts associated with implementation of WCM programs across all FCA's manufacturing sites to ensure objective competitive assessments of operational performance and provide a framework for the proper application of WCM principles, and (iii) to actively assist in the achievement of FCA US's long-term business plan. In consideration for these legally enforceable commitments, FCA US agreed to make payments to a UAW-organized independent VEBA Trust totaling U.S.$700 million (€518 million at the transaction date) to be paid in four equal annual installments. Considering FCA US's non-performance risk over the payment period as of the transaction date and its unsecured nature, this payment obligation had a fair value of U.S.$672 million (€497 million) as of the transaction date.

The Group considered the terms and conditions set forth in the above mentioned agreements and accounted for the Equity Purchase Agreement and the MOU as a single commercial transaction with multiple elements. As such, the fair value

F - 36

of the consideration paid discussed above, which amounts to U.S.$4,624 million (€3,411 million at the transaction date), including the fair value of the previously exercised disputed options, was allocated to the elements obtained by the Group. Due to the unique nature and inherent judgment involved in determining the fair value of the UAW's commitments under the MOU, a residual value methodology was used to determine the portion of the consideration paid attributable to the UAW's commitments as follows:

| (€ million) | |
|---|---|
| Special distribution from FCA US | 1,404 |
| Cash payment from FCA NA | 1,287 |
| Fair value of the previously exercised options | 223 |
| Fair value of financial commitments under the MOU | 497 |
| **Fair value of total consideration paid** | **3,411** |
| Less the fair value of an approximately 41.5 percent non-controlling ownership interest in FCA US | (2,916) |
| **Consideration allocated to the UAW's commitments** | **495** |

The fair value of the 41.5 percent non-controlling ownership interest in FCA US acquired by FCA from the VEBA Trust (which includes the approximately 10 percent pursuant to the settlement of the previously exercised options discussed above) was determined using the valuation methodology discussed above.

The residual of the fair value of the consideration paid of U.S.$670 million (€495 million) was allocated to the UAW's contractually binding and legally enforceable commitments to FCA US under the MOU.

The effects of changes in ownership interests in FCA US was as follows:

| | Transaction date |
|---|---|
| | (€ million) |
| Carrying amount of non-controlling interest acquired | 3,976 |
| Less consideration allocated to the acquisition of the non-controlling interest | (2,916) |
| Additional net deferred tax assets | 251 |
| **Effect on the equity attributable to owners of the parent** | **1,311** |

In accordance with IFRS 10 – *Consolidated Financial Statements*, equity reserves were adjusted to reflect the change in the ownership interest in FCA US through a corresponding adjustment to Equity attributable to the parent. As the transaction described above resulted in the elimination of the non-controlling interest in FCA US, all items of comprehensive income previously attributed to the non-controlling interest were recognized in equity reserves.

Accumulated actuarial gains and losses from the remeasurement of the defined benefit plans of FCA US totaling €1,248 million has been recognized since the consolidation of FCA US in 2011. As of the transaction date, €518 million, which is approximately 41.5 percent of this amount, had been recognized in non-controlling interest. In connection with the acquisition of the non-controlling interest in FCA US, this amount was recognized as an adjustment to the equity reserve for Remeasurement of defined benefit plans.

With respect to the MOU entered into with the UAW, the Group recognized €495 million (U.S.$670 million) in Other unusual expenses in the Consolidated income statement. The first U.S.$175 million installment under the MOU was paid on January 21, 2014, which was equivalent to €129 million at that date, and is reflected in the operating section of the Consolidated statement of cash flows. The remaining outstanding obligation pursuant to the MOU as of December 31, 2014 of €417 million (U.S.$506 million), which includes €7 million (U.S.$9 million) of accreted interest, is recorded in Other current liabilities in the Consolidated statement of financial position (Note 23). The second installment of $175 million (approximately €151 million at that date) to the VEBA Trust was made on January 21, 2015.

The Equity Purchase Agreement also provided for a tax distribution from FCA US to its members under the terms of FCA US Group's Limited Liability Company Operating Agreement (as amended from time to time, the "LLC Operating Agreement") in the amount of approximately U.S.$60 million (€45 million) to cover the VEBA Trust's tax obligation. As this

payment was made pursuant to a specific requirement in FCA US's LLC Operating Agreement, it is not considered part of the multiple element transaction.

**Transactions with non-controlling interests in 2014, 2013 and 2012 were as follows:**

- Acquisition of the remaining 41.5 percent ownership in FCA US (described above) consummated in January 2014. In accordance with IFRS 10 - *Consolidated Financial Statements*, non-controlling interest and equity reserves were adjusted to reflect the change in the ownership interest through a corresponding adjustment to equity attributable to the parent.

- In the context of the Merger described above, in April 2014, Fiat Investments N.V. was incorporated as a public limited liability company under the laws of the Netherlands and was renamed FCA upon completion of the Merger. This transaction did not have an effect on the Consolidated financial statements.

- In August 2014 Ferrari S.p.A. acquired an additional 21.0 percent in the share capital of the subsidiary Ferrari Maserati Cars International Trading (Shanghai) Co. Ltd. increasing its interest from 59.0 percent to 80.0 percent (the Group's interests increased from 53.1 percent to 72.0 percent). In accordance with IFRS 10 - *Consolidated Financial Statements,* non-controlling interest and equity reserves were adjusted to reflect the change in the ownership interest through a corresponding adjustment to Equity attributable to the parent.

- On January 2012, FCA's ownership interest in FCA US increased by an additional 5.0 percent on a fully-diluted basis.

- On October 28, 2013, FCA acquired the remaining 50.0 percent interests in VM Motori Group.

The effects of changes in ownership interests in 2013 for VM Motori Group and in 2012 for FCA US on the Equity attributable to owners of the parent were as follows:

| | 2013 | 2012 |
|---|---|---|
| | (€ million) | |
| Carrying amount of non-controlling interest acquired | 36 | 200 |
| Consideration paid to non-controlling interests | (34) | — |
| Other financial assets derecognized | — | (288) |
| Deferred tax liabilities recognized | — | — |
| **Effect on the Equity attributable to owners of the parent** | 2 | **(88)** |

F - 38

**Exhibit 12.1**

**FIAT CHRYSLER AUTOMOBILES N.V.**

**SECTION 302 CERTIFICATION OF THE CHIEF EXECUTIVE OFFICER**

I, Sergio Marchionne, Chief Executive Officer and Director of Fiat Chrysler Automobiles N.V., certify that:

1.  I have reviewed this annual report on Form 20-F of Fiat Chrysler Automobiles N.V.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4.  The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the company and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5.  The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

Date: March 5, 2015                                     /s/ Sergio Marchionne

                                                        Sergio Marchionne
                                                        Chief Executive Officer and Director

Exhibit 12.2

**FIAT CHRYSLER AUTOMOBILES N.V.**

**SECTION 302 CERTIFICATION OF THE CHIEF FINANCIAL OFFICER**

I, Richard K. Palmer, Chief Financial Officer of Fiat Chrysler Automobiles N.V., certify that:

1.  I have reviewed this annual report on Form 20-F of Fiat Chrysler Automobiles N.V.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4.  The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the company and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5.  The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

Date: March 5, 2015                                  /s/ Richard K. Palmer

                                                     Richard K. Palmer
                                                     Chief Financial Officer