# Exhibit 12

United States District Court
Eastern District of Michigan
Southern Division



FILED

AUG 2 9 2017

CLERK'S OFFICE
U.S. DISTRICT COURT
ANN ARBOR, MI

United States of America,

v.

D-4 Virdell King,

Defendant.

Case No. 17-cr-20406

Honorable John Corbett O'Meara

Offense: **Conspiracy to Violate the Labor Management Relations Act** (18 U.S.C. § 371)

Maximum Imprisonment: 5 years

Maximum Fine: $250,000

Maximum Supervised Release: 3 years

---

## Rule 11 Plea Agreement

---

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, Defendant **Virdell King** and the government agree as follows:

## I. Guilty Plea

### A. Count of Conviction

Defendant **Virdell King** will enter a plea of guilty to Count One of the Second Superseding Information.

-1-

Count One charges conspiracy to violate the Labor Management Relations Act, in violation of 18 U.S.C. § 371.

**Elements of the Offense**

The elements of conspiracy to violate the Labor Management Relations Act, as charged in Count One of the Second Superseding Information, are as follows:

(1)     Two or more persons conspired to violate the Labor Management Relations Act in violation of 29 U.S.C. § 186(a)(2), (b)(1), and (d)(1).

(2)     The defendant knowingly and voluntarily joined the conspiracy.

(3)     A member of the conspiracy did one of the overt acts described in the Second Superseding Information for the purpose of advancing or helping the conspiracy.

**B.     Factual Basis for Guilty Plea**

The following facts are a sufficient and accurate basis for Defendant **Virdell King**'s guilty plea to Count One:

1.     From 2012 through 2016, while serving as a representative and employee of the UAW, a labor organization, **Virdell King** knowingly joined a conspiracy where officers and employees of the UAW would willfully request, receive, and accept—and agree to receive and accept—money and things of value worth over $40,000 from persons acting in the interest of FCA. During that time, FCA was the employer of tens of thousands of employees represented by the UAW.

-2-

2.      Defendant **Virdell King**, then a representative and employee of the UAW, knowingly and voluntarily joined this conspiracy to take and receive money and things of value from persons acting in the interest of FCA. King joined knowing that the money and things of value, which were delivered through and concealed by the UAW-Chrysler National Training Center (NTC), were willfully made with the intent to benefit **Virdell King**, then-UAW Vice President General Holiefield, UAW-2, UAW-4, and other senior UAW officials, who were not permitted to receive the money and things of value.

3.      The International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (UAW) was a labor organization based in Detroit, Michigan. The UAW represented tens of thousands of non-managerial employees employed by FCA at numerous locations in Michigan and across the United States. The UAW was a labor organization subject to the Labor Management Relations Act, 29 U.S.C. §§ 142 & 152.

4.      **Virdell King** was a UAW employee who served as a senior official in the UAW Chrysler Department from 2008 until she retired in February 2016. As a senior UAW official in the Chrysler Department, **Virdell King** was responsible for negotiating and administering the collective bargaining agreements between the UAW and FCA on behalf of tens of thousands of FCA employees represented by the UAW. In 2011 and 2015, **Virdell King** served as a member of the UAW

- 3 -

national negotiating committee responsible for the collective bargaining agreements between the UAW and FCA. From 2008 through 2015, **Virdell King** was the Assistant Director of the NTC and from 2011 through 2015, **Virdell King** served on the NTC's Joint Activities Board.

5.      General Holiefield was an elected UAW officer who served as the UAW Vice President for the Chrysler Department from 2008 through 2014. As the UAW Vice President, Holiefield had primary responsibility for negotiating with FCA and for administering the collective bargaining agreements between the UAW and FCA on behalf of tens of thousands of FCA employees represented by the UAW. As UAW Vice President, General Holiefield was responsible for managing the UAW's relationship with FCA. Holiefield was the senior UAW official responsible for resolving disputes and grievances that arose under the collective bargaining agreements between the UAW and FCA.

6.      UAW-2 was a UAW employee who served as a senior official in the UAW Chrysler Department from 2010 through 2014. As a senior UAW official in the Chrysler Department, UAW-2 was responsible for negotiating and administering the collective bargaining agreements between the UAW and FCA on behalf of tens of thousands of FCA employees represented by the UAW. In 2011, UAW-2 served as a member of the UAW national negotiating committee responsible for the collective bargaining agreement between the UAW and FCA.

