# Exhibit 20



**ORIGINAL**

United States District Court
Eastern District of Michigan
Southern Division

United States of America,

        v.

D-2 Alphons Iacobelli,

        Defendant.

Case No. 17-cr-20406

Honorable Paul D. Borman

Offenses:
Count One: **Conspiracy to Violate the Labor Management Relations Act** (18 U.S.C. § 371)

Count Seven: **Subscribing a False Tax Return** (26 U.S.C. § 7206(1))

Maximum Imprisonment:
Count One:      5 years
Count Seven:    3 years

Maximum Fine:
Count One:      $250,000
Count Seven:    $100,000

Maximum Supervised Release:
Count One:      3 years
Count Seven:    1 year

---

# Rule 11 Plea Agreement

---

- 1 -

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, defendant **Alphons Iacobelli** and the government agree as follows:

## I.     Guilty Plea

### A.     Counts of Conviction

Defendant **Alphons Iacobelli** will enter a plea of guilty to Count One and Count Seven of the First Superseding Indictment.

Count One of the First Superseding Indictment charges conspiracy to violate the Labor Management Relations Act, in violation of 18 U.S.C. § 371.

Count Seven of the First Superseding Indictment charges subscribing a false tax return, in violation of 26 U.S.C. § 7206(1).

### Elements of the Offenses

The elements of conspiracy to violate the Labor Management Relations Act, as charged in Count One of the First Superseding Indictment, are as follows:

(1)     Two or more persons conspired to violate the Labor Management Relations Act in violation of 29 U.S.C. § 186(a)(2), (b)(1), and (d)(1).

(2)     The defendant knowingly and voluntarily joined the conspiracy.

(3)     A member of the conspiracy did one of the overt acts described in the First Superseding Indictment for the purpose of advancing or helping the conspiracy.

The elements of subscribing a false tax return, as charged in Count Seven of the First Superseding Indictment, are as follows:

(1)  The defendant made and subscribed a return, statement, or document containing a written declaration made under penalty of perjury;

(2)  The defendant knew that the return, statement, or document was false as to a material matter; and

(3)  The defendant did so with the specific, willful intent to violate the law.

## B.  Factual Basis for Guilty Pleas

The following facts are a sufficient and accurate basis for Defendant **Alphons Iacobelli**'s guilty plea to Count One:

Between in or before January 2009 and continuing through in or after June 2015, **Alphons Iacobelli** knowingly and voluntarily joined a conspiracy in which Fiat Chrysler Automobiles US LLC and its executives agreed to pay and deliver, and willfully paid and delivered, more than $1.5 million in prohibited payments and things of value to officers and employees of the UAW.

### Relevant Organizations

1.  Fiat Chrysler Automobiles US LLC was an automotive company based in Auburn Hills, Michigan, and the successor to the automotive company formerly known as Chrysler Group LLC. Both are referred to here as "FCA." FCA is the

- 3 -

Case 2:17-cr-20406-FDB-RSW   Doc # 58   Filed 01/25/18   Pg 4 of 32   Pg ID 251

United States operating subsidiary of Fiat Chrysler Automobiles NV, a publicly traded organization listed on the New York Stock Exchange. FCA manufactured and sold automobiles in the United States under brands such as Chrysler, Jeep, Dodge, and Ram. FCA was an employer in an industry affecting interstate commerce.

2. The International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (UAW) was a labor organization based in Detroit, Michigan. The UAW represented tens of thousands of non-managerial employees employed by FCA at numerous locations in Michigan and across the United States.

3. The UAW-Chrysler Skill Development & Training Program d/b/a the UAW-Chrysler National Training Center (NTC) was a tax-exempt corporation based in Detroit, Michigan. The NTC purported to function as a labor management committee under the Labor Management Labor Relations Act, 29 U.S.C. § 186(c)(9). The stated purpose of the NTC was to provide for the education, training, and retraining of workers.

**Collective Bargaining Agreements between FCA and the UAW**

4. Approximately every four years FCA and the UAW engaged in national negotiations resulting in collective bargaining agreements that set wages,

- 4 -

attendance policies, profit sharing, ratification bonuses, holidays, and other working conditions for FCA employees represented by the UAW.

5. In 2011 and 2015, FCA and the UAW held national negotiation sessions that resulted in ratified collective bargaining agreements covering tens of thousands of FCA employees represented by the UAW.

### Conspiracy to Violate the Labor Management Relations Act

6. From 2008 until he retired in June 2015, **Alphons Iacobelli** was the FCA Vice President for Employee Relations. As the FCA Vice President for Employee Relations, **Alphons Iacobelli** was FCA's lead representative for labor relations and had lead responsibility for managing FCA's relationship with the UAW. **Alphons Iacobelli** was the senior FCA official responsible for negotiating with the UAW and for administering the collective bargaining agreements between FCA and the UAW, including the resolution of disputes and grievances that arose under the collective bargaining agreements between FCA and the UAW.

7. Between in or before January 2009 and continuing through in or after June 2015, **Alphons Iacobelli** knowingly and voluntarily joined a conspiracy in which FCA and FCA executives and FCA employees agreed to pay and deliver, and willfully paid and delivered, money and things of value to officers and employees of the UAW. As part of that conspiracy, **Alphons Iacobelli** and other FCA executives and FCA employees acting in the interest of employer FCA used the

bank accounts and credit card accounts of the NTC to benefit officers and employees of the UAW, knowing that those individuals were not permitted to receive the money and other things of value.

8. Over the course of the conspiracy, FCA Vice President **Alphons Iacobelli**, FCA Director FCA-7, FCA Senior Manager FCA-11, FCA Financial Analyst Jerome Durden, and other FCA executives and employees, unlawfully paid and delivered more than $1.5 million in prohibited payments and things of value directly and indirectly to UAW Vice President General Holiefield, UAW Assistant Director Virdell King, UAW Official UAW-2, UAW Official UAW-3, UAW Official UAW-4 and other UAW officials. The prohibited payments and things of value included paying off the mortgage on the personal residence of a UAW Vice President, personal travel, designer clothing, cases of custom-labeled wine, furniture, jewelry, and custom-made watches.

9. As part of the same conspiracy, FCA Vice President **Alphons Iacobelli** and other FCA executives and FCA employees transferred hundreds of thousands of dollars in prohibited payments from FCA, through the NTC, into tax-exempt organizations controlled by UAW officials, including the Leave the Light On Foundation and the Making Our Children Smile Foundation, among others.

10. As part of the same conspiracy, FCA Vice President **Alphons Iacobelli** and other FCA executives and FCA employees authorized the regular

- 6 -

Case 2:17-cr-20406-FDB-RSW   Doc # 58   Filed 01/23/18   Pg 7 of 32   Pg ID 254

transfer of hundreds of thousands of dollars from the NTC to the UAW, purportedly as reimbursement for the salaries of UAW employees assigned to the NTC. In fact, many of those UAW employees provided no services to the NTC. The salary reimbursements, along with a fraudulent 7% administrative fee, were authorized by FCA executives as a political gift to the Vice Presidents of the UAW Chrysler Department, and were paid for using funds provided by FCA.

11.     FCA Vice President **Alphons Iacobelli**, FCA Director FCA-7, FCA Senior Manager FCA-11, FCA Financial Analyst Jerome Durden, FCA and other co-conspirators acting in the interest of employer FCA paid and delivered more than $1.5 million in prohibited payments and things of value to UAW officers and UAW employees in an effort to obtain benefits, concessions, and advantages for FCA in the negotiation, implementation, and administration of the collective bargaining agreements between FCA and the UAW.

### Overt Acts

12.     One or more members of the conspiracy completed one or more of the following overt acts to effect the object of the conspiracy:

13.     In September 2009, FCA Vice President **Alphons Iacobelli** met with FCA Director FCA-7, FCA Senior Manager FCA-11, and FCA Financial Analyst Jerome Durden to review spending of NTC funds. During that meeting, **Alphons Iacobelli** explained that cost cutting was no longer needed at the NTC and that it

- 7 -

was time to consider funding for selected "high value/high leverage programs." **Alphons Iacobelli** identified a $50,000 transfer to UAW Vice President General Holiefield's Leave the Light On Foundation as one of four such "high value/high leverage" expenditures.

14.     In February 2010, another FCA executive gave a custom-made Terra Cielo Mare watch to UAW Vice President General Holiefield. Along with the Terra Cielo Mare watch was a hand-written note from the FCA executive that stated "Dear General, I declared the goods at less than fifty bucks. That should remove any potential conflict. Best regards, and see you soon."

15.     In May 2011, FCA Vice President **Alphons Iacobelli** authorized the expenditure of more than $2,100 to pay for first-class airline travel for Monica Morgan, the girlfriend of UAW Vice President General Holiefield. The first-class airfare was paid for by the NTC using funds provided by FCA.

16.     In May 2011, FCA Vice President **Alphons Iacobelli** sent an email to FCA Financial Analyst Jerome Durden cautioning Durden not to put the details of certain expenditures made for the benefit of UAW Vice President General Holiefield in writing.

17.     In 2011 and 2012, FCA Vice President **Alphons Iacobelli** and other FCA executives and employees authorized and directed the expenditure of more than $435,000 to a company called Wilson's Diversified Products, also known as

Wilson Diversifed Products, which was owned and controlled by UAW Vice President General Holiefield and his girlfriend and later wife, Monica Morgan. The payments to Wilson Diversified Products were made by the NTC using funds provided by FCA.

18.    Between 2012 and June 2015, FCA Vice President **Alphons Iacobelli** authorized the expenditure of more than $450,000 to pay for personal purchases made by UAW Vice President General Holiefield and other UAW officials on their NTC-issued credit cards.  FCA Vice President **Alphons Iacobelli** encouraged and authorized UAW Vice President General Holiefield, UAW Assistant Director Virdell King, UAW Official UAW-2, UAW Official UAW-3, UAW Official UAW-4, and other UAW officials to purchase items such as jewelry, furniture, electronics, designer clothing, and other personal items using their NTC credit cards.  The purchases of personal items and other personal expenses were paid for by the NTC using funds provided by FCA.

19.    In December 2013, FCA Vice President **Alphons Iacobelli** sent an email to another FCA executive confirming that UAW Vice President General Holiefield had been "scripted" in advance of a scheduled meeting between Holiefield and other members of the UAW's International Executive Board. **Iacobelli** told the other FCA executive that, during the upcoming meeting, UAW Vice President General Holiefield would "create a dialogue pursuant to our

- 9 -

Case 2:17-cv-20406-FDB-RSW   Doc # 58   Filed 01/23/18   Pg 10 of 32   Pg ID 257

outline." At the time of the December 2013 email, members of the UAW International Executive Board were considering the terms of a multi-billion dollar offer to purchase the equity interest held by the UAW Retiree Medical Benefits Trust in Chrysler Group LLC, subsequently known as FCA. That transaction was completed in January of 2014.

20. In June 2014, FCA Vice President **Alphons Iacobelli** authorized the expenditure of $262,219.71 to pay off the mortgage on the residence of UAW Vice President General Holiefield and Monica Morgan in Harrison Township, Michigan. The mortgage was paid off with a check issued by the NTC using funds provided by FCA.

21. In August 2014, FCA Vice President **Alphons Iacobelli** authorized the expenditure of more than $30,000 for a party for UAW official UAW-3 held at the FCA-UAW World Class Manufacturing Academy in Warren, Michigan. The expenditure included charges for "ultra-premium" liquor, more than $7,000 worth of cigars, and more than $3,000 worth of wine with custom labels in honor of UAW-3. The expenses were paid for by the NTC using funds provided by FCA.

22. In February and March of 2015, FCA Vice President **Alphons Iacobelli** and other FCA executives and employees, including FCA Senior Manager FCA-10, offered to pay $50,000 each to select UAW officials under the guise of bogus "settlement agreements." The terms of those agreements stated that the

Case 1:19-cv-06770-EK-MMH    Document 34-8    Filed 08/21/20    Page 12 of 82 PageID
#: 1001
Case 2:17-cr-20406-FDB-RSW    Doc # 58    Filed 01/23/18    Pg 11 of 32    Pg ID 258

payments were to be confidential and that FCA would not pay the $50,000 "if it were unable to avoid public disclosure" of the arrangements.

23. On February 18, 2015, at the direction of FCA Vice President **Alphons Iacobelli**, FCA Senior Manager FCA-10 sent an email to UAW Official UAW-4 offering that FCA would make lump sum payments of $50,000 to select UAW officials as a "one-time non-precedent setting" retirement offer. To ensure that the rank and file UAW members would not be made aware of the $50,000 payments offered only to senior UAW officials, FCA-10 assured UAW-4: "My people will process the transactions to keep them out of the plants."

\*                          \*                          \*

The following facts are a sufficient and accurate basis for defendant **Alphons Iacobelli's** guilty plea to Count Seven of the First Superseding Indictment:

24. From in and before January 1, 2009 through June of 2015, **Alphons Iacobelli** served as the Co-Chairman of the NTC. **Alphons Iacobelli** held that position at the NTC in his capacity as the FCA Vice President for Employee Relations.

