# Exhibit 26

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———————

| | |
|---|---|
| BEVERLY L. SWANIGAN, BRIAN LEE KELLER, and SHERI ANOLICK, individually and on behalf of others similarly situated, | Case No.<br>Hon.<br>Magistrate |

                    Plaintiffs,

vs.

FCA US, LLC, a foreign limited
liability company,

and

INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA ("UAW"),
jointly and severally,

                    Defendants.

_____/

Raymond J. Sterling (P34456)
James C. Baker (P62668)
Brian J. Farrar (P79404)
Attorneys for Plaintiffs
STERLING ATTORNEYS AT LAW, P.C.
33 Bloomfield Hills Pkwy., Ste. 250
Bloomfield Hills, MI 48304
(248) 644-1500
rsterling@sterlingattorneys.com
jbaker@sterlingattorneys.com
bfarrar@sterlingattorneys.com

_____/

# CLASS ACTION COMPLAINT
# AND DEMAND FOR JURY TRIAL

Case 2:18-cv-10915-GAD-DRG   ECF No. 1   filed 01/26/18   PageID.2   Page 2 of 35

# CLASS ACTION COMPLAINT
# AND DEMAND FOR JURY TRIAL

## INTRODUCTION

1.      Plaintiffs bring this hybrid § 301 claim against FCA US, LLC

("FCA") and/or its predecessors and International Union, United Automobile,

Aerospace and Agricultural Implement Workers of America ("UAW").

2.      FCA and the UAW engaged in collusion when FCA bribed the

UAW to obtain company-friendly positions at the bargaining table and

elsewhere; bribes which the UAW accepted, to the detriment of plaintiffs and

the proposed class.

3.      Plaintiffs are employees of Defendant FCA US, LLC ("FCA")

and/or its predecessors and are dues-paying members of defendant International

Union, United Automobile, Aerospace and Agricultural Implement Workers of

America (the "UAW" or the "Union").

4.      Plaintiffs, individually and on behalf of those similarly situated,

bring this action against FCA for breaches of collectively bargained agreements

pursuant to the Labor Management Relations Act, 29 USC 185 ("LMRA")

resulting from the illegal and overt acts of FCA by itself and by its designated

agent(s) in violation of 29 USC 186.

5.      Plaintiffs, individually and on behalf of those similarly situated,

bring this action against their labor union, the UAW, pursuant to Section 301 of

the LMRA (codified at 29 USC 185) for violations and breaches of its duty of fair representation by accepting money, gifts, bribes, and other prohibited payments to bargain away plaintiffs' rights, and the rights of other similarly situated individuals, and to engage in other improper acts, including the improper use of Union dues for purposes other than the purposes intended.

## THE PLAINTIFFS

6.     Plaintiff Beverly L. Swanigan, an individual residing in Clinton Township, Macomb County, Michigan, is a citizen and resident of Michigan.

7.     Plaintiff Brian Lee Keller, an individual residing in Mount Clemens, Macomb County, Michigan, is a citizen and resident of Michigan.

8.     Plaintiff Sheri Anolick, an individual residing in Garden City, Wayne County, Michigan, is a citizen and resident of Michigan.

9.     The potential class members who are similarly situated to plaintiffs include all dues paying FCA employees who were dues paying UAW members impacted by the illegal, improper, and collusive conduct of FCA and the UAW in violation of the LMRA.

## THE DEFENDANTS

10.    Defendant FCA is a foreign limited liability company organized under the laws of the State of Delaware, with its principal place of business in Auburn Hills, Oakland County, Michigan.

Case 2:18-cv-10915-GAD-DRG   ECF No. 1-1   Filed 01/26/18   PageID.4   Page 4 of 35

11.     Defendant UAW is a labor organization as the term is defined by the NLRA, 29 USC 152(5), and plaintiffs' exclusive bargaining representative under the NLRA, 29 USC 159(a).

## CLASS ALLEGATIONS

12.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the class defined as follows: all past and current employees of defendant FCA who were dues paying members of the UAW impacted by the illegal, improper, and collusive conduct of FCA and the UAW in violation of the LMRA.

13.     The members of the class are so numerous that joinder is impractical, if not impossible.

14.     The members of the class can be identified easily through a review of the business records of FCA and the UAW.

15.     There are common questions of fact and law affecting all class members that arise as a result of the allegations in this complaint.

16.     The plaintiffs' claims are typical of all members of the class as they were members of the UAW and paid dues for the purpose of having the UAW negotiate with FCA in good faith and on their behalf, they have been adversely impacted by the actions of FCA and the UAW arising from the illegal and collusive conduct, and have been adversely impacted by the collective

bargaining agreements negotiated in violation of the duties of FCA and the UAW as prescribed by the LMRA.

