# Exhibit 35

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 17-cr-20406 |
| | |
| | HONORABLE PAUL D. BORMAN |
| v. | |
| | |
| D-6 NANCY A. JOHNSON, | Violations: **Conspiracy to Violate the Labor Management Relations Act** (18 U.S.C. § 371) |
| Defendant. | |
| | **Receiving and Accepting Prohibited Money and Things of Value From A Union Employer** (29 U.S.C. §§ 186(b)(1) & (d)(1)) |

---

## FOURTH SUPERSEDING INDICTMENT

THE GRAND JURY CHARGES:

FILED USDC - DT
2018 MAR 14 PM3:10

### General Allegations

At times relevant to this Fourth Superseding Indictment:

1. The Labor Management Relations Act, commonly known as the Taft Hartley Act, prohibited employers and persons acting in the interest of employers from paying, lending, or delivering, or agreeing to pay, lend, or deliver, any money or other thing of value to any officer or employee of a labor organization representing its employees.

2.     The Labor Management Relations Act also prohibited any officer or employee of a labor organization representing the employees of an employer from receiving, accepting, or agreeing to receive or accept, any money or other thing of value from that employer or from any person acting in the interest of that employer.

3.     One of the purposes of the Labor Management Relations Act was to combat the corruption of the collective bargaining process that occurs when a union employer gives something of value to a union representative.

**Relevant Organizations**

4.     Fiat Chrysler Automobiles US LLC was an automotive company based in Auburn Hills, Michigan, and the successor to the automotive company formerly known as Chrysler Group LLC. Both are referred to here as "FCA." FCA manufactured and sold automobiles in the United States under brands such as Chrysler, Jeep, Dodge, and Ram. FCA was an employer in an industry affecting interstate commerce and subject to the Labor Management Relations Act, 29 U.S.C. §§ 142 & 152.

5.     The International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (UAW) was a labor organization based in Detroit, Michigan. The UAW represented tens of thousands of non-

2

managerial employees employed by FCA at numerous locations in Michigan and across the United States. The UAW was a labor organization subject to the Labor Management Relations Act, 29 U.S.C. §§ 142 & 152.

6.      The UAW-Chrysler Skill Development & Training Program d/b/a the UAW-Chrysler National Training Center (NTC) was a tax-exempt corporation based in Detroit, Michigan. The NTC purported to function as a labor management committee under the Labor Management Relations Act, 29 U.S.C. § 186(c)(9). The stated purpose of the NTC was to provide for the education, training, and retraining of workers.

7.      The governing body of the NTC was known as the Joint Activities Board. The Vice President of Employee Relations of FCA and the Vice President of the Chrysler Department of the UAW served as the Chairmen of the NTC Joint Activities Board. The remainder of the Joint Activities Board was made up of senior officials from the UAW and executives from FCA.

**Collective Bargaining Agreements between FCA and the UAW**

8.      Approximately every four years FCA and the UAW engaged in national negotiations resulting in a collective bargaining agreement that set wages, attendance policies, profit sharing, ratification bonuses, holidays, and other working conditions for FCA employees represented by the UAW.

3

9.      In and after July 2015, UAW and FCA held national negotiation sessions that resulted in collective bargaining agreements covering tens of thousands of FCA employees represented by the UAW.

**The Defendants**

10.     **Nancy A. Johnson (D-6)** was a UAW employee who served as a senior official in the UAW Chrysler Department from 2014 through 2016. As a senior UAW official in the Chrysler Department, **Nancy A. Johnson** was responsible for negotiating and administering the collective bargaining agreements between the UAW and FCA.   In 2015, **Nancy A. Johnson** served as a member of the UAW national committee responsible for negotiating the terms of the collective bargaining agreements between the UAW and FCA.   In September 2015, **Nancy A. Johnson** and the other members of the UAW national committee announced that they had reached a tentative agreement with FCA, which agreement was thereafter rejected by a majority vote of the UAW membership.

11.     Virdell King (D-4) was a UAW employee who served as a senior official in the UAW Chrysler Department from 2008 until 2016. As a senior UAW official in the Chrysler Department, Virdell King was responsible for negotiating and administering the collective bargaining agreements between the UAW and FCA on behalf of tens of thousands of FCA employees represented by the UAW.

