# Exhibit 56

Case 2:17-cr-20406-PDB-RSW   ECF No. 132   filed 08/20/18   PageID.819   Page 1 of 14

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                                    NO. 17-CR-20406

vs.

                                     HON. PAUL D. BORMAN

D-2   ALPHONS IACOBELLI,

     Defendant.

_____/

## SENTENCING MEMORANDUM OF THE UNITED STATES

### I.    Introduction

Fiat Chrysler Automobiles US LLC ("FCA"), through its Vice President for Employee Relations, defendant Alphons Iacobelli, sought to corrupt and warp the labor-management relationship with senior officials of the International Union, United Automobile, Aerospace, and Agriculture Implement Workers of America ("UAW"). FCA sought to obtain benefits, concessions, and advantages in the negotiation and administration of collective bargaining agreements with the UAW in an effort to buy labor peace. High-level officials of the UAW sought to enrich themselves and live lavish lifestyles rather than zealously work on behalf of the best interests of tens of thousands of rank and file members of their union. Additionally, these labor officials sought to advance the interests of the UAW by willingly,

purposefully, and unlawfully taking millions of dollars from FCA in order to reduce the expenses of the union and improve its budgetary position.

For years, defendant Iacobelli stood at the center of this dishonorable and nefarious relationship between FCA and the UAW. At FCA, Iacobelli was the most senior executive tasked with managing the company's relationship with the UAW. For certain aspects of FCA's negotiations and relationship with the UAW, Iacobelli reported directly to FCA's Chief Executive Officer. Iacobelli was highly compensated by FCA, earning millions of dollars in salary and bonuses. During the course of the conspiracy, Iacobelli executed a policy of buying labor peace with the UAW by enriching those officials in order to make them "fat, dumb, and happy." Iacobelli intentionally flouted the law and corrupted union leadership for the benefit of his employer, FCA. In the process, however, Iacobelli also enriched himself, while fraudulently avoiding hundreds of thousands of dollars in taxes.

The Court's sentence should reflect the seriousness of Iacobelli's crimes and the need to deter corporate executives, corporations, union officials, and labor unions from similar conduct. At the same time, the sentence also should account for Iacobelli's acceptance of responsibility and his sincere efforts at revealing vast labor-management corruption and assisting in efforts to end it.

## II.    <u>Analysis of Sentencing Factors</u>

### A.    <u>Sentencing Guideline Issues</u>

Based on Iacobelli's sentencing memorandum, the parties are now in agreement with the Probation Officer's calculation of the sentencing guideline range of 97 to 121 months. This range is capped at 96 months based on the statutory maximum sentences for the offenses of conviction.

### B.    <u>Seriousness of the Offenses</u>

#### 1.    <u>The Corruption of the Labor-Management Relationship</u>

The Labor Management Relations Act of 1947, better known as the Taft-Hartley Act, sought to deter and punish the real danger that corporations and their executives would seek to corrupt union officials by bribing those officials to ignore the best interests of the rank and file union members. The law made it a criminal offense for an employer and its executives to give money or things of value to union officials. Given the grave and substantial danger of the corruption of the labor-management relationship, the Taft-Hartley Act criminalized such payments to union officials without any need to demonstrate that the corrupting payments actually bought particular advantages for the employer. Instead, Congress drew a bright-line rule, criminalizing all payments by employers to union officials, subject to certain

exceptions that do not apply here.  In this way, the law protects every union member who must rely upon his or her union's leadership.

In this case, Iacobelli, on behalf of FCA, gave millions of dollars to UAW officials and the union itself in order to corruptly purchase labor peace.  Fully aware of the dictates and criminal penalties of the Taft-Hartley Act, Iacobelli and his co-conspirators worked through the joint UAW-FCA National Training Center ("NTC") as a mechanism to flout the law and pass millions to UAW officials and the union itself.  The NTC, whose board was chaired by Iacobelli and the UAW Vice President in command of the Chrysler Department, was an instrumentality and part of the criminal conspiracy, used as a method to conceal illegal Taft-Hartley payments under the benevolent guise of training workers and ensuring their health and safety.

Iacobelli was the Vice President for Employee Relations for FCA.  In that position, Iacobelli was the lead FCA executive for labor relations and had top responsibility for managing the company's relationship with the UAW.  Iacobelli was the senior FCA official responsible for negotiating with the UAW and for administering the collective bargaining agreements between FCA and the UAW, including the resolution of disputes and grievances that arose under these agreements.  The NTC provided an opportunity for FCA and its executives to seek

4

Case 2:17-cr-20406-FDB-RSW   ECF No. 132   filed 08/20/18   PageID.823   Page 5 of 14

a corporate advantage by funneling money to UAW officials and the UAW in direct violation of the Taft-Hartley Act.

This corrupt conspiracy took a number of forms. First, senior UAW officials were greased and influenced by FCA with first class travel, designer clothing, furniture, lavish meals and parties, jewelry, and custom-made Italian watches. Iacobelli directed that senior UAW officials like UAW Vice President General Holiefield, Keith Mickens, Virdell King, Nancy Johnson, and others receive NTC credit cards, and that these UAW officials could use those cards to make personal purchases. High-level UAW officials engaged in obscenely expensive meals, parties, and the unlimited consumption of alcohol at the expense of FCA. UAW officials used FCA money through their NTC credit cards to buy designer shoes for over $1,000 per pair, seemingly unlimited rounds of golf, cigars, vanity-labeled bottles of wine, an Italian shotgun, designer clothing, and expensive luggage. In this way, UAW officials became indebted to FCA and Iacobelli at the expense of violating their duty to loyally represent tens of thousands of rank and file UAW members.

Second, Iacobelli oversaw a series of payments to Holiefield and his wife, Monica Morgan, amounting to hundreds of thousands of dollars. FCA money was used to fund Holiefield's "charity," the Leave the Light On Foundation, which was

5

Case 1:19-cv-06770-EK-MMH   Document 34-20   Filed 08/21/20   Page 7 of 42 PageID
Case 2:17-cr-20406-FDB-RSW   ECF No. 132   Filed 08/20/18   PageID.824   Page 6 of 14
#: 1292

in fact a thinly-disguised mechanism to enrich Holiefield and Morgan. Iacobelli directed that over $260,000 in money provided by FCA be used to pay off the mortgage on the Holiefield home. Iacobelli directed that the NTC use money provided by FCA to purchase hundreds of thousands of dollars in "trinkets and trash" and purported photography lessons from companies established by Morgan and Holiefield as a way to funnel more money to the UAW Vice President.

Third, FCA and Iacobelli directed a stream of income of millions of dollars to the UAW as an entity. Ostensibly, FCA reimbursed the UAW for the salaries and benefits of UAW officials who were assigned to and worked at the NTC. This payment of the salaries of UAW officials with money provided by FCA was known as "chargebacks." Some UAW officials actually did work at the NTC, and FCA money was given to the UAW to pay the salaries, benefits, and UAW bonuses of these officials. However, a large number of UAW officials, purportedly assigned to the NTC, actually spent their time doing UAW work representing the union's interests and not performing work at the NTC. Iacobelli and FCA viewed the chargebacks to FCA of these UAW salaries as a political gift to the UAW. High-level UAW officials intentionally assigned UAW officials to the NTC with no intention that they would perform any real work at the NTC. It was merely a corrupt mechanism whereby FCA money could be used by the UAW to keep the UAW's

6

Case 2:17-cr-20406-FDB-RSW    ECF No. 132    filed 08/20/18    PageID.825    Page 7 of 14

costs down. In total, from June 2009 through July 2017, the amount of the illegal chargebacks paid by FCA to the UAW was over $9 million. This illegal revenue was unrelated to the UAW's tax-exempt purpose. It should be noted that Iacobelli left FCA in June 2015, but these chargeback payments and other payments described below continued after his departure.

Additional income the UAW received from FCA was in the form of a fraudulent and bogus 7% administrative fee that the UAW added on to the chargeback invoices for the salaries of UAW officials. When FCA paid the salaries of UAW officials assigned to the NTC, the UAW charged FCA a 7% fee, ostensibly to pay the administrative costs of overseeing the payment of salaries and benefits of UAW officials at the NTC. In fact, however, the administrative cost to the UAW of maintaining its employees at the NTC was negligible and certainly did not amount to the 7% charged. Instead, the UAW and its high-level officials viewed the 7% administrative fee as a profit center to make money for the union. From June 2009 through July 2017, the UAW received over $2.9 million in administrative fees paid by FCA. The $2.9 million in administrative fees taken by the UAW was based on all of the chargebacks paid by FCA, not just the improper $9 million in chargebacks for UAW officials nominally assigned to the NTC. This fraudulent administrative fee revenue was also unrelated to the tax-exempt purpose of the UAW. Even though

7

the UAW is a tax-exempt organization, the union is required under law to pay taxes on sources of income unrelated to its tax-exempt purpose.  FCA viewed the 7% as simply another cost of doing business with the UAW in terms of keeping labor peace.

