# Exhibit 72

2018 WL 6257377, 2018 L.R.R.M. (BNA) 442,517

2018 WL 6257377
United States District Court,
N.D. Ohio, Western Division.

Robert DESHETLER, Jr., et al., Plaintiffs,
v.
FCA US LLC, et al., Defendants.

Case Nos. 3:18 CV 78, 3:18 CV 85
|
Signed 11/30/2018

**Attorneys and Law Firms**

Dennis E. Murray, Jr., Michael J. Stewart, Murray & Murray, Sandusky, OH, John T. Murray, Leslie O. Murray, Leslie Murray Law, Huron, OH, for Plaintiffs.

Jacob E. Cohen, Sullivan & Cromwell, New York, NY, Julia M. Jordan, Sullivan & Cromwell, Washington, DC, Heidi N. Hartman, Eastman & Smith, Toledo, OH, for Defendants.

MEMORANDUM OPINION AND ORDER

JACK ZOUHARY, U. S. DISTRICT JUDGE

### INTRODUCTION

**\*1** Defendant FCA US LLC (FCA) and Defendants International Union United Automobile, Aerospace and Agricultural Implement Workers of America and UAW Region 2B (collectively "UAW") move to dismiss the Amended Complaints (Docs. 18, 20) (referred to as "DeShetler Complaint" and "Sheets Complaint"). Plaintiffs oppose (Docs. 21, 22), and FCA replies (Doc. 23). This Court then sent the parties questions (Doc. 25), to which the parties responded (Docs. 28–30) and a hearing was held.

### BACKGROUND

This case arises from Plaintiffs' employment in the Wrangler Paint Shop at the Toledo Supplier Park, which is operated by FCA (DeShetler Complaint ¶ 73; Sheets Complaint ¶ 65). At all relevant times, Plaintiffs were represented by UAW.

**The Toledo Supplier Park Arrangement.** "In the early 2000's," then-Chrysler, now-FCA (hereinafter referred to as

"FCA" regardless of ownership or corporate structure at the time) constructed a new assembly line "to manufacture the 2007 Jeep Wrangler" -- the Toledo Supplier Park (DeShetler Complaint ¶¶ 96–97; Sheets Complaint ¶¶ 85–86). This assembly line tested a new "collaborative" structure where "third-party suppliers would be co-located and would perform portions of the manufacturing and assembly process traditionally undertaken by [FCA] hourly employees" (DeShetler Complaint ¶ 97; Sheets Complaint ¶ 86). Plaintiffs allege this " 'collaborative structure' deviated significantly from a long-established practice" and "violated several provisions of the master agreements" prohibiting the use of independent contractors (DeShetler Complaint ¶ 98; Sheets Complaint ¶ 87).

To successfully launch the Toledo Supplier Park, FCA and the collaborating suppliers "needed a cadre of experienced autoworkers" (DeShetler Complaint ¶ 99). But such workers were hard to find. To fill the spots, FCA and UAW began recruiting "senior UAW members already employed by [FCA]...by encouraging them to retire from [FCA], begin collecting their pensions[,] and begin working at the Toledo Supplier Park through the nominally independent third-party suppliers" (*id.* ¶ 101). This group included the DeShetler Plaintiffs. Relying on FCA and UAW's representations that they "could continue to work indefinitely" and would otherwise be "taken care of," the DeShetler Plaintiffs retired from FCA "in or around 2006" and shortly after, began working in the Toledo Supplier Park Wrangler Paint Shop (*id.* ¶ 102–04, 134). The Sheets Plaintiffs were also hired around this time "to work for the [third-party] suppliers" (Sheets Complaint ¶¶ 1, 108, 113).

"Between 2006 and 2011," Plaintiffs worked for a variety of third-party employers (DeShetler Complaint ¶ 116; Sheets Complaint ¶ 116). These included, "[i]n approximate chronological order[,] ...Hayden, Durr[,] Magna Styer[,] Gonzalez/[FCA]" (DeShetler Complaint ¶ 116; Sheets Complaint ¶ 116). "From 2008" forward, Plaintiffs "were covered by a collective bargaining agreement between the UAW...and a [sic] Magna Styer" (DeShetler Complaint ¶ 111; Sheets Complaint ¶ 106).

**\*2** Plaintiffs contend these third-party employers were "independent in name only" and, in reality, FCA "operated the Wrangler Paint Shop" (DeShetler Complaint ¶ 110; Sheets Complaint ¶ 105). Plaintiffs further allege that, "[a]s a practical matter," "all workers in the Wrangler Paint Shop...were [FCA] employees at all times," but FCA

**DeShetler v. FCA US LLC, Not Reported in Fed. Supp. (2018)**
2018 WL 6257377, 2018 L.R.R.M. (BNA) 442,517

"intentionally sought to avoid acknowledging [this] through the fig leafs [sic]" of the independent-contractor arrangement (DeShetler Complaint ¶¶ 118, 122; Sheets Complaint ¶¶ 117–21).

By early 2011, the relationship between Magna Styer and FCA "had deteriorated" and FCA "desired to exercise more direct control over management of the plant" (DeShetler Complaint ¶ 138; Sheets Complaint ¶ 127). Plaintiffs contend that FCA, through a letter sent in February 2011, "took over direct management of the Wrangler Paint Shop" and became a party to the 2008 Magna-Styer agreement (DeShetler Complaint ¶¶ 139–44; Sheets Complaint ¶¶ 128–33). But this letter also provided that the Wrangler Paint Shop employees would be "hired by a third party" (Doc. 16-5), and Plaintiffs were assigned to "Gonzalez Contract Services" around this same time (DeShetler Complaint ¶ 146; Sheets Complaint ¶ 136). Plaintiffs allege that "Gonzalez performed almost no management or business function besides serving as the[ir] nominal employer" (DeShetler Complaint ¶ 147; Sheets Complaint ¶ 137). They assert that despite the fact the independent-contractor arrangement "was contrary to various master agreements," UAW "permitted the unconventional arrangement to continue," while "repeatedly assur[ing] Plaintiffs...that the arrangement would have no adverse affect [sic]" on them (DeShetler Complaint ¶¶ 151–52; Sheets Complaint ¶¶ 141–42).

**The New Agreement.** "At some point in late 2011 or early 2012," FCA and UAW "decided to end the nominal supplier/ contractor agreement that had prevailed in the Wrangler Paint Shop since it opened" (DeShetler Complaint ¶ 153; Sheets Complaint ¶ 143). As a result, FCA terminated the Gonzalez contract. Then, "[a]s FCA expected and intended," Gonzalez laid off all the Wrangler Paint Shop employees, including Plaintiffs (DeShetler Complaint ¶ 154; Sheets Complaint ¶ 144). FCA's decision to "insource[ ]" the Wrangler Paint Shop employees "created a need for collective bargaining concerning the[ir] status" (DeShetler Complaint ¶ 155; Sheets Complaint ¶ 146). As discussed further below, this bargaining process was "marred by several procedural and substantive irregularities" and, in November 2012, resulted in a new proposed collective bargaining agreement (New Agreement) (DeShetler Complaint ¶ 156; Sheets Complaint ¶ 147).

In this New Agreement, UAW accepted FCA's position that Plaintiffs were "solely employed by Gonzalez" and "functionally equivalent to new hires from the street," despite the parties' previous course of dealing and UAW's own repeated representations (DeShetler Complaint ¶ 194; Sheets Complaint ¶ 174). The New Agreement resulted in the DeShetler Plaintiffs' termination (DeShetler Complaint ¶ 185). At the time, an FCA spokesperson told media outlets that, "[b]y virtue of their retirement," the DeShetler Plaintiffs were ineligible for reemployment (DeShetler Complaint ¶ 170). Plaintiffs allege this was patently false and that they brought this to UAW's attention several times before and after their termination (*id.* at ¶¶ 169–75). The New Agreement also "stripped [the Sheets Plaintiffs] of their seniority based upon their actual date of hire and arbitrarily assigned a seniority date of November 30, 2012, or the date that [FCA] purported to officially take over direct management of the Wrangler Paint Shop" (Sheets Complaint ¶ 163).

