# Exhibit 81

United States District Court
Eastern District of Michigan
Southern Division


United States of America,

v.

D-1 Norwood Jewell,

Defendant.

Case No. 19-CR-20146

Honorable Paul D. Borman

Offense: **Conspiracy to Violate the Labor Management Relations Act** (18 U.S.C. § 371)

Maximum Imprisonment: 5 years

Maximum Fine: $250,000

Maximum Supervised Release: 3 years

---

# Rule 11 Plea Agreement

---

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, Defendant **Norwood Jewell** and the government agree as follows:

## I. Guilty Plea

### A. Count of Conviction

Defendant **Norwood Jewell** will enter a plea of guilty to Count One of the Information.

- 1 -

Count One charges conspiracy to violate the Labor Management Relations Act, in violation of 18 U.S.C. § 371.

### Elements of the Offense

The elements of conspiracy to violate the Labor Management Relations Act, as charged in Count One of the Information, are as follows:

(1)     Two or more persons conspired to violate the Labor Management Relations Act in violation of 29 U.S.C. § 186(a)(2), (b)(1), and (d)(1).

(2)     The defendant knowingly and voluntarily joined the conspiracy.

(3)     A member of the conspiracy did one of the overt acts described in the Information for the purpose of advancing or helping the conspiracy.

### B.     Factual Basis for Guilty Plea

The following facts are a sufficient and accurate basis for Defendant **Norwood Jewell's** guilty plea to Count One:

1.     From in or before 2009 through 2016, FCA executives conspired with one another, with FCA, with officials at the UAW, and with the UAW, to violate the Labor Management Relations Act. From 2009 through 2014, General Holiefield, while serving as a Vice President of the UAW in charge of the Chrysler Department, knowingly created and/or joined the conspiracy whereby officers and employees of the UAW would willfully request, receive, and accept money and things of value from persons acting in the interest of FCA. During the Holiefield

- 2 -

Case 2:19-cr-20746-FDB-RSW ECF No. 16 filed 04/02/19 PageID.34 Page 3 of 29

leadership years, a "culture of corruption" was continued and enhanced between Holiefield, his staff, and executives of FCA to violate the Labor Management Relations Act. Holiefield retired from the UAW in 2014, leaving several co-conspirators in place at their previous positions in the UAW.

2.      In 2014, **Norwood Jewell** was elected Vice President of the UAW, and he was assigned to the Chrysler Department. **Norwood Jewell** had no previous experience with the Chrysler Department, nor was he familiar with any of the co-conspirators from the Holiefield era who had conspired with executives from FCA to violate the Labor Management Relations Act.

3.      From 2014 through 2016, while serving as a Vice President of the UAW in charge of the Chrysler Department, **Norwood Jewell** knowingly joined the conspiracy whereby officers and employees of the UAW would willfully request, receive, and accept things of value worth over $40,000 from persons acting in the interest of FCA by failing to apportion the amounts attributable to the UAW, the NTC, and to **Norwood Jewell** personally. The things of value included travel, lodging, and meals.

4.      Defendant **Norwood Jewell**, then a representative, officer, and Vice President of the UAW, knowingly and voluntarily joined this conspiracy to receive things of value from persons acting in the interest of FCA. **Norwood Jewell** joined knowing that the prohibited payments of things of value, which were delivered

through and concealed by the UAW-Chrysler National Training Center (NTC), were willfully made with the intent to benefit the UAW, **Norwood Jewell**, senior UAW official Nancy A. Johnson, senior UAW official Virdell King, Keith Mickens, and other senior UAW officials, who were not permitted to receive things of value.

5.      The International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (UAW) was a labor organization based in Detroit, Michigan. The UAW represented tens of thousands of non-managerial employees employed by FCA at numerous locations in Michigan and across the United States. The UAW was a labor organization subject to the Labor Management Relations Act, 29 U.S.C. §§ 142 & 152.

6.      **Norwood Jewell** was a UAW officer who served as a Vice President of the UAW, the most senior official in the UAW Chrysler Department from 2014 through 2016. As the most senior UAW official in the Chrysler Department, **Norwood Jewell** was responsible for negotiating and administering the collective bargaining agreements between the UAW and FCA on behalf of tens of thousands of FCA employees represented by the UAW. In 2015, **Norwood Jewell** served as a member of the UAW national negotiating committee responsible for the collective bargaining agreements between the UAW and FCA.

