# Exhibit 85

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**REID BIGLAND,**

      Plaintiff,

vs.

                                        Case No. 19-cv-11659
                                        Hon. Gershwin A. Drain
                                        Mag. Stephanie Dawkins Davis

**FCA NORTH AMERICA HOLDINGS, LLC**,
*a Delaware Corporation,* **FCA US LLC,** *a foreign corporation*, and **FIAT CHRYSLER AUTOMOBILES, N.V.,** *a foreign corporation*, *jointly and severally,*

      Defendants.

---

| | |
|---|---|
| **DEBORAH GORDON LAW** | **SULLIVAN AND CROMWELL LLP** |
| **Deborah L. Gordon (P27058)** | **Jacob Eden Cohen** |
| **Elizabeth A. Marzotto Taylor (P82061)** | Attorney for Defendants |
| Attorneys for Plaintiff | 125 Broad Street |
| 33 Bloomfield Hills Parkway, Suite 220 | New York, New York 10004 |
| Bloomfield Hills, Michigan 48304 | (212) 558-3262 |
| (248) 258-2500 | cohenja@sullcrom.com |
| dgordon@deborahgordonlaw.com | |
| emarzottotaylor@deborahgordonlaw.com | **MILLER, CANFIELD, PADDOCK AND STONE, PLC** |
| | **Thomas W. Cranmer (P25252)** |
| | Attorney for Defendants |
| | 840 W. Long Lake Road, Suite 200 |
| | Troy, Michigan 48098 |
| | cranmer@millercanfield.com |
| | |
| | **SULLIVAN AND CROMWELL LLP** |
| | **Julia Marie Jordan** |
| | Attorney for Defendants |
| | 1700 New York Ave., N.W., Suite 700 |
| | Washington, DC 20006 |
| | (202) 293-6330 |
| | jordanjm@sullcrom.com |

---

## FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY

Plaintiff **Reid Bigland**, by his attorneys **Deborah Gordon Law**, complains against Defendants FCA North America Holdings, LLC, a Delaware Corporation, FCA US LLC, a foreign corporation, and Fiat Chrysler Automobiles, N.V., a foreign corporation, as follows:

**JURISDICTION AND PARTIES**

1.      This is an action for violations of Michigan's Whistleblower Protections Act M.C.L. § 15.361 *et. seq.*, The Dodd-Frank Wall Street Reform and Consumer Protection Act, and for other tort claims. Defendants have retaliated against Plaintiff by withholding approximately 90% of his compensation because of his participation in a U.S. Securities Exchange Commission ("SEC") investigation into FCA, and because he exercised his legal right to sell his shares of FCA stock in 2018, which highly irritated the Defendants.

2.      Plaintiff Reid Bigland at all times pertinent hereto was a citizen of Oakland County, Michigan.

3.      Defendants FCA North America Holdings LLC, FCA US LLC, and Fiat Chrysler Automobiles N.V. are foreign companies doing business in Oakland County, Michigan.

4.      Defendant FCA North America Holdings, LLC is an automotive company located at 1000 Chrysler Drive, Auburn Hills, MI 48326, and is a subsidiary of Defendant Fiat Chrysler Automobiles N.V.

1

5.      Defendant FCA US LLC is an automotive company located at 1000 Chrysler Drive, Auburn Hills, MI 48326, and is a subsidiary of Defendant Fiat Chrysler Automobiles N.V.

6.      The events underlying this action occurred in this District.

7.      Defendants removed this case to this Court on or about June 5, 2019.

8.      This Court has personal jurisdiction over Defendants because they do business and can be found within this District.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants may be found within this District, and the events giving rise to this Complaint occurred in this District; namely, Plaintiff was employed and retaliated against, in this District.

## FACTS

### Plaintiff's Work History: 1997-2019

10.     For 22 years, Plaintiff has been a dedicated, high performing employee of what is now Defendant Fiat Chrysler Automotive, N.V.

