# Exhibit 95



# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED STATES OF AMERICA,

v.

D-1  MICHAEL GRIMES,

        Defendant.

_____/

CRIMINAL NO.  **ORIGINAL**

Case:2:19-cr-20520
Judge: Friedman, Bernard A.
MJ: Patti, Anthony P.
Filed: 08-09-2019 At 02:55 PM
USA v SEALED MATTER (af)

Count One: Conspiracy to Commit
Honest Services Wire Fraud (18 U.S.C. §
1349)

Count Two: Conspiracy to Commit
Money Laundering (18 U.S.C. §
1956(h))

## INFORMATION

The United States Attorney charges:

## GENERAL ALLEGATIONS

At all times relevant to this Information:

1.  The International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (UAW) was a labor organization engaged in an industry affecting commerce within the meaning of Sections 402(i) and 402(j) of Title 29, United States Code. The UAW represented tens of thousands of production, skilled trades, and salaried workers employed by the General Motors Company (GM) at numerous locations in Michigan, and across the United States and Canada. The UAW was headquartered in Detroit, Michigan.

2.    The UAW-GM Center for Human Resources (CHR) was a tax-exempt corporation based in Detroit, Michigan. The stated purpose of the CHR was to develop, deliver, coordinate and administer joint strategies and programs designed to educate and train UAW-represented GM employees. GM's funding of the CHR was negotiated as part of the relevant collective bargaining agreements between UAW and GM.

3.    The Executive Board-Joint Activities (Executive Board) was the governing body responsible for overseeing and facilitating the joint activities of the CHR. The Executive Board's duties and responsibilities included, but were not limited to, the following: setting policies, allocating funds for projects and activities, and monitoring expenditures for approved projects and activities. The Co-Directors of the Executive Board were the Vice President, GM North America (GMNA) Labor Relations, and the UAW Vice President and Director of the GM Department. The remaining members of the Executive Board consisted of GM and UAW representatives, equally appointed by each of the Co-Directors.

4.    From in or about 2006, through on or about July 1, 2018, MICHAEL GRIMES was a senior UAW official, at times working closely with the UAW Vice President and Director of the GM Department, and also served as a member on the CHR Executive Board.

5. From in or before July 2010, until in or about July 2014, Union Official 1 and Union Official 2 were senior officials in the UAW GM Department and also served as officers on the CHR Executive Board.

6. Vendor A and his wife, along with other partners, were the owners and operators of a group of affiliated companies (hereinafter collectively referred to as "Vendor A") that sold American-made custom logo products. The vast majority of Vendor A's business was with the UAW and CHR, providing clothing and accessories bearing the UAW or UAW-GM logo. Vendor A also owned and maintained "brick and mortar" clothing/voucher stores controlled by the UAW GM Department inside multiple GM manufacturing plants throughout the United States.

7. Vendor B was a chiropractor based in the Philadelphia, Pennsylvania and southern New Jersey areas. Vendor B provided chiropractic care to Union Official 1 for many years preceding the relevant time period of this Information.

8. In or about August 2012, Vendor B opened a business which purported to sell American-made custom watches. The only income Vendor B's company earned was from UAW and CHR business.

Case 2:19-cr-20026-BAF-APP  Document 34-39  Filed 08/09/19  PageID: 4  Page 2 of 19 PageID

## COUNT ONE
### (Conspiracy to Commit Honest Services
### Wire Fraud - 18 U.S.C. § 1349)

9. The General Allegations are incorporated in Count One by this reference.

10. As a senior UAW official and also as a member of the CHR Executive Board, MICHAEL GRIMES was a fiduciary of the UAW and the CHR and was prohibited by UAW and CHR policy from accepting kickbacks and improperly using his position to benefit himself, his family, and outside businesses.

11. MICHAEL GRIMES was required by state and federal law to discharge his duties solely in the interest of the union and its membership. 29 U.S.C. §§ 186 & 501(a).

12. Michigan and federal law prohibits union officials, such as MICHAEL GRIMES, from accepting bribes. M.C.L. § 750.125; 29 U.S.C. §§ 186 & 501.

13. From in or about 2006, through on or about July 1, 2018, in the Eastern District of Michigan, Southern Division, and elsewhere, the defendant, MICHAEL GRIMES, Union Official 1, and Union Official 2, unlawfully and knowingly conspired and agreed with each other and with other persons, known and unknown, to commit honest services wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1346.

