# Exhibit 103

Case 1:19-cv-06770-EK-MMH Document 34-43 Filed 08/21/20 Page 2 of 41 PageID #: 1652
Case 2:19-mj-30488-DUTY ECF No. 1 filed 09/12/19 PageID.1 Page 1 of 40

# UNITED STATES DISTRICT COURT
for the

## Eastern District of Michigan

| | |
|---|---|
| United States of America<br>v.<br>**VANCE PEARSON,**<br>Defendant. | Case: 2:19-mj-30488<br>Assigned To : Unassigned<br>Assign. Date : 9/12/2019<br>Description: RE: SEALED MATTER<br>(EOB) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ 2014 through 2018 _____ in the county of _____ Wayne _____ in the _____ Eastern _____ District of _Michigan & elsewhere_ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 29 U.S.C. § 50l(c) | Embezzlement of Union Funds |
| 29 U.S.C. § 439(b) and (c) | Filing False LM Reports and Maintaining False Union Records |
| 18 U.S.C. §§ 1341 & 1343 | Mail and Wire Fraud |
| 18 U.S.C. §§ 1956 & 1957 | Money Laundering |
| 18 U.S.C. § 2 | Aiding and Abetting |
| 18 U.S.C. § 371 | Conspiracy |

This criminal complaint is based on these facts:
    SEE ATTACHED AFFIDAVIT

☐ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent Andrew Donohue, U.S. Dept. of Labor-OIG
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __September 12, 2019__

_____
*Judge's signature*

City and state: __Detroit, Michigan__

David R. Grand, U.S. Magistrate Judde
*Printed name and title*

## Affidavit in Support of a Criminal Complaint

I, Andrew Donohue, being first duly sworn, hereby depose and state as follows:

## Introduction and Agent Background

1. I am a Special Agent with the U.S. Department of Labor, Office of Inspector General, Office of Investigations - Labor Racketeering and Fraud (DOL-OIG/OI-LRF), and was previously employed as a Senior Investigator with the U.S. Department of Labor, Office of Labor Management-Standards (DOL-OLMS). I have been employed within the DOL since September 2006 and am currently assigned to the DOL-OIG Detroit Field Office.

2. I have graduated from the Criminal Investigator Training Program (CITP) and the Inspector General Investigator Training Program (IGITP) at the Federal Law Enforcement Training Center (FLETC). I attended and participated in multiple joint in-service sessions for DOL-OIG/OI-LRF agents and Federal Bureau of Investigation (FBI) agents, for training on the current criminal laws prohibiting labor racketeering and other criminal violations of Title 18 and Title 29 of the United Stated Code. I have also received training in documentary and electronic evidence given by members of the Computer Crime & Intellectual Property Section (CCIPS) of the U.S. Department of Justice.

3.    During my years at the Department of Labor, I have conducted numerous investigations into criminal violations of both Title 29 and Title 18 of the United States Code.  Through my training and investigative casework involving labor organizations, I am familiar with the operation, administration, and business practices of labor unions and the corporate employers with which they negotiate.

4.    I make this affidavit based upon personal involvement in the subject criminal investigation, including review of financial, property and business records, review of email communications, interviews of witnesses, the execution of search warrants, the seizure and review of physical and electronic evidence, and law enforcement surveillances.  I have also been provided with information and reports from other law enforcement agents and officials from the FBI and Internal Revenue Service – Criminal Investigations (IRS-CI).  This affidavit does not contain all of the facts developed to date in the underlying investigation and is being submitted in support of the Government's application for the issuance of a criminal complaint.

5.    As a result of my participation in this investigation, I believe probable cause exists to show that Vance Pearson (PEARSON) has committed the following offenses:  29 U.S.C. § 501(c), Embezzlement of Union Funds;  29 U.S.C. § 439(b) and (c), Filing False LM Reports and Maintaining False Union Records; 18 U.S.C.

2

§§ 1341 & 1343, Mail and Wire Fraud; 18 U.S.C. §§ 1956 & 1957, Money

Laundering;  18 U.S.C. § 2, Aiding and Abetting others in the commission of the

same; and 18 U.S.C. § 371, Conspiracy to commit the same.

### Summary of the Relevant Labor Statutes

6.      The Labor-Management Reporting and Disclosure Act (LMRDA),

also known as the Landrum-Griffin Act, is a Federal statute that regulates certain

aspects of internal union affairs.  Labor organizations comprised wholly or in part

of private sector employees are covered by the Act. The LMRDA guarantees union

members rights such as the right to participate in union meetings and vote in union

elections.  The Act also contains reporting provisions that require unions to

disclose information about their structure and financial condition (called LM

Reports).  Section 206 of the LMRDA creates an affirmative obligation for union

officials to maintain records that explain or clarify entries on the union's LM

reports and allow the reports to be checked for accuracy and completeness.  The

statute makes filing of a false LM report or false entries, including willful

concealment in union records, a crime.  Finally, the LMRDA provides safeguards

for protecting labor organization funds and assets through criminalizing the

embezzlement of union funds or assets by any officer or employee of the

organization.

## Summary of the Investigation

7.  Since 2015, I have been involved in a multi-agency investigation of the United Auto Workers (UAW) and Fiat Chrysler Automobiles (FCA). To date, nine individuals have been convicted of crimes for their roles in criminal activity uncovered by the investigation. Many of these charges and convictions involved UAW officials' improper receipt of things of value from FCA officials and others acting on their behalf. More recently, a former UAW official has pleaded guilty to conspiring to accept kickbacks from vendors in exchange for the official awarding contracts to those vendors.

8.  However, apart from the activity described in the paragraph above, the investigation has also uncovered a multi-year conspiracy involving senior UAW officials embezzling, stealing, and unlawfully and willfully abstracting and converting UAW funds to purchase luxury items and accommodations for their own personal benefit. The outlay of the funds was not properly approved, was concealed from the view of the UAW members, and used for the personal benefit of the upper echelon of union officials who were elected to represent the members' best interests above their own.

9.  The investigation has shown that these officials obtained fraudulent "approval" through the submission of vouchers that misrepresented payments as official business and concealed the true destination and purpose of the expenses.

4

Case 1:19-cv-06770-EK-MMH   Document 34-43   Filed 08/21/20   Page 7 of 41 PageID
#: 1657
Case 2:19-mj-30468-DUTY   ECF No. 1   filed 09/12/19   PageID.6   Page 6 of 40

These schemes resulted in the UAW filing false LM reports with the U.S.
Department of Labor by making material misrepresentations as to the true nature
of the expenses, subsequent money laundering transactions, and mail/wire fraud
activity involving the concealment and movement of the money.

## Background

### *The UAW and its Structure*

10. The UAW is a "labor organization" as defined in the LMRDA, with
its headquarters based in Detroit, Michigan. The UAW represents hundreds of
thousands of non-management workers employed in private industry at numerous
locations in Michigan and across the United States. The UAW engages in contract
negotiating sessions with FCA, Ford, GM, and dozens of other employers that
establish collective bargaining agreements (CBA) covering wages, working
conditions, and numerous related benefits for the rank-and-file UAW members.

