# Exhibit 106

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

United States of America,

      v.

D-1 Jeffery Pietrzyk,

      Defendant.

_____/

No. 19-cr-20630

Hon. Bernard A. Friedman

**Offense:**
Count One – 18 U.S.C. § 1349;
Conspiracy to Commit Honest
Services Wire Fraud

Count Two – 18 U.S.C. § 1956(h);
Conspiracy to Commit Money
Laundering

**Maximum Penalty:**
Count One – Up to 20 years'
imprisonment

Count Two – Up to 10 years'
imprisonment

**Maximum Fine:**
Counts One and Two – Up to $250,000

# Rule 11 Plea Agreement

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, defendant

JEFFERY PIETRZYK and the government agree as follows:

1

## 1.    Guilty Plea

### A.    Counts of Conviction

Defendant will enter a plea of guilty to counts one and two of the Information which charges him with conspiracy to commit honest services wire fraud, in violation of 18 U.S.C. § 1349, and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h).

### B.    Elements of Offenses

The elements of count one, conspiracy to commit honest services wire fraud, are as follows:

1. Two or more persons, in some way or manner, agreed to try to accomplish a common and unlawful plan to commit honest services wire fraud, as charged in the information; and

2. The defendant knew the unlawful purpose of the plan and willfully joined in it.

The elements of honest services wire fraud are:

1. The defendant knowingly and unlawfully devised and participated in a scheme to defraud his employer of its right to the honest services of the defendant through bribery or kickbacks;

2. The defendant did so knowingly and with an intent to defraud;

3. The scheme or artifice to defraud involved a material misrepresentation, false statement, false pretense, or concealment of fact; and

4. In furtherance or execution of this scheme, the defendant used or caused to be transmitted, any writing, signal, or sound by means of a wire communication in interstate or foreign commerce.

2                                             Defendant's Initials

The elements of count two, conspiracy to commit money laundering, are as follows:

1. Two or more persons, in some way or manner, agreed to try to accomplish a common and unlawful plan to commit money laundering, as charged in the information; and

2. The defendant knew the unlawful purpose of the plan and willfully joined in it.

The elements of money laundering are:

1. The defendant knowingly engaged in a monetary transaction;

2. The monetary transaction was of a value greater than $10,000.00;

3. The monetary transaction involved criminally derived property;

4. The criminally derived property was derived from specified unlawful activity;

5. The defendant knew that the monetary transaction involved criminally derived property; and

6. The monetary transaction took place within the United States.

### C.   Factual Basis for Guilty Plea

The following facts are a sufficient and accurate basis for defendant's guilty plea and are relevant to the charges and time period contained in the Information:

The International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (UAW) was a labor organization engaged in an industry affecting commerce. The UAW represented tens of thousands of production, skilled trades, and salaried workers employed by the General Motors

3                                                Defendant's Initials _____

Company (GM) at numerous locations in Michigan, and across the United States and Canada. The UAW was headquartered in Detroit, Michigan. The UAW-GM Center for Human Resources (CHR) was a tax-exempt corporation based in Detroit, Michigan. The stated purpose of the CHR was to develop, deliver, coordinate and administer joint strategies and programs designed to educate and train UAW-represented GM employees. GM's funding of the CHR was negotiated as part of the relevant collective bargaining agreements between UAW and GM. The Executive Board-Joint Activities (Executive Board) was the governing body responsible for overseeing and facilitating the joint activities of the CHR.

From in or about 2010, until in or about July 2014, JEFFERY PIETRZYK was a senior UAW official, working closely with the UAW Vice President and Director of the GM Department, and also served as the Co-Director of the CHR and as an officer on the CHR Executive Board. As a senior UAW official, the Co-Director of the CHR, and also as an officer on the CHR Executive Board, JEFFERY PIETRZYK was a fiduciary of the UAW and the CHR and was prohibited by UAW and CHR policy from accepting kickbacks and improperly using his position to benefit himself, his family and friends, and outside businesses. JEFFERY PIETRZYK was required by state and federal law to discharge his duties solely in the interest of the union and its membership.

Union Official 1 and Michael Grimes were senior officials in the UAW GM

4                                        Defendant's Initials

Case 1:19-cv-06770-EK-MMH   Document 34-45   Filed 08/21/20   Page 6 of 39 PageID
Case 2:19-cr-20630-BAF-APP   ECF No. 10-1   filed 10/22/19   PageID.39   Page 5 of 94
#: 1706

Department and also served on the CHR Executive Board. Vendor A and his wife,
along with other partners, were the owners and operators of a group of affiliated
companies that sold American-made custom logo products. The vast majority of
Vendor A's business was with the UAW and CHR, providing clothing and
accessories bearing the UAW or UAW-GM logo. Vendor A also owned and
maintained "brick and mortar" clothing/voucher stores controlled by the UAW GM
Department inside multiple GM manufacturing plants throughout the United States.
Vendor B was a chiropractor based in the Philadelphia, Pennsylvania, and southern
New Jersey areas. Vendor B had a relationship with Union Official 1 for many
years preceding the relevant time period of this Information. Union Official 1
introduced JEFFERY PIETRZYK to Vendor B when PIETRZYK worked at the
CHR. In August 2012, Vendor B opened a business which purported to sell
American-made custom watches. The only income Vendor B's company earned
was from UAW and CHR business.

### Conspiracy to Commit Honest Services Wire Fraud

From in or about 2006, through in or about July 1, 2018, Michael Grimes
conspired with others including, at times, JEFFERY PIETRZYK and Union
Official 1, to devise a scheme to defraud the CHR and UAW members of their right
to honest, faithful, and impartial services, including the CHR's and UAW members'
right to conscientious, loyal, faithful, disinterested, unbiased service, to be

5                                          Defendant's Initials _____

performed free of deceit, undue influence, conflict of interest, self-enrichment, self-dealing, concealment, bribery, fraud, and corruption, and to cause writings, signals, and sounds to be transmitted by wire in interstate and foreign commerce, for the purpose of executing and attempting to execute the scheme and artifice.

From in or about 2010, through in or about July 2018, it was an object of the scheme to defraud for JEFFERY PIETRZYK, Michael Grimes, and Union Official 1 to use their positions with the UAW and CHR to personally enrich themselves by deceptively soliciting, influencing, and obtaining contracts from the UAW and the CHR for Vendor A and Vendor B to provide clothing and other products to the CHR and to UAW members. In return, JEFFERY PIETRZYK, Michael Grimes, and Union Official 1 demanded and accepted from Vendor A and Vendor B hundreds of thousands of dollars in bribes and kickbacks in the form of cash, checks, and other things of value.

JEFFERY PIETRZYK, Michael Grimes, and Union Official 1 concealed and did not disclose the manner in which certain contracts between the CHR and Vendor A and Vendor B, and between the UAW and Vendor A and Vendor B were obtained or the fact that JEFFERY PIETRZYK, Michael Grimes, and Union Official 1 accepted bribes and kickbacks from Vendor A and Vendor B. JEFFERY PIETRZYK deposited into his bank accounts the cash and checks he received and also caused the CHR to send payments to Vendors A and B via interstate wire,

6                                                   Defendant's Initials: _____

thereby transmitting a writing or signal by means of a wire communication in interstate commerce.

### Conspiracy to Commit Money Laundering

From in or about 2011, through in or about July 2018, JEFFERY PIETRZYK conspired with Michael Grimes and Union Official 1 to knowingly engage in monetary transactions by depositing the cash and checks he received as kickbacks from Vendor A and Vendor B, through or to a financial institution in the United States, thereby affecting interstate and foreign commerce. The criminally derived property was of a value of at least $250,000.

2.  **Sentencing Guidelines**

   A.  **Standard of Proof**

The Court will find sentencing factors by a preponderance of the evidence, following receipt of this Rule 11 Plea Agreement, the Presentence Report, and any other information that the Court may require of the parties.

   B.  **Guideline Range**

The government's recommended guideline range is **24 to 30 months**, and the defendant agrees with this guideline range. Except as necessary to the Court's determination regarding paragraph 2.B.1, neither party may take any position concerning the applicable guidelines that is different than any position of that party as noted above and as reflected in the attached worksheets.

7                                        Defendant's Initials

    1.  <u>Findings that Increase the Government's Recommended Guideline Range</u>

If the Court finds that (i) the defendant's criminal history category is higher than reflected on the attached worksheets, or (ii) the offense level should be higher because, after pleading guilty, the defendant made any false statement to or withheld information from his probation officer, otherwise demonstrated a lack of acceptance of responsibility for his offense, or obstruction of justice or committed any crime, and if any such finding results in a guideline range higher than **24 to 30 months**, the higher guidelines range becomes the government's recommended guidelines range in paragraph 2B.

    2.  <u>Findings That Do Not Increase The Government's Recommended Guidelines Range</u>

If the Court finds that defendant is a career offender, an armed career criminal, or a repeat and dangerous sex offender as defined under the sentencing guidelines or other federal law, and that finding is not already reflected in the attached worksheets, this paragraph does not authorize a corresponding increase in the government's recommended guideline range.

3.  **Sentence**

The Court will impose a sentence pursuant to 18 U.S.C. § 3553, and in doing so must consider the sentencing guideline range.

8            Defendant's Initials _____

Case 1:19-cv-06770-EK-MMH Document 34-45 Filed 08/21/20 Page 10 of 39 PageID
Case 2:19-cr-20635-BAF-APP ECF No. 10 Filed 10/22/19 PageID.42 Page 9 of 44 PageID
#: 1710

### A.    Imprisonment

Pursuant to the Federal Rules of Criminal Procedure 11(c)(1)(C) the sentence of imprisonment in this case may not exceed the midpoint of the sentencing guideline range as determined by Paragraph 2B.

### B.    Supervised Release

A term of supervised release, if imposed, follows the term of imprisonment. There is no agreement on supervised release. In other words, the Court may impose any term of supervised release up to the statutory maximum term, which in this case is 3 years. The agreement concerning imprisonment described above in Paragraph 3A does not apply to any term of imprisonment that result from any later revocation of supervised release.

### C.    Special Assessment

Defendant will pay a special assessment of $200. The defendant is required to pay the special assessment immediately after sentence is imposed, and provide a receipt to the United States Attorney's Office within 24 hours of sentencing. The defendant is encouraged to voluntarily pay the special assessment before sentencing and bring the receipt to sentencing.

### D.    Fine

There is no agreement as to fines.

9                                                      Defendant's Initials

Case 1:19-cv-06770-EK-MMH   Document 34-45   Filed 08/21/20   Page 11 of 39 PageID
Case 2:19-cr-20630-BAF-APP   ECF No. 10   filed 10/22/19   PageID.43   Page 10 of 34
#: 1711

**E.  Restitution**

Restitution is not applicable in this case.

**F.  Forfeiture**

As part of this agreement, defendant agrees to forfeit any and all property, real or personal, which constitutes or is derived from proceeds traceable to his participation in the described honest services wire fraud conspiracy under 18 U.S.C. § 981(a)(1)(C) together with 28 U.S.C. § 2461(c). Defendant also agrees to forfeit any property, real or personal, involved in or traceable to the money laundering conspiracy under 18 U.S.C. § 982(a)(1). Specifically, defendant agrees to the entry of a forfeiture money judgment against him, in favor of the United States, in the amount of $123,000.00 (the "Money Judgment"). Defendant agrees that he personally obtained at least $123,000.00 as bribe payments as described in the Factual Basis for Guilty Plea, above. Defendant further agrees that he knowingly engaged in monetary transactions with the bribes he received to conceal the nature of the funds.

Following entry of this Rule 11 Agreement, defendant agrees to the Court's prompt entry of one or more orders of forfeiture, and agrees to sign a Stipulated Preliminary Order of Forfeiture for the $123,000.00 Money Judgment, at his Rule 11 plea hearing, or within two weeks of that hearing. Defendant agrees that the forfeiture order shall be final and effective as to him upon entry.

10                                                    Defendant's Initials _____

Defendant agrees to satisfy the Money Judgment before his sentencing in this case. At least two weeks prior to sentencing, Defendant agrees to pay the United States $123,000.00 in the form of a Cashier's Check or Money Order made payable to the "United States Marshals Service," referencing this case number. Defendant agrees to deliver this payment to the below address and to provide a copy of the payment to the undersigned AUSAs:

> **United States Marshals Service**
> **U.S. Courthouse**
> **231 W. Lafayette Street, Suite 300**
> **Detroit, Michigan 48226**
> **ATTENTION: Shannon Alexander**

(the "Money Judgment Payment").

If Defendant has not made the full Money Judgment Payment at least two weeks prior to sentencing, Defendant agrees that the Money Judgment may be satisfied through forfeiture of any property owned by him or under his dominion and control. Defendant explicitly agrees to the forfeiture of any and all identified substitute assets under 21 U.S.C. § 853(p)(2) and waives and relinquishes his right to oppose the forfeiture of substitute assets under 21 U.S.C. § 853(p)(1) or otherwise.

If the forfeiture of substitute assets is necessary, Defendant agrees to cooperate with the United States in connection with its efforts to identify, locate, seize, and forfeit property in accordance with this agreement. Defendant agrees that

11

Defendant's Initials:

Case 1:19-cv-06770-EK-MMH Document 34-45 Filed 08/21/20 Page 13 of 39 PageID
Case 2:19-cr-20690-BAF-APP ECF No. 10 filed 10/22/19 PageID.43 Page 12 of 94
#: 1713

he will cooperate with the United States by taking whatever steps are necessary to deliver possession of, and clear title to, any property that is forfeitable to the United States and will execute any legal documents that may be required to transfer title to the United States. Defendant will take whatever steps are necessary to ensure that his assets are not sold, disbursed, hidden, wasted or otherwise made unavailable for forfeiture.

Defendant knowingly, voluntarily, and intelligently waives all constitutional and statutory challenges, in any form, to any forfeiture carried out in accordance with this plea agreement, on any grounds, including that the forfeiture constitutes an excessive fine or punishment under the Excessive Fines Clause of the Eighth Amendment.

Defendant acknowledges that he understands that forfeiture is part of the sentence that may be imposed on him in this case and waives his right to challenge any failure by the court to advise him of this, under Rule 11(b)(1)(J), or otherwise, at the time his guilty plea is accepted. Defendant further waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of forfeiture in the charging instrument, pronouncement of forfeiture at sentencing, and incorporation of forfeiture in the judgment and waives any right he may have to request a jury determine forfeiture under Rule 32.2(b)(5).

12                                                    Defendant's Initials

4. **Other charges**

The government agrees that it will forego prosecution of JEFFERY PIETRZYK for other charges relating to the conspiracy to commit honest services wire fraud and money laundering and for any other matters revealed to the government during the investigation leading to this charge.

5. **Use of Withdrawn Guilty Plea**

If the Court allows defendant to withdraw his guilty plea for a "fair and just reason" pursuant to Fed. R. Crim. P. 11(d)(2)(B), defendant waives his rights under Fed. R. Evid. 410, and the government may use his guilty plea, any statement made under oath at the change-of-plea hearing, and the factual basis statement in this plea agreement, against him in any proceeding.

6. **Each Party's Right to Withdraw from this Agreement**

If defendant is allowed to withdraw his guilty plea or if any conviction entered pursuant to this agreement is vacated, the Court shall, on the government's request, reinstate any charges that were dismissed as part of this agreement. If additional charges are filed against defendant within six months after the date the order vacating defendant's conviction or allowing him to withdraw his guilty pleas becomes final, which charges relate directly or indirectly to the conduct underlying the guilty pleas or to any conduct reflected in the attached worksheets, defendant waives his right to challenge the additional charges on the ground that they were not

13                                                    Defendant's Initials:_____

filed in a timely manner, including any claim that they were filed after the limitations period expired.

7.    **Appeal Waiver**

The defendant waives any right he may have to appeal his conviction on any grounds. If the defendant's sentence does not exceed **27 months**, the defendant also waives any right he may have to appeal his sentence on any grounds.   If the defendant's sentence of imprisonment is at least **24 months,** the government waives any right it may have to appeal the defendant's sentence.

8.    **Collateral Consequences of Conviction**

Defendant understands that his convictions here may carry additional consequences under federal and state law, including the potential loss of the right to vote, right to carry a firearm, right to serve on a jury, and ability to hold certain licenses or to be employed in certain fields. Defendant further understands that, if he is not a native-born citizen of the United States, there may be adverse immigration consequences resulting from conviction. These include possible removal from the United States, denial of citizenship, denaturalization, denied admission to the United States in the future and other possible consequences. Defendant understands that no one, including the defendant's attorney or the Court, can predict to a certainty the effect of defendant's conviction on any of these

14                                              Defendant's Initials

Case 1:19-cv-06770-EK-MMH Document 34-45 Filed 08/21/20 Page 16 of 39 PageID
Case 2:19-cr-20630-BAF-APP ECF No. 10 filed 10/22/19 PageID.48 Page 15 of 94
#: 1716

matters. Defendant nevertheless affirms that he chooses to plead guilty regardless of any immigration consequences or other collateral consequences of his conviction.

## 9.    Parties to Plea Agreement

Unless otherwise indicated, this agreement does not bind any government agency except the United States Attorney's Office for the Eastern District of Michigan.

## 10.    Scope of Plea Agreement

This agreement, which includes all documents that it explicitly incorporates, is the complete agreement between the parties. This agreement supersedes all other promises, representations, understandings and agreements between the parties concerning the subject matter of this plea agreement that were made at any time before the guilty plea is entered in court. Thus, no oral or written promises made by the government to defendant or to the attorney for the defendant at any time before defendant pleads guilty are binding except to the extent they have been explicitly incorporated into this agreement.

Notwithstanding the previous paragraph, if defendant has entered into a proffer agreement in writing or a cooperation agreement in writing with the government, this plea agreement does not supersede or abrogate the terms of any such prior written agreement.

15                                            Defendant's Initials _____

Case 1:19-cv-06770-EK-MMH   Document 34-45   Filed 08/21/20   Page 17 of 39 PageID
Case 2:19-cr-20690-BAF-APP   ECF No. 10   filed 10/22/19   PageID.49   Page 16 of 94
#: 1717

This agreement also does not prevent any civil or administrative actions against defendant, or any forfeiture claim against any property, by the United States or any other party.

## 11.   **Acceptance of Agreement by Defendant**

This plea offer expires unless it has been received, fully signed, in the Office of the United States Attorney by **5:00 P.M. on September 19, 2019**. The government reserves the right to modify or revoke this offer at any time before defendant pleads guilty.

MATTHEW SCHNEIDER
United States Attorney

DAVID A. GARDEY
Assistant United States Attorney
Chief, Public Corruption Unit

FRANCES LEE CARLSON
Assistant United States Attorney
Deputy Chief, Public Corruption Unit

EATON P. BROWN
Assistant United States Attorney

Date: **10/21/2019**

16                                                                      Defendant's Initials: _____

Case 1:19-cv-06770-EK-MMH Document 34-45 Filed 08/21/20 Page 18 of 39 PageID
Case 2:19-cr-20630-BAF-APP ECF No. 10-1 filed 10/22/19 PageID.98 Page 17 of 34
#: 1718

By signing below, defendant acknowledges that he has read (or been read) this entire document, understands it, and agrees to its terms. He also acknowledges that he is satisfied with his attorney's advice and representation. Defendant agrees that he has had a full and complete opportunity to confer with his lawyer, and has had all of his questions answered by his lawyer.

ROBERT C. SINGER
Attorney for Defendant

Date: 9/19/2019

JEFFERY PIETRZAK
Defendant

Date: 9/19/2019

17

Defendant's Initials: _____

# Exhibit 107

Case 1:19-cv-06770-EK-MMH   Document 34-45   Filed 08/21/20   Page 19 of 39 PageID #: 1719

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

UNITED STATES OF AMERICA,

v.

D-1   JEFFERY PIETRZYK,

              Defendant.

_____ /

Case:2:19-cr-20630
Judge: Drain, Gershwin A.
MJ: Stafford, Elizabeth A.
Filed: 09-20-2019 At 10:03 AM
INFO USA V PIETRZYK (af)

VIOLATIONS:

Count One: Conspiracy to Commit Honest Services Wire Fraud (18 U.S.C. § 1349)

Count Two: Conspiracy to Commit Money Laundering (18 U.S.C. § 1956(h))

**INFORMATION**

The United States Attorney charges:

**GENERAL ALLEGATIONS**

At all times relevant to this Information:

1.   The International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (UAW) was a labor organization engaged in an industry affecting commerce within the meaning of Sections 402(i) and 402(j) of Title 29, United States Code. The UAW represented tens of thousands of production, skilled trades, and salaried workers employed by the General Motors Company (GM) at numerous locations in Michigan, and across the United States and Canada. The UAW was headquartered in Detroit, Michigan.

Case 2:19-cr-20650-BAF-APP ECF No. 1 Filed 09/26/19 PageID.23 Page 2 of 20

2.  The UAW-GM Center for Human Resources (CHR) was a tax-exempt corporation based in Detroit, Michigan. The stated purpose of the CHR was to develop, deliver, coordinate and administer joint strategies and programs designed to educate and train UAW-represented GM employees. GM's funding of the CHR was negotiated as part of the relevant collective bargaining agreements between UAW and GM.

3.  The Executive Board-Joint Activities (Executive Board) was the governing body responsible for overseeing and facilitating the joint activities of the CHR. The Executive Board's duties and responsibilities included, but were not limited to, the following: setting policies, allocating funds for projects and activities, and monitoring expenditures for approved projects and activities. The Co-Directors of the Executive Board were the Vice President, GM North America (GMNA) Labor Relations, and the UAW Vice President and Director of the GM Department. The remaining members of the Executive Board consisted of GM and UAW representatives, equally appointed by each of the Co-Directors.

4.  From in or before July 2010, through in or about July 2014, JEFFERY PIETRZYK was a senior UAW official, working closely with the UAW Vice President and Director of the GM Department. During this time period, JEFFERY

2

PIETRZYK also was the Co-Director of the CHR and served as an officer on the CHR Executive Board.

5. From in or about 2006, through on or about July 1, 2018, Michael Grimes was a senior UAW official, at times working closely with the UAW Vice President and Director of the GM Department, and also served as a member on the CHR Executive Board.

6. From in or before July 2010, until in or about July 2014, Union Official 1 was a senior official in the UAW GM Department and also served as an officer on the CHR Executive Board.

7. Vendor A and his wife, along with other partners, were the owners and operators of a group of affiliated companies (hereinafter collectively referred to as "Vendor A") that sold American-made custom logo products. The vast majority of Vendor A's business was with the UAW and CHR, providing clothing and accessories bearing the UAW or UAW-GM logo. Vendor A also owned and maintained "brick and mortar" clothing/voucher stores controlled by the UAW GM Department inside multiple GM manufacturing plants throughout the United States.

8. Vendor B was a chiropractor based in the Philadelphia, Pennsylvania and southern New Jersey areas. Vendor B had a relationship with Union Official 1

3

Case 2:19-cr-20650-BAF-APP ECF No. 1 Filed 09/20/19 PageID.4 Page 4 of 20

for many years preceding the relevant time period of this Information. Union Official 1 introduced JEFFERY PIETRZYK to Vendor B when PIETRZYK worked at the CHR. In or about August 2012, Vendor B opened a business which purported to sell American-made custom watches. The only income Vendor B's company earned was from UAW and CHR business.

**COUNT ONE**
**(Conspiracy to Commit Honest Services Wire Fraud –**
**18 U.S.C. § 1349)**

9.    The General Allegations are incorporated in Count One by this reference.

10.   As a senior UAW official, an officer of the CHR Executive Board, and Co-Director of the CHR, JEFFERY PIETRZYK was a fiduciary of the UAW and the CHR and was prohibited by UAW and CHR policy from accepting kickbacks and improperly using his position to benefit himself, his family and friends, and outside businesses.

11.   JEFFERY PIETRZYK was required by state and federal law to discharge his duties solely in the interest of the union and its membership. 29 U.S.C. §§ 186 & 501(a).

12.   Michigan and federal law prohibits union officials, such as JEFFERY PIETRZYK, from accepting bribes. M.C.L. § 750.125; 29 U.S.C. §§ 186 & 501.

4

Case 2:19-cr-20650-BAF-APP ECF No. 1 Filed 09/20/19 PageID.9 Page 5 of 20

13. From in or about 2006, through on or about July 1, 2018, in the Eastern District of Michigan, Southern Division, and elsewhere, the defendant, JEFFERY PIETRZYK, Michael Grimes, and Union Official 1, unlawfully and knowingly conspired and agreed with each other and with other persons, known and unknown, to commit honest services wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1346.

## SCHEME TO DEFRAUD

14. JEFFERY PIETRZYK conspired with Michael Grimes and Union Official 1 to devise a scheme to defraud the CHR and UAW members of their right to honest, faithful, and impartial services, including the CHR's and UAW members' right to conscientious, loyal, faithful, disinterested, unbiased service, to be performed free of deceit, undue influence, conflict of interest, self-enrichment, self-dealing, concealment, bribery, fraud, and corruption, and to cause writings, signals, and sounds to be transmitted by wire in interstate and foreign commerce, for the purpose of executing and attempting to execute the scheme and artifice, as set forth below.

## OBJECTS OF THE SCHEME TO DEFRAUD

15. From in or about 2010, through in or about July 2018, it was an object of the scheme to defraud for JEFFERY PIETRZYK, Michael Grimes, and Union

Official 1 to use their positions with the UAW and CHR to personally enrich themselves by deceptively soliciting, influencing, and obtaining contracts for Vendor A and Vendor B to provide clothing and other products to the CHR and to UAW members. In return, JEFFERY PIETRZYK, Michael Grimes, and Union Official 1 demanded and accepted from Vendor A and Vendor B hundreds of thousands of dollars in bribes and kickbacks in the form of cash, checks, and other things of value.

16. JEFFERY PIETRZYK, Michael Grimes, and Union Official 1 concealed and did not disclose the manner in which certain contracts between the CHR and Vendor A and Vendor B were obtained or the fact that JEFFERY PIETRZYK, Michael Grimes, and Union Official 1 accepted bribes and kickbacks from Vendor A and Vendor B.

## METHODS OF ACCOMPLISHING THE SCHEME TO DEFRAUD

17. To achieve the objects of the scheme to defraud, JEFFERY PIETRZYK, Michael Grimes, and Union Official 1 participated in various transactions and activities, which included, but are not limited to, the following:

**Vendor A:**
*2006 watch contract and the beginning of the scheme to defraud*

18. In approximately 2006, Michael Grimes recommended Vendor A to provide 23,000 watches to the CHR to distribute to one of GM's powertrain divisions. After Vendor A was awarded the contract and had financially committed to the production of the watches with the manufacturer, Michael Grimes approached Vendor A and demanded a loan to purchase property in Rose Township, Michigan. When Vendor A refused Michael Grimes's demands, Michael Grimes threatened to cancel the watch contract.

19. Fearing economic harm to his company, Vendor A agreed to provide a mortgage for $60,000, so that Michael Grimes could buy the property. Accompanying the $60,000 contract was a "consulting agreement" between Vendor A and Michael Grimes. The agreement dictated that in addition to the lump sum of $60,000 to be paid by Vendor A to Michael Grimes, Vendor A would pay additional compensation to Michael Grimes in the amount of $1,800 per month as a purported "consultant." In exchange for Vendor A's kickbacks, Michael Grimes would secure the "watch order," ensure the retention and maintenance of Vendor A's retail stores in the GM plants and secure future business contracts between Vendor A and the UAW GM Department. In November 2006, Vendor A paid Michael Grimes $60,000.

Case 2:19-cr-20650-BAF-APP ECF No. 1 Filed 09/20/19 PageID.8 Page 8 of 20 PageID

20. Following the 2006 watch order, Michael Grimes continued accepting cash bribes and kickbacks from Vendor A on an almost monthly basis. The payments began at $1,800 per month and eventually increased to a sum of approximately $3,800 per month. Michael Grimes's financial demands of Vendor A continued until Michael Grimes retired from the UAW and CHR on July 1, 2018.

21. In addition to monthly cash payments, Michael Grimes demanded various other bribes from Vendor A in exchange for not interfering with Vendor A's existing business with the UAW and CHR and continuing to recommend Vendor A for future business.

22. In order to conceal the nature of the bribes, and at Michael Grimes's direction, Vendor A provided Michael Grimes checks payable to Michael Grimes's relative or to "KKG Consulting," which was a sham company in the name of Michael Grimes's relative.

23. From at least November 2010, through in or about October 2017, Michael Grimes accepted from Vendor A approximately 27 checks totaling almost $900,000 payable to his relative or to KKG Consulting.

## *2011 Jacket Contract*

24. In 2011, Union Official 1 proposed the purchase of 50,000 "Team UAW-GM" jackets using joint funds from the CHR to be distributed to all GM plant employees. In order to continue receiving bribes and kickbacks, Michael Grimes recommended Vendor A as the sole source to fulfill this contract.

25. After Vendor A was awarded the jacket contract valued at approximately $6 million, JEFFERY PIETRZYK told Michael Grimes that Union Official 1 wanted a cut of Vendor A's proceeds from the jackets. JEFFERY PIETRZYK directed Michael Grimes to demand from Vendor A approximately $300,000 in kickbacks for Union Official 1.

26. Over a period of six months in 2012, Michael Grimes demanded from Vendor A the $300,000 in cash for Union Official 1. Michael Grimes delivered the kickbacks from Vendor A to JEFFERY PIETRZYK, who in turn delivered the cash to Union Official 1.

27. In exchange for obtaining the 2011 jacket contract for Vendor A, Michael Grimes also demanded a $525,000 kickback from Vendor A so Michael Grimes could purchase a house in Fenton, Michigan. When Vendor A refused Michael Grimes's demands, Michael Grimes threatened to cancel the jacket contract. Michael Grimes eventually increased his financial demands on Vendor A,

Case 1:19-cv-06770-EK-MMH Document 34-45 Filed 08/21/20 Page 29 of 39 PageID
Case 2:19-cr-20638-BAF-APP ECF No. 1 filed 09/26/19 PageID.10 Page 10 of 26 PageID
#: 1729

and fearing economic harm to his company, Vendor A agreed to provide a kickback to Michael Grimes in the form of a $530,000 cashier's check payable to Michael Grimes's relative.

28. On May 3, 2011, Michael Grimes and his relative used the $530,000 cashier's check Michael Grimes received from Vendor A in order to pay off the remaining balance due on a land contract for the Fenton, Michigan house.

### *2016 Backpack Contract*

29. In order to continue receiving bribes and kickbacks, in or about March of 2016, Michael Grimes recommended Vendor A to the CHR as the sole source for a $5.8 million contract to provide 55,000 backpacks to be distributed to UAW members.

30. Shortly after Vendor A was awarded the contract, Michael Grimes demanded a payment of $1 million from Vendor A. Vendor A resisted Michael Grimes's demands and agreed to pay Michael Grimes a $500,000 kickback instead.

31. In order to conceal the nature of the kickback payments, and at Michael Grimes's direction, Vendor A provided Michael Grimes a series of checks payable to "KKG Consulting." These checks are among the checks described in Paragraph 23 of this Information.

Case 1:19-cv-06770-EK-MMH Document 34-45 Filed 08/21/20 Page 30 of 39 PageID
Case 2:19-cr-20635-BAF-APP ECF No. 1 filed 09/26/19 PageID.19 Page 11 of 20 PageID
#: 1730

## Vendor B:
### *2013 Watch Contract*

32.  In or about 2010, Union Official 1 convinced Vendor B to loan $250,000 to a construction company owned by an associate of Union Official 1. In or about March 2012, the construction company stopped making loan payments to Vendor B.

33.  In or about 2012, Union Official 1 approached Vendor B and proposed a way that Vendor B could recoup the money on the failed loan to the construction company. Union Official 1 described that the UAW was going to purchase over 50,000 watches, and directed Vendor B to open a company that could win the contract to supply the watches. Union Official 1 suggested that the profits from the watch contract would repay Vendor B what he was owed on the $250,000 loan to the construction company.

34.  In August and September 2012, Vendor B filed a Certificate of Formation with the State of New Jersey, obtained an Employer Identification Number, and established a website for Vendor B's business.

35.  In late 2012, and early 2013, Vendor B located a manufacturer that could provide 58,000 custom watches. Union Official 1 actively participated in the design, production and pricing of the watches. Union Official 1 negotiated and

approved for Vendor B to purchase the watches from the manufacturer at a total cost of approximately $2,288,200, based on a unit cost of $42.90 per watch.

36. Union Official 1 then directed Vendor B to submit a bid for the watch contract to JEFFERY PIETRZYK, listing a total price of $3,973,000 based on a unit cost of $68.50 per watch. Both JEFFERY PIETRZYK and Union Official 1 then used their positions with the UAW and CHR to influence and facilitate the award of the watch contract by the CHR to Vendor B.

37. As a result, on or about April 13, 2013, the CHR awarded a contract valued at $3,973,000 to Vendor B for 58,000 watches at a price of $68.50 per watch.

38. On or about May 1, 2013, the CHR sent via interstate wire transfer $1,973,000 to Vendor B as the first payment for the watches. Shortly thereafter, Union Official 1 demanded $250,000 from Vendor B as a kickback for the watch contract.

39. Vendor B began making regular cash withdrawals from his bank account in order to pay Union Official 1. At Union Official 1's direction, Vendor B would travel to Union Official 1's house to deliver the cash payments on a regular basis. Vendor B gave Union Official 1 between $5,000 and $30,000 each time he visited Union Official 1 between in or about May 2013 through early 2015.

40. In 2016, Vendor B began providing kickbacks in the form of checks payable to Union Official 1. These checks, which were deposited into Union Official 1's personal bank account, included the following:

|  | Date | Payor | Payee | Amount |
|---|---|---|---|---|
| a. | 2/26/2016 | Vendor B | Union Official 1 | $15,000 |
| b. | 4/11/2016 | Vendor B | Union Official 1 | $5,000 |
| c. | 5/18/2016 | Vendor B | Union Official 1 | $5,000 |
| d. | 7/1/2016 | Vendor B | Union Official 1 | $5,000 |

41. In exchange for the watch contract, Union Official 1 also directed Vendor B to pay kickbacks to JEFFERY PIETRZYK. In order to conceal their scheme to defraud, Vendor B wrote "antique furniture" or "furniture" in the memo line of the checks he gave to JEFFERY PIETRZYK. JEFFERY PIETRZYK accepted the following kickbacks from Vendor B, some of which he split with Michael Grimes:

|  | Date | Payor | Payee | Amount | Memo |
|---|---|---|---|---|---|
| a. | 8/28/2013 | Vendor B | JEFFERY PIETRZYK | $25,000 | "antique furniture" |
| b. | 8/29/2013 | Union Official 2 | Michael Grimes | $12,500 | "antique furniture" |
| c. | 12/5/2013 | Union Official 2 | Michael Grimes | $12,500 | "antique furniture" |
| d. | 1/18/2014 | Vendor B | JEFFERY PIETRZYK | $25,000 | "furniture" |

Case 1:19-cv-06770-EK-MMH Document 34-45 Filed 08/21/20 Page 33 of 39 PageID
Case 2:19-cr-20635-BAF-APP ECF No. 1 filed 09/26/19 PageID.14 Page 14 of 26 ID
#: 1733

| e. | 7/18/2014 | Vendor B | JEFFERY PIETRZYK | $10,000 | "furniture" |
| f. | 8/12/2014 | Vendor B | JEFFERY PIETRZYK | $10,000 | "antique furniture" |

42. Vendor B's payments to Union Official 1, continued through the summer of 2016. In the fall of 2016, following the news of a federal investigation into corruption in the UAW and Fiat Chrysler Automobiles US LLC, Union Official 1 met with Vendor B and informed Vendor B that the payments had to stop because of the UAW/Fiat Chrysler investigation.

43. On or about January 31, 2014, the CHR received the 58,000 watches Vendor B provided. The watches were never distributed to UAW-represented GM workers and are currently being stored in a warehouse at the CHR.

All in violation of Title 18, United States Code, Section 1349.

**COUNT TWO**
**(Conspiracy to Commit Money Laundering – 18 U.S.C. § 1956(h))**

From in or about 2006, through in or about 2018, said dates being approximate, in the Eastern District of Michigan, Southern Division, and elsewhere, defendant JEFFERY PIETRZYK, knowingly combined, conspired, and agreed with others both known and unknown to commit offenses against the United States in violation of Title 18, United States Code, Section 1957, to wit: to knowingly engage and attempt to engage, in monetary transactions by, through or to a financial institution, affecting interstate and foreign commerce, in criminally

14

derived property of a value greater than $10,000, that is at least $250,000, such

property having been derived from a specified unlawful activity, that is, conspiracy

to commit honest services wire fraud, in violation of Title 18, United States Code,

Section 1957.

All in violation of Title 18, United States Code, Section 1956(h).

## CRIMINAL FORFEITURE ALLEGATIONS

## (18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(1) and 28 U.S.C. § 2461)

1. Upon conviction of conspiracy to commit honest services wire fraud, in violation of Title 18, United States Code, Section 1349, as alleged in Count One, defendant JEFFERY PIETRZYK shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, his right, title, and interest in any property, real or personal, which constitutes or is derived from proceeds obtained, directly or indirectly, as a result of conspiracy to commit honest services wire fraud, in violation of 18 U.S.C. § 1349.

2. Property subject to forfeiture to the United States for violation of Count One includes, but is not limited to, a forfeiture money judgment representing a sum of money equal to the total amount of proceeds obtained as a result of defendant's participation in the conspiracy to commit honest services wire fraud. The United States anticipates that this amount shall be approximately $123,000.00 dollars.

3. Under Title 18, United States Code, Section 982(a)(1), upon conviction of an offense in violation of Title 18, United States Code, Section 1956, the defendant JEFFERY PIETRZYK, shall forfeit to the United States of America any property, real or personal, involved in such offense, and any property traceable to such property. The property to be forfeited includes, but is not limited to, a forfeiture

16

Case 2:19-cr-20630-BAF-APP ECF No. 1 filed 09/20/19 PageID.179 Page 17 of 26

money judgment representing a sum of money equal to the total amount of property involved in the money laundering conspiracy.

4.  Substitute Assets: Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b) and Title 28, United States Code, Section 2461(c), defendant JEFFERY PIETRZYK shall forfeit substitute property, up to the value of the sums of money described in paragraphs 2 and 3 above, if, by any act or omission of the defendant, the property described:

a.  cannot be located upon the exercise of due diligence;

b.  has been transferred, sold to or deposited with a third party;

c.  has been placed beyond the jurisdiction of the court;

d.  has been substantially diminished in value; or

e.  has been commingled with other property which cannot be divided without difficulty.

Case 2:19-cr-20635-BAF-APP ECF No. 1 filed 09/26/19 PageID.18 Page 18 of 20

All in accordance with Title 18, United States Code, Section 981(a)(1)(C); Title 18, United States Code, Section 982(a)(1); Title 28, United States Code, Section 2461(c); and Rule 32.2, Federal Rules of Criminal Procedure.

MATTHEW SCHNEIDER
United States Attorney



DAVID A. GARDEY
Assistant United States Attorney
Chief, Public Corruption Unit
211 W. Fort Street, Suite 2001
Detroit, Michigan    48226
313-226-9591
David.Gardey@usdoj.gov
P48990



FRANCES LEE CARLSON
Assistant United States Attorney
Deputy Chief, Public Corruption Unit
313-226-9696
Frances.Carlson@usdoj.gov
P62624



EATON P. BROWN
Assistant United States Attorney
313-226-9184
Eaton.Brown@usdoj.gov
P66003


Dated: September 20, 2019

**(Companion Case information MUST be completed by AUSA and initialed.)**

| United States District Court<br>Eastern District of Michigan | **Criminal Case Cove** | Case:2:19-cr-20630<br>Judge: Drain, Gershwin A.<br>MJ: Stafford, Elizabeth A.<br>Filed: 09-20-2019 At 10:03 AM<br>INFO USA V PIETRZYK (af) |
|---|---|---|

NOTE: It is the responsibility of the Assistant U.S. Attorney signing this form to compl

| **Companion Case Information** | **Companion Case Number:19-20520** |
|---|---|
| This may be a companion case based upon **LCrR 57.10 (b)(4)**[1]: | **Judge Assigned: Bernard A. Friedman** |
| ☒ Yes   ☐ No | **AUSA's Initials:** _FC_ |

**Case Title:** USA v.     JEFFREY PIETRZYK

**County where offense occurred :** _____ Wayne _____

**Check One:**    ☒ **Felony**        ☐ **Misdemeanor**        ☐ **Petty**

✓ Indictment/ Information --- **no** prior complaint.
_____ Indictment/ Information --- based upon prior complaint [Case number:                    ]
_____ Indictment/ Information --- based upon **LCrR 57.10 (d)** *[Complete Superseding section below]*.

## Superseding Case Information

**Superseding to Case No:** _____    **Judge:** _____

☐ Corrects errors; no additional charges or defendants.
☐ Involves, for plea purposes, different charges or adds counts.
☐ Embraces same subject matter but adds the additional defendants or charges below:

| **Defendant name** | **Charges** | **Prior Complaint (if applicable)** |
|---|---|---|

**Please take notice that the below listed Assistant United States Attorney is the attorney of record for the above captioned case.**

**September 20, 2019**
            Date

Frances Lee Carlson
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226-3277
Phone: 313-226-9696
Fax: 313-226-3413
E-Mail address: Frances.Carlson@usdoj.gov
Attorney Bar #:P62624

[1] Companion cases are matters in which it appears that (1) substantially similar evidence will be offered at trial, or (2) the same or related parties are present, and the cases arise out of the same transaction or occurrence. Cases may be companion cases even though one of them may have already been terminated.