**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE FIAT CHRYSLER AUTOMOBILES N.V. SECURITIES LITIGATION | Case No.: 1:19-cv-06770 (EK) (VMS)<br><br>JURY TRIAL DEMANDED |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION**
**TO DEFENDANTS' MOTION TO DISMISS**

TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS .............................................................................................. 2

    A.   FCA and the Bribery Scheme Designed to Influence the 2015 CBA ................ 2

    B.   The Department of Justice Exposes FCA's Bribery Scheme ........................... 5

    C.   Defendants' False and Misleading Statements About FCA's Bribery Scheme . 6

    D.   The Market Learns the Truth About the Extent of FCA's Bribery Scheme ...... 6

ARGUMENT ................................................................................................................... 6

    I.    LEGAL STANDARD ............................................................................... 6

    II.   PLAINTIFF ADEQUATELY PLEADS MISREPRESENTATIONS AND OMISSIONS BY DEFENDANTS .................................................................... 7

        A.   Defendants' Misleading Statements Concerning FCA's Role in the Bribery Scheme and the Effects of the Scheme ............................................. 8

           1.   Defendants' "Victim" Statements Were Material and Are Actionable ...................................................................................... 11

        B.   Defendants Had A Duty to Disclose that the Labor Concessions Obtained by FCA Were the Product of the Bribery Scheme ........................... 13

    III.  THE COMPLAINT PLEADS A STRONG INFERENCE OF SCIENTER ................ 15

        A.   Marchionne Had Motive and Opportunity to Commit Fraud .......................... 16

        B.   Marchionne Acted with Knowledge or Recklessness .................................... 16

        C.   Plaintiff Has Sufficiently Alleged Corporate Scienter .................................... 19

           1.   Plaintiff's Scienter Allegations Are Bolstered By Core Operations ... 21

    IV.  THE COMPLAINT PLEADS LOSS CAUSATION ................................................. 22

        A.   The GM Complaint Was A Corrective Disclosure ......................................... 22

        B.   Plaintiff Has Alleged a Materialization of the Risk ........................................ 24

    V.   Plaintiff Has Sufficiently Alleged a Section 20(a) Claim ........................................... 25

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020) ...................................................................................... 12

*Akerman v. Arotech Corp.*,
608 F. Supp. 2d 372 (E.D.N.Y. 2009) ......................................................................... 15

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..................................................................................................... 11

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)..................................................................................................... 13

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................................................................................................... 6

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
750 F.3d 227 (2d Cir. 2014) ................................................................................ 22, 23

*City of Roseville Employees' Retirement System v. EnergySolutions, Inc.*,
814 F. Supp. 2d 395 (S.D.N.Y. 2011) ......................................................................... 24

*Constr. Laborers Pension Trust for Southern Cal. v. CBS Corp.*,
433 F. Supp. 3d 515 (S.D.N.Y. 2020) ......................................................................... 24

*Dalberth v. Xerox Corp.*,
766 F.3d 172 (2d Cir. 2014) ....................................................................................... 24

*Das v. Rio Tinto*,
332 F. Supp. 3d 786 (S.D.N.Y. 2018) ......................................................................... 15

*DoubleLine Capital L.P. v. Odebrecht Fin., Ltd.*,
323 F. Supp 3d 393 (S.D.N.Y. 2018) ......................................................................... 15

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005)..................................................................................................... 22

*Employees' Ret. Sys. of Gov. of the Virgin Islands v. Blanford*,
794 F.3d 297 (2d Cir. 2015) ................................................................................ 17, 18

*Garber v. Legg Mason, Inc.*,
347 F. App'x 665 (2d Cir. 2009)................................................................................. 12

ii

*IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. The Royal Bank of Scotland Grp., PLC*,
783 F.3d 383 (2d Cir. 2015) ........................................................................... 7

*In re Avon Sec. Litig.*,
2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) ....................................................... 13

*In re Bear Sterns Mortg. Pass-Through Certificates Litig.*,
851 F.Supp. 2d 746 ............................................................................... 8, 9

*In re BofI Holding, Inc. Sec. Litig.*,
2020 WL 5951150 (9th Cir. Oct. 8, 2020) ........................................................ 22

*In re Cognizant Technology Solutions Corp. Sec. Litig.*,
2020 WL 3026564 (D.N.J. June 5, 2020) ......................................................... 19

*In re Dynex Capital, Inc. Se*c. Litig.,
2006 WL 314524 (S.D.N.Y. Feb. 10, 2006)*,*
*vacated on other grounds sub nom.*
*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital In*c.,
531 F.3d 190 (2d Cir. 2008) ...................................................................... 18

*In re Gentiva Sec. Litig.*,
971 F. Supp. 2d 305 (E.D.N.Y. 2013) ............................................................ 24

*In re Grupo Televisa Sec. Litig.*,
368 F. Supp. 3d 711 (S.D.N.Y. 2019) ............................................................ 14

*In re Henry Schein, Inc. Secs. Litig.*,
2019 WL 8638851 (E.D.N.Y. Sept. 27, 2019) .......................................... 11, 19, 22

*In re Hi*-Crush *Partners L.P. Sec. Litig.,*
2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ...................................................... 22

*In re Initial Pub. Offering Sec. Litig.*,
241 F. Supp. 2d 281 ............................................................................... 25

*In re Initial Pub. Offering Sec. Litig.*,
544 F. Supp. 2d 277 (S.D.N.Y. 2008) ............................................................ 23

*In re Inv. Tech. Grp., Inc. Sec. Litig.,*
2018 WL 1449206 (S.D.N.Y. Mar. 23, 2018) ..................................................... 25

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
218 F.R.D. 76 (S.D.N.Y. 2003) ................................................................... 24

*In re Mylan N.V. Sec. Litig.*,
379 F.Supp. 3d 198 (S.D.N.Y. 2019) ............................................................... 8

iii

*In re Netshoes Sec. Litig. v. XXX*,
 126 N.Y.S.3d 856 (N.Y. Sup. Ct. 2020) ................................................................. 24

*In re Rockwell Med., Inc., Sec. Litig.*,
 2018 WL 1725553 (S.D.N.Y. Mar. 30, 2018) ......................................................... 21

*In re Sanofi Sec. Litig.*,
 155 F. Supp. 3d 386 (S.D.N.Y. 2016) ..................................................................... 21

*In re Vale S.A. Sec. Litig.*,
 2017 WL 1102666 (S.D.N.Y. Mar. 23, 2017) ......................................................... 24

*In re Vivendi, S.A. Sec. Litig.*,
 838 F.3d 223 (2d Cir. 2016) ................................................................................... 14

*Ind. Pub. Ret Sys. v. SAIC, Inc.*,
 818 F.3d 85 (2d Cir. 2016) ..................................................................................... 20

*Kalnit v. Eichler*,
 264 F.3d 131 (2d Cir. 2001) ................................................................................... 16

*Kleinman v. Elan Corp*., PLC,
 706 F.3d 145 (2d Cir. 2013) ............................................................................ 11, 12

*Lawrence v. Town of Brookhaven Dep't of Hous., Cmty. Dev. & Intergov. Affairs*,
 2007 WL 4591845 (E.D.N.Y. Dec. 26, 2007) .......................................................... 6

*Loreley Fin. (Jersey) No. 3, Ltd. v. Wells Fargo Sec., LLC*,
 797 F.3d 160 (2d Cir. 2015) ................................................................................... 25

*Matrixx Initiatives, Inc., v. Siracusano*,
 563 U.S. 27 (2011) .................................................................................................... 7

*Menaldi v. Oc-Ziff Cap. Mgmt. Grp. LLC*,
 164 F. Supp. 3d 568 (S.D.N.Y. 2016) ..................................................................... 14

*Metz v. U.S. Life Ins. Co. in the City of New York*,
 662 F.3d 600 (2d Cir. 2011) ..................................................................................... 6

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
 761 F.3d 245 (2d Cir. 2014) ................................................................................... 14

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
 455 F. App'x 10 (2d Cir. 2011) ............................................................................... 21

*Novak v. Kasaks*,
 216 F.3d 300 (2d Cir. 2000) ................................................................................... 15

iv

*Omnicare Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015) ................................................................................................ 12

*Pa. Pub. Sch. Employees' Ret. Sys. v. Bank of Am. Corp.*,
  874 F. Supp. 2d 341 (S.D.N.Y. 2012) ..................................................................... 19

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) ...................................................................................... 7

*RSM Prod. Corp. v. Fridman*,
  643 F. Supp. 2d 382 (S.D.N.Y. 2009), *aff'd*, 387 F. App'x 72 (2d Cir. 2010) .......... 24

*Schiro v. Cemex*,
  396 F. Supp. 3d 283 (S.D.N.Y. 2019) ...................................................................... 18

*SEC v. Cohmad Sec. Corp.*,
  2010 WL 363844 (S.D.N.Y. Feb. 2, 2010) ............................................................... 18

*Sfiraila v. Deutche Bank Aktiengesellschaft*,
  729 F. App'x 55 (2d Cir. 2018) ................................................................................ 19

*Skiada v. Acer Therapeutics, Inc.*,
  2020 WL 3268495 (S.D.N.Y. June 16, 2020), *reconsideration denied*,
  2020 WL 4208442 (S.D.N.Y. July 21, 2020 ............................................................ 16

*Slayton v. Am. Exp. Co.*,
  604 F.3d 758 (2d Cir. 2010) .................................................................................... 20

*Speakes v. Taro Pharm. Indus., Ltd.*,
  2018 WL 4572987 (S.D.N.Y. Sept. 24, 2018) .......................................................... 24

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,
  250 F.3d 87 (2d Cir. 2001) ...................................................................................... 25

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital In*c.,
  531 F.3d 190 (2d Cir. 2008) .................................................................................... 19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ................................................................................................. 15

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976) ................................................................................................... 7

*Van Dongen v. CNinsure Inc.*,
  951 F. Supp. 2d 457 (S.D.N.Y. 2013) ...................................................................... 16

**Statutes**

15 U.S.C. § 78u-4(b)(1)(B) ............................................................................................... 7

**Rules**

Fed. R. Civ. P. 15(a) ...................................................................................................... 25

Lead Plaintiff Nicholas S. Panitza ("Lead Plaintiff"), through his counsel, respectfully submits this opposition to the motion to dismiss filed by Defendants Fiat Chrysler Automobiles N.V. ("FCA" or the "Company"), Roland Iseli and Alessandro Baldi, Co-Executors of the Estate for former FCA CEO, Sergio Marchionne ("Marchionne"), current FCA CEO Michael Manley ("Manley"), and current FCA CFO Richard Palmer (collectively, "Defendants").[1]

## INTRODUCTION

This is a securities fraud action about how Defendants purposely misled investors as to the effects of a multi-year-long bribery scheme that has implicated FCA's former CEO, Sergio Marchionne, and resulted in the convictions of 15 former senior FCA employees and UAW officials. FCA and the UAW have been named as co-conspirators in the scheme and FCA has been negotiating with the Department of Justice ("DOJ") with respect to a settlement that will reportedly include FCA's admittance of guilt.

Beginning in June 2017, investors started to learn about some aspects of FCA's scheme when the DOJ began filing indictments against FCA employees and UAW officials. The DOJ concluded that FCA made illegal payments to UAW officials for the purpose of obtaining labor concessions. In an effort to distance FCA from the scheme and conceal the fact that FCA had obtained labor concessions from the UAW, Defendants issued statements throughout the Class Period claiming that FCA was a victim of the scheme and denying that the bribes had any effect on the CBA process. Defendants also misled investors by touting the labor terms the Company negotiated with the UAW without disclosing that those terms were obtained through the illegal bribery scheme.

---

[1] Unless otherwise stated, all "¶__" references are to Lead Plaintiff's Amended Class Action Complaint (the "Complaint") (Dkt. No. 29). References to the memorandum of law in support of Defendants' motion to dismiss are cited as "MTD__."

On November 20, 2019, investors learned the truth when General Motors, Inc. ("GM") filed a racketeering complaint against FCA, detailing labor concessions FCA obtained from the UAW in exchange for the bribes – concessions GM requested but was denied.  In addition, GM alleged that Marchionne not only knew about the scheme, but orchestrated it in an attempt to force a merger of FCA and GM.  As a result of the news, FCA's stock price declined $0.58 per share, or 3.72%, wiping out nearly $1 billion in market capitalization.  Reporting on the news, a Wolfe Research analyst stated that without FCA's unfair labor cost advantages, it expected FCA's labor costs to increase between $500 million and $700 million.

Defendants seek to dismiss the Complaint arguing that it does not plead falsity, scienter, and loss causation.  But each argument fails. In their effort to avoid answering to the Company's shareholders, Defendants resort to improperly recasting Plaintiff's claims and ignoring relevant facts set forth in the GM Complaint and uncovered by the DOJ's investigation.  In so doing, Defendants urge the Court to ignore the cogent and compelling inferences that flow from the numerous facts pled in the Complaint.  Accordingly, Defendants' motion should be denied.

## STATEMENT OF FACTS

### A.    FCA and the Bribery Scheme Designed to Influence the 2015 CBA

In 2008, the U.S. auto industry was on the verge of collapse.  ¶ 54.  Marchionne saw the crisis as an opportunity for European-based Fiat to enter the U.S. marketplace by acquiring Chrysler. ¶ 57.  Recognizing the influence the United Auto Workers Union ("UAW") had over the U.S. auto industry, Marchionne befriended UAW Vice President, General Holiefield ("Holiefield") to help support his bid to acquire Chrysler.  *Id.*  In 2009, with UAW's support,

FCA acquired an ownership stake in Chrysler. ¶¶ 58-62. By October 2014, Fiat fully owned Chrysler, and the merged company became FCA with Marchionne as its CEO.[2] ¶ 65.

As their primary source of labor, the UAW holds enormous leverage over U.S. auto manufacturers. ¶ 4. Every four years, the UAW negotiates new collective bargaining agreements ("CBAs") with the "Big Three" U.S. automakers to define each company's labor costs. ¶ 79. The UAW typically selects the best performing automaker to negotiate first (the "target") to secure the most favorable terms for its members by pointing to the target's high profit margins. ¶ 86. These favorable terms are then used as a model for the other companies and are imposed on the succeeding agreements through pattern bargaining. ¶¶ 85-86.

Starting in July 2009, FCA began implementing a scheme designed to bribe UAW officials to obtain concessions in connection with the CBA process. ¶ 66. These payments were made by FCA senior executives, including Alphons Iacobelli ("Iacobelli"), Michael Brown ("Brown"), and Jerome Durden ("Durden"), and were primarily funneled through the UAW-Chrysler joint training center (the "NTC"). *Id*. Iacobelli and Durden testified that the bribes were made in an effort to "obtain benefits, concessions, and advantages for FCA in the negotiation, implementation, and administration of the collective bargaining agreements between FCA and the UAW." ¶ 10. Brown similarly admitted the purpose of the bribes was to "grease the skids" with UAW officials. ¶ 67.

To minimize detection of the scheme, FCA directed the NTC to funnel money to various UAW officials through false business fronts and sham charities. ¶¶ 68-78, 167. FCA also facilitated illegal payments using credit cards and bank accounts linked to the NTC. ¶¶ 68, 73, 75. FCA also funneled millions of dollars directly to the UAW through payments known as

---

[2] FCA became the parent company to FCA US LLC, the Company's U.S. based operations. ¶ 43.

"chargebacks," which reimbursed the UAW for salaries and benefits for employees that worked at the NTC. ¶¶ 76-78. Marchionne himself gave Holiefield a custom-made Terra Cielo Mare watch worth thousands of dollars, in violation of the federal labor laws. ¶ 71.

After initiating the bribery scheme, FCA immediately began making demands on the UAW by way of concessions. ¶ 88. For example, in 2009, Holiefield agreed to modify the 2007 CBA (the "2009 Modification") by adopting World Class Manufacturing ("WCM"). ¶ 92. WCM was a manufacturing system that significantly benefitted FCA, because it broke down the hierarchy within the union with respect to which workers could perform which roles. ¶ 90. Specifically, it enabled FCA to use cheaper Tier-2 workers in higher-wage Tier-1 roles, reducing FCA's labor costs. ¶¶ 91, 97. The UAW continued to support FCA's WCM program through the 2011 and 2015 CBAs, despite refusing to implement equivalent programs with the other Big Three automakers. ¶¶ 93-95, 235.

To maximize the benefits of WCM, FCA wanted to employ more temporary and Tier-2 workers, but under the 2007 CBA, FCA and GM were subject to a 20-25% cap on Tier-2 workers. ¶¶ 98-99. Holiefield agreed to eliminate the cap as part of the 2009 Modification, with the understanding that a 25% cap would be reinstituted as part of the 2015 CBA. ¶ 100. However, FCA allegedly received assurance in advance of the 2015 CBA negotiations that the UAW would not insist on reinstating the Tier-2 cap. ¶ 102. Free to exceed the cap without penalty, by 2015, Tier-2 workers made up approximately 40% of FCA's UAW workforce, more than twice its competitors, giving FCA a significant labor cost advantage – something Marchionne admitted was "instrumental" to FCA's profitability. ¶¶ 103-104.

The 2015 CBA negotiations began in July 2015. ¶ 105. Then-UAW President Williams, who was later implicated in FCA's bribery scheme, unexpectedly named FCA as the target

4

company.  ¶ 107.  Industry analysts were shocked, as FCA was deemed the least likely to be the lead because it had the lowest profit margins and most Tier-2 employees, which would make it more difficult for the UAW to secure higher pay and benefits.  ¶ 108.  Marchionne led the negotiations for FCA.  ¶ 83.  The lead negotiator for the UAW was then-Vice President Jewell, assisted by other UAW officials – each of whom had accepted bribes from FCA.  ¶¶ 109-10. Marchionne and Jewell reached an agreement in just 48 hours. ¶ 111.  The deal favored FCA so much that, for the first time in 30 years, the UAW's membership rejected it.  ¶ 113. A later-ratified agreement still favored FCA, as it did not contain a cap on Tier-2 workers.  ¶¶ 114-15.

### B.        The Department of Justice Exposes FCA's Bribery Scheme

In September 2013, the Department of Justice ("DOJ") began investigating FCA. ¶ 134. The DOJ discovered that Iacobelli was stealing NTC funds for himself, in addition to bribing UAW officials.   ¶ 135.   After the DOJ notified FCA in June 2015, FCA conducted an investigation and fired Iacobelli and Durden for "wrongdoing."  ¶ 264.  FCA did not publicly report the firings – which would have derailed the CBA negotiations – and instead falsely reported that Iacobelli had retired.  ¶ 83, n.36.

In June 2017, the DOJ began charging FCA and UAW officials for their roles in the bribery scheme.  ¶ 136.  Since then, details of the scheme have dribbled out as the DOJ secured multiple convictions related to the scheme.   ¶ 137.   Marchionne has been implicated in the scheme and was questioned by the DOJ in 2016.  ¶¶ 136-140. Marchionne passed away before the DOJ brought any charges.  ¶ 140.  FCA has been named as a co-conspirator in the scheme, and the DOJ's investigation is still ongoing.  ¶ 197.

**C.**      **Defendants' False and Misleading Statements About FCA's Bribery Scheme**

After the market began to learn of some aspects of FCA's scheme, Defendants issued a series of false and misleading statements designed to distance FCA from the scheme and create the impression that it did not benefit from the scheme. ¶ 199. For example, Defendants falsely represented that FCA was a "victim" of the scheme and that the scheme was perpetrated by rogue employees, and assured the market that the bribes did not impact the 2015 CBA negotiations. *Id.* Defendants repeated these statements throughout the Class Period. ¶¶ 201-233.

**D.**      **The Market Learns the Truth About the Extent of FCA's Bribery Scheme**

On November 20, 2019, GM filed a racketeering complaint against FCA (the "GM Complaint") revealing for the first time facts showing that FCA obtained labor concessions as a result of the scheme and that the scheme was not limited to the actions of a few rogue employees, but instead reached the highest levels of the Company, including Marchionne. ¶¶ 234-237. Following these revelations, on November 20, 2019, FCA's stock declined $0.58 per share, or 3.72%. ¶ 239.

**ARGUMENT**

**I.      LEGAL STANDARD**

On a Rule 12(b)(6) motion, the Court must "accept all factual allegations as true and draw all reasonable inference in favor of the plaintiff." *Metz v. U.S. Life Ins. Co. in the City of New York*, 662 F.3d 600, 602 (2d Cir. 2011). "[A] plaintiff is not required to prove her case; she must simply establish that the allegations in the [c]omplaint are sufficient to render her claims plausible." *Lawrence v. Town of Brookhaven Dep't of Hous., Cmty. Dev. & Intergov. Affairs*, 2007 WL 4591845, at *13 (E.D.N.Y. Dec. 26, 2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

6

545 (2007) (a complaint need only contain "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" supporting the claims). To state a claim under §10(b) of the Exchange Act, Plaintiff must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Matrixx Initiatives, Inc., v. Siracusano*, 563 U.S. 27, 37-38 (2011). Here, Defendants contest falsity, scienter, and loss causation. Defendants' challenges fail.

## II. PLAINTIFF ADEQUATELY PLEADS MISREPRESENTATIONS AND OMISSIONS BY DEFENDANTS

The Complaint alleges numerous materially false and misleading statements and omissions by the Defendants. *See* ¶¶ 202-33. A complaint adequately alleges falsity under the PSLRA by "specify[ing] each statement alleged to have been misleading, the reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004); 15 U.S.C. § 78u-4(b)(1)(B).

"A false statement or omission is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding how to act" or that it "changed the total mix of information available."[3] In determining whether a statement or omission is materially misleading, the Court should draw all reasonable inferences in favor of the plaintiffs and should only dismiss a complaint if the alleged misstatements or omissions are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."[4]

---

[3] *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. The Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 389-90 (2d Cir. 2015).

[4] *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976).

A.    **Defendants' Misleading Statements Concerning FCA's Role in the Bribery Scheme and the Effects of the Scheme**

Throughout the Class Period, Defendants falsely represented that the bribery scheme did not impact the CBA process, and that FCA was a victim of the scheme. ¶¶ 213, 222, 232. These statements were false and misleading. As a result of the conspiracy, FCA received concessions and favors from the UAW – concessions that they refused to give to GM, including: (1) the UAW's continued agreement to implement WCM (¶ 235); (2) the UAW's agreement that the 25% cap on Tier-2 workers would not be reinstated as part of the 2015 CBA (¶¶ 102, 235); (3) the UAW's agreement not to hold FCA to contractual limits regarding the number of temporary workers the Company could hire (¶ 235); (4) the UAW's agreement to allow FCA to exercise control over the UAW with respect to pursuing labor grievances and health and safety issues (*id.*); (5) the UAW's agreement to a side letter with FCA in 2014 that allowed FCA to use a prescription drug formulary that would benefit FCA (*id.*); (6) the UAW's assistance in trying to persuade GM to agree to a merger with FCA at a June 18, 2015 meeting, where former UAW President Williams (who has since been indicted) gave a presentation to GM CEO Mary Berra, GM President Daniel Ammann, GM CFO Chuck Stevens, and GM's lead labor negotiator Cathy Clegg that was "scripted" by Iacobelli (*id*); and (7) UAW's section of FCA as the target company for the 2015 CBA. *Id*.

These facts are sufficient to plead that Defendants' statements were false and misleading. Here, in addition to detailing the labor concessions FCA received, the GM Complaint pleads specific facts known to GM. ¶ 235. Courts have routinely found that "plaintiffs may base factual allegations on complaints from other proceedings." *In re Mylan N.V. Sec. Litig.*, 379 F.Supp. 3d 198, 214 (S.D.N.Y. 2019) (holding "neither Circuit precedent nor logic supports … an absolute rule against [relying on other complaints]."); *see also In re Bear Sterns Mortg. Pass-Through*

8

*Certificates Litig.*, 851 F. Supp. 2d 746, 768 n.24 (S.D.N.Y. 2012) (rejecting defendants' argument that sections of plaintiffs' complaint relying on other litigants' complaints should be "disregarded or stricken.").[5]

The facts alleged in the GM Complaint detailing concessions that FCA received from the UAW as a result of the bribery scheme show that FCA was not a victim of the scheme, and they are corroborated by the facts revealed through the DOJ's investigation. For example, the DOJ found that FCA's bribery scheme was not limited to Iacobelli and Durden, but rather, included "other unnamed FCA executives" (¶ 144) including Marchionne, who was referred to as "FCA-1," whose knowledge of the scheme is evidenced in an internal FCA email suggesting that Marchionne was aware that senior UAW officials were improperly using NTC credit cards (¶ 260), and who participated in the scheme by giving Holiefield an illegal gift. ¶ 139. Indeed, Iacobelli, who reported directly to Marchionne, admitted that he joined an ongoing conspiracy involving FCA and FCA executives agreeing to pay bribes to UAW officials.[6] ¶ 143.

Defendants' contention that the bribery scheme did not affect the CBA process because Iacobelli and Durden left FCA before the 2015 CBA was negotiated (MTD at 20) ignores that: (1) the DOJ found that the scheme continued *after* Iacobelli was fired and (2) the purpose of the

---

[5] The district court's dismissal of the GM Complaint does not negate Plaintiff's claims, as the court opined that the exact labor terms that Plaintiff claims were the product of bribery "were concessions that would never be available from an uncorrupted union." *General Motors LLC v. FCA US LLC*, 2020 WL 3833058, at *9 (E.D. Mich. July 8, 2020). Instead, the court dismissed the action for the failure to plead that it was GM, rather than the UAW, that was primarily harmed due to FCA's alleged racketeering activity under § 1962. *Id.* at *9-11. The dismissal is currently on appeal.

[6] While Defendants summarily dismiss Marchionne's illegal gift to Holiefield as a mere promotional item, Marchionne (and the DOJ) thought otherwise, as Marchionne wrote a handwritten note to Holiefield in attempt to conceal its value (¶ 71), the DOJ identified the illegal gift in filings detailing the bribery scheme (*See* Declaration of Thomas C. White ("White Decl.") (ECF No. 43). Ex. 20 at 8), and questioned Marchionne about the gift at his July 2016 interview. ¶ 140.

bribes was to obtain *future* concessions from the UAW.[7]  Iacobelli and Durden both testified that the bribes were made in an effort to *"obtain benefits, concessions, and advantages for FCA in the negotiation, implementation, and administration of the collective bargaining agreements between FCA and the UAW."*[8]  ¶ 10.  Further, Iacobelli and Durden left FCA only one month before the 2015 CBA negotiations began and Marchionne (who has been implicated in the scheme) led the negotiations with the *same* UAW officials who accepted the bribes.  In sum, the Complaint alleges facts showing that:

- FCA paid bribes to UAW officials for the purpose of gaining concessions (¶¶ 10, 152);
- UAW officials accepted millions of dollars in bribes from FCA (¶¶ 66-78);
- The bribes were orchestrated by Iacobelli, FCA's VP of labor relations for the UAW, who reported directly to Marchionne and testified that he joined an ongoing conspiracy to bribe UAW officials (¶¶ 141, 143);
- The DOJ implicated Marchionne in the scheme and identified him as "FCA-1" (¶ 260);
- An internal FCA email between Iacobelli and Brown evidences Marchionne's knowledge of the bribery scheme (¶ 260);
- Marchionne gave Holiefield an illegal gift and lied to federal investigators when questioned about it (¶¶ 139-40);
- Holiefield (who received over $ 1 million in illegal payments from FCA) agreed to implement FCA's WCM even though he admitted it did not benefit UAW members (¶¶ 90, 163-175);
- Iacobelli was fired before the 2015 CBA negotiations, and Marchionne took over (¶ 83);
- The bribery scheme continued after Iacobelli was fired. *See* White Decl. Ex. 56 at 6-8.
- Former UAW President Williams, who accepted bribes from FCA, chose FCA as the target for the 2015 CBA process, to the surprise of industry analysts (¶¶ 191-92);
- Former UAW Vice President Jewell, who pled guilty to accepting bribes from FCA, was responsible for negotiating the 2015 CBA with FCA (¶¶ 157-61);
- The first CBA negotiated between FCA and the UAW in 2015 was completed in 48 hours, and was so favorable to FCA that it was rejected by membership (¶¶ 111, 113);[9]

---

[7] *See* White Decl. Ex. 56 at 6-8; ¶ 78.

[8] *See* White Decl. Ex. 20 at 7-11; White Decl. Ex. 2 at 4.

[9] The mere fact that FCA made some concessions after the first CBA was rejected does not mean the bribery scheme did not affect the CBA process. MTD at 20.  That the initial CBA was completed so quickly, and summarily rejected, evidences the one-sided nature of the agreement. Further, Defendants'

10

- As a result of FCA's 2015 CBA, which was used for pattern bargaining, GM was forced to pay over $1 billion more than what was tentatively agreed to between GM and the UAW prior to FCA being chosen as the target company (¶ 235); and

- GM has disclosed facts showing that it was denied various labor concessions that the UAW granted to FCA (¶ 235).

Based on these facts, Plaintiff has plausibly alleged that the Defendants' statements that FCA was a victim of the scheme, that the scheme was limited to rogue employees and that the scheme did not affect the CBA process were false and misleading. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

### 1.  Defendants' "Victim" Statements Were Material and Are Actionable

Defendants' assertion that their "victim" statements referred only to the fact that Iacobelli and Durden stole from the NTC for their personal benefit (MTD at 21) is not supported by the statements themselves, which show that Defendants were commenting on the conspiracy between FCA and the UAW. *See* ¶ 219.  Nowhere in Defendants' February 20, 2018 statement do they mention that Iacobelli and Durden stole from NTC.  *Id.*

Even if Defendants intended to speak only to Iacobelli's and Durden's personal use of NTC funds, their statements were still misleading. MTD at 21.  "True statements can become, 'through their context and manner of presentation, devices which misled investors.'" *In re Henry Schein, Inc. Secs. Litig.*, 2019 WL 8638851, *1, 11 (E.D.N.Y. Sept. 27, 2019) (quoting *Kleinman v. Elan Corp.*, PLC 706 F.3d 145, 153 (2d Cir. 2013). "Even a statement which is literally true, if susceptible to quite another interpretation by the reasonable investor[,] may properly be

---

insistence that the 2015 CBA was the "richest ever negotiated" is not credible, as the quote is from then-President Dennis Williams, who accepted bribes from FCA and has since pled guilty.  ¶¶ 191-194.

11

considered a material misrepresentation." *Kleinman*, 706 F.3d at 153. Here, a reasonable investor would have understood Defendants' statements as referring to the bribery scheme.

Further, Defendants' assertion that investors could not have been misled by Defendants' "victim" statements because the bribery scheme was already public mischaracterizes Plaintiff's claims. MTD at 22. Plaintiff is not claiming that Defendants' "victim" statements were misleading because they misled investors as to the *existence of the bribery scheme*. Plaintiff alleges that Defendants' statements misled the market as to the effects of the scheme on the CBA process. ¶¶ 211, 220, 223. That the existence of the NTC scandal was "*already public*" (MTD at 22) in no way alerted investors that FCA obtained concessions as a result of the scheme, especially since Defendants affirmatively denied that fact.[10] ¶¶ 213, 222, 232.

Finally, Defendants' February 20, 2018 statement, while phrased as an opinion, is actionable.[11] ¶ 219. As the Supreme Court noted in *Omnicare*, "those magic words ["we believe" or "we think"] can preface nearly any conclusion, and the resulting statements, as we have shown, remain perfectly capable of misleading investors." *Omnicare Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 193 (2015). As the Second Circuit explained, "*Omnicare* rejected the proposition that there can be no liability based on a statement of opinion unless the speaker disbelieved the opinion at the time it was made." *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020). "[W]hen a statement of opinion implies facts or the absence of contrary facts, and the speaker knows or *reasonably should know* of different material facts that were omitted, liability under Rule 10b-5 may follow." *Id*.

---

[10] *Garber v. Legg Mason, Inc.*, 347 F. App'x. 665 (2d Cir. 2009) is distinguishable. Unlike here, the information the plaintiffs claimed was omitted – that a key employee would be leaving the company – was reported in the company's SEC filings and various newspaper articles.

[11] Defendants' June 26, 2017 and August 27, 2018 statements are clearly not "opinion statements." *See* ¶ 210 ("FCA US and the UAW were the victims of malfeasance . . ."); ¶ 222 ("FCA US firmly states that it was a victim of illegal conduct . . .").

Here, Marchionne (who served as CEO of both FCA and FCA US) knew that the bribes bought FCA concessions because he was implicated in the scheme and negotiated the CBA.[12] ¶ 83.  Accordingly, Marchionne knew or *reasonably should have known* of material facts that were omitted from FCA's statement that conflicted with the impression the statement gave to investors – that FCA did not benefit from the conspiracy.  *See In re Avon Sec. Litig.*, 2019 WL 6115349, at *17 (S.D.N.Y. Nov. 18, 2019) (the core inquiry is whether the omitted facts "conflict with what a reasonable investor would take from the statement itself"). Because Defendants' statements created the false and misleading impression that FCA did not benefit from the scheme, the statement was material and actionable.[13] ¶¶ 211, 214, 220, 223, 233.

### B.    Defendants Had A Duty to Disclose that the Labor Concessions Obtained by FCA Were the Product of the Bribery Scheme

Asserting that FCA had no duty to disclose *the existence of the bribery scheme*, Defendants again mischaracterize Plaintiff's allegations.  *See* MTD at 18.  As an initial matter, the fact that Plaintiff alleges needed to be disclosed is that FCA received concessions from the UAW as a result of the bribery scheme – not the existence of the scheme.  *See, e.g.*, ¶ 204. Defendants' mischaracterization is not by accident.  By framing Plaintiff's claim as "failing to disclose uncharged illegal conduct," Defendants wrongly urge the Court to dismiss Plaintiff's claims based on the generally accepted view that "companies do not have a duty to disclose uncharged, unadjudicated wrongdoing."  MTD at 19.  However, this standard is inapplicable to the majority of Plaintiff's alleged omissions, which occurred *after* FCA employees had been charged in connection with the bribery scheme.  *See* ¶¶ 216, 217, 219, 225, 226.  With respect to

---

[12] *See* Declaration of William B. Monahan ("Monahan Decl.") (ECF No. 33), Exhibit R.

[13] *See Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988) ("A misstatement is material if there is 'a substantial likelihood' that the misstatement 'would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available).

these statements, Plaintiff must only show that the defendant "is subject to a duty to disclose the omitted facts" or "that the defendants spoke in half-truths," which are "statements that are misleading … by virtue of what they omit to disclose." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239-40 (2d Cir. 2016). "[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014). Here, Defendants touted that the Company obtained a "specific commitment" from the UAW to implement WCM and specifically described relevant labor terms in the 2015 CBA relating to worker classification. ¶¶ 216-17, 225-26. Once Defendants raised these issues, they had a duty to disclose that the Company's favorable concessions, including the UAW's agreement to support WCM and the suspension of the cap on Tier-2 hiring, were the product of bribery. *See In re Grupo Televisa Sec. Litig.*, 368 F. Supp. 3d 711, 721 (S.D.N.Y. 2019) (once defendants told the market that its World Cup broadcast rights "[were] extremely relevant" they had a duty to disclose the rights were obtained through bribery).

Defendants' statements issued before FCA employees were charged (¶¶ 202-203, 206-207) are similarly actionable, because a duty to disclose uncharged illegal conduct arises when, like here,  Defendants put the reason for their success into issue. *See Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 581 (S.D.N.Y. 2016) (a duty to disclose arises "when a corporation puts the reason for its success at issue, but fails to disclose that a material source of its success is the use of improper or illegal business practices"). Here, Defendants touted the UAW's "specific commitment" to implement WCM, and that FCA "was the only OEM [Original Equipment Manufacturer]" to deploy WCM. ¶¶ 203, 207. Further, Defendants identified specific terms that it was able to negotiate as part of the 2015 CBA that related to worker classification. ¶¶ 202, 206. These statements informed investors of specific CBA terms that

reduced FCA's U.S. labor costs, but failed to disclose that they were the product of bribery.  *See DoubleLine Capital L.P. v. Odebrecht Fin., Ltd.*, 323 F. Supp 3d 393 (S.D.N.Y. 2018) (finding a duty to disclose bribery underlying a bid process where defendants made statements that their bid success rate was high and "reflects our selectivity").[14]

## III.   THE COMPLAINT PLEADS A STRONG INFERENCE OF SCIENTER

The Complaint states "with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind" of intent "to deceive, manipulate, or defraud" (*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007)) through allegations showing that Marchionne had a motive to commit fraud, and through circumstantial evidence of Defendants' conscious misbehavior or recklessness.  *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000). A complaint states a claim based on recklessness when it "specifically allege[s] defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Id.* at 308.

On a motion to dismiss, a court must assess whether a reasonable person would "deem the inference of scienter at least as strong as any opposing inference[.]" *Tellabs*, 551 U.S. at 326. "When the competing inferences rest in equipoise, the tie goes to the plaintiff."  *Akerman v. Arotech Corp.*, 608 F. Supp. 2d 372, 382 (E.D.N.Y. 2009).  "[T]he court's job is not to scrutinize each allegation in isolation." *Tellabs*, 551 U.S. at 326.  The inference need not be irrefutable or a "smoking-gun." *Id.* at 330.   The proper inquiry is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Id.* at 322-23.

---

[14] *Das v. Rio Tinto*, 332 F. Supp. 3d 786 (S.D.N.Y. 2018) is distinguishable.  MTD at 19.  Unlike here, in *Rio Tinto*, defendants did not put their success (related to bribes) into issue. *Id*. at 808.

### A.      Marchionne Had Motive and Opportunity to Commit Fraud

The Complaint pleads specific facts showing that Marchionne had a concrete personal motive to obtain concessions through bribery – to force a merger with GM and fulfill his desire to be the CEO of the largest automaker in the world (¶ 251); and, when that failed, to conceal his role in the bribery scheme and its effects on the 2015 CBA to avoid criminal liability.[15] ¶ 263. A finding of motive is not limited to situations where a defendant sells stock or profits personally from the alleged wrongdoing.  Instead, the relevant question is whether the motive alleged is one that is "generally possessed by most corporate directors." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001); *see also Skiada v. Acer Therapeutics, Inc.*, 2020 WL 3268495 at *1, *11 (S.D.N.Y. June 16, 2020) (allegations that the defendants needed to raise money to avoid bankruptcy were sufficient to establish motive because "[a]n executive at a company that will go belly up if it fails to fundraise has different incentives from a generic corporate insider"). Avoiding criminal charges in an ongoing DOJ investigation is not a motive that is generally possessed by most corporate directors.[16] During the Class Period, the DOJ was actively investigating FCA employees (including Marchionne). ¶¶ 138-156.  Marchionne's motivation to not be charged in the scheme is neither conclusory nor speculative.

### B.      Marchionne Acted with Knowledge or Recklessness

The Complaint pleads a strong inference that Marchionne knew or recklessly disregarded that, contrary to Defendants' Class Period statements, FCA was not "a victim" of the bribery scheme and that FCA obtained labor concessions as a result of the bribery scheme.  *See* §II.A

---

[15] Marchionne, as FCA's CEO, clearly had the opportunity to commit fraud. *See Van Dongen v. CNinsure Inc.*, 951 F. Supp.2d 457, 468 (S.D.N.Y. 2013) (opportunity assumed for corporate officers).

[16] Further, *Kalnit* did not hold that scienter could never be based on a motive to avoid personal liability; only that because there was no threat of litigation against the defendant in that case, the allegation was conclusory or speculative.  264 F.3d at 142 ("there is no reason to expect that Comcast would sue MediaOne's directors individual for breach").

*supra* at 8. Plaintiff has sufficiently alleged recklessness with respect to Marchionne (1) through his involvement in the bribery scheme and (2) through his supervision of Iacobelli. *See Employees' Ret. Sys. of Gov. of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (circumstances comprising recklessness include allegations that a defendant "engaged in deliberately illegal behavior" or "knew facts or had access to information suggesting that their public statements were not accurate"). Marchionne's involvement in the scheme raises a strong inference of scienter: (1) he was directly involved in the Company's relationship with the UAW (¶ 57); (2) he personally provided a bribe to Holiefield by giving him a watch worth thousands of dollars, in violation of federal labor laws (¶ 71); (3) he was implicated in the scheme and questioned by the DOJ prior to his passing (¶¶ 140, 260); (4) he is referred to as "FCA-1" in the DOJ's investigation (¶ 138); (5) he is referred to in a February 2014 email from Brown to Iacobelli discussing the UAW's request for records on the use of NTC credit cards by Holiefield that suggests he knew of the scheme (¶ 260); he replaced Iacobelli in negotiating the 2015 CBA on behalf of FCA with the same UAW representatives who accepted FCA's bribes (¶¶ 83, 109-110); and he negotiated a CBA that was so unfavorable to the UAW that it was initially rejected by its membership (¶ 17). Further, Marchionne obtained concessions from the UAW – concessions that the UAW refused to give to GM. *See* §II.A *supra* at 8.[17]

Even if Marchionne had not been implicated in the scheme, the fact that Iacobelli answered only to Marchionne on all matters related to the UAW (¶ 83) supports the inference that Marchionne "knew facts or had access to information" that is sufficient to establish a strong

---

[17] Plaintiff's allegations that Marchionne participated in the bribery scheme do not rely solely on anonymous sources. MTD at 17-18. Plaintiff alleges Marchionne's knowledge based on, among other things, an internal FCA email (¶ 260), the DOJ's implication of Marchionne, and the DOJ's finding that he gave an illegal gift to Holiefield (¶ 139). Further, the 2018 press report cited by Defendants is not based entirely on anonymous sources. *See* ¶ 266, n 154. Taken together, these facts support a strong and compelling inference of scienter.

inference of scienter.  *See Blanford*, 794 F.3d at 306; *see also In re Dynex Capital, Inc., Sec. Litig.,* 2006 WL 314524, at *9 (S.D.N.Y. Feb. 10, 2006) (allegations that the individuals "directly supervised or knew of any identified individual(s) who were engaged in specific wrongdoing" can demonstrate scienter).  For example, between 2009 and 2014, Iacobelli funneled over $1 million in NTC funds to UAW officials for the purpose of gaining concessions for FCA in the CBA process.  ¶ 75. FCA was alerted to Iacobelli's and Durden's wrongdoing by the DOJ and conducted its own investigation, which led to Iacobelli's firing just one month prior to the 2015 CBA negotiations. ¶¶ 11, 135.  FCA covered up Iacobelli's firing, stating only that he retired (¶83 n.6), so as to not derail the CBA negotiations, and Marchionne replaced Iacobelli as FCA's lead negotiator.  ¶ 83.  Accordingly, it is implausible that Marchionne was not advised of the investigation's findings or why his direct report was terminated one month before the CBA negotiations began.  MTD at 15. Indeed, the inference that FCA's internal investigation confirmed the existence of a bribery scheme and its purpose, but was hidden to nevertheless obtain the desired concessions in the 2015 CBA, is at least as compelling as the non-culpable inference that FCA's internal investigation merely revealed internal corporate theft.[18]

When viewed collectively, these allegations support the strong inference that Marchionne knew of the scheme in which FCA paid millions of dollars in bribes to UAW officials for the purpose of gaining concessions in the CBA process, and knew that FCA obtained concessions from the UAW as a result of the bribes.  The competing innocent inference – that Marchionne did not know of the bribery scheme, and that the concessions that the UAW gave to FCA (but

---

[18] The facts here are distinguishable from *Schiro v. Cemex*, 396 F. Supp. 3d 283, 305 (S.D.N.Y. 2019), where the court declined to find scienter where plaintiffs did not allege sufficient detail regarding the bribery scheme and *SEC v. Cohmad Sec. Corp.*, 2010 WL 363844, at *5 (S.D.N.Y. Feb. 2, 2010), because unlike here, the SEC had failed to plead facts showing the defendant's awareness of the fraud.

that were denied to GM) had nothing to do with the millions of dollars in bribes that FCA paid the UAW for that very purpose – is not only not compelling, it is implausible.

### C.    Plaintiff Has Sufficiently Alleged Corporate Scienter

In addition to Marchionne's scienter, which can be imputed to FCA, Plaintiff has pled a strong inference of corporate scienter. "It is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190 (2008). One way a plaintiff can plead corporate scienter is by pleading facts sufficient to create a strong inference that the Company's statements "would have been approved by corporate officials sufficiently knowledgeable about the company to know those statements were misleading." *Schein*, 2019 WL 8638851, at *22; *see also Sfiraiala v.Deutsche Bank Aktiengesellschaft*, 729 F. App'x 55, 58 n. 1 (2d Cir. 2018); *Pa. Pub. Sch. Employees' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 363 (S.D.N.Y. 2012) (allegations of scienter, while not sufficient to allege scienter of senior executive defendants, taken together, raised a strong inference of scienter as to corporate defendant).

Judge Salas of the United States District Court for the District of New Jersey recently analyzed corporate scienter under Second Circuit law (as well as the law of the other Circuits that have addressed the issue) in *In re Cognizant Technology Solutions Corp. Sec. Litig.*, 2020 WL 3026564, at *1, *28 (D.N.J. June 5, 2020), and found that the plaintiffs in that case had alleged corporate scienter irrespective of whether they had alleged scienter on the part of the individual defendants. *Id*. at *28. *In re Cognizant* involved an undisclosed bribery scheme to obtain a permit to build a facility in one of India's "Special Economic Zones," which provided the company with lucrative labor and tax advantages. *Id* at *2. Judge Salas held that under the

19

"broad approach" followed by the Second Circuit, corporate scienter was established because of the breadth and duration of the bribery scheme, the importance of the permits to the company, and the alleged involvement of the president and other senior management. *Id.* at *33. Under the Second Circuit's approach, the allegations reflected "a scheme which plausibly extended beyond those named senior management in the SAC." *Id*. at *28. Similarly here, Plaintiff has alleged a multi-year-long bribery scheme involving labor concessions critical to FCA, the involvement of FCA's CEO, and the involvement of other named and unnamed senior FCA officials.[19] The DOJ's investigation also concluded that the illegal payments continued after Iacobelli left the Company, evidencing that others at the Company participated in the scheme.[20] Accordingly, the Complaint pleads facts establishing corporate scienter.

FCA's investigation resulting in the firing of Iacobelli does not negate the strong inference of scienter. MTD at 14-15. *See Ind. Pub. Ret Sys. v. SAIC, Inc.*, 818 F.3d 85, 88, 96-97 (2d Cir. 2016) (finding scienter where defendants continued to hide a kickback scheme after conducting an internal investigation). Indeed, an internal investigation only weakens an inference of scienter where the facts alleged do not support an inference that defendants were trying to hide anything from investors. *See Slayton v. Am. Exp. Co.*, 604 F.3d 758, 777 (2d Cir. 2010). While the investigation resulted in Iacobelli's firing, Defendants hid that fact for two years, claiming he had retired. ¶¶ 83 n.36, 210. Further, as stated above, the scheme continued after the investigation was conducted.[21]

*In re Sanofi* is distinguishable. MTD at 16. In *In re Sanofi*, the court declined to find a compelling inference of scienter "based on the unreported findings of an unreported internal

---

[19] *See* White Decl. Ex. 20 at 5-11.

[20] *See* White Decl. Ex. 56 at 6-8.

[21] *See* White Decl. Ex. 56 at 6-8.

investigation" where the plaintiffs had failed to allege any facts showing that the illegal bribes took place, that the investigation took place, or that the investigation uncovered fraudulent activity. *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 407 (S.D.N.Y. 2016). Here, there is no dispute that an investigation took place. ¶ 210. Further, while the court found it "unreasonable" in *In re Sanofi* to assume that Sanofi "was silently clutching the results of an investigation," it is not unreasonable here, where the nature of the fraud is such that the bribes that FCA paid were for *future* concessions from the UAW, and the scheme continued after the investigation concluded. *In re Sanofi,* 155 F. Supp. 3d. at 400. For the same reason, the fact that Iacobelli and Durden were terminated prior to the CBA negotiation process does not negate the strong inference of scienter.

### 1.    Plaintiff's Scienter Allegations Are Bolstered By Core Operations

"Under the core operations theory, if a plaintiff can plead that a defendant made false or misleading statements when contradictory facts of critical importance to the company either were apparent, or should have been apparent, an inference arises that high-level officers and directors had knowledge of those facts by virtue of their positions within the company." *In re Rockwell Med., Inc., Sec. Litig.*, 2018 WL 1725553, at *14 (S.D.N.Y. Mar. 30, 2018).[22]

FCA's core business is the manufacture of vehicles for the U.S. market. ¶ 271. Throughout the Class Period, FCA's NAFTA segment, which is driven by U.S. sales, generated close to or over 90% of the Company's EBIT. *Id.* Despite Defendants' claim to the contrary, 90% of FCA's EBIT unquestionably "constitute[s] nearly all" of FCA's Class Period business. *See* MTD at 14, n. 8. FCA's ability to negotiate favorable terms with the UAW is critical to

---

[22] The core operations doctrine remains a valid basis to support scienter in the Second Circuit. *See New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 n.3 (2d Cir. 2011) (The Second Circuit has "endorsed the idea behind the core operations doctrine as enhancing, if not independently supporting, an inference of scienter").

FCA's operations, because the UAW's labor costs make up a material amount of total vehicle cost. ¶ 272. Marchionne acted as lead negotiator for FCA during the 2015 CBA negotiations (¶ 83), and the Company disclosed CBA terms related to worker classification in FCA's 20-F filings. *See e.g.* ¶¶ 206-07, 216-17. Accordingly, these facts, when taken together, show that FCA's UAW labor costs were of critical importance to and materially impacted FCA's core business segment.[23]

## IV. THE COMPLAINT PLEADS LOSS CAUSATION

Pleading loss causation is not meant to impose a heavy burden on the plaintiff, as "the complaint must simply give Defendants 'some indication' of the actual loss suffered and of a plausible causal link between the loss and the alleged misrepresentations." *Dura Pharm. Inc. v. Broudo*, 544 U.S. 336, 347 (2005). Loss causation can be pled either by alleging "that the market reacted negatively to a corrective disclosure" or "the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232-33 (2d Cir. 2014). Here, Plaintiff has done both.

### A. The GM Complaint Was A Corrective Disclosure

A complaint containing new information can be a corrective disclosure.[24] The Ninth Circuit recently addressed this question in *In re BofI Holdings, Inc., Secs. Litig.*, 2020 WL 5951150, at *1 (9th Cir. Oct. 8, 2020), where the it rejected a categorical rule "that allegations in a lawsuit can never qualify as a corrective disclosure because they are just that – allegations." *Id.* at *7. The Ninth Circuit held that "shareholders did not have to establish that the allegations in

---

[23] *See In re Hi*-Crush *Partners L.P. Sec. Litig.,* 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013) (finding scienter under core operations where defendants had knowledge of a repudiation letter related to a contract that was a significant source of income").

[24] *See Schein,* 2019 WL 8638851, at *24 (FTC lawsuit that revealed communications between the defendant and co-conspirators revealed the defendant's role in the scheme and was a corrective disclosure).

[plaintiff's complaint] are in fact true" and "the relevant question for loss causation is whether the market reasonably *perceived* [plaintiff's] allegations as true and acted upon them accordingly." *Id.* at *7. Because BofI's stock price dropped after the filing of the whistleblower complaint, the plaintiffs had alleged facts suggesting that the market perceived the allegations as credible. *Id.*

*In re BofI* is entirely consistent with Second Circuit law which requires plaintiff to plausibly allege the disclosure of the fraud and a negative reaction by the market. *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d at 233, 235 (2d Cir. 2014) (reversing district court's dismissal of a securities fraud complaint where the plaintiffs alleged that the falsity of the defendants' statements were revealed through settlement agreements with the DOJ and SEC, and the market reacted to the news).[25] Plaintiff has sufficiently pled that the GM Complaint was a corrective disclosure by alleging that FCA's share price dropped after the market learned that FCA obtained concessions in the CBA process as a result of the bribery scheme. ¶ 234. The GM Complaint revealed previously unreported facts showing that FCA obtained concessions from the UAW that were denied to GM. ¶ 235; *See* §II.A *supra* at 8. The GM Complaint also revealed to the market that FCA's bribery scheme was sanctioned by Marchionne.[26] ¶ 237. These disclosures revealed that Defendants' prior statements, proclaiming that the bribery scheme had no impact on the CBA process and that FCA was a victim of the

---

[25] *See also In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 289 (S.D.N.Y. 2008) ("there is no requirement that the disclosure take a particular form or be of a particular quality").

[26] Defendants' claim that the market was aware of Marchionne's involvement in the scheme is rebutted by a BNP Paribas analyst report published the day after the GM Complaint was filed calling the revelation that Marchionne sanctioned the bribery scheme "both new and unprecedented." ¶ 238.

scheme, were false and misleading.  Upon learning the truth, the market reacted negatively, with shares falling 3.72%.[27]  ¶ 34.

While facts regarding the existence of the bribery scheme were public prior to the GM Complaint, the fact that FCA obtained concessions as a result of the scheme was not known. The GM Complaint alerted investors to new information for loss causation purposes.  *See In re Vale S.A. Sec. Litig.*, 2017 WL 1102666, at \*27 (S.D.N.Y. Mar. 23, 2017) (a disclosure revealing the potential *degree* of a defendant's liability is considered new information); *Speakes v. Taro Pharm. Indus., Ltd.*, 2018 WL 4572987, at \*11 (S.D.N.Y. Sept. 24, 2018) (the fact that the market was aware of investigations concerning possible price-fixing did not negate loss causation where later disclosures reported on the extent of the defendant's specific involvement and revealed new information); *Constr. Laborers Pension Trust for Southern Cal. v. CBS Corp.*, 433 F. Supp. 3d 515 (S.D.N.Y. 2020) (information revealed to the market was new even though an analyst had suggested the "new" information was a possibility prior to the disclosure).

**B.      Plaintiff Has Alleged a Materialization of the Risk**

The Complaint also pleads the materialization-of-the-risk theory of loss causation, in which "a plaintiff need only plead … 'that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement.'"  *City of Roseville Employees' Retirement System v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 422 (S.D.N.Y. 2011).

---

[27] Defendants' cases are not on point. *In re Gentiva* addressed materiality in the context of scienter and, in fact, held that the plaintiff had adequately alleged loss causation. *In re Gentiva Sec. Litig.*, 971 F. Supp. 2d 305, 316,322 (E.D.N.Y. 2013). Neither *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009), *aff'd*, 387 F. App'x 72 (2d Cir. 2010) (MTD at 5) or *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.* 218 F.R.D. 76, 79 (S.D.N.Y. 2003) (MTD at 24) addressed whether a complaint was a corrective disclosure.  Further, the holding in *In re Merrill Lynch* was recently rejected in *In re Netshoes Sec. Litig. v. XXX*, 126 N.Y.S.3d 856, 866 (N.Y. Sup. Ct. 2020) (noting that the Second Circuit has not held that a complaint may not reference another complaint). *Dalberth v. Xerox Corp.*, 766 F.3d 172 (2d Cir. 2014) is also inapposite, as the court was reviewing whether the plaintiffs had alleged new information for loss causation sufficient to withstand summary judgment.

Throughout the Class Period, Defendants concealed the risks that the Company's ability to obtain its labor cost advantages was unsustainable absent bribery.  ¶¶ 290-91.  That risk materialized when the GM Complaint revealed that the Company obtained concessions from the UAW as a result of the scheme, causing the Company's stock to drop. ¶¶ 292, 296.  As FCA and UAW officials had long been the subject of government investigations related to the scheme, it was foreseeable that FCA's stock price would decline once the effects of the scheme were revealed and investors realized that FCA's labor cost advantage was unsustainable.[28]  ¶ 291.  Indeed, following the revelations in the GM Complaint, an analyst report by Wolfe Research stated that without FCA's unfair labor cost advantages, the Company's labor cost would increase between $500 million and $700 million.  ¶ 293.

## V.     Plaintiff Has Sufficiently Alleged a Section 20(a) Claim

Because the Complaint states a §10(b) claim, Plaintiff's §20(a) claim stands.  *Cf.* MTD at 25 n. 15.[29]

**CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss should be denied in its entirety. [30]

---

[28] The GM Complaint triggered the foreseeable event (the exposure of the true impact and scope of FCA's bribery scheme) - it was not the foreseeable event itself. MTD at 25.

[29] Plaintiff is not required to plead "culpable participation" at this stage.  *See Suez Equity Investors, L.P. v. Toronto-Dominion Bank,* 250 F.3d 87, 101 (2d Cir. 2001); *see also In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 395 (stating that the Second Circuit has "essentially rendered the culpable participation requirement meaningless" at the pleading stage). Further, whether an individual defendant "is a controlling person is a fact-intensive inquiry that generally should not be resolved on a motion to dismiss." *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 2018 WL 1449206, at *7 (S.D.N.Y. Mar. 23, 2018).

[30] In the event the Court grants Defendants' motion, Plaintiff should be granted leave to amend.  *See* Fed. R. Civ. P. 15(a) ("leave [to] amend shall be freely given"). Plaintiff amended the originally filed complaint "as a matter of course … before a responsive pleading [was] served." *Id.*  There has been no undue delay here because Plaintiff is not presently aware of any deficiencies in the Complaint that need curing.  *See Loreley*, 797 F.3d 160, 190 (finding the district court erred in denying leave to amend by making plaintiff decide whether to cure without the benefit of a ruling from the court).

25

DATED: October 21, 2020          Respectfully submitted,

**BERNSTEIN LIEBHARD LLP**

By: /s/ Stanley D. Bernstein
      Stanley D. Bernstein
      Stephanie M. Beige
      Peter J. Harrington
      10 East 40th Street
      New York, NY  10016
      Telephone: (212) 779-1414
      Facsimile:  (212) 779-3218
      bernstein@bernlieb.com
      beige@bernlieb.com
      pharrington@bernlieb.com

      *Lead Counsel for Lead Plaintiff and the Proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that on October 21, 2020 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List, and I hereby certify that I have mailed a paper copy of the foregoing document via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List generated by the CM/ECF system.

/s/ Stanley D. Bernstein
STANLEY D. BERNSTEIN