- 4 -

7.     UAW-4 was a UAW employee who served as a senior official in the UAW Chrysler Department from 2014 through July 2016. As a senior UAW official in the Chrysler Department, UAW-4 was responsible for negotiating and administering the collective bargaining agreements between the UAW and FCA on behalf of tens of thousands of FCA employees represented by the UAW. In 2015, UAW-4 served as a member of the UAW national negotiating committee responsible for the collective bargaining agreement between the UAW and FCA.

8.     Fiat Chrysler Automobiles US LLC was an automotive company based in Auburn Hills, Michigan, and the successor to the automotive company formerly known as Chrysler Group LLC. Both are referred to here as "FCA." FCA was an employer in an industry affecting interstate commerce and subject to the Labor Management Relations Act, 29 U.S.C. §§ 142 & 152.

9.     Alphons Iacobelli was the FCA Vice President for Employee Relations and a person acting in the interest of employer FCA from 2008 through 2015. As the FCA Vice President for Employee Relations, Alphons Iacobelli was the senior FCA official responsible for negotiating with the UAW and for administering the collective bargaining agreements between FCA and the UAW. As the FCA Vice President for Employee Relations, Alphons Iacobelli was FCA's lead representative for labor relations and managed FCA's relationship with the UAW. Alphons Iacobelli was the senior FCA official responsible for resolving disputes and

- 5 -

grievances that arose under the collective bargaining agreements between FCA and the UAW.

10.    Jerome Durden was a Financial Analyst in FCA's Corporate Accounting Department. From 2008 through 2015, Jerome Durden was the controller of the NTC and served as the secretary of the NTC Joint Activities Board.

11.    The UAW-Chrysler Skill Development & Training Program d/b/a the UAW-Chrysler National Training Center (NTC) was a tax-exempt corporation based in Detroit, Michigan. The NTC purported to function as a labor management committee under the Labor Management Relations Act, 29 U.S.C. § 186(c)(9). The stated purpose of the NTC was to provide for the education, training, and retraining of workers.

12.    The governing body of the NTC was known as the Joint Activities Board. The Vice President of Employee Relations of FCA and the Vice President of the Chrysler Department of the UAW served as the Chairmen of the NTC Joint Activities Board. The remainder of the Joint Activities Board was made up of senior officials from FCA and the UAW.

13.    FCA Vice President Alphons Iacobelli, FCA Financial Analyst Jerome Durden, and their co-conspirators used NTC bank accounts and NTC credit card accounts to conceal prohibited payments and things of value paid and delivered to

senior UAW official **Virdell King**, UAW Vice President General Holiefield, UAW-2, UAW-4, and other senior UAW officials.

14.    In December 2012, UAW Vice President Holiefield told **Virdell King** that FCA Vice President Alphons Iacobelli did not have a problem with them using their NTC credit cards to purchase personal items "if we see something that we want."

15.    In July 2014, UAW-4 told **Virdell King** that FCA Vice President Alphons Iacobelli said, "if you see something you want, feel free to buy it. I don't have a problem if you buy it on the charge card." UAW-4 also told **Virdell King** "Al [Iacobelli] didn't have a problem" with union officials making personal purchases on their NTC credit cards.

## Overt Acts

16.    One or more members of the conspiracy completed one or more of the following overt acts to effect the object of the conspiracy:

17.    In and after 2012, NTC credit cards were given to senior UAW official **Virdell King**, UAW Vice President General Holiefield, UAW-2, UAW-4, and other UAW senior officials.

18.    From 2012 through 2015, **Virdell King** made purchases on her NTC credit card at the direction and request of other high-ranking UAW officials and for the benefit of other high-ranking UAW officials. In December 2012, **Virdell King**

-7-

made a personal purchase of over $1,000 in designer clothing for herself. On that same shopping trip, **Virdell King** made another purchase of over $1,000 in designer clothing for Monica Morgan at the direction of UAW Vice President General Holiefield.

19. In March 2015, UAW-4 made a personal purchase of over $1,000 on UAW-4's NTC credit card for a pair of Christian Louboutin shoes and encouraged **Virdell King** to do the same. In March 2015, **Virdell King** made a personal purchase of over $1,000 on her NTC credit card for a pair of Christian Louboutin shoes.

20. In August 2015, UAW-4 directed **Virdell King** to purchase a shotgun. **Virdell King** texted UAW-4 to ask, "Do you want me to go and pick up the gun." UAW-4 texted back, "Yes. Ask them for a really good one with case." In August 2015, at the direction of UAW-4, **Virdell King** charged over $1,000 on her NTC credit card to purchase a shotgun.

21. **Virdell King**'s NTC credit card purchases made at the direction and for the benefit of senior UAW officials also included golf equipment, luggage, concert tickets, theme park tickets, and other personal purchases and expenses.

22. **Virdell King**'s NTC credit card purchases for herself also included clothing, jewelry, luggage, and other personal items and expenses.

23.   **Virdell King** used the NTC credit card to make over $40,000 in personal purchases for other senior UAW officials and herself. **Virdell King** made these personal purchases for herself and other high-ranking UAW officials knowing that the credit card purchases were authorized by individuals acting in the interest of FCA and paid for by funds provided by FCA.

## II.   Sentencing Guidelines

### A.   Standard of Proof

The Court will find sentencing factors by a preponderance of the evidence.

### B.   Agreed Guideline Range

The parties agree on all sentencing factors except the following:

### 1.   If the offense involved "abuse of trust" within the definition of USSG § 3B1.3.

The government takes the position that the two-level enhancement pursuant to USSG § 3B1.1 (abuse of a position of public or private trust) applies. Defendant Virdell King reserves her right to contest the application of USSG § 3B1.1 to her offense of conviction.

The parties agree that the Court shall determine this and all sentence guideline factors by a preponderance of the evidence and further agree to be bound by the Court's determination.

As is set forth on the attached worksheets, the government takes the position that the defendant's advisory guideline range is **10–16 months**.  If the Court finds:

- 9 -

1. that defendant's criminal history category is higher than reflected on the attached worksheets, or

2. that the offense level should be higher because, after pleading guilty, defendant made any false statement to or withheld information from her probation officer; otherwise demonstrated a lack of acceptance of responsibility for her offense; or obstructed justice or committed any crime,

and if any such finding results in a guideline range higher than 10–16 months, the higher guideline range becomes the **agreed range**.

## III. Sentence

The Court will impose a sentence pursuant to 18 U.S.C. § 3553, and in doing so must consider the sentencing guideline range.

### A. Imprisonment

Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) the sentence of imprisonment in this case may not exceed **16 months**.

### B. Supervised Release

A term of supervised release, if imposed, follows the term of imprisonment. There is no agreement on supervised release. In other words, the Court may impose any term of supervised release up to the statutory maximum term, which in this case is not more than three years. The agreement concerning imprisonment described

- 10 -

above in Paragraph 3A does not apply to any term of imprisonment that results from any later revocation of supervised release.

### C.     Special Assessment

Defendant will pay a special assessment of $100.00.

### D.     Fine

There is no agreement as to fines.

### E.     Restitution

The Court shall order restitution to every identifiable victim of defendant's offense. Pursuant to 18 U.S.C. § 3664(h), the parties agree that defendant Virdell King's portion of the total amount of restitution should be an amount of not more than $15,000.

## IV.   Cooperation Agreement

The written cooperation agreement between Defendant Virdell King and the government, which is dated June 6, 2017, is part of this plea agreement. The government agrees to bring no further charges against Defendant Virdell King arising out of her involvement in the charged offenses, unless the Defendant withdraws her plea or breaches the June 6, 2017 cooperation agreement.

## V.    Use of Withdrawn Guilty Plea

If the Court allows defendant to withdraw her guilty plea for a "fair and just reason" pursuant to Fed. R. Crim. P. 11(d)(2)(B), King waives her rights under Fed.

- 11 -

R. Evid. 410, and the government may use her guilty plea, any statement made under oath at the change-of-plea hearing, and the factual basis statement in this plea agreement, against her in any proceeding.

## VI. Defendant's Right to Withdraw from this Agreement

Defendant King may withdraw from this agreement, and may withdraw her guilty plea, if the Court decides to impose a sentence higher than 16 months. This is the only reason for which King may withdraw from this agreement. The Court shall advise defendant that if she does not withdraw her guilty plea under this circumstance, the Court may impose a sentence greater than 16 months.

## VII. Appeal Waiver

Defendant Virdell King waives any right she may have to appeal her conviction on any grounds. If the defendant's sentence of imprisonment does not exceed 16 months, the defendant also waives any right she may have to appeal her sentence, including the fine and amount of restitution imposed, on any grounds.

Nothing in this waiver bars a timely claim of ineffective assistance of counsel on appeal or by collateral relief under 28 U.S.C. § 2255.

## VIII. Consequences of Withdrawal of Guilty Plea or Vacation of Conviction

If the defendant is allowed to withdraw her guilty plea or if any conviction entered pursuant to this agreement is vacated, the Court shall, on the government's request, reinstate any charges that were dismissed as part of this agreement. If

additional charges are filed against defendant within six months after the date the order vacating defendant's conviction or allowing her to withdraw her guilty plea becomes final, which charges relate directly or indirectly to the conduct underlying the guilty plea or to any conduct reflected in the attached worksheets, defendant waives her right to challenge the additional charges on the ground that they were not filed in a timely manner, including any claim that they were filed after the limitations period expired.

## IX. Parties to Plea Agreement

Unless otherwise indicated, this agreement does not bind any government agency except the United States Attorney's Office for the Eastern District of Michigan.

## X. Scope of Plea Agreement

This agreement, which includes all documents that it explicitly incorporates, is the complete agreement between the parties. This agreement supersedes all other promises, representations, understandings and agreements between the parties concerning the subject matter of this plea agreement that were made at any time before the guilty plea is entered in court. Thus, no oral or written promises made by the government to defendant or to the attorney for the defendant at any time before defendant pleads guilty are binding except to the extent they have been explicitly incorporated into this agreement.

- 13 -

Notwithstanding the previous paragraph, if defendant has entered into a proffer agreement in writing or a cooperation agreement in writing with the government, this plea agreement does not supersede or abrogate the terms of any such prior written agreement.

This agreement also does not prevent any civil or administrative actions against defendant, or any forfeiture claim against any property, by the United States or any other party.

## XI.    Acceptance of Agreement by Defendant

This plea offer expires unless it has been received, fully signed, in the Office of the United States Attorney by 5:00 P.M. on August 17, 2017. The government reserves the right to modify or revoke this offer at any time before defendant pleads guilty.

Daniel L. Lemisch
Acting United States Attorney

David A. Gardey
Assistant United States Attorney
Chief, Public Corruption Unit

Bruce C. Judge
Assistant United States Attorney

Charles J. Kalil II
Assistant United States Attorney

Stephanie M. Gorgon
Assistant United State Attorney

Date:

- 14 -

By signing below, defendant acknowledges that she has read (or has been read) this entire document, understands it, and agrees to its terms. She also acknowledges that she is satisfied with her attorney's advice and representation. Defendant agrees that she has had a full and complete opportunity to confer with her lawyer, and has had all of her questions answered by her lawyer.

John Shea
Attorney for Defendant

Virdell King
Defendant

Date: 8/17/17

# Exhibit 13

Case 1:19-cv-06770-EK-MMH Document 34-6 Filed 08/21/20 Page 18 of 34 PageID #: 955

**ORIGINAL**

United States District Court
Eastern District of Michigan
Southern Division

United States of America,

Case No. 17-CR-20406

Hon. John Corbett O'Meara

v.

D-4 Virdell King,

Violation: **Conspiracy to Violate the Labor Management Relations Act** (18 U.S.C. § 371)

Defendant.

_____

## Second Superseding Information

The United States Attorney charges:

### General Allegations

At times relevant to this Second Superseding Information:

1. The Labor Management Relations Act, commonly known as the Taft Hartley Act, prohibited employers and persons acting in the interest of employers from paying, lending, or delivering, or agreeing to pay, lend, or deliver, any money or other thing of value to any officer or employee of a labor organization representing its employees.

1

2.      The Labor Management Relations Act also prohibited any officer or employee of a labor organization representing the employees of an employer from receiving, accepting, or agreeing to receive or accept, any money or other thing of value from that employer or from any person acting in the interest of that employer.

3.      One of the purposes of the Labor Management Relations Act was to combat the corruption of the collective bargaining process that occurs when a union employer gives something of value to a union representative.

**Relevant Organizations**

4.      Fiat Chrysler Automobiles US LLC was an automotive company based in Auburn Hills, Michigan, and the successor to the automotive company formerly known as Chrysler Group LLC. Both are referred to here as "FCA." FCA manufactured and sold automobiles in the United States under brands such as Chrysler, Jeep, Dodge, and Ram. FCA was an employer in an industry affecting interstate commerce and subject to the Labor Management Relations Act, 29 U.S.C. §§ 142 & 152.

5.      The International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (UAW) was a labor organization based in Detroit, Michigan. The UAW represented tens of thousands of non-

2

managerial employees employed by FCA at numerous locations in Michigan and across the United States. The UAW was a labor organization subject to the Labor Management Relations Act, 29 U.S.C. §§ 142 & 152.

6.     The UAW-Chrysler Skill Development & Training Program d/b/a the UAW-Chrysler National Training Center (NTC) was a tax-exempt corporation based in Detroit, Michigan. The NTC purported to function as a labor management committee under the Labor Management Relations Act, 29 U.S.C. § 186(c)(9). The stated purpose of the NTC was to provide for the education, training, and retraining of workers.

7.     The governing body of the NTC was known as the Joint Activities Board. The Vice President of Employee Relations of FCA and the Vice President of the Chrysler Department of the UAW served as the Chairmen of the NTC Joint Activities Board. The remainder of the Joint Activities Board was made up of senior officials from FCA and the UAW.

### Collective Bargaining Agreements between FCA and the UAW

8.     Approximately every four years FCA and the UAW engaged in national negotiations resulting in a collective bargaining agreement that set wages, attendance policies, profit sharing, ratification bonuses, holidays, and other working conditions for FCA employees represented by the UAW.

3

9.     In 2011 and 2015, UAW and FCA held national negotiation sessions that resulted in ratified collective bargaining agreements covering tens of thousands of FCA employees represented by the UAW.

## Relevant Persons

10.     Alphons Iacobelli was the FCA Vice President for Employee Relations and a person acting in the interest of employer FCA from 2008 through 2015. As the FCA Vice President for Employee Relations, Alphons Iacobelli was the senior FCA official responsible for negotiating with the UAW and for administering the collective bargaining agreements between FCA and the UAW. As the FCA Vice President for Employee Relations, Alphons Iacobelli was FCA's lead representative for labor relations and managed FCA's relationship with the UAW. Alphons Iacobelli was the senior FCA official responsible for resolving disputes and grievances that arose under the collective bargaining agreements between FCA and the UAW.

11.     FCA-7 was a member of the FCA Employee Relations Department from 2007 through 2016. FCA-7 was directly involved in negotiating with the UAW and responsible for administering the collective bargaining agreements between FCA and the UAW.

4

Case 1:19-cv-06770-EK-MMH   Document 34-6   Filed 08/21/20   Page 22 of 34 PageID
Case 2:17-cr-20406-FDB-RSW   ECF No. 34   filed 08/18/17   PageID.965   Page 5 of 17
#: 959

12.     FCA-11 was a member of the FCA Employee Relations Department from 2007 to 2015.

13.     General Holiefield was an elected UAW officer who served as the UAW Vice President for the Chrysler Department from 2006 through 2014. As the UAW Vice President, Holiefield had primary responsibility for negotiating with FCA and for administering the collective bargaining agreements between the UAW and FCA on behalf of tens of thousands of FCA employees represented by the UAW. As UAW Vice President, General Holiefield was responsible for managing the UAW's relationship with FCA. Holiefield was the senior UAW official responsible for resolving disputes and grievances that arose under the collective bargaining agreements between the UAW and FCA.

14.     **Virdell King** was a UAW employee who served as a senior official in the UAW Chrysler Department from 2008 until she retired in February 2016. As a senior UAW official in the Chrysler Department, **Virdell King** was responsible for negotiating and administering the collective bargaining agreements between the UAW and FCA on behalf of tens of thousands of FCA employees represented by the UAW. In 2011 and 2015, **Virdell King** served as a member of the UAW national negotiating committee responsible for the collective bargaining agreements between the UAW and FCA.

5

Case 2:17-cr-20406-PDB-RSW   ECF No. 34   filed 08/18/17   PageID.966   Page 6 of 17

15. UAW-2 was a UAW employee who served as a senior official in the UAW Chrysler Department from 2010 through 2014. As a senior UAW official in the Chrysler Department, UAW-2 was responsible for negotiating and administering the collective bargaining agreements between the UAW and FCA on behalf of tens of thousands of FCA employees represented by the UAW. In 2011, UAW-2 served as a member of the UAW national negotiating committee responsible for the collective bargaining agreement between the UAW and FCA.

16. UAW-4 was a UAW employee who served as a senior official in the UAW Chrysler Department from 2014 through July 2016. As a senior UAW official in the Chrysler Department, UAW-4 was responsible for negotiating and administering the collective bargaining agreements between the UAW and FCA on behalf of tens of thousands of FCA employees represented by the UAW. In 2015, UAW-4 served as a member of the UAW national negotiating committee responsible for the collective bargaining agreement between the UAW and FCA.

17. Jerome Durden was a Financial Analyst in FCA's Corporate Accounting Department. From 2008 through 2015, Jerome Durden was the controller of the NTC and served as the secretary of the NTC Joint Activities Board.

18.     All dates in this Second Superseding Information are alleged to have occurred on or about the stated dates.

## Count One

### (18 U.S.C. § 371 – Conspiracy to Violate the Labor Management Relations Act)

1.     Paragraphs 1 through 18 of the General Allegations are incorporated by reference here.

2.     Between on or about 2011 through 2015, within the Eastern District of Michigan and elsewhere, Alphons Iacobelli, **Virdell King**, and other individuals and entities known and unknown to the United States Attorney, did knowingly and voluntarily conspire to violate the Labor Management Relations Act. The objects of this conspiracy were:

(a) that one or more persons acting in the interest of employer FCA would willfully pay and deliver—and agree to pay and deliver—money and things of value to officers and employees of the UAW, the labor organization representing its employees, using the NTC with the intent to benefit persons who they knew were not permitted to receive the money and things of value, in violation of Title 29, United States Code, Section 186(a)(2), (d)(1); and

7

(b) that officers and employees of the UAW would willfully request, receive, and accept—and agree to receive and accept—money and things of value from employer FCA and one or more persons acting in the interest of FCA, using the NTC with the intent to benefit themselves and other persons who they knew were not permitted to receive the money and things of value, in violation of Title 29, United State Code, Section 186(b)(1), (d)(1).

3. Over the course of the conspiracy, FCA Vice President Alphons Iacobelli, FCA Financial Analyst Jerome Durden, and other co-conspirators acting in the interest of employer FCA, unlawfully paid and delivered more than $1,000 in prohibited payments and things of value, directly and indirectly, which funds were used to pay for the personal credit card purchases and expenses of UAW Vice President General Holiefield, senior UAW official **Virdell King**, UAW-2, UAW-4, and other senior UAW employees. The prohibited payments and things of value included designer clothing, designer shoes, personal travel, luggage, jewelry, and electronics.

### UAW-Chrysler National Training Center

4. FCA Vice President Alphons Iacobelli, FCA Financial Analyst Jerome Durden, and their co-conspirators used NTC bank accounts and NTC credit card accounts to conceal prohibited payments and things of value paid and

8

delivered to UAW Vice President General Holiefield, senior UAW official **Virdell King**, UAW-2, UAW-4, and other senior UAW officials.

5.      FCA Vice President Alphons Iacobelli was the Co-Chairman of the NTC and the NTC Joint Activities Board from 2008 through 2015. FCA-7 was a member of the FCA Employee Relations Department who served on the NTC Joint Activities Board from 2007 until 2015. FCA-11 was a member of the FCA Employee Relations Department who served on the NTC Joint Activities Board from 2010 to 2015. FCA Financial Analyst Jerome Durden was a member of the FCA Corporate Accounting Department who served as the controller of the NTC from in and before 2008 through 2015.

6.      FCA provided the funding for the NTC. From 2009 to 2014, FCA made annual transfers to the NTC of between $13 million and $31 million per year. During that time period, FCA Vice President Alphons Iacobelli, FCA-7, FCA-11, and FCA Financial Analyst Jerome Durden controlled the finances and spending of the NTC.

7.      The stated purpose of the NTC was to provide for the education, training, and retraining of FCA workers. However, FCA Vice President Alphons Iacobelli, FCA-7, FCA-11, FCA Financial Analyst Jerome Durden, and others acting in the interest of employer FCA, directed hundreds of thousands of dollars

9

Case 2:17-cr-20406-FDB-RSW    ECF No. 34 filed 08/15/17    PageID.190    Page 10 of 17

in NTC funds to pay for personal travel, personal purchases and personal expenditures of UAW Vice President General Holiefield, senior UAW official **Virdell King**, UAW-2, UAW-4, and other UAW officials, their family members and their associates.

## Credit Cards for UAW Officials

8.     In and after 2012, FCA Vice President Alphons Iacobelli directed FCA Financial Analyst Jerome Durden to obtain credit cards for UAW Vice President General Holiefield and for other senior UAW officials. The credit cards were issued through accounts maintained in the name of the NTC and were paid for with funds provided by FCA. FCA Vice President Alphons Iacobelli, FCA Financial Analyst Jerome Durden, and their co-conspirators used the NTC credit cards to conceal prohibited payments and things of value paid and delivered to UAW Vice President General Holiefield, senior UAW official **Virdell King**, UAW-2, UAW-4, and other senior UAW officials.

9.     In and after 2012, Alphons Iacobelli and others acting in the interest of employer FCA encouraged and authorized UAW Vice President General Holiefield and other senior UAW officials to use the NTC credit cards to pay for personal purchases and personal expenditures.

10.     In December 2012, UAW Vice President Holiefield told **Virdell King**

10

Case 2:17-cr-20406-FDB-RSW   ECF No. 34 filed 08/18/17   PageID.191   Page 11 of 17

that FCA Vice President Alphons Iacobelli did not have a problem with them using their NTC credit cards to purchase personal items "if we see something that we want."

11.    In July 2014, UAW-4 told **Virdell King** that FCA Vice President Alphons Iacobelli said, "if you see something you want, feel free to buy it. I don't have a problem if you buy it on the charge card." UAW-4 also told **Virdell King** "Al [Iacobelli] didn't have a problem" with union officials making personal purchases on their NTC credit cards.

12.    FCA Financial Analyst Jerome Durden reported that he, Iacobelli, FCA-7, and FCA-11 created a liberal spending policy for the NTC issued credit cards as part of their effort to keep the senior members of the UAW Chrysler Department "fat, dumb and happy."

13.    Iacobelli directed the NTC to follow "liberal" credit card and expense policies to persuade union officials to take company-friendly positions.

## Overt Acts

14.    One or more members of the conspiracy completed one or more of the following acts to effect the object of the conspiracy:

15.    In and after 2011, NTC credit cards were given to UAW Vice President General Holiefield, senior UAW official **Virdell King**, UAW-2, UAW-

11

4, and other UAW senior officials.

16.    In and after 2012, FCA Vice President Alphons Iacobelli encouraged UAW Vice President General Holiefield, senior UAW official **Virdell King**, UAW-2, UAW-4, and other senior UAW officials to use their NTC credit cards for personal purchases and expenses.

17.    In and after 2012, FCA Financial Analyst Jerome Durden personally collected the credit card statements for senior UAW officials that were mailed to the NTC. Durden instructed NTC accounting staff not to open, examine, or review the NTC credit card statements.

18.    In or before February of 2012, FCA-7 instructed FCA Financial Analyst Jerome Durden to take steps to conceal "NTC spending that was wrong and shouldn't be happening."

19.    In February 2012, FCA Financial Analyst Jerome Durden directed that payments to credit cards were to be "screened" from the members of the NTC accounting staff. Durden also took steps to change the security settings of the NTC accounting software to further conceal those payments.

20.    From 2012 through 2015, UAW Vice President General Holiefield, **Virdell King**, UAW-2, UAW-4, and other senior UAW officials made personal purchases on their NTC credit cards. These purchases were authorized by FCA

12

Vice President Alphons Iacobelli, FCA-7, FCA-11, FCA Financial Analyst Jerome Durden, and others acting in the interest of employer FCA, and were paid for with funds provided by FCA.

21.     From 2012 through 2013, UAW Vice President General Holiefield made over $200,000 worth of personal purchases on his NTC credit cards, including jewelry, furniture, designer clothing, and other personal items and expenses.

22.     From 2012 through 2015, **Virdell King** made purchases on her NTC credit card at the direction and request of other high-ranking UAW officials and for the benefit of other high-ranking UAW officials. In December 2012, **Virdell King** made a personal purchase of over $1,000 in designer clothing for herself. On that same shopping trip, **Virdell King** made another purchase of over $1,000 in designer clothing for Monica Morgan and at the direction of UAW Vice President General Holiefield.

23.     In March 2015, UAW-4 made a personal purchase of over $1,000 on UAW-4's NTC credit card for a pair of Christian Louboutin shoes and encouraged **Virdell King** to do the same. In March 2015, **Virdell King** made a personal purchase of over $1,000 on her NTC credit card for a pair of Christian Louboutin shoes.

13

Case 2:17-cr-20406-FDB-RSW    ECF No. 34    filed 08/18/17    PageID.194    Page 14 of 17

24.     In August 2015, UAW-4 directed **Virdell King** to purchase a shotgun. **King** texted UAW-4 to ask, "Do you want me to go and pick up the gun." UAW-4 texted back, "Yes. Ask them for a really good one with case." In August 2015, **Virdell King** charged over $1,000 on her NTC credit card for a shotgun.

25.     **Virdell King**'s NTC credit card purchases made at the direction and for the benefit of senior UAW officials also included golf equipment, luggage, concert tickets, theme park tickets, and other personal purchases and expenses.

26.     **Virdell King**'s NTC credit card purchases for herself also included clothing, jewelry, luggage, and other personal items and expenses.

27.     Between 2012 and 2015, **Virdell King** used her NTC credit cards to make over $40,000 in personal purchases for other senior UAW officials and for herself.

28.     From 2012 through 2014, senior UAW official UAW-2 made over $141,000 worth of purchases on UAW-2's NTC credit card, including electronics, concert and sporting event tickets, and other personal items and expenses.

29.     From 2014 through 2016, senior UAW official UAW-4 made over $75,000 worth of purchases on UAW-4's NTC credit card, including clothing, jewelry, luggage, designer shoes, dining, and other personal items and expenses.

30.     In and after January 2014, the UAW President made official requests

14

Case 2:17-cr-20406-FDB-RSW   ECF No. 34 filed 08/18/17   PageID.195   Page 15 of 17

to FCA for information on the use of NTC credit cards by UAW Vice President Holiefield and other UAW officials. FCA Vice President Alphons Iacobelli, FCA-7, and FCA Financial Analyst Jerome Durden refused to provide that information.

31.     In and after January 2014, UAW-2 told **Virdell King** the UAW President and the UAW President's senior assistant were "trying to find out stuff" about the NTC credit cards. UAW-2 instructed **Virdell King** to stop using her NTC credit card. UAW-2 falsely told the UAW President's senior assistant that **Virdell King** did not have an NTC credit card.

32.     In or about January 2014, a senior assistant to the UAW President made a request to FCA-7 for records and information on the use of NTC credit cards by UAW Vice President General Holiefield and other UAW officials. In or about February 2014, FCA-7 sent an email to FCA Vice President Alphons Iacobelli stating "We can't provide the requested type of information to such people" and "If we tell [the UAW President and the UAW President's senior assistant] that we aren't giving them shit, what are they going to do, tell [FCA-1] we are being uncooperative? If so, so what?" Alphons Iacobelli responded, "We are providing nothing. Just what we reviewed for the binder…in about a month…maybe." And: "We're gonna have fun with these evil people."

15

All in violation of Title 18, United States Code, Section 371.


DANIEL L. LEMISCH
Acting United States Attorney



Bruce C. Judge
Assistant United States Attorney

Stephanie M. Gorgon
Assistant United States Attorney



Charles J. Kalil II
Assistant United States Attorney



Date: August 18, 2017


16

| United States District Court<br>Eastern District of Michigan | **Criminal Case Cover Sheet** | Case Number<br>17-cr-20406 |
|---|---|---|

NOTE: It is the responsibility of the Assistant U.S. Attorney signing this form to complete it accurately in all respects.

| **Companion Case Information** | Companion Case Number: |
|---|---|
| This may be a companion case based upon **LCrR 57.10 (b)(4)[1]**: | Judge Assigned: |
| ☐ Yes    ☒ No | AUSA's Initials: |

Case Title: USA v.  D-4 Virdell King

County where offense occurred :  Wayne County and Oakland County

Check One:    ☒ Felony        ☐ Misdemeanor            ☐ Petty

    ____Indictment/ ✓ Information --- **no** prior complaint.
    ____Indictment/____Information --- based upon prior complaint [Case number:                    ]
    ____Indictment/____Information --- based upon **LCrR 57.10 (d)** *[Complete Superseding section below]*.

## Superseding Case Information

Superseding to Case No: 17-cr-20406                    **Judge:**  John Corbett O'Meara

☐ Corrects errors; no additional charges or defendants.
☐ Involves, for plea purposes, different charges or adds counts.
☒ Embraces same subject matter but adds the additional defendants or charges below:

| **Defendant name** | **Charges** | **Prior Complaint (if applicable)** |
|---|---|---|
| D-4 Virdell King | 18 USC 371 | N/A |

**Please take notice that the below listed Assistant United States Attorney is the attorney of record for the above captioned case.**

August 18, 2017
Date

BRUCE C. JUDGE
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226-3277
Phone: 313-226-9122
Fax:    313-226-3413
E-Mail address: Bruce.Judge@usdoj.gov
Attorney Bar #: CA 148805

[1] Companion cases are matters in which it appears that (1) substantially similar evidence will be offered at trial, or (2) the same or related parties are present, and the cases arise out of the same transaction or occurrence. Cases may be companion cases even though one of them may have already been terminated.