25. Between 2011 and 2015, **Alphons Iacobelli** received hundreds of thousands of dollars in compensation from the NTC, which compensation was falsely and fraudulently omitted from tax returns filed with the Internal Revenue Service.

- 11 -

Case 1:19-cv-06770-EK-MMH    Document 34-8    Filed 08/21/20    Page 13 of 82 PageID
Case 2:17-cv-20406-FDB-RSW    Doc # 38    Filed 01/23/18    Pg 12 of 32    Pg ID 259
#: 1002

26. On or about March 19, 2015, **Alphons Iacobelli**, a resident of
Rochester Hills, Michigan, willfully made and subscribed a false Form 1040
Individual Income Tax Return for calendar year 2014, verified by a written
declaration that it was made under the penalties of perjury, and caused it to be filed
with the Internal Revenue Service. At the time he signed and subscribed the 2014
IRS Form 1040 Return, **Alphons Iacobelli** did not believe the return to be true and
correct as to every material matter, in that the return failed to report additional
income, in the amount of $861,927, that **Alphons Iacobelli** received in calendar
year 2014.

## II.    Sentencing Guidelines

### A.    Standard of Proof

The parties agree that the Court will determine all sentencing factors by a
preponderance of the evidence.

### B.    Agreed Guideline Range

The parties agree on all sentencing factors except the following:

1.    **If the offense of conviction charged in Count Seven involved
"sophisticated means" within the definition of USSG § 2T1.1(b)(2).**

The government takes the position that the defendant's offense of conviction
charged in Count Seven falls within the definition of sophisticated means and that
defendant's base offense level on that offense should be increased by 2 levels

- 12 -

pursuant to USSG § 2T1.1(b)(2). Defendant **Alphons Iacobelli** reserves his right to contest the application of USSG § 2T1.1(b)(2).

The parties agree that the Court shall determine this and all sentence guideline factors by a preponderance of the evidence and further agree to be bound by the Court's determination.

The government takes the position that the defendant's advisory sentencing guideline range is **97–121 months** which, by operation of the statutory maximum penalties for the offenses of conviction, becomes **96 months**. If the Court finds:

1. that defendant's criminal history category is higher than reflected on the attached worksheets, or

2. that the offense level should be higher because, after pleading guilty, defendant made any false statement to or withheld information from his probation officer; otherwise demonstrated a lack of acceptance of responsibility for his offenses; or obstructed justice or committed any crime,

and if any such finding results in a higher guideline range higher, the higher guideline range becomes the advisory sentencing guideline range in this matter.

## III. Sentence

The Court will impose a sentence pursuant to 18 U.S.C. § 3553, and in doing so must consider the sentencing guideline range.

- 13 -

**A.    Imprisonment**

Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) the sentence of imprisonment in this case may not exceed **96 months**. The parties further agree that 96 months is the statutory maximum penalty that can be imposed based upon the offenses of conviction.

**B.    Supervised Release**

A term of supervised release, if imposed, follows the term of imprisonment. There is no agreement on supervised release. In other words, the Court may impose any term of supervised release up to the statutory maximum term, which in this case is not more than three years. The agreement concerning imprisonment described above in Paragraph 3A does not apply to any term of imprisonment that results from any later revocation of supervised release.

**C.    Special Assessment**

Defendant will pay a special assessment of $200.

**D.    Fine**

There is no agreement as to fines.

**E.    Restitution**

Pursuant to 18 U.S.C. § 3663, the parties agree that restitution payable to the U.S. Department of the Treasury shall be imposed in this matter in the amount of not less than $835,523, which figure represents additional federal income taxes due

- 14 -

and owing to the Internal Revenue Service by defendant **Alphons Iacobelli** for tax years 2012, 2013, 2014 and 2015. The restitution amount of $835,523 may be increased by any interest and assessable penalties due and owing as calculated by the U.S. Probation department.

> **F.    Preparation of Tax Returns and Calculation and
> Payment of Taxes Due and Owing**

(i)   Not later than 14 days from entry of his guilty plea, defendant **Alphons Iacobelli** will provide the IRS Examination Division with a true and accurate IRS Form 4549 and a true and accurate IRS Form 870 for the years 2012 through 2015 inclusive by delivering signed copies of such documents to: IRS-CI Special Agent Michael Petroske, 985 Michigan Avenue, Room 251, Detroit, Michigan 48226.

(ii)   As a condition of and at least 90 days prior to the expiration of any term of probation or supervised release imposed herein, defendant **Alphons Iacobelli** shall in good faith file true and correct amended individual IRS Form 1040 income tax returns for the tax years 2012, 2013, 2014 and 2015.

(iii)   Defendant **Alphons Iacobelli** shall further cooperate fully and in good faith with the Internal Revenue Service in determining his correct tax liability, including, any assessable penalties and applicable interest owed thereon, and shall make satisfactory arrangements with the Internal Revenue Service for payment of any unpaid taxes, penalties, and interest.

(iv)   Defendant **Alphons Iacobelli** agrees that he will not seek, request or file any claim for any refunds of any taxes, penalties or interest for the tax years 2012 through 2015, inclusive.

(v)   Defendant **Alphons Iacobelli** shall further cooperate fully and in good faith with the Internal Revenue Service in determining the correct tax liabilities of the NTC and any individual who received unreported income from the NTC, between 2009 and 2015, including any assessable penalties, and interest owed thereon.

(vi)   Nothing in this Agreement shall limit the Internal Revenue Service in its collection of any taxes, penalties or interest due from defendant **Alphons Iacobelli**.

### G.   Forfeiture

(i)   Mont Blanc Pens

Defendant **Alphons Iacobelli** agrees that the following assets shall not be forfeited in this criminal action, but shall instead be forfeited administratively and/or liquidated under the terms of a separate written agreement between the parties as payment towards defendant's restitution judgment for his outstanding income tax obligations for 2012 through 2015:

1. One Mont Blanc, America's Sign for Freedom, Abraham Lincoln themed pen and the accompanying book and box, serial number 11 ("Pen SN 11"); and

2. One Mont Blanc, America's Sign for Freedom, Abraham Lincoln themed pen and the accompanying book and box, serial number 28 ("Pen SN 28").

(together, the "Subject Property").

To facilitate liquidation of the Subject Property, defendant agrees to secure a withdrawal of the third party claim filed by Dr. Michael Graham for Pen SN 11. Defendant acknowledges that if he is unable to secure a withdrawal of the third party claim for Pen SN 11, the pen shall be subject to a judicial forfeiture proceeding. If the United States is required to include Pen SN 11 in a judicial forfeiture proceeding, defendant shall not receive any credit for this asset towards his restitution judgment for his outstanding income tax obligations for 2012 through 2015.

Subject to the preceding paragraph, the net proceeds from the sale of any Subject Property liquidated under this agreement shall be turned over to be applied toward defendant's restitution judgment for his outstanding income tax obligations for 2012 through 2015, as described above.

    ii.    Funds in the amount of $354,000

Defendant **Alphons Iacobelli** acknowledges that funds in the amount of $354,000 were seized in this matter on or about February 18, 2016 pursuant to a federal seizure warrant (16-FBI-002141). Defendant further acknowledges that the $354,000 in funds were thereafter administratively forfeited.

As part of this agreement, defendant agrees not to contest either the seizure or the administrative forfeiture of the $354,000 in funds. Defendant further requests that the $354,000 be applied toward the restitution judgment for his outstanding income tax obligations for 2012 through 2015, as described above.

In the event that the Court enters the requested Judgment of Restitution in favor of the United States Department of Treasury in this case, the parties agree to submit a request to the U.S. Department of Justice, Criminal Division, Money Laundering and Asset Recovery Section ("MLARS"), to remit or restore the administratively forfeited funds to the United States Department of Treasury. Defendant expressly acknowledges that these funds have already been administratively forfeited, that any request to remit or restore the funds may be denied by MLARS, which denial will not be subject to further review, and that no representations have been made to him by or on behalf of the U.S. Attorney's Office as to the likelihood that the request to MLARS will be granted.

**IV.    Cooperation Agreement**

- 18 -

The written cooperation agreement between defendant **Alphons Iacobelli** and the government, which is dated December 15, 2017, is part of this plea agreement. The government agrees to bring no additional criminal charges against defendant **Alphons Iacobelli** arising out of his involvement in the offenses charged in the First Superseding Indictment, or for additional criminal conduct disclosed under the terms of the December 15, 2017 cooperation agreement, unless the defendant withdraws his plea or breaches that cooperation agreement.

## V.    Use of Withdrawn Guilty Plea

If the Court allows defendant to withdraw his guilty plea for a "fair and just reason" pursuant to Fed. R. Crim. P. 11(d)(2)(B), defendant **Alphons Iacobelli** waives his rights under Fed. R. Evid. 410, and the government may use his guilty plea, any statement made under oath at the change-of-plea hearing, and the factual basis statement in this plea agreement, against him in any proceeding.

## VI.    Defendant's Right to Withdraw from this Agreement

Defendant **Alphons Iacobelli** may withdraw from this agreement, and may withdraw his guilty plea, if the Court decides to impose a sentence higher than 96 months. This is the only reason for which defendant may withdraw from this agreement. The Court shall advise defendant that if he does not withdraw his guilty plea under this circumstance, the Court may impose a sentence greater than 96 months.

## VII.   Appeal Waiver

Defendant **Alphons Iacobelli** waives any right he may have to appeal his conviction on any grounds. If the defendant's sentence of imprisonment does not exceed 96 months, the defendant also waives any right he may have to appeal his sentence, including the fine and amount of restitution imposed, on any grounds.

Nothing in this waiver bars a timely claim of ineffective assistance of counsel on appeal or by collateral relief under 28 U.S.C. § 2255.

## VIII.   Consequences of Withdrawal of Guilty Plea or Vacation of Conviction

If the defendant is allowed to withdraw his guilty plea or if any conviction entered pursuant to this agreement is vacated, the Court shall, on the government's request, reinstate any charges that were dismissed as part of this agreement. If additional charges are filed against defendant within six months after the date the order vacating defendant's conviction or allowing him to withdraw his guilty plea becomes final, which charges relate directly or indirectly to the conduct underlying the guilty plea or to any conduct reflected in the attached worksheets, defendant waives his right to challenge the additional charges on the ground that they were not filed in a timely manner, including any claim that they were filed after the limitations period expired.

## IX.   Parties to Plea Agreement

Unless otherwise indicated, this agreement does not bind any government agency except the United States Attorney's Office for the Eastern District of Michigan.

## X.    Scope of Plea Agreement

This agreement, which includes all documents that it explicitly incorporates, is the complete agreement between the parties. This agreement supersedes all other promises, representations, understandings and agreements between the parties concerning the subject matter of this plea agreement that were made at any time before the guilty plea is entered in court. Thus, no oral or written promises made by the government to defendant or to the attorney for the defendant at any time before defendant pleads guilty are binding except to the extent they have been explicitly incorporated into this agreement.

Notwithstanding the previous paragraph, if defendant has entered into a written proffer agreement or a written cooperation agreement with the government, this plea agreement does not supersede or abrogate the terms of any such prior written agreement.

This agreement also does not prevent any civil or administrative actions against defendant, or any forfeiture claim against any property, by the United States or any other party.

## XI.    Acceptance of Agreement by Defendant

This plea offer expires unless it has been received, fully signed, in the Office

of the United States Attorney by 5:00 P.M. on December 15, 2017. The government

reserves the right to modify or revoke this offer at any time before defendant pleads

guilty.

Daniel L. Lemisch
Acting United States Attorney


_____
David A. Gardey
Assistant United States Attorney
Chief, Public Corruption Unit


_____
Bruce C. Judge
Assistant United States Attorney


_____
Charles J. Kalil II
Assistant United States Attorney


_____
Erin S. Shaw
Assistant United States Attorney

Date:    12/15/2017

By signing below, defendant acknowledges that he has read (or has been read) this entire document, understands it, and agrees to its terms. He also acknowledges that he is satisfied with his attorney's advice and representation. Defendant agrees that he has had a full and complete opportunity to confer with his lawyers, and has had all of his questions answered by his lawyers.

| | |
|---|---|
| _David F. DuMouchel_ | _Alphons Iacobelli_ |
| David F. DuMouchel | Alphons Iacobelli |
| Attorney for Defendant | Defendant |
| Date: 12/15/17 | Date: 12-15-2017 |

_Damien P. DuMouchel_
Damien P. DuMouchel
Attorney for Defendant

Date: 12/15/17

- 23 -

# Exhibit 21

**ORIGINAL**

United States District Court
Eastern District of Michigan
Southern Division

United States of America,

        Plaintiff,

v.

D-3 Monica Morgan,

        Defendant.

Case No. 17-cr-20406

Honorable Paul D. Borman

Offense:
Count Nine: **Subscribing a False Tax Return** (26 U.S.C. § 7206(1)).

Maximum Imprisonment: 3 years

Maximum Fine: $100,000

Maximum Supervised Release: 1 year

---

# Rule 11 Plea Agreement

---

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, defendant

**Monica Morgan** and the government agree as follows:

- 1 -

## I.   Guilty Plea

### A.   Count of Conviction

Defendant **Monica Morgan** will enter a plea of guilty to Count Nine of the First Superseding Indictment.

Count Nine of the First Superseding Indictment charges subscribing a false tax return, in violation of 26 U.S.C. § 7206(1).

### Elements of the Offense

The elements of subscribing a false tax return, as charged in Count Nine of the First Superseding Indictment, are as follows:

(1)   The defendant made and subscribed a return, statement, or document containing a written declaration made under penalty of perjury;

(2)   The defendant knew that the return, statement, or document was false as to a material matter; and

(3)   The defendant did so with the specific, willful intent to violate the law.

### B.   Factual Basis for Guilty Plea

The following facts are a sufficient and accurate basis for Defendant **Monica Morgan**'s guilty plea to Count Nine of the First Superseding Indictment:

1.   On or about November 3, 2014, **Monica Morgan**, a resident of Harrison Township, Michigan, willfully made and subscribed a false Form 1040 Individual Income Tax Return for calendar year 2011, verified by a written

- 2 -

declaration that it was made under the penalties of perjury, and caused it to be filed with the Internal Revenue Service. At the time she signed and subscribed the 2011 IRS Form 1040 Return, **Monica Morgan** did not believe the return to be true and correct as to every material matter, in that the return failed to report additional income, in the amount of $201,231, that **Monica Morgan** received in calendar year 2011.

## II. Sentencing Guidelines

### A. Standard of Proof

The parties agree that the Court will determine all sentencing factors by a preponderance of the evidence.

### B. Agreed Guideline Range

The parties agree on all sentencing factors, except for the following:

**1. If the defendant failed to report or correctly identify the source of income exceeding $10,000 from criminal activity.**

The government takes the position that the defendant's offense of conviction should be increased by two levels pursuant to USSG § 2T1.1(b)(1) because she failed to report or to correctly identify the source of income exceeding $10,000 in any year from criminal activity. Defendant Monica Morgan reserves her right to contest the application of USSG § 2T1.1(b)(1) to her offense of conviction.

**2.     If the offense of conviction involved "sophisticated means" within the definition of USSG § 2T1.1(b)(2).**

The government takes the position that the defendant's offense of conviction falls within the definition of sophisticated means and that defendant's base offense level should be increased by 2 levels pursuant to USSG § 2T1.1(b)(2). Defendant Monica Morgan reserves her right to contest the application of USSG § 2T1.1(b)(2) to her offense of conviction.

The parties agree that the Court shall determine these and all sentence guideline factors by a preponderance of the evidence and further agree to be bound by the Court's determination.

As is set forth on the attached worksheets, the government takes the position that the defendant's advisory guideline range is 24-30 months. If the Court finds:

1.      That defendant's criminal history category is higher than reflected on the attached worksheets, or

2.      that the offense level should be higher because, after pleading guilty, defendant made any false statement to or withheld information from her probation officer; otherwise demonstrated a lack of acceptance of responsibility for her offenses; or obstructed justice or committed any crime,

and if any such finding results in a guideline range higher than 24-30 months, then the government takes the position that the higher guideline range should apply.

- 4 -

## III.   Sentence

The Court will impose a sentence pursuant to 18 U.S.C. § 3553, and in doing

so must consider the sentencing guideline range.

### A.   Imprisonment

Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) the sentence of

imprisonment in this case may not exceed **27 months**.

### B.   Supervised Release

A term of supervised release, if imposed, follows the term of imprisonment.

There is no agreement on supervised release. In other words, the Court may impose

any term of supervised release up to the statutory maximum term, which in this case

is not more than one year. The agreement concerning imprisonment described

above in Paragraph 3A does not apply to any term of imprisonment that results

from any later revocation of supervised release.

### C.   Special Assessment

Defendant will pay a special assessment of $100.00.

### D.   Fine

There is no agreement as to fines.

### E.   Restitution

Pursuant to 18 U.S.C. § 3663, the parties agree that restitution payable to the

U.S. Department of the Treasury shall be imposed in this matter in the amount of

not less than $190,747, which figure represents additional federal income taxes due and owing to the Internal Revenue Service by defendant **Monica Morgan** for tax years 2011, 2012, 2013 and 2014. The restitution amount of $190,747 may be increased by any interest and assessable penalties due and owing as calculated by the U.S. Probation department.

     **F.**     **Preparation of Tax Returns and Calculation and Payment of Taxes Due and Owing**

(i)   Not later than 14 days from entry of her guilty plea, defendant **Monica Morgan** will provide the IRS Examination Division with a true and accurate IRS Form 4549 and a true and accurate IRS Form 870 for the years 2011 through 2014 inclusive by delivering signed copies of such documents to: IRS-CI Special Agent Michael Petroske, 985 Michigan Avenue, Room 251, Detroit, Michigan 48226.

(ii)   As a condition of and at least 90 days prior to the expiration of any term of probation or supervised release imposed herein, defendant **Monica Morgan** shall in good faith file true and correct amended individual IRS Form 1040 income tax returns for the tax years 2011, 2012 and 2013. Defendant Monica Morgan shall also in good faith file a true and correct individual IRS Form 1040 income tax return for the tax year 2014.

(iii)   Defendant **Monica Morgan** shall further cooperate fully and in good faith with the Internal Revenue Service in determining her correct tax liability, including, any assessable penalties and applicable interest owed thereon, and shall

- 6 -

make satisfactory arrangements with the Internal Revenue Service for payment of any unpaid taxes, penalties, and interest.

(iv)  Defendant **Monica Morgan** agrees that she  will not seek, request or file any claim for any refunds of any taxes, penalties or interest for the tax years 2011 through 2014, inclusive.

(v)     Nothing in this Agreement shall limit the Internal Revenue Service in its collection of any taxes, penalties or interest due from defendant **Monica Morgan**.

### G.    Forfeiture

(i)     Funds in the amount of $102,984.32

Defendant **Monica Morgan** acknowledges that $102,984.32 in funds were seized from Huntington National Bank Account #XXXXXXX3313 on or about May 12, 2016 pursuant to a federal seizure warrant (16-FBI-00XXXX).  Defendant **Monica Morgan** agrees not to contest that seizure and further agrees that those funds shall not be forfeited in this criminal action, but shall instead be paid to the U.S. Treasury Department under the terms of a separate written agreement between the parties as payment towards defendant's restitution judgment for her outstanding income tax obligations for 2011 through 2014.

Following entry of a judgment of restitution in this case, the $102,984.32 shall be turned over to the U.S. Treasury Department to be applied against defendant's restitution amount for her unpaid tax obligations. Defendant **Monica Morgan** agrees that her signature on this Rule 11 Agreement represents her final consent to the transfer of the seized $102,984.32 to the U.S. Treasury Department and the application of the seized funds to her restitution judgment for unpaid federal income taxes.

## IV.   Use of Withdrawn Guilty Plea

If the Court allows defendant to withdraw her guilty plea for a "fair and just reason" pursuant to Fed. R. Crim. P. 11(d)(2)(B), defendant **Monica Morgan** waives her rights under Fed. R. Evid. 410, and the government may use her guilty plea, any statement made under oath at the change-of-plea hearing, and the factual basis statement in this plea agreement, against her in any proceeding.

## V.   Defendant's Right to Withdraw from this Agreement

Defendant **Monica Morgan** may withdraw from this agreement, and may withdraw her guilty plea, if the Court decides to impose a sentence higher than **27 months**. This is the only reason for which defendant may withdraw from this agreement. The Court shall advise defendant that if she does not withdraw her guilty plea under this circumstance, the Court may impose a sentence greater than 27 months.

Case 2:17-cv-20400-FDB-RSW   Doc # 63   Filed 02/06/18   Pg 9 of 20   Pg ID 350

## VII.  Appeal Waiver

Defendant **Monica Morgan** waives any right she may have to appeal her conviction on any grounds. If the defendant's sentence of imprisonment does not exceed 27 months, the defendant also waives any right she may have to appeal her sentence, including the fine and amount of restitution imposed, on any grounds.

Nothing in this waiver bars a timely claim of ineffective assistance of counsel on appeal or by collateral relief under 28 U.S.C. § 2255.

## VIII.  Consequences of Withdrawal of Guilty Plea or Vacation of Conviction

If the defendant is allowed to withdraw her guilty plea or if any conviction entered pursuant to this agreement is vacated, the Court shall, on the government's request, reinstate any charges that were dismissed as part of this agreement. If additional charges are filed against defendant within six months after the date the order vacating defendant's conviction or allowing her to withdraw her guilty plea becomes final, which charges relate directly or indirectly to the conduct underlying the guilty plea or to any conduct reflected in the attached worksheets, defendant waives her right to challenge the additional charges on the ground that they were not filed in a timely manner, including any claim that they were filed after the limitations period expired.

## IX.    Parties to Plea Agreement

Unless otherwise indicated, this agreement does not bind any government agency except the United States Attorney's Office for the Eastern District of Michigan.

## X.    Scope of Plea Agreement

This agreement, which includes all documents that it explicitly incorporates, is the complete agreement between the parties. This agreement supersedes all other promises, representations, understandings and agreements between the parties concerning the subject matter of this plea agreement that were made at any time before the guilty plea is entered in court. Thus, no oral or written promises made by the government to defendant or to the attorney for the defendant at any time before defendant pleads guilty are binding except to the extent they have been explicitly incorporated into this agreement.

Notwithstanding the previous paragraph, if defendant has entered into a written proffer agreement or a written cooperation agreement with the government, this plea agreement does not supersede or abrogate the terms of any such prior written agreement.

This agreement also does not prevent any civil or administrative actions against defendant, or any forfeiture claim against any property, by the United States or any other party.

## XI.    Acceptance of Agreement by Defendant

This plea offer expires unless it has been received, fully signed, in the Office

of the United States Attorney by 5:00 P.M. on December 8, 2017. The government

reserves the right to modify or revoke this offer at any time before defendant pleads

guilty.

Daniel L. Lemisch
Acting United States Attorney

_____
David A. Gardey
Assistant United States Attorney
Chief, Public Corruption Unit

_____
Charles J. Kalil II
Assistant United States Attorney

_____
Bruce C. Judge
Assistant United States Attorney

Date: Nov. 28, 2017

By signing below, defendant acknowledges that she has read (or has been read) this entire document, understands it, and agrees to its terms. she also acknowledges that she is satisfied with her attorney's advice and representation. Defendant agrees that she has had a full and complete opportunity to confer with her lawyers, and has had all of her questions answered by her lawyers.

_____
Steven F. Fishman
Attorney for Defendant

Date: 12/27/17

_____
Monica Morgan
Defendant

Date: 12/27/17

- 12 -

# Exhibit 22

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

|  |  |  |
|---|---|---|
| | : | |
| **ROBERT L. DeSHETLER, JR.,** | | |
| **individually and on behalf of others** | : | |
| **similarly situated** | | |
| 966 Clarion Avenue | : | |
| Holland, Ohio  43528 | | |
| | : | |
| **ELIZABETH S. WESLEY, individually** | | |
| **and on behalf of others similarly situated** | : | |
| 2267 Dean Rd. | | |
| Temperance, Michigan  48182 | : | |
| | | |
| **CYNTHIA ALLEN** | : | Case No.: |
| 5135 Barlingame Dr. | | |
| Toledo, Ohio  43615 | : | Judge |
| | | |
| **DARIAN BANKS** | : | |
| 716 N. Washington Ave. | | **COMPLAINT** with Class Action |
| Scranton, Pennsylvania  18509-3218 | : | **Allegations** |
| | | |
| **DAVID P. BEAKAS** | : | **(Jury Demand Endorsed Hereon)** |
| 1423 Mill Creek Lane | | |
| Waterville, Ohio  43566 | : | |
| | | |
| **GREGORY BEAUDOIN** | : | |
| 3500 145th St. | | |
| Toledo, Ohio  43611 | : | |
| | | |
| **ROBERT BEDARD** | : | |
| 861 Village Parkway | | |
| Waterville, Ohio  43566 | : | |
| | | |
| **LINDA BURKHALTER** | : | |
| 3743 Willow Run | | |
| Toledo, Ohio  43607 | : | |
| | | |
| **KENNETH J. BURZYNSKI** | : | |
| 3592 W. Yankee Rd. | | |
| Sand Creek, MI  49279 | : | |
| | | |
| **JOSEPH A. CANTWELL** | : | |
| 355 Wolf Creek Ct. | | |

1

Case: 3.18-cv-00078-JZ Doc #: 1 Filed: 01/11/18 2 of 44. PageID #: 2

Northwood, Ohio  43619                                   :

**DELORES COLEMAN CARTER**                               :
5751 Crossbrooke Lane
Waterville, Ohio  43566                                  :

**THOMAS CASPER**                                        :
8329 Water Park Dr.
Holland, Ohio  43528                                     :

**MICHAEL J. COLE**                                      :
30241 Cedar Valley Dr.
Northwood, Ohio  43619                                   :

**RITA A. COPE**                                         :
4648 Commonwealth
Toledo, Ohio  43612                                      :

**CYNTHIA CROSS**                                        :
4035 Ariel Avenue
Toledo, Ohio  43623                                      :

**JOHN A. DANDAIZ**                                      :
731 Yoder Rd.
Curtice, Ohio  43412                                     :

**JAMES M. DeVOL**                                       :
2312 Brookridge Dr.
Toledo, Ohio  43613                                      :

**MARY A. FLISNIK**                                      :
5120 Secor Rd. #304
Toledo, Ohio  43623                                      :

**JAMES E. GROVES**                                      :
13714 Lenore Dr.
Hudson, Michigan  49247                                  :

**PAMELA HEAMS**                                         :
8541 Sandra Kay Dr.
Lambertville, Michigan  48144                            :

**EDWARD HOLEY**                                         :
7939 Summerfield Rd.
Lambertville, Michigan  48144                            :

Case 1:19-cv-06770-EK-MMH Document 34-8 Filed 08/21/20 Page 41 of 82 PageID
Case: 3.18-cv-00078-JZ Doc #: 1 Filed: 01/11/18 3 of 44. PageID #: 9
#: 1030

**EVA HOLSTON-COLE**                    :
6055 Fallen Timbers Lane
Maumee, Ohio 43537                      :


**JEFFERY D. HOWELL**                   :
6847 N. Fredericksburg Dr.
Sylvania, Ohio 43560                    :


**CYNTHIA P. JAKAB**                    :
9646 Belmont Circle
Whitehouse, Ohio 43571                  :


**ROBERT L. JOHNSON**                   :
1780 Linzden Pl.
Temperance, Michigan 48182             :


**KRIST M. KALLIL**                     :
5713 Flanders Rd.
Toledo, Ohio 43623                      :


**JOHN J. KLOSOWSKI**                   :
2314 Fawn Hollow Rd.
Toledo, Ohio 43617                      :


**LENORA LAMBRIGHT**                    :
2720 Hoehler Dr.
Toledo, OH 43606                        :


**DORA MARTINEZ**                       :
2108 Sheffield Pl.
Northwood, Ohio 43619                  :


**LEON McDANIEL**                       :
520 S. Monroe
Montpelier, Ohio 43543                 :


**HENRIETTA L. MEFFERD**                :
Co. Rd. V 2447
Liberty Ct, Ohio 43532                 :


**WILLIE R. MILLER**                    :
523 Hackett Rd.
Toledo, Ohio 43610                     :


**MARK S. MILLER**                      :
10971 Thompson Hwy

3

Case: 3.18-cv-00078-JZ Doc #: 1 Filed: 01/11/18 4 of 44. PageID #: 4

Blissfield, Michigan  49228                      :

**VASIL NEDESKI**                                :
4023 Monroe St.
Toledo, Ohio  43606                              :

**LEROY OLSON**                                  :
11700 County Road 6
Delta, Ohio  43515                               :

**AHMAD M. ORRA**                                :
9623 Bishopswood Ln.
Perrysburg, Ohio  43551                          :

**PAMELA R. PATTERSON**                          :
1030 Woodland Ave.
Toledo, Ohio  43607                              :

**JOHN P. PENROD**                               :
527 South Avenue
Toledo, Michigan  43609                          :

**RONALD PETERSON**                              :
9360 Saint Angela Way
Sylvania, Ohio  43560                            :

**DONALD REED**                                  :
3416 Angela Pl.
Toledo, Ohio  43609                              :

**THOMAS A. RICKMAN**                            :
1028 Patchen Rd.
Oregon, Ohio  43616                              :

**RANDY ROOKS**                                  :
947 Orchard Dr.
Rossford, Ohio  43460                            :

**STEPHEN J. SANFORD**                           :
1037 Feltis
Temperance, Michigan  48182                      :

**HILLARY E. SCOTT**                             :
1939 Mount Vernon
Toledo, Ohio  43607                              :

4

**STEVEN JAMES SEEGERT**       :
17330 LuLu
Petersburg, Michigan 49270       :

**DAVID RAYMOND STEFFES**       :
1602 Roman Drive
Monroe, Michigan 48162       :

**JEFFERY STRONG**       :
5580 Forest Green Dr.
Ottawa Hills, Ohio 43615       :

**WILLIAM J. SZYMANSKI**       :
4554 286th St.
Toledo, Ohio 43611       :

**LARRY TATUM**       :
2302 Secor
Toledo, Ohio 43606       :

**RONALD L. VANBUSKIRK**       :
4848 Marble Cliff Blvd.
Sylvania, Ohio 43560       :

**CAROLE WAWRZYNIAK**       :
6427 Julianna Lane
Whitehouse, Ohio 43571       :

**JOHN A. WISNIEWSKI**       :
8984 S.E. Hawks Nest Court
Hobe Sound, Florida 33455       :

**JERRI WISNIEWSKI**       :
8984 S.E. Hawks Nest Court
Hobe Sound, Florida 33455       :

**FREDERICK J. WOZNIAK JR.**       :
9020 Castlebury Dr.
Temperance, Michigan 48182       :

**PEGGY A. ZIMMERMAN**       :
1066 Fire Creek Ct.
Temperance, Michigan 48182       :

      :

         Plaintiffs,

5

:

    v.

:

**FCA US LLC**
c/o Chris Pardi, General Counsel      :
1000 Chrysler Drive
Auburn Hills, MI 48326      :
    Statutory agent:
    CT Corporation System
    4400 Easton Commons Way,
    Suite 125
    Columbus, OH 43219

and

**INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA**
c/o Dennis Williams, President
Solidarity House
8000 E. Jefferson Ave.
Detroit, MI 48214

and

**UNITED AUTOMOBILE, AEROSPACE
AND AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA, REGION 2B**
c/o Rich Rankin, Director
1691 Woodlands Dr.
Maumee, Ohio 43232

Defendants.

## INTRODUCTION

1.     Now come Plaintiffs, all individuals who were induced to "retire" from Chrysler

to work at nominally independent suppliers and fired when Chrysler unilaterally abandoned the

arrangement, and bring this action against FCA US LLC and their labor union, the United

6

Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW"), for breach of a collective bargaining agreement pursuant to the Labor Management Relations Act, 29 U.S.C. § 185, ("LMRA") and against their labor union, the UAW International Union, for violations of its duty of fair representation by accepting bribes to bargain away Plaintiffs' jobs, pursuant to Section 301 of the LMRA (codified at 29 U.S.C. § 185). In addition, Plaintiffs bring allegations of discrimination based upon age under Ohio law.

**PARTIES**

1.      Plaintiff Robert L. DeShetler Jr. is an individual residing in Holland, Lucas County, Ohio. Robert L. DeShetler Jr. is a citizen and resident of Michigan.

2.      Plaintiff Elizabeth S. Wesley is an individual residing in Temperance, Monroe County, Michigan. Elizabeth S. Wesley is a citizen and resident of Michigan.

3.      Plaintiff Cynthia Allen is an individual residing in Toledo, Lucas County, Ohio. Cynthia Allen is a citizen and resident of Ohio.

4.      Plaintiff Darian Banks is an individual residing in Scranton, Lackawanna County, Pennsylvania. Darian Banks is a citizen and resident of Pennsylvania.

5.      Plaintiff David P. Beakas is an individual residing in Waterville, Lucas County, Ohio. David P. Beakas is a citizen and resident of Ohio.

6.      Plaintiff Gregory Beaudoin is an individual residing in Toledo, Lucas County, Ohio. Gregory Beaudoin is a citizen and resident of Ohio.

7.      Plaintiff Robert Bedard is an individual residing in Waterville, Lucas County, Ohio. Robert Bedard is a citizen and resident of Ohio.

8.      Plaintiff Linda Burkhalter is an individual residing in Toledo, Lucas County, Ohio. Linda Burkhalter is a citizen and resident of Ohio.

9. Plaintiff Kenneth J. Burzynski is an individual residing in Sand Creek, Lenawee County, Michigan. Kenneth J. Burzynski is a citizen and resident of Michigan.

10. Plaintiff Joseph A. Cantwell is an individual residing in Northwood, Wood County, Ohio. Joseph A. Cantwell is a citizen and resident of Ohio.

11. Plaintiff Delores Coleman Carter is an individual residing in Waterville, Lucas County, Ohio. Delores Coleman Carter is a citizen and resident of Ohio.

12. Plaintiff Thomas Casper is an individual residing in Holland, Lucas County, Ohio. Thomas Casper is a citizen and resident of Ohio.

13. Plaintiff Michael J. Cole is an individual residing in Northwood, Wood County, Ohio. Michael J. Cole is a citizen and resident of Ohio.

14. Plaintiff Rita A. Cope is an individual residing in Toledo, Lucas County, Ohio. Rita A. Cope is a citizen and resident of Ohio.

15. Plaintiff Cynthia Cross is an individual residing in Toledo, Lucas County, Ohio. Cynthia Cross is a citizen and resident of Ohio.

16. Plaintiff John A. Dandaiz is an individual residing in Curtice, Lucas County, Ohio. John A. Dandaiz is a citizen and resident of Ohio.

17. Plaintiff James M. DeVol is an individual residing in Toledo, Lucas County, Ohio. James M. DeVol is a citizen and resident of Ohio.

18. Plaintiff Mary A. Flisnik is an individual residing in Toledo, Lucas County, Ohio. Mary A. Flisnik is a citizen and resident of Ohio.

19. Plaintiff James E. Groves is an individual residing in Hudson, Hillsdale County, Michigan. James E. Groves is a citizen and resident of Michigan.

Case: 3.18-cv-00078-JZ Doc #: 1 Filed: 01/11/18 9 of 44. PageID #: 9

20.     Plaintiff Pamela Heams is an individual residing in Lambertville, Monroe County, Michigan. Pamela Heams is a citizen and resident of Michigan.

21.     Plaintiff Edward Holey is an individual residing in Lambertville, Monroe County, Michigan. Edward Holey is a citizen and resident of Michigan.

22.     Plaintiff Eva Holston-Cole is an individual residing in Maumee, Lucas County, Ohio. Eva Holston-Cole is a citizen and resident of Ohio.

23.     Plaintiff Jeffery D. Howell is an individual residing in Sylvania, Lucas County, Ohio. Jeffery D. Howell is a citizen and resident of Ohio.

24.     Plaintiff Cynthia P. Jakab is an individual residing in Whitehouse, Lucas County, Ohio. Cynthia P. Jakab is a citizen and resident of Ohio.

25.     Plaintiff Robert L. Johnson is an individual residing in Temperance, Monroe County, Michigan. Robert L. Johnson is a citizen and resident of Michigan.

26.     Plaintiff Krist M. Kallil is an individual residing in Toledo, Lucas County, Ohio. Krist M. Kallil is a citizen and resident of Ohio.

27.     Plaintiff John J. Klosowski is an individual residing in Toledo, Lucas County, Ohio. John J. Klosowski is a citizen and resident of Ohio.

28.     Plaintiff Lenora Lambright is an individual residing in Toledo, Lucas County, Ohio. Lenora Lambright is a citizen and resident of Ohio.

29.     Plaintiff Dora Martinez is an individual residing in Northwood, Wood County, Ohio. Dora Martinez is a citizen and resident of Ohio.

30.     Plaintiff Leon McDaniel is an individual residing in Montpelier, Williams County, Ohio. Leon McDaniel is a citizen and resident of Ohio.

31.     Plaintiff Henrietta L. Mefferd is an individual residing in Liberty Ct., Henry County, Ohio. Henrietta L. Mefferd is a citizen and resident of Ohio.

32.     Plaintiff Willie R. Miller is an individual residing in Toledo, Lucas County, Ohio. Willie R. Miller is a citizen and resident of Ohio.

33.     Plaintiff Mark S. Miller is an individual residing in Blissfield, Lenawee County, Michigan. Mark S. Miller is a citizen and resident of Michigan.

34.     Plaintiff Vasil Nedeski is an individual residing in Toledo, Lucas County, Ohio. Vasil Nedeski is a citizen and resident of Ohio.

35.     Plaintiff LeRoy Olson is an individual residing in Delta, Fulton County, Ohio. LeRoy Olson is a citizen and resident of Ohio.

36.     Plaintiff Ahmad M. Orra is an individual residing in Perrysburg, Wood County, Ohio. Ahmad M. Orra is a citizen and resident of Ohio.

37.     Plaintiff Pamela R. Patterson is an individual residing in Toledo, Lucas County, Ohio. Pamela R. Patterson is a citizen and resident of Ohio.

38.     Plaintiff John P. Penrod is an individual residing in Toledo, Lucas County, Michigan. John P. Penrod is a citizen and resident of Michigan.

39.     Plaintiff Ronald Peterson is an individual residing in Sylvania, Lucas County, Ohio. Ronald Peterson is a citizen and resident of Ohio.

40.     Plaintiff Donald Reed is an individual residing in Toledo, Lucas County, Ohio. Donald Reed is a citizen and resident of Ohio.

41.     Plaintiff Thomas A. Rickman is an individual residing in Oregon, Lucas County, Ohio. Thomas A. Rickman is a citizen and resident of Ohio.

Case: 3:18-cv-00078-JZ  Doc #: 1  Filed: 01/11/18  11 of 44.  PageID #: 11

42.     Plaintiff Randy Rooks is an individual residing in Rossford, Wood County, Ohio. Randy Rooks is a citizen and resident of Ohio.

43.     Plaintiff Stephen J. Sanford is an individual residing in Temperance, Monroe County, Michigan. Stephen J. Sanford is a citizen and resident of Michigan.

44.     Plaintiff Hillary E. Scott is an individual residing in Toledo, Lucas County, Ohio. Hillary E. Scott is a citizen and resident of Ohio.

45.     Plaintiff Steven James Seegert is an individual residing in Petersburg, Monroe County, Michigan. Steven James Seegert is a citizen and resident of Michigan.

46.     Plaintiff David Raymond Steffes is an individual residing in Monroe, Monroe County, Michigan. David Raymond Steffes is a citizen and resident of Michigan.

47.     Plaintiff Jeffery Strong is an individual residing in Ottawa Hills, Lucas County, Ohio. Jeffery Strong is a citizen and resident of Ohio.

48.     Plaintiff William J. Szymanski is an individual residing in Toledo, Lucas County, Ohio. William J. Szymanski is a citizen and resident of Ohio.

49.     Plaintiff Larry Tatum is an individual residing in Toledo, Lucas County, Ohio. Larry Tatum is a citizen and resident of Ohio.

50.     Plaintiff Ronald L. VanBuskirk is an individual residing in Sylvania, Lucas County, Ohio. Ronald L. VanBuskirk is a citizen and resident of Ohio.

51.     Plaintiff Carole Wawrzyniak is an individual residing in Whitehouse, Lucas County, Ohio. Carole Wawrzyniak is a citizen and resident of Ohio.

52.     Plaintiff John A. Wisniewski is an individual residing in Hobe Sound, Martin County, Florida. John A. Wisniewski is a citizen and resident of Florida.

Case: 3:18-cv-00078-JZ   Doc #: 1   Filed: 01/11/18   12 of 44.   PageID #: 12

53.     Plaintiff Jerri Wisniewski is an individual residing in Hobe Sound, Martin County, Florida. Jerri Wisniewski is a citizen and resident of Florida.

54.     Plaintiff Frederick J. Wozniak Jr. is an individual residing in Temperance, Monroe County, Michigan. Frederick J. Wozniak Jr. is a citizen and resident of Michigan.

55.     Plaintiff Peggy A. Zimmerman is an individual residing in Temperance, Monroe County, Michigan. Peggy A. Zimmerman is a citizen and resident of Michigan.

56.     Defendant FCA US LLC is a foreign limited liability company organized under the laws of the State of Delaware.

57.     Defendant International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW International Union") is one of the largest and most diverse labor organizations in the United States, representing over 400,000 active workers and 580,000 retirees.

58.     Defendant United Automobile, Aerospace and Agricultural Implement Workers of America, Region 2B ("UAW Region 2B") is a labor organization and is a constituent part of the UAW International Union responsible for overseeing and supporting UAW locals in Ohio and Indiana.

59.     Defendants UAW International Union and UAW Region 2B will be referenced as the UAW Defendants.

**JURISDICTION AND VENUE**

60.     This action arises from Plaintiffs' employment at, and subsequent termination from, a substantial automobile assembly plant in Toledo, Ohio (the "Jeep Complex") operated by Defendant FCA US LLC.  Although employment numbers varied over time, FCA US LLC employs, and the UAW Defendants represent, thousands of workers at the Jeep Complex.

12

61.     This Court possesses personal jurisdiction over Defendant FCA US LLC because this action arises from its regular transaction of business in this state through the operation of the Jeep Complex.

62.     As set forth below, the UAW Defendants represent workers at the Jeep Complex. This Court possesses jurisdiction over each of the UAW Defendants pursuant to the LMRA at 29 U.S.C. § 185(c)(2).

63.     This action arises from a series of employment and collective bargaining relationships centered at the Jeep Complex in Toledo, Lucas County, Ohio.  Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391(b)(1) as a substantial part of the events or omissions giving rise to the claim occurred here.

64.     This Court has subject matter jurisdiction over Plaintiffs' LMRA claims pursuant to 28 U.S.C. § 1331 because they arise under the laws of the United States.  *See*: 29 U.S.C. § 185.  This Court has supplemental jurisdiction with respect to Plaintiffs' state-law discrimination claims pursuant to 28 U.S.C. § 1367 as they arise from the same case and controversy.

## COMMON FACTUAL ALLEGATIONS

65.     Under various corporate entities, Jeep vehicles and related components have been manufactured at the Jeep Complex, a substantial facility in northern Toledo, since the 1940's.

66.     Over the years, a variety of different Jeep vehicles and components have been manufactured at the Jeep Complex under the auspices of a variety of different corporate structures and contractor/supplier arrangements.

67.     Since the late 1980's, the Jeep brand has been part of the Chrysler family of brands, one of the "Big Three" American automobile manufacturers.  Over the years, Chrysler

13

Case: 3:18-cv-00078-JZ   Doc #: 1   Filed: 01/11/18   14 of 44.   PageID #: 14

has undergone a series of mergers, partnerships, corporate structures and a Chapter 11

Bankruptcy reorganization in 2008-2009.[1]

68.     In 2009, Chrysler emerged from bankruptcy protection with the UAW pension

fund, Fiat S.p.A. (an Italian automaker) and the United States and Canadian government as

principal owners.  Since 2009, Fiat has gradually acquired the other parties' shares and the

Chrysler family of brands is now a wholly owned subsidiary of Fiat: Defendant FCA[2] US LLC.

69.     The UAW, one of the largest labor organizations in the United States, has

historically represented hourly Chrysler workers, along with hourly workers in the automobile

industry in the United States.

70.     The UAW is a hierarchical organization governed by the Constitution of the

UAW International Union.

71.     UAW Members form Local Unions, which bargain with one or a handful of

employers or worksites.  UAW locals are grouped into approximately nine regions, which are

intended to oversee and support local organizing and bargaining activities.  In turn, UAW

International Union oversees and supports all UAW Regions and Locals.

72.     Hourly workers at the Jeep complex are, and have historically been, represented

by United Automobile, Aerospace and Agricultural Implement Workers of America, Local 12

("UAW Local 12").

73.     UAW Local 12 represents multiple UAW bargaining units in the Toledo, Ohio

area.  Relevant to this case, UAW Local 12 represents hourly workers at the paint shop, which

(among other things) painted new Jeep Wrangler vehicles assembled at the nearby Toledo South

---

[1] Unless otherwise specified, "Chrysler" as used herein shall mean the sequence of corporations that manufactured and marketed Chrysler automobiles, now FCA US LLC.

[2] "FCA" is an abbreviation for "Fiat Chrysler Automotive."

Case: 3:18-cv-00078-JZ Doc #: 1 Filed: 01/11/18 15 of 44. PageID #: 15

Assembly Plant. As set forth below, the "Wrangler Paint Shop" was operated by a number of corporate entities throughout the relevant time period.

74. In the U.S. automotive industry, collective bargaining agreements between the UAW and the "Big Three" manufacturers (General Motors, Ford and Chrysler) are negotiated in two parts.

75. Approximately every four years, the UAW International Union bargains for a series of master agreements with each of the Big Three automakers.

76. With respect to Chrysler, the UAW International Union bargains for two separate master agreements: one covering Engineering, Office and Clerical workers and one covering Production Maintenance and Parts workers. These agreements cover issues such as changes in wage rates, seniority, grievance processes, attendance polices, hours of work, procedures for transferring from one plant to another, etc. Of relevance to this case are:

    a. The 2015 Production Maintenance and Parts agreement, attached hereto as Exhibit 1 (except for minor modifications in 2007 and 2011, this plan was in effect for the entire time period);

    b. The 2011 Pension Agreement, attached hereto as Exhibit 2;

    c. The 2009 Jeep Corporation Retirement Income Plan, attached hereto as Exhibit 3 (except for minor modifications in 2009, this plan was in effect during the entire until approximately 2011).

77. The UAW International Union and Chrysler have also, from time to time, bargained for various letters, memoranda and supplemental agreements. In addition, the UAW International Union and Chrysler have bargained for a separate pension agreement covering all Chrysler employees represented by the UAW.

Case 1:19-cv-06770-EK-MMH   Document 34-8   Filed 08/21/20   Page 54 of 82 PageID
Case: 3:18-cv-00078-JZ   Doc #: 1   Filed: 01/11/18   16 of 44.   PageID #: 16
#: 1043

78.     The master agreements described in the preceding paragraphs contemplate additional agreements between UAW Local Unions and Chrysler management concerning specific bargaining units, including units at specific Chrysler facilities.  Some issues, such as the specific order of applicable seniority lists, are explicitly left to local negotiation.  In addition,  the UAW Local Unions are permitted limited discretion to bargain with local Chrysler management about particular issues governing a plant or bargaining unit, provided these agreements are consistent with the master agreements bargained for between Chrysler and the UAW International Union.

**Chrysler induces Plaintiffs to "retire" to help the
company launch a new product at the Jeep Complex**

79.     In approximately 2004-2006, each Plaintiff was a long-serving hourly Chrysler employee and UAW member who had accumulated significant seniority within his or her respective bargaining unit.

80.     Each Plaintiff was a Chrysler employee in the 2004-2006 timeframe.  Some had been working at the Jeep Complex before Chrysler took over management of the plant from American Motors in the 1980's.

81.     In 1998, Chrysler, then an independent company, merged with the German automaker Daimler-Benz AG and became a division of DaimlerChrysler.

82.     In the early 2000's, Chrysler constructed a new assembly line in the Jeep Complex to manufacture the 2007 Jeep Wrangler, a significant redesign of the vehicle that began its life as a general-purpose military vehicle prior to the Second World War.

83.     Unlike traditional automobile assembly plants, the new assembly line tested a new "collaborative" structure in which third-party suppliers would be co-located and would perform

16

Case: 3:18-cv-00078-JZ   Doc #: 1   Filed: 01/11/18   17 of 44.   PageID #: 17

portions of the manufacturing and assembly process traditionally undertaken by Chrysler hourly employees (the "Toledo Supplier Park").

84.     In order to "launch" the new assembly line, Chrysler and its suppliers needed a cadre of experienced autoworkers to ensure that the smooth operations of the new plant.

85.     However, Chrysler and its suppliers had difficulty recruiting experienced workers willing to leave established plants at which they had acquired seniority for the Toledo Supplier Park, due to relative uncertainty surrounding both the new product and the new management structure.

86.     Chrysler and the UAW actively recruited senior UAW members already employed by Chrysler at the Jeep Complex in order to staff the Toledo Supplier Park by encouraging them to retire from Chrysler, begin collecting their pensions and begin working at the Toledo Supplier Park through the nominally independent third-party suppliers.

87.     Each Plaintiff retired from Chrysler in or around 2006 and eventually went to work in the "Wrangler Paint Shop," a part of the Toledo Supplier Park that painted Jeep Wranglers as they came off the production line.

88.     Both Chrysler managers and UAW International Union executives represented to Plaintiffs that, if they retired from Chrysler and went to work at the Toledo Supplier Park they could continue to work indefinitely and that there was no "expiration date" to their employment. Chrysler managers and UAW International Union executives made similar representations to the leadership of UAW Local 12.

89.     Plaintiffs were in their late forties and early fifties in 2006 and intended to work for another decade or more.  Plaintiffs relied on the representations described in the previous

Case 1:19-cv-06770-EK-MMH Document 34-8 Filed 08/21/20 Page 56 of 82 PageID
#: 1045
Case: 3:18-cv-00078-JZ Doc #: 1 Filed: 01/11/18 18 of 44. PageID #: 18

paragraph that their long-term employment was secure when they decided to retire from Chrysler earlier than they otherwise planned.

90.     As originally planned, Hayden Prism was the supplier identified to operate the paint shop for the new Wrangler line ("the Wrangler Paint Shop").

91.     However, Hayden pulled out of the project at the last minute due to bankruptcy in 2006. At that time, while the plant was still preparing to start production, Chrysler took direct control of the Wrangler Paint Shop.

92.     Following Hayden's bankruptcy, Chrysler engaged Spherion, a national staffing agency, to operate, mostly off site, certain payroll and human resources functions for hourly employees in the Wrangler Paint Shop. However, Chrysler employed all managers in the shop. Chrysler made all substantive decisions about production and staffing.

93.     Upon information and belief, during 2006 and 2007, Chrysler worked on finding a replacement for Hayden. In 2007, Magna Styer agreed to take over the Wrangler Paint Shop.

94.     When the so-called Toledo Supplier Park began production: the KUKA group, a German company, was responsible for building the bodies for the Wrangler; Hyundai owned Mobis-Ohio Module Manufacturing Company (OMMC) assembled the vehicle's chassis; and Magna Styer ran the paint shop. All of these entities and respective processes were conducted at the direction of, and coordinated by, Chrysler at all relevant time periods.

95.     From 2008, hourly workers in the Wrangler Paint Shop were covered by a collective bargaining agreement between the UAW International Union, UAW Local 12 and a Magna Styer, attached hereto as Exhibit 4.

18

96.     Between 2006 and 2011, various other corporate entities undertook Magna Styer's duties as successors.  In approximate chronological order, these nominal employers consisted of: Hayden, Durr; Spherion; Magna Styer; and Gonzalez.

97.     At all times however, Chrysler operated the Wrangler Paint Shop as part of larger assembly line for the company's Jeep Wrangler vehicles.  This assembly line, in turn, is and was a part of a larger Jeep Complex, owned and operated by Chrysler.  That is, the Wrangler Paint Shop was at all times an integrated part of a Chrysler plant, was located on Chrysler property and exclusively worked on Chrysler vehicles.

98.     The central arrangement in the Toledo Supplier Park, having suppliers perform central assembly functions on Chrysler's premises, is specifically prohibited and/or severely curtailed by the various master agreements in place between the UAW and Chrysler.  For example, the UAW is appointed the exclusive bargaining representative for hourly workers in Chrysler plants and independent contractors are broadly prohibited from displacing UAW member to undertake traditional assembly work.

99.     In order to operate the Toledo Supplier Park, including the Wrangler Paint Shop, with employees of suppliers and other entities, Chrysler needed the agreement and cooperation of the UAW International and Local unions.

100.    Chrysler management and leadership of the UAW International Union repeatedly assured both the leadership of UAW Local 12 and individual employees such as Plaintiffs, that they would be "taken care of" if they agreed to retire from Chrysler and work in the Wrangler Paint Shop, notwithstanding the unprecedented management structure and that any future significant changes to Plaintiffs' employment conditions would only occur after additional collective bargaining between the UAW and Chrysler.

19

Case 1:19-cv-06770-EK-MMH   Document 34-8   Filed 08/21/20   Page 58 of 82 PageID
Case: 3:18-cv-00078-JZ Doc #: 1 Filed: 01/11/18 20 of 44. PageID #: 20 PageID
#: 1047

101.    Traditionally, any bargaining concerning the status of UAW members working in a Chrysler plant would involve the UAW International Union, the UAW Local Union (in this case Local 12) and Chrysler management.  In 2006, neither Chrysler nor the UAW International Union indicated to Plaintiffs or UAW Local 12 leadership that they intended to deviate from this longstanding pattern.

102.    During this period, the UAW International Union and UAW Local 12 continued to represent Plaintiffs, as well as all hourly employees at Toledo Supplier Park generally, and the Wrangler Paint Shop in particular.

**Chrysler takes direct control of Wrangler Paint Shop
and Terminates Plaintiffs**

103.    Between the opening of the Toledo Supplier Park and early 2011, Chrysler had undergone a series of significant corporate transactions, including the end of its partnership with Daimler-Benz, the Chapter 11 Bankruptcy reorganization and purchase by Fiat.

104.     By early 2011, the business relationship concerning the Wrangler Paint Shop between Magna Styer and Chrysler had deteriorated.  Generally, Magna Styer no longer desired to operate the Wrangler Paint Shop and Chrysler desired to exercise more direct control over the management of the plant.

105.    Effective March 1, 2011, and pursuant to an agreement with Magna Styer, Chrysler (then "Chrysler LLC," a division of Fiat) took over direct management of the Wrangler Paint Shop.

106.    Pursuant to a letter agreement (attached hereto as Exhibit 5) between Chrysler Human Resources Director P.G. Shagena and UAW Region 2B Director Kenneth Lortz, Chrysler "carried over" the conditions of Exhibit 4 after it took over management of the Wrangler Paint Shop.

20

Case 1:19-cv-06770-EK-MMH  Document 34-8  Filed 08/21/20  Page 59 of 82 PageID
Case: 3:18-cv-00078-JZ  Doc #: 1  Filed: 01/11/18  21 of 44.  PageID #: 21 PageID
#: 1048

107.    Pursuant to Section 3.4 of Exhibit 4, the collective bargaining agreement between Chrysler and Magna Styer could be assigned to other successor entities.

108.    On behalf of UAW Region 2B, Lortz also agreed in Exhibit 3 to permit Chrysler to "assign" represented employees, including Plaintiffs, to "a third party to be managed by Chrysler."

109.    After March 2011, Chrysler exercised direct control of the Wrangler Paint Shop. Chrysler directly employed all managers in the shop.  Chrysler made all substantive decisions about production and staffing.

110.    However, Chrysler "assigned" Plaintiffs and other hourly workers at the Wrangler Paint Shop to the payroll of Gonzalez Contract Services, LLC ("Gonzalez").

111.    Between early 2011 and middle of 2012, with respect to the Wrangler Paint Shop, Gonzalez performed almost no management or business function besides serving as the nominal employer of the hourly workers inherited from Magna Styer, including Plaintiffs.

112.    Plaintiffs continued to work at a Chrysler facility, reporting exclusively to Chrysler management, making only Chrysler vehicles.  As outlined above, this arrangement was contrary to various master agreements in place between the UAW and Chrysler, which limited or strictly curtailed the use of contract workers in Chrysler facilities.

113.    The UAW International Union agreed to permit the unconventional arrangement to continue, despite provisions in the applicable master agreements to the contrary.  During this period, UAW International Union leadership again repeatedly reassured Plaintiffs and the leadership of UAW Local 12 that the arrangement would have no adverse affect on the UAW members working in the Wrangler Paint Shop.

21

114.     At some point in late 2011 or early 2012, Chrysler and the UAW International Union decided to end the nominal supplier/contractor agreement that had prevailed in the Wrangler Paint Shop since it opened.  The reasons for and timing of this decision were obscure to both Plaintiffs and the leadership of UAW Local 12.  However, the primary goal of both Chrysler and the UAW International Union appeared to involve "insourcing" the Wrangler Paint Shop such that all employees would be traditional employees of Chrysler.

115.     This "insourcing" took the form of Chrysler purporting to "terminate" Gonzalez's contract to perform the nominal payroll and human resources functions with respect to the Wrangler Paint Shop.  As Chrysler expected and intended, this decision resulted directly in Gonzalez purporting to "lay off" all of the UAW employees in the Wrangler Paint Shop.

116.     Because of the unconventional nature of the of the arrangement governing the Wrangler Paint Shop from the beginning, Chrysler's decision to assert direct control of the plant created a need for collective bargaining concerning the status of UAW employees in the Wrangler Paint Shop.

117.     The bargaining between the UAW International Union and Chrysler in 2012 concerning the status of the employees of the Wrangler Paint Shop was marred by several procedural and substantive irregularities.

118.     First, a small number of UAW International Union executives, led by then Vice President of the UAW International Union's Chrysler Division General Holiefield, took over bargaining concerning the status of employees at Wrangler Paint Shop.  This group included, among others, Holiefield's aid James Hardy and UAW International Union Region 2B representative Jim Waingrow.

22

119.    At the time, Holiefield was the Vice President of the UAW International Union's Chrysler division.  As such, Holiefield was the top executive responsible for representing the UAW International Union in collective bargaining with Chrysler.  The other UAW International Union employees involved in bargaining over the status of the Wrangler Paint Shop were subordinate to Holiefield.

120.    In 2012, Holiefield was a long-serving and powerful executive of the UAW International Union who exerted extensive control over the national collective bargaining relationship between Chrysler and the UAW through his official authority, personal relationships and loyalty of his subordinates, many of whom Holiefield hired.

121.    Holiefield and his team from the UAW International Union systematically locked the employees of Wrangler Paint Shop and the leadership of UAW Local Union 12 out of the bargaining with Chrysler over the status of the Union's membership in the Wrangler Paint Shop.

122.    Holiefield's and UAW International Union's decision to exclude UAW Local Union 12 violates, among other provisions, Article 19, Section 3 of the UAW International Union's Constitution which provides:

> No Local Union Officer, International Officer or International Representative shall have the authority to negotiate the terms of a contract or any supplement thereof with any employer without first obtaining the approval of the Local Union. ***

Neither Holiefield nor the UAW International Union obtained approval form UAW Local 12 to undertake negotiations with Chrysler on behalf of workers in the Wrangler Paint Shop.

123.    Moreover, UAW Local Union 12's exclusion from bargaining with Chrysler is contrary to a long and well-established practice that the UAW Local and International Unions both participate in similar bargaining.

23

Case 1:19-cv-06770-EK-MMH Document 34-8 Filed 08/21/20 Page 62 of 82 PageID
Case: 3:18-cv-00078-JZ Doc #: 1 Filed: 01/11/18 24 of 44. PageID #: 24 PageID
#: 1051

124.    Second, Holiefield and his team from the UAW International Union accepted, apparently without objection or dispute, Chrysler's position that the UAW members working in the Wrangler Paint Shop in late 2012 were solely employed by Gonzalez, had no particular relationship to Chrysler or the applicable master agreements and were functionally equivalent to new hires from the street.

125.    Holiefield and his team inexplicably accepted Chrysler's position on this point, despite:

   a. a long course of dealing between Chrysler and the UAW International Union concerning the status of its membership working in the Wrangler Paint Shop;

   b. Chrysler's assumption of an assignment of Magna Styer's role under the local collective bargaining agreement pursuant to Section 3.4 of Exhibit 4;

   c. the UAW International Union's repeated waivers of provisions of the applicable master agreements, which limited or strictly curtailed the used of contract workers in Chrysler facilities, allegedly in exchange for assurances from Chrysler that these individuals would be treated as Chrysler employees;

   d. Plaintiffs' treatment, like all of the employees in the Wrangler Paint Shop, as Chrysler employees, with mirror-image wages and benefits, including a Chrysler employee number that remained consistent throughout the relevant time period until the present;  and

   e. the repeated assurances given by the UAW International Union to Plaintiffs and UAW Local 12 that the status of these employees would be subject to bargaining between the UAW International Union, UAW Local 12 and Chrysler.

Case 1:19-cv-06770-EK-MMH Document 34-8 Filed 08/21/20 Page 63 of 82 PageID
Case: 3:18-cv-00078-JZ Doc #: 1 Filed: 01/11/18 25 of 44. PageID #: 25
#: 1052

126.    Third, both Chrysler and the UAW International Union were inexplicably insistent on firing Plaintiffs, who had "retired" from Chrysler in 2006 and transferred to the Wrangler Paint Shop in order to offer the experience and expertise necessary to launch the production line.

127.    UAW International Union officials from Holiefield's team who were in communication with Plaintiffs or the leadership of UAW Local 12, including James Hardy and Jim Waingrow, offered shifting and illogical explanations for the decision to terminate Plaintiffs, along with all other employees who had "retired" from Chrysler in 2006 and transferred to the Wrangler Paint Shop.

128.    At various times, the UAW International Union and Chrysler management explained the need to terminate Plaintiffs by indicating that the applicable master agreements prohibited individuals who had "retired" from Chrysler and begun collecting a pension from returning to work for the company.

129.    Indeed, Chrysler spokeswomen Jodi Tinson offered this explanation in a November 29, 2012 article in the Toledo Blade: "By virtue of their retirement, they cannot return to employment with the company."

130.    Ms. Tinson's public pronouncements on this topic were consistent with the position communicated by both Chrysler and the UAW International Union during most discussions with Plaintiffs and the UAW Local 12 leadership during 2011 and 2012.

131.    However, the plain language of the master pension agreements explicitly permits UAW retirees to return to work for the company and provides an extensive framework for how such a situation would be handled:

Case: 3:18-cv-00078-JZ  Doc #: 1  Filed: 01/11/18  26 of 44.  PageID #: 26

a. With respect to the 2011 Pension Agreement in place at the time that Chrysler took direct control of the Wrangler Paint Shop (Exhibit 2), see, *inter alia:* Section 1(C); Section 5; Section 7(D); Section 11(Q); and Letter Agreement dated October 14, 1996.

b. With respect to the Jeep Corporation-UAW Retirement Income Plan in place at the time that Plaintiffs "retired" from Chrysler and began collecting pensions (Exhibit 3), see, *inter alia:* Article I, Section 10; Article IV, Section V.

132. Indeed, no local or master agreement in effect between the UAW International Union, UAW Local 12 and Chrysler prohibited Plaintiffs from continuing to work in the Wrangler Paint Shop after Chrysler ended the nominal supplier/contractor arrangement in place with Gonzalez, as was represented to Plaintiffs by both the UAW Defendants and Chrysler.

133. As set forth above, the applicable master agreements provide a framework for just such an instance.

134. Individual Plaintiffs, as well as the leadership of UAW Local 12, repeatedly brought the plain language of the applicable pension agreements to the attention of the officials at the UAW International Union who had unilaterally assumed authority for negotiations with Chrysler, including James Hardy and Jim Waingrow, and excluded UAW Local 12 officials from participating. In response, the officials of the UAW International Union offered conflicting and contradictory explanations for why the applicable master agreements required Plaintiffs' termination. Eventually, the UAW International Union stopped responding to the inquiries.

135. At one point, UAW Local 12 leaders arranged a single meeting between themselves, a group of Plaintiffs, the UAW International Union officials and Chrysler human resources executive Lisa Rhinehart Klosh. At that meeting, Plaintiffs, including Plaintiff

26

Wawzyniak, and UAW Local 12 leaders presented the plain language of the applicable bargaining agreements permitting Plaintiffs to continue to work in the Wrangler Paint Shop.

136. At that meeting, Klosh seemed receptive to the presentation by Plaintiffs and the leadership of UAW Local 12 and indicated that Plaintiffs should continue to be employed according to the terms of the applicable master agreements.

137. Shortly after this meeting, UAW International Union official Tim Bressler told members of the leadership of UAW Local 12 that Holiefield specifically desired that Chrysler's takeover of the Wrangler Paint Shop proceed as an "insourcing" of new employees and that this form of transaction required that Plaintiffs be terminated. Bressler made it clear that Holiefield believed that this path was the best way forward and that no official at the UAW International Union and/or UAW Region 2B would question Holiefield's judgment on this point for fear of his or her own position.

138. Bressler made the representations described in the preceding paragraph for the purposes of discouraging Plaintiffs and the leadership of UAW Local Union 12 from continuing to resist the proposed structure of Chrysler's takeover of the Wrangler Paint Shop.

139. As set forth above, in the fall of 2012, Chrysler executives and Holiefield's team from the UAW International Union engaged in closed-door negotiations in Detroit, Michigan, excluding any of Plaintiffs or members of UAW Local 12, concerning the status of workers at the Wrangler Paint Shop following Chrysler's takeover.

140. On or about November 14, 2012, Chrysler and the UAW International Union prepared a memorandum titled "Wrangler Paint Shop Understandings," attached hereto as Exhibit 6, purporting to memorialize an agreement between Chrysler and the UAW International Union.

Case: 3.18-cv-00078-JZ Doc #: 1 Filed: 01/11/18 28 of 44. PageID #: 28

141.    Pursuant to Exhibit 6, Chrysler would "hire" most UAW members working in the Wrangler Paint Shop.  These workers would be stripped of their existing seniority date and arbitrarily assigned an entry date of November 30, 2012, or the date that Chrysler purported to officially take over direct management of the Wrangler Paint Shop.

142.    In most cases, wages of UAW members working in the Wrangler Paint Shop would be frozen, regardless of seniority in the plant.  As a result, these workers would be deprived of periodic raises that they would otherwise have received pursuant to either the existing Local Agreement (Exhibit 4) or starting pay pursuant to the then-prevailing master agreement with Chrysler (Exhibit 1).  In addition, workers remaining in the Wrangler Paint Shop would be deprived of certain pension or other benefits to which they would have otherwise been entitled based on their seniority at that plant.

143.    Pursuant to Exhibit 6, Plaintiffs, individuals who "retired" from Chrysler in order to work at the Wrangler Paint Shop, would be terminated effective November 30, 2012.

144.    Pursuant to Exhibit 6, Plaintiffs would receive a severance payment and would be required to execute a release of potential claims against Chrysler, all UAW entities and Gonzalez.

145.    Exhibit 6 is signed by Holiefield and UAW Region 2B representative Ken Lortz on behalf to the UAW International Union.

146.    Exhibit 6 is initialed by subordinates of Chrysler Vice President of Employee Relations Alphons Iacobelli on behalf of the company.

147.    Holiefield and the Chrysler executives identified in the previous paragraph reached the terms of the agreement memorialized in Exhibit 6.

148.     No member of Holiefield's team from the UAW International Union approached Plaintiffs or the leadership of UAW Local 12 about any concessions, however drastic, which would preserve their jobs in the Wrangler Paint Shop.  Instead, Holiefield and his team simply seemed intent on pushing through an agreement that resulted in Plaintiffs' termination.

149.     On approximately November 18, 2012, the UAW International Union presented a collective bargaining agreement reflecting the substantive terms of Exhibit 6 to the members of UAW Local 12 for ratification.

150.     The November 18 meeting was held less than four days after the agreement reflected in Exhibit 6 was reached and only 12 days before Plaintiffs were to be terminated.

151.     At the November 18 meeting, for the first time, Jim Waingrow presented the proposed agreement on behalf of the UAW International Union to employees of Wrangler Paint Shop.  Waingrow indicated that the proposal was the result of complex negotiations conducted in good faith between Chrysler and the UAW International Union and, in general, "was the best that could be accomplished under difficult circumstances."

152.     Moreover, Waingrow presented the proposed agreement as a take-it-or-leave-it offer.  Waingrow made it clear that the UAW International Union was not willing to engage in further bargaining over the issue.  Waingrow also emphasized the position of the UAW International Union and Chrysler that, as the result of the years-long course of bargaining between them described above, all UAW members working in the Wrangler Paint Shop were solely employed by Gonzalez, had no particular relationship to Chrysler or the applicable master agreements and, with respect to Chrysler, were functionally equivalent to new hires from the street.

153. As set forth above, Waingrow's statement regarding the status of UAW members working in the paint shop is neither accurate nor complete. Both Chrysler and the UAW International Union repeatedly reassured Plaintiffs and the leadership of UAW Local 12 that Plaintiffs would be fairly treated as a result of the unconventional arrangements in the Supplier Park. Moreover, as set forth above, Chrysler and the UAW International Union had repeatedly negotiated "waivers" of provisions of the relevant master agreements to permit the arrangement.

154. Waingrow further indicated that, if the UAW members working in the Wrangler Paint Shop failed to approve a bargaining agreement memorializing Exhibit 6 at the November 18 meeting, Chrysler would likely terminate substantially all of these employees in the short term.

155. As a result, the UAW members affected by Exhibit 6, including Plaintiffs, were given only a matter of hours to consider its terms and a very limited opportunity to ask questions of the UAW International Union officials who negotiated the terms of Exhibit 6.

156. In short, Waingrow and the UAW International Union deliberately staged the November 18 meeting to exert the maximum pressure on UAW members working in the Wrangler Paint Shop to approve Exhibit 6 with a minimum amount of time for consideration or scrutiny of the negotiations leading to the proposal.

157. At the November 18 meeting, a majority of UAW members working in the Wrangler Paint Shop approved a bargaining agreement memorializing Exhibit 6.

158. Upon information and belief, the majority of UAW members working in the Wrangler Paint Shop who voted in favor of approving the proposed agreement at the November 18 meeting were individuals who would retain their positions, or were friends or relatives of

30

individuals who would retain their positions, and voted in favor of the proposed agreement out of fear that they would be terminated in the near term if the proposal was not ratified.

159.    Pursuant to the terms of Exhibit 6, Plaintiffs were terminated on November 30, 2012.

160.    Pursuant to the terms of Exhibit 6, Plaintiffs received a severance payment at approximately three months they were terminated.

161.    In order to receive a severance payment, the UAW International Union and Chrysler required each Plaintiff to execute a release of claims against the UAW, Chrysler and others.

162.    Plaintiffs executed a release.  Each Plaintiff did so upon the representations of the UAW International Union, who were bound by a fiduciary duty of fair representation, that:

   a.   The UAW International Union, bound by a fiduciary duty of fair representation, had engaged in good-faith negotiations with Chrysler concerning the status of employees in the Wrangler Paint Shop;

   b.   In the judgment of the UAW International Union, the agreement evidenced by Exhibit 6 was "the best that could be accomplished under a difficult circumstance" and was, on balance, in the best interest of the UAW union as a whole, as well as the UAW members working in the Wrangler Paint Shop;

   c.   The UAW International Union would not engage in any further bargaining with Chrysler on Plaintiffs' behalf and Plaintiffs would be laid off anyway, regardless of whether they signed the release; and

   d.   The UAW International Union had the right to bargain with Chrysler, while locking the affected employees and local union out of the bargaining.

31

Case 1:19-cv-06770-EK-MMH   Document 34-8   Filed 08/21/20   Page 70 of 82 PageID
Case: 3:18-cv-00078-JZ   Doc #: 1   Filed: 01/11/18   32 of 44.   PageID #: 92 PageID
#: 1059

163.     Plaintiffs, individually and collectively, attempted to utilize administrative or internal paths to challenge their terminations, including the grievance procedure established by the applicable master and local bargaining agreements between Chrysler and the UAW, as well as an internal appellate procedure established by the UAW International Union Constitution.

164.     Like many grievance procedures established by collective bargaining agreements, both the master and local bargaining agreements involve an escalating series of "steps." Generally, the decision to process grievances at early steps involved UAW stewards working in individual plants and the relevant local union.  As the grievance escalates through the "steps," discretion to process and prosecute any grievance shifts to the UAW International Union.

165.     Pursuant to the applicable master agreements, any decision to process a grievance to an impartial Appeal Board must be made by the UAW International Union.  Any resolution of a grievance prior to this stage requires Chrysler's voluntary agreement.

166.     With respect to Plaintiffs, at the early stages of the grievance process, Chrysler simply denied the claims.

167.     The UAW International Union, which controlled the later stages of the grievance process, refused to process any grievance concerning Plaintiffs' termination once it escalated beyond the early stages of the process where local shop stewards and the local union were responsible for processing grievances.

168.     At the time, the UAW International Union cited the agreement between itself and Chrysler contained in Exhibit 6 as its basis for refusing to process any grievance concerning Plaintiffs' termination.  That is, the UAW International Union purported to exercise its judgment that any such grievance lacked merit because Chrysler's termination of Plaintiffs was consistent with the Exhibit 6.

Case 1:19-cv-06770-EK-MMH Document 34-8 Filed 08/21/20 Page 71 of 82 PageID
Case: 3:18-cv-00078-JZ Doc #: 1 Filed: 01/11/18 33 of 44. PageID #: 33 PageID
#: 1060

169.    Jeff Weills and Richard Sheets, who were local officers of the UAW shop committee, prosecuted an internal appeal of, among other issues, Plaintiffs' termination pursuant to procedures established by the UAW International Union Constitution.  This appeal timely advanced through all stages of the UAW appellate process, including the Public Review Board, an internal UAW body formed "for the purpose of insuring a continuation of the high moral and ethical standards in the administrative and operative practices of the International Union and its subordinate bodies, and to further strengthen the democratic processes and appeal procedures within the Union as they affect the rights and privileges of individual members and subordinate bodies."  *See*: UAW International Union Constitution Article 23, § 1.

170.    The UAW International Union rejected Weills' and Sheets' appeal at all stages, choosing to credit the version of events presented by Holiefield's team from the UAW International Union Chrysler Department: generally, that they negotiated in good faith, reached the best possible deal under the circumstances and had the authority to lock the UAW Local 12 out of negotiations.  In general, the UAW International Union, at all levels of the appellate process, deferred to the judgment of Holiefield's team from the UAW International Union Chrysler Department.

171.    During the course of the UAW internal appellate procedure, the officials of the UAW International Union involved in the November 2012 bargaining described above abandoned all pretext that provisions of any bargaining agreement prohibited Plaintiffs from continuing to work in the Wrangler Paint Shop due to their status as Chrysler retirees.  Instead, these officials now claimed that they attempted to negotiate for Plaintiffs to remain employed in Wrangler Paint Shop, but Chrysler steadfastly and apparently irrationally refused to continue to employ Plaintiffs under any circumstances.

33

172.    Plaintiffs were unable to obtain any relief concerning their termination, despite exhausting all available remedies available under the applicable collective bargaining agreements and the UAW's internal procedures.

### Federal indictments reveal that UAW International Union executives accepted bribes from Chrysler executives and prospective employees

173.    General Holiefield died in March 2015.

174.    On July 26, 2017, a federal investigation into the Chrysler Department of the UAW International Union became public knowledge when a felony indictment was unsealed in the Eastern District of Michigan against Alphons Iacobelli and Monica Morgan, as well as criminal charges by information against Jerome Durden.

175.    As set forth above, Iacobelli was Chrysler's Vice President of Employee Relations during the fall 2012 negotiations concerning the status of the UAW members in the Wrangler Paint Shop.

176.    Morgan was Holiefield's girlfriend, and later wife, prior to Holiefield's death.

177.    Durden was an accountant and subordinate of Iacobelli at Chrysler.

178.    In general, the July 2017 indictment and surrounding press coverage revealed that Iacobelli diverted millions of dollars from Chrysler from a joint UAW-Chrysler National Training Center to the individual pockets Holiefield, his family and close associates.

179.    Many of these funds were diverted though sham businesses operated by Morgan.

180.    Among other things, Iacobelli caused Chrysler to pay for at least $1.2 million of personal travel, designer cloths, furniture and jewelry.  In addition, Iacobelli caused Chrysler funds to be diverted from the National Training Center to pay off Holiefield's and Morgan's $262,219 personal mortgage.

181.    Such payments violate, among other laws, the NLRA at 29 U.S.C. § 186.

34

182. As noted above, in 2012, Holiefield was the top UAW International Union official responsible for managing a national collective bargaining relationship with Chrysler involving hundreds of thousands of UAW members.

183. Similarly, in 2012, Iacobelli was the top-ranking Chrysler executive responsible for bargaining with the UAW.

184. Iacobelli caused illegal payments of Chrysler funds to be made to Holiefield and other officials of the UAW International Union's Chrysler Department in exchange for company-friendly treatment in collective bargaining negotiations at the expense of UAW members.

185. As set forth above, Holiefield and his team took control of bargaining concerning the status of the UAW members working in the Wrangler Paint Shop in a manner contrary to the UAW Constitution, and longstanding past practice, by locking the affected employees and UAW Local 12 out of the negotiations. Having done so, Holiefield and his team negotiated a company friendly agreement at the expense of Plaintiffs.

186. Press reports immediately following the July 2017 indictments also revealed that members of the UAW International Union's Chrysler Department were under investigation for "selling jobs," or accepting cash payments of a few thousand dollars, from prospective employees for assistance in finding UAW jobs in Chrysler plants.

187. James Hardy is under investigation for selling jobs at Chrysler plants.

188. As set forth above, Plaintiffs were replaced by new UAW hires on an almost one-for-one basis following their termination in November 2012.

189. Despite widespread interest from local Toledo residents, a suspiciously large number of individuals who were hired to replace Plaintiffs relocated from Detroit to accept

35

Case 1:19-cv-06770-EK-MMH   Document 34-8   Filed 08/21/20   Page 74 of 82 PageID
Case: 3:18-cv-00078-JZ   Doc #: 1   Filed: 01/11/18   36 of 44.   PageID #: 96 PageID
#: 1063

positions in the Wrangler Paint Shop. Some such individuals have acknowledged "buying" their jobs.

190. Thus, Holiefield and his team from the Chrysler Department of the UAW International Union had two separate unlawful motives directly adverse to Plaintiffs at the time that they bargained away Plaintiffs' jobs with Iacobelli and Chrysler. First, Holiefield and his team had accepted bribes, and hoped to accept additional bribes, from Chrysler to take company-friendly positions at the expense of the UAW members that they represented. Second, members of the Chrysler Department of the UAW International Union had developed a lucrative side business of selling Chrysler jobs. By acting in the manner described above, these officials created over 70 open positions that could be sold.

## CLASS ACTION ALLEGATIONS

191. Plaintiffs repeat and incorporate herein all previously pleaded averments.

192. Plaintiffs DeShetler and Wesley bring this action pursuant to Fed.R.Civ.P. 23 on behalf of the Class defined as follows:

> All individuals who retired from Chrysler between 2004 and 2007 and were terminated from the Wrangler Paint Shop on or about November 30, 2012.

193. The members of the Class are so numerous that joinder is impracticable. Plaintiffs believe that there are approximately 73 such individuals.

194. The members of the Class can be identified through the review of business records in the possession of Chrysler, the UAW International Union and UAW Local 12.

195. There are common questions of fact and law affecting all class members, including, among others:

Case: 3:18-cv-00078-JZ   Doc #: 1   Filed: 01/11/18   37 of 44.   PageID #: 37

a. Whether any collective bargaining agreement can reasonably be interpreted as prohibiting Plaintiffs and members of the class from continued employment after Chrysler purported to take direct control of the Wrangler Paint Shop in 2012;

b. Whether Chrysler and the UAW International Union reasonably interpreted the applicable master and local collective bargaining agreements, as informed by the years-long course of dealing between the company, UAW International Union and UAW Local 12, as permitting Chrysler to engineer a situation where all of the UAW members working in the Wrangler Paint Shop were "laid off" by Gonzalez and considered for "rehire" by Chrysler;

c. Whether the UAW International Union acted in good faith when it locked its membership and local union out of negotiations concerning the status of its membership working in the Wrangler Paint Shop;

d. Whether Chrysler paid, and the UAW International Union Chrysler Department accepted, bribes in order to take company-friendly negotiation-positions at the expense of UAW members, including members of the Class;

e. Whether the UAW International Union Chrysler Department bargained in good faith on behalf of members of the Class in the fall of 2012;

f. Whether officials in the UAW International Union Chrysler Department accepted bribes to fill the jobs vacated by Plaintiffs and members of the Class in the Wrangler Paint Shop;

g. Whether Chrysler discriminated on the basis of age;

h. Whether there is any underlying business justification for Chrysler's decision not to consider Plaintiffs and members of the Class for rehire; and

37

      i.     Whether the releases procured from Plaintiffs and members of the Class can be

enforced as a matter of fact and law.

196.     The Plaintiffs' claims are typical of all members of the Class as they were

terminated as the result of the same collective bargaining agreement, at the same time and for the

same pretextual reasons as members of the Class.

197.     Plaintiffs will fairly and adequately represent the interests of members of the

Class.

198.     Both Plaintiffs and their counsel meet the adequacy requirements of Fed.R.Civ.P.

23.

199.     Plaintiffs' interests are not antagonistic to other members of the Class and are, in

fact, similar with respect to Chrysler and the UAW International Union.  Plaintiffs' interests are

identical to those of the members of the Class.

200.     Plaintiffs' legal counsel has a time-honored reputation for competency,

experience and skill in handling complex litigation, including class actions.  Their counsel's

ability to skillfully litigate cases such as the present case is well-documented. Their counsel has

and will continue to dedicate high levels of skill and dedication to the vigorous prosecution of

this class action litigation.

201.     A class action is a superior method of resolution to the other available methods

for a fair, efficient and just resolution of this controversy.

202.     The expense and burden of individual litigation are impediments to Class

members seeking redress for the wrongful conduct alleged.

203.     This action is maintainable under Fed.R.Civ.P. 23(b)(3) because common

questions of fact and law, as outlined above, predominate over questions affecting only

Case 1:19-cv-06770-EK-MMH  Document 34-8  Filed 08/21/20  Page 77 of 82 PageID
Case: 3:18-cv-00078-JZ  Doc #: 1  Filed: 01/11/18  39 of 44.  PageID #: 99 PageID
#: 1066

individual class members, which focus almost exclusively on the amount of damages owed in the form of back wages, front wages and other compensation, including compensatory damages, punitive damages and interest.

204.    A class action is a superior method to other mechanisms available.  The amount in controversy with respect to each individual member of the Class is relatively modest and the prosecution of separate actions is comparatively costly.

## FIRST CAUSE OF ACTION
### (Violations of the LMRA Against All Defendants)

205.    Plaintiffs repeat and incorporate herein all previously pleaded averments.

206.    Plaintiffs bring their first cause of action against all Defendants pursuant to Section 301 of the LMRA, codified at 29 U.S.C. § 185.

207.    As set forth above, Chrysler terminated Plaintiffs in violation of the applicable master and local bargaining agreements between Chrysler and the UAW.

208.    As set forth herein, Chrysler discriminated against Plaintiffs on the basis of age.

209.    Moreover, as set forth above, Chrysler unlawfully paid bribes to executives of the UAW International Union to take company-friendly positions during collective bargaining negotiations, including those leading to Plaintiffs' termination in November 2012.

210.    Plaintiffs sought to prosecute grievances pursuant to the applicable collective bargaining agreements, but the UAW International Union refused to process their grievances beyond any stage over which it had discretion.

211.    In the alternative, any further attempt to prosecute grievances by Plaintiffs would have been futile under the circumstances described above.

212.    Plaintiffs have exhausted all internal union procedures with respect to their terminations.

Case: 3:18-cv-00078-JZ Doc #: 1 Filed: 01/11/18 40 of 44. PageID #: 40

213.    In the alternative, any further attempt to utilize internal union procedures by Plaintiffs would have been futile under the circumstances described above.

214.    As set forth above, the UAW International Union acted in an arbitrary, discriminatory and dishonest manner in its duty to represent Plaintiffs in the bargaining process that resulted in their termination in November 2012.

215.    Through its arbitrary, discriminatory and bad-faith conduct, the UAW International Union has breached its duty of fair representation to their members, including Plaintiffs.

216.    Due to the UAW International Union's breach, Plaintiffs have sustained damages. Specifically, Plaintiffs would not have been terminated in violation of the master and local bargaining agreement, or in an unlawful and discriminatory manner, as set forth above.

217.    Plaintiffs bring this hybrid action against Chrysler and the UAW International Union to recover all legal and equitable relief available, including reinstatement, an award of back pay, an award of front pay, consequential and compensatory damages, punitive damages, costs and reasonable attorney's fees.

218.    Had the UAW International Union appropriately represented Plaintiffs, this action would not be necessary.  Plaintiffs are entitled to recover their costs and reasonable attorneys' fees as an element of actual damages as a result of the UAW International Union's breach.

219.    To the extent that Defendants seek to rely on releases of claims purported executed by Plaintiffs in 2012, such releases are void under the doctrines of fraud, duress, illegality and undue influence.

220.    As described above, Plaintiffs were unable to discover the UAW International Union's breach of its duty of fair representation until the federal investigation became public knowledge in July 2017.  As set forth above, Plaintiffs had no way of knowing that executives in the UAW International Union had accepted bribes to act against their interest until this investigation became public.

**SECOND CAUSE OF ACTION**
**(Age Discrimination Pursuant to O.R.C. § 4112.14 as to Chrysler)**

221.    Plaintiffs repeat and incorporate herein all previously pleaded averments.

222.    As set forth above, Plaintiffs herein are all long-serving employees of Chrysler and members of the UAW.  By 2006, each Plaintiff had accumulated sufficient seniority to participate in Chrysler's unconventional plan to operate the Toledo Supplier Park and "retire" from Chrysler, begin collecting their pension and start working for a nominally independent third-party supplier.

223.    In 2012, each Plaintiff was over the age of forty.

224.    In 2012, each Plaintiff was working in the Wrangler Paint Shop, satisfactorily performing his or her job function and qualified to continue to do so.

225.    In November 2012, each Plaintiff was terminated from his or her employment under the circumstances described above.

226.    At the time that Plaintiffs were terminated, Chrysler systemically retained substantially younger workers hired between 2006 and 2012.

227.    Following Plaintiffs' termination in 2012, Chrysler systematically replaced them with substantially younger workers.

228.    In addition to being manifestly unfair to the Plaintiffs who "retired" from Chrysler in order to work at the Wrangler Paint Shop, the agreement memorialized in Exhibit 6 appears to

41

make little economic sense to Chrysler with respect to Plaintiffs.  If Plaintiffs were permitted to continue to work under the other substantive terms of Exhibit 6, however otherwise unlawful or unfair, their "seniority date" would have been November 30, 2012, and their wages would have been frozen or reduced.

229.    Plaintiffs' nominal reemployment with Chrysler pursuant to the other substantive terms of Exhibit 6, however otherwise unlawful or unfair, would not have resulted in any increase in pension payments to them.  In fact, under the terms of the applicable master pension agreements, pension payments would have been identical, reduced or suspended during a period of reemployment.

230.    Moreover, the termination of Plaintiffs had no appreciable effect on the overall employment in the Wrangler Paint Shop.  As Chrysler intended, Plaintiffs were replaced on a nearly one-for-one basis by UAW members who were "new hires" into the Wrangler Paint Shop.

231.    Chrysler's conduct as described herein constitutes discrimination on the basis of age.

232.    Chrysler lacked any legitimate alternative business reason for not continuing Plaintiffs' employment.  Indeed, according to the UAW International Union, Chrysler simply refused to continue Plaintiffs' employment under any circumstances and at any rate of pay. Instead, Chrysler simply insisted on terminating Plaintiffs due to their status as older retirees.

233.    To the extent that Chrysler seeks to offer an alternative basis for Plaintiffs' termination, such explanation would be mere pretext.

234.    Plaintiffs bring their second claim for relief pursuant to O.R.C. § 4112.14 against Chrysler.  In the alternative, Plaintiffs bring their second claim for relief under any provision of Ohio law prohibiting discrimination on the basis of age.

42

Case 1:19-cv-06770-EK-MMH   Document 34-8   Filed 08/21/20   Page 81 of 82 PageID
Case: 3:18-cv-00078-JZ Doc #: 1 Filed: 01/11/18 43 of 44. PageID #: 43 PageID
#: 1070

235.    To the extent that Chrysler seeks to rely on releases of claims purported executed by Plaintiffs in 2012, such releases are void under the doctrines of fraud, duress, illegality and undue influence.

236.    To the extent that Chrysler contends that Plaintiffs have or had available avenues to arbitrate their discharge, such arbitration would be futile due to the UAW International Union's failure to represent them in good faith as described above.

**WHEREFORE,** the individual Plaintiffs named above and Plaintiffs DeShelter and Wesley on behalf of themselves and others similarly situated, demand judgment against Defendants, jointly and severally, in an amount to be determined by a jury and further demand judgment as follows:

A.  That this Court, as soon as practicable, certify the Class defined herein and appoint the undersigned counsel to represent it;

B.  For injunctive and declaratory relief ordering their reinstatement;

C.  For damages in an amount to be determined by a jury, including back pay, front pay, compensatory damages, punitive damages and whatever additional monetary relief may be available in law and equity;

D.  For an award of reasonable attorney's fees, costs and expert witness fees; and

E.  For whatever additional legal and equitable relief may be available under the circumstances.

Respectfully submitted,

*/s/ Leslie O. Murray*
Leslie O. Murray (0081496)
Direct Dial: (419) 624-3125

43

lom@murrayandmurray.com
Michael J. Stewart (0082257)
stewart@murrayandmurray.com
**MURRAY & MURRAY CO., L.P.A.**
111 East Shoreline Drive
Sandusky, OH 44870
Facsimile: (419) 624-0707

*Attorneys for Plaintiffs*


## JURY DEMAND

Plaintiffs hereby demand trial by jury as to all issues.

*/s/ Leslie O. Murray*
Leslie O. Murray (0081496)
**MURRAY & MURRAY CO., L.P.A.**

*Attorneys for Plaintiffs*

44