17.    Plaintiffs will fairly and adequately protect the interests of the proposed class as they are injured employees of FCA and injured members of the UAW.

18.    A class action is a superior method of resolution to the other available methods for a fair, efficient, and just resolution of this controversy.

19.    The expense and burden of individual litigation are impediments to class members' seeking relief for the wrongful conduct alleged.

20.    This action is maintainable under Rule 23(b)(3) of the Federal Rules of Civil Procedure because common questions of fact and law predominate over questions affecting only individual class members (individual questions focus almost exclusively on the amount of damages owed in the form of dues paid by the class members, and other compensation, including compensatory damages, punitive damages, and interest).

21.    The amount in controversy with respect to each individual member of the class is relatively modest when compared to the costly prosecution of separate actions.

22.    Plaintiffs have retained the undersigned counsel for these purposes, who are experienced in employment and class action litigation.

Case 2:18-cv-10915-GAD-DRG   ECF No. 1-1   filed 01/26/18   PageID.8   Page 6 of 33

## JURISDICTION

23.     This action arises from plaintiffs' employment with FCA, and membership with the UAW.

24.     Although employment numbers varied slightly over time, FCA employs, and the UAW represents, tens of thousands of union workers.

25.     This Court has personal jurisdiction over defendants because the claims arise from the transaction of business, the negotiation of collectively bargained agreements, and other conduct between the defendants, all of which occurred in this State.

26.     This Court has subject matter jurisdiction pursuant to: 28 USC 1331 because the claims arise under the laws of the United States; 28 USC 1337(a) because the claims arise under an Act of Congress regulating commerce; and 29 USC 185 because the claims concern the violation of contracts and/or contract negotiations between an employer and labor organization.

27.     To the extent the claims allege violations of state law, this Court has supplemental jurisdiction over state law claims pursuant to 28 USC 1367, because those claims are so related to the claims arising under federal law that they form part of the same case or controversy.

## VENUE

28.     Venue is proper pursuant to 28 USC 1391 because both FCA and the UAW have principal places of business in this judicial district and all of the

6

Case 2:18-cv-10915-GAD-DRG   ECF No. 1-1   filed 01/26/18   PageID.7   Page 7 of 35

events, omissions, or occurrences giving rise to the lawsuit took place in this district.

## THE COLLECTIVE BARGAINING PROCESS

29. In 2009, Chrysler (the predecessor to FCA), emerged from bankruptcy protection.

30. Upon emerging from bankruptcy, the UAW pension fund, Fiat S.p.A. (an Italian automaker), and the United States and Canadian governments became the principal owners.

31. Since 2009, Fiat has gradually acquired the other parties' shares and the Chrysler brand is now a wholly-owned subsidiary of defendant FCA US, LLC.

32. The UAW is one of the largest labor organizations in the United States and has historically represented Chrysler and FCA hourly workers.

33. The UAW is a hierarchical organization governed by the Constitution of the International UAW.

34. In the United States, collective bargaining agreements between the UAW and the "Big 3" automobile manufacturers (General Motors, Ford, and Chrysler/FCA) are negotiated approximately every four years.[1]

---

[1] Since emergence from bankruptcy, Chrysler bargained with the UAW in 2009, then again in 2011, and most recently in 2015.

Case 2:18-cv-10915-GAD-DRG   ECF No. 1-1 filed 01/26/18   PageID.80   Page 8 of 33

35. Negotiations of the most recent master collective bargaining agreement between FCA and the UAW began in or around June 2015, with the final agreement completed sometime later in 2015.

36. The International UAW and FCA have also, from time to time, negotiated other agreements, including pension and bonus agreements, as well as an agreement negotiated and completed in 2014 whereby the International UAW purchased the equity held by the UAW Retirees Medical Benefits Trust in Chrysler Group LLC (subsequently FCA) for billions of dollars.

37. The collective bargaining agreements described in the preceding paragraphs contemplate additional agreements between UAW Local Unions and FCA management concerning matters specific to those locals, so long as those agreements are consistent with the master collective bargaining agreements bargained for between the International Union and FCA.

38. The UAW's membership, of which plaintiffs and the class are members, pay periodic dues, the substantial majority of which are designated to be used in the bargaining process.

39. FCA designates a number of its employees, including officers, directors, and senior executives, to represent FCA in the master collective bargaining discussions; these designees are the agents of FCA empowered and authorized to negotiate on behalf of FCA.

40. Between 2009 and approximately June 2015, FCA designated Alphons Iacobelli ("Iacobelli"), its Vice President of Labor Relations, to be its lead representative for managing FCA's contractual relationship with the UAW.

41. The UAW similarly designates a number of its employees, including officers, directors, and senior executives, to represent the UAW and its membership in the master collective bargaining process; these designees are the agents of the Union authorized to negotiate on behalf of UAW and its membership.

42. Between 2009 and early 2015, the UAW designated its officer General Holiefield ("Holiefield") to be its lead representative for managing UAW's contractual relationship with FCA.

43. From 2012 through the 2015 collective bargaining process, one of the UAW's designees, who was senior in the negotiating process and relationship with FCA, was Virdell King ("King").

### THE COLLUSION BETWEEN FCA AND THE UAW

44. Based on the sworn statement of FCA's Vice President Alphons Iacobelli, "Between in or before January 2009 and continuing through or after June 2015, [I] knowingly and voluntarily joined a conspiracy in which FCA and FCA executives and FCA employees agree to pay and deliver, and willfully paid and delivered, money and things of value to officers and employees of the UAW," including Holiefield and King. January 15, 2018 Rule 11 Plea

Agreement of Alphons Iacobelli, Eastern District of Michigan Case No. 2:17-cr-20406.

45.    Iacobelli admitted to performing these prohibited acts with "FCA and other co-conspirators" while "acting in the interest of employer FCA."

46.    Iacobelli also admitted that "Over the course of the conspiracy, [Iacobelli], FCA" and other yet-to-be-named FCA director(s), senior manager(s), executives, and employees, "unlawfully paid and delivered more than $1.5 million in prohibited payments and things of value directly and indirectly to" Holiefield, King, and other yet-to-be-named UAW officials.

47.    Over the course of the conspiracy, FCA transferred prohibited payments and things of value to UAW officers and employees, per Iacobelli, "in an effort to obtain benefits, concessions, and advantages for FCA in the negotiation, implementation, and administration of collective bargaining agreements between FCA and the UAW."

48.    In or before December 2013, Iacobelli provided Holiefield with a script in advance of a meeting between Holiefield and other members of the International UAW's executive board, during which the UAW was considering expending billions of dollars to purchase the equity interest held by the UAW Retiree Medical Benefits Trust in Chrysler Group, LLC.

10

Case 2:18-cv-10319-GAD-DRG ECF No. 1 filed 01/26/18 PageID.11 Page 11 of 19

49. The purchase was completed in January 2014, using in substantial part the dues paid by UAW members to finance the billions paid for the equity interest in FCA.

50. The illegal and collusive relationship between Iacobelli and Holiefield led to the script that Holiefield relied upon to encourage the UAW's executive board to spend billions of dollars on the purchase of the equity interest in FCA.

51. The conspiracy of collusion makes it reasonable to conclude that the purchase price arrived at between FCA and the UAW was not negotiated at arm's length, was not a legitimate bargained-for exchange, and was overvalued to the benefit of FCA and to the detriment of the UAW's membership.

52. The result was that in all likelihood, the UAW's membership paid tens, if not hundreds of millions of dollars in Union dues for a transaction tainted by the conspiracy between FCA and the UAW.

53. Additionally, during the ongoing conspiracy, the UAW's dues-paying membership paid a substantial percentage of periodic dues to the UAW so that the Union would engage in good faith and honest negotiations with FCA.

54. As a result of the conspiracy, the Union acted on improper motivations or in a manner which is contrary to its arbitrary, perfunctory, or inexcusably neglectful.

Case 2:18-cv-10315-GAD-DRG ECF No. 1 filed 01/26/18 PageID.12 Page 12 of 19

55.     From at least 2012 through 2016, per the sworn statement of Union officer Virdell King, after the 2015 master collective bargaining agreement was finalized between FCA and the UAW, King "knowingly joined a conspiracy where officers and employees of the UAW would willfully request, receive, and accept – and agree to receive and accept – money and things of value" from persons acting in the interest of FCA. During that time, FCA was the employer of tens of thousands of employees represented by the UAW." August 17, 2017 Rule 11 Plea Agreement of Virdell King; Eastern District of Michigan Case No. 2:17-cr-20406.

56.     Per King, she "was a UAW employee who served as a senior official in the UAW Chrysler Department from 2008 until … February 2016. As a senior UAW official … King was responsible for negotiating and administering the collective bargaining agreements between the UAW and FCA on behalf of tens of thousands of FCA employees represented by the UAW" who were dues paying members of the UAW, whose dues in substantial part were used in the bargaining process.

57.     According to King, "In 2011 and 2015, King served as a member of the UAW national negotiating committee responsible for the collective bargaining agreements between the UAW and FCA."

58.     Holiefield, King, and other yet-to-be-named UAW senior officials participated in the conspiracy that included FCA making payments that were

Case 2:18-cv-10315-GAD-DRG ECF No. 1 filed 01/26/18 PageID.13 Page 13 of 19

intended to obtain benefits, concessions, and advantages for FCA in the negotiation, implementation, and administration of collective bargaining agreements between FCA and the UAW.

59. The requesting, receiving, accepting, and agreeing to receive and accept money, gifts, things of value, and prohibited payments caused FCA to obtain benefits, concessions, and advantages for FCA in the negotiation, implementation, and administration of collective bargaining agreements between FCA and the UAW as well as to cause UAW to pay a substantially higher price for the purchase of an equity interest in Chrysler Group, LLC (subsequently FCA).

60. Iacobelli and King have both pled guilty to conspiracy to violate the LMRA, 29 USC 186; Holiefield is deceased.

61. Other FCA and UAW officials engaged in the ongoing conspiracy have yet to be named through supplemental criminal indictments, despite having been identified by numeric monikers in the existing indictments and Iacobelli's and King's Rule 11 Plea Agreements.

62. The conspiracy to violate the LMRA by both FCA and the UAW has resulted in tens, if not hundreds of millions of dollars in Union dues not being used for the intended purpose: bargaining for the benefit of the Union members.

63. All collective bargaining agreements, with letters, other agreements, and supporting documents are in the possession of FCA and the UAW.

64. Plaintiffs were unable to reasonably discover FCA's violation of the LMRA and the UAW's breach of its duty of fair representation until the public issuance of federal indictments against Iacobelli on July 26, 2017 and King on August 8, 2017.

65. Plaintiffs had no way of knowing about the details or extent of the conspiracy, including the levels of involvement of FCA, the UAW, and its respective officers, directors, managers, senior executives, executives, and employees, until the public filing of King's August 17, 2017 Rule 11 Plea Agreement and Iacobelli's January 15, 2018 Rule 11 Plea Agreement.

## COUNT I
### VIOLATION OF THE
### LABOR MANAGEMENT RELATIONS ACT

66. Plaintiffs incorporate the preceding paragraphs by reference.

67. FCA unlawfully paid bribes to executives of the UAW to take FCA-friendly positions during collecting bargaining negotiations, including those in 2011 and 2015.

68. FCA's unlawful conduct violated the LMRA in that two or more persons conspired in violation of 29 USC 186.

14

69.   FCA, through the acts of its designated agents, who included officers, directors, senior managers, and executives, knowingly and voluntarily joined the conspiracy.

70.   Members of the conspiracy made prohibited payments with the intention of impermissibly influencing the collective bargaining process.

71.   The prohibited payments did impermissibly influence the collective bargaining process by allowing FCA to obtain company-friendly concessions from the UAW during the collective bargaining process.

72.   The prohibited payments caused at least one designated agent of the UAW, a co-conspirator with FCA, to direct and/or impermissibly influence the decision of the UAW Executive Board to expend billions of dollars in the non-arm's length purchase of an equity interest in FCA.

73.   As a result of FCA's violation of the LMRA, plaintiffs and other class members have been harmed in that potentially hundreds of millions of dollars of their dues paid to the UAW for the purposes of good-faith negotiations have instead been spent on tainted and/or illegal collective bargaining negotiations.

74.   As a result of FCA's violation of the LMRA, plaintiffs' and other class members' dues have not been spent for the purposes of good-faith negotiations but instead on a multi-billion dollars non-arm's length, overvalued purchase of equity in FCA.

Case 2:18-cv-10315-GAD-DRG ECF No. 1 filed 01/26/18 PageID.16 Page 16 of 19

## COUNT II
## BREACH OF THE DUTY OF
## FAIR REPRESENTATION UNDER THE LMRA

75.     Plaintiffs incorporate the preceding paragraphs by reference.

76.     The UAW engaged in willfully requesting, receiving, accepting, and agreeing to receive and accept, money and things of value from persons acting in the interest of FCA.

77.     The UAW gave authority to its designated agents, including Holiefield and King, among others, to represent its members who were employees of FCA.

78.     The UAW had an obligation to serve the interests of all members without favoritism to the company, and/or without favoritism or hostility to any members, to exercise its representational discretion with complete good faith and honesty, and to avoid arbitrary conduct.

79.     The UAW breached its duty to its membership, by acting based upon the improper motivation of FCA's bribery, and the UAW's requesting and receiving prohibited payments and things of value.

80.     The UAW's representation of its membership was arbitrary, perfunctory, or inexcusably neglectful.

81.     By its involvement in the FCA conspiracy, the UAW, through its designated agents, lacked a rational basis for decision-making within the

16

Case 2:18-cv-10319-GAD-DRG ECF No. 1 filed 01/26/18 PageID.19 Page 17 of 19

bargaining process, and engaged in egregious unfairness or reckless disregard for its members' rights.

82. By its involvement in the FCA/UAW conspiracy, the UAW, through its designated agents, lacked a rational basis for decision-making when it chose to expend millions of dollars of its members' dues in the tainted bargaining process.

83. By its involvement in the conspiracy, the UAW, through its designated agents, lacked a rational basis for decision making and acted egregiously neglectful when it expended billions of dollars of its membership's dues on a non-arm's length purchase of an equity interest in FCA.

84. By the multiple UAW actors in the FCA conspiracy, the UAW failed in its duty to investigate the actions of its designated agents, to the detriment of its members' rights, and to the expense of its membership through hundreds of millions of dollars of dues having been wasted on tainted bargaining.

85. As a result of the UAW's breach of its duty of fair representation, plaintiffs and other class members have been harmed in that hundreds of millions of dollars of their dues paid to the UAW, spent for the purposes of good-faith negotiations, have been spent on a multi-billion dollars non-arm's length, overvalued purchase of an equity interest in FCA.

Case 2:18-cv-10315-GAD-DRG ECF No. 1 filed 01/26/18 PageID.18 Page 18 of 19

WHEREFORE, plaintiffs, on behalf of themselves and others similarly situated, respectfully request that a money judgment be entered against defendants, jointly and severally, or by statutory apportionment, for an amount to be determined by a jury to compensate them for their damages and specifically request the following:

A.  That this Court, as soon as practicable, certify the Class and appoint the undersigned to represent it;

B.  That this Court award damages in an amount to be determined by a jury, including reimbursement of the value of all dues paid during the conspiracy period by the UAW membership who were or are FCA employees;

C.  That this Court award damages in an amount to be determined by a jury to compensate plaintiffs and the Class for the value of those dues paid which were spent on the UAW's non-arm's length, overvalued purchase of an equity interest in FCA;

D.  That this Court exercise its legal and equitable power by ordering FCA to repay plaintiffs and the class the excess value the UAW paid for the equity interest;

E.  That this Court grant any injunctive relief it determines is necessary to protect the claims of the plaintiffs and the class;

Case 2:18-cv-10313-GAD-DRG ECF No. 1 filed 01/26/18 PageID.19 Page 19 of 19

F.  That this Court award plaintiffs and the Class any additional damages it determines are reasonable and appropriate as compensatory damages, punitive damages, and interest;

G.  That this Court award reasonable attorney fees, costs and expenses, and expert witness fees; and

H.  That this Court award whatever additional monetary relief that may be available in law and equity.

**DEMAND FOR JURY TRIAL**

Plaintiffs, by themselves and as representatives of the Class, respectfully demand a trial by jury as to all issues.

Respectfully submitted,

STERLING ATTORNEYS AT LAW, P.C.

By:  /s/ Raymond J. Sterling
     Raymond J. Sterling (P34456)
     James C. Baker (P62668)
     Brian J. Farrar (P79404)
     Attorneys for Plaintiffs
     33 Bloomfield Hills Pkwy., Ste. 250
     Bloomfield Hills, MI 48304
Dated: January 26, 2018        (248) 644-1500

# Exhibit 27

13

United States District Court
Eastern District of Michigan
Southern Division

United States of America,

v.

D-5 Keith Mickens,

Defendant.

Case No. 17-CR-20406

Honorable Paul D. Borman

Violation: **Conspiracy to Violate the Labor Management Relations Act** (18 U.S.C. § 371)

---

**Third Superseding Information**

The United States Attorney charges:

**General Allegations**

F I L E D

FEB 06 2018

CLERK'S OFFICE
U.S. DISTRICT COURT

At times relevant to this Third Superseding Information:

1.      The Labor Management Relations Act, commonly known as the Taft Hartley Act, prohibited employers and persons acting in the interest of employers from paying, lending, or delivering, or agreeing to pay, lend, or deliver, any money or other thing of value to any officer or employee of a labor organization representing its employees.

1

2. The Labor Management Relations Act also prohibited any officer or employee of a labor organization representing the employees of an employer from receiving, accepting, or agreeing to receive or accept, any money or other thing of value from that employer or from any person acting in the interest of that employer.

3. One of the purposes of the Labor Management Relations Act was to combat the corruption of the collective bargaining process that occurs when a union employer gives something of value to a union representative.

**Relevant Organizations**

4. Fiat Chrysler Automobiles US LLC was an automotive company based in Auburn Hills, Michigan, and the successor to the automotive company formerly known as Chrysler Group LLC. Both are referred to here as "FCA." FCA manufactured and sold automobiles in the United States under brands such as Chrysler, Jeep, Dodge, and Ram. FCA was an employer in an industry affecting interstate commerce and subject to the Labor Management Relations Act, 29 U.S.C. §§ 142 & 152.

5. The International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (UAW) was a labor organization based in Detroit, Michigan. The UAW represented tens of thousands of non-

2

managerial employees employed by FCA at numerous locations in Michigan and across the United States. The UAW was a labor organization subject to the Labor Management Relations Act, 29 U.S.C. §§ 142 & 152.

6.      The UAW-Chrysler Skill Development & Training Program d/b/a the UAW-Chrysler National Training Center (NTC) was a tax-exempt corporation based in Detroit, Michigan. The NTC purported to function as a labor management committee under the Labor Management Relations Act, 29 U.S.C. § 186(c)(9). The stated purpose of the NTC was to provide for the education, training, and retraining of workers.

7.      The governing body of the NTC was known as the Joint Activities Board. The Vice President of Employee Relations of FCA and the Vice President of the Chrysler Department of the UAW served as the Chairmen of the NTC Joint Activities Board. The remainder of the Joint Activities Board was made up of senior officials from the UAW and executives from FCA.

**Collective Bargaining Agreements between FCA and the UAW**

8.      Approximately every four years FCA and the UAW engaged in national negotiations resulting in a collective bargaining agreement that set wages, attendance policies, profit sharing, ratification bonuses, holidays, and other working conditions for FCA employees represented by the UAW.

9.     In 2011 and 2015, UAW and FCA held national negotiation sessions that resulted in ratified collective bargaining agreements covering tens of thousands of FCA employees represented by the UAW.

**Relevant Persons**

10.     **Keith Mickens** was a UAW employee who served as a senior official in the UAW Chrysler Department from 2010 through 2015. As a senior UAW official in the Chrysler Department, **Keith Mickens** was responsible for negotiating and administering the collective bargaining agreements between the UAW and FCA on behalf of tens of thousands of FCA employees represented by the UAW. In 2011, **Keith Mickens** served as a member of the UAW national negotiating committee responsible for the collective bargaining agreement between the UAW and FCA.

11.     General Holiefield was an elected UAW officer who served as the UAW Vice President for the Chrysler Department from 2006 through 2014. As the UAW Vice President, Holiefield had primary responsibility for negotiating with FCA and for administering the collective bargaining agreements between the UAW and FCA on behalf of tens of thousands of FCA employees represented by the UAW. As UAW Vice President, General Holiefield was responsible for managing the UAW's relationship with FCA. Holiefield was the senior UAW

4

official responsible for resolving disputes and grievances that arose under the collective bargaining agreements between the UAW and FCA.

12. D-4 Virdell King was a UAW employee who served as a senior official in the UAW Chrysler Department from 2008 until she retired in February 2016. As a senior UAW official in the Chrysler Department, Virdell King was responsible for negotiating and administering the collective bargaining agreements between the UAW and FCA on behalf of tens of thousands of FCA employees represented by the UAW. In 2011 and 2015, Virdell King served as a member of the UAW national negotiating committee responsible for the collective bargaining agreements between the UAW and FCA.

13. D-2 Alphons Iacobelli was the FCA Vice President for Employee Relations and a person acting in the interest of employer FCA from 2008 through 2015. As the FCA Vice President for Employee Relations, Alphons Iacobelli was the senior FCA official responsible for negotiating with the UAW and for administering the collective bargaining agreements between FCA and the UAW. As the FCA Vice President for Employee Relations, Alphons Iacobelli was FCA's lead representative for labor relations and managed FCA's relationship with the UAW. Alphons Iacobelli was the senior FCA official responsible for resolving

disputes and grievances that arose under the collective bargaining agreements between FCA and the UAW.

14. D-1 Jerome Durden was a Financial Analyst in FCA's Corporate Accounting Department. From 2008 through 2015, Jerome Durden was the controller of the NTC and served as the secretary of the NTC Joint Activities Board.

15. FCA-7 was a member of the FCA Employee Relations Department from 2007 through 2016. FCA-7 was directly involved in negotiating with the UAW and responsible for administering the collective bargaining agreements between FCA and the UAW.

16. FCA-11 was a member of the FCA Employee Relations Department from 2007 to 2015.

17. All dates in this Third Superseding Information are alleged to have occurred on or about the stated dates.

## Count One

### (18 U.S.C. § 371 – Conspiracy to Violate the Labor Management Relations Act)

1. Paragraphs 1 through 17 of the General Allegations are incorporated by reference here.

6

2. Between in or about 2010 through 2015, within the Eastern District of Michigan and elsewhere, **Keith Mickens**, General Holiefield, Virdell King, Alphons Iacobelli, Jerome Durden, and other individuals and entities known and unknown to the United States Attorney, did knowingly and voluntarily conspire to violate the Labor Management Relations Act. The objects of this conspiracy were:

(a) that one or more persons acting in the interest of employer FCA would willfully pay and deliver—and agree to pay and deliver—money and things of value to officers and employees of the UAW, the labor organization representing its employees, using the NTC with the intent to benefit persons who they knew were not permitted to receive the money and things of value, in violation of Title 29, United States Code, Section 186(a)(2), (d)(1); and

(b) that officers and employees of the UAW would willfully request, receive, and accept—and agree to receive and accept—money and things of value from employer FCA and one or more persons acting in the interest of FCA, using the NTC with the intent to benefit themselves and other persons who they knew were not permitted to receive the money and things of value, in violation of Title 29, United State Code, Section 186(b)(1), (d)(1).

3.     Over the course of the conspiracy, FCA Vice President Alphons Iacobelli, FCA Financial Analyst Jerome Durden, FCA Director FCA-7, FCA Senior Manager FCA-11 and other co-conspirators acting in the interest of employer FCA, unlawfully paid and delivered more than $1,000 in prohibited payments and things of value, directly and indirectly, to UAW Vice President General Holiefield, senior UAW official **Keith Mickens**, senior UAW official Virdell King, and other UAW officials. The prohibited payments and things of value included thousands of dollars in personal travel, electronics, designer clothing, luggage, and golf equipment.

### UAW-Chrysler National Training Center

4.     FCA Vice President Alphons Iacobelli, FCA Financial Analyst Jerome Durden, and their co-conspirators used NTC bank accounts and NTC credit card accounts to conceal prohibited payments and things of value paid and delivered to UAW Vice President General Holiefield, senior UAW official **Keith Mickens**, senior UAW official Virdell King, and other UAW officials.

5.     FCA Vice President Alphons Iacobelli was the Co-Chairman of the NTC and the NTC Joint Activities Board from 2008 through 2015. FCA-7 was a member of the FCA Employee Relations Department who served on the NTC Joint Activities Board from 2007 until 2015. FCA-11 was a member of the FCA

8

Employee Relations Department who served on the NTC Joint Activities Board from 2010 to 2015. FCA Financial Analyst Jerome Durden was a member of the FCA Corporate Accounting Department who served as the controller of the NTC from in and before 2008 through 2015.

6. FCA provided the funding for the NTC. From 2009 to 2014, FCA made annual transfers to the NTC of between approximately $13 million and approximately $31 million per year. During that time period, FCA Vice President Alphons Iacobelli, FCA-7, FCA-11, and FCA Financial Analyst Jerome Durden controlled the finances and spending of the NTC.

7. The stated purpose of the NTC was to provide for the education, training, and retraining of FCA workers. However, FCA Vice President Alphons Iacobelli, FCA-7, FCA-11, FCA Financial Analyst Jerome Durden, and others acting in the interest of employer FCA, directed thousands of dollars in NTC funds to pay for personal travel, personal purchases and personal expenditures of UAW Vice President General Holiefield, senior UAW official **Keith Mickens**, senior UAW official Virdell King, other UAW officials, and their associates and family members.

8. In and after 2012, FCA Vice President Alphons Iacobelli directed FCA Financial Analyst Jerome Durden to obtain credit cards for UAW Vice

9

President General Holiefield and for other senior UAW officials. The credit cards were issued through accounts maintained in the name of the NTC and were paid for with funds provided by FCA. FCA Vice President Alphons Iacobelli, FCA Financial Analyst Jerome Durden, and their co-conspirators used the NTC credit cards to conceal prohibited payments and things of value paid and delivered to UAW Vice President General Holiefield, senior UAW official **Keith Mickens,** senior UAW official Virdell King, and other UAW officials.

9. In and after 2012, Alphons Iacobelli and others acting in the interest of employer FCA encouraged and authorized UAW Vice President General Holiefield and other senior UAW officials to use the NTC credit cards to pay for personal purchases and personal expenditures.

## Overt Acts

10. One or more members of the conspiracy completed one or more of the following acts to effect the object of the conspiracy:

11. In May 2011, senior UAW official **Keith Mickens** and others arranged for the girlfriend of UAW Vice President General Holiefield to fly from Michigan to California at a cost of over $2,100. FCA Vice President Alphons Iacobelli, FCA Financial Analyst Jerome Durden, and other FCA executives acting in the interest of FCA approved of the expenditure of more than $2,100 to pay for

10

personal travel by the girlfriend of UAW Vice President General Holiefield. The first-class airfare was paid for by the NTC using funds provided by FCA.

12.     In and after 2011, FCA executives gave NTC credit cards to UAW Vice President General Holiefield, senior UAW official **Keith Mickens**, senior UAW official Virdell King, and other UAW officials.

13.     In and after 2012, FCA Vice President Alphons Iacobelli encouraged UAW Vice President General Holiefield and other senior UAW officials to use their NTC credit cards for personal purchases and expenses.

14.     In February 2012, FCA Financial Analyst Jerome Durden directed that payments for credit card expenses were to be screened from the members of the NTC accounting staff.

15.     From 2012 through 2015, UAW Vice President General Holiefield, senior UAW official **Keith Mickens**, senior UAW official Virdell King, and other UAW officials made personal purchases on their NTC credit cards.   The personal purchases were authorized by FCA Vice President Alphons Iacobelli, FCA Financial Analyst Jerome Durden, and other FCA executives acting in the interest of FCA, and were paid for using funds provided by FCA.

16.     In January 2013, senior UAW official Keith Mickens used his NTC credit card to purchase of over $1,000 worth of luggage from a store located in

11

Detroit, Michigan.

17.     From 2012 through June 2014, senior UAW official **Keith Mickens** used his NTC credit card to make more than $6,500 in personal purchases, including electronics, designer clothing, and golf equipment for himself and for other UAW officials.

All in violation of Title 18, United States Code, Section 371.

MATTHEW SCHNEIDER
United States Attorney


Bruce C. Judge
Assistant United States Attorney


Charles J. Kalil II
Assistant United States Attorney


Erin S. Shaw
Assistant United States Attorney


Date:  February 5, 2018

12

Case 2:17-cr-20406-PDB-MKM   Document 1   Filed 02/06/18   Page 13 of 13   Pg ID 360

| United States District Court<br>Eastern District of Michigan | **Criminal Case Cover Sheet** | **Case Number**<br>17-CR-20406 |
| --- | --- | --- |

**NOTE: It is the responsibility of the Assistant U.S. Attorney signing this form to complete it accurately in all respects.**

| **Companion Case Information** | **Companion Case Number:** |
| --- | --- |
| This may be a companion case based upon LCrR 57.10 (b)(4)[1]: | **Judge Assigned:** |
| ☐ Yes    ☒ No | **AUSA's Initials:** _B(J_ |

**Case Title:** USA v. D-5 Keith Mickens

**County where offense occurred :** Wayne County, Macomb County and Oakland County

**Check One:**    ☒ **Felony**         ☐ **Misdemeanor**         ☐ **Petty**

_____Indictment/_____Information --- **no prior complaint.**

_____Indictment/_____Information --- based upon prior complaint [Case number:                    ]

_____Indictment/__✓__Information --- based upon LCrR 57.10 (d) [*Complete Superseding section below*].

## Superseding Case Information

**Superseding to Case No:** 17-CR-20406          **Judge:** Paul D. Borman

☐ Corrects errors; no additional charges or defendants.
☐ Involves, for plea purposes, different charges or adds counts.
☒ Embraces same subject matter but adds the additional defendants or charges below:

| **Defendant name** | **Charges** | **Prior Complaint (if applicable)** |
| --- | --- | --- |
| D-5 Keith Mickens | 18 U.S.C. § 371 | N/A |

**Please take notice that the below listed Assistant United States Attorney is the attorney of record for the above captioned case.**

February 6, 2018
Date

BRUCE C. JUDGE
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226-3277
Phone: 313-226-9122
Fax:    313-226-3413
E-Mail address: Bruce.Judge@usdoj.gov
Attorney Bar #: CA 148805

[1] Companion cases are matters in which it appears that (1) substantially similar evidence will be offered at trial, or (2) the same or related parties are present, and the cases arise out of the same transaction or occurrence. Cases may be companion cases even though one of them may have already been terminated.

5 / 1