4

In 2011 and 2015, Virdell King served as a member of the UAW national committee responsible for negotiating the terms of the collective bargaining agreements between the UAW and FCA.

12. Keith Mickens (D-5) was a UAW employee who served as a senior official in the UAW Chrysler Department from 2010 through 2015. As a senior UAW official in the Chrysler Department, Keith Mickens was responsible for negotiating and administering the collective bargaining agreements between the UAW and FCA on behalf of tens of thousands of FCA employees represented by the UAW. In 2011, Keith Mickens served as a member of the UAW national committee responsible negotiating the terms of the collective bargaining agreements between the UAW and FCA.

13. Alphons Iacobelli (D-2) was the FCA Vice President for Employee Relations and a person acting in the interest of employer FCA from 2008 through 2015. As the FCA Vice President for Employee Relations, Alphons Iacobelli was the senior FCA official responsible for negotiating with the UAW and for administering the collective bargaining agreements between FCA and the UAW.

14. Jerome Durden (D-1) was a Financial Analyst in FCA's Corporate Accounting Department. From 2008 through 2015, Jerome Durden was the

5

Controller of the NTC and served as the secretary of the NTC Joint Activities Board.

15.     All dates in this Fourth Superseding Indictment are alleged to have occurred on or about the stated dates.

## COUNT ONE

### (18 U.S.C. § 371 – Conspiracy to Violate the Labor Management Relations Act)

**D-6 NANCY A. JOHNSON**

1.     Paragraphs 1 through 15 of the General Allegations are incorporated by reference here.

2.     Between in or about 2014 through 2016, within the Eastern District of Michigan and elsewhere, **Nancy A. Johnson**, Virdell King, Keith Mickens, Alphons Iacobelli, Jerome Durden, and other individuals and entities known and unknown to the grand jury, did knowingly and voluntarily conspire to violate the Labor Management Relations Act. The objects of this conspiracy were:

(a) that one or more persons acting in the interest of employer FCA would willfully pay and deliver—and agree to pay and deliver—money and things of value to officers and employees of the UAW, the labor organization representing its employees, using the NTC with the intent to benefit persons who they knew were not permitted to receive the money and

6

things of value, in violation of Title 29, United States Code, Section 186(a)(2), (d)(1); and

(b) that officers and employees of the UAW would willfully request, receive, and accept—and agree to receive and accept—money and things of value from employer FCA and one or more persons acting in the interest of FCA, using the NTC with the intent to benefit themselves and other persons who they knew were not permitted to receive the money and things of value, in violation of Title 29, United State Code, Section 186(b)(1), (d)(1).

3.      Over the course of the conspiracy, FCA Vice President Alphons Iacobelli, FCA Financial Analyst Jerome Durden, and other FCA executives acting in the interest of employer FCA, unlawfully paid and delivered more than $1,000 in prohibited payments and things of value, directly and indirectly, to senior UAW official **Nancy A. Johnson**, to senior UAW official Virdell King, to senior UAW official Keith Mickens, and to other UAW officials. The prohibited payments and things of value included tens of thousands of dollars in personal travel, golf resort fees, lavish meals, limousine services, designer clothing, jewelry, designer shoes, golf equipment, electronics, and a shotgun.

4.      FCA Vice President Alphons Iacobelli, FCA Financial Analyst Jerome Durden, and their co-conspirators used NTC bank accounts and NTC credit

7

card accounts to conceal prohibited payments and things of value paid and delivered to senior UAW official **Nancy A. Johnson**, to senior UAW official Virdell King, to senior UAW official Keith Mickens, and to other UAW officials.

5. FCA Vice President Alphons Iacobelli was the Co-Chairman of the NTC and the NTC Joint Activities Board from 2008 through 2015.

6. FCA provided the funding for the NTC. From 2009 to 2015, FCA made annual transfers to the NTC of between approximately $13 million and approximately $31 million per year. During that time, FCA executives, including FCA Vice President Alphons Iacobelli and FCA Financial Analyst Jerome Durden controlled the finances and spending of the NTC.

7. The stated purpose of the NTC was to provide for the education, training, and retraining of FCA workers. However, FCA Vice President Alphons Iacobelli, FCA Financial Analyst Jerome Durden, and other FCA executives acting in the interest of employer FCA, directed tens of thousands of dollars in NTC funds to pay for personal purchases, personal expenditures, and personal travel of senior UAW official **Nancy A. Johnson**, senior UAW official Virdell King, senior UAW official Keith Mickens, other UAW officials, and their associates and family members.

8. In and before 2014, FCA Vice President Alphons Iacobelli directed

FCA Financial Analyst Jerome Durden to obtain credit cards for senior UAW official Nancy A. Johnson, senior UAW official Virdell King, senior UAW official Keith Mickens and other UAW officials. The credit cards were issued through accounts maintained in the name of the NTC and were paid for with funds provided by FCA. FCA Vice President Alphons Iacobelli, FCA Financial Analyst Jerome Durden, and their co-conspirators used the NTC credit cards to conceal prohibited payments and things of value paid and delivered to senior UAW official **Nancy A. Johnson**, to senior UAW official Virdell King, to senior UAW official Keith Mickens, and to other UAW officials.

9. In and after 2014, FCA Vice President Alphons Iacobelli, FCA Financial Analyst Jerome Durden and other FCA executives encouraged and authorized senior UAW official **Nancy A. Johnson** and other senior UAW officials to use the NTC credit cards to pay for personal purchases and personal expenditures in an effort to obtain benefits, concessions, and advantages in the negotiation, implementation, and administration of the collective bargaining agreements between FCA and the UAW.

**Overt Acts**

10. One or more members of the conspiracy completed one or more of the following acts to effect the object of the conspiracy:

9

11.     In June 2014, the UAW President approved the appointment of **Nancy A. Johnson** as the Top Administrative Assistant to the Vice President for the UAW Chrysler Department.   As the Top Administrative Assistant, **Nancy A. Johnson** was the second most senior official in the UAW Chrysler Department.

12.     In October and December 2014, at the direction of **Nancy A. Johnson,** Virdell King spent $1,259 to purchase luggage for **Nancy A. Johnson** at the London Luggage Shop in Detroit, Michigan.   The luggage was paid for by the NTC using funds provided by FCA.

13.     In December 2014, **Nancy A. Johnson** spent and caused to be spent $1,914 to purchase an airline ticket for herself for travel between Michigan and Palm Springs, California.   The first-class air travel was paid for by the NTC using funds provided by FCA.

14.     In December 2014, **Nancy A. Johnson** spent and caused to be spent $2,382 to purchase an airline ticket for her associate ("LR") for travel between Detroit, Michigan and Los Angeles, California.   The first-class travel was paid for by the NTC using funds provided by FCA.

15.     In December 2014, **Nancy A. Johnson** spent and caused to be spent $2,382 to purchase an airline ticket for herself for travel between Detroit, Michigan and Los Angeles, California.   The first-class travel was paid for by the NTC using

10

funds provided by FCA.

16.    In January 2015, **Nancy A. Johnson** spent over $1,800 at Indian Canyons Golf Resort in Palm Springs, California.   The golf resort fees and related purchases were paid for by the NTC using funds provided by FCA.

17.    In January 2015, **Nancy A. Johnson** spent $4,587 for a meal at LG's Prime Steak House in Palm Springs, California.   The meal was paid for by the NTC using funds provided by FCA.

18.    In January 2015, **Nancy A. Johnson** spent $1,652 at Cardliff Limousine in Palm Springs, California.   The round-trip limousine travel between Palm Springs, California and San Diego, California was paid for the NTC using funds provided by FCA.

19.    In January 2015, **Nancy A. Johnson** spent over $1,800 at St. John Knits and other retail stores located in and around Palm Springs, California.   The designer clothing, jewelry, and accessories were paid for by the NTC using funds provided by FCA.

20.    In January and February of 2015, **Nancy A. Johnson** spent over $6,900 at the Renaissance Resort & Spa in Palm Springs, California.   The resort and spa fees were paid for by the NTC using funds provided by FCA.

21.    In February 2015, **Nancy A. Johnson** spent $1,217 at Salon Bilal in

11

Pasadena, California. The salon and spa services were paid for by the NTC using funds provided by FCA.

22. In March 2015, **Nancy A. Johnson** spent $1,160 at Neiman Marcus online for a pair of Christian Louboutin shoes. The designer shoes were paid for by the NTC using funds provided by FCA.

23. In April 2015, **Nancy A. Johnson** spent over $1,700 for a set of graphite women's golf clubs and a diva cart bag purchased from Amazon.com. The golf equipment was paid for by NTC using funds provided by FCA.

24. In May 2015, **Nancy A. Johnson** spent over $1,000 at Divalicious, and other retail stores located in Orlando, Florida and Clinton Township, Michigan. The designer clothing, accessories, and home furnishings were paid for by the NTC using funds provided by FCA.

25. In and after July 2015, **Nancy A. Johnson** served as a member of the UAW National Committee negotiating, on behalf of tens of thousands of UAW members, against FCA for the terms of new collective bargaining agreements.

26. In August 2015, **Nancy A. Johnson** directed Virdell King to purchase a shotgun to be presented as a birthday present to another senior UAW officer. At the direction of **Nancy A. Johnson**, Virdell King spent $2,182 to purchase an Italian-made Beretta shotgun at Field & Stream in Troy, Michigan. The shotgun

12

was paid for by the NTC, using funds provided by FCA.

27. In September 2015, **Nancy A. Johnson** spent $6,912 at the London Chop House in Detroit, Michigan. The meal was paid for by NTC using funds provided by FCA.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO

### 29 U.S.C. § 186(b)(1) & (d)(1) – Receiving and Accepting Prohibited Money and Things of Value from a Union Employer

**D-6 NANCY A. JOHNSON**

1. Paragraphs 1 through 15 of the General Allegations are incorporated by reference here.

2. In December 2014, in the Eastern District of Michigan and elsewhere, **Nancy A. Johnson**, an employee of the UAW, a labor organization representing the employees of FCA, willfully received and accepted, and agreed to receive and accept, money and things of value from Alphons Iacobelli (D-2), Jerome Durden (D-1) and others acting in the interest of employer FCA, with the intent to benefit a person she knew was not permitted to receive and accept the money and things of value, that is, the expenditure of over $1,000 for the purchase of an airline ticket for her companion ("LR"), which expenditure was paid for with funds provided by FCA.

13

All in violation of Title 29, United States Code, Sections 186(b)(1), (d)(1).

## COUNT THREE

### 29 U.S.C. § 186(b)(1) & (d)(1) – Receiving and Accepting Prohibited Money and Things of Value from a Union Employer

**D-6 NANCY A. JOHNSON**

1.      Paragraphs 1 through 15 of the General Allegations are incorporated by reference here.

2.      In January 2015, in the Eastern District of Michigan and elsewhere, **Nancy A. Johnson**, an employee of the UAW, a labor organization representing the employees of FCA, willfully received and accepted, and agreed to receive and accept, money and things of value from Alphons Iacobelli (D-2), Jerome Durden (D-1) and others acting in the interest of employer FCA, with the intent to benefit a person she knew was not permitted to receive and accept the money and things of value, that is, the expenditure of over $1,000 for limousine services, which expenditure was paid for with funds provided by FCA.

All in violation of Title 29, United States Code, Sections 186(b)(1), (d)(1).

14

## COUNT FOUR

### 29 U.S.C. § 186(b)(1) & (d)(1) – Receiving and Accepting Prohibited Money and Things of Value from a Union Employer

**D-6 NANCY A. JOHNSON**

1.      Paragraphs 1 through 15 of the General Allegations are incorporated by reference here.

2.      In March 2015, in the Eastern District of Michigan and elsewhere, **Nancy A. Johnson,** an employee of the UAW, a labor organization representing the employees of FCA, willfully received and accepted, and agreed to receive and accept, money and things of value from Alphons Iacobelli (D-2), Jerome Durden (D-1) and others acting in the interest of employer FCA, with the intent to benefit a person she knew was not permitted to receive and accept the money and things of value, that is, the expenditure of over $1,000 for a pair of designer shoes, which expenditure was paid for with funds provided by FCA.

All in violation of Title 29, United States Code, Sections 186(b)(1), (d)(1).

15

## COUNT FIVE

**29 U.S.C. § 186(b)(1) & (d)(1) – Receiving and Accepting
Prohibited Money and Things of Value from a Union Employer**

**D-6 NANCY A. JOHNSON**

1.    Paragraphs 1 through 15 of the General Allegations are incorporated by reference here.

2.    In April 2015, in the Eastern District of Michigan and elsewhere, **Nancy A. Johnson**, an employee of the UAW, a labor organization representing the employees of FCA, willfully received and accepted, and agreed to receive and accept, money and things of value from Alphons Iacobelli (D-2), Jerome Durden (D-1) and others acting in the interest of employer FCA, with the intent to benefit a person she knew was not permitted to receive and accept the money and things of value, that is, the expenditure of over $1,000 for golf equipment, which expenditure was paid for with funds provided by FCA.

All in violation of Title 29, United States Code, Sections 186(b)(1), (d)(1).

16

THIS IS A TRUE BILL.


/s/ GRAND JURY FOREPERSON
GRAND JURY FOREPERSON


MATTHEW SCHNEIDER
United States Attorney


s/Bruce C. Judge                             s/Charles J. Kalil II
Bruce C. Judge                               Charles J. Kalil II
Assistant United States Attorney      Assistant United States Attorney
211 W. Fort Street, Suite 2001         211 W. Fort Street, Suite 2001
Detroit, Michigan 48226               Detroit, Michigan 48226
Bruce.Judge@usdoj.gov              Charles.Kalil@usdoj.gov


Date: March 14, 2018

Case 2:17-cr-20406-PDB-RSW   Doc # 69   Filed 03/14/18   Pg 18 of 18   Pg ID 411

| United States District Court<br>Eastern District of Michigan | **Criminal Case Cover Sheet** | **Case Number**<br>17-cr-20406 |
|---|---|---|

**NOTE: It is the responsibility of the Assistant U.S. Attorney signing this form to complete it accurately in all respects.**

| **Companion Case Information** | **Companion Case Number:** |
|---|---|
| This may be a companion case based upon **LCrR 57.10 (b)(4)**[1]: | **Judge Assigned:** |
| ☐ Yes       ☒ No | **AUSA's Initials:** _BJ_ |

**Case Title:** USA v.  NANCY A. JOHNSON

**County where offense occurred :**  Wayne County, Oakland County & Macomb County

**Check One:**       ☒ **Felony**              ☐ **Misdemeanor**              ☐ **Petty**

  ____Indictment/____Information --- **no** prior complaint.
  ____Indictment/____Information --- based upon prior complaint [**Case number:**        ]
  _✓_Indictment/____Information --- based upon **LCrR 57.10 (d)** *[Complete Superseding section below]*.

## Superseding Case Information

**Superseding to Case No:** 17-cr-20406      **Judge:**  PAUL D. BORMAN

☐ Corrects errors; no additional charges or defendants.
☐ Involves, for plea purposes, different charges or adds counts.
☒ Embraces same subject matter but adds the additional defendants or charges below:

| **Defendant name** | **Charges** | **Prior Complaint (if applicable)** |
|---|---|---|
| D-6 NANCY A. JOHNSON | 18 U.S.C. § 371<br>29 U.S.C. §§ 186(b)(1) &<br>(d)(1) | N/A |

**Please take notice that the below listed Assistant United States Attorney is the attorney of record for the above captioned case.**

March 14, 2018
  Date

BRUCE C. JUDGE
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226-3277
Phone: 313-226-9122
Fax:    313-226-3413
E-Mail address: Bruce.Judge@usdoj.gov
Attorney Bar #: CA 148805

---

[1] Companion cases are matters in which it appears that (1) substantially similar evidence will be offered at trial, or (2) the same or related parties are present, and the cases arise out of the same transaction or occurrence. Cases may be companion cases even though one of them may have already been terminated.