Through this criminal conspiracy to violate the Taft-Hartley Act, FCA, through Iacobelli and its executives, was implementing a corporate policy to buy good relationships with UAW officials.  As one FCA executive put it, FCA was making an "investment," by "spending thousands here," in the form of illegal payments to UAW officials through the NTC, in an effort to obtain benefits, concessions, and advantages for FCA in its relationship with the UAW.  FCA executives sought to keep UAW officials "fat, dumb and happy" with their few thousand dollars and credit cards, whereas FCA was seeking advantages and concessions in the negotiation and administration of the collective bargaining agreements.  Another FCA executive admitted that it was the intent of FCA executives to "grease the skids" in their relationship with UAW officials.  This was how Iacobelli viewed his actions on behalf of his employer, FCA—using FCA's money in an attempt to buy "company-friendly" policies among the UAW's leadership.  The seriousness of the corruption of the labor-management relationship cannot be overstated.  Because of FCA's conduct, through Iacobelli and others, tens

8

of thousands of hourly UAW workers were deprived of the representation that they deserved and paid for in union dues.

### 2. Iacobelli's Tax Fraud

While Iacobelli was executing a corporate culture by engineering and overseeing the illegal payments to union officials and the UAW, Iacobelli also directed income and benefits to himself using the NTC as a mechanism. This additional income that Iacobelli received took many forms, including a Ferrari, jewel-encrusted pens, hundreds of thousands of dollars in improvements and additions to the pool at his residence, personal spending on his credit cards, and more. Rather than paying taxes on this additional income, Iacobelli fraudulently concealed his income and paid nothing to the IRS.

Iacobelli himself identified the seriousness of his tax offense, and courts have consistently recognized that "'[t]ax offenses, in and of themselves, are serious offenses,'" and that "'a greater tax loss is obviously more harmful to the treasury and more serious than a smaller one.'" *United States v. Ture*, 450 F.3d 352, 357-58 (8th Cir. 2006) (quoting U.S.S.G. § 2T1.1, cmt. background). The "criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system" and that "[c]riminal tax prosecutions serve to punish the

violator and promote respect for the tax laws." *United States v. Carlson*, 498 F.3d 761, 764 (8th Cir. 2007).

Not only did Iacobelli deny rank and file UAW workers of honest and effective representation, he also denied the tax-paying citizens of his fair share of taxes. Through his criminal tax fraud, Iacobelli "in effect stole from his fellow taxpayers." *United States v. Trupin*, 475 F.3d 71, 76 (2d Cir. 2007), *cert. granted, judgment vacated on other grounds*, 552 U.S. 1089 (2008). "While tax fraud is not violent in nature, at its heart, it is theft, specifically theft of money to which the public is entitled." *United States v. Taylor*, 499 F.3d 94, 102 (1st Cir. 2007), *cert. granted, judgment vacated on other grounds*, 552 U.S. 1092 (2008).

C.    **Respect for the Law and Just Punishment**

The Court's sentence for Iacobelli's crimes needs to promote respect for the law and impose just punishment for his misconduct. Iacobelli was employed at a very high and sensitive level of a public company, and he intentionally acted to violate federal law in the interests of his company. Over 45,000 hourly employees for FCA were represented by the UAW during the period of the conspiracy. These men and women believed that their union leaders were looking out for their best interests and negotiating in good faith, not double dealing them for personal gain. Through this criminal conspiracy, however, FCA and its executives, like Iacobelli,

10

and the UAW and its officials, were operating under a corrupted labor-management process. During his involvement in the scheme, Iacobelli was the quarterback of this criminal conspiracy. It is difficult to calculate the harm that resulted to the grievance process, the bargaining process, and labor relations generally. Despite this difficulty, there is no doubt about the need to impose punishment for the wrongdoing and to vindicate the rule of law in the face of such long-standing and extensive criminal conduct.

However, part of just punishment is a recognition of sincere acceptance of responsibility and remorse. Through their dealings with Iacobelli, government agents and prosecutors have identified such qualities in Iacobelli's genuine acknowledgement of the gravity of his wrongdoing. Iacobelli pleaded guilty to both his participation in the Taft-Hartley conspiracy and to his tax violation. The Court's sentence should factor Iacobelli's contrition and acceptance of responsibility in determining an appropriate sentence.

### D. Deterrence

Given the importance of the integrity of good faith and honest-dealing in labor-management negotiations, general deterrence is a critical component of the Court's sentence in this case. Corporate executives and high-level union officials need to know that labor corruption will be punished severely. Business executives

11

like Iacobelli who are responsible for negotiating with labor leaders need to know that their dealings with union officials must be conducted at the highest level of honesty, integrity, and transparency.  White collar criminals are "prime candidates for general deterrence," because they act rationally, calculating and comparing the risks and the rewards before deciding whether to engage in criminal activity. *United States v. Peppel*, 707 F.3d 627, 637 (6th Cir. 2013).  Corporate executives spend their days and nights determining risk and calculating the costs of their business plans.  This Court can inject those plans with the knowledge that illegal payments to union officials will receive significant punishment.

In the same way, deterrence needs to be served in terms of Iacobelli's violations of the tax laws through his avoidance of over $800,000 in taxes on the significant stream of income he directed to himself.

### III.   Conclusion

Acting in the interests of his corporate employer, Iacobelli was a leader and organizer of serious criminal activity.  He also avoided paying over $800,000 in taxes on income and benefits he received.  Iacobelli's criminal conduct, and the criminal conduct of his co-conspirators, have undermined the trust and confidence that hundreds of thousands of rank and file union members have in the integrity of their union's leadership and the integrity of the collective bargaining process.  This

12

harm is not limited to the tens of thousands of FCA hourly employees.  Iacobelli participated in the most serious of criminal conduct that resulted in poisonous and lasting harm.  Because the criminal conduct at issue in this case is subject to repetition in this and other industries, there is a great need to strengthen general deterrence so as to dissuade other executives, companies, and unions from engaging in similar crimes.  Finally, Iacobelli has engaged in extensive and serious efforts, described elsewhere, to take responsibility for his conduct and to cooperate with the government's ongoing investigation of long-standing criminal conduct.  The Court should recognize these efforts and sentence Iacobelli to a term of 76 months of imprisonment so as to achieve the goals of Section 3553(a).

<div style="margin-left: 50%;">

MATTHEW SCHNEIDER
United States Attorney

s/David A. Gardey
DAVID A. GARDEY
ERIN S. SHAW
CHARLES J. KALIL II
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone:  (313) 226-9591

</div>

Dated: August 20, 2018

<div style="text-align: center;">13</div>

Case 2:17-cr-20406-FDB-RSW   ECF No. 132   filed 08/20/18   PageID.892   Page 14 of 14

## CERTIFICATE OF SERVICE

I hereby certify that on August 20, 2018, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to the following:

Counsel of Record for Alphons Iacobelli

s/David A. Gardey

DAVID A. GARDEY
ERIN S. SHAW
CHARLES KALIL II
Assistant United States Attorneys
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone:  (313) 226-9591

Dated: August 20, 2018

# Exhibit 57

**2018 WL 4030815**
United States District Court, E.D.
Michigan, Southern Division.

Beverly L. SWANIGAN, Brian Lee Keller,
and Sheri Anolick, individually and on
behalf of other similarly situated, Plaintiffs,
v.
FCA US, LLC, a foreign limited liability
company, and International Union, United
Automobile, Aerospace and Agricultural
Implement Workers of America, ("UAW"),
jointly and severally, Defendants.

Case No.: 18-cv-10319
|
Signed 08/23/2018

**Attorneys and Law Firms**

Brian Farrar, James C. Baker, Raymond J. Sterling, Sterling Attorneys at Law, P.C., Bloomfield Hills, MI, for Plaintiffs.

Brian M. Schwartz, Miller, Canfield, Jeffrey D. Sodko, UAW Legal Dept., William J. Karges, III, International Union, UAW, Detroit, MI, David D. O'Brien, Miller, Canfield, Ann Arbor, MI, Jacob Eden Cohen, Steven L. Holley, Sullivan and Cromwell LLP, New York, NY, Julia Marie Jordan, Sullivan and Cromwell LLP, Abigail V. Carter, Elisabeth Oppenheimer, Bredhoff & Kaiser, PLLC, Washington, DC, Thomas W. Cranmer, Miller Canfield Paddock and Stone PLC, Troy, MI, for Defendants.

**OPINION AND ORDER GRANTING FCA
US LLC'S MOTION TO DISMISS SECOND
AMENDED COMPLAINT [#27] AND GRANTING
UAW INTERNATIONAL'S MOTION TO
DISMISS PLAINTIFFS' SECOND AMENDED
COMPLAINT [#28] AND DISMISSING ACTION**

GERSHWIN A. DRAIN, United States District Judge

**I. INTRODUCTION**

*1 Plaintiffs Beverly Swanigan, Brian Lee Keller, and Sheri Anolick filed the instant putative class action lawsuit against their employer, Defendant FCA US LLC ("FCA"), and their union, the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America

("UAW") on January 26, 2018. Plaintiffs filed their Second Amended Class Action Complaint on May 22, 2018.

Presently before the Court are the Defendants' Motions to Dismiss the Second Amended Class Action Complaint, both filed on June 5, 2018. Plaintiffs filed a Consolidated Response in Opposition on July 10, 2018, and the Defendants filed their Reply Briefs on July 31, 2018. A hearing was held on August 20, 2018. For the reasons that follow, the Court will grant Defendant FCA's Motion to Dismiss and will also grant Defendant UAW's Motion to Dismiss.

**II. FACTUAL BACKGROUND**
Plaintiffs and the potential class members are all past or current employees of FCA, as well as past or current members of the UAW, a labor union that represents employees of several automakers. Plaintiffs characterize the instant action as a "hybrid" claim under Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185.

Plaintiffs allege that after Chrysler Corporation emerged from bankruptcy in 2009, the UAW Benefits Trust ("UAW Trust") owned 41% of Chrysler. Italian automaker, Fiat S.p.A. ("Fiat"), which is now Defendant FCA, as well as the United States and Canadian governments owned the remaining shares. In January of 2014, FCA purchased the 41.5 % interest that the UAW Trust held in Chrysler for approximately $4.4 billion dollars.

As members of the UAW, Plaintiffs pay periodic dues, the majority of which fund the collective bargaining and other negotiating processes between FCA and the UAW. Between 2009 and June of 2015, FCA designated Alphons Iacobelli, its Vice President of Labor Relations, to be its lead representative for managing the FCA's bargaining relationship with the UAW. Between 2009 and early 2015, the UAW designated General Holiefield to be its lead representative for managing UAW's bargaining relationship with FCA. The UAW also designated Virdell King as a senior representative alongside Holiefield in the negotiation process with FCA.

On July 26, 2017, federal indictments against Iacobelli and King were unsealed charging both with conspiracy to violate the LMRA, 29 U.S.C. § 186. On January 15, 2018, Iacobelli entered a Rule 11 Plea Agreement wherein he admitted to knowingly and voluntarily joining a conspiracy in which FCA and its executives agreed to pay money —more than 1.5 million—and things of value to officers and employees of the UAW, including Holiefield and

Case 1:19-cv-06770-EK-MMH    Document 34-20    Filed 08/21/20    Page 18 of 42 PageID #: 1303

Swanigan v. FCA US, LLC, Not Reported in Fed. Supp. (2018)

2018 WL 4030815, 2018 L.R.R.M. (BNA) 304,131

King. Iacobelli's Plea Agreement further states that these payments were provided to UAW officers with the intent to obtain benefits, concessions and advantages for FCA in the negotiation and implementation of collective bargaining agreements. Plaintiffs assert that "discovery will likely reveal that the collusion impacted the sale of the equity interest in old Chrysler." Sec. Am. Compl. at ¶ 69. In support of this allegation, Plaintiffs rely on a December 2013 email from Iacobelli to another FCA executive confirming that Holiefield "had been 'scripted' in advance of the scheduled meeting between Holiefield and other members of the UAW's International Executive Board." *Id.* at ¶ 70. During this time, the UAW International Executive Board was considering the terms of a multi-billion dollar purchase for the equity held by the UAW Trust.

**\*2** King also entered a Rule 11 Plea Agreement on August 17, 2017, wherein he admitted that as a senior UAW official he was responsible for negotiating and administering collective bargaining agreements on behalf of FCA employees. Plaintiffs also allege that discovery will likely reveal that their UAW membership dues were used to pay for non CBA matters, including costs and expenses associated with the valuation, purchase and sale of the UAW's Trust interest in Chrysler. During Iacobelli's plea, he testified that the collusion tainted the negotiations between FCA and the UAW Trust, which led to a non-arm's length transaction. *Id.* at ¶ 88.

Plaintiffs were unaware of the collusion until the indictments were unsealed and became available to the public in July of 2017. Plaintiffs filed this action roughly six months later and prior to exhausting any remedies pursuant to the UAW constitution. Plaintiffs assert that they had no ability or duty to exhaust their contractual remedies under the operative collective bargaining agreement or internal union procedures because of the prolonged and expansive collusive conduct of UAW and FCA officials, thus rendering exhaustion of internal remedies futile.

### III. LAW & ANALYSIS

#### A. Standard of Review

Federal Rule of Civil Procedure 12(b)(6) allows the court to make an assessment as to whether the plaintiff has stated a claim upon which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6). "Federal Rule of Civil Procedure 8(a)(2) requires

only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (citing *Conley v. Gibson*, 355 U.S. 41, 47 (1957) ). Even though the complaint need not contain "detailed" factual allegations, its "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true." *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007) (quoting *Bell Atlantic*, 550 U.S. at 555, 127 S.Ct. 1955).

The court must construe the complaint in favor of the plaintiff, accept the allegations of the complaint as true, and determine whether plaintiff's factual allegations present plausible claims. To survive a Rule 12(b)(6) motion to dismiss, plaintiff's pleading for relief must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (citations and quotations omitted). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *Id.* "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Id.* The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Id.* at 1950.

The district court generally reviews only the allegations set forth in the complaint in determining on whether to grant a Rule 12(b)(6) motion to dismiss, however "matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account. *Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir. 2001). Documents attached to a defendant's "motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Id.*

#### B. FCA's Motion to Dismiss

Case 1:19-cv-06770-EK-MMH    Document 34-20    Filed 08/21/20    Page 19 of 42 PageID #: 1304

Swanigan v. FCA US, LLC, Not Reported in Fed. Supp. (2018)
2018 WL 4030815, 2018 L.R.R.M. (BNA) 304,131

**\*3** In Defendant FCA's Motion to Dismiss, it raises several arguments in support of dismissal. First, FCA argues that Plaintiffs have failed to allege an actionable violation of the LMRA because: (1) there is no viable Section 301 claim based on the alleged dissatisfaction with the price at which the UAW Trust sold certain securities to FCA because the UAW Trust is not a labor organization and has nothing to do with collective bargaining or any terms or conditions of Plaintiffs' employment, (2) Plaintiffs fail to allege a breach of any collective bargaining agreement and lastly, (3) Plaintiffs cannot transform a Section 302 claim—improper payoffs to union officials—into a Section 301 claim because Section 302 does not create a private right of action. FCA also maintains that dismissal of this action is warranted because Plaintiffs fail to adequately allege that they are excused from exhausting their administrative remedies. The Court will address each argument in turn.

### 1. Violation of the LMRA

Employee actions under § 301 are characterized as "hybrid" claims and to recover employee-union members "must prove both (1) that the employer breached the collective bargaining agreement and (2) that the union breached its duty of fair representation." *Garrish v. Int'l Union*, 417 F.3d 590, 594 (6th Cir. 2005). "If both prongs are not satisfied, Plaintiffs cannot succeed against any Defendant." *Id.* Section 301 actions authorize federal courts to hear "[s]uits for violation of contracts between an employer and a labor organization[.]" 29 U.S.C. § 185(a).

As an initial matter, FCA first argues that the Purchase Agreement between the UAW Trust and the FCA does not fall within the purview of Section 301 for the following reasons: (1) the UAW Trust is not a labor organization, rather it is an entirely separate entity from the UAW, thus it is not an agreement between an employer and a labor organization, and (2) has nothing to do with collective bargaining.

Plaintiffs fail to address this argument in their Responsive Brief. At the hearing in this matter, Plaintiffs asserted that they had not waived this aspect of their claim. Plaintiffs failure to address FCA's argument in their Responsive brief "constitutes waiver or abandonment[.]" *Beydoun v. Countrywide Home Loans, Inc.*, No. 09-10445, 2009 WL 1803198, \*3, 2009 U.S. Dist. LEXIS 53309 \*8 (E.D. Mich. Jun. 23, 2009); *Ortiz v. Gaston Cty. Dyeing Mach. Co.*, 277 F.3d 594, 597 (2d Cir. 2002). It appears to the Court that Plaintiffs failure to respond

to FCA's argument may be due to the apparent meritorious argument advanced.

The LMRA defines labor organizations as "any organization ... in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." 29 U.S.C. § 152(5). The UAW Trust does not fall within this definition because it is "a voluntary employees beneficiary association trust," *Fiat N. Am. LLC v. UAW Retiree Med. Benefits Trust*, C.A.No. 7903 (DFP), 2013 WL 3963684, \*2 (Del. Ch. Jul. 30, 2013), and "union benefit trust funds ... are not 'labor organizations' " as a matter of law. *Smith v. Hickey*, 482 F.Supp. 644, 648 (S.D.N.Y. 1979); *see also Tr. of Operating Eng'rs Pension Trust v. Tab Contractors, Inc.*, 224 F.Supp.2d 1272, 1279 (D. Nev. 2002) (holding that union "Trust Funds are not 'labor organizations' " under the LMRA); *Morrissey v. Curran*, 483 F.2d 480, 484 (2d Cir. 1973) (same); *Marine Terminal, Welfare Fund v. Tri-River Docks, Inc.*, No. 94-cv-3461 (GMM), 1992 WL 82389, \*5 (N.D. Ill. Apr. 20, 1992). Therefore, Plaintiffs cannot allege that the UAW Trust is a labor organization; rather it is a separate legal entity from the UAW that is an employee benefits trust.

Additionally, the Trust Agreement does not fall within the purview of § 301 because it is not a labor contract, which relates to "hiring and work and pay in [the bargaining] unit." *J.I. Case Co. v. N.L.R.B.*, 321 U.S. 332, 334-35, 64 S.Ct. 576, 88 L.Ed. 762 (1994); *see also Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 563, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976) ("Wages, hours, working conditions, seniority, and job security" are the typical subjects of labor contracts.) Here, the Purchase Agreement does not deal with the wages, working conditions and employment relationship of FCA's employees, thus it is not a labor contract within the LMRA and there is no available § 301 cause of action for Plaintiffs related to the sale of the Trust's interest in Chrysler.

**\*4** FCA next argues that dismissal is appropriate because Plaintiffs fail to allege any specific provision of any collective bargaining agreement that was breached by FCA's conduct. [1] In their Responsive Brief, Plaintiffs concede that their Second Amended Class Action Complaint fails to allege a breach of any provision of the operative collective bargaining agreement. *See* Plfs.' Resp. at Pg ID 650 ("[P]laintiffs plead FCA's violation of federal labor law, not the express terms of the CBA.") Plaintiffs maintain that since they have alleged

Swanigan v. FCA US, LLC, Not Reported in Fed. Supp. (2018)

2018 WL 4030815, 2018 L.R.R.M. (BNA) 304,131

FCA bribed the UAW, an unfair labor practice under the NLRA, they have sufficiently alleged a breach of contract to withstand Rule 12(b)(6) scrutiny. Plaintiffs' argument is without merit.

1    The UAW also asserts this argument in its Motion to Dismiss.

Relying on *Smith v. Evening News Ass'n*, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962), Plaintiffs argue that the Supreme Court has held that an employer's unfair labor practice is also a breach of a collective bargaining agreement giving rise to the right to seek redress under the LMRA. Plaintiffs misconstrue the holding in *Smith*. In *Smith*, the plaintiff-petitioner brought suit alleging that his employer breached a collective bargaining contract by discriminating against him based on his membership in a labor organization. *Id.* at 195-96, 83 S.Ct. 267. The trial court dismissed the action concluding that the plaintiff-petitioner's allegations, if true, would make out an unfair labor practice under the National Labor Relations Act, thus the subject matter of the suit was within the sole jurisdiction of the National Labor Relations Board. *Id.* at 196, 83 S.Ct. 267.

The Supreme Court reversed and concluded that the National Labor Relations Board did not have exclusive jurisdiction over an action alleging a breach of contract that would also amount to an unfair labor practice and such a suit does not destroy § 301 jurisdiction in the federal courts. *Id.* at 197, 83 S.Ct. 267. The *Smith* court did not hold that an unfair labor practice can be a breach of a collective bargaining agreement under § 301. To the contrary, the *Smith* action was based on a breach of a collective bargaining agreement. *Id.* at 196, 83 S.Ct. 267.

Moreover, the Court rejects Plaintiffs' assertion that the *Smith* court recognized other cases holding that an employer's violation of federal labor law is sufficient to support breach of a collective bargaining agreement under § 301. In all of those cases, the action alleged a violation of a collective bargaining agreement. *See Atkinson v. Sinclair Rfg Co.*, 370 U.S. 238, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962) (alleging breach of a clause prohibiting union members to strike in a collective bargaining agreement); *Local 174, Teamsters Union v. Lucas Flour Co.*, 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962) (alleging a breach of clause in collective bargaining agreement); *Charles Dowd Box Co. v. Courtney*, 368 U.S. 502, 82 S.Ct. 519, 7 L.Ed.2d 483 (1962)(same).

Plaintiffs' suggestion that the Supreme Court has held that an unfair labor practice is a breach of contract sufficient to state a claim under § 301 is contrary to Supreme Court precedent holding that the National Labor Relations Board has exclusive jurisdiction over unfair labor practice claims. *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 245, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959); *Martin v. Lake County Sewer Co.*, 269 F.3d 673, 680 (6th Cir. 2001)(dismissing a "claim alleg[ing] bad-faith bargaining" because such a claim is "an unfair labor practice claim over which the NLRB has exclusive jurisdiction.")

Plaintiffs are asking this Court to ignore well settled precedent requiring § 301 Plaintiffs to allege a claim for breach of contract. *See Young v. Int'l Union,* 148 F.Supp.3d 602, 616 (E.D. Mich. 2015), aff'd, 686 Fed.Appx. 304 (2017) (dismissing hybrid Section 301 claim because the plaintiffs failed to "identify specific contract provisions that support their assertions of how Defendants breached the CBA and other agreements."); *see also Campbell v. PMI Food Equip. Grp., Inc.*, 509 F.3d 776, 787 (6th Cir. 2007)(affirming dismissal "because there is a complete absence of factual allegations to support a claim for breach of contract."). Plaintiffs argue that these decisions do not apply here because these cases involved "contract interpretation," rather than claims alleging bribery and collusion. This purported distinction is counterintuitive; this well settled authority required the plaintiffs to plead a breach of contract because § 301 applies to suits that are "filed *because a contract has been violated.*" *Textron v. UAW*, 523 U.S. 653, 657, 118 S.Ct. 1626, 140 L.Ed.2d 863 (1998)(emphasis in original). Plaintiffs "cannot avoid having to show breach-of-contract by 'artful[ ] pleading[.]' " *Young*, 686 Fed.Appx. at 312.

**\*5**  Lastly, Defendant FCA argues that Plaintiffs have not sufficiently alleged a § 301 claim because they are attempting to bring a disguised § 302 claim for bribery and collusion, which does not provide a private right of action pursuant to Sixth Circuit authority. 2  *See Ohlendorf v. United Food & Comm. Workers Int'l Union, Local 876*, 883 F.3d 636, 640 (6th Cir. 2018); *Garrish v. Int'l Union United Auto., Aerospace & Agric. Implement Workers of Am.*, 417 F.3d 590 (6th Cir. 2005). Defendants are correct.

2    The UAW also raises this argument in its Rule 12(b)(6) motion.

"Section 302 of the Labor Management Relations Act makes it a crime for an employer to willfully give money to a labor

2018 WL 4030815, 2018 L.R.R.M. (BNA) 304,131

union, 29 U.S.C. § 186(a), and for a labor union to willfully accept money from an employer, *id.* § 186(b). *Ohlendorf,* 883 F.3d at 640. The *Ohlendorf* court rejected the plaintiffs' argument that Section 302 confers a right for private parties to sue. *Id.* at 639-40. Here, Plaintiffs characterize their claim as a hybrid § 301 claim but their allegations stem from "collusion" between FCA and the UAW whereby the FCA "transferred prohibited payments and things of value to UAW officers ... to obtain company-friendly positions at the bargaining table and elsewhere." Sec. Am. Compl. at §§ 2, 67. However, allegations of "improper payoffs to union officials" "may not be redressed pursuant to § 301." *Garrish,* 417 F.3d at 597-98.

Plaintiffs mistakenly suggest that *Ohlendorf* is inapplicable here because the plaintiffs in that action brought a single count under § 302, whereas here, Plaintiffs have brought their action under § 301. Plaintiffs simply cannot bring a purported hybrid claim under the LMRA which is in reality a disguised claim under § 302. *Ohlendorf,* 883 F.3d at 642 (rejecting contention that § 302 criminal provision provides for a private right of action because "Section 302 is flanked by provisions of the [LMRA] that expressly establish private rights of action" however Section 301's "provision—creating a right of action for violations of [cbas]—does not cover this dispute.... We should respect [Congress's] ability to decide when, and when not, to create private rights of action."); *see also Granite Rock Co. v. Int'l Bhd. of Teamsters,* 561 U.S. 287, 311, 130 S.Ct. 2847, 177 L.Ed.2d 567 (2010)(holding that "[t]he balance federal statutes strike between employer and union relations in the collective-bargaining arena is carefully calibrated," and thus Section 301 may not be extended beyond its narrow confines as "a grant of jurisdiction only to enforce contracts."). Contrary to Plaintiffs' argument, *Ohlendorf* does not endorse characterizing a Section 302 claim as a hybrid § 301 claim, rather *Ohlendorf* stressed that federal courts must respect Congress's decision about "when, and when not, to create private rights of action." *Ohlendorf,* 883 F.3d at 642.

Plaintiffs also attempt to distinguish *Garrish* by arguing the case was at the summary judgment stage, the decision to dismiss the action was based on the statute of limitations and the court did not specifically cite § 302. None of these purported distinguishing characteristics save Plaintiffs' claim. The *Garrish* court expressly held that, in addition to the failure to bring suit within the statute of limitations, judgment in favor of the employer and union was also appropriate for the additional reason that their "allegations may not be redressed pursuant to § 301—[ ][n]either the prolongation of a strike nor the payoffs constitutes a cause of action in the

instant appeal—GMC did not breach the NCBA and the union did not breach its duty of fair representation." *Garrish,* 417 F.3d at 598.

**\*6** Here, Plaintiffs have not alleged a breach of any provision in the operative collective bargaining agreement. Additionally, the UAW Trust is a separate entity that is not a labor organization and its Agreement does not qualify as a labor contract. Lastly, their purported § 301 claim is a disguised § 302 claim, which does not give them a private cause of action. For all of these reasons, Plaintiffs claims for breach of contract against FCA (Count I) and for breach of the duty of fair representation against the UAW (Count II) fail to state a viable cause of action and are dismissed.

### 2. Exhaustion of Contractual and Internal Union Remedies

Even if Plaintiffs sufficiently alleged a § 301 claim, this action must also be dismissed because Plaintiffs failed to adequately allege they are excused from attempting to exhaust both the grievance procedure established by the operative collective bargaining agreement, as well as the internal union remedies established by the UAW Constitution. In their Second Amended Class Action Complaint, Plaintiffs allege that FCA's and the UAW's "prolonged and expansive collusive conduct [renders] exhaustion of internal remedies [ ] futile if not impossible." Sec. Am. Compl. at ¶ 38.

Before aggrieved employees may bring a § 301 action, they must satisfy two separate exhaustion requirements. *Chapman v. United Auto Workers Local 1005,* 670 F.3d 677, 680-82 (6th Cir. 2015). Specifically, they must exhaust (1) "contractual grievance and arbitration procedures set forth in the collective bargaining agreement," and (2) "internal union ... appeal procedure[s] established in the UAW Constitution." *Id.* "Exhaustion of internal union remedies and resort to exclusive contractual remedies are separate prerequisites to an employee suit." *Willits v. Ford Motor Co.,* 583 F.2d 852, 856 (6th Cir. 1978).

In their Responsive Brief, Plaintiffs assert that their contractual duty to invoke the grievance procedure under the operable collective bargaining agreement is excused because employees are not required to utilize these internal union procedures when the union has breached its duty of fair representation. Plaintiffs cite to *Jackson v. Local Union 992,* 991 F.Supp.2d 71, 81 (D.D.C. 2014), but mainly rely on

*Hines v. Anchor Freight, Inc.*, 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976) for this proposition. Both cases do not demonstrate that Plaintiffs are excused from invoking the grievance process set forth in the collective bargaining agreement.

In *Hines*, employee-truck drivers were terminated from their employment based on charges of dishonesty. *Id.* at 556, 96 S.Ct. 1048. The employer's practice was to reimburse the drivers for lodging expenses while the drivers were on the road. *Id.* However, the employer had obtained evidence that the drivers sought reimbursement in excess of the actual motel charges. *Id.* Initially the union represented the drivers during the arbitration process set forth in the collective bargaining agreement. *Id.* Even though the union told the drivers there was no need to hire their own attorney and "there was nothing to worry about," the union did not investigate the motel and presented no evidence at the arbitration hearing other than the drivers' denials of the charges. *Id.* at 557-58, 96 S.Ct. 1048. The arbitration concluded in favor of the employer. *Id.* at 558, 96 S.Ct. 1048. After the drivers hired their own attorney, evidence came to light that the motel clerk listed the charges to the drivers in the motel's documents for less than what was actually charged to the drivers and pocketed the difference. *Id.*

The drivers filed suit alleging a breach of the collective bargaining agreement which required discharge for "just cause." *Id.* at 556, 96 S.Ct. 1048. They also sued the union asserting that the falsity of the charges would have been discovered had the union conducted the most minimal investigation, yet the union "made no effort to ascertain the truth of the charges ... and [therefore] had violated its duty of fair representation...." *Id.*

 **\*7** The Supreme Court ultimately concluded that employees seeking remedy pursuant to § 301 were not foreclosed from doing so when "the contractual processes have been seriously flawed by the union's breach of its duty to represent employees honestly and in good faith and without invidious discrimination or arbitrary conduct." *Id.* at 571, 96 S.Ct. 1048. Relying on its prior precedent in *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1960), and *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), the Supreme Court held that an employee may be excused from using collective bargaining grievance procedures under circumstances where "the union subverts the arbitration process by refusing to proceed ... or follows the arbitration to the end, but in so doing subverts the arbitration process by failing to fairly represent the employee." *Id.*

at 572, 96 S.Ct. 1048; *see also Jackson*, 991 F.Supp.2d at 81 (excusing exhaustion of grievance procedure where the complaint describes the difficulties the plaintiffs had in getting their union to respond to their grievances).

Thus, contrary to Plaintiffs' argument, *Hines* does not permit an employee to forego altogether the grievance process set forth in the collective bargaining agreement. Exhaustion is only excused when the union engages in unfair representation *during the grievance process*, and not, for any and all purported breaches of the duty of fair representation in the employment context. Rather, it must be a breach in the context of the actual grievance process. Here, Plaintiffs admit they have not attempted to invoke the collective bargaining agreement's grievance procedure. *Hines* does not permit them to do this prior to filing their § 301 suit.

Because Plaintiffs have not attempted to exhaust the grievance procedures outlined in the collective bargaining agreement, their § 301 claim must be dismissed. However, FCA also maintains that Plaintiffs have likewise failed to exhaust their internal union procedures as required by the UAW Constitution. Thus, this circumstance provides yet another reason for dismissal of the instant action. Plaintiffs counter that they are excused from exhausting the internal union procedures set forth in the UAW's Constitution because the "UAW's violations of its duty of fair representation have created hostility" which prevents these procedures from "adequately address[ing] the class's grievances ... [and cannot] provide the class with the full relief it seeks." Sec. Am. Compl. at ¶¶ 39-41.

Before bringing suit under § 301, plaintiffs must "show that internal union remedies were exhausted, or were futile, before allowing them to litigate a claim alleging a union's breach of the duty of fair representation." *Chapman*, 670 F.3d at 683. "The plaintiff bears the burden of showing that exhaustion should be excused." *Pearson v. United Auto Workers Int'l Union*, 694 Fed.Appx. 401, 403 (6th Cir. Aug. 16, 2017). [3]

3    Plaintiffs improperly argue that FCA and the UAW must establish the adequacy of their administrative procedures by citing to Second and Ninth Circuit authority, which is contrary to Sixth Circuit authority. *See Fruit and Vegetable Packers & Ware Local 760 v. Morley*, 378 F.2d 738 (9th Cir. 1967); *see also Johnson v. Gen. Motors*, 641 F.2d 1075, 1079-80 (2d Cir. 1981).

Courts have the discretion to decide whether to excuse exhaustion of internal union procedures if any of the

Case 1:19-cv-06770-EK-MMH    Document 34-20    Filed 08/21/20    Page 23 of 42 PageID #: 1308

Swanigan v. FCA US, LLC, Not Reported in Fed. Supp. (2018)
2018 WL 4030815, 2018 L.R.R.M. (BNA) 304,131

following three factors exist: (1) "the Union is so hostile to them that they have no hope of obtaining a fair hearing," (2) "internal union appeals procedures are inadequate to provide relief or reactivate their grievances," or (3) "exhaustion would unreasonably delay their chances to obtain a judicial hearing on the merits of their claims." *Spicer v. Ford Motor Co.*, 491 Fed.Appx. 543, 545 (6th Cir. Jul. 30, 2012).

In their Second Amended Class Action Complaint Plaintiffs speculate that due to the expansive nature of the collusion; the UAW is hostile to them. Plaintiffs do not explain in their pleading why they cannot receive a fair hearing in 2017 or 2018 when the conspirators are no longer in a position to thwart the internal union procedures. Additionally, Plaintiffs' assertion that the union would be hostile towards them ignores the fact that the UAW Constitution permits them to seek redress before the Public Review Board, which the Sixth Circuit has previously held consists of an "impartial" and "independent group of academic and social agency persons ... of good public repute and ... with no UAW affiliation." *Wagner v. General Dynamics*, 905 F.2d 126, 128 (1990).

**\*8** Plaintiffs' contention that the internal union procedures will not provide the full relief they seek is disingenuous. The UAW's Public Review Board "has the authority to require the Union to pay money damages." *Chapman*, 670 F.3d at 685; *see also Washington v. Ford Motor Co.*, 35 Fed.Appx. 160, 163 (6th Cir. 2002) ("The [UAW's] internal union appeals procedures available to [plaintiff], however, were plainly adequate to award [him] the only relief sought: monetary damages."); *Pearson*, 694 Fed.Appx. at 406 (Because the UAW's "[Convention Appeals Committee] has the authority to order the Union to pay monetary damages to [plaintiff]," plaintiff cannot show that the UAW's internal appeal bodies "would not be able to award the full relief he seeks.").

In support of their claim that they are excused from exhausting their internal union procedures, Plaintiffs assert that courts have "waived the exhaustion requirement in the face of management/union collusion." *See Parker v. Local 413, Intern Broth of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 657 F.2d 269 (6th Cir. 1981). However, Plaintiffs again misstate the holding of *Parker*, which excused exhaustion due to the union's "failure to provide meaningful review after receiving various complaints." *Id.* The *Parker* case demonstrates again that in order for collusive conduct to excuse exhaustion, such conduct must be directed toward, and impact the internal union procedure itself, which Plaintiffs do

not, and cannot allege in this matter because they failed to invoke their internal union procedures altogether.

Plaintiffs also rely on *Brown v. Int'l Union, United Auto Aerospace & Agr Implement Workers of Am.*, 512 F.Supp. 1337, 1353 (W.D. Mich. 1981), wherein the district court excused internal union remedy exhaustion in a class action case involving over 1,000 plaintiffs. *Id.* The *Brown* court noted it was unaware of any case "involving a class action of this magnitude and complexity...."). However, the *Brown* court relied on out-of-circuit authority that requires the defendant-union to establish its procedures and remedies are adequate. *Id.* (relying on *Foust v. Int. Broth. Elec. Workers*, 572 F.2d 710 (10th Cir. 1978) ). *Brown* is not controlling upon this Court, and it was decided in 1981, or before the Sixth Circuit decisions in *Chapman* and *Pearson*, which hold that it is the plaintiff's burden to establish the futility of exhaustion. *See Chapman*, 670 F.3d at 683; *Pearson*, 694 Fed.Appx. at 403.

Lastly, Plaintiffs argue, without any substantive allegations set forth in the Second Amended Class Action Complaint that a final reason to excuse exhaustion is that it will cause undue delay. Plaintiffs do not allege this in their pleading and this assertion is conclusory without any factual support.

Accordingly, the Court agrees that this action must be dismissed for the additional reason that Plaintiffs have not sufficiently alleged they should be excused from exhausting their contractual remedies and internal union procedures.

### 3. Amendment

In their Responsive Brief, Plaintiffs ask that they be allowed to amend their pleading to correct any deficiencies the Court finds with respect to their allegations. A bare request without providing any explanation as to how Plaintiffs will remedy their deficient allegations does not warrant leave to amend. *Patterson v. Novartis Pharm. Corp.*, 451 Fed.Appx. 495, 499 (6th Cir. 2011).

To the extent Plaintiffs believe *Garrish* provides them an avenue for stating a claim, they are mistaken. The *Garrish* court held that "the hiring of unqualified employees is a viable claim under § 301," 471 F.3d at 598, and here, Plaintiffs could similarly allege that the collusive conduct of the FCA and UAW involved the hiring of UAW family members at the National Training Center. However, the National Training

Center is a separate legal entity. As such, hiring UAW members to work there would not amount to a breach of the operative collective bargaining agreement between FCA and the UAW. Such a claim would therefore be futile. Their request to amend their pleading is denied. *Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 519 (6th Cir. 2001)(holding that leave to amend should be denied where amendment would be futile); *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000) (A "proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss.")

### C. UAW's Motion to Dismiss

**\*9** Because the Court concludes that Plaintiffs' purported § 301 claim fails as a matter of law since (1) Plaintiffs have not alleged a breach of the operable collective bargaining agreement, as well as (2) pursuant to Sixth Circuit precedent of *Ohlendorf,* 883 F.3d at 640 and *Garrish*, 417 F.3d at 595, their claim against the UAW for breach of the duty of fair representation fails as a matter of law. *Garrish*, 417 F.3d at 595. (If a § 301 claimant cannot establish that the employer breached the collective bargaining agreement *and* that the union breached its duty of fair representation, he cannot succeed against either his employer or his union)(emphasis supplied).

In its present motion, the UAW makes many of the same arguments in support of dismissal as the FCA, namely that Plaintiffs have not alleged a breach of the collective bargaining agreement; their claims are precluded by *Ohlendorf* and *Garrish*, and lastly, they failed to exhaust their contractual and internal union procedures. The Court need not repeat its conclusions with respect to these arguments. However, the UAW raises two additional arguments in support of their Rule 12(b)(6) Motion. Specifically, the UAW maintains that Plaintiffs have not alleged any harm proximately caused by Defendants' purported actions and Plaintiffs' claims are time-barred.

### 1. Proximate Cause

The UAW argues that even if Plaintiffs had adequately alleged a breach of the collective bargaining agreement, they have failed to articulate the harmful effects of the purported breach. Plaintiffs allege that the unlawful payments made to the UAW officials "allow[ed] FCA to obtain company-friendly concessions from the UAW during the collective bargaining process." Sec. Am. Compl. at ¶ 100. However, Plaintiffs do not specify which provisions of the collective bargaining agreements would have been different absent the payments. *See Anderson v. United Paperworks Int'l Union*, 641 F.2d 574, 580 (8th Cir. 1981) (no damages available when "it is mere speculation" that a better agreement could have been reached absent union's breach).

Plaintiffs also argue that the harm they suffered was the improper collection and use of union dues while the UAW engaged in collusive conduct. Thus, Plaintiffs maintain that their Second Amended Class Action Complaint provides sufficient reason to award their dues back. The UAW counters that return of union dues is inappropriate in this case, asserting that it is not aware of any case where member dues were refunded in a Section 301 action.

Neither party provides controlling authority on this point, rather both cite to *Addington v. U.S. Airline Pilots Ass'n, Nos. CV08-1633, CV08-1728-PHX-NVW, 2009 WL 856334 (D. Ariz. Mar. 26, 2009)*, where the court recognized the limited circumstance where restitution in the form of return of dues may be appropriate when collection of dues were coerced by threats or when the union spends the dues on "expenditures unrelated to collective bargaining and labor disputes." *Id.* at \*2 (citing *Int'l Ass'n of Machinists v. Street*, 367 U.S. 740, 775, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961), *Dean v. Trans World Airlines, Inc.*, 708 F.2d 486, 488 (9th Cir. 1983) ).

Based on this authority, it appears there is some precedent for providing relief in the form of union dues, if such dues were used for purposes outside of the collective bargaining process or labor disputes. However, Plaintiffs' Second Amended Class Action Complaint stops short of making this allegation. Rather, they allege that "[d]iscovery will likely reveal that dues paid were used to pay non-CBA matters...." Sec. Am. Compl. at ¶ 81. In fact, Plaintiffs' pleading repeatedly asserts that discovery "*will likely*" reveal more information. *Id.* at ¶ 68, 104 and 115 (emphasis in original). A party may not "use the discovery process to obtain" the very facts needed to file a suit. *Holliday v. Wells Fargo Bank, NA*, 569 Fed.Appx. 366, 372, n.1 (6th Cir. 2014); *Patterson*, 451 Fed.Appx. at 498 ("The Supreme Court's decisions in *Twombly* and *Iqbal* do not permit a Plaintiff to proceed past the pleading stage and take discovery in order to cure a defect in a complaint.")

**\*10** Thus, Plaintiffs' § 301 claim also suffers from a failure to allege their specific injuries resulting from the collusive

2018 WL 4030815, 2018 L.R.R.M. (BNA) 304,131

conduct of the UAW and FCA officials. For this additional reason, Plaintiffs have failed to state an actionable § 301 claim.

### 2. Statute of Limitations

Lastly, the UAW argues that even if Plaintiffs have stated a viable § 301 claim, it is nonetheless subject to dismissal because their claim is time barred under the applicable statute of limitations. The statute of limitations for a § 301 claim is six months. *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 172, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). The claim accrues "when the plaintiff discovers, or with due diligence should have discovered, the injury that is the basis of the action." *Patterson v. Chrysler Grp., LLC*, 845 F.3d 756, 763-64 (6th Cir. 2017).

The UAW maintains that even if Plaintiffs adequately plead harm associated with the collective bargaining agreements and the UAW Trust's sale of its equity share in Chrysler, this harm should have been apparent to them long before 2018. The UAW theorizes that Plaintiffs should have known of the injuries when the collective bargaining agreement was ratified in 2015, thus their statute of limitations ran in 2016. Similarly, their claims associated with the sale of the Trust's stock accrued when that transaction was consummated in 2014. The UAW argues that Plaintiffs cannot rely on the unsealing of Iacobelli's and King's Indictments in July of 2017 because Plaintiffs were aware of the terms of the collective bargaining agreement and sale of the stock much earlier than 2017.

Plaintiffs counter that July 26, 2017 was the earliest that they had any knowledge of the collusion giving rise to this action because this was the first time it was publicly disclosed that Iacobelli, King and Holiefield were engaged in collusion.

Because the Court finds that Plaintiffs have not stated a claim under § 301 and failed to exhaust their administrative remedies, the Court need not resolve the UAW's statute of limitations argument. However, the Court finds that the UAW's statute of limitations argument has limited merit because Plaintiffs could not have known of the unlawful acts of FCA and UAW executives until it came to light publicly.

### IV. CONCLUSION

Accordingly, for the reasons articulated above, FCA US LLC's Motion to Dismiss Second Amended Complaint [#27] is GRANTED.

The UAW International's Motion to Dismiss Plaintiffs' Second Amended Complaint [#28] is also GRANTED.

This cause of action is DISMISSED.

SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2018 WL 4030815, 2018 L.R.R.M. (BNA) 304,131

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 58

Case 1:19-cv-06770-EK-MMH   Document 34-20   Filed 08/21/20   Page 27 of 42 PageID
#: 1312
Case 2:17-cr-20406-PDB-RSW   ECF No. 134-20   filed 09/05/18   PageID.869   Page 1 of 55

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**UNITED STATES OF AMERICA,**

        Plaintiff,

                                      **HONORABLE PAUL D. BORMAN**

  v.                                 **No. 17-20406**

**ALPHONS IACOBELLI,**

        Defendant.
_____/

**SENTENCING**

**Monday, August 27, 2018**

**10:00 a.m.**

APPEARANCES:

   For the Plaintiff:          **DAVID A. GARDEY**
                              **CHARLES J. KALIL, II**
                              **ERIN SHAW**
                              U.S. Attorney's Office
                              211 West Fort Street
                              Suite 2001
                              Detroit, Michigan  48226
                              (313) 226-9100

   For the Defendant:          **DAVID F. DUMOUCHEL**
                              Butzel Long
                              150 West Jefferson
                              Suite 900
                              Detroit, Michigan  48226
                              (313) 225-7000

   (Appearances continued):

To Obtain Certified Transcript, Contact:
Leann S. Lizza, CSR-3746, RPR, CRR, RMR, CRC
(313) 234-2608

Case 1:19-cv-06770-EK-MMH   Document 34-20   Filed 08/21/20   Page 28 of 42 PageID
Case 2:17-cr-20406-FDB-RSW   ECF No. 134   filed 09/05/18   PageID.940   Page 2 of 35
#: 1313

2

APPEARANCES (Continued):

   For the Defendant:        **DAMIEN P. DUMOUCHEL**
                                   Butzel Long
                                   Stoneridge West
                                   41000 Woodward Avenue
                                   Bloomfield Hills, Michigan
                                     48304
                                   (248) 258-2610

Case 1:19-cv-06770-EK-MMH   Document 34-20   Filed 08/21/20   Page 29 of 42 PageID
#: 1314
Case 2:17-cr-20406-PDB-RSW   ECF No. 134   filed 09/05/18   PageID.841   Page 3 of 35

3

**TABLE OF CONTENTS**

Sentencing                                                    Page

  Allocution by Mr. David DuMouchel                            8

  Allocution by Mr. Iacobelli                                 17

  Response by Mr. Gardey                                      18

  Imposition of sentence by the Court                         25


Exhibits:                                                Received

  (None offered.)

**SENTENCING**

                                    August 27, 2018

                                    Detroit, Michigan

                                    -   -   -

    (Call to order of the Court, 10:00 a.m.)

    (Court, Counsel and Defendant present.)

        THE COURT CLERK:  Now calling the case the *United States of America versus Alphons Iacobelli*, Case Number 17-20406.

        THE COURT:  Parties please identify themselves for the record beginning with the government.

        MR. GARDEY:  Good morning, Your Honor.  David Gardey appearing on behalf of the United States.

        MS. SHAW:  Erin Shaw for the United States.

        MR. KALIL:  Charles Kalil on behalf of the United States.

        THE COURT:  Okay.  Who will be arguing?

        MR. GARDEY:  I will, Your Honor.

        THE COURT:  Okay.  Thank you.

        And for defendant, please.

        MR. DAVID DUMOUCHEL:  Good morning, Your Honor.  David DuMouchel and Damien DuMouchel appearing on behalf of Mr. Iacobelli, and I'll be arguing this morning.

        THE COURT:  Good morning, Mr. Iacobelli.

        THE DEFENDANT:  Good morning.

        THE COURT:  Why don't you all sit down for a minute.

Case 2:17-cr-20406-PDB-RSW   ECF No. 134   filed 09/05/18   PageID.843   Page 5 of 35

**SENTENCING**                                                    5

Let me just...

There is a scrivener's error, I think, in the pre that we're going to deal with sidebar, presentence report, so if counsel for defendant and counsel for government and Miss Vue -- could the probation officers please identify themselves for the record and spell their first name and last name.

MS. VUE:  Yes, Your Honor.  Good morning.  Xia, X-I-A, Vue, V-U-E, for the probation, Your Honor.

MS. MACK:  Good morning.  Tierra, T-I-E-R-R-A, Mack, M-A-C-K, U.S. probation.

THE COURT:  Thank you.  Okay.  Please.

(Bench conference held.)

**USA v. IACOBELLI, 17-20406**

**IMPOSITION OF SENTENCE BY THE COURT**                    25

MR. GARDEY:  Unless the Court has any questions, I have nothing further.

THE COURT:  Do you wish to respond further?

MR. DAVID DUMOUCHEL:  No, thank you, Your Honor.

THE COURT:  The Court has the sentencing of Mr. Alphons Iacobelli.  The factors the Court must take into account are, first, setting up the guideline range, and that is 96 months.  Then the government has filed a 5K where they believe that 76 is an appropriate sentence.

The factors that the Court is required to take into account in imposing sentence pursuant to Title 18 U.S.C. Section 3553(a) are the nature and circumstances of the offense, and it's difficult to imagine a more egregious offense and a more impactful offense of corrupting the labor management process and also while doing it stealing for himself large amounts of money.

And the history and characteristics of the defendant are good.  He has no prior involvement and, indeed, a history of good works in the community, schools.

There is a need for the sentence imposed to reflect the seriousness of this offense, promote respect for the law, provide just punishment, to afford adequate deterrence to criminal conduct.  And I do not believe there's a need to protect the public from further crimes of this defendant.

The offense was well documented in the charging papers

and also in the memorandum of both parties.  The offense took place within a large corporation that may have sought labor peace or even favoritism for the corporation, but I am sure that the large corporation did not know about how a defendant was enriching himself at its expense without regard to the other matters of giving money to union officials improperly.

The union itself, the members who were working at the training center and receiving money will be dealt with seriatim down the line for their willingness to be part of this scheme by accepting money that was not belonging to them and, indeed, was large amounts of money.  That remains to be dealt with in later sentences.

One thing that defense counsel raised, well, is saying about unwarranted disparities, and in this case we just have one person who has been sentenced.  But a recent opinion of the U.S. Court of Appeals for the Second Circuit in *U.S. v. Sampson* decided August 6, 2018, says the provision regarding unwarranted disparities, the primary purpose is to reduce unwarranted sentence disparities on a national level and not in a particular case.  So at this point there's only one sentence in this case and there are more to come.

But with regard to a tax crime, I think that it's worth noting that that shines a spotlight just on this defendant and it recalls the statement of Justice Holmes dissenting with Justice Brandeis back in a case in 1927 where

he said "Taxes are what we pay for civilized society."  So I believe that that is -- and it's tax crimes as well.  There's another recent case that talks about the fact that tax crimes represent an especially damaging category of criminal offenses which strike at the foundation of a functioning government. Here we have the tax crime and we also have a crime that strikes at the foundation of a functioning labor union management agreement by a huge corporation, tens of thousands of workers.

So taking these factors into account, the Court, pursuant to the Sentencing Reform Act, considering the guidelines and factors contained in 18 U.S.C. Section 3553(a), commits the defendant to the custody of the Bureau of Prisons for a term of 60 months on Count 1 and 6 months consecutive on Count 7 for a total of 66 months incarceration.

Upon release from imprisonment, defendant shall be placed on supervised release for a term of two years of Count 1 -- on Count 1 and one year on Count 7 to run concurrent.  Defendant pay a special assessment of $100 per count for a total of $200 which is due immediately.

The Court imposes a $10,000 fine which is due immediately.  Interest shall not accrue.

The Court waives costs of incarceration and costs of supervision due to the imposition of a fine.

With regard to restitution, I'm not going to deal with

that issue today, deal with that in a separate proceeding. I did receive a -- I guess a motion with regard to restitution by the National Training Center and I know that the government based on what I read in the papers is contesting that, and so we will deal with that at a later time. And this is permitted under the sentencing laws and the laws of the United States.

The mand -- there's no mandatory drug testing.

While on supervised release, defendant shall abide by the standard conditions adopted by this Court and comply with the following special conditions: Make monthly installment payments on any remaining balance of restitution that will be resolved later, fine or special assessment at a rate and schedule recommended by probation and approved by the Court, not incur new credit charges or open additional lines of credit without approval of the probation officer unless defendant's in compliance with the payment schedule, provide the probation officer access to requested financial information, fully cooperate with the IRS with regard to delinquent amended tax returns and file future returns as they are due. Also, make arrangements with the IRS regarding the amended tax returns for the affected years. I believe some of that has taken place already. And then file corrected tax returns for the years 2012 through -- not -- 2009, I think, through 2012, at least 90 days prior to the expiration of supervised release.

Let me ask counsel for defendant, are there any

Case 1:19-cv-06770-EK-MMH   Document 34-20   Filed 08/21/20   Page 36 of 42 PageID #: 1321

objections to the sentence just pronounced that have not previously been raised?

MR. DAVID DUMOUCHEL:  No, Your Honor.

THE COURT:  Same question, Mr. Gardey?

MR. GARDEY:  No objection.

THE COURT:  Within the Rule 11 plea agreement there is a waiver of the right to appeal if the sentence is within the guideline range and the sentence is except for one basis.  So tell Mr. Iacobelli that you have the right to appeal only on the ground of ineffective assistance of counsel.  You understand that, sir?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Okay.  If you wish to file such an appeal, it must be filed within 14 days of today's date.  You understand that, sir?

THE DEFENDANT:  Yes.  Yes, Your Honor.

THE COURT:  If you can not afford counsel to represent you on appeal and you want to appeal only on the basis of the ineffective assistance of counsel, then let the Court know and the Court would appoint counsel to represent you at no cost to yourself if you qualify for that.  But you must notify the Court within 14 days.  You understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  And the Court will allow him to surrender when designated.  Is there anything you wish to say with regard

**IMPOSITION OF SENTENCE BY THE COURT**

to that, Mr. DuMouchel?

MR. DAVID DUMOUCHEL: Yes. And also we'd like to address one matter on the appeal waiver, if we could.

THE COURT: Sure.

MR. DAVID DUMOUCHEL: And I don't want to get into the later conversation about the restitution, but it matters. The plea agreement --

THE COURT: There's a separate right to appeal from the restitution determination if it's done later, so you can do that --

MR. DAVID DUMOUCHEL: Okay.

THE COURT: -- after any -- even with this language in here.

MR. DAVID DUMOUCHEL: Our concern is I don't want this language to be used later, if there's a ruling on that that is unfavorable to Mr. Iacobelli. I wouldn't want this appeal waiver to be used to bar us from appealing --

THE COURT: The restitution matter?

MR. DAVID DUMOUCHEL: Yes.

THE COURT: Okay. Any objection to that?

MR. GARDEY: There are two parts to the restitution. One is the restitution to the United States Treasury for the tax offense, and the parties are in agreement on that.

THE COURT: Agreement on that, right.

MR. DAVID DUMOUCHEL: Right.

Case 1:19-cv-06770-EK-MMH Document 34-20 Filed 08/21/20 Page 38 of 42 PageID #: 1323

Case 2:17-cr-20406-FDB-RSW ECF No. 134 filed 09/05/18 PageID.809 Page 31 of 35

THE COURT:  The other one is -- and that one you're aware of.

MR. DAVID DUMOUCHEL:  Oh, sure.

THE COURT:  In that one you've agreed on the figure.

MR. DAVID DUMOUCHEL:  Yes, we have.  We're not looking to appeal it.

THE COURT:  With regard to the tax offense.

This deals with the issue of restitution, that we'll be discussing that at a later hearing --

MR. DAVID DUMOUCHEL:  Yes.

THE COURT:  -- to see if there is a basis for restitution to the training center and, if so, what amount and matters like that.

MR. DAVID DUMOUCHEL:  Yeah, exactly, Your Honor. Thank you.

THE COURT:  Okay.

MR. GARDEY:  The appellate waiver in the Rule 11 agreement specifically mentions restitution but the parties intended that to cover the restitution to the Treasury or the tax offense and it was not to cover -- obviously we didn't know about this effort for restitution.

THE COURT:  Right.  We didn't -- the Court didn't know about it either until it received a pleading from the National Training Center saying that they believe that they are entitled to restitution with regard to this case.  So no one has had a

## IMPOSITION OF SENTENCE BY THE COURT

chance to answer, there are no issues yet, and when they are raised, the Court will deal with them.

Anything further, Mr. DuMouchel?

MR. DAVID DUMOUCHEL:  Yes.  What I -- could I ask, Your Honor, please, to recommend to the Bureau of Prisons designation to Morgantown?

THE COURT:  Morgantown, West Virginia?

MR. DAVID DUMOUCHEL:  Yes, please.

THE COURT:  Okay.  We'll recommend Morgantown, West Virginia.

Let me ask Mr. Gardey, are there any objections to the sentence just pronounced not previously raised?

MR. GARDEY:  No, Your Honor.  I would just ask that the Court dismiss the remaining counts of the indictment as to Mr. Iacobelli and also that in its judgment and sentence it incorporate the restitution to the United States Treasury for the tax consequences.

THE COURT:  Okay.  Why don't you set forth the amount just so we have it on the record.  I believe it's in the pre but do you have it in front of you?

MR. GARDEY:  Yes, Your Honor.  It's $835,523.

THE COURT:  Okay.  That's correct, Mr. DuMouchel?

MR. DAVID DUMOUCHEL:  That is correct.  You'll note in the plea agreement there may be some effort to apply that number to --

## IMPOSITION OF SENTENCE BY THE COURT

THE COURT:  What's been --

MR. DAVID DUMOUCHEL:  Let me leave it alone.  Yes.

THE COURT:  Okay, okay.

MR. DAVID DUMOUCHEL:  The more I talk, the worse I get.

THE COURT:  You're doing fine.  Okay.

MR. DAVID DUMOUCHEL:  Your Honor, might we approach on one matter?

THE COURT:  Yes, yes.

Let me first ask, Miss Vue, are there any matters that the Court has not taken into account that it should?

MS. VUE:  No, Your Honor.  Thank you.

THE COURT:  We'll go sidebar.

(Bench conference held.)

**IMPOSITION OF SENTENCE BY THE COURT**

MR. DAVID DUMOUCHEL:  Well, that's his.

THE COURT:  Okay.

MR. DAVID DUMOUCHEL:  What's in there.

Mr. Iacobelli's wife had an accident.  She's severed three tendons in her right wrist.

THE COURT:  Oh, wow.

MR. DAVID DUMOUCHEL:  She's going to need several months of rehab.

THE COURT:  Yeah.

MR. DAVID DUMOUCHEL:  She needs him.

THE COURT:  Yeah.

MR. DAVID DUMOUCHEL:  Can we delay the reporting date?  Just delay it?

THE COURT:  Once we get a date, just submit and we'll delay it until her rehab is done.  Is that --

MR. DAVID DUMOUCHEL:  Is it better to do it that way?

THE COURT:  I think it is, yeah.

MR. GARDEY:  That's fine.

THE COURT:  That way they set something and we can deal with it.

MR. DAVID DUMOUCHEL:  Thank you.

(Bench conference concluded.)

**USA v. IACOBELLI, 17-20406**

**IMPOSITION OF SENTENCE BY THE COURT**

THE COURT: Okay. Ms. Tofil, we are concluded.

THE COURT CLERK: Everyone please rise. Court is in recess.

(Proceedings concluded, 10:50 a.m.)

-   -   -

CERTIFICATION OF REPORTER


I, Leann S. Lizza, do hereby certify that the above-entitled matter was taken before me at the time and place hereinbefore set forth; that the proceedings were duly recorded by me stenographically and reduced to computer transcription; that this is a true, full and correct transcript of my stenographic notes so taken; and that I am not related to, nor of counsel to either party, nor interested in the event of this cause.



S/Leann S. Lizza                                          8-30-2018

Leann S. Lizza, CSR-3746, RPR, CRR, RMR          Date