**\*3** The New Agreement was eventually presented to the affected employees on November 18, 2012 -- a mere twelve days before the DeShetler Plaintiffs were to be terminated and the Sheets Plaintiffs were to lose their seniority status (DeShetler Complaint ¶¶ 191–92; Sheets Complaint ¶¶ 171–72). UAW "indicated that the proposal was the result of complex negotiations conducted in good faith...[and] was the best that could be accomplished under difficult circumstances" (DeShetler Complaint ¶ 193; Sheets Complaint ¶ 173). A majority of the Wrangler Paint Shop employees approved the agreement (DeShetler Complaint ¶ 199; Sheets Complaint ¶ 179). The DeShetler Plaintiffs then signed a release of their potential claims against the UAW, FCA, and Gonzalez in exchange for a severance payment (DeShetler Complaint ¶¶ 201–03).

Plaintiffs attempted to challenge their termination and loss of seniority through the grievance process but were unsuccessful (DeShetler Complaint ¶¶ 210–15; Sheets Complaint ¶¶ 181–90). UAW "refused to process any grievance concerning Plaintiffs' [treatment] once it escalated beyond the early stages of the process where the local shop stewards and the local union" maintained control, citing the November 2012 agreement and "its judgment that any such grievance lacked merit" as that agreement was "the best possible resolution under the circumstances" (DeShetler Complaint ¶¶ 214– 15; Sheets Complaint ¶¶ 185–86).

**The Indictments.** Several years later, in July 2017, federal indictments against Alphons Iacobelli (FCA Vice President of Employee Relations during the fall of 2012); Monica Morgan (girlfriend/wife of General Holiefield, Vice President of UAW's FCA Division before his death in March 2015); and Jerome Durden (FCA accountant

Case 1:19-cv-06770-EK-MMH    Document 34-28    Filed 08/21/20    Page 4 of 30 PageID #: 1418

DeShetler v. FCA US LLC, Not Reported in Fed. Supp. (2018)

2018 WL 6257377, 2018 L.R.R.M. (BNA) 442,517

and subordinate of Iacobelli) were unsealed (DeShetler Complaint ¶¶ 222–26; Sheets Complaint ¶¶ 192–95). These Indictments and the "surrounding press coverage" revealed that Iacobelli "diverted millions of dollars from [FCA]...to the individual pockets of Holiefield, his family[,] and close associates" (DeShetler Complaint ¶ 226; Sheets Complaint ¶196). The Indictments do not identify any particular agreement or union action influenced by the bribes, but generally allege that the scheme continued between January 2009 and July 2015. Plaintiffs allege that Iacobelli paid these bribes to Holiefield and UAW officials "in exchange for company-friendly treatment in collective bargaining negotiations," including the New Agreement (DeShetler Complaint ¶¶ 232–33; Sheets Complaint ¶¶ 202–03).

Plaintiffs filed these actions in January 2018 -- about five and a half months after the Indictments were unsealed and five and a half years after the terminations and loss of seniority rights. Defendants move to dismiss under Federal Civil Rule 12(b)(6).

## STANDARD OF REVIEW AND DOCUMENTS CONSIDERED

When ruling on a motion under Federal Civil Rule 12(b)(6), this Court must accept all well-pled factual allegations as true and construe the Complaints in the light most favorable to Plaintiffs. *Haviland v. Metro. Life Ins. Co.*, 730 F.3d 563, 566–67 (6th Cir. 2013). Although the Complaints need not contain "detailed factual allegations," they must have more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the Complaints will survive the Motions to Dismiss only if they "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). A claim is facially plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

**\*4** Ordinarily, this Court may not consider evidence outside a complaint when deciding a motion to dismiss. *Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 576 (6th Cir. 2008). But "a court may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central

to the claims contained therein." *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016). In deciding the Motions to Dismiss, this Court considers the Complaints, the documents attached to the Complaints, the briefings, and the April 2014 Public Review Board (PRB) Decision (Docs. 19-3, 20-1) attached to the Motions to Dismiss.

Plaintiffs argue the PRB Decision should not be considered because it is not attached to or specifically referred to in the Complaints. But the Complaints generally refer to the substance of the Decision, as well as other decisions made during UAW's grievance process (*see* DeShetler Complaint ¶¶ 210–20; Sheets Complaint ¶¶ 181–90). And, although Plaintiffs contend Defendants use the Decision to suggest Plaintiffs had "actual knowledge" of the bribery scheme prior to the release of the Indictments, the decision provides no such information. Instead, it indicates Plaintiffs had misgivings about UAW's conduct during the negotiations leading up to the New Agreement, consistent with the allegations in the Complaints (*see* DeShetler Complaint ¶¶ 156–79, 190, 194–95, 219, 233; Sheets Complaint ¶¶ 147–59, 173–77, 203). Further, Plaintiffs do not dispute that the Decision "is authentic and it occurred" (Hearing Tr. at 11–12). The Decision merely adds support for the findings below and is not outcome determinative.

## DISCUSSION

### Hybrid and Fair Representation Claims

Plaintiffs bring hybrid claims against FCA and UAW under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185. Alternatively, Plaintiffs bring claims against only UAW for breach of its independent duty of fair representation under Section 9(a) of the National Labor Relations Act, 29 U.S.C. § 159(a).

To state a hybrid claim under Section 301, Plaintiffs must allege facts showing (1) FCA breached a provision of a collective bargaining agreement and (2) UAW breached its duty of fair representation. *Vencl v. Int'l Union of Operating Eng'rs, Local 18*, 137 F.3d 420, 424 (6th Cir. 1998). "Liability attaches to neither employer nor union unless fault can be proved as to both." *Courie v. Alcoa Wheel & Forged Prods.*, 577 F.3d 625, 630 (6th Cir. 2009).

A union breaches its duty of fair representation if its conduct in representing a union member was arbitrary, discriminatory, or in bad faith -- "three separate and distinct possible

DeShetler v. FCA US LLC, Not Reported in Fed. Supp. (2018)

2018 WL 6257377, 2018 L.R.R.M. (BNA) 442,517

routes by which a union may be found to have breached its duty." *Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573, 584 (6th Cir. 1994). Conduct is arbitrary if it falls "so far outside a wide range of reasonableness as to be irrational." *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991) (internal quotation marks and citation omitted). Conduct is discriminatory if it is "intentional, severe, and unrelated to legitimate union objectives." *Amalgamated Ass'n of St., Elec., Ry. & Motor Coach Emps. of Am. v. Lockridge*, 403 U.S. 274, 301 (1971). Finally, conduct is in bad faith if it is undertaken "with an improper intent, purpose, or motive encompassing fraud, dishonesty, and other intentionally misleading conduct." *Ohlendorf v. United Food & Commercial Workers Int'l Union, Local 876*, 883 F.3d 636, 644 (6th Cir. 2018).

Here, Plaintiffs allege FCA breached the applicable collective bargaining agreements by (1) creating the independent-contractor arrangement in the first place; (2) terminating employees or stripping them of seniority rights with the New Agreement; and/or (3) bribing UAW officials, thereby breaching the covenant of good faith and fair dealing "inherent in all contracts" (DeShetler Complaint ¶¶ 257–60; Sheets Complaint ¶¶ 226–27).

**\*5** Plaintiffs contend UAW breached its duty of fair representation in several ways. First, by repeatedly assuring Plaintiffs that the independent-contractor arrangement would not adversely affect their employee rights, but then "ultimately le[aving them] without any collective bargaining protection" (DeShetler Complaint ¶ 276; Sheets Complaint ¶ 242). Second, by "act[ing] in an arbitrary, discriminatory and dishonest manner in its duty to represent Plaintiffs in the bargaining process that resulted" in the New Agreement, which either stripped them of their seniority rights or led to their termination (DeShetler Complaint ¶ 265; Sheets Complaint ¶ 232). Finally, by refusing to process their grievances about their termination or loss of rights "beyond any stage over which it had discretion" (DeShetler Complaint ¶ 261; Sheets Complaint ¶ 228).

### *Statute of Limitations*

Defendants move to dismiss Plaintiffs' hybrid and fair representation claims as untimely. Generally, a motion to dismiss is an "inappropriate vehicle" for dismissing a claim on statute of limitations grounds. *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012). But dismissal is appropriate

if "the allegations in the complaint affirmatively show that the claim is time-barred." *Id.*

The statute of limitations for hybrid and fair representation claims is six months. *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 155, 164–66 (1983). The limitations period is intentionally short, consistent with federal policy favoring the "rapid final resolution of labor disputes." *Id.* at 168. The clock starts "against both the union and the employer when the employee knew or should have known of the acts constituting either the employer's alleged violation or the union's alleged breach, whichever occurs later." *Lombard v. Chrome Craft Corp.*, 264 F. App'x 489, 490–91 (6th Cir. 2008) (citing *Robinson v. Cent. Brass Mfg. Co.*, 987 F.2d 1235, 1239 (6th Cir. 1993) ). *See also Bowerman v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., Local No. 12*, 646 F. 3d 360, 366 (6th Cir. 2011). This is an objective standard, and "the asserted actual knowledge of the plaintiffs is not determinative if they did not act as reasonable persons and, in effect, closed their eyes to evident and objective facts concerning the accrual of their right to sue." *Garrish v. Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am.*, 417 F.3d 590, 594 (6th Cir. 2005) (citation omitted).

The dispositive question here is when Plaintiffs knew or should have known of UAW's alleged breach -- that is, when Plaintiffs knew or should have known that UAW acted arbitrarily, discriminatory, or in bad faith in (1) negotiating the New Agreement; (2) refusing to process their grievances; and (3) leaving them without collective bargaining protection despite repeated assurances that the independent-contractor arrangement would not disadvantage them.

First, "[c]auses of action based on entry into collective bargaining agreements" generally accrue "when the contract is signed" and the employees become aware of its terms. *United Indep. Flight Officers, Inc. v. United Air Lines, Inc.*, 756 F.2d 1262, 1273 (7th Cir. 1985). *See also Spaulding v. United Transp. Union*, 279 F.3d 901, 908 (10th Cir. 2002); *Gvozdenovic v. United Air Lines, Inc.*, 933 F.2d 1100, 1106 (2d Cir. 1991); *Ratkosky v. United Transp. Union*, 843 F.2d 869, 873 (6th Cir. 1988); *Fabian v. Cooper Indus.*, 1993 WL 332629, at \*6 (E.D. Mich. 1993). The New Agreement at issue here was signed in November 2012 (DeShetler Complaint ¶¶ 182–89, 191, 199; Sheets Complaint ¶¶ 162–68, 171, 179). At that time, Plaintiffs also learned of the New Agreement's harmful terms (*see* DeShetler Complaint ¶¶ 191–99; Sheets Complaint ¶¶ 162–79). Thus, Plaintiffs' claims based on that Agreement, and the bargaining process

Case 1:19-cv-06770-EK-MMH   Document 34-28   Filed 08/21/20   Page 6 of 30 PageID #: 1420

DeShetler v. FCA US LLC, Not Reported in Fed. Supp. (2018)
2018 WL 6257377, 2018 L.R.R.M. (BNA) 442,517

leading up to it, accrued in November 2012, years before this lawsuit was filed.

 **\*6**  Second, fair representation claims relating to a union's failure to pursue a grievance typically accrue when the union rejects or abandons the grievance. *See, e.g.*, *Saunders v. Ford Motor Co.*, 879 F.3d 742, 751 (6th Cir. 2018); *Flatford v. Int'l Union United Auto., Aerospace & Agric. Implement Workers of Am.*, 652 F. App'x 409, 413 (6th Cir. 2016); *Potts v. Am. Bottling Co.*, 595 F. App'x 540, 543 (6th Cir. 2014). Here, the Complaints omit the date UAW declined to further pursue Plaintiffs' grievances (*see* DeShetler Complaint ¶¶ 210–20; Sheets Complaint ¶¶ 181–90). But Plaintiffs do not dispute this occurred sometime around 2014 (*see* Doc. 22 at 15 & n.5; Hearing Tr. at 12). Thus, Plaintiffs' claims based on UAW's failure to pursue their grievances also accrued well before this lawsuit was filed.

Finally, Plaintiffs learned that the independent-contractor arrangement negatively affected their employee rights, despite UAW's repeated assurances, when they learned of the terms of the New Agreement and UAW's refusal to move forward with their grievances (*see* DeShetler Complaint ¶¶ 182–99; Sheets Complaint ¶¶ 162–79) -- again, years before this lawsuit was filed.

Plaintiffs argue these general rules are inapplicable here because this is an extraordinary case. They contend their claims against UAW did not accrue until the bribery Indictments were unsealed because, until then, all they knew was that UAW "made a series of discretionary decisions that disadvantaged them" (Doc. 22 at 6). Thus, until they learned of the bribery scheme, they argue they were not aware of facts supporting each essential element of a fair representation claim: "Without that bad faith, there's no claim under [Section] 301" (Hearing Tr. at 14).

But a fair representation claim does not require proof that a union acted in bad faith -- it requires proof that a union acted arbitrary, discriminatory, *or* in bad faith. To bring a viable claim, "a plaintiff need only show that the union's actions *could be characterized* in any one of these three ways." *See* *Black*, 15 F.3d at 584 (emphasis added). Even without the Indictments, the Complaints show Plaintiffs were aware of facts suggesting UAW acted arbitrarily, discriminatory, or in bad faith in negotiating and ratifying the New Agreement at the time it was signed.

For example, Plaintiffs allege the negotiations leading to the New Agreement were "marred by several procedural and substantive irregularities" (DeShetler Complaint ¶ 156; Sheets Complaint ¶ 147). First, FCA and UAW International "systematically locked the employees of the Wrangler Paint Shop and UAW Local Union 12 out of the bargaining with [FCA]," contrary to "a long and well-established practice" and in violation of UAW's own constitution (DeShetler Complaint ¶¶ 160– 63; Sheets Complaint ¶¶ 151–54). Next, UAW "inexplicably accepted" -- without "objection or dispute" -- FCA's position that Plaintiffs were "solely employed by Gonzalez" and "were functionally equivalent to new hires from the street," despite (1) "a long course of dealing" between FCA and UAW treating Plaintiffs "as [FCA] employees"; (2) FCA and UAW's "repeated assurances" that Plaintiffs "would be afforded appropriate seniority"; and (3) FCA's assumption of the Magna-Styer agreement "no later than 2011" (DeShetler Complaint ¶¶ 164–66, 183, 195; Sheets Complaint ¶¶ 155–57, 163, 175). Plaintiffs believed UAW's position was "directly contrary to the applicable ...local and master collective bargaining agreements" (DeShetler Complaint ¶ 194; Sheets Complaint ¶ 174).

 **\*7**  Further, FCA and UAW were "inexplicitly insistent" on terminating the DeShetler Plaintiffs, and UAW "offered shifting and illogical explanations" for that action (DeShetler Complaint ¶¶ 167– 68). At one point, a group of DeShetler Plaintiffs met with UAW officials and an FCA human resources executive. According to Plaintiffs, the FCA representative "seemed receptive...and indicated that [the DeShetler] Plaintiffs should continue to be employed according to the terms of the applicable master agreements" (*id.* ¶¶ 177–78). But "[s]hortly after this meeting," UAW officials told Plaintiffs that "Holiefield specifically desired that [FCA]'s takeover of the Wrangler Paint Shop proceed as an 'insourcing' of new employees and that this form of transaction required that [the DeShetler] Plaintiffs be terminated" (DeShetler Complaint ¶ 179; *see also* Sheets Complaint ¶ 158). UAW "simply seemed intent on pushing through an agreement that resulted in [the DeShetler] Plaintiffs' termination" (DeShetler Complaint ¶ 190), and that "arbitrarily assigned [the Sheets Plaintiffs] a seniority date" (Sheets Complaint ¶ 163). And when UAW finally presented this "grossly unfair[ ]" New Agreement to Plaintiffs (Doc. 22 at 19), they were given "very limited opportunity to ask questions" and "only a matter of hours to consider its terms" (DeShetler Complaint ¶¶ 197–98; Sheets Complaint ¶¶ 177–78).

Case 1:19-cv-06770-EK-MMH   Document 34-28   Filed 08/21/20   Page 7 of 30 PageID #: 1421

DeShetler v. FCA US LLC, Not Reported in Fed. Supp. (2018)
2018 WL 6257377, 2018 L.R.R.M. (BNA) 442,517

In sum, Plaintiffs allege that in negotiating the New Agreement, UAW took positions that were contrary to its own previous and repeated representations, the long course of dealing between the parties, and the applicable collective bargaining agreements. According to Plaintiffs, UAW's actions were "inexplicable," and its offered justifications "shifting and illogical." Accepting these allegations as true, Plaintiffs were aware of facts indicating UAW's conduct "could be characterized" as at least arbitrary -- and perhaps even as discriminatory or in bad faith -- well before the Indictments were unsealed. *See Black*, 15 F.3d at 584. *Cf. Linton v. United Parcel Serv.*, 15 F.3d 1365, 1372–75 (6th Cir. 1994) (finding a union's "unprecedented departure from past practice" created a jury question as to whether the union breached its duty of fair representation).

In addition, during the grievance process, Plaintiffs argued that Holiefield's insistence on treating FCA's takeover as an insource was "clear[ ]...evidence that there was something amiss at Solidarity House," or UAW's headquarters (Doc. 19-3 at 9; Doc. 20-1 at 9). At that point, Plaintiffs were also "concerned about the fairness of the negotiations" leading to the New Agreement "[i]n light of recent allegations" about several UAW officials (Doc. 19-3 at 9; Doc. 20-1 at 9). Although it is unclear whether those allegations concerned collusion, the April 2014 PRB Decision further demonstrates that Plaintiffs were aware, or should have been aware, of a breach of fair representation claim before the Indictments were unsealed.

Although the information provided in the unsealed Indictments may have *strengthened* Plaintiffs' claims -- and perhaps provided an explanation for UAW's conduct -- the information was not necessary for Plaintiffs to file suit. As the Sixth Circuit explained in *Bowerman*, Plaintiffs "did not need to know the *extent* of the alleged breach of the duty of fair representation to file a claim." 646 F.3d at 367 (emphasis in original). *See also* Hearing Tr. at 13–17. And as the Supreme Court stated in *Rotella v. Wood*, "in applying a discovery accrual rule, we have been at pains to explain that discovery of the injury, not discovery of the other elements of a claim, is what starts the clock." 528 U.S. 549, 555 (2000). This is true even when "considerable enquiry and investigation may be necessary before [a plaintiff] can make a responsible judgment about the actionability" of that injury. *Id.* at 556. Here, Plaintiffs knew and were vocal about their injury, as well as the source of that injury, well before the Indictments were unsealed.

Perhaps the result in this case would be different if, before July 2017, there had been *no* indication that UAW acted discriminatorily, arbitrarily, or in bad faith in negotiating the New Agreement or processing Plaintiffs' grievances. But based on the allegations in the Complaints, reasonable people would have known they needed to act to preserve their rights by at least 2014, when UAW declined to pursue their grievances.

### *Tolling*

**\*8** The final question in the statute-of-limitations analysis is whether there is a basis for tolling. Plaintiffs do not explicitly raise any tolling arguments in their Oppositions (*see* Doc. 21, 22). But in their responses to this Court's pre-hearing questions, they argued that equitable tolling is warranted because Defendants fraudulently concealed the bribery scheme (Doc. 28 at 2–3). A plaintiff who relies on fraudulent concealment to save an untimely claim "must allege and establish" that (1) the defendant took affirmative steps to conceal the conduct constituting the cause of action; (2) the defendant's conduct prevented the plaintiff from discovering the cause of action within the limitations period; and (3) until discovery, the plaintiff exercised due diligence in trying to find out about the cause of action. *Egerer v. Woodland Realty, Inc.*, 556 F.3d 415, 422 (6th Cir. 2009). The doctrine is to be "narrowly applied," *id.* at 424, and requires a plaintiff to "plead the factual allegations underlying a claim of fraudulent concealment with particularity." *Carrier Corp. v. Outokumpu Oyj*, 673 F. 3d 430, 446 (6th Cir. 2012).

*Hill v. United States Department of Labor*, 65 F.3d 1331 (6th Cir. 1995), is instructive. In *Hill*, the Sixth Circuit held that "[a] deception regarding motive supports application of equitable tolling only where the deception conceals the very fact of discrimination," or the cause of action. *Id.* at 1337. Equitable tolling is "not warranted where a [plaintiff] is aware of all the essential facts...but lacks direct knowledge or evidence of the defendant's subjective discriminatory motivation." *Id.* Here, within the statute-of-limitations period, Plaintiffs were aware of all the current allegations against UAW except that UAW may have been motivated or influenced by FCA bribes. As discussed, this includes conduct that could be characterized as arbitrary, discriminatory, or in bad faith, as required to bring a fair representation claim. Thus, in concealing the bribery scheme,

Case 1:19-cv-06770-EK-MMH   Document 34-28   Filed 08/21/20   Page 8 of 30 PageID #: 1422

DeShetler v. FCA US LLC, Not Reported in Fed. Supp. (2018)
2018 WL 6257377, 2018 L.R.R.M. (BNA) 442,517

Defendants concealed further evidence of, rather than the existence or accrual of, their fair representation claims.

Further, "[i]n order for a fraudulent concealment claim to prevail, a plaintiff must prove that the defendant's attempts to mislead the plaintiff actually succeeded." *Id.* at 1338. Equitable tolling "is warranted only when the defendant's allegedly fraudulent statements constituted 'a plausible explanation' that 'lulled [the plaintiffs] into not filing [their] claim[s] sooner.' " *Guy v. Mercantile Bank Mortg. Co.*, 711 F. App'x 250, 254 (6th Cir. 2017) (alterations in original) (quoting *Hill*, 65 F.3d at 1337). But here, the Complaints and the PRB Decision show Plaintiffs "immediately doubted the veracity of [UAW]'s stated reasons for" its actions in negotiating and accepting the New Agreement. *See id. See also* DeShetler Complaint ¶¶ 164–80, 194–95, 210; Sheets Complaint ¶¶ 155–60, 174–75, 181. In fact, during the grievance process, Plaintiffs challenged the fairness of the negotiations and argued clear evidence showed UAW's justifications for its positions did not hold water (Doc. 19-3 at 9; Doc. 20-1 at 9; *see also* DeShetler Complaint ¶¶ 164–75).

Finally, the Complaints do not allege any ways in which Plaintiffs attempted to investigate the suspect circumstances surrounding the New Agreement. *See Reid v. Baker*, 499 F. App'x 520, 527 (6th Cir. 2012). Instead, Plaintiffs simply state they "were unable to discover" UAW's alleged breach "until the federal investigation became public knowledge in July 2017" (DeShetler Complaint ¶ 271; Sheets Complaint ¶ 237).

For all of these reasons, this Court finds the hybrid and fair representation claims are time barred.

### Breach of Contract

Because this Court finds the hybrid and fair representation claims are untimely, it need not address the other grounds FCA raises for dismissing the claims. However, this Court will also briefly address FCA's argument that Plaintiffs failed to sufficiently allege that FCA breached any provision of a collective bargaining agreement, as required to state a hybrid claim. This Court agrees with FCA that Plaintiffs' arguments have shifted over time and do not present a plausible breach-of-contract claim.

**\*9** First, Plaintiffs argue that "the entire arrangement in the Wrangler Paint Shop under which Plaintiffs would perform assembly work[ ] while employed by nominally independent suppliers constituted a clear breach" of the applicable master agreement (Doc. 21 at 10–11; *see also* DeShetler Complaint ¶¶ 98, 124, 132–33; Sheets Complaint ¶¶ 87–88, 96–97). Plaintiffs point to provisions in the 2015 Production, Maintenance, and Parts Agreement stating that "[e]mployees of an outside contractor will not be utilized in a plant covered by this Agreement to replace seniority employees," and that "[i]n no event shall any seniority employee...be laid off as a direct and immediate result of work being performed by any outside contractor on the plant premises" (DeShetler Complaint ¶¶ 127, 129; Sheets Complaint ¶¶ 91, 93). They allege that "[s]ubstantially identical" provisions also appeared in the 2007 and 2011 agreements (DeShetler Complaint ¶¶ 128, 130; Sheets Complaint ¶¶ 92, 94).

But Plaintiffs overlook that the 2015 agreement also provides that "[t]he foregoing shall not affect the right of [FCA] to continue arrangements *currently in effect*" (Doc. 16-1 at 79) (emphasis added). And according to the Complaints, the independent-contractor arrangement at issue was created "[i]n the early 2000's," by at least 2006 (*see* DeShetler Complaint ¶¶ 96, 101–02, 104–08, 116, 135; Sheets Complaint ¶¶ 85–87, 100–03, 116). In other words, the arrangement was created *before* the 2007, 2011, or 2015 agreements were entered. Further, the 2003 Toledo Assembly Agreement, attached to the Sheets Complaint, expressly contemplated that Supplier Park employees may "be employed by a third party" (Case No. 18 CV 85, Doc. 11-1 at 24–26). And although Plaintiffs argue that the independent-contractor arrangement nonetheless violated these provisions because it "was repeatedly modified and changed over time" as Plaintiffs were "reassigned to different nominal employers," they do not identify any contract provision prohibiting these assignments (Case No. 18 CV 78, Doc. 28 at 3–4; *see also* Doc. 16-1 at 79; Doc. 16-4 at 10).

Plaintiffs also argue that "all of the Plaintiffs were employees of [FCA] throughout the whole period we're talking about" -- between 2006 and 2012 (Hearing Tr. at 24–25). But, as the Complaints acknowledge, "[b]etween 2006 and 2011," Plaintiffs' "employers consisted of: Hayden, Durr[,] Spherion[,] Magna Styer[,] [and then] Gonzalez" (DeShetler Complaint ¶¶ 101, 116; Sheets Complaint ¶ 116). And during that time, Plaintiffs "were covered by a collective bargaining agreement between the UAW...[and] *Magna Styer*" (DeShetler Complaint ¶ 111; Sheets Complaint ¶ 106) (emphasis added). A quick review of that agreement confirms FCA was not a party to it (*see* Doc. 16-4 at 79). Plaintiffs essentially ask this Court to disregard that agreement and

DeShetler v. FCA US LLC, Not Reported in Fed. Supp. (2018)
2018 WL 6257377, 2018 L.R.R.M. (BNA) 442,517

substitute its own judgment as to who employed Plaintiffs "[a]s a practical matter" (*see* DeShetler Complaint ¶ 118; Sheets Complaint ¶ 117). Plaintiffs provide no legal support for this theory.

Whether FCA became a party to the Magna-Styer agreement *after* February 2011 presents a closer question. In February 2011, FCA sent UAW a letter recognizing that Magna would "turn Management of the Toledo South Paint facility over to" FCA in March 2011 (Doc. 16-5). "MAGNA represented employees" would then be "hired by a third party...managed by" FCA. (*id.*). Even accepting -- without deciding -- Plaintiffs' argument that FCA assumed and became a party to the Magna-Steyer agreement through this letter, this Court is skeptical that FCA then breached that agreement by assigning Plaintiffs to Gonzalez or modifying the agreement conditions when FCA ended the independent-contractor arrangement. First, the letter clearly envisioned that Plaintiffs would ultimately be employed by a third party and not directly by FCA. The Magna-Styer agreement also allowed for such an assignment (*see* Doc. 16-4 at 10). Second, although the letter states that the conditions of the Magna-Steyer agreement were to "carryover," and there was to be "no break in the employees' service," it explicitly states that the conditions could be "modified by mutual agreement between the parties" (Doc. 16-5). Third, to the extent Plaintiffs contend that FCA breached the applicable master agreements by enacting the New Agreement, they are essentially arguing that the the Agreement is invalid. Claims that a collective bargaining agreement is invalid, standing alone, are not properly brought under Section 301. *Angel v. United Paperworkers Int'l Union (PACE) Local 1967,* 221 F. App'x 393, 398 (6th Cir. 2007). *See also Textron Lycoming Reciprocating Engine Div., Avco Corp. v. United Auto., Aerospace, Agric. Implement Workers of Am.,* 523 U.S. 653, 657 (1998) (" 'Suits for violation of contracts' under § 301(a) are not suits that claim a contract is invalid, but suits that claim a contract has been violated.").

**\*10** Finally, Plaintiffs argue that FCA "negotiated with [UAW] in bad faith and in breach of the covenant of good faith and fair dealing inherent in all contracts" by unlawfully bribing UAW officials (DeShetler Complaint ¶ 260; Sheets Complaint ¶ 227). But to state a hybrid claim, a plaintiff "must point to a *specific* provision in the [collective bargaining] agreement that the employer allegedly violated." *Kenney v. United Auto., Aerospace & Agric. Implement Workers of Am.,* 2016 WL 1409014, at \*2 (N.D. Ohio 2016) (emphasis added). *See also Harris v. Am. Postal Workers Union,* 1999

WL 993882, at \*4 (6th Cir. 1999) ("It is a basic tenet of contract law that a party can only advance a claim of breach of written contract by identifying and presenting the actual terms of the contract allegedly breached."). "[T]o the extent that this claim [merely] alleges bad-faith bargaining on behalf of [FCA]," rather than a violation of a specific provision of a collective bargaining agreement, the claim is "an unfair labor practice claim over which the NLRB has exclusive jurisdiction." *Martin v. Lake Cty. Sewer Co.,* 269 F.3d 673, 680 (6th Cir. 2001). *See also Copeland v. Penske Logistics LLC,* 675 F.3d 1040, 1043–44 (7th Cir. 2012).

In addition, although stated as a Section 301 claim, this argument is clearly a disguised Section 302 claim for bribery and collusion. The Sixth Circuit has expressly held that Section 302 "does not create a private right of action," *Ohlendorf,* 883 F.3d at 639, and that allegations of "improper payoffs" to union officials "may not be redressed pursuant to [Section 301]." *Garrish,* 417 F.3d at 597–98. Plaintiffs' theory that they were terminated and stripped of their seniority "outside of the fair process...that all of the agreements require" -- raised for the first time during the hearing -- fails for similar reasons (Hearing Tr. at 24–25).

**Age Discrimination Claim**

The DeShetler Plaintiffs bring an additional claim against FCA: age discrimination under Ohio Revised Code § 4112.14. Plaintiffs allege that they were qualified to continue working in November 2012, but instead were "systematically replaced...with substantially younger workers" (DeShetler Complaint ¶¶ 285–87). They contend that FCA "lacked any legitimate alternative business reason for not continuing [their] employment," and that any offered explanation would be pretextual (*id.* ¶ 290). Plaintiffs allege that FCA "simply refused to continue [their] employment under any circumstances" due to their "status as older retirees" (*id.*). Finally, to the extent FCA contends Plaintiffs had "available avenues to arbitrate their discharge," Plaintiffs argue those avenues would be futile because UAW was compromised by bribes and therefore would fail "to represent them in good faith" (*id.* ¶ 294).

FCA moves to dismiss the age discrimination claim on several grounds, including that (1) the claim is preempted by Section 301 and therefore time barred; (2) the claim is precluded under Ohio Revised Code § 4112.14(C) because Plaintiffs had available the opportunity to arbitrate; and (3) Plaintiffs executed valid releases covering this cause of action.

DeShetler v. FCA US LLC, Not Reported in Fed. Supp. (2018)
2018 WL 6257377, 2018 L.R.R.M. (BNA) 442,517

Turning first to the preemption argument, the Supreme Court has instructed that "when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a [Section] 301 claim or dismissed as pre-empted by federal labor-contract law." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985) (citation omitted). The Sixth Circuit has developed a two-step process for determining whether a state-law claim is preempted, *Mattis v. Massman*, 355 F.3d 902, 906 (6th Cir. 2004) (citation omitted):

> First, courts must determine whether resolving the state-law claim would require interpretation of the terms of the collective bargaining agreement. If so, the claim is preempted. Second, courts must ascertain whether the rights claimed by the plaintiff were created by the collective bargaining agreement, or instead by state law. If the rights were created by the collective bargaining agreement, the claim is preempted. In short, if a state-law claim fails *either* of these two requirements, it is preempted by [Section] 301.

 **\*11**  With respect to the first point, this Court must analyze whether Plaintiffs "can prove the elements of [the] state-law claim without contract interpretation." *Paluda v. ThyssenKrupp Budd Co.*, 303 F. App'x 305, 308 (6th Cir. 2008). Preemption is triggered if "resolution of the state[-]law claim is 'inextricably intertwined' with consideration of the terms of the" collective bargaining agreement. *Paul v. Kaiser Found. Health Plan of Ohio*, 701 F.3d 514, 522 (6th Cir. 2012) (quoting *Smolarek v. Chrysler Corp.*, 879 F.2d 1326, 1330 (6th Cir. 1989) (en banc) ).

The parties dispute whether this inquiry should consider only the elements of Plaintiffs' prima facie case or all elements of the burden-shifting analysis, including FCA's alternative reason for its actions and whether that reason is pretextual. *See, e.g.*, Doc. 21 at 27–28 (citing *Smolarek*, 879 F.2d at 1333) (articulating the standard under the well-pleaded complaint rule in the removal context); Doc. 23 at 10–11 (citing *Howard v. Cumberland River Coal Co.*, 838 F. Supp. 2d 577, 580–

82) (E.D. Ky. 2011) ) (distinguishing between the standard in the jurisdictional context verses the merits stage). This Court agrees with FCA that it is appropriate to consider all aspects of the burden-shifting analysis here, especially given that FCA's alternative business justification -- as well as several relevant contract-interpretation disputes -- is clear from the face of the Complaint (*see* DeShetler Complaint ¶¶ 164–75, 257–59).

But, this Court need not decide this issue. Determining whether Plaintiffs were eligible for reemployment (or continued employment) with FCA will require interpreting the same provisions of the 2011 Master Pension plan. As part of their prima facie case of age discrimination under Ohio law, Plaintiffs must show that they were "qualified for the position" *Coryell v. Bank One Trust Co. N.A.*, 101 Ohio St. 3d 175, 177 (2004) -- or that they were "physically able to perform the duties *and* otherwise m[et] the established requirements of the job and laws pertaining to the relationship between employer and employee." Ohio Rev. Code. § 4112.14(A) (emphasis added). Based on the language of the applicable master agreements, the parties dispute whether Plaintiffs can satisfy this requirement (*see* DeShetler Complaint ¶¶ 167–75, 284; Doc. 18-1 at 20–21, 31–33). Further, the substantial overlap between Plaintiffs' Section 301 claim and their age discrimination claim supports that resolving the age discrimination claim will require contract interpretation to determine the respective rights and obligations of the parties (*see, e.g.*, DeShetler Complaint ¶¶ 257–59). *See also Slinker v. Jim Beam Brands Co.*, 689 F. App'x 406, 408–09 (6th Cir. 2017); *Paluda*, 303 F. App'x at 309–09.

In addition, the Sixth Circuit has held that the relief a plaintiff seeks can warrant preemption, even if the claim itself does not. *Klepsky v. United Parcel Serv., Inc.*, 489 F.3d 264, 270 (6th Cir. 2007). Here, Plaintiffs request reinstatement (DeShetler Complaint p. 54). Such a request, standing alone, "is enough to support preemption...as it would require interpretation of the terms of the [collective bargaining agreement], and implicates a right created under [that agreement]." *Klepsky*, 489 F.3d at 270.

For all these reasons, this Court finds the DeShetler Plaintiffs' age discrimination claim is "inextricably intertwined" with consideration of the applicable collective bargaining agreements and is therefore preempted by Section 301. A finding of preemption "transforms [the claim] into a 'hybrid' [Section] 301 claim" that is subject to the six-month

DeShetler v. FCA US LLC, Not Reported in Fed. Supp. (2018)
2018 WL 6257377, 2018 L.R.R.M. (BNA) 442,517

statute of limitations. *Jones v. Gen. Motors Corp.*, 939 F.2d 380, 384 (6th Cir. 1991). The claim is therefore time barred.

**\*12** FCA next argues that the age discrimination claim is barred by Ohio Revised Code § 4112.14(C), which states that "[t]he cause of action described in division (B) of this section...shall not be available in the case of discharges where the employee has available to the employee the opportunity to arbitrate the discharge." A plaintiff has the "opportunity to arbitrate" if he or she "had access to an arbitration procedure" through a grievance procedure under a collective bargaining agreement. *Hopkins v. City. of Columbus*, 2014 WL 1121479, at \*5 (S.D. Ohio 2014) (citation omitted). *See also Dobrski v. Ford Motor Co.*, 698 F. Supp. 2d 966, 984 (N.D. Ohio 2010); *Cramton v. Siemens Energy & Automation, Inc.*, 2009 WL 2524689, at \*4 (S.D. Ohio 2009). The provision applies, barring an age discrimination claim, "even when a plaintiff seeks to utilize the arbitration procedure, but the union refuses to arbitrate." *Hopkins*, 2014 WL 1121479, at \*5. Such a refusal "does not negate the fact that the opportunity to arbitrate was available." *Id.* (quoting *Cramton*, 2009 WL 2524689, at \*4). *See also Dobrski*, 698 F. Supp. 2d at 984–85. If a plaintiff believes the union's conduct in processing a grievance was "discriminatory, dishonest, arbitrary, or perfunctory," he or she is not left without recourse. *Hopkins*, 2014 WL 1121479, at \*5 (citation omitted). But under those circumstances, a plaintiff "must pursue a claim for breach of the union's duty of fair representation." *Id.* (citing *Cramton*, 2009 WL 2524689, at \*4).

Here, there is no dispute that Plaintiffs had access to a grievance procedure, which included the possibility of arbitration (*see, e.g.*, DeShetler Complaint ¶¶ 210–16). Plaintiffs argue this opportunity to arbitrate does not bar their claim under Section 4112.14(C) because "such arbitration would be futile due to [UAW]'s failure to represent them in good faith" (DeShetler Complaint ¶ 294). But the hybrid and fair representation claims against UAW are time barred -- meaning Plaintiffs cannot succeed on the merits of those claims. Because Plaintiffs had available the opportunity to arbitrate, and because they cannot succeed on their fair representation claims against UAW, their age discrimination claim is barred under Section 4112.14(C).

According to Plaintiffs, they fall within an exception to Section 4112.14(C) simply because they *allege* UAW breached its duty of fair representation. This Court disagrees. First, the statute itself does not create this exception. Second, the cases recognizing this exception rely on *Sutterlin v. Mansfield Plumbing Products*, 2001 WL 310633, at \*1 (Ohio Ct. App. 2001). But *Sutterlin* merely recites the standard for stating a hybrid claim under Section 301. *See Sutterlin*, 2001 WL 310633, at \*1 (quoting *DelCostello*, 462 U.S. at 163–65). Third, to the extent *Sutterlin* and its progeny suggest that a plaintiff can merely tack on a breach of fair representation claim against a union under Section 4112.14(B), this Court is skeptical the union would be a proper party. *See Ohio Rev. Code § 4112.14(B)* ("Any person aged forty or older who is discriminated against...may institute a civil action *against the employer....*") (emphasis added). *See also Lee v. City of Moraine Fire Dep't*, 2014 WL 1775621, at \*7 n.8 (S.D. Ohio 2014). Further, any breach of fair representation claim brought under Section 4112.14 would also run into preemption and timeliness issues. *See Maynard v. Revere Copper Prods., Inc.*, 773 F.2d 733, 735 (6th Cir. 1985) ("Whether union conduct constitutes a breach of the duty of fair representation is a question of federal law.").

Because this Court finds the age discrimination claim is preempted as well as precluded under Section 4112.14(C), this Court declines to determine whether the claim is also barred by the DeShetler Plaintiffs' releases.

## CONCLUSION

This Court sympathizes with Plaintiffs' situation. But, unfortunately for Plaintiffs, their claims are too late. The allegations in the Complaints, accepted as true, affirmatively establish that the claims are time barred and fail to establish a basis for equitable tolling.

**\*13** For all these reasons, the Motions to Dismiss (Docs. 18, 20) are granted and this case is dismissed.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 6257377, 2018 L.R.R.M. (BNA) 442,517

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 73

Case 1:19-cv-06770-EK-MMH   Document 34-28   Filed 08/21/20   Page 13 of 30 PageID #: 1427

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

**UNITED STATES OF AMERICA,**

        **vs.**

**D-6   NANCY A. JOHNSON,**

        **Defendant.**

_____/

        **NO. 17-CR-20406**

        **HON. PAUL D. BORMAN**

## SENTENCING MEMORANDUM OF THE UNITED STATES

**I.    Introduction**

Nancy Johnson was the second highest official in the Chrysler Department of the United Auto Workers ("UAW") union. She betrayed the trust placed in her by the rank and file members of her union. Johnson took thousands of dollars in illegal, prohibited payments for her own personal benefit from Fiat Chrysler Automobiles US LLC ("FCA" or "Fiat Chrysler"). In addition, at the direction of more senior UAW officials, Johnson directed tens of thousands of dollars of prohibited payments from Fiat Chrysler for the personal benefit of those senior UAW officials and for the personal benefit of other UAW officials.

Johnson's criminal activity in betraying tens of thousands of UAW members and their families was serious, and it is deserving of a serious punishment. The Court

needs to deter other union officials from engaging in similar misconduct. In addition, however, the Court's sentence should reflect Johnson's acceptance of responsibility and her sincere remorse.

Johnson has been cooperating in an ongoing investigation with federal authorities over the past six months. However, at this point, her cooperation is incomplete, and the government is not yet in a position to bring a motion on her behalf for a reduction in sentence under Section 5K1.1. The Court should be aware for purposes of this sentencing hearing that Johnson has been diligent in her cooperation with law enforcement, and that it is not her fault that her cooperation is not yet complete.

## II. Analysis of Sentencing Factors

### A. Sentencing Guideline Range

The parties and the Probation Officer are in agreement as to the correct sentencing guideline range applicable in this case. In the Rule 11 agreement, the parties agreed that the amount of prohibited Taft-Hartley payments for which Johnson is responsible is over $40,000, for a 6-level enhancement. As a result, Johnson's sentencing guideline range is 12 to 18 months. Under the terms of the plea agreement, the possible sentence of imprisonment was capped at 18 months under Federal Rule of Criminal Procedure 11(c)(1)(C).

2

## B.      Seriousness of the Offense

The Labor Management Relations Act of 1947, better known as the Taft-Hartley Act, sought to deter and punish the real danger that union officials, who are supposed to represent the best interests of their rank and file members, could be corrupted by corporations seeking to buy labor peace or bribe their way to concessions at the bargaining table. This investigation and prosecution has revealed that there was a culture of corruption in the senior leadership of the United Auto Workers union. Leaders of the UAW viewed the National Training Center as a mechanism to take apparently unlimited and illegal payments from Fiat Chrysler for their own personal benefit, for the benefit of the union itself, and for their own lavish entertainment.

Through her leadership skills and political savvy within the UAW, Johnson reached the highest levels of the UAW's Chrysler Department. She became enmeshed in a culture of corruption where acceptance of lavish entertainment and personal freebies, all paid for by the car company, was the rule rather than the exception. As a top leader of the UAW, Johnson should have been dedicated to improving the working lives and conditions of the tens of thousands of UAW members. Johnson should have been ensuring that the money made available for the

3

Case 1:19-cv-06770-EK-MMH    Document 24-28    Filed 08/21/20    Page 16 of 30 PageID
#: 1430
Case 2:17-cr-20406-FDB-RSW    ECF No. 176    filed 12/12/18    PageID.2911    Page 4 of 10

purpose of training and health and safety through the National Training Center were used for their intended purpose. Instead, Johnson chose to ignore her fiduciary responsibilities and her sacred trust to the rank and file membership and help direct tens of thousands of dollars in dedicated training funds to the corrupt personal use of other more senior UAW officials. Along the way, Johnson took advantage of her position to use her NTC credit card for thousands of dollars in personal purchases. She also enjoyed the lavish dining and entertainment that came with her position as the second highest official in the UAW's Chrysler Department.

An example of the wrongdoing in this conspiracy sought to be blocked by the Taft-Hartley Act occurred in the summer of 2015. At that time, the UAW was set to negotiate a new collective bargaining agreement with Fiat Chrysler. The UAW's senior leadership and its national negotiating committee started off negotiation season with a lavish meal on July 14, 2015 at the London Chop House in Detroit for senior UAW leadership. There were no FCA executives present at the meal, and it had nothing whatsoever to do with the joint UAW/FCA National Training Center. However, senior UAW officials directed Johnson and another UAW official to use their NTC credit cards to pay for an extravagant meal for the UAW officials. Johnson used her NTC credit card to pay for cigars and liquor at the London Chop House costing $800.30. Another UAW official used his NTC credit card to pay

Case 1:19-cv-06770-EK-MMH    Document 24-28    Filed 08/21/20    Page 17 of 30 PageID
Case 2:17-cr-20406-FDB-RSW    ECF No. 176    filed 12/12/18    PageID.2912    Page 5 of 10
#: 1431

$7,694.07 for the sumptuous meal at the chop house. Johnson and the other UAW official acted at the direction of more senior UAW leaders. All of the $8,494.37 used to pay for the meal, liquor, and cigars at the London Chop House came from Fiat Chrysler by way of the National Training Center.

After enjoying their feast at the chop house courtesy of Fiat Chrysler, senior UAW leaders then sat down with FCA executives to negotiate a new collective bargaining agreement. After a new agreement was negotiated that summer, senior UAW officials then directed that yet another luxurious meal for senior UAW officials take place at the London Chop House on September 17, 2015. Again, no FCA executives were present, and the purpose of the meal had nothing to do with the National Training Center. Again, however, senior UAW leaders directed Johnson to use her NTC credit card to pay $6,912.81 for liquor and food at the chop house. Again, all of the money used to pay for the lavish meal came from Fiat Chrysler through the NTC. Following the negotiation of the collective bargaining agreement between the UAW and FCA celebrated by UAW leaders at the chop house, the rank and file of the union voted down the agreement at the end of September 2015. This was the first time the rank and file had voted down a proposed collective bargaining agreement with Fiat Chrysler or its predecessor companies in more than twenty years.

Given the chain of circumstances set forth above, the seriousness of the criminal conspiracy stands out. The very leadership who were supposed to be zealously negotiating in the best interests of the rank and file membership were instead enjoying lavish meals paid for by the car company with whom they were negotiating. These facts can only serve to undermine the confidence of rank and file members in the good faith of their leadership who negotiated on their behalf with FCA executives, all while feasting on more than $15,000 in filets, cigars, and liquor paid for by that car company. These corrosive and poisoning circumstances are exactly what the Taft-Hartley Act was intended to avoid.

## C. Respect for the Law and Just Punishment

The Court's sentence for Johnson's crime needs to promote respect for the law and impose just punishment for her misconduct. Johnson was a high-level UAW official, and she intentionally acted to violate federal law for her own personal benefit and for the benefit of even more senior UAW officials. Over 45,000 hourly employees for FCA were represented by the UAW during the period of the conspiracy. These men and women believed that their union leaders were looking out for their best interests and negotiating in good faith, not double dealing them for personal gain. Through their involvement in this criminal conspiracy, however, Johnson and other senior UAW leaders were accepting corrupt payments from FCA

6

and its executives.  It is difficult to calculate the harm that resulted to the grievance process, the bargaining process, and labor relations generally.  There is no doubt, however, about the need to impose punishment for the wrongdoing and to vindicate the rule of law in the face of such long-standing and extensive criminal conduct.

In Johnson's case, part of just punishment is a recognition of sincere acceptance of responsibility and remorse.  Johnson has openly and completely accepted responsibility for her involvement in the culture of corruption which was, at least, the UAW's Chrysler Department.  Furthermore, Johnson's acceptance of responsibility was not just limited to the thousands of dollars in personal expenses she accepted, but also included the wider aspects of the conspiracy reflected in the gross misconduct of other, more senior UAW officials.  The Court should take into account Johnson's sincere acceptance of responsibility in determining an appropriate sentence.

## D.    Deterrence

Millions of Americans are members of labor unions.  They depend on the leadership of their unions to act zealously in the best interests of the membership and their families.  Given the importance of the integrity of good faith and honest-dealing in labor-management negotiations, general deterrence is a critical component of the Court's sentence in this case.  Senior union officials need to know

that labor corruption will be punished. They need to know that they occupy positions of trust over their members and their families. Union leaders must conduct themselves at the highest level of honesty, integrity, and transparency. Union leaders in this city and across the country are watching this case, and the Court can instruct those union officials with the knowledge that union officials who accept or facilitate illegal payments from employers will receive significant punishment.

## III.  Conclusion

For two years, Johnson took advantage of her position as a senior UAW official in order to take thousands of dollars in illegal payments from Fiat Chrysler. Johnson willingly participated and acted at the direction of more senior UAW officials in order to facilitate tens of thousands of dollars in illegal payments from Fiat Chrysler. During the conspiracy, the UAW's FCA/Chrysler Department was riddled with corruption, and it was fatally compromised in its ability to represent the best interests of the UAW's members and their families. Instead of zealously pursuing union grievances and health and safety issues, senior officials of the UAW sought to line their own pockets with money and things of value provided to them by Fiat Chrysler.

To her credit, Johnson recognized her wrongdoing and accepted responsibility for her criminal activity. Beyond just accepting responsibility, however, Johnson

has acted to cooperate with the government's investigation so as to rectify the corruption.  Although her cooperation is not yet complete so as to justify a downward departure motion, Johnson's efforts towards cooperation can be considered by the Court in measuring her acceptance of responsibility and remorse.  Under all of the circumstances, the Court should sentence Johnson at the low end of the guideline range of 12 months of imprisonment so as to achieve the goals of Section 3553(a).

The government also requests a six-month delay in the start date of her sentence so that she can continue to cooperate in the investigation.

MATTHEW SCHNEIDER
United States Attorney

/s/ DAVID A. GARDEY
/s/ ERIN S. SHAW
Assistant United States Attorneys
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone:  (313) 226-9591 (Gardey)
Phone:  (313) 226-9182 (Shaw)
david.gardey@usdoj.gov
erin.shaw@usdoj.gov

Dated:  December 12, 2018

Case 2:17-cr-20406-FDB-RSW    ECF No. 176    filed 12/12/18    PageID.2417    Page 10 of 10

# CERTIFICATE OF SERVICE

I hereby certify that on  December 12, 2018, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to the following:

Counsel of Record for Nancy A. Johnson

/s/ DAVID A. GARDEY
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone:  (313) 226-9591
E-Mail:  David.Gardey@usdoj.gov
Bar No. P48990

10

# Exhibit 74

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**UNITED STATES OF AMERICA,**

        Plaintiff,

                             **HONORABLE PAUL D. BORMAN**

  v.                              **No. 17-20406**

**NANCY JOHNSON,**

        Defendant.
_____/

**SENTENCING**

**Tuesday, December 18, 2018**

**10:10 a.m.**

APPEARANCES:

   For the Plaintiff:       **DAVID A. GARDEY**
                             U.S. Attorney's Office
                             211 West Fort Street
                             Suite 2001
                             Detroit, Michigan  48226
                             (313) 226-9100

   For the Defendant:      **HAROLD Z. GUREWITZ**
                             Gurewitz & Raben
                             333 West Fort Street
                             Suite 1400
                             Detroit, Michigan  48226
                             (313) 628-4733

To Obtain Certified Transcript, Contact:
Leann S. Lizza, CSR-3746, RPR, CRR, RMR, CRC
(313) 234-2608

Case 2:17-cr-20406-FDB-RSW ECF No. 180-2 filed 01/29/19 PageID.2961 Page 2 of 20

2

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| Sentencing | | 3 |
| Allocution by Mr. Gurewitz | | 7 |
| Allocution by Ms. Johnson | | 11 |
| Response by Mr. Gardey | | 13 |
| Imposition of sentence by the Court | | 17 |

| Exhibits: | | Received |
|---|---|---|
| (None offered.) | | |

Case 1:19-cv-06770-EK-MMH   Document 34-28   Filed 08/21/20   Page 26 of 30 PageID #: 1440
Case 2:17-cv-20406-FDB-RSW   ECF No. 180   filed 01/29/19   PageID.2962   Page 3 of 20

SENTENCING                                               3

December 18, 2018

Detroit, Michigan

-   -   -

(Call to order of the Court, 10:10 a.m.)

(Court, Counsel and Defendant present.)

THE COURT CLERK:  Now calling the case the *United States versus Nancy Johnson*, Case Number 17-20406.

THE COURT:  Okay.  Parties please identify themselves for the record beginning with the government.

MR. GARDEY:  Good morning, Your Honor.  David Gardey appearing on behalf of the United States.

THE COURT:  And for Miss Johnson, please.

MR. GUREWITZ:  Good morning, Your Honor.  Harold Gurewitz on behalf of Nancy Johnson who is standing to my right.

THE COURT:  Good morning, Miss Johnson.

THE DEFENDANT:  Good morning.  I'm Nancy Johnson.

THE COURT:  Thank you.

Okay.  Then why don't we proceed.  If Mr. Gardey would go sidebar.  Mr. Gurewitz, if you and Miss Johnson approach the podium, then we'll proceed.

Let me ask Mr. Gurewitz, did you get a copy of the presentence report in this case?

MR. GUREWITZ:  I did, Your Honor, and I've reviewed it with Miss Johnson.

**SENTENCING**                                                        17

important that you explain it to your client.

MR. GARDEY:  And I would concur in that request.

THE COURT:  The Court has before it the sentencing of Miss Nancy Johnson.  The guideline range is 12 to 18 months.  Among the factors the Court must take into account under the statute of 18 U.S.C. Section 3553(a) are the nature and circumstances of the offense, and it's a very serious offense, corrupting a labor union and the process.

The history and characteristics of the defendant are absolutely no contacts with any criminal matters.  There's a need for a sentence to reflect the seriousness of the offense, respect for the law, provide just punishment and to deter other people who may think, well, it's just a money offense, I took money, I'll pay back some money and no harm, no foul.  Well, there is significant harm in this conviction, and the Court has to deal with it.

There's no need to protect the public from further crimes of this defendant.

The matters -- in this case she was a very high-ranking UAW official.  She benefited from some of the money that was spent on herself personally.  She ordered people below her like Miss Virdell King to buy things that should not have been bought and that's why the presentence report shows a role in the offense here that others did not have those -- that enhancement.

**USA v. JOHNSON, 17-20406**

Taking these factors into account, pursuant to Sentencing Reform Act of 1984, and the Court does recognize her significant cooperation which Mr. Gardey mentioned and, of course, Mr. Gurewitz mentioned, but as Mr. Gardey said, that it's ongoing, but the Court, in terms of imposing a sentence, looks at the guidelines. It does not have to follow them. But as I mentioned and gave particular credence to her role in this case, pursuant to Sentencing Reform Act, commit the defendant to the custody of Bureau of Prisons for 12 months and one day which is like a ten-month-plus-some-change sentence.

Upon release from imprisonment, supervised release for a term of one year. Special assessment of $100, $10,000 fine due immediately. Interest shall not accrue. I believe that will probably be dealt with before any inmate status down the road. So we don't have to go through any inmate financial responsibility program. No drug testing.

While on supervision, she should abide by the standard conditions adopted by this court. We'll adjourn the sent -- the report date for six months and then after the sentence on supervision, she should abide by the standard conditions adopted by this court.

Let me ask Mr. Gurewitz, are there any factors that the Court did not deal with that you wish to speak -- I'm going to waive costs of imprisonment and supervision, going to accept the Rule 11, and we'll deal with the restitution at a later

Case 2:17-cr-20406-FDB-RSW    ECF No. 180    filed 01/29/19    PageID.4728    Page 19 of 20

**SENTENCING**

19

time.

MR. GUREWITZ:  I have nothing else, Your Honor.  I have no objections.

THE COURT:  Okay.  Mr. Gardey, do you have any objections?

MR. GARDEY:  No objections, Your Honor, and I would just request that the Court dismiss Counts 2 through 5, remaining counts of the fourth superseding indictment.

THE COURT:  The Court will do that.  Submit an order and I will sign it.

Mr. Luke, is there anything else that the Court needs to do?

MR. LUKE:  No, Your Honor.

THE COURT:  Thank you.  We are concluded.

MR. GARDEY:  Thank you.

THE COURT CLERK:  Everyone please rise.  Court is in recess.

(Proceedings concluded, 10:39 a.m.)

-  -  -

**USA v. JOHNSON, 17-20406**

Case 1:19-cv-06770-EK-MMH   Document 34-28   Filed 08/21/20   Page 30 of 30 PageID
Case 2:17-cr-20406-FDB-RSW   ECF No. 180-4 filed 01/29/19   PageID.2479   Page 20 of 20
#: 1444

20

**SENTENCING**

CERTIFICATION OF REPORTER

I, Leann S. Lizza, do hereby certify that the above-entitled matter was taken before me at the time and place hereinbefore set forth; that the proceedings were duly recorded by me stenographically and reduced to computer transcription; that this is a true, full and correct transcript of my stenographic notes so taken; and that I am not related to, nor of counsel to either party, nor interested in the event of this cause.


S/Leann S. Lizza                                    1/29/2019

Leann S. Lizza, CSR-3746, RPR, CRR, RMR        Date