Case 2:15-cr-20146-PDB-RSW ECF No. 16-3 filed 04/02/15 PageID.30 Page 5 of 29

7. Nancy A. Johnson was a UAW employee who served as a senior official in the UAW Chrysler Department from 2014 through 2016. As a senior UAW official in the Chrysler Department, Nancy A. Johnson was responsible for negotiating and administering the collective bargaining agreements between the UAW and FCA on behalf of tens of thousands of FCA employees represented by the UAW. In 2015, Nancy A. Johnson served as a member of the UAW national negotiating committee in an administrative role responsible for the collective bargaining agreements between the UAW and FCA.

8. Keith Mickens was a UAW employee who served as a senior official in the UAW Chrysler Department from 2010 through June of 2014. As a senior UAW official in the Chrysler Department, Keith Mickens was responsible for negotiating and administering the collective bargaining agreements between the UAW and FCA on behalf of tens of thousands of FCA employees represented by the UAW. In 2011, Keith Mickens served as a member of the UAW national negotiating committee responsible for negotiating the terms of the collective bargaining agreements between the UAW and FCA.

9. Virdell King was a UAW employee who served as a senior official in the UAW Chrysler Department. As a senior UAW official in the Chrysler Department, Virdell King was responsible for negotiating and administering the collective bargaining agreements between the UAW and FCA on behalf of tens of

- 5 -

thousands of FCA employees represented by the UAW. In 2011 (under General Holiefield), Virdell King served as a member of the UAW national negotiating committee responsible for negotiating the terms of the collective bargaining agreements between the UAW and FCA. In 2014, Virdell King was reassigned into an administrative role by Norwood Jewell and did not participate in the actual negotiating process between the UAW and FCA.

10. Fiat Chrysler Automobiles US LLC was an automotive company based in Auburn Hills, Michigan, and the successor to the automotive company formerly known as Chrysler Group LLC. Both are referred to here as "FCA." FCA was an employer in an industry affecting interstate commerce and subject to the Labor Management Relations Act, 29 U.S.C. §§ 142 & 152.

11. Alphons Iacobelli was the FCA Vice President for Employee Relations and a person acting in the interest of employer FCA from 2008 through June of 2015. As the FCA Vice President for Employee Relations, Alphons Iacobelli was the senior FCA official responsible for negotiating with the UAW and for administering the collective bargaining agreements between FCA and the UAW. As the FCA Vice President for Employee Relations, Alphons Iacobelli was FCA's lead representative for labor relations and managed FCA's relationship with the UAW. Alphons Iacobelli was the senior FCA official responsible for resolving disputes

- 6 -

and grievances that arose under the collective bargaining agreements between FCA and the UAW.

12. Jerome Durden was a Financial Analyst in FCA's Corporate Accounting Department. From 2008 through 2015, Jerome Durden was the controller of the NTC and served as the secretary of the NTC Joint Activities Board.

13. After Alphons Iacobelli and Jerome Durden left FCA in June 2015, other FCA executives continued the conspiracy on through 2016 by, among other things, approving illegal payments of things of value to UAW officials and the UAW, while the FCA executives were acting in the interest of FCA.

14. The UAW-Chrysler Skill Development & Training Program d/b/a the UAW-Chrysler National Training Center (NTC) was a tax-exempt corporation based in Detroit, Michigan. The NTC purported to function as a labor management committee under the Labor Management Labor Relations Act, 29 U.S.C. § 186(c)(9). The stated purpose of the NTC was to provide for the education, training, and retraining of workers.

15. The governing body of the NTC was known as the Joint Activities Board. The Vice President of Employee Relations of FCA and the Vice President of the Chrysler Department of the UAW served as the Chairmen of the NTC Joint Activities Board. Based on his position in the UAW, between June 2014 and December 2016, **Norwood Jewell** served as one of the Chairmen of the NTC Joint

- 7 -

Activities Board. The remainder of the Joint Activities Board was made up of senior officials from FCA and the UAW.

16.     FCA Vice President Alphons Iacobelli, FCA Financial Analyst Jerome Durden, and their co-conspirators used NTC bank accounts and NTC credit card accounts to conceal prohibited payments and things of value paid and delivered to senior UAW officials.

17.     In and after 2012, FCA Vice President Alphons Iacobelli, FCA Financial Analyst Jerome Durden, and other FCA executives encouraged and authorized senior UAW officials to use the NTC credit cards to pay for personal purchases and personal expenditures in violation of the Labor Management Relations Actions Act.

### Overt Acts

18.     One or more members of the conspiracy completed one or more of the following overt acts to effect the object of the conspiracy:

19.     In June 2014, **Norwood Jewell** became the Vice President of the UAW's Chrysler Department. As Vice President, **Norwood Jewell** was the most senior official in the UAW Chrysler Department.

20.     In June 2014, the UAW President approved the appointment of Nancy A. Johnson as the Top Administrative Assistant to the Vice President for the UAW Chrysler Department. As the Top Administrative Assistant, Nancy A. Johnson was

- 8 -

the second most senior official in the UAW Chrysler Department.

21.  In and after 2012, NTC credit cards were given to senior UAW officials, including Nancy A. Johnson, Virdell King, Keith Mickens, and others. **Norwood Jewell** received an NTC credit card in 2014.

22.  From 2014 through 2016, in instances set forth below, **Norwood Jewell** made purchases on his NTC credit card for the UAW's benefit by failing to account and/or apportion expenditures charged to the NTC account that in fact should have been apportioned to the UAW or that should not have been charged.

23.  On August 6, 2014, **Norwood Jewell** held an open house for senior UAW officials at the offices of the NTC in Warren, Michigan. While the open house included a tour of the NTC facility, **Norwood Jewell** did not apportion any of the thousands of dollars in costs associated with the event to the UAW and instead directed payment of all of the costs of the event to be paid by the NTC using FCA funds, in violation of the Labor Management Relations Act.

24.  On January 9, 2015, **Norwood Jewell** spent $7,569.55 at LG's Prime Steakhouse in Palm Springs, California using his NTC credit card. The meal was paid by the NTC using FCA funds, in violation of the Labor Management Relations Act.

25.  In January 2015, **Norwood Jewell** spent $1,267.79 at Indian Canyons Golf Resort in Palm Springs, California. These expenditures were paid by the NTC

using FCA funds, in violation of the Labor Management relations Act.

26.     On January 18, 2015, Nancy A. Johnson, spent $4,587.04 for a meal at LG's Prime Steak House in Palm Springs, California. **Norwood** Jewell approved Nancy A. Johnson to spend the money at the restaurant. The meal was paid by the NTC using FCA funds, in violation of the Labor Management Relations Act.

27.     On January 23, 2015, a UAW official spent $3,372.74 for a meal at Spencer's Restaurant in Palm Springs, California. **Norwood Jewell** approved the UAW official to spend the money at the restaurant. The meal was paid by the NTC using FCA funds, in violation of the Labor Management Relations Act.

28.     On January 24, 2015, a UAW official spent $6,200.05 for a meal at Palm Springs Steak & Chop Restaurant in Palm Springs, California. **Norwood Jewell** approved the UAW official to spend the money at the restaurant. The meal was paid by the NTC using FCA funds, in violation of the Labor Management Relations Act.

29.     On January 28, 2015, a UAW official spent $4,147.74 for a meal at Melvyn's Restaurant in Palm Springs, California. **Norwood Jewell** approved the UAW official to spend the money at the restaurant. The meal was paid by the NTC using FCA funds, in violation of the Labor Management Relations Act.

30.     On July 14, 2015, a UAW official spent $7,694.07 at the London Chop House in Detroit, Michigan. **Norwood Jewell** approved that the UAW official was to

pay for such meals using his NTC credit card. The meal was paid by the NTC using FCA funds, in violation of the Labor Management Relations Act.

31.     On July 14, 2015, Nancy A. Johnson spent $800.30 at the London Chop House in Detroit, Michigan. **Norwood Jewell** approved that Nancy A. Johnson was to pay for such meals using her NTC credit card. The expenditure was paid by the NTC using FCA funds, in violation of the Labor Management Relations Act.

32.     On August 12, 2015, **Norwood Jewell** held another open house for senior UAW officials at the offices of the NTC in Warren, Michigan. While the open house included a tour of the facility, **Norwood Jewell** did not apportion any of the thousands of dollars in costs associated with the event to the UAW and instead directed payment of all of the costs of the event to be paid by the NTC using FCA funds, in violation of the Labor Management Relations Act.

33.     On September 17, 2015, Nancy A. Johnson spent $6,912.81 at the London Chop House in Detroit, Michigan. **Norwood Jewell** approved that Nancy A. Johnson was to pay for such meals using her NTC credit card. The meal was paid by the NTC using FCA funds, in violation of the Labor Management Relations Act.

34.     In January and February 2016, **Norwood Jewell** spent $6,681.12 at Indian Canyons Golf Resort in Palm Springs, California. These expenditures were paid by the NTC using FCA funds, in violation of the Labor Management

Relations Act.

35.     On February 3, 2016, a UAW official spent $6,081.04 for a meal at Melvyn's Restaurant in Palm Springs, California. **Norwood Jewell** approved the UAW official to spend the money at the restaurant. The meal was paid by the NTC using FCA funds, in violation of the Labor Management Relations Act.

36.     On February 12, 2016, a UAW official spent $3,583.47 for a meal at Palm Springs Steak & Chop Restaurant in Palm Springs, California. **Norwood Jewell** approved the UAW official to spend the money at the restaurant. The meal was paid by the NTC using FCA funds, in violation of the Labor Management Relations Act.

37.     **Norwood Jewell** used the NTC credit card, and he approved UAW officials to use their NTC credit cards, to make over $40,000 in purchases for himself, senior UAW officials, and other UAW members. **Norwood Jewell** made these purchases and approved other UAW officials to make similar purchases knowing that said purchases would not be apportioned to the UAW for payment. Instead, **Norwood Jewell** approved the use of NTC credit cards for payments using FCA funds, in violation of the Labor Management Relations Act.

### Defendant's Position

The defendant contends the following:

38.     **Norwood Jewell** was assigned to the UAW Chrysler Department in

- 12 -

Case 1:19-cv-06770-EK-MMH Document 34-32 Filed 08/21/20 Page 14 of 21 PageID #: 1495

June of 2014 and was not familiar with any of the UAW Chrysler or FCA staff in place. Unbeknownst to **Jewell**, he entered a "culture of corruption" that existed between Alphons Iacobelli and other FCA officials and former UAW Vice President General Holiefield and other members of his staff - most of whom were inherited by **Jewell**. **Jewell** asserts that this corruption was ongoing and intentionally concealed from him. Even though he was unaware of this corruption, **Jewell** immediately made significant changes in the UAW Chrysler leadership and servicing staff. Iacobelli and members of his staff inhibited financial auditing of the NTC as had been requested by the UAW and **Jewell** himself. After FCA released Iacobelli from employment in June of 2015, the UAW and FCA began to further change the operation of the NTC. In September of 2015, during negotiations, the UAW's goal of an annual financial audit was agreed to and a reputable company was hired to perform the first financial audit in many years. The financial audit revealed many inappropriate expenditures that had been concealed from **Jewell**. Led by **Jewell** and the FCA co-director of the JAB of the NTC, the JAB immediately began the process of implementing new policies and procedures to ensure compliance with the LMRA. **Jewell** began the process of replacing UAW NTC board members immediately and by the end of 2015 the entire NTC JAB had been replaced. Even though many significant changes were made during the first year and one half of his tenure, **Jewell** acknowledges several violations of the

- 13 -

LMRA.

There was a lack of apportionment between what should have been charged to the UAW and the NTC, and this lack of apportionment of funds clearly violated the LMRA. As the UAW Vice President of the Chrysler Department, **Jewell** understands the perception these violations of the LMRA created to UAW membership and the public and accepts full responsibility.

**Jewell** asserts that his conduct as a Vice President of the UAW was not influenced in any way by the items described in the Factual Basis section above. His actions as Vice President were always done in the best interest of the UAW, its rank and file members, and their families. Although acknowledging that he violated the Labor Management Relations Act and taking responsibility for his own conduct, **Jewell** in no way intended to aid FCA or to harm the UAW or its members. In partial mitigation, **Jewell** contends that some of the violations of the Labor Management Relations Act described above were the result of the actions and decisions of subordinates in the UAW Chrysler Department who were seeking to benefit themselves or were overzealous in seeking to advance what they perceived to be in **Jewell's** interests. **Jewell** acknowledges that Iacobelli and other FCA executives have sought to provide things of value to UAW officials in an effort to influence those officials, but **Jewell** contends that it was never his intent to be influenced in any way by the actions of Iacobelli or other FCA executives. In

- 14 -

particular, **Jewell** contends that his decisions during the 2015 collective bargaining negotiations were not affected by the activity described above or the efforts of Iacobelli.

## II. Sentencing Guidelines

### A. Standard of Proof

The Court will find sentencing factors by a preponderance of the evidence.

### B. Agreed Guideline Range

There are no sentencing guideline disputes. Except as provided below, the defendant's guideline range is **12–18 months**, as set forth on the attached worksheets. If the Court finds:

1. that defendant's criminal history category is higher than reflected on the attached worksheets, or

2. that the offense level should be higher because, after pleading guilty, defendant made any false statement to or withheld information from his probation officer; otherwise demonstrated a lack of acceptance of responsibility for his offense; or obstructed justice or committed any crime,

and if any such finding results in a guideline range higher than 12–18 months, the higher guideline range becomes the **agreed range**.

- 15 -

## III. Sentence

The Court will impose a sentence pursuant to 18 U.S.C. § 3553, and in doing so must consider the sentencing guideline range.

### A. Imprisonment

Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) the sentence of imprisonment in this case may not exceed the top of the agreed guideline range. The government agrees to recommend that the sentence of imprisonment be no more than the mid-point of the agreed guideline range.

### B. Supervised Release

A term of supervised release, if imposed, follows the term of imprisonment. There is no agreement on supervised release. In other words, the Court may impose any term of supervised release up to the statutory maximum term, which in this case is not more than three years. The agreement concerning imprisonment described above in Paragraph 3A does not apply to any term of imprisonment that result from any later revocation of supervised release.

### C. Special Assessment

Defendant will pay a special assessment of $100.00.

### D. Fine

There is no agreement as to fines.

**E.     Restitution**

The parties are in agreement that restitution to either FCA or the NTC is legally inapplicable based on the defendant's offense of conviction.

**IV.   Use of Withdrawn Guilty Plea**

If the Court allows defendant to withdraw his guilty plea for a "fair and just reason" pursuant to Fed. R. Crim. P. 11(d)(2)(B), defendant waives his rights under Fed. R. Evid. 410, and the government may use his guilty plea, any statement made under oath at the change-of-plea hearing, and the factual basis statement in this plea agreement, against his in any proceeding.

**V.     Defendant's Right to Withdraw from this Agreement**

Defendant **Norwood Jewell** may withdraw from this agreement, and may withdraw his guilty plea, if the Court decides to impose a sentence higher than 18 months. This is the only reason for which **Norwood Jewell** may withdraw from this agreement. The Court shall advise defendant that if he does not withdraw his guilty plea under this circumstance, the Court may impose a sentence greater than 18 months.

**VI.   Appeal Waiver**

Defendant **Norwood Jewell** waives any right he may have to appeal his conviction on any grounds. If the defendant's sentence of imprisonment does not exceed 18 months, the defendant also waives any right he may have to appeal his

sentence, including the fine and amount of restitution imposed, on any grounds.

Nothing in this waiver bars a timely claim of ineffective assistance of counsel on appeal or by collateral relief under 28 U.S.C. § 2255.

## VII. Consequences of Withdrawal of Guilty Plea or Vacation of Conviction

If the defendant is allowed to withdraw his guilty plea or if any conviction entered pursuant to this agreement is vacated, the Court shall, on the government's request, reinstate any charges that were dismissed as part of this agreement. If additional charges are filed against defendant within six months after the date the order vacating defendant's conviction or allowing his to withdraw his guilty plea becomes final, which charges relate directly or indirectly to the conduct underlying the guilty plea or to any conduct reflected in the attached worksheets, defendant waives his right to challenge the additional charges on the ground that they were not filed in a timely manner, including any claim that they were filed after the limitations period expired.

## VIII. Parties to Plea Agreement

Unless otherwise indicated, this agreement does not bind any government agency except the United States Attorney's Office for the Eastern District of Michigan.

## IX. Scope of Plea Agreement

This agreement, which includes all documents that it explicitly incorporates,

- 18 -

is the complete agreement between the parties. This agreement supersedes all other promises, representations, understandings and agreements between the parties concerning the subject matter of this plea agreement that were made at any time before the guilty plea is entered in court. Thus, no oral or written promises made by the government to defendant or to the attorney for the defendant at any time before defendant pleads guilty are binding except to the extent they have been explicitly incorporated into this agreement.

Notwithstanding the previous paragraph, if defendant has entered into a proffer agreement in writing or a cooperation agreement in writing with the government, this plea agreement does not supersede or abrogate the terms of any such prior written agreement.

This agreement also does not prevent any civil or administrative actions against defendant, or any forfeiture claim against any property, by the United States or any other party.

## X.   Acceptance of Agreement by Defendant

This plea offer expires unless it has been received, fully signed, in the Office of the United States Attorney by 5:00 P.M. on March 15, 2019. The government reserves the right to modify or revoke this offer at any time before defendant pleads guilty.

Matthew Schneider
United States Attorney

David A. Gardey
Assistant United States Attorney
Chief, Public Corruption Unit

Date: **3-7-19**

By signing below, defendant acknowledges that he has read (or has been read) this entire document, understands it, and agrees to its terms. He also acknowledges that he is satisfied with his attorney's advice and representation. Defendant agrees that he has had a full and complete opportunity to confer with his lawyer, and has had all of his questions answered by his lawyer.

Michael P. Manley
Attorney for Defendant

Norwood Jewell
Defendant

Date:

- 20 -