11.     In 1997, Plaintiff joined the company as the Director of Human Resources for Western Star Trucks in Kelowna, British Columbia, Canada.

12.     By 2001, Plaintiff was promoted to the Director of U.S. Sales for Western Star Trucks.

2

Case 2:19-cv-11699-GAD-SDD ECF No. 15-3 filed 06/12/19 PageID.74 Page 4 of 24

13. Between 2001 and 2006, Plaintiff held the positions of Director of Vocational Truck Sales, General Manager of Dealer Operations for Freightliner North America, and President of Freightliner Custom Chassis Corporation.

14. In 2006, Plaintiff was promoted to the position of Chairman, President, and CEO of Daimler Chrysler Canada, a position he still holds currently, now under the title of Chairman, President, and CEO of Fiat Chrysler Canada.

15. Since 2006, Plaintiff has been the Chairman of the Fiat Chrysler Canada Board of Directors.

16. Plaintiff was a member of the original Fiat Chrysler North America management team formed on June 10, 2009, the first day Fiat officially merged with Chrysler.

17. Between 2009 and 2018, Plaintiff reported directly to the Global Fiat Chrysler CEO, Sergio Marchionne. From 2018 to the present, Plaintiff reported to Marchionne's successor, Michael Manley.

18. Plaintiff is also an original member of the Group Executive Council and Group Product Committee formed in August 2011. These are the highest executive decision-making bodies in the company, comprising the 20 most senior executives globally within Fiat Chrysler, and are chaired by the Global Fiat Chrysler CEO. Plaintiff receives an additional $200,000 a year (included in his base salary) for performing this service for the company.

3

Case 2:19-cv-11699-GAD-SDD ECF No. 10 Filed 06/12/19 PageID.79 Page 5 of 24

19.     In 2011, Plaintiff was named Head of U.S. Sales for Fiat Chrysler Automobiles N.V., a position he still currently holds. From 2015 to the present, Plaintiff also held the position of Head of U.S. Fleet Operations under his role as Head of U.S. Sales.

20.     Between 2011 and 2013, Plaintiff was named CEO of the Dodge Brand, and between 2013 and 2015, Plaintiff was named CEO of the Ram Brand. Between 2015 and 2018, Plaintiff was the Head of Alfa Romeo North America, and the Global CEO of Maserati.

21.     Plaintiff has been a member of the Fiat Chrysler U.S. Board of Directors since 2014.

22.     In October 2014, shares of Fiat Chrysler stock first became available to trade on the New York Stock Exchange.

23.     Under Plaintiff's leadership, in 2015, Fiat Chrysler Canada became the number one selling vehicle company in Canada for the first time in the company's 90-year history.

24.     Between 2016 and 2018, Plaintiff simultaneously held seven major executive positions supporting three organizations in Windsor, Ontario, Canada; Auburn Hills, Michigan; and Modena, Italy:

- Chairman, President, and CEO of Fiat Chrysler Canada;
- Head of US Sales;
- Global Head of Alfa Romeo;
- Global CEO of Maserati;

- Global Head of Maserati Sales;
- Head of Alfa Romeo North America; and
- Head of US Fleet Operations.

25.     In 2017, Fiat Chrysler Automobiles N.V. achieved its highest annual profit ever. Approximately 95% of the 2017 annual profit came from the U.S., Canada, and the Maserati brand. Plaintiff played a significant role in each of these areas of the company.

26.     Between 2014 and 2018, the North American Region, where Plaintiff played a large role, delivered approximately 90% of Fiat Chrysler Automobiles N.V.'s global profitability, and was the only Region to exceed its five-year business plan objectives.

27.     In 2018, FCA US LLC achieved its highest retail sales in 17 years, was the fastest growing automaker in the United States, and gained more year-over-year market share than any other manufacturer. The U.S. region also achieved a record annual profit in 2018.

28.     In 2018, Plaintiff was named Global Head of the Ram Brand, in addition to his other positions.

29.     Plaintiff's current positions are:

- Chairman, President, and CEO of Fiat Chrysler Canada;
- Head of US Sales;
- Head of US Fleet; and
- Global Head of the Ram Brand.

30.    Plaintiff also currently serves as a member of the following Committees for Defendants FCA North America Holdings, LLC and FCA US, LLC: Product Committee, Industrial Committee, and Commercial Committee. These committees govern the company's North American Operations, and have historically been chaired by the Global CEO of Fiat Chrysler.

31.    As set forth below, in March, 2019, Defendants made a decision to withhold approximately 90% of Plaintiff's compensation package due to him for his work in 2018. In fact, Plaintiff's performance in 2018 was excellent; there is nothing in writing (or otherwise) to the contrary.

32.    In spite of the drastic diminution of his pay, Plaintiff continues to work extraordinarily hard and successfully for Defendant companies.

**Plaintiff's Compensation: 1997-2018**

33.    Plaintiff's compensation package reflects his demonstrated history of dedication to the company, high-level of responsibility, and excellent performance.

34.    Since 1997, Plaintiff's compensation has consisted of three components: base pay; an annual bonus; and a "Long Term Incentive" (stock payout) payment.

35.    Plaintiff's performance has always been excellent, and his continued advancement is evidence of that. He has always received an annual bonus (except for 2009-2012, when executive level bonuses were restricted by the terms of the

6

Case 2:19-cv-11699-GAD-SDD ECF No. 10-3 filed 06/12/19 PageID.78 Page 8 of 24

U.S. government "bail-out" conditions). As set forth above, the business units Plaintiff has managed have been very successful, and his level of responsibility has increased exponentially over time.

36. Annual bonuses are awarded in the first quarter of every year, and reflect an employee's performance during the prior year. For example, Plaintiff received an annual bonus in the first quarter of 2018 reflecting his performance throughout the 2017 year.

37. Annual bonuses are generally a percentage of an employee's base salary, depending on his level within the company.

38. Plaintiff received a stock payout each year between 1997 and 2018, or accrued a stock award that was in the process of being vested.

39. The "Long Term Incentive" award consists of performance share units and restricted share units of company stock awarded to employees, including Plaintiff, with a portion of these shares generally vesting every year.

40. Performance share units, which are tied to an employee's performance, vest annually, typically in March. For example, Plaintiff's performance share units awarded for his performance in 2017 vested in March of 2018.

41.     Restricted share units, which are linked to continued employment with the company, are also granted each year, and vest in installments following each grant.

42.     Plaintiff has always remained free to hold, sell, transfer, or otherwise dispose of his shares in the company at his discretion (except during the company's periodic trading "blackout periods").

43.     Plaintiff received stock payouts each year in 2016, 2017, and 2018. As in previous years, in or around March 2019, Plaintiff was due to receive his stock payouts and bonus payments for his performance during 2018.

44.     On March 8, 2019, Plaintiff was advised that those payments would be withheld indefinitely.

**Defendants' Monthly Sales Reporting: 2016-present**

45.     The SEC investigation described in ¶ 1 relates to FCA's method of reporting monthly sales beginning the period 1989 – mid 2016.

46.     When Plaintiff became Head of U.S. Sales in 2011, he inherited a system used to report monthly sales that had been in place since approximately 1989.

47.     Due to litigation filed by a dealership owner and investors regarding Defendants' monthly sales reporting, from approximately January through May

8

2016, Defendants' Internal Audit and Legal departments analyzed Defendants' monthly sales reporting practices, and found no wrongdoing.

48. Regardless, in early summer 2016, Defendants', at the recommendation of their outside counsel, "self-reported" their methodology for reporting monthly sales to the U.S. Securities Exchange Commission ("SEC").

49. In July 2016, Defendant Fiat Chrysler Automobiles N.V. voluntarily changed its system for reporting monthly sales, and "restated" its monthly sales numbers for the previous five years to reflect its new reporting methodology. Any alleged issues with Defendants' monthly sales reporting protocol ended in July 2016 when they voluntarily changed their methodology.

50. Plaintiff was excluded from the process of devising the new monthly sales reporting methodology, and was only advised that Defendants were considering a number of different methods to use.

51. The SEC has never required monthly sales reporting. Defendants will discontinue monthly sales reporting effective July 2019, as many major automotive manufacturers have already done.

**The SEC Investigates Defendants' Monthly Sales Reporting Process**

52. Based only on Defendants' "self-report," in or about May 2017, the SEC began an investigation into Defendants' former monthly sales reporting practices which had ended in 2016.

9

53.    As part of this investigation, Plaintiff was requested by the SEC to meet. For two days in Plaintiff and testified at length under oath about Defendants' monthly sales reporting.

54.    In pertinent part, Plaintiff testified under oath before the SEC that the monthly sales reporting practices at issue were in place long before he became Head of U.S. Sales, and that he merely followed these practices; that monthly sales reporting was immaterial to investors and stock prices; and that the company mainly intended its monthly sales numbers as a tool to motivate and build confidence amongst the salesforce and dealers in the wake of the company's bankruptcy.

55.    Defendants were, at all times, well aware that the SEC was looking into the pre-July 2016 monthly sales reporting methodology, and whether it had any improper impact on investors.

56.    In late 2018, presumably as a way to wrap up their investigation with some result, the SEC suggested to Plaintiff that he admit to some wrongdoing as to Defendants' monthly sales reporting. The SEC also suggested a resolution involving some penalty to FCA.

57.    Because Plaintiff had not engaged in any wrongdoing, and there was no wrongdoing, he declined to do so.

10

**Plaintiff's White Paper to the SEC**

58.     As of late 2018, it was clear to Plaintiff that the SEC did not have an accurate understanding of Defendants' reporting methodologies, or the derivation thereof prior to Plaintiff's involvement.

59.     Accordingly, to ensure that the SEC had all relevant information, Plaintiff submitted a White Paper to the SEC in early 2019 which thoroughly set forth the monthly sales reporting methodology he **inherited** and his use of this protocol, and also summarized what he had testified to before the SEC in his meetings with them.

60.     Prior to providing his White Paper to the SEC in January 2019, Plaintiff gave a draft to Defendants.

61.     Plaintiff's White Paper contained a detailed account of Plaintiff's knowledge of Defendants' monthly sales reporting methodology, which had been in place and widely utilized since the late 1980s; and that this methodology was widely known of throughout FCA, including by the Global Fiat Chrysler CEO, Sergio Marchionne and Global Fiat Chrysler CFO, Richard Palmer. Plaintiff explained that the administrative monthly sales reporting methodology was extremely transparent and well-known throughout Defendant companies.

62.     In sum, Plaintiff's White Paper sets forth the following facts and conclusions:

a.     Plaintiff did not invent or manipulate Defendants' monthly sales reporting methodology, which had been in place since the late 1980s; the protocol was completely institutionalized with systems built to support it before and throughout Plaintiff's tenure as Head of U.S. Sales;

b.     Defendants' monthly sales reports had no appreciable impact on investors;

c.     Neither Defendants' previous monthly sales reporting methodology, nor Plaintiff's use of this protocol were improper; Plaintiff administered the protocol in accordance with guidance and best practices he received from Defendants, including the Global CEO;

d.     Both the monthly sales reporting methodology and Plaintiff's use of it were well-documented and well-known throughout the FCA organization; and

e.     Defendants' most senior executive and leadership levels, including Marchionne and Palmer, were well aware of the methodology throughout the period in question; Plaintiff referenced specific emails, reports, and documents demonstrating this fact; he had taken his direction from them.

## Defendants Retaliate Against Plaintiff

63.     When Defendants received Plaintiff's White Paper in January 2019, they became aware of the full scope of Plaintiff's participation in the SEC's investigation and the position he was taking.

64.     Defendants learned that Plaintiff set forth verbally and in writing his detailed knowledge that he did not devise, but had in fact only administered Defendants' long-standing protocol for reporting monthly sales, and that he had not improperly manipulated this methodology.

65.     Plaintiff's unwillingness to act as a scapegoat for Defendants' 30-year practice which predated him, and his candor regarding Defendants' knowledge of this practice prior to and during his tenure as head of U.S. caused FCA to retaliate against Plaintiff less than 2 months later by withholding his compensation.

66.     With no fore-warning, on March 8, 2019, Global Human Resources Chief Linda Knoll advised Plaintiff that Defendants had decided to indefinitely "defer" his annual bonus for 2018 and payout of shares. Plaintiff has never been advised of a specific reason for Defendants' decision to withhold his compensation, either verbally or in writing.

67.     Defendants alluded to an "internal investigation" as to the SEC issues. This explanation was clearly a pretext for retaliation.

13

68.     Defendants were fully aware of all the issues concerning monthly sales reporting by the end of 2016, including those matters the government inquired into. Nothing new had occurred or been brought forward since 2017. The "investigation" Knoll referred to had been ongoing since 2016, and Plaintiff had still received all of his compensation for 2016 in the first fiscal quarter of 2017; and all of his compensation for 2017 in the first quarter of 2018. He expected to receive both these elements of his compensation for 2018 in the first quarter of 2019.

69.     Defendants also admitted that Plaintiff's compensation was withheld, in part, because Defendants were angry that Plaintiff had recently exercised his legal right to sell his vested shares in the company.

70.     On March 8, 2019, Knoll told Plaintiff he was the "only person" in the company who had sold all of his shares.

71.     Plaintiff was subsequently told by the Global CEO and Defendants' outside counsel that the FCA Compensation Committee was "concerned" about his "recent sales of all his shares."

72.     As a result of Defendants' "deferral" of Plaintiff's "Long Term Incentive" shares, he is ineligible to receive the May 2 and 30, 2019 special dividends payable on these shares, which, upon information and belief, amounted to another approximately $1.8 million.

Case 2:19-cv-11699-GAD-SDD ECF No. 10 Filed 06/12/19 PageID.86 Page 16 of 24

73. Upon information and belief, Defendants intend to withhold these payments from Plaintiff, and instead offer them, in part, as fines or settlements to the SEC at Plaintiff's direct expense, and/or to suggest to the SEC that they should be exonerated from further responsibility because they took this action against Plaintiff.

## COUNT I
### Violation of the Whistleblowers' Protection Act

74. Plaintiff realleges all prior paragraphs as if they were fully set forth herein.

75. Plaintiff was an employee and Defendants FCA North America Holdings LLC, FCA US LLC, and Fiat Chrysler Automobiles N.V. were his employers covered by and within the meaning of the Whistleblowers' Protection Act, MCL 15.361 *et seq.* (WBPA).

76. Defendants withheld most of Plaintiff's 2018 compensation from him because he participated in the SEC's investigation of Defendants' monthly sales reporting practices, and in pertinent part refused to allow himself to become a scapegoat for Defendants' long-standing reporting practices which predated him by reporting the full scope of this information to the SEC.

77. Defendants knew not only that Plaintiff participated in the SEC's investigation, but also what he testified to before the SEC and wrote of in his

White Paper. Defendants received a draft of Plaintiff's white paper (which also summarized his verbal discussions) in or around early 2019.

78. The WPBA prohibits retaliation against employees "who participate in hearings, investigations, … or court actions."

79. The retaliatory conduct of Defendant companies, their agents, representatives, and employees, including in committing, directing and/or condoning the withholding of Plaintiff's compensation violated the Whistleblower's Protection Act.

80. Defendants' actions, and those of their agents, representatives, and employees, were intentional, wanton, willful, malicious and taken in bad faith, in deliberate disregard of and with reckless indifference to the rights and sensibilities of the Plaintiff.

81. As a further direct and proximate result of Defendants' wrongful acts, Plaintiff sustained injuries and damages including but not limited to: loss of earnings, benefits, "Long Term Incentive" compensation (shares) and special dividends, as well as earning capacity; mental anguish; anxiety about his future, physical and emotional distress, humiliation and embarrassment; loss of professional reputation; damage to his good name and reputation; and loss of the ordinary pleasures of everyday life.

## COUNT II
### Violation of the Dodd-Frank Wall Street Reform and Consumer Protection Act

82. Plaintiff realleges all prior paragraphs as if they were fully set forth herein.

83. Plaintiff was an employee and Defendants FCA North America Holdings LLC, FCA US LLC, and Fiat Chrysler Automobiles N.V. were his employers covered by and within the meaning of the anti-retaliation provisions of the Dodd-Frank Wall Street Reform and Consumers Protection Act (Dodd-Frank), 15 U.S.C. § 78u-6.

84. Plaintiff's participation in the SEC's investigation of Defendants' monthly sales reporting practices clearly qualifies defendant as a whistleblower under 15 U.S.C. § 78u-6(h).

85. Defendants' withholding of compensation and other vengeful actions at issue in this complaint constitutes prohibited retaliation for Plaintiff's whistleblowing activity under 15 U.S.C. § 78u-6(h)(1)(A).

86. Venue is proper in this Court under 15 U.S.C. § 78u-6(h)(1)(B)(i).

87. Because Dodd-Frank was designed to deter retaliatory actions against a whistleblower aiding the SEC in an investigation, it requires that a prevailing plaintiff receive "2 times the amount of back pay otherwise owed to the individual, with interest" under 15 U.S.C. § 78u-6(h)(1)(C)(ii) and "compensation

for litigation costs, expert witness fees, and reasonable attorneys' fees" under 15 U.S.C. § 78u-6(h)(1)(C)(ii).

## COUNT III
### Violation of Michigan Public Policy

88. Plaintiff realleges all prior paragraphs as if they were fully set forth herein.

89. As set forth above, Plaintiff is eligible to be issued shares of Defendants' corporate stock as compensation in exchange for his services.

90. It is uncontested that according to well-established state and federal legislative enactments, the shares of stock Plaintiff received as compensation were freely transferrable. Moreover, Defendants knew that corporate shares provided as compensation could be sold and transferred at the employee's discretion and will.

91. Accordingly, Plaintiff has a well-established legal right to sell his stock in Defendant companies at his discretion.

92. Michigan law protects employees who are retaliated against for exercising a right conferred by a well-established legislative enactment.

93. Defendants admitted that one reason they withheld his annual bonus and "Long Term Incentive" payout for 2018 was their displeasure that Plaintiff sold his shares in the company. Plaintiff properly disclosed his sale of shares.

Case 2:19-cv-11699-GAD-SDD ECF No. 10-3 filed 06/12/19 PageID.90 Page 20 of 24

94. As a result of this retaliation, Plaintiff is also ineligible to receive payment of the company's May 2 and 30, 2019 special dividends on the stock he should have received as his 2018 "Long Term Incentive" payout.

95. This retaliation would not have occurred if Plaintiff had not exercised his well-established right to transfer his shares of Defendants' stock.

96. The actions of Defendants, by their agents, employees and representatives, were intentional, in deliberate disregard for the rights and sensibilities of Plaintiff.

97. As a direct and proximate result of those actions, the terms, conditions and privileges of Plaintiff's employment were adversely affected, and he has been denied 90% of his compensation.

98. As a further direct and proximate result of Defendants' wrongful acts, Plaintiff sustained injuries and damages including but not limited to: loss of earnings, benefits, "Long Term Incentive" compensation (shares) and special dividends, as well as earning capacity; mental anguish; anxiety about his future, physical and emotional distress, humiliation and embarrassment; loss of professional reputation; damage to his good name and reputation; and loss of the ordinary pleasures of everyday life.

## COUNT IV
### Unjust Enrichment

99. Plaintiff realleges all prior paragraphs as if they were fully set forth herein.

100. As set forth above, Defendants remain under investigation by the SEC in connection with their self-reported longstanding, well-known practice of reporting monthly fleet sales numbers.

101. Plaintiff provided services to Defendants in 2018 in reliance upon their promises to provide him compensation, including his annual bonus, "Long Term Incentive" payout, and special dividends, which constitute more than 90% of his total compensation, to his substantial detriment.

102. Defendants intentionally withheld Plaintiff's annual bonus, "Long Term Incentive" payout, and special dividends with the intention of using these resources to fund a voluntary fine or settlement to the SEC, in order to avoid exposure to public scrutiny and potential for a finding of wrongdoing against Defendants from the SEC and because they were misled that Plaintiff sold his stock shares and preferred to keep the value of the 2018 shares themselves.

103. Defendants have been unjustly enriched by the money and property withheld from Plaintiff, as well as by the services Plaintiff provided that they now wrongfully refuse to compensate him for.

104.    At the time Defendants induced Plaintiff to provide services for 2018, they could reasonably foresee that their failure to provide him more than 90% of his compensation would significantly damage Plaintiff.

105.    Despite Plaintiff's repeated requests and demands to Defendants for his annual bonus, stock payout, and special dividends, Defendant refuses to provide Plaintiff with this compensation, which he is due.

106.    As a direct and proximate result of Defendants' failure to perform as promised, Plaintiff has been damaged monetarily, by Defendants intentionally withholding more than 90% of his total compensation for the year 2018.

107.    Plaintiff is entitled to a judgment of this Court compelling Defendants to provide him the compensation he is due, including his annual bonus and "Long Term Incentive" payout for 2018, as well as the special dividends associated with this payout, as stated above.

### RELIEF REQUESTED

Plaintiff demands judgment against Defendants as follows:

A.    Legal Relief:

1.    Compensatory damages in whatever amount he is found to be entitled;

2.    Exemplary damages in whatever amount he is found to be en titled; and,

3. An award of interest, costs, reasonable attorney fees, and expert witness fees.

B. Equitable Relief:

1. An injunction from this Court prohibiting any further acts of wrongdoing or retaliation against Plaintiff;

2. An award of interest, costs and reasonable attorney fees; and,

3. Whatever other equitable relief appears appropriate at the time of final judgment.

Dated: June 12, 2019

Respectfully submitted,
**DEBORAH GORDON LAW**
/s/Deborah L. Gordon (P27058)
Elizabeth A. Marzotto Taylor (P82061)
Attorney for Plaintiff
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
248-258-2500/FAX 248-258-7881
dgordon@deborahgordonlaw.com
emarzottotaylor@deborahgordonlaw.com

## DEMAND FOR TRIAL BY JURY

Plaintiff **Reid Bigland**, by his attorneys **Deborah Gordon Law**, demands a trial by jury of all the issues in this cause.

Dated: June 12, 2019

Respectfully submitted,
**DEBORAH GORDON LAW**
/s/Deborah L. Gordon (P27058)
Elizabeth A. Marzotto Taylor (P82061)
Attorney for Plaintiff
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304

Case 1:19-cv-06770-EK-MMH   Document 34-35   Filed 08/21/20   Page 25 of 25 PageID
Case 2:19-cv-11699-GAD-SDD   ECF No. 10   filed 06/12/19   PageID.94   Page 24 of 24
#: 1547

248-258-2500/FAX 248-258-7881
dgordon@deborahgordonlaw.com
emarzottotaylor@deborahgordonlaw.com

23