## SCHEME TO DEFRAUD

14. MICHAEL GRIMES conspired with Union Official 1 and Union Official 2 to devise a scheme to defraud the CHR and UAW members of their right to honest, faithful, and impartial services, including the CHR's and UAW members' right to conscientious, loyal, faithful, disinterested, unbiased service, to be performed free of deceit, undue influence, conflict of interest, self-enrichment, self-dealing, concealment, bribery, fraud, and corruption, and to cause writings, signals, and sounds to be transmitted by wire in interstate and foreign commerce, for the purpose of executing and attempting to execute the scheme and artifice, as set forth below.

## OBJECTS OF THE SCHEME TO DEFRAUD

15. It was an object of the scheme to defraud for MICHAEL GRIMES, Union Official 1, and Union Official 2 to use their positions with the UAW and CHR to personally enrich themselves by deceptively soliciting, influencing, and obtaining contracts for Vendor A and Vendor B to provide clothing and other products to the CHR and to UAW members. In return, MICHAEL GRIMES, Union Official 1, and Union Official 2 demanded and accepted from Vendor A and Vendor B hundreds of thousands of dollars in bribes and kickbacks in the form of cash, checks, and other things of value.

16.  MICHAEL GRIMES, Union Official 1 and Union Official 2 concealed and did not disclose the manner in which certain contracts between the CHR and Vendor A and Vendor B were obtained or the fact that MICHAEL GRIMES, Union Official 1, and Union Official 2 accepted bribes and kickbacks from Vendor A and Vendor B.

## METHODS OF ACCOMPLISHING THE SCHEME TO DEFRAUD

17.  To achieve the objects of the scheme to defraud, MICHAEL GRIMES, Union Official 1, and Union Official 2 participated in various transactions and activities, which included, but are not limited to, the following:

### Vendor A:
### *2006 watch contract and the beginning of the scheme to defraud*

18.  In approximately 2006, MICHAEL GRIMES recommended Vendor A to provide 23,000 watches to the CHR to distribute to one of GM's powertrain divisions. After Vendor A was awarded the contract and had financially committed to the production of the watches with the manufacturer, MICHAEL GRIMES approached Vendor A and demanded a loan to purchase property in Rose Township, Michigan. When Vendor A refused MICHAEL GRIMES's demands, MICHAEL GRIMES threatened to cancel the watch contract.

19. Fearing economic harm to his company, Vendor A agreed to provide a mortgage for $60,000, so that MICHAEL GRIMES could buy the property. Accompanying the $60,000 contract was a "consulting agreement" between Vendor A and MICHAEL GRIMES. The agreement dictated that in addition to the lump sum of $60,000 to be paid by Vendor A to MICHAEL GRIMES, Vendor A would pay additional compensation to MICHAEL GRIMES in the amount of $1,800 per month as a purported "consultant." In exchange for Vendor A's kickbacks, MICHAEL GRIMES would secure the "watch order," ensure the retention and maintenance of Vendor A's retail stores in the GM plants and secure future business contracts between Vendor A and the UAW GM Department. In November 2006, Vendor A paid MICHAEL GRIMES $60,000.

20. Following the 2006 watch order, MICHAEL GRIMES continued accepting cash bribes and kickbacks from Vendor A on an almost monthly basis. The payments began at $1,800 per month and eventually increased to a sum of approximately $3,800 per month. MICHAEL GRIMES's financial demands of Vendor A continued until MICHAEL GRIMES retired from the UAW and CHR on July 1, 2018.

21. In addition to monthly cash payments, MICHAEL GRIMES demanded various other bribes from Vendor A in exchange for not interfering with Vendor

A's existing business with the UAW and CHR and continuing to recommend Vendor A for future business.

22. In order to conceal the nature of the bribes, and at MICHAEL GRIMES's direction, Vendor A provided MICHAEL GRIMES checks payable to MICHAEL GRIMES's relative or to "KKG Consulting," which was a sham company in the name of MICHAEL GRIMES's relative.

23. From at least November 2010, through in or about October 2017, MICHAEL GRIMES accepted from Vendor A approximately 27 checks totaling almost $900,000 payable to his relative or to KKG Consulting.

### *2011 Jacket Contract*

24. In 2011, Union Official 1 proposed the purchase of 50,000 "Team UAW-GM" jackets using joint funds from the CHR to be distributed to all GM plant employees. In order to continue receiving bribes and kickbacks, MICHAEL GRIMES recommended Vendor A as the sole source to fulfill this contract.

25. After Vendor A was awarded the jacket contract valued at approximately $6 million, Union Official 2 told MICHAEL GRIMES that Union Official 1 wanted a cut of Vendor A's proceeds from the jackets. Union Official 2 directed MICHAEL GRIMES to demand from Vendor A approximately $300,000 in kickbacks for Union Official 1.

26. Over a period of six months in 2012, MICHAEL GRIMES demanded from Vendor A the $300,000 in cash for Union Official 1. MICHAEL GRIMES delivered the kickbacks from Vendor A to Union Official 2, who in turn delivered the cash to Union Official 1.

27. Union Official 1 paid Union Official 2, $30,000 of the $300,000 in kickbacks from Vendor A.

28. In exchange for obtaining the 2011 jacket contract for Vendor A, MICHAEL GRIMES also demanded a $525,000 kickback from Vendor A so MICHAEL GRIMES could purchase a house in Fenton, Michigan. When Vendor A refused MICHAEL GRIMES's demands, MICHAEL GRIMES threatened to cancel the jacket contract. MICHAEL GRIMES eventually increased his financial demands on Vendor A, and fearing economic harm to his company, Vendor A agreed to provide a kickback to MICHAEL GRIMES in the form of a $530,000 cashier's check payable to MICHAEL GRIMES's relative.

29. On May 3, 2011, MICHAEL GRIMES and his relative used the $530,000 cashier's check MICHAEL GRIMES received from Vendor A in order to pay off the remaining balance due on a land contract for the Fenton, Michigan house.

### 2016 Backpack Contract

30. In order to continue receiving bribes and kickbacks, in or about March of 2016, MICHAEL GRIMES recommended Vendor A to the CHR as the sole source for a $5.8 million contract to provide 55,000 backpacks to be distributed to UAW members.

31. Shortly after Vendor A was awarded the contract, MICHAEL GRIMES demanded a payment of $1 million from Vendor A. Vendor A resisted MICHAEL GRIMES's demands and agreed to pay MICHAEL GRIMES a $500,000 kickback instead.

32. In order to conceal the nature of the kickback payments, and at MICHAEL GRIMES's direction, Vendor A provided MICHAEL GRIMES a series of checks payable to "KKG Consulting." These checks are among the checks described in Paragraph 23 of this Information.

### Vendor B:
### 2013 Watch Contract

33. In or about 2010, Union Official 1 convinced Vendor B to loan $250,000 to a construction company owned by an associate of Union Official 1. In or about March 2012, the construction company stopped making loan payments to Vendor B.

34. In or about 2012, Union Official 1 approached Vendor B and proposed a way that Vendor B could recoup the money on the failed loan to the construction company. Union Official 1 described that the UAW was going to purchase over 50,000 watches, and directed Vendor B to open a company that could win the contract to supply the watches. Union Official 1 suggested that the profits from the watch contract would repay Vendor B what he was owed on the $250,000 loan to the construction company.

35. In August and September 2012, Vendor B filed a Certificate of Formation with the State of New Jersey, obtained an Employer Identification Number, and established a website for Vendor B's business.

36. In late 2012, and early 2013, Vendor B located a manufacturer that could provide 58,000 custom watches. Union Official 1 actively participated in the design, production and pricing of the watches. Union Official 1 negotiated and approved for Vendor B to purchase the watches from the manufacturer at a total cost of approximately $2,288,200, based on a unit cost of $42.90 per watch.

37. Union Official 1 then directed Vendor B to submit a bid for the watch contract to Union Official 2, listing a total price of $3,973,000 based on a unit cost of $68.50 per watch. Both Union Official 1 and Union Official 2 then used their positions with the UAW and CHR to influence and facilitate the award of the watch contract by the CHR to Vendor B.

11

38. As a result, on or about April 13, 2013, the CHR awarded a contract valued at $3,973,000 to Vendor B for 58,000 watches at a price of $68.50 per watch.

39. On or about May 1, 2013, the CHR sent via interstate wire transfer $1,973,000 to Vendor B as the first payment for the watches. Shortly thereafter, Union Official 1 demanded $250,000 from Vendor B as a kickback for the watch contract.

40. Vendor B began making regular cash withdrawals from his bank account in order to pay Union Official 1. At Union Official 1's direction, Vendor B would travel to Union Official 1's house to deliver the cash payments on a regular basis. Vendor B gave Union Official 1 between $5,000 and $30,000 each time he visited Union Official 1 between in or about May 2013 through early 2015.

41. In 2016, Vendor B began providing kickbacks in the form of checks payable to Union Official 1. These checks, which were deposited into Union Official 1's personal bank account, included the following:

|    | Date | Payor | Payee | Amount |
|----|------|-------|-------|--------|
| a. | 2/26/2016 | Vendor B | Union Official 1 | $15,00 |
| b. | 4/11/2016 | Vendor B | Union Official 1 | $5,000 |
| c. | 5/18/2016 | Vendor B | Union Official 1 | $5,000 |
| d. | 7/1/2016 | Vendor B | Union Official 1 | $5,000 |

42. In exchange for the watch contract, Union Official 1 also directed Vendor B to pay kickbacks to Union Official 2. In order to conceal their scheme to defraud, Vendor B wrote "antique furniture" or "furniture" in the memo line of the checks he gave to Union Official 2. Union Official 2 accepted the following kickbacks from Vendor B, some of which he split with MICHAEL GRIMES:

| | Date | Payor | Payee | Amount | Memo |
|---|---|---|---|---|---|
| a. | 8/28/2013 | Vendor B | Union Official 2 | $25,000 | "antique furniture" |
| b. | 8/29/2013 | Union Official 2 | MICHAEL GRIMES | $12,500 | "antique furniture" |
| c. | 12/5/2013 | Union Official 2 | MICHAEL GRIMES | $12,500 | "antique furniture" |
| d. | 1/18/2014 | Vendor B | Union Official 2 | $25,000 | "furniture" |
| e. | 7/18/2014 | Vendor B | Union Official 2 | $10,000 | "furniture" |
| f. | 8/12/2014 | Vendor B | Union Official 2 | $10,000 | "antique furniture" |

43. Vendor B's payments to Union Official 1, continued through the summer of 2016. In the fall of 2016, following the news of a federal investigation into corruption in the UAW and Fiat Chrysler Automobiles US LLC, Union Official 1 met with Vendor B and informed Vendor B that the payments had to stop because of the UAW/Fiat Chrysler investigation.

44.   On or about January 31, 2014, the CHR received the 58,000 watches Vendor B provided. The watches were never distributed to UAW-represented GM workers and are currently being stored in a warehouse at the CHR.

All in violation of Title 18, United States Code, Section 1349.

## COUNT TWO
### (Conspiracy to Commit Money Laundering – 18 U.S.C. § 1956(h))

From in or about 2006, through in or about 2018, said dates being approximate, in the Eastern District of Michigan, Southern Division, and elsewhere, defendant MICHAEL GRIMES, knowingly combined, conspired, and agreed with others both known and unknown to commit offenses against the United States in violation of Title 18, United States Code, Section 1957, to wit: to knowingly engage, and attempt to engage in, monetary transactions by, through or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is at least $1.5 million, such property having been derived from a specified unlawful activity, that is, conspiracy to commit honest services wire fraud, in violation of Title 18, United States Code, Section 1957.

All in violation of Title 18, United States Code, Section 1956(h).

14

# CRIMINAL FORFEITURE ALLEGATIONS

## (18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(1) and 28 U.S.C. § 2461)

1. Upon conviction of conspiracy to commit honest services wire fraud, in violation of Title 18, United States Code, Section 1349, as alleged in Count One, defendant MICHAEL GRIMES shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, his right, title, and interest in any property, real or personal, which constitutes or is derived from proceeds obtained, directly or indirectly, as a result of conspiracy to commit honest services wire fraud, in violation of 18 U.S.C. § 1349.

2. Property subject to forfeiture to the United States for violation of Count One includes, but is not limited to, the following: real property located at 10272 Gulfstone Court, Fort Myers, Florida, and a 2017 Jeep Wrangler unlimited VIN 1C4BJWFG1HL689828 (the "Subject Property"). The property to be forfeited also includes a forfeiture money judgment representing a sum of money equal to the total amount of proceeds obtained as a result of defendant's participation in the conspiracy to commit honest services wire fraud. The United States anticipates that this amount shall be approximately $2 million dollars.

3. Under Title 18, United States Code, Section 982(a)(1), upon conviction of an offense in violation of Title 18, United States Code, Section 1956, the defendant MICHAEL GRIMES, shall forfeit to the United States of America any property,

15

real or personal, involved in such offense, and any property traceable to such property. The property to be forfeited includes, but is not limited to, forfeiture of the Subject Property identified above and a forfeiture money judgment representing a sum of money equal to the total amount of property involved in the money laundering conspiracy.

4.  Substitute Assets: Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b) and Title 28, United States Code, Section 2461(c), defendant MICHAEL GRIMES shall forfeit substitute property, up to the value of the sums of money described in paragraphs 2 and 3 above, if, by any act or omission of the defendant, the property described:

    a.  cannot be located upon the exercise of due diligence;

    b.  has been transferred, sold to or deposited with a third party;

    c.  has been placed beyond the jurisdiction of the court;

    d.  has been substantially diminished in value; or

    e.  has been commingled with other property which cannot be divided without difficulty.

All in accordance with Title 18, United States Code, Section 981(a)(1)(C); Title 18, United States Code, Section 982(a)(1); Title 28, United States Code, Section 2461(c); and Rule 32.2, Federal Rules of Criminal Procedure.

MATTHEW SCHNEIDER
United States Attorney

DAVID A. GARDEY
Assistant United States Attorney
Chief, Public Corruption Unit
211 W. Fort Street, Suite 2001
Detroit, Michigan    48226
313-226-9591
David.Gardey@usdoj.gov
P48990

FRANCES LEE CARLSON
Assistant United States Attorney
Deputy Chief, Public Corruption Unit
313-226-9696
Frances.Carlson@usdoj.gov
P62624

EATON P. BROWN
Assistant United States Attorney
313-226-9184
Eaton.Brown@usdoj.gov
P66003

Dated: __8-9-19__

18

| United States District Court<br>Eastern District of Michigan | **Criminal Case Cov** | Case:2:19-cr-20520<br>Judge: Friedman, Bernard A.<br>MJ: Patti, Anthony P.<br>Filed: 08-09-2019 At 02:55 PM<br>USA v SEALED MATTER (af) |
|---|---|---|

NOTE: It is the responsibility of the Assistant U.S. Attorney signing this form to comp.

| Companion Case Information | Companion Case Number: |
|---|---|
| This may be a companion case based upon LCrR 57.10 (b)(4)[1]: | Judge Assigned: |
| ☐ Yes   ☒ No | AUSA's Initials: |

Case Title: USA v. MICHAEL GRIMES

County where offense occurred : Wayne

Check One:   ☒ Felony      ☐ Misdemeanor      ☐ Petty

\_\_\_\_\_Indictment/ ✓ Information --- no prior complaint.

\_\_\_\_\_Indictment/\_\_\_\_\_Information --- based upon prior complaint [**Case number:** 18-MJ-30489  ]

\_\_\_\_\_Indictment/\_\_\_\_\_Information --- based upon **LCrR 57.10 (d)** *[Complete Superseding section below]*.

## Superseding Case Information

Superseding to Case No: _____     Judge: _____

☐ Corrects errors; no additional charges or defendants.
☐ Involves, for plea purposes, different charges or adds counts.
☐ Embraces same subject matter but adds the additional defendants or charges below:

| **Defendant name** | **Charges** | **Prior Complaint (if applicable)** |
|---|---|---|
| | | |

**Please take notice that the below listed Assistant United States Attorney is the attorney of record for the above captioned case.**

August 9, 2019
Date

Eaton P. Brown
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226-3277
Phone: 313-226-9184
Fax:   313-226-3413
E-Mail address: Eaton.Brown@usdoj.gov
Attorney Bar #: P66003

[1] Companion cases are matters in which it appears that (1) substantially similar evidence will be offered at trial, or (2) the same or related parties are present, and the cases arise out of the same transaction or occurrence. Cases may be companion cases even though one of them may have already been terminated.