11. Like most unions, the UAW is a "tiered" organization. The UAW
International Union is the union's parent body and is located within the Eastern
District of Michigan (EDMI) at 8000 East Jefferson Avenue, Detroit, MI 48214.
Colloquially, the union's headquarters is known as "Solidarity House" or "Solid
House" amongst its members and may be referenced as such in this affidavit. Most
rank-and-file UAW members belong to local unions, which generally are
organized by either employer, plant, or geographic area. According to the UAW's

Case 2:19-mj-30468-DUTY   ECF No. 1   filed 09/12/19   PageID.   Page 7 of 40 PageID

website, UAW members belong to more than 600 local unions and are supported by Solidarity House and its nine regional offices.

12.     The UAW Regions are administrative arms of Solidarity House located across the United States. The UAW Region 5 Office (REGION 5) is located within the Eastern District of Missouri (EDMO) at 721 Dunn Road, Hazelwood, MO 63042. According to the union's website, UAW Region 5 covers 17 western states and has sub offices in Dallas, TX, Kansas City, MO, and Pico Rivera, CA. REGION 5 represents UAW members who work in the academia, auto parts, aerospace, and beverage container industries for employers like GM, Ford, Lear Corp., Lockheed, Raytheon, and Vought.

13.     Agents have learned that the UAW Region 5 Midwest States CAP Council (MIDWEST CAP) and Region 5 Southwest States CAP Council (SOUTHWEST CAP) operate within REGION 5's jurisdiction. The CAP councils are the UAW's "Community Action Programs." The MIDWEST CAP is located within the EDMO and co-located with REGION 5 at Region 5's headquarters at 721 Dunn Road, Hazelwood, MO 63042. The SOUTHWEST CAP is located at 1341 W. Mockingbird Lane, Suite 301W, Dallas, TX 75247. According to the UAW Constitution, the CAP Councils are "designed to improve and enrich the quality of American life" and otherwise promote and engage in community activism. The UAW CAP councils are funded through "per-capita" tax payments

6

derived from dues money collected by the UAW local unions and are subject to the same governance as Solidarity House and UAW locals. The UAW CAP Councils are "labor organization[s]" as defined in the LMRDA and file LM reports with the U.S. Department of Labor.

### The UAW's Governance

14. The UAW is governed by the UAW Constitution, which lays out the organization's objects, structure, officers, and framework. The UAW holds elections every four years to elect its officers. The officers include the President, Secretary-Treasurer, three (3) Vice Presidents, and nine (9) Regional Directors. These officers hold de facto positions on the union's International Executive Board (IEB), which is the highest authority in the UAW between meetings of the International Convention of UAW Delegates. On occasion, the IEB issues guidance in the form of Administrative Letters. These letters serve as policy clarification or to fill in gaps in the governance of the union.

15. Both Federal Law and the UAW Constitution impute a fiduciary duty on union officers to manage the funds and property of the union solely for the benefit of its members. The UAW Constitution has a special section entitled the Ethical Practices Code (EPC), which prescribes the moral principles to which all UAW members and officials must adhere. Like the EPC, multiple Administrative Letters prohibit moral turpitude, self-dealing, the mere appearance of conflicts of

7

interest, and leveraging union positions for personal advantage. Furthermore, the EPC states: *"Union funds are held in sacred trust for the benefit of the membership."* and *"No officer or representative shall accept "kickbacks," under-the-table payments, valuable gifts, lavish entertainment or any personal payment of any kind."*

16. The union's Financial Officers Manual discloses that the UAW operates on a "voucher system." This means that all "order[s] on the treasury" (aka check requests) must be attested to by two officers who can verify or "vouch" for these actions. The UAW's "voucher system" is also supported by a June 4, 1957, Administrative Letter issued by famed UAW President Walter Reuther. This letter indicates that the UAW adopted the "AFL-CIO's CODE OF MINIMUM ACCOUNTING AND FINANCIAL CONTROLS FOR AFFILIATES," which states in part, "All expenditures should be approved by proper authority under constitutional provision and be recorded and supported by vouchers; providing an adequate description of the nature and purpose of the expenditure sufficient for a reasonable audit by internal and independent auditors."

*UAW Officials*

17. Vance Pearson (PEARSON) is currently the Regional Director of UAW Region 5 and has been such since June 2018. This makes PEARSON one of the most senior officials in the UAW and a member of the IEB. In his position as

8

Case 1:19-cv-06730-EK-MMH   Document 34-43   Filed 08/21/20   Page 11 of 41 PageID
Case 2:19-mj-30488-DUTY   ECF No. 1   filed 09/12/19   PageID.10   Page 10 of 49 PageID
#: 1661

Regional Director, PEARSON is responsible for representing the best interests of the tens of thousands of UAW members employed within Region 5. PEARSON has been an officer or employee of the UAW continually since 2002. In 2003, PEARSON was assigned to Region 5 as a servicing representative responsible for collective bargaining, arbitrations, and organizing. For a time, PEARSON was third in command of Region 5. In January 2016, PEARSON became Region 5 Assistant Director or second in command of Region 5. In that position, PEARSON was heavily involved in seeking approval from UAW HQ for the expenditure of UAW funds on Region 5 conferences in California and Missouri.

18. UAW Official A is currently a UAW officer and has held several senior UAW positions for many years.

19. UAW Official B is a former UAW officer. UAW Official B has held senior UAW officer positions for a number of years.

20. UAW Officer C was a former UAW official in UAW Region 5. UAW Official C had worked for the union for a number of years.

21. UAW Official D was a former senior UAW official who worked for the union for a number of years.

Case 1:19-cv-06770-EK-MMH    Document 34-43    Filed 08/21/20    Page 12 of 41 PageID
Case 2:19-mj-30488-DUTY    ECF No. 1    filed 09/12/19    PageID.11    Page 11 of 49
#: 1662

**The Embezzlement and Fraudulent Approval Scheme**

*Palm Springs, California*

22.    The investigation has revealed an embezzlement scheme whereby UAW officials hid their personal use of UAW money without any legitimate union business purpose.  These UAW officials have intentionally and fraudulently concealed these personal expenses within the cost of UAW leadership and training conferences in order to prevent their discovery by the government and the UAW membership.

23.    The investigation has disclosed that the UAW controls multiple bank accounts located in the EDMI at JP Morgan Chase Bank N.A.  This includes the union's checking account #XXXX6 at JPMorgan Chase Bank Dearborn Branch listed in Dearborn, MI 48126 (ABA Routing # XXXXXXX7).  Review of the union's books and records show that between 2014 and 2017, the union outlaid by check or wire, over $1 million to the Renaissance Palm Springs Hotel (RPSH) in Palm Springs, CA.  Listed below is a selection of those checks and wires:

10

| Check Date | Check # | Payee | Check Amount |
|---|---|---|---|
| 8/15/2014 | 1591619 | RPSH | $175,000 |
| 1/5/2015 | WIRE - 99020288 | RPSH | $150,000 |
| 6/8/2015 | 1616783 | RPSH | $245,000 |
| 5/26/2016 | 1660844 | RPSH | $175,000 |
| 12/8/2016 | 1679635 | RPSH | $80,000 |
| 1/18/2017 | 1683410 | RPSH | $25,000 |
| 6/7/2017 | 1696310 | RPSH | $175,000 |
| | | **TOTAL** | **$1,025,000** |

24.     The union's publicly available LM-2 Reports filed with the U.S. Department of Labor for 2014 through 2017 represent that the destination of those expenditures was the RPSH, a hotel in Palm Springs, CA.  Furthermore, the UAW disclosed that the purpose of these payments were for deposits and expenses associated with the UAW's 2014 to 2018 Region 5 Leadership Conferences (Region 5 Conference).

25.     Agents have learned that the Region 5 Conference is an event that traditionally occurs each January in Palm Springs, CA.  Ostensibly, the purpose of the Region 5 Conference is to train local union leadership on issues that affect them, such as bargaining, grievance adjudication, and the proper administration of the union.  According to the "Call Letter" (the official announcement of the conference) issued by the UAW, the Region 5 Conference typically lasts between 3 and 5 days.  However, UAW officials, including PEARSON, and others would

spend weeks and/or months living in Palm Springs enjoying an extravagant lifestyle paid for with UAW funds.

26. Agents obtained and reviewed the UAW Payment Request Forms (commonly known as "vouchers") that requested the disbursement of UAW funds and provided the underlying supporting documentation related to the expenses. Agents found that the vouchers were authorized/approved by UAW Official A, PEARSON, and UAW Official C, or some combination thereof, depending on the instance. Review of the vouchers disclosed that the payments listed above were "deposits" or advance payments made to the RPSH for the Region 5 Conference. Cursory examination of the agreement reflected expenses one might expect to see when conducting a legitimate training conference. That is to say, the securing of a block of hotel rooms, meeting rooms, and audio-visual fees. However, upon an in depth review, agents also noted language in the contracts regarding the creation of a "Master Account," which provided "UAW authorized staff may sign for payments (charges) at local restaurants, golf courses, and additional retail outlets, and the Hotel will post these charges to their Master Account."

27. Agents contacted the RPSH and spoke with Cooperating Witness #1 (CW-1), an employee of RPSH, who indicated that the UAW had a "Direct Bill" or "Master Account" arrangement with the hotel. This allowed senior UAW officials to deposit UAW funds up-front and run a tab for retail, grocery, meals, liquor,

12

cigar, and other entertainment expenses at vendors in and around Palm Springs. The RPSH would satisfy those debts using funds from the UAW's deposit. CW-1 also stated that a significant portion of UAW funds was used to pay local companies for offsite housing including villas with private pools and condominiums in gated neighborhoods for select UAW officials. The investigation has established that the conspirators used the Master Account as a way to conceal the embezzling of union funds for their own personal use.

28. Armed with this knowledge, agents obtained not only records from the RPSH, but also from the vendors paid by the RPSH on the UAW's behalf. Agents noticed many expenses that are inconsistent with the legitimate conduct of union business, were not disclosed to the UAW's HQ at Solidarity House, and did not appear on the union's LM reports. Records show over $600,000 of the money paid by UAW to RPSH was used by the hotel to satisfy debts incurred and arranged by senior UAW officials at Palm Springs, California area businesses such as Holly Homes, Desert Princess Rentals, LG Prime Steak House, Johnny Costa's Ristorante, Las Casuelas, Indian Canyons Golf Resort, Gary's Sales, and the Tinder Box, between 2014 and 2017. In many, if not all instances, UAW Official A, PEARSON, and UAW Official C were the individuals that made the underlying billing arrangements. Agents also noted that these expenses were concealed in line

13

items on the RSPH master invoice called "off-site rooms" and "off-site functions" or variations thereof.

29.     Agents determined that through the RPSH, the UAW paid over $400,000 to Palm Springs area businesses Holly Homes, Desert Princess Rentals, and Home Cleaning Services of America between 2015 and 2017.  Records and testimony disclosed that off-site condominiums and villas with private pools and hot tubs in gated communities were secured for individual high-ranking union officials, including PEARSON, and UAW Officials A, B, C, & D.  Agents noted that UAW email addresses assigned to UAW Official A and PEARSON discuss the villas and condominiums arrangements between 2015 and 2018.  Agents found examples of UAW Official A, PEARSON, and UAW Official C signing vouchers to the UAW requesting "deposit" payments to the RPSH even after they had been directly involved in making arrangements with Holly Homes, Desert Princess Rentals, and/or Cleaning Services of America.  A selection of notable findings include:

a.     According to the official call letter, the 2014 Region 5 Conference took place between January 14-16, 2014 (3 days).  However, records indicate individual villas were rented for UAW Official A and UAW Official B from December 27, 2013 to January 27, 2014 (31 days).

b.      According to the official call letter, the 2015 Region 5 Conference took place between January 5-9, 2015 (5 days). However, records indicate individual villas were rented for UAW Official A from about December 28, 2014 to January 31, 2015 (34 days); UAW Official B from about December 25, 2014 to January 31, 2015 (37 days); and UAW Official D from about December 25, 2014, to January 31, 2015 (37 days).

c.      According to the official call letter, the 2016 Region 5 Conference took place between January 11-15, 2016 (5 days). However, records indicate that a villa was rented at 67-740 S. Trancas, Cathedral City, CA for UAW Official D between December 24, 2015 and February 29, 2016 (67 days) at a total cost over $11,000 to the UAW. A villa located at 29-296 W. Laguna, Cathedral City, CA was rented for UAW Official B between December 17, 2015 and March 31, 2016 (105 days) at a total cost of over $15,000 to the UAW. A villa located at 67-698 S. Natoma, Cathedral City, CA was rented for UAW Official A from December 28, 2015 to February 29, 2016 (63 days), at a total cost of over $10,000 to the UAW.

d.      According to the official UAW call letter, the 2017 Region 5 Conference took place between January 9-13, 2017 (5 days). Agents found that PEARSON executed a rental agreement for the property located at 67-619 S. Laguna, Cathedral City, CA for December 1, 2016 to April 1, 2017

15

(about 121 days). Desert Princess Rentals recorded the inhabitant of that address as UAW Official B. The total cost of the single villa was over $20,000 and was satisfied with funds from the UAW.

30.     Between 2016 and 2018, Agents learned that over $60,000 of UAW funds were used for meals at Palm Springs area restaurants LG Prime Steak House and Johnny Costa's Ristorante paid via the master billing arrangement. Ostensibly, these meals were falsely represented to be part of the Region 5 Conferences. In fact, some of these meals took place far outside the dates of the conferences. Like the villa expenses, the subject vouchers submitted to Solidarity House make no mention of the meals. Furthermore, investigating agents found no records detailing the business purpose of the meals, and those in attendance, as is required by the LMRDA to substantiate the expenses. Agents obtained underlying receipts from the vendors and found multiple instances of the meals taking place outside the official conference dates and the significant purchases of wine and liquor. For example, the call letter indicates that the 2017 UAW Region 5 Conference took place between January 9-13, 2017. However, agents found that the following meals were paid for with UAW funds under the fraudulent claim that the meals related to the Region 5 Conference:

a.     An LG Prime Steak House invoice reflecting a December 31, 2016 (New Year's Eve) meal totaling over $6,599.87, which included $1,942 in

16

Case 1:19-cv-06770-EK-MMH   Document 34-43   Filed 08/21/20   Page 19 of 41 PageID
Case 2:19-mj-30488-DUTY   ECF No. 1   filed 09/12/19   PageID.18   Page 18 of 49
#: 1669

liquor, $1,440 in wine, and what appears to be a $1,100 tip. The bill also indicates the purchase of four (4) bottles of Louis Roederer Cristal Champagne totaling $1,760. The Louis Roederer website indicates that Cristal Champagne is the company's flagship brand, which was originally created "in 1876 to satisfy the demanding tastes of [Russian] Tsar Alexander II."

b.      A Johnny Costas Ristorante invoice from December 29, 2016, totaling $2,079. This meal included the purchase of multiple glasses of Crown Royal XR (Extra Reserve) at $40 a glass, a drink that Crown Royal Distillery describes as "the rarest in our extra rare whiskey series."

c.      Another Johnny Costas Ristorante invoice from January 3, 2017, totaling $2,292.65. This meal included the purchase of multiple glasses of Crown Royal XR and Macallan 18-Year-Old Scotch at $40 a glass.

d.      Another LG Prime Steakhouse receipt from January 5, 2017, reflects the outlay of $4,827.77. Notable purchases include glasses of 17-year-old Macallan Scotch at $25 per glass and eight (8) bottles of Duckhorn 3 Palms Merlot (aka wine) purchased at $180 a bottle totaling $1,440.

31.     Agents determined that through the RPSH master billing arrangement, the UAW paid the Indian Canyons Golf Resort over $80,000 between 2015 and 2018 for purchases made by a set of people using the *nom de guerre* of the "[UAW

Official A] Group."   Indian Canyons Golf Resort records indicate that expenses included food and beverage, green fees, club rental, and retail purchases.  More often than not, these expenses occurred outside the official dates of the yearly conferences.  Additionally, many of these invoices were signed by UAW Official A, PEARSON, and UAW Official C.  Again, Agents note the absence of disclosure of the golf and merchandise expenses to Solidarity House on vouchers submitted to secure funding.  Agents also found examples of expenses that on their face are inconsistent with the legitimate conduct of union business.  For example:

a.      A purchase of over $3,000 at the Indian Canyons pro shop on December 29, 2014.  The invoice appears to bear the signature of UAW Official C.  Purchases include men's and women's shirts, jackets, hats, visors, and sunglasses.

b.      An almost $900 purchase at the Indian Canyons pro shop on January 2, 2016.  The invoice appears to bear the signature of UAW Official A. Purchases include, hats, gloves, a golf bag, jackets, socks, and "fashion shorts."

c.      A purchase of over $2,000 at the Indian Canyons pro shop on December 31, 2016.  The invoice appears to bear the signature of PEARSON and contains the hand written name "Vance Pearson" directly

under the signature. Purchases include polo shirts, shoes, jackets, hats, and "Men's Fashion Short[s]."

32.     Agents reviewed Indian Canyon's Golf Resort records and noted significant purchases of green fees billed to the "[UAW Official A] Group." The records also indicate that greens fees were for golf played outside the dates of the official conference dates. For instance in 2015, the official Region 5 Conference took place between January 5 and 9, 2015. Indian Canyon's records indicate that 107 18-hole rounds of golf (or 1,926 holes) were paid for by the UAW outside the conference dates. Green fees were secured as early as December 29 and as late as January 29 at a total cost of almost $9,000 to the UAW membership:

| Date | Golfers | $ per Round | Holes of Golf | Running Total | Total Cost | Running Total |
|------|---------|-------------|---------------|---------------|------------|---------------|
| 12/29/2014 | 10 | $74 | 180 | 180 | $740 | $740 |
| 12/30/2014 | 12 | $74 | 216 | 396 | $888 | $1,628 |
| 1/2/2015 | 9 | $84 | 162 | 558 | $756 | $2,384 |
| 1/3/2015 | 10 | $84 | 180 | 738 | $840 | $3,224 |
| 1/4/2015 | 11 | $84 | 198 | 936 | $924 | $4,148 |
| 1/13/2015 | 12 | $84 | 216 | 1152 | $1,008 | $5,156 |
| 1/14/2015 | 8 | $84 | 144 | 1296 | $672 | $5,828 |
| 1/15/2015 | 3 | $84 | 54 | 1350 | $252 | $6,080 |
| 1/17/2015 | 8 | $110 | 144 | 1494 | $880 | $6,960 |
| 1/18/2015 | 2 | $84 | 36 | 1530 | $168 | $7,128 |
| 1/19/2015 | 4 | $84 | 72 | 1602 | $336 | $7,464 |
| 1/24/2015 | 2 | $84 | 36 | 1638 | $168 | $7,632 |
| 1/25/2015 | 6 | $84 | 108 | 1746 | $504 | $8,136 |
| 1/27/2015 | 3 | $84 | 54 | 1800 | $252 | $8,388 |
| 1/29/2015 | 7 | $84 | 126 | 1926 | $588 | $8,976 |

**107**

Case 1:19-cv-06770-EK-MMH   Document 34-43   Filed 08/21/20   Page 22 of 41 PageID
#: 1672
Case 2:19-mj-30488-DUTY   ECF No. 1   filed 09/12/19   PageID.21   Page 21 of 49

33.     Agents determined that through the RPSH, the UAW paid over $60,000 for cigar and tobacco, humidors, cigar cutters, and related expenses between 2014 and 2018 at The Tinder Box in Palm Springs, CA and Gary's Sales in Parker, AZ.  Like the expenses detailed above, no mention of cigars was made to Solidarity House in securing funding for the Region 5 Conferences.  Notable items include:

a.     A 2014 Tinderbox invoice issued to "UAW C/O [UAW Official C]" for an over $1,800 purchase that included four (4) stainless steel table cutters at $72.50 a piece for a total of $285 and four (4) 100 count humidors at $187.50 each for a total of $750.

b.     The November 2016 Gary's Sales invoice issued to "UAW C/O VANCE PEARSON" for an over $13,000 purchase that included 16 boxes of Diamond Crown Churchills at $243 a box (totaling $3,888) and 10 boxes of Ashton Monarch Tubos cigars at $274.50 a box (totaling $2,745). Handwritten on the bottom of the invoice reads "Hi Vance, Thank You & Merry Christmas."

c.     A December 2015 Gary's Sales invoice issued to "UAW c/o [UAW Official A]" for a $13,046.91 purchase that included an order for 12 boxes of Ashton Double Magnum cigars at $268.00 per box (totaling $3,216) and 12 boxes of Ashton Monarch Tubos cigars at $274.50 a box (totaling $3,294).

Case 1:19-cv-06770-EK-MMH   Document 34-43   Filed 08/21/20   Page 23 of 41 PageID
Case 2:19-mj-30488-DUTY   ECF No. 1   filed 09/12/19   PageID.22   Page 22 of 49
#: 1673

Handwritten on the bottom of the invoice reads "Hi [UAW Official A], Thank you & Happy New Year."

d.      A 2017 Tinderbox invoice issued to "UAW C/O VANCE PEARSON" for over $1,700 that included a single 400-count humidor for $450 and 10 "Big Stinky Ashtrays" totaling $299.50.

34.      During the review of the RPSH records, agents noted the name of Cooperating Witness #2 (CW-2) on many of the documents originating from the RPSH. Follow-up with CW-2 disclosed that CW-2 was an employee of RPSH between 2011 and 2017. CW-2 interfaced directly with UAW Official A, PEARSON, and UAW Official C with respect to the UAW Region 5 Leadership Conferences. CW-2 confirmed the "Master Agreement" billing arrangement as described by CW-1 and detailed in the sales agreements. CW-2 added that the arrangement was made at the request of the union. While invoicing the 2015 conference, CW-2 was approached by UAW Official C. UAW Official C asked CW-2 to conceal the condominium, villa, meal, golf, and cigar expenses by falsely inflating hotel room rentals on the RPSH invoice. However, CW-2 told UAW Official C that CW-2 could not do it because it would be wrong to fraudulently hide the expenses. Soon thereafter, UAW Official A approached CW-2. UAW Official A asked CW-2 to lump the expenses together into line items like "outside activities" and "outside housing." CW-2 and RPSH agreed to the compromise, but

21

Case 1:19-cv-06770-EK-MMH   Document 34-43 09/12/19 Filed 08/21/20   Page 24 of 41 PageID
Case 2:19-mj-30488-DUTY   ECF No. 1   filed 09/12/19   PageID.23   Page 23 of 49
#: 1674

CW-2 felt personally conflicted, as CW-2 believed the purpose of the endeavor was to conceal the true nature of the union's expenditures from its members.

*Coronado, California*

35.    Once agents recognized the fraudulent expenditure of UAW funds in Palm Springs for the Region 5 Conference, they began reviewing other "training" and "conference" expenses related to REGION 5. Financial records show that between 2014 and 2018, the UAW HQ paid over $200,000, and the UAW's SOUTHWEST CAP paid over $195,000 to the Loews Coronado Bay Resort (Coronado Resort) in Coronado, CA for the UAW Region 5 Community Action Program (CAP) Conference.

36.    Agents have determined that the subject UAW SOUTHWEST CAP funds were paid via check drawn against a checking account ending #XXX2 at Enterprise Bank and Trust headquartered in Clayton, MO and located in the EDMO (ABA Routing # XXXXXXXX2). The UAW SOUTHWEST CAP was funded from funds drawn on the EDMI based account previously identified.

37.    Agents obtained the subject vouchers submitted to the UAW's HQ at Solidarity House and determined that they were signed by UAW Official A, PEARSON, and UAW Official C, or a combination thereof. The majority of funds paid to the Coronado Resort by Solidarity House based on the vouchers were made as "advance" payments.

38.   Records from the Coronado Resort indicate that the union had a similar master billing arrangement as the RPSH in that the Coronado Resort was not the ultimate destination of the union funds, but merely a temporary stop.  For example:

39.   Agents found that the Coronado Resort directed over $25,000 in UAW funds to Access Destinations (an event service company) for high-end meals and excursions in 2015 and 2016.  Access Destination records show that the expenses preceded the official meeting dates of the CAP Conference.  The outlay of union funds covered chauffeured transportation to private dining events including purchases of 18-year old Macallan Scotch, Crown Royal Reserve, and other high-end liquor and meal expenses.  Agents also discovered over $2,000 in excursion expenses for senior UAW officials, including UAW Official A, and their spouses for tickets to the San Diego Zoo's Safari Park as well as horseback riding on the beach.

40.   Additionally, agents discovered the Coronado Resort used UAW advances to pay for over $70,000 to Showtime Golf between 2015 and 2018 for green fees at The Maderas Golf Club, The Grand Del Mar Golf Resort, and The Torrey Pines Golf Club as well as retail purchases at golf course pros shops.  In one example, $4,599.93 of UAW funds was spent at the Grand Del Mar Pro Shop outside the conference dates for clothing and golf equipment, including polo shirts,

23

jackets, ribbon belts, pullover jackets, gloves, hats, shorts, pants, and golf balls. That same day, the UAW also paid for 2-hour horseback trail rides for five individuals.

*Lake of the Ozarks, Missouri*

41.     Agents have even more recently uncovered a similar pattern of concealed expenses surrounding REGION 5 events in Lake of the Ozarks, MO. Financial records show that between 2014 and 2018, the UAW HQ in Detroit paid over $300,000, and the MIDWEST CAP paid over $190,000 to the Lodge of Four Seasons (Four Seasons) in Lake Ozark, MO for union events like the Region 5 Retired Workers IAC Training and Region 5 Staff Meetings.

42.     Agents have determined that the subject MIDWEST CAP funds were paid via check drawn against a checking account ending #XXX4 at Enterprise Bank and Trust based in Clayton, MO (ABA Routing # XXXXXXXX2).  The UAW funds were drawn on the previously identified EDMI-based bank account.

43.     Agents obtained records from the Four Seasons and determined that the union had a similar arrangement as at the RSPH in Palm Springs and at the Coronado Resort in Coronado, CA.  That is to say, the union advanced money to the Four Seasons, and the Four Seasons used that money to offset expenses incurred by senior UAW officials at outside vendors.  Agents determined that over $45,000 was spent by the UAW on meals and liquor; over $75,000 on golf green

24

fees, golf merchandise, and accoutrements, including multiple sets of golf clubs; over $3,000 was spent on merchandise like clothing in the hotel store; over $8,000 was spent in spa treatments, and over $1,000 was spent at a local gun range.

44.     Examples of the expenditure of UAW funds for the purchase of golf clubs through the Four Seasons include the following:  An August 19, 2015, receipt from the Club at Porto Cima golf course in Missouri, which was ultimately paid for with UAW funds through the Four Seasons, indicates that UAW funds were used to purchase a Titleist 915 driver at a cost of $476.88.  On September 7, 2016, UAW officials used UAW funds to purchase a set of eight Titleist 716 AP1 Irons at a cost of $896.00, two Titleist 816H Hybrids at a cost of $499.98, and two Titleist 915 fairway woods at a cost of $599.98.  On October 26, 2016, $529.86 in UAW funds were used to purchase a Titleist 917 Driver.  On April 29, 2017, a UAW official used UAW funds to purchase a CA EpicDriver for $499.99, a Titleist 2016 select putter for $379.99, a Titleist SM6 wedge for $149.99, and a Titleist putter for $399.99 on April 30, 2017.  On May 10, 2017, at the Club at Porto Cima, UAW officials purchased two sets of Titleist golf clubs costing $1,404.15 and $1,955.21 using UAW funds.  On May 27, 2017, a UAW official purchased three Titleist golf clubs at a cost of $791.63.  None of the purchases of any of these golf clubs and others using UAW funds were disclosed to or approved by UAW HQ.  Instead, these purchases of golf clubs using UAW funds were

25

Case 1:19-cv-06770-EK-MMH   Document 34-43   Filed 08/21/20   Page 28 of 41 PageID
Case 2:19-mj-30488-DUTY   ECF No. 1   filed 09/12/19   PageID.27   Page 27 of 49 PageID
#: 1678

concealed within larger bills for Region 5 UAW conferences at the Four Seasons,
with the hotel using UAW funds to pay the Club at Porto Cima.  In 2016 and 2017,
PEARSON and Union Official A approved and submitted UAW vouchers to UAW
HQ in Detroit for payment without disclosing that UAW funds were being used to
pay for golf clubs for the personal benefit of UAW Official A, PEARSON, and
others.

<em>Interviews</em>

45.    Cooperating Witness #3 (CW-3) was a senior UAW official in the
UAW's Chrysler Department.   CW-3 reported to UAW Vice President Norwood
Jewell (Jewell) and his top administrative assistant.  CW-3 entered into a
cooperation agreement with the government and agreed to enter a felony guilty
plea.  As part of CW-3's cooperation agreement, CW-3 agreed to provide truthful
and complete information regarding their criminal activity and that of others.  CW-
3 provided information to federal investigators concerning a multi-year pattern of
prohibited payments to union officials, extortion, mail fraud, money laundering,
and other criminal activities.  Significant portions of the information provided by
CW-3 have been corroborated by bank records, credit card records, text and email
communications, records from vendors and other third parties, and interviews with
other witnesses.  On that basis, CW-3 is considered a reliable source of
information.

26

Case 1:19-cv-06770-EK-MMH   Document 34-43   Filed 08/21/20   Page 29 of 41 PageID
Case 2:19-mj-30488-DUTY   ECF No. 1   filed 09/12/19   PageID.28   Page 28 of 49
#: 1679

46.     CW-3 pled guilty to conspiracy to violate the Labor Management Relations Act (Taft Hartley Act) arising from CW-3's acceptance and receipt of prohibited payments and things of value from FCA officials.  As part of CW-3's plea, CW-3 acknowledged that CW-3 made significant personal purchases (over $40,000) on credit cards issued by the joint UAW/FCA National Training Center (NTC) for CW-3 and for other UAW officials knowing that the purchases were encouraged and authorized by FCA management officials acting in the interest of FCA and paid for by funds provided by FCA.

47.     CW-3 told agents that CW-3 was tasked with shipping Jewell's and other UAW officials' golf clubs to Palm Springs, CA in about 2015.  CW-3 was uncertain of the destination or the purpose and began asking other UAW officials to determine where to send the clubs.  When Jewell found out about CW-3's inquiries, Jewell called CW-3 into his office and braced CW-3 with questions on the matter.  CW-3 came to learn that Jewell and other senior UAW officials including Jewell, UAW Official A, and UAW Official B were staying in private villas in a gated Palm Springs community under the pretense that it was for the Region 5 Conference.  Jewell directed CW-3 to keep the matter quiet, as Jewell did not want others to know about the arrangements.  CW-3 told agents that the outlay of union funds for such extravagant lodging was inappropriate, served no legitimate union business purpose, and further that there was no reason for these

27

Case 1:19-cv-06770-EK-MMH   Document 34-43   Filed 08/21/20   Page 30 of 41 PageID
Case 2:19-mj-30488-DUTY   ECF No. 1   filed 09/12/19   PageID.29   Page 29 of 49 PageID
#: 1680

officials to attend the conference. Later, CW-3 learned that senior UAW officials spent months at a time in Palm Springs for the weeklong conference, which CW-3 characterized as unequivocally wrong. Much of what CW-3 learned was from conversations with Cooperating Witness #4 (CW-4) who told CW-3 about the happenings inside the villas in the gated community in 2015 and 2016.

48.     CW-4 was a senior UAW official in the UAW's Chrysler Department. CW-4 reported directly to Jewell. CW-4 entered into a cooperation agreement with the Government and agreed to enter a felony guilty plea. As part of CW-4's cooperation agreement, CW-4 agreed to provide truthful and complete information regarding CW-4's criminal activity and that of others. CW-4 provided information to federal investigators concerning a multi-year pattern of prohibited payments to union officials, union embezzlement, extortion, mail fraud, money laundering, and other criminal activities. Significant portions of the information provided by CW-4 has been corroborated by bank records, credit card records, text and email communications, records from vendors and other third parties, and interviews with other witnesses. On that basis, CW-4 is considered a reliable source of information.

49.     In 2018, CW-4 pled guilty to conspiracy to violate the Labor Taft Hartley Act arising from CW-4's acceptance and receipt of prohibited payments and things of value from FCA officials. As part of CW-4's plea, CW-4

28

Case 1:19-cv-06730-EK-MMH    Document 34-43    Filed 08/21/20    Page 31 of 41 PageID
Case 2:19-mj-30488-DUTY    ECF No. 1    filed 09/12/19    PageID.30    Page 30 of 49 PageID
#: 1681

acknowledged that CW-4 made significant personal purchases (over $40,000) on the NTC-issued credit cards for CW-4 and for other UAW officials knowing that the purchases were encouraged and authorized by FCA management officials acting in the interest of FCA and paid for by funds provided by FCA.

50.    CW-4 told agents that Jewell, PEARSON, UAW Officials A, B, C & D, and others spent months in Palms Springs, CA paid for by the UAW or FCA. The UAW officials strung together meetings and conferences in Palm Springs, during which union officials conducted little or no union business, to camouflage the month long stays.  CW-4 stated that the aforementioned officials stayed in private condominiums, golfed, dined at lavish restaurants, and otherwise "partied" under the pretense that they were conducting union or labor-management business. In reality, little to no union business was conducted.  CW-4 and other similarly situated officials, like PEARSON, were directed by their seniors to outlay UAW and employer funds to cover the expenses.  CW-4 recalled an incident where CW-4 went shopping at the Indian Canyons Golf Resort and when CW-4 got to the checkout, the cashier asked if CW-4 wanted to put the items on UAW Official A's tab.  The cashier also told CW-4 that UAW Official D had spent about $1,000 on UAW Official A's tab earlier that day purchasing apparel, golf equipment, and other items at the pro shop.  CW-4 characterized the activity as wrong and an improper use of union and joint-training funds (depending on which entity paid).

29

51.     Agents interviewed Cooperating Witness #5 (CW-5), who is a former UAW officer.  CW-5 was accompanied by CW-5's attorney during the interview, and the statements made by CW-5 were subject to a proffer agreement between the government and CW-5, which barred the use of the statements or any evidence derived from the statements against CW-5.  CW-5 confirmed that all UAW expenses had to be properly approved and for the benefit of the UAW's membership.  CW-5 reviewed excerpts of the transactions detailed above from Palm Springs and the Coronado Resort, and CW-5 stated that they were outside what CW-5 would have approved, and that CW-5 did not know that union funds were being outlaid for such expenses.  CW-5 indicated that the UAW's accounting department cut the checks based on the representation that they were legitimate expenses made for legitimate union conferences.  CW-5 did not believe that the union's LM reports gave an accurate picture of expenses surrounding the UAW Region 5 Leadership Conference and the UAW Region 5 CAP conference based on the vouchers submitted by UAW Region 5.

52.     Agents interviewed Cooperating Witness #6 (CW-6), who has served in the UAW's Accounting Department for several years.  CW-6 was accompanied by CW-6's attorney during the interview, and the statements made by CW-6 were subject to a proffer agreement between the government and CW-6, which barred the use of CW-6's statements against CW-6.  CW-6 indicated that the UAW

30

Case 1:19-cv-06730-EK-MMH    Document 34-43 09/12/19  Filed 08/21/20   Page 33 of 41 PageID
Case 2:19-mj-30488-DUTY    ECF No. 1   filed 09/12/19   PageID.32   Page 32 of 49 PageID
#: 1683

Accounting Department reviews the UAW vouchers, classifies the payments, and helps prepare the union's LM reports based on the representations made by those union officials requesting/authorizing the payment. CW-6 indicated that there is an understanding that union officials are maintaining all applicable records and making good-faith representations on the check requests. CW-6 reviewed select expenses from Palm Springs, CA and Coronado, CA detailed above and indicated that CW-6 had no idea that UAW funds were being used for expenses like cigars, liquor, clothing, and excursions. CW-6 stated that any outlay of union funds had to be used for the benefit of the members and that CW-6 had no knowledge of the union benefit because CW-6 had no knowledge of the expenses. CW-6 confirmed that the source of the funds was the union's bank accounts located within the EDMI and confirmed that all UAW vouchers, including the subject vouchers, were sent via U.S. Mail to Solidarity House in Detroit.

53.    Agents interviewed UAW Official C. During the interview, UAW Official C was accompanied by an attorney, and the statements made by UAW Official C were subject to a proffer agreement between the government and UAW Official C, which barred the use of the statements or any evidence derived from the statements against UAW Official C as long as UAW Official C provided truthful and complete answers. UAW Official C stated that the "Master Account" billing arrangement at the RPSH was established at UAW Official A's request, and that

31

the purpose of it was to conceal the true nature of how the union money was being spent. UAW Official C confirmed that UAW Official C submitted false vouchers to the UAW to conceal the expenses at UAW Official A's direction. UAW Official C stated that UAW Official C and PEARSON were involved in making the arrangements at RPSH and the Coronado Resort at UAW Official A's behest. UAW Official C also confirmed that UAW monies were used for the purchase of expensive cigars, high-end liquor, fancy meals, nice clothing, and extravagant lodging for high-level union officials and that those expenses were wrong. UAW Official C witnessed PEARSON and UAW Official A purchase golf clothing on the "[UAW Official A] Group" account at the Indian Canyons Golf Resort. UAW Official C believes that UAW Official A used the events to curry favor with UAW Official B who also enjoyed the lavish lifestyle. UAW Official C stated that union monies were used to secure villas and pay for expenses for retired UAW members to attend and that those members had no legitimate reason to attend the events. UAW Official C stated that the retirees were simply friends of UAW Official A and/or UAW Official B. UAW Official C also indicated that this activity began before 2014 and that the UAW and REGION 5 has had similar billing arrangements for some time prior.

32

Case 1:19-cv-06770-EK-MMH   Document 34-43   Filed 08/21/20   Page 35 of 41 PageID
#: 1685
Case 2:19-mj-30488-DUTY   ECF No. 1   filed 09/12/19   PageID.34   Page 34 of 49 PageID

## The "Culture of Alcohol"

54.    During the course of the investigation, agents have developed significant information concerning the "culture of alcohol" that exists in the senior ranks of the UAW.  Said term was first used by CW-4 during interviews with agents.  In those and other interviews, CW-4 detailed the outlay of NTC training funds used to purchase significant amounts of liquor and custom-labeled bottles of wine for senior UAW officials including a bottle of Crown Royal Whiskey purchased for UAW Official B costing $185.

55.    Agents also spoke with vendors to the NTC who were present in Palm Springs, CA for the events and told agents that there was "no limit" on the amount of alcohol they would purchase for requesting union officials.  The vendor added that although a conference in Palm Springs was only a few days, the UAW executives stayed for a month or more.  The vendor usually took a full semi-truck of luggage and golf clubs for the UAW so they did not have to travel with luggage. The vendor also transported the luggage back to Detroit as well as any luxury items that were purchased in and around Palm Springs by the UAW officials.

56.    Vendor records and statements testimony obtained from CW-4 & 5, and others detailed two parties totaling over $50,000 thrown by then UAW Vice President Norwood Jewell, funded by the NTC, under the guise that they were dinners for the UAW IEB to showcase the NTC.  These events included thousands

33

Case 1:19-cv-06770-EK-MMH   Document 34-43  Filed 08/21/20   Page 36 of 41 PageID
Case 2:19-mj-30488-DUTY   ECF No. 1   filed 09/12/19   PageID.35   Page 35 of 40 PageID
#: 1686

of dollars of "ultra-premium" liquor, cigars, a torcedor (a person who rolls cigars),

and "kandy girls" (provocatively dressed women) to light the cigars for the UAW

officials. If that alone were not enough, training funds were also spent on mojito

tables and decorations to theme the event like the 1980's hit T.V. show Miami

Vice.

57.     As the investigation shifted from investigating the NTC to

investigating the UAW proper, the investigators began noticing similar patterns

involving the outlay of union funds for alcohol for senior UAW officials. Agents

discovered early on that UAW funds sent to the RPSH were used to purchase

Crown Royal Reserve at $227 per bottle, Crystal Head Vodka at $175 per bottle,

and Belvedere Vodka at $200 per bottle for conference VIPs.

58.     When questioned about REGION 5 conferences, UAW Official C

detailed the purchase of high-end Crown Royal Whiskey, Macallan Scotch, and

Grey Goose Vodka for senior UAW officials. UAW Official C also told agents

that the villas in Palm Springs were fully stocked with alcohol for the UAW VIPs.

None of which the UAW officials had to pay for from their personal funds.

**Money Laundering, False Entries in Union Records, and False LM Reports**

59.     Based on my knowledge, training, and experience, and through

consultation with other agents on this and other cases, I know that money

laundering is the term given to financial transactions, which are conducted for the

34

purpose of concealing funds, generated by illegal activity. Individuals engaged in laundering illegal funds often flow money through various bank accounts and nominees to avoid detection of law enforcement, conceal the true nature of the transactions, and give those funds the appearance of legitimacy.

60. As detailed above in paragraph 23, agents identified six checks and one wire drawn on the UAW's bank accounts and issued to the Renaissance Palm Springs Hotel between August 2014 and June 2017. Also as detailed above, the payment originated after fraudulent authorization was obtained based on misrepresentations made by PEARSON and others on UAW vouchers. The senior UAW officials concealed the embezzlement by representing that the payments were advances for legitimate conference expenses surrounding the Region 5 Conference, and that the ultimate destination of the funds was the RPSH.

61. Agents have identified at least 40 subsequent payments totaling over $650,000 made by the RPSH (doing business as HHC TRS Portsmouth, LLC) to the outside vendors identified above. These subsequent money-laundering transactions were made at the direction of senior UAW officials, including PEARSON and drawn off funds made available through the fraudulent "advances." These payments were undisclosed to the UAW and made to satisfy the lavish personal lifestyles of PEARSON, UAW Officials A, B, C & D, and other senior

35

UAW officials.  A schedule of the subject  payments originating from the RPSH

bank account are listed below:

| Check # | Check Date | Payor | Payee | Amount |
|---|---|---|---|---|
| ■ | 9/17/2014 | HHC TRS Portsmouth, LLC | Holly's Homes | $1,950.00 |
| ■ | 9/24/2014 | HHC TRS Portsmouth, LLC | Desert Princess | $7,500.00 |
| ■ | 10/14/2014 | HHC TRS Portsmouth, LLC | Desert Princess | $1,500.00 |
| ■ | 11/18/2014 | HHC TRS Portsmouth, LLC | Holly's Homes | $19,577.00 |
| ■ | 12/23/2014 | HHC TRS Portsmouth, LLC | Desert Princess | $44,525.00 |
| ■ | 12/23/2014 | HHC TRS Portsmouth, LLC | Holly's Homes | $1,825.00 |
| ■ | 1/7/2015 | HHC TRS Portsmouth, LLC | Holly's Homes | $5,175.00 |
| ■ | 1/27/2015 | HHC TRS Portsmouth, LLC | Indian Canyon's | $6,082.15 |
| ■ | 2/11/2015 | HHC TRS Portsmouth, LLC | Indian Canyon's | $18,176.30 |
| ■ | 7/23/2015 | HHC TRS Portsmouth, LLC | Desert Princess | $9,000.00 |
| ■ | 9/16/2015 | HHC TRS Portsmouth, LLC | Holly's Homes | $1,625.00 |
| ■ | 10/20/2015 | HHC TRS Portsmouth, LLC | Holly's Homes | $28,985.00 |
| ■ | 11/24/2015 | HHC TRS Portsmouth, LLC | Desert Princess | $47,619.89 |
| ■ | 12/15/2015 | HHC TRS Portsmouth, LLC | Desert Princess | $5,465.89 |
| ■ | 1/2/2016 | HHC TRS Portsmouth, LLC | Desert Princess | $1,595.00 |
| ■ | 1/20/2016 | HHC TRS Portsmouth, LLC | Gary Sale's | $13,046.91 |
| ■ | 1/20/2016 | HHC TRS Portsmouth, LLC | Johnny Costas | $9,870.05 |
| ■ | 1/20/2016 | HHC TRS Portsmouth, LLC | LG Prime | $11,284.05 |
| ■ | 1/20/2016 | HHC TRS Portsmouth, LLC | Tinder Box | $2,634.80 |
| ■ | 1/27/2016 | HHC TRS Portsmouth, LLC | Home Cleaning | $2,105.00 |
| ■ | 1/27/2016 | HHC TRS Portsmouth, LLC | Indian Canyon's | $5,024.75 |
| ■ | 1/27/2016 | HHC TRS Portsmouth, LLC | Johnny Costas | $2,150.27 |
| ■ | 4/6/2016 | HHC TRS Portsmouth, LLC | Gary Sale's | $455.50 |
| ■ | 4/6/2016 | HHC TRS Portsmouth, LLC | Home Cleaning | $1,175.00 |
| ■ | 4/6/2016 | HHC TRS Portsmouth, LLC | Indian Canyon's | $16,551.10 |
| ■ | 4/6/2016 | HHC TRS Portsmouth, LLC | Tinder Box | $134.83 |
| ■ | 7/6/2016 | HHC TRS Portsmouth, LLC | Desert Princess | $7,334.62 |
| ■ | 11/2/2016 | HHC TRS Portsmouth, LLC | Holly's Homes | $30,375.00 |
| ■ | 11/30/2016 | HHC TRS Portsmouth, LLC | Desert Princess | $88,941.00 |
| ■ | 12/20/2016 | HHC TRS Portsmouth, LLC | Desert Princess | $2,685.00 |
| ■ | 12/28/2016 | HHC TRS Portsmouth, LLC | Gary Sale's | $13,688.66 |
| ■ | 12/28/2016 | HHC TRS Portsmouth, LLC | Tinder Box | $1,584.95 |
| ■ | 1/11/2017 | HHC TRS Portsmouth, LLC | Johnny Costas | $4,371.65 |
| ■ | 1/18/2017 | HHC TRS Portsmouth, LLC | Indian Canyon's | $4,944.05 |

Case 1:19-cv-06770-EK-MMH   Document 34-43   Filed 08/21/20   Page 39 of 41 PageID
Case 2:19-mj-30488-DUTY   ECF No. 1   filed 09/12/19   PageID.38   Page 38 of 40 PageID
#: 1689

| | 1/25/2017 | HHC TRS Portsmouth, LLC | Johnny Costas | $6,120.40 |
| | 2/8/2017 | HHC TRS Portsmouth, LLC | Indian Canyon's | $14,971.68 |
| | 2/8/2017 | HHC TRS Portsmouth, LLC | LG Prime | $14,925.80 |
| | 7/24/2017 | HHC TRS Portsmouth, LLC | Holly's Homes | $28,881.00 |
| | 11/21/2017 | HHC TRS Portsmouth, LLC | Holly's Homes | $5,585.00 |
| | 11/21/2017 | HHC TRS Portsmouth, LLC | Desert Princess | $71,422.62 |
| | 1/22/2018 | HHC TRS Portsmouth, LLC | Tinder Box | $1,720.53 |
| | 1/26/2018 | HHC TRS Portsmouth, LLC | Indian Canyon's | $19,822.69 |
| | 1/26/2018 | HHC TRS Portsmouth, LLC | Johnny Costas | $12,352.00 |
| | 1/26/2018 | HHC TRS Portsmouth, LLC | Gary Sale's | $13,535.62 |
| | 11/1/2018 | HHC TRS Portsmouth, LLC | Desert Princess | $52,270.00 |
| | | | **TOTAL** | **$660,565.76** |

62.    Agents have also identified similar payments originating from the financial accounts of the Loews Coronado Resort and the Lodge of Four Seasons.

63.    As demonstrated above, the vouchers submitted by PEARSON and others to the UAW HQ at Solidarity House were not complete and accurate as they did not detail the true destinations of the UAW funds and the true purpose of the payments.

64.    As stated above, CW-5 & 6 were directly involved in the UAW's recordkeeping and filing public financial disclosure forms as required by the LMRDA. Both CW-5 & 6 had no knowledge of cigar, golf equipment, green fee, and villa expenses that were paid for by the UAW as the vouchers submitted by PEARSON and others failed to report any of the expenses. CW-5 signed the UAW's LM report and did not believe that the report accurately characterized the expenses.

Case 1:19-cv-06770-EK-MMH   Document 34-43   Filed 08/21/20   Page 40 of 41 PageID
Case 2:19-mj-30488-DUTY   ECF No. 1   filed 09/12/19   PageID.39   Page 39 of 49 PageID
#: 1690

## Search Warrants

65.     In August 2019, I and my partners from the FBI, IRS, and DOL executed multiple search warrant operations at the residences and work locations of senior UAW officials, including locations related to PEARSON. Those affidavits contained sections similar to this affidavit, but also contain additional sections and information, which I have not included in this particular application for a criminal complaint.  During those searches, agents seized hundreds of high-end bottles of liquor, hundreds of golf shirts, multiple sets of golf clubs, a large quantity of cigars and related items, humidors, and tens of thousands of dollars in cash.  Agents seized a set of Titleist irons and hybrids consistent with those purchased at The Club at Porto Cima with UAW funds at the home of UAW Official A.  In addition, Agents seized over $30,000 in cash from the residence of UAW Official A.  Agents seized a similar set of Titleist clubs, consistent with the clubs purchased with UAW funds at The Club at Porto Cima, located in PEARSON's office in Hazelwood, MO.

## Conclusion

66.     Based on the forgoing, there is probable cause to believe that Vance Pearson has committed the following offenses:  29 U.S.C. § 501(c), Embezzlement of Union Funds;  29 U.S.C. § 439(b) and (c), Filing False LM Reports and

38

Maintaining False Union Records; 18 U.S.C. §§ 1341 & 1343, Mail and Wire

Fraud; 18 U.S.C. §§ 1956 & 1957, Money Laundering;  18 U.S.C. § 2, Aiding and

Abetting others in the commission of the same; and 18 U.S.C. § 371, Conspiracy to

commit the same.

Respectfully submitted,

Andrew Donohue
Special Agent
U.S. Department of Labor –
Office of Inspector General

Subscribed and sworn to before me and signed in my presence and/or by reliable

electronic means.

DAVID R. GRAND
United States Magistrate Judge

Dated: _____9/12/19_____

39