**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE STELLANTIS N.V. SECURITIES LITIGATION | Case No.: 1:19-cv-06770 (EK) (VMS) <br><br> <u>JURY TRIAL DEMANDED</u> |

## SECOND AMENDED CLASS ACTION COMPLAINT
## <u>FOR VIOLATION OF THE FEDERAL SECURITIES LAWS</u>

# TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................... 1

JURISDICTION AND VENUE ........................................................................................... 11

PARTIES .............................................................................................................................. 12

   I.   SUBSTANTIVE ALLEGATIONS ............................................................................... 14

      A.   Fiat's Ownership Acquisition of Chrysler ...................................................... 14

      B.   FCA Engages in a Bribery Scheme to Keep UAW Officials "Fat, Dumb and Happy" to Gain Labor Concessions ......................................................... 17

      C.   FCA's Bribery Scheme Works – FCA Obtains Labor Costs Advantages from the UAW Officials Involved in the Scheme ................................................. 20

           1.   The Collective Bargaining Process ................................................... 20

           2.   Holiefield Agrees to Implement FCA's World Class Manufacturing System . 22

           3.   FCA Gets Assurance That the Cap on Tier-2 Workers Will Not Be Reinstated…………………………………………………………………..24

           4.   The 2015 CBA Process ..................................................................... 25

      D.   Low Labor Costs Enable FCA to Increase Profit Margins in its Most Important Business Segment .................................................................... 30

      E.   The Department of Justice Begins to Uncover FCA's Scheme .............................. 33

      F.   FCA Negotiating a Settlement with the DOJ ......................................................... 45

      G.   Defendants' False and Misleading Statements ....................................................... 46

           1.   The February 29, 2016 False and Misleading Statements ................................ 47

           2.   The February 28, 2017 Misstatements and Omissions .................................... 49

           3.   The June 26, 2017 Misstatements and Omissions ........................................... 51

           4.   The September 19, 2017 False and Misleading Statements ............................ 52

           5.   The February 20, 2018 False and Misleading Statements ............................... 53

           6.   The August 27, 2018 False and Misleading Statements ................................. 56

           7.   The February 22, 2019 False and Misleading Statements ............................... 57

           8.   The August 23, 2019 False and Misleading Statements ................................. 59

      H.   The Truth about the Scope of FCA's Bribery Scheme and its Effects on the CBA Process is Revealed ................................................................... 61

      I.   The 2019 CBA Confirms the Falsity of Defendants' Statements ........................... 63

J.     Additional Scienter and Falsity Allegations .............................................................. 66

    1.   Marchionne Had the Motive and Opportunity to Commit Fraud and Participated in the Fraud.................................................................................. 67

    2.   The Individual Defendants Knew from FCA's Internal Investigation that Iacobelli and Durden Had Bribed UAW Leadership in An Attempt to Gain Labor Concessions .......................................................................................... 69

    3.   The Individual Defendants Controlled the Contents of the Company's Public Statements during the Class Period ................................................................. 70

    4.   The Fraud Impacted FCA's Core Operations.................................................... 71

    5.   The Individual Defendants' High-Level Positions Support an Inference of Scienter ............................................................................................................ 72

K.    Presumption of Reliance: Fraud on the Market ......................................................... 74

L.    Loss Causation ........................................................................................................... 75

    1.   Corrective Disclosure ...................................................................................... 75

    2.   Materialization of the Risk .............................................................................. 77

M.   CLASS ACTION ALLEGATIONS ........................................................................ 79

COUNT I  VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS ..................................... 81

COUNT II  VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS............................................................................................... 84

PRAYER FOR RELIEF ....................................................................................................... 85

JURY TRIAL DEMANDED ................................................................................................ 85

Lead Plaintiff Nicholas S. Panitza ("Lead Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge. Lead Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation, review and analysis of filings with the United States Securities and Exchange Commission ("SEC"), all public court filings regarding the investigation concerning Fiat Chrysler Automobiles N.V. and the United Auto Workers, press releases, news articles and analyst reports. Lead Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of persons and entities that purchased Fiat Chrysler Automobiles N.V. ("FCA" or the "Company") securities between February 26, 2016 and January 27, 2021, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2. FCA designs, engineers, manufactures, distributes and sells vehicles and components under a number of brand names including, Alfa Romeo, Chrysler, Dodge, Fiat, Jeep, Ram, and Maserati. The Company operates over 100 manufacturing facilities and sells its products and services through dealers and distributors in over 130 countries.

3. Fiat SpA FIA.MI ("Fiat") (now FCA) acquired an ownership stake in Chrysler LLC ("Chrysler") in 2009 as a result of the financial crisis of 2008 and the taxpayer bailout of

the company. Through a U.S. government-approved restructuring, Fiat obtained operating control over Chrysler and Sergio Marchionne ("Marchionne") became its CEO.[1]

4.      Critical to Chrysler's future was the ability to work with the United Auto Workers Union (the "UAW"), which wields enormous leverage over U.S. auto manufacturers. Armed with $12.5 billion in taxpayer funds, FCA executives almost immediately started funneling bribes and illegal payments to UAW officials through a bribery scheme that lasted over six years and, so far, has resulted in the convictions of three FCA senior executives and four UAW officials and has implicated numerous others, including Marchionne.

5.      Unknown to investors, FCA had obtained massive labor cost advantages from the UAW as a result of its bribery scheme. The wage advantage enabled FCA to achieve profit margin gains in the Company's most important business segment during the Class Period. The labor cost advantages and resulting increases in profit margins were not sustainable however, as FCA would not likely obtain similar concessions once the full scope of the scheme was exposed.

## SUMMARY OF THE ALLEGATIONS

### FCA's Bribery Scheme Buys the Company Advantageous Labor Concessions

6.      Critical to FCA's success post-bankruptcy was its ability to reduce the Company's labor costs and pay back the loans provided by the U.S. and Canadian governments. Accordingly, starting in July 2009, Alphons Iacobelli ("Iacobelli"), FCA's then-Vice President of Labor Relations and Chrysler's top labor negotiator, and others at FCA, started bribing UAW leadership in an effort to gain benefits and concessions from the union that would enable FCA to significantly reduce its labor costs.

---

[1] Fiat acquired full ownership of Chrysler in 2014. The merged companies became FCA.

7.      Iacobelli and FCA made more than $9 million in illegal payments over eight years to the UAW to cover salaries and benefits for union officials assigned to the UAW-FCA National Training Center (the "NTC"), in addition to approximately $1.2 million in other illegal payments and gifts.[2]

8.      Iacobelli reported directly to Marchionne, who has been implicated in the scheme. Marchionne himself gave an illegal gift to former (now deceased) UAW Vice President for Chrysler, General Holiefield ("Holiefield"), in February 2010. General Holiefield had primary responsibility for negotiating with FCA and for administering the collective bargaining agreements ("CBAs") between the UAW and FCA. Marchionne later lied about the gift when questioned by federal investigators.[3]

9.      FCA executives James Durden ("Durden") (a former financial analyst at Chrysler and FCA, Controller of the NTC and Secretary of the NTC Joint Activities Board from 2008 through 2015) and Michael Brown ("Brown") (Director for Employee Relations at Chrysler from 2009 through 2016 and Co-Director of the NTC through 2016), also participated in the bribery scheme. Brown testified that *at least* four other unnamed FCA officials were funneling illegal payments to UAW officials.[4] The Department of Justice (the "DOJ") has since named FCA as a

---

[2] The NTC is a joint labor management committee that oversees "joint programs that improve job skills, enhance competitiveness and enrich the personal lives of UAW-represented workers at FCA US LLC." http://uawchrysler.com/about-ntc/.

[3] Holiefield received additional illegal payments from FCA through the bribery scheme, including over $250,000 to pay off his mortgage and $150,000 in the form of a donation to his sham charity. *See* Neal E. Boudette, *Ex-Fiat Chrysler Executive Accused of Siphoning Millions with Union Leader*, NEW YORK TIMES (July, 26, 2017) https://www.nytimes.com/2017/07/26/business/ex-fiat-chrysler-executive-accused-of-siphoning-millions-with-union-leader.html.

[4] Brown Plea Agreement, May 25, 2018 (ECF No. 102) at 3. The individual criminal pleadings cited herein are filed in the Eastern District of Michigan, *United States v. Durden, et al.*, Case No. 2:17-cr-204006-PDB-RSW, unless otherwise specified.

co-conspirator in the scheme but has not identified all of the FCA senior executives that have been implicated.

10.     The purpose of the bribes was to "obtain benefits, concessions, and advantages for FCA in the negotiation, implementation, and administration of the collective bargaining agreements between FCA and the UAW."[5]  According to federal prosecutors, the bribes were an attempt by FCA to secure labor concessions from UAW by keeping UAW leaders "fat, dumb and happy."[6]

11.     Unknown to investors, federal investigators began looking into the bribery scheme in or around 2014, leading FCA to conduct its own internal investigation in June 2015 – just one month before negotiations concerning the 2015 CBA were set to begin.  FCA found "credible evidence of wrongdoing" that resulted in the "prompt separation" of Iacobelli and Durden from the Company.  Publicly, FCA represented that Iacobelli retired.

12.     Public knowledge of the investigation would have derailed the 2015 CBA process, as union membership and FCA's competitors would have questioned the UAW leadership's ability to objectively negotiate with FCA.

13.     Indeed, the highest ranking UAW official responsible for negotiating and administering the CBAs with FCA at the time, former UAW Vice President Norwood Jewell ("Jewell") (Holiefield's successor), had already received tens of thousands of dollars in illegal

---

[5] Iacobelli Plea Agreement, Jan. 23, 2018 (ECF No. 58) at 7; Brown Plea Agreement, May 25, 2018 (ECF No. 102) at 4.

[6] Iacobelli Plea Agreement, Jan. 23, 2018 (ECF No. 58) at 16.

gifts and payments from FCA by the time the 2015 CBA negotiations began, including a $25,000

"decadent" party in his honor and three-bedroom villa rental on a golf course in Palm Springs.[7]

14.     Instead, Marchionne replaced Iacobelli as lead negotiator for FCA and the

Company was able to reap the benefits of the "good will" FCA had purchased from Jewell and

other UAW officials through its bribery scheme.

15.     The advantages FCA received in connection with the 2015 CBA as a result of the

bribery scheme started with the UAW's selection of the "target" company for negotiations.  Each

CBA round, the UAW selects one company to negotiate an agreement that serves as model for

the other auto manufacturers through a practice known as "pattern bargaining." Being chosen

target is something all of the automakers desire – it allows the target to shape a contract that

bests meets their needs.[8]

16.     Then-UAW President Dennis Williams ("Williams") (who has since been

implicated in the scheme and is reported to have received substantial gifts from FCA)[9]  shocked

---

[7] Jewell Plea Agreement, *United States v. Jewell*, Case No. 2:19-cr-20146 (E.D. Mich. Apr. 2, 2019) (ECF No. 10) at 8-12; Robert Snell, *Guilty UAW Boss' Luxe Life Shown*, THE DETROIT NEWS (July 31, 2019), https://www.pressreader.com/usa/the-detroit-news/20190731/281741271030207; Jewell was later sentenced to 15 months in prison for his role in the scheme. *See* Eric D. Lawrence, *Ex-UAW VP Gets 15 Months For Using Training Center Funds For High Life*, DETROIT FREE PRESS (Aug. 5, 2019), https://www.freep.com/story/money/cars/chrysler/2019/08/05/norwood-jewell-sentenced-in-scandal/1920672001/.

[8] Through pattern bargaining, unionized workers attempt to bargain uniform terms in their contracts. "But pattern does not mean the same."  https://uaw.org/pattern-bargaining/.

[9] Williams is alleged to have directed or approved the improper use of over $1 million in union funds, some of which came from FCA through the NTC, in connection with UAW retreats in Palm Springs, California, including at least $570,000 prior to the 2015 CBA negotiations.  *See* Pearson Criminal Complaint, *United States v. Pearson*, Case No. 2:19-mj-30488-DUTY (E.D. Mich. Sept. 12, 2019) (ECF No. 1) at 10-12, 15-17; *see also* Robert Snell, Ian Thibodeau and Daniel Howes, *UAW Presidents Gary Jones, Dennis Williams Implicated in Federal Probe*, THE DETROIT NEWS, Sept. 12, 2019 (identifying Dennis Williams as "UAW Official B" in the Pearson Criminal Complaint),

industry analysts by choosing FCA to be the target company for the 2015 negotiations. FCA was the least likely to be chosen as the target company since it was the smallest and least profitable of the Big Three and Marchionne was seen as "the toughest negotiator and an unpredictable corporate chief."[10]

17.     FCA and UAW reported a deal just two days later.   However, because the deal favored FCA so much, the UAW membership rejected it by 65% - the first time in 30 years that the UAW membership rejected a proposed agreement.[11]

18.     A revised agreement (that still favored FCA) was ratified by the UAW in October 2015.   While the revised agreement included additional benefits for Tier-1 workers (the most senior and highly paid category of union workers), it did not meaningfully reduce the pay gap between Tier-1 and Tier-2 workers, create a pathway for Tier-2 workers to become Tier-1 workers, or cap the number of Tier-2 new hires – all stated goals of the UAW heading into the negotiations.[12]

---

https://www.detroitnews.com/story/business/autos/2019/09/12/uaw-presidents-gary-jones-dennis-williams-implicated-in-federal-probe/2302410001/; Johnson Plea Agreement, July 23, 2018 (ECF No. 112) at 10.

[10] Alisa Priddle and Brent Snavely, *Fiat Chrysler is Surprise Lead Company in UAW Talks*, DETROIT FREE PRESS (Sept. 13, 2015), https://www.freep.com/story/money/cars/general-motors/2015/09/13/fiat-chrysler-lead-company-uaw-contract-talks/72091592/; *UAW Chooses Fiat Chrysler as Target in Contract Talks*, CBS DETROIT (Sept. 13, 2015), https://detroit.cbslocal.com/2015/09/13/uaw-chooses-fiat-chrysler-as-target-in-contract-talks/.

[11] Brent Snavely, *UAW Confirms Members Rejected Proposed FCA Contract,* DETROIT FREE PRESS (Oct. 1, 2015), https://www.freep.com/story/money/cars/chrysler/2015/10/01/uaw-confirms-members-rejected-proposed-fca-contract/73122808/.

[12] *Expert: UAW Talks Could Bring End to 2-Tier Wage System*, THE DETROIT NEWS (June 23, 2015), https://www.detroitnews.com/story/business/autos/2015/06/23/two-tier-phased/29184543/; David Barkholz, *UAW-FCA Deal Dooms Tier 1 if Passed*, AUTOMOTIVE NEWS (Sept. 26, 2015), https://www.autonews.com/article/20150926/OEM01/309289954/uaw-fca-deal-dooms-tier-1-if-passed.

19.     One of the most important concessions Marchionne obtained was the agreement from the UAW that the pre-2009 cap on the number of temporary or Tier-2 workers that the Company could hire would not be reinstituted in the 2015 CBA.  Tier-2 workers are paid less than Tier-1 workers, receive less favorable health benefits than Tier-1 workers, and are ineligible for certain performance bonuses, profit sharing, and pension benefits.  Thus, Tier-2 workers are a less expensive labor source.  The UAW agreed to lift the cap in 2009 to help FCA's and GM's restructuring efforts, with the expectation that the cap would be reinstated in 2015.

20.     Under the 2009 and 2011 agreements, the reinstitution of the cap in 2015 was to include a penalty for companies that had over 25% of its union workforce consisting of Tier-2 workers at the time of the 2015 CBA.  Specifically, all Tier-2 workers over 25% would be automatically converted to Tier-1 status by seniority until the automaker was below the cap.

21.     The UAW's agreement not to reinstitute the cap in 2015 benefited FCA over its competitors. According to General Motors, Inc. ("GM"), prior to 2015, FCA and UAW officials entered into a side letter agreeing that the cap would not be reinstituted in 2015.  Based on this agreement, FCA ramped up its hiring of Tier-2 workers leading up to 2015 without any risk that the Company would be subjected to the "penalty" that was to accompany reinstitution of the cap.

22.     At the time of the 2015 CBA, 40% of FCA's union workforce consisted of Tier-2 workers and the expected penalty would have cost FCA dearly.  However, the UAW's agreement not reinstitute a cap (and FCA's advance notice of such), enabled FCA to lower its labor costs leading up to 2015 by employing a large percentage of Tier-2 workers without the risk of having to convert 15% of its Tier-2 workers to Tier-1 status as part of the 2015 CBA.

23.     The side agreement also gave FCA a head start over its competitors once the cap was officially not reinstituted in 2015 CBAs.  GM, for example, anticipating the reinstatement of the cap, only had approximately 20% of its workforce consisting of Tier-2 workers in 2015.[13]

24.     FCA' agreement with the UAW regarding Tier-2 workers also benefitted FCA because Marchionne had already gotten the UAW (through Holiefield) to support and implement its World Class Manufacturing ("WCM"), a manufacturing system that broke down the hierarchy within the union with respect to which workers could perform which roles.  The UAW's implementation of WCM created an opportunity for FCA to assign Tier-2 workers to normally high-wage roles, in the name of efficiency.

25.     As a result of the concessions FCA purchased through its bribery scheme, the Company was able to obtain massive labor cost advantages over its competitors.  These advantages allowed FCA to reduce its overall production costs in the U.S. and increase its profit margins during the Class Period in the Company's most important business segment – its North American Free Trade Agreement ("NAFTA") segment.

26.     Unknown to investors, however, was that the labor cost advantages and the resulting increases in profit margins were obtained because of FCA's bribery scheme and were not sustainable, as FCA would not likely obtain similar concessions once the full scope of the scheme was exposed.

**As Details of FCA's Bribery Scheme Begin to Emerge,**
**FCA Misleads Investors about the Scope of the Scheme and its Undisclosed Risks**

27.     Two years after the 2015 CBA was ratified, the market started to learn about the possibility of some aspects of the bribery scheme when, on July 26, 2017, the DOJ filed

---

[13] Bernie Woodall, *For UAW Members, Two-Tier Wage Issue is Personal*, REUTERS (June 2, 2015), https://www.reuters.com/article/us-autos-usa-families/for-uaw-members-two-tier-wage-issue-is-personal-idUSKBN0OI0C420150602.

indictments against Iacobelli, Durden and Monica Morgan-Holiefield (the widow of the Holiefield).

28. FCA and the UAW quickly defended their organizations, with FCA falsely representing to investors that FCA was a "victim" of the scheme, that the conduct was carried out by rogue former employees who were fired from the Company in 2015, and that bribery scheme had no effect on the CBA process.

29. As the investigation progressed and more details of the bribery dribbled out, FCA continued to issue false and misleading statements misrepresenting the scope of the scheme. Even after the DOJ named FCA and the UAW as co-conspirators in the scheme, with each new piece of information disclosed by investigators, FCA denied that the Company had any role in the scheme and denied that the scheme had any effect on the CBA process. Thus, the market was misled about the scope and effect of the bribery scheme.

**GM Links FCA's Wage Advantages to the Bribery Scheme**

30. On November 20, 2019, GM shocked the auto industry when it filed a federal racketeering lawsuit (the "GM Complaint") against FCA, claiming that FCA, through its bribery scheme, corrupted the collective bargaining process to gain advantages over GM and force a merger of the two companies – a merger that Marchionne openly desired and continuously pursued.[14]

31. GM alleged that Marchionne not only knew about the bribery scheme but that he orchestrated it in order to obtain a wage advantage over GM and force increased labor costs on

---

[14] *See* Complaint, *General Motors LLC, General Motors Company v. FCA US LLC, et al.*, 2:19-cv-13429(PDB-DRG) (E.D. Mich. Nov. 20, 2019). References to the GM Complaint are cited herein as "GM Complaint ¶__."

GM.  Until the GM Complaint was filed, GM's higher labor costs (and FCA's corresponding lower labor costs) had not been linked to the bribery scheme.

32.     The GM Complaint added to the public knowledge material facts showing that because of the bribes, FCA was not a victim of the bribery scheme, as it had previously represented to the public, but instead, knowingly orchestrated, participated, and benefited from it by obtaining labor cost advantages.

33.     The GM Complaint also revealed the risk that FCA would not be able to obtain the same labor cost concessions from the UAW in the future.  Without the labor cost advantages that FCA obtained through the bribery scheme, FCA would not likely continue to outperform the industry in terms of margin gains in its NAFTA segment.  The Company's NAFTA segment, which is driven by its U.S. sales, generated roughly 90% of the FCA's earnings before income and taxes ("EBIT").

34.     On this news, FCA shares dropped $0.58 per share, or 3.72%, wiping out nearly $1 billion in market capitalization in one day.

35.     While FCA has denied the allegations, the risk to FCA's shareholders as a result of GM's allegations is massive. J.P. Morgan analyst Ryan Brinkman estimated that GM could seek $6 billion to $15 billion in damages[15] and FCA's inability to continue to obtain unfair labor cost advantages will likely decrease its operating profits for the foreseeable future.

36.     Subsequent events have confirmed that the concessions FCA previously obtained through its bribery scheme were not sustainable.  As part of the 2019 CBA, which was ratified

---

[15] Ryan Brinkman, "GM v. FCA Lawsuit Rocks Auto Industry – See Potential Large Positive for GM Shares (and Possibly Ford Also)," JP Morgan (Nov. 21, 2019), p. 1, available from Investext, accessed May 25, 2020.

on December 11, 2019, FCA was forced to agree to the biggest increase in labor costs out the Big Three.[16]

37. As a direct and proximate result of Defendants' fraud, FCA investors lost nearly $1 billion.

### JURISDICTION AND VENUE

38. The claims asserted herein arise under Sections 10(b) (15 U.S.C. §78j(b)) and 20(a) (15 U.S.C. §78t(a)) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

39. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. 1331, Section 27 of the Exchange Act (15 U.S.C. §78aa).

40. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in furtherance of the alleged federal securities violations have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false or misleading information, occurred in substantial part in this Judicial District.

41. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate communications, and the facilities of a national securities exchange.

---

[16] Dziczek, Kristen, *What the D3-UAW Contracts Mean for U.S. Auto Manufacturing*, Center for Automotive Research, at 7, 12-13 (Jan. 16, 2020) available at https://www.chicagofed.org/~/media/others/events/2020/auto-insights-conference/dziczek-uaw-contract-pdf.pdf (herein after referred to as the "2020 CAR Report"); Breana Noble, *UAW Sends Fiat Chrysler Contract with Health-Care, Profit Sharing Gains to Membership*, THE DETROIT NEWS (Dec. 4, 2019), https://www.detroitnews.com/story/business/autos/chrysler/2019/12/04/uaw-fca-tentative-agreement-health-care-profit-sharing-gains/2589012001/.

42.     Lead Plaintiff Nicholas S. Panitza, as set forth in the certification submitted with his motion for appointment as lead plaintiff, incorporated by reference herein, purchased FCA securities during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

43.     Defendant FCA is an automotive group that, during the Class Period, both directly and through its subsidiaries, designed, engineered, manufactured, distributed, and sold vehicles and components worldwide, including throughout the U.S.  FCA is the successor of the Italian automotive company formally known as Fiat S.p.A. ("Fiat") and is the ultimate parent company and owner of FCA US LLC ("FCA US").[17]  FCA US is FCA's United States automotive operations and is based in Auburn Hills, Michigan.  FCA is incorporated in the Netherlands, as a Naamloze Venootschap (N.V.), with its principal executive offices located in London, United Kingdom. FCA's stock traded on the New York Stock Exchange under the symbol "FCAU."  On January 16, 2021, FCA merged with Peugeot S.A., with FCA as the surviving company.  On January 17, 2021, FCA changed its name to Stellantis N.V. ("Stellantis"). Stellantis' stock trades on the New York Stock Exchange under the symbol "STLA."

44.     Defendants Roland Iseli and Alessandro Baldi are Co-Executors of the Estate for Sergio Marchionne ("Marchionne"), who served as the Company's Chief Executive Officer ("CEO") until July 2018.  Marchionne passed away on July 25, 2018.

45.     Defendant Michael Manley ("Manley") has served as the Company's CEO since July 21, 2018.  Prior to becoming CEO, Manley served as the Head of FCA US's Jeep division from 2009 to 2018 and as the Head of the Ram division from 2014 to 2018.  Following FCA's

---

[17] FCA US was formerly known as Chrysler Group LLC, the successor of Chrysler LLC.

acquisition of Chrysler in 2009, Manley served on Marchionne's management committee and reported directly to Marchionne.

46.     Defendant Richard K. Palmer ("Palmer") was the Company's Chief Financial Officer ("CFO") at all relevant times.

47.     Defendants Marchionne, Manley, and Palmer are sometimes referred to herein as the "Individual Defendants."  Each of the Individual Defendants:

(a) had intimate knowledge of every aspect of FCA's business, including its labor costs and the labor negotiation process;

(b) directly participated in the management of the Company, including being involved negotiating the Company's labor agreements with the UAW;

(c) were directly involved in the day-to-day operations of the Company at the highest levels;

(d) were privy to confidential proprietary information concerning the Company and its business and operations;

(e) were directly or indirectly involved in drafting, producing, reviewing or disseminating the false and misleading statements and information alleged herein;

(f) were aware of or recklessly disregarded that FCA used illegal bribes to obtain concessions when negotiating the Company's labor agreement with UAW officials;

(g) were aware of or recklessly disregarded that FCA's illegal bribes directly influenced the Company's labor negotiations and final agreement with the UAW;

(h) were aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and

(i) approved or ratified these statements in violation of the federal securities laws.

48.     FCA is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

49.	The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to FCA under *respondeat superior* and agency principles.

50.	Defendant FCA and the Individual Defendants are collectively referred to herein as "Defendants."

## I.	SUBSTANTIVE ALLEGATIONS

### A.	Fiat's Ownership Acquisition of Chrysler

51.	In 2004, Fiat named Marchionne as its CEO (its fifth in two years) in an effort to turn the European auto maker around as it struggled to stay alive.

52.	Under Marchionne, Fiat underwent one of the most dramatic turnarounds in European auto history – the Company went from reporting $12 billion in losses in 2004 to posting gains for six straight quarters by 2007.

53.	In 2008, Marchionne stated that the only way Fiat could survive was through a merger with another auto company.[18]  Marchionne believed that in order to compete globally, "you need at least 5.5 million to 6 million cars (a year) to have a chance of making money."[19] Marchionne acknowledged that "Fiat is not even halfway there. And we are not alone in this. So we need to aggregate, one way or another."[20]

54.	By 2008, the U.S. automotive industry was facing a major crisis.  In addition to pushing sales of high-gasoline-consuming vehicles such as SUVs and pick-up trucks in a time when demand was growing for smaller, more fuel efficient vehicles, the Big Three (Chrysler,

---

[18] *Fiat Can't Survive Alone; Needs a Partner: CEO*, REUTERS (Dec. 8, 2008), https://www.reuters.com/article/us-rb-fiat-ceo/fiat-cant-survive-alone-needs-partner-ceo-idUSTRE4B738Z20081208.

[19] *Id.*

[20] *Id.*

GM and Ford Motor Company ("Ford")) were facing increased competition from foreign automakers with lower labor costs.

55. By 2009, the financial crisis and credit market freeze wreaked havoc on the U.S. auto industry: sales had cratered, losses continued to mount, and many questioned whether the Big Three could (or should) survive.

56. Government officials decided that the country could not withstand another industry collapse (and the loss of millions of jobs) and agreed to provide a bailout to the automakers through the Troubled Assets Relief Program ("TARP"). As a condition to the bailout, the federal government required Chrysler and GM to come up with restructuring plans that would allow the companies to shed debt and become profitable.[21]

57. Marchionne recognized the crisis as an opportunity to enter the U.S. marketplace and believed an alliance with UAW leadership would help a bid to acquire Chrysler. To that end, Marchionne befriended UAW Vice President, General Holiefield ("Holiefield"), the head of UAW's Chrysler Department.[22] "If the union would come around to the view that the Fiat-Chrysler partnership was the only way to keep the company from going bust, maybe it would throw its weight behind Fiat when it came time for talks to start at the Treasury."[23]

58. In January 2009, Fiat proposed a global strategic alliance between Fiat and Chrysler. Fiat would gain manufacturing capacity and a U.S. sales network and in return,

---

[21] Ford claimed it did not need to be bailed out in 2009, however the company did receive government loans to retool its manufacturing plants.

[22] Sergio Marchionne, *Eulogy for General Holiefield* (Mar. 17, 2015), https://media.fcanorthamerica.com/pdf.do?id=16436.

[23] JENNIFER CLARK, MONDO AGNELLI: FIAT, CHRYSLER, AND THE POWER OF A DYNASTY at 247 (2012) ("MONDO AGNELLI").

Chrysler would gain access to competitive, more fuel-efficient vehicles and to distribution in Europe and Latin America.[24]

59.    On March 30, 2009, the U.S government rejected Chrysler's restructuring plan and warned that the company may be put through bankruptcy to reduce its debts.    The government gave Chrysler 30 days to complete an alliance with Fiat or risk being cut off from future bail out funds.

60.    On April 30, 2009, Chrysler and Fiat announced a global strategic alliance as Chrysler filed for bankruptcy.

61.    On June 10, 2009, Chrysler emerged from the bankruptcy proceedings with Fiat, the UAW pension fund, and the U.S. and Canadian governments as its principal owners.

62.    Fiat initially received a 20% ownership interest in Chrysler, contributing only intellectual capital and no actual money.  Fiat also obtained operating control over Chrysler and Marchionne became its CEO.  The UAW pension fund emerged as the majority owner of Chrysler, owning 55%.  The U.S. and Canadian governments owned the remaining 25%.

63.    By January 2012, Fiat's equity stake in Chrysler grew to 58.5%.

64.    On January 21, 2014, Fiat completed the acquisition of the remaining 41.5% from the UAW pension fund, making Chrysler a wholly-owned subsidiary of Fiat.  Fiat's total cost to acquire Chrysler was $4.9 billion, with an additional $5.5 billion in pension liability.

65.    On October 12, 2014, Fiat and Chrysler official merged into FCA following board and shareholder approval with Marchionne as the CEO of the combined entity.

---

[24] *Announcement of the Fiat Chrysler Alliance,* WALL STREET JOURNAL (Jan. 20, 2009) https://www.wsj.com/articles/SB123245481832897597.

**B.    FCA Engages in a Bribery Scheme to Keep UAW Officials "Fat, Dumb and Happy" to Gain Labor Concessions**

66.    In July 2009, just one month after Chrysler emerged from bankruptcy, FCA began implementing a scheme designed to provide improper payments to certain UAW officials.  These payments were primarily funneled through the UAW-Chrysler joint training center, the NTC.  The payments were made by FCA senior executives Iacobelli, Durden, Brown, and others, and were designed to influence the collective bargaining process.[25]

67.    Indeed, Brown, FCA's Director of Employee Relations and NTC Co-Director admitted, "it was the intent of FCA executives to 'grease the skids' in their relationship with UAW officials."[26]

68.    Iacobelli provided the improper payments to UAW officials using credit cards and bank accounts linked to the NTC to conceal the payments.  To minimize detection of the payments, FCA had the NTC provide the bribes to various UAW officials through various means and methods, including sham charities.

69.    For example, between July 2009 and 2013, FCA funneled more than $386,400 from the NTC to Holiefield through Holiefield's charity, the Leave the Light on Foundation.  Holiefield, along with his girlfriend and later wife, Monica Morgan-Holiefield ("Morgan-Holiefield"), used the purported charitable donations for personal expenditures.[27]

70.    FCA also funneled NTC funds to Holiefield and Morgan-Holiefield, through false business fronts, including Monica Morgan Photography, Wilson's Diversified Products, and

---

[25] Iacobelli Plea Agreement, Jan. 23, 2018, (ECF No. 58) at 7-11; Durden Plea Agreement, Aug. 8, 2017, (ECF No. 29) at 4.

[26] Brown Plea Agreement, May 25, 2018, (ECF No. 102) at 3.

[27] Tresa Baldas, *Feds: UAW and FCA Exec Laundered Money Through Fake Hospice Center*, DETROIT FREE PRESS (Sept. 19, 2017),https://www.freep.com/story/news/2017/09/19/feds-uaw-and-fca-execs-laundered-money-through-fake-hospice-center/682358001/.

Hospice of Metropolitan Detroit, a phony hospice, in an attempt to launder funds from the NTC and the Leave the Light on Foundation. Between July 2009 and 2014, the NTC transferred more than $650,000 to these sham entities, which directly benefitted Holiefield and Morgan Holiefield.[28]

71.    Additionally, in February 2010, Marchionne gave Holiefield a custom-made Terra Cielo Mare watch with the Fiat logo on it. The watch was given to Holiefield with a hand-written note that said: "Dear General, I declared the goods at less than fifty bucks. That should remove any potential conflict. Best regards, and see you soon." A similar 2014 model of the watch retailed for $2,245.[29]

72.    In May of 2011, Iacobelli sent an email to Durden (the FCA financial analyst that controlled the NTC's finances), cautioning Durden not to put the details of certain expenditures made for the benefit of Holiefield in writing.[30]

73.    In or around 2012, FCA executives began to encourage certain senior UAW officials, including then-UAW President Williams, then-UAW Region 1C Director Jewell (who later succeeded Holiefield as Vice President in charge of FCA's CBAs), Virdell King ("King") (Associate Director of the UAW's Chrysler Department, who served on the committee responsible for negotiating the 2011 and 2015 CBAs), Nancy Adams Johnson ("Johnson") (top Administrative Assistant to Jewel and a member of the NTC Board, who served on the committee responsible for negotiating the 2011 and 2015 CBAs), and Keith Mickens

---

[28] *See* Iacobelli Plea Agreement, Jan. 23, 2018, (ECF No. 58) at 8; Durden Plea Agreement, Aug. 8, 2017 (ECF No. 29) at 6.

[29] Robert Snell, *FCA Chief Failed to Disclose Gift to UAW, Sources Say*, THE DETROIT NEWS (Aug. 16, 2018), https://www.detroitnews.com/story/business/autos/chrysler/2018/08/16/sergio-marchionne-gave-expensive-watch-uaw-failed-tell-investigators-orruption/985477002/.

[30] Iacobelli Indictment, July 26, 2017, (ECF No. 4) at 20.

("Mickens") (Senior UAW official in the Chrysler Department and Co-Director of the NTC, who served on the committee responsible for negotiating the 2011 and 2015 CBAs), to use credit cards issued by the NTC so they could charge personal expenses that would ultimately be paid for by FCA.

74.     "Iacobelli directed the NTC to follow 'liberal' credit card and expense policies to persuade union officials to take company-friendly positions."[31]

75.     Over the course of the conspiracy, UAW officials used, or approved the use of NTC funds, paid for by FCA, for personal expenses, including, but not limited to the following:

(a) Williams (UAW President): thousands in meals, travel, luxury accommodations, golf, golf equipment, and clothing;

(b) Jewell (UAW Vice President): over $90,000 in meals, travel, luxury accommodations, and events;

(c) King (Associate Director UAW Chrysler Department): over $40,000 in designer clothing, jewelry, golf equipment, luggage, concert and theme park tickets, and a $2,180 shotgun as birthday present for UAW Vice President Jewell;

(d) Mickens (NTC Co-Director for UAW): over $7,500 in clothing, electronics and other personal items; and

(e) Adams Johnson (senior UAW official): over $40,000 in meals, travel, luxury accommodations, golf, and designer clothes and shoes.[32]

76.     FCA also created a system for providing funds directly to the UAW itself using the NTC. FCA funneled of millions of dollars directly to the UAW by reimbursing the UAW for

[31] King Information, Aug. 18, 2017, (ECF No. 34) at 11.

[32] *See supra,* n. 9; Press Release, U.S. Dep't of Justice, *Former UAW Vice President Norwood Jewell Sentenced to Prison for Conspiring with Fiat Chrysler to Accept Illegal Payments* (Aug. 5, 2019) https://www.justice.gov/usao-edmi/pr/former-uaw-vice-president-norwood-jewell-sentenced-prison-conspiring-fiat-chrysler; King Plea Agreement, Aug. 29, 2017, (ECF No. 43) at 8-9; Mickens Plea Agreement, Apr. 5, 2018, (ECF No. 88) at 7-8; Johnson Plea Agreement, July 23, 2018 (ECF No. 112) at 3, 8-9.

the salaries and benefits for UAW officials who worked at the NTC. These payments were known as "chargebacks."[33]

77.     While some UAW officials did work at the NTC, many of these salaries were paid for "no show" jobs and a way for FCA to further reduce the UAW's costs.

78.     From June 2009 through July 2017, the UAW received over $9 million in illegal chargebacks from FCA. In addition, FCA provided the UAW with an additional 7% on each chargeback invoice as an "administration fee," amounting to an additional $2.9 million in illegal administrative fees from FCA.[34]

**C.     FCA's Bribery Scheme Works – FCA Obtains Labor Costs Advantages from the UAW Officials Involved in the Scheme**

**1.     The Collective Bargaining Process**

79.     The UAW negotiates a new collective CBA with each of the Big Three automakers approximately every four years. The UAW's negotiations occur during the same year and happen consecutively to try to secure similar terms with each automaker. The UAW typically begins negotiating with each automaker in July. In 2011 and 2015, the UAW entered into new CBAs with each of the Big Three.

80.     For the negotiations, each automaker designates a number of its employees, including officers, directors, and senior executives, to represent the company in the CBA discussions.

81.     Between 2009 and approximately June 2015, as FCA's Vice President of Labor Relations, FCA designated Iacobelli to be its lead representative for managing the CBA negotiations with the UAW.

---

[33] Iacobelli Sentencing Memo, Aug. 20, 2018, (ECF No. 132) at 6-7.

[34] *Id.*

82.     On matters related to the UAW, Iacobelli answered to one person: Marchionne.[35]

83.     After Iacobelli was fired from FCA in June 2015, Glenn Shagena, FCA Head of Employee Relations became FCA's representative, with Marchionne taking the lead role in negotiations.[36]

84.     Between 2009 and early 2015, the UAW designated Holiefield to be its lead representative for managing the UAW's contractual relationship with FCA.  Holiefield passed away in March 2015 however, and Jewell took over as lead representative for the UAW for the 2015 CBA negotiations.

85.     Shortly before the prior CBA is set to expire, the UAW selects one of the automakers as a "target" to negotiate the first CBA.  Through pattern bargaining, the UAW uses the completed CBA as a model for negotiating with the other two companies.

86.     The UAW typically selects the best performing automaker as the target because the union can point to the higher profit margins to secure more favorable terms, including wages and signing bonuses.  These favorable terms can then be imposed on the other automakers through pattern bargaining.

87.     While the principal terms in FCA's 2011 and 2015 CBAs were similar to those of the other Big Three (because of pattern bargaining), FCA nevertheless was able gain and maintain a labor cost advantage over Ford and GM from 2011 through 2019.

---

[35] Daniel Howes and Robert Snell, *Driven by Greed: Alliance of FCA, Union Leaders Fueled Decade of Corruption*, THE DETROIT NEWS (Dec. 18, 2019), https://www.detroitnews.com/in-depth/business/autos/2019/12/18/greed-driven-alliance-fca-uaw-leaders-sparks-decade-corruption/2634016001/.

[36] In June 2015, FCA reported that Iacobelli had retired. However, after Iacobelli was indicted in July 2017, FCA revealed that the Company fired Iacobelli after learning of wrongful conduct.

## 2. Holiefield Agrees to Implement FCA's World Class Manufacturing System

88. In 2009, Marchionne, who had already persuaded Holiefield to support a Fiat-Chrysler alliance, almost immediately began making demands with respect to what Fiat would need in the 2009 CBA between Chrysler and the UAW.

89. Marchionne wanted a commitment from the UAW to support World Class Manufacturing ("WCM"), a manufacturing system that "broke down the union's rigid job classification system with its strict hierarchy and boundaries about who could do what."[37] Marchionne believed WCM "got rid of an excessive cost structure and it created efficiency."[38]

90. Getting the UAW to agree to implement the WCM would be a significant advantage for FCA because it broke down the hierarchy within the union with respect to which workers could perform which roles. Tier-2 workers for example, are paid less than Tier-1 workers, receive less favorable health benefits than Tier-1 workers, and are ineligible for certain performance bonuses, profit sharing, and pension benefits. Thus, Tier-2 workers are a less expensive labor source.

91. Eliminating the rigid nature of job classification within the UAW through WCM, created an opportunity for FCA to assign Tier-2 workers to normally high-wage roles, in the name of efficiency.

92. Through Holiefield, the UAW agreed in 2009 to a settlement agreement with Chrysler, which modified the 2007 CBA (the "2009 Modification").[39] In addition to eliminating

---

[37] Mondo Agnelli at 259.

[38] *Id*.

[39] 2009 Settlement Agreement between UAW and Chrysler, at 3, https://www.npr.org/blogs/globalpoolofmoney/images/2009/04/UAW.pdf (accessed May 25, 2020).

a cap on Tier-2 and temporary workers (discussed below), as part of the 2009 Modification, the UAW formally adopted FCA's WCM system.[40]

93.     By the time the 2011 CBA was reached, FCA and the UAW (through Iacobelli and Holiefield) documented their joint commitment to WCM.  They agreed that it was "of critical importance that WCM be jointly implemented systematically and fully in order to operate successfully and thereby position [Chrysler] and the [UAW] firmly among the winners of the global automotive community."[41]

94.     In 2014, in a Memorandum of Understanding ("MOU") negotiated outside of the CBA process, the UAW again committed to support FCA's WCM program.[42]

95.     In October 2015, in a letter attached to the 2015 CBA, FCA and the UAW once again agreed that "the need for unit flexibility to address fluctuating workloads is essential," and committed to "continue to support the full implementation of [WCM], New Hire Entry Level Wages and Benefits, and significant efficiency improvements."[43]

96.     The UAW committed to the "flexible utilization of [the] salary workforce," including: (a) that there may exist "[i]nefficient work rules and practices…within the salary

---

[40] *Id.* at 3, 6.

[41] Letter from A. Iacobelli, Chrysler Group LLC, to General Holiefield, International Union, UAW, World Class Employee Participation (Oct. 12, 2011), available at Letters, Memoranda and Agreements, 2015 Production, Maintenance and Parts Agreement between FCA US LLC and UAW https://uaw.org/wp-content/uploads/2017/03/2015-letters-memoranda-and-agreements-production-maintenance-and-parts-UAW-FCA-US-LLC.pdf.

[42] Press Release, *Chrysler Group Announces Agreement with UAW Calling For Contributions to VEBA Trust and Also Announces a Special Distribution*, PR NEWSWIRE (Jan. 1, 2014), https://www.prnewswire.com/news-releases/chrysler-group-announces-agreement-with-uaw-calling-for-contributions-to-veba-trust-and-also-announces-a-special-distribution-238366031.html.

[43] 2015 Agreement between FCA US LLC and the UAW, Engineering Office & Clerical, October 22, 2015 at p. 426 https://uaw.org/wp-content/uploads/2017/03/2015-agreement-engineering-office-and-clerical-UAW-FCA-US-LLC.pdf.

bargaining units," (b) "[t]he flexible use of the salary bargaining workforce can perform within classifications and departments, across classifications and departments, within units, across units, and within locals," and (c) "[t]he parties agree to discuss any opportunities to assign work across locals provided there is mutual agreement between the parties and a positive business case for keeping the work in-house."[44]

97.     The UAW's agreement to implement WCM enabled Marchionne to use temporary and Tier-2 workers to perform some Tier-1 work, significantly reducing FCA's labor costs.

### 3.     FCA Gets Assurance That the Cap on Tier-2 Workers Will Not Be Reinstated

98.     In order to fully maximize the benefits of WCM, Marchionne wanted to employ more temporary and Tier-2 workers and assign these workers to higher paid Tier-1 roles.

99.     However, under the previous 2007 CBA, FCA and GM were subject to a 20-25% cap on Tier-2 workers.[45]

100.     Holiefield agreed to lift the cap as part of the 2009 Modification – with the explicit understanding that a 25% cap on Tier-2 workers would be reinstated as part of the 2015 CBA.[46] Under the 2009 Modification (and reiterated in the 2011 CBAs), the reinstitution of the cap in 2015 would include a penalty for companies that had over 25% of its union workforce

---

[44] *Id.*

[45] Jerry White, *Autoworkers Defy UAW Bid to Ram through Chrysler Contract*, (Sept. 24, 2015) https://www.wsws.org/en/articles/2015/09/24/chry-s24.html.

[46] 2009 Settlement Agreement between UAW and Chrysler, at 3. https://www.npr.org/blogs/globalpoolofmoney/images/2009/04/UAW.pdf (accessed May 25, 2020); "UAW-Chrysler Hourly Workers Contract Summary," International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America, at p. 1 (October 2011), available at https://s3-prod.autonews.com/s3fs-public/CA759461012.PDF (herein after referred to as the "October 2011 UAW Summary").

consisting of Tier-2 workers as of September 2015. Specifically, all Tier-2 workers over 25% as of September 2015 would be automatically converted to Tier-1 status by seniority until the automaker was below the cap.[47]

101. The UAW also agreed to expand the use of temporary and part-time workers for the duration of the 2009 CBA term.[48]

102. According to the GM Complaint, because of the bribes FCA paid to UAW officials, FCA received assurances from UAW leaders prior to 2015 (through a side letter), that the UAW would not insist on reinstating the cap on Tier-2 workers during the 2015 CBA negotiations.[49]

103. Knowing that the Company would not be penalized by the reinstatement of the cap (by having to convert Tier-2 workers to Tier-1 status), FCA continued to hire Tier-2 workers above the projected 25% cap.

104. By 2015, Tier-2 workers made up approximately 40% of FCA's UAW workforce – more than double its Big Three competitors – giving FCA a significant advantage with respect to average labor costs, but without the huge risk that 15% of these Tier-2 workers would be converted to Tier-1 status. Marchionne confirmed that this "classification structure has be instrumental [in FCA's profitability in North America]."[50]

### 4. The 2015 CBA Process

105. The 2015 CBA negotiations between the UAW and subcommittees from each of the Big Three began in July 2015.

---

[47] 2009 Settlement Agreement between UAW and Chrysler at 3.

[48] *Id.* at 3.

[49] GM Complaint at ¶78.

[50] FCA.MI – 1Q2015 Fiat Chrysler Automobiles N.V. Earnings Call, Thomson Reuters Streetevents, April 29, 2015, at 34.

106.     Heading into the negotiations, the UAW had three main goals:  (1) reduce the pay gap between Tier-1 and Tier-2 workers; (2) create a pathway for Tier-2 workers to become Tier-1; and (3) cap the number of Tier-2 workers each company could hire.[51]

107.     In September 2015, then-UAW President Williams (who has since been implicated in the scheme and is said to have substantial benefits from FCA)[52] unexpectedly named FCA as the "target" company for the 2015 labor negotiations.

108.     FCA's selection came as a shock to industry analysts.  FCA was "the smallest of the three companies, with the lowest profit margins and the highest-percentage of lower-paid entry-level workers seeking higher wages," which would "make it more difficult for the UAW to win big pay raises for its workers and big signing bonuses."[53]   CBS Detroit reported that "just about every analyst said that Fiat Chrysler was the least likely to be the lead company."[54]

109.     The lead negotiator for the UAW was then-Vice President Jewell (who was later sentenced to 15 months in prison for accepting bribes from FCA).  As of September 2015, Jewell had already accepted over $90,000 worth of gifts and illegal payments from FCA.[55]

110.     In addition to Jewell, King, Johnson, and Mickens were involved in the negotiations with FCA – each of whom had benefitted from FCA bribery scheme.  As of

---

[51] *Expert: UAW Talks Could Bring End to 2-Tier Wage System*, THE DETROIT NEWS (June 23, 2015), https://www.detroitnews.com/story/business/autos/2015/06/23/two-tier-phased/29184543/.

[52] *See supra,* n.9.

[53] Alisa Priddle & Brent Snavely, *Fiat Chrysler Is Surprise Lead Company in UAW Talks*, DETROIT FREE PRESS (Sept. 13, 2015), https://www.freep.com/story/money/cars/general-motors/2015/09/13/fiat-chrysler-lead-company-uaw-contract-talks/72091592/.

[54] *UAW Chooses Fiat Chrysler as Target in Contract Talks*, CBS DETROIT, Sept. 13, 2015, https://detroit.cbslocal.com/2015/09/13/uaw-chooses-fiat-chrysler-as-target-in-contract-talks/.

[55] Jewell Sentencing Memo of the United States, *United States v. Jewell*, Case No. 2:19-cr-20146 (E.D. Mich. Apr. 2, 2019) (ECF No. 15), at 5-14.

September 2015: King had received over $40,000 in illegal gifts or payments, Johnson had received over $40,000, and Mickens had received over $30,000.[56]

111.  On September 15, 2015, just two days after FCA was selected as lead, FCA and the UAW announced that an agreement had been reached.

112.  Following the announcement of the tentative agreement, the UAW bargaining team, including Jewell, Nancy Adams Johnson and others, celebrated the deal with a $6,912.18 dinner at a Detroit steakhouse. The meal was paid for using a NTC credit card with funds supplied by FCA.[57]

113.  The deal favored FCA so much that, for the first time in 30 years, the UAW's FCA membership rejected the tentative agreement; forcing the UAW to continue negotiations.[58]

114.  FCA and the UAW agreed to a revised tentative agreement on October 8, 2015, which was ratified on October 22, 2015.[59]

115.  However, the ratified agreement still favored FCA. While the revised agreement included an 8-year pathway for Tier-2 workers to gain Tier-1 status, the cap on Tier-2 workers

---

[56] King Plea Agreement, Aug. 29, 2017 (ECF No. 43) at 9; Johnson Plea Agreement at 9, July 23, 2018 (ECF No. 112) at 9; Mickens Plea Agreement, Apr. 5, 2018 (ECF No. 88) at 7-8.

[57] Johnson Sentencing Mem. of the United States, Dec. 12, 2018, (ECF No. 176), at 5.

[58] Brent Snavely, *UAW Confirms Members Rejected Proposed FCA Contract,* DETROIT FREE PRESS, Oct. 1, 2015, https://www.freep.com/story/money/cars/chrysler/2015/10/01/uaw-confirms-members-rejected-proposed-fca-contract/73122808/.

[59] Alisa Priddle and Brent Snavely, *Done Deal: UAW Confirms Ratification of FCA Contract*, DETROIT FREE PRESS (Oct. 22, 2015), https://www.freep.com/story/money/cars/chrysler/2015/10/22/done-deal-uaw-confirms-ratification-fca-contract/74380230/.

was not reinstituted (as FCA and the UAW had previously agreed). Instead, the majority of the benefits gained were given to Tier-1 workers.[60]

116. As explained above, FCA's advanced notice that the UAW would agree to abandon the 25% cap on Tier-2 workers in 2015 was a material benefit to the Company. It allowed FCA to ramp up its Tier-2 (cheaper) workforce to approximately 40% without the risk of being subjected to the penalty provision accompanying the expected cap. The agreement also gave FCA a head start over its competitors with respect to the number of Tier-2 workers who were already working at FCA (and performing some Tier-1 work) when the 2015 CBAs were ratified and the cap was formally not reinstituted.

117. The Center for Automotive Research ("CAR") issued a report summarizing the 2015 CBA round on June 3, 2016 (the "2016 CAR Report"), showing that FCA had achieved a significant labor cost advantage over Ford and GM during the duration of 2011 CBA.

118. Rather than FCA's labor cost increasing by two dollars per employee as CAR had projected in 2011 based on the 2011 CBA, from 2011 through 2015, FCA's labor cost per employee, per hour *fell* five dollars and FCA doubled its labor cost advantage to eight dollars per employee over GM.[61]

119. The 2016 CAR Report projected that the gap in labor cost between FCA, GM, and Ford would close by 2019 (when the next CBA was to be negotiated), with FCA's expected per

---

[60] *See* "UAW-FCA US LLC Hourly Report," International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America, October 2015 at 1-3, available at https://uaw.org/wp-content/uploads/2015/10/FCA-FINAL-HOURLY-100815-730-AM.pdf (herein after referred to as the "October 2015 UAW Summary"); *see also* Dziczek, Kristen, "2015 Auto Contracts Wrap-Up," Center for Automotive Research (June 3, 2016) at 3, available at https://www.chicagofed.org/~/media/others/events/2016/automotive-outlook-symposium/dziczek-060316-pdf.pdf (herein after referred to as the "2016 CAR Report") (noting that the revised contract shifted cash to current workers).

[61] *See* 2011 CAR Report at 36; *Cf.* 2016 CAR Report at 8.

hour labor cost increasing from $47 to $56 by 2019, while Ford and GM would only increase to $60 per hour.[62]



120.    However, without a cap on Tier-2 employees, with 40% of FCA's workforce consisting of Tier-2 workers as of October 2015, and with the UAW's agreement to implement WCM, FCA was able to maximize its labor cost advantage through the 2015 CBA term.  As of 2019, FCA's average hourly labor cost was just $55 - $8 per hour less than GM and $6 less than Ford.[63]

---

[62]2016 CAR Report at 8.

[63] 2020 CAR Report at 12.

**D. Low Labor Costs Enable FCA to Increase Profit Margins in its Most Important Business Segment**

121. FCA's NAFTA (North American) segment is the Company's most important business segment, accounting for 79%-90% of FCA's earnings before interest ("EBIT") during the Class Period.[64]

122. During the Class Period, FCA's cost of revenue (i.e. costs incurred to get a product to the consumer), which includes the Company's direct labor costs, accounted for approximately 85% of FCA's total Class Period net revenue.[65] Accordingly, any reduction in FCA's cost of revenue (e.g. a reduction in labor costs), increases FCA's profits.

123. By exploiting the advantages FCA improperly obtained from the UAW through bribery scheme, Defendants were able to reduce the Company's U.S. labor costs and thus, reduce its cost of revenues and increase its profit margins – frequently outperforming the industry in the Company's most important business segment.

124. For example, on April 26, 2016, FCA reported that in 1Q16, FCA had "an adjusted EBIT margin for the quarter of nearly 5.2%, nearly double [FCA's] quarterly margin from a year ago" and highlighted North American results saying that "NAFTA margins were up 7.2%" ahead of the forecasted 7%.[66]

---

[64] *See* FCA 2018 Form 20-F (filed 2/22/19) at p. 58 (showing EBIT by segment); FCA 2019 Form 20-F (filed 2/25/20) at 61 (showing EBIT by segment).

[65] *See* FCA 2018 Form 20-F (filed 2/22/19) at p. 151; FCA 2019 Form 20-F (filed 2/25/20) at 150.

[66] FCA.MI – Q1 2016 Fiat Chrysler Automobiles NV Earnings Call, Thomson Reuters Streetevents, April 26, 2016, at 3.

125.     On July 26, 2016, FCA reported that 2Q16 NAFTA margins were up to 7.9%, up from 7.7% the prior year.[67]

126.     On October 25, 2016, FCA reported that it had its "best Q3 for adjusted EBIT and our best adjusted net profit ever," with adjusted EBIT margins up at 5.6%, up 130 basis points over prior year.[68]

127.     On July 27, 2017, FCA reported that "[a]ll of [FCA's] operating segments showed margin improvements year-over-year.  And in particular, NAFTA posted an 8.4% margin, which is a record for that region."[69]

128.     On October 24, 2017, FCA again reported increases in margins for 3Q17, highlighting NAFTA, stating that "[a]djusted margins were up 110 basis points to 6.7%.  All our segments made positive year-over-year contributions to adjusted EBIT, with margins in NAFTA reaching 8.0%."[70]

129.     On January 25, 2018, Defendants again reported that margins were up 90 basis points to 6.4% for the Company and reiterated its 2018 guidance, confirming its targets for adjusted EBIT and adjusted net income.[71]

---

[67] FCA.MI – Q2 2016 Fiat Chrysler Automobiles NV Earnings Call, Thomson Reuters Streetevents, July 27, 2016, at 3.

[68] FCA.MI – Q3 2016 Fiat Chrysler Automobiles NV Earnings Call, Thomson Reuters Streetevents, October 25, 2016, at 3.

[69] FCA.MI – Q2 2017 Fiat Chrysler Automobiles NV Earnings Call, Thomson Reuters Streetevents, July 27, 2017, at 3.

[70] FCA.MI – Q3 2017 Fiat Chrysler Automobiles NV Earnings Call, Thomson Reuters Streetevents, October 24, 2017, at 3.

[71] FCA.MI – Q4 2017 Fiat Chrysler Automobiles NV Earnings Call, Thomson Reuters Streetevents, January 25, 2018, at 3.

130. On July 25, 2018, FCA informed investors that its U.S. performance continued to trend upward. Defendant Palmer reported that "NAFTA performance was good…margins are 8%, representing a pretty strong performance."[72]

131. On October 30, 2018, the Company once again reported margin growth in the U.S., despite the industry being generally down. Defendant Manley announced that in North America, FCA achieved a 10.2% margin and improved adjusted EBIT about 50% year-over-year.[73]

132. FCA's margin growth trend continued into 2019. On February 7, 2019, Defendant Manley announced that the Company "see[s] continued strong performance in NAFTA and LATAM with higher year-over-year adjusted EBIT and margin."[74]

133. On October 31, 2019, in the Company's final investor call under the 2015 CBA, FCA once again announced that it continued to outperform the North American market. FCA Chief Technical Compliance Officer, Mark Chernoby revealed that "[i]n North America, the overall industry was substantially flat. However, our share was up slightly year-over-year to 12.1%." Palmer added that "[b]oth North America and LATAM had very strong quarters, up 4% and 83% respectively, with North America margins at a record 10.6%."[75]

---

[72] FCA.MI – Q2 2018 Fiat Chrysler Automobiles NV Earnings Call, Thomson Reuters Streetevents, July 25, 2018, at 5.

[73] FCA.MI – Q3 2018 Fiat Chrysler Automobiles NV Earnings Call, Thomson Reuters Streetevents, October 30, 2018, at 3.

[74] FCA.MI – Q4 2018 Fiat Chrysler Automobiles NV Earnings Call, Thomson Reuters Streetevents, February 7, 2019, at 3.

[75] FCA.MI – Q3 2019 Fiat Chrysler Automobiles NV Earnings Call, Thomson Reuters Streetevents, October 31, 2019, at 4.

### E.     The Department of Justice Begins to Uncover FCA's Scheme

134.     The DOJ's investigation into FCA was trigged in September 2013, after Holiefield's top aide, James Hardy abruptly left the UAW amid allegations that he was selling jobs at Chrysler plants.  When questioned by federal prosecutors, Hardy provided information about how the UAW's FCA department was plagued by corruption.[76]

135.     The investigation quickly led to Iacobelli who, in addition to bribing UAW leadership, saw FCA's open checkbook as an opportunity to benefit himself.[77]

136.     After three years of investigating, in June 2017, the DOJ began charging FCA and UAW individuals for acts in connection with the bribery scheme.

137.     Almost three years later, the DOJ had convicted three FCA senior executives and four UAW officials for their roles in the scheme with many others being implicated.  Set forth below is a summary of the relevant players:

### SERGIO MARCHIONNE

138.     Marchionne was CEO of FCA from 2009 through 2018.  Marchionne was implicated in the scheme and is named as "FCA-1" in the indictment filed against Iacobelli.[78]

139.     In February 2010, Marchionne gave Holiefield a custom Terra Cielo Mare watch with the Fiat logo on it worth several thousand dollars.  The watch was given to Holiefield with a

---

[76] Daniel Howes and Robert Snell, *Driven by Greed: Alliance of FCA, Union Leaders Fueled Decade of Corruption*, THE DETROIT NEWS (Dec. 18, 2019), https://www.detroitnews.com/in-depth/business/autos/2019/12/18/greed-driven-alliance-fca-uaw-leaders-sparks-decade-corruption/2634016001/.

[77] Iacobelli reportedly used FCA funds that were meant for the NTC to purchase items for himself, including a Ferrari convertible, and landscaping for his home, among other things.  *See* Iacobelli Indictment, July 26, 2017, (ECF No. 4) at 31-32.

[78] *Id.* at 17.

hand-written note that said: Dear General, I declared the goods at less than fifty bucks. That should remove any potential conflict. Best regards, and see you soon." [79]

140.    Marchionne was questioned by investigators in July 2016 where he reportedly lied to investigators about the watch.[80]    Marchionne died before any charges were brought against him.

**ALPHONS IACOBELLI**

141.    Iacobelli was Vice President of Employee Relations at FCA and the Co-Chairman of the NTC and its Joint Activities Board from 2008 to 2015.   Iacobelli was a senior official at Chrysler and FCA responsible for negotiating and implementing labor agreements with the UAW and resolving disputes and grievances that arose under the CBAs between Chrysler/FCA and UAW.   Iacobelli reported directly to Marchionne.

142.    On January 22, 2018, Iacobelli pled guilty to conspiracy to violate the Labor Relations Management Act, and to one count of subscribing a false tax return.   Iacobelli was sentenced to 5½ years in prison, ordered to pay a $10,000 fine and $835,532 in restitution for his role in the bribery scheme.

143.    Iacobelli admitted "[b]etween in or before January 2009 and continuing through or after June 2015, [I] knowingly and voluntarily joined a conspiracy in which FCA and FCA executives and FCA employees agree to pay and deliver, and willfully paid and delivered, money

---

[79] *The Detroit News* revealed in August 2018 that Marchionne was in fact FCA-1. See Robert Snell, *FCA Chief Failed to Disclose Gift to UAW, Sources Say*, THE DETROIT NEWS (Aug. 16, 2018), https://www.detroitnews.com/story/business/autos/chrysler/2018/08/16/sergio-marchionne-gave-expensive-watch-uaw-failed-tell-investigators-orruption/985477002/.

[80] *Id.*

and things of value to officers and employees of the UAW," including Holiefield and Virdell King.[81]

144.    Iacobelli admitted that he, Durden, and other unnamed FCA executives and employees provided over $1.5 million in illegal benefits to UAW officials to "obtain benefits, concessions, and advantages in the negotiation, implementation and administration of the collective bargaining agreement between FCA and the UAW."[82]

145.    Iacobelli provided money and gifts to UAW leadership in order to influence FCA's labor negotiations.  He directed that senior UAW officials receive NTC credit cards to buy designer clothing, lavish meals, rounds golf and other luxury items at FCA's expense. Additionally, Iacobelli oversaw a series of payments funneled through various entities, amounting to hundreds of thousands of dollars to Holiefield and Morgan-Holiefield.[83]

146.    Iacobelli directed over $9 million directly to the UAW as an entity by reimbursing the UAW for the salaries and benefits for the UAW officials who worked at the NTC, also known as "chargebacks."[84]

147.    Iacobelli was also charged with tax violations related to diverting more than $1 million of funds from the NTC for his own benefit.[85]

---

[81] Iacobelli Plea Agreement, Jan. 23, 2018, (ECF No. 58) at 5-6.

[82] *Id.* at 6.

[83] *Id.* at 7-11.

[84] Robert Snell, *Corrupt Fiat Chrysler Exec Gets 5.5 Years in Prison*, THE DETROIT NEWS (Aug. 27, 2018), https://www.detroitnews.com/story/business/autos/chrysler/2018/08/27/fiat-chrysler-exec-gets-five-years-prison/1085900002/.

[85] *Id.*

**JEROME DURDEN**

148.    Jerome Durden was a financial analyst at FCA and Chrysler from 1985 to 2015. From 2009 to 2015, Durden was also Controller of the NTC and served as secretary of the NTC Joint Activities Board. Durden was responsible for controlling the NTC's finances and approving payments made by the NTC. From 2009 to 2015, Durden also served as treasurer to the Leave the Light on Foundation, a non-profit organization controlled by UAW Vice President General Holiefield.

149.    On August 7, 2017, Durden plead guilty to failure to file tax returns on behalf of the NTC and the Leave the Light on Foundation, and to conspiracy to defraud the United States. Durden was sentenced to 15 months in prison.

150.    Durden admitted that he and his co-conspirators used the NTC as a conduit "to conceal over a million dollars in prohibited payments and things of value paid directly and indirectly to UAW Vice President General Holiefield and other UAW officials by persons acting in the interest of Fiat Chrysler Automobiles US LLC (FCA)."[86]

151.    Durden admitted that he concealed hundreds of thousands of dollars in transfers from the NTC to the Leave the Light on Foundation and other companies controlled by Holiefield or his wife, Monica Morgan. Durden also concealed over $262,000 in direct compensation to Holiefield.[87]

152.    Along with Iacobelli and others, Durden helped to create a spending policy using NTC credit cards to keep senior UAW members "fat, dumb and happy." Durden personally

---

[86] Durden Plea Agreement, Aug. 8. 2017, (ECF No. 29), at 4.

[87] *Id.* at 11-13.

collected the credit card statements for Holiefield and other UAW officials and was instructed to conceal NTC expenditures that benefitted UAW officials that could "raise eyebrows."[88]

## MICHAEL BROWN

153. Michael Brown was Director of Labor Employee Relations at Chrysler and FCA from 2009 to 2016. Brown participated in the negotiation and administration of the CBAs between Chrysler or FCA and the UAW, and had the authority to sign letters and agreements on behalf of Chrysler or FCA with the UAW. Brown also represented Chrysler and FCA as Co-Director of the NTC.[89]

154. On May 25, 2018, Brown pled guilty to one count of lying to a federal grand jury about the scope of the FCA bribery scheme. Brown was sentenced to 12 months in prison for his role in the conspiracy.

155. Brown admitted to knowing that bribes authorized by FCA executives were being paid to UAW officials and the UAW. Brown also admitted that he and other FCA executives authorized hundreds and thousands to dollars in payments to the UAW and UAW officials, including General Holiefield, in the guise of reimbursement for salaries and benefits and administration fees, for no-show jobs at the NTC.[90]

156. Brown admitted that it was the intent of FCA executives to "grease the skids in order to obtain benefits, advantages, and concessions in the negotiation, implementation, and administration of the collective bargaining agreements between FCA and the UAW.[91]

---

[88] Iacobelli Indictment, July 26, 2017, (ECF No. 4), at 7-8.

[89] Brown Plea Agreement, May 25, 2018, (ECF No. 102), at 2-3.

[90] *Id*. at 6-7.

[91] *Id*. at 4.

**NORWOOD JEWELL**

157. Norwood Jewell served as Vice President of the UAW, the most senior official in the UAW Chrysler Department from 2014 to 2016. As UAW Vice President, Jewell was responsible for negotiating and administering the CBAs between the UAW and FCA. In 2015, Jewell served as a member of the UAW national negotiating committee responsible for the CBA between the UAW and FCA.[92]

158. On April 2, 2019, Jewell pled guilty to one count of conspiracy to violate the Labor Relations Management Act. Jewell was sentenced to 15 months in prison for his role in the conspiracy between FCA and the UAW.

159. Jewell admitted that he "knowingly and voluntarily joined [the conspiracy between FCA and the UAW] to receive things of value from persons acting in the interest of FCA" and that he knew that these impermissible bribes were intended to benefit him and other senior UAW officials.[93]

160. Jewell admitted that he received an NTC credit card in 2014, and from 2014 to 2016 he used his NTC credit card for the benefit of himself and other UAW officials.[94]

161. From 2014 to 2016, Jewell accepted over $90,000 in illegal payments from FCA for his own personal benefit, for the benefit of his friends, and for the entertainment of other UAW officials.[95]

---

[92] Jewell Information, *United States v. Jewell*, Case No. 2:19-cr-20146 (E.D. Mich. Mar. 18, 2019) (ECF No. 1), at 4.

[93] Jewell Plea Agreement, *United States v. Jewell*, Case No. 2:19-cr-20146 (E.D. Mich. Apr. 2, 2019) (ECF No. 10), at 3-4.

[94] *Id.* at 9.

[95] Press Release, U.S. Dep't of Justice, *Former UAW Vice President Norwood Jewell Sentenced to Prison for Conspiring with Fiat Chrysler to Accept Illegal Payments* (Aug. 5, 2019),

162.	Jewell's purchases included a $2,180 shotgun, golf, travel, luxury accommodations, lavish meals, cigars, and over $25,000 on a 2014 party at the NTC for senior UAW officials.[96]

**GENERAL HOLIEFIELD**

163.	General Holiefield was UAW Vice President from 2008 to 2014.  As UAW Vice President, Holiefield was the senior UAW officer responsible for negotiating with FCA and for administering the CBAs between the UAW and FCA on behalf of the UAW membership. Holiefield was also responsible for managing the UAW's relationship with FCA and for resolving disputes that arose under the collective bargaining agreements between the UAW and FCA.[97]

164.	From 2009 to 2014, Holiefield illegally accepted substantial benefits from FCA.

165.	Between 2009 and 2014, more than $386,400 was improperly transferred from the NTC to Holiefield's non-profit organization, the Leave the Light on Foundation.[98]

166.	In 2010, Marchionne gave Holiefield a custom Terra Cielo Mare watch worth several thousand dollars.

167.	In 2012 and 2013, Holiefield made over $200,000 worth of personal purchases on an NTC-issued credit card, including jewelry, furniture, designer clothing, and other personal items and expenses, and in 2014, FCA (through the NTC) paid off the remaining $262,219.71

---

https://www.justice.gov/usao-edmi/pr/former-uaw-vice-president-norwood-jewell-sentenced-prison-conspiring-fiat-chrysler.

[96]Jewell Sentencing Mem. of the United States, *United States v. Jewell*, Case No. 2:19-cr-20146 (E.D. Mich. July 30, 2019), (ECF No. 15), at 5-14.

[97] Iacobelli Indictment, July 26, 2017, (ECF No. 4), at 5.

[98] Durden Plea Agreement, Aug. 8. 2017, (ECF No. 29), at 6-7.

balance of the mortgage on Holiefield's home.[99]  Holiefield also funneled benefits through his wife's various companies (some of which were mere front companies), including $13,500 that FCA (through the NTC) paid to Monica Morgan Photography, which was used to pay off the balance of the installation of a swimming pool at his home.[100]

168.    Holiefield died in March 2015 before he could be charged for his role in the conspiracy. However, his wife, Monica Morgan-Holiefield, was charged and sentenced to prison.

## MONICA MORGAN-HOLIEFIELD

169.    Monica Morgan-Holiefield was wife of former-UAW Vice President General Holiefield.    Morgan-Holiefield owned and operated Wilson's Diversified Products LLC ("WDP") and Monica Morgan Photography ("MMP").[101]

170.    In and after 2011, General Holiefield selected WDP and MMP as preferred and single-source vendors for the NTC.  On numerous occasions between 2011 and 2013, Holiefield and Morgan-Holiefield created invoices from WDP and MMP, and received payments from the NTC for services that were never provided.[102]

171.    Between July 2009 and 2011, over $70,000 of NTC funds were funneled through the Leave the Light on Foundation to MMP, which Morgan-Holiefield used at retailers, night clubs, and restaurants.[103]

172.    Between January 2011 and July 2012, the NTC transferred more than $425,000 to WDF.[104]

---

[99] Iacobelli Indictment, July 26, 2017, (ECF No. 4), at 16-17.

[100] Mickens Plea Agreement, Apr. 5, 2018, (ECF No. 88), at 7.

[101] Iacobelli Indictment, July 26, 2017 (ECF No. 4), at 5.

[102] Mickens Plea Agreement, Apr. 5, 2018, (ECF No. 88), at 6.

[103] Iacobelli Indictment, July 26, 2017 (ECF No. 4), at 10-11.

173.    As described above, NTC funds provided by FCA were also used to pay off the mortgage on the Holiefields' home and for the installation of a swimming pool.[105]

174.    On February 6, 2019, Morgan-Holiefield pled guilty to filing false tax return documents from 2011 in 2014 that excluded over $200,000 in taxes.[106]  Morgan-Holiefield was sentenced to 18 months in prison, fined $25,000, and ordered to pay $190,747 in restitution for her tax offense.

175.    Following Morgan's sentencing, U.S. Attorney Matthew Schneider stated that "Morgan was punished for cheating on her taxes and for helping conceal hundreds of thousands of dollars in illegal payments from FCA executives to Morgan and her husband."[107]

**VIRDELL KING**

176.    Virdell King was a senior UAW official in the UAW's Chrysler Department from 2008 until 2016.  King was responsible for negotiating and administering the CBAs between the UAW and FCA.  In 2011 and 2015, King served as a member of the UAW national negotiating committee responsible for the CBA between the UAW and FCA.  From 2008 to 2015, King also was the Assistant Director of the NTC, and from 2011 to 2015 she served on the NTC's Joint Activities Board.[108]

---

[104] *Id.* at 13.

[105] Iacobelli Indictment, July 26, 2017 (ECF No. 4), at 16-17; Mickens Plea Agreement, Apr. 5, 2018, (ECF No. 88), at 7.

[106] Morgan Plea Agreement, Feb. 16, 2018 (ECF No. 63), at 2-3.

[107] Robert Snell, *Holiefield Widow Gets 18 Months in Auto Industry Corruption Scandal*, THE DETROIT NEWS (July 18, 2018), https://www.detroitnews.com/story/business/autos/2018/07/13/monica-morgan-holiefield-sentenced-uaw-fiat-chrysler/781882002/.

[108] King Plea Agreement, Aug. 29, 2017 (ECF No. 43), at 3-4.

177. On August 29, 2017, King pled guilty to conspiracy to violate the Labor Management Relations Act. King was sentenced to two months in prison and a fine of $5,500 for her role in the conspiracy between the UAW and FCA.

178. King admitted that from 2012 through 2015, she used an NTC credit card to make over $40,000 in personal purchases for herself and for other senior UAW officials knowing that the credit card purchases were authorized by Iacobelli, who was acting in the interest of FCA, and were paid for by funds provided by FCA.[109]

179. King's purchases included Christian Louboutin shoes worth over $1,000, jewelry, golf equipment, luggage, concert and theme park tickets, and $2,180 shotgun as a birthday present for Jewell.[110]

**NANCY ADAMS JOHNSON**

180. Nancy Adams Johnson was the Top Administrative Assistant to Norwood Jewell, Vice President of the UAW's Chrysler Department from 2014 through 2016. As the Top Administrative Assistant, Johnson was the second most senior official in the UAW Chrysler Department. Johnson was responsible for negotiating and administering the CBAs between the UAW and FCA. In 2015, Johnson served as a member of the UAW national negotiating committee responsible for the CBA between the UAW and FCA.[111]

181. On July 23, 2018, Johnson pled guilty to one count of conspiracy to violate the Labor Relations Management Act. Johnson was sentenced to five months in prison and a fine of $10,000 for her role in the conspiracy between the UAW and FCA.

---

[109] *Id.* at 9.

[110] *Id.* at 8; Johnson Plea Agreement, July 23, 2018 (ECF No. 112), at 8.

[111] *Id.* at 4, 7.

182.     Johnson admitted that she was given an NTC credit card in 2014 and, from 2014 through 2016 she used the NTC credit card to make over $40,000 in personal purchases for herself and other senior UAW officials.  Johnson also admitted that she knew these purchases were authorized by individuals acting in the interest of FCA and were paid for with funds provided by FCA.[112]

183.     Johnson's purchases included travel, golf, limousine rides, designer clothes and shoes, including a pair of Christian Louboutin shoes worth over $1,000, jewelry, and lavish meals.[113]

184.     Johnson also revealed that in 2014, 2015 and 2016, high-level UAW officials used NTC credit cards with funds supplied by FCA to pay for lavish months-long stays in Palm Springs where little to no UAW business was being conducted.

**KEITH MICKENS**

185.     Keith Mickens was a senior UAW official in the UAW Chrysler Department from 2010 through 2015.  Mickens was responsible for negotiating and administering the CBAs between the UAW and FCA.  In 2011, Mickens served as a member of the UAW national negotiating committee responsible for the CBA between the UAW and FCA.[114]

186.     Mickens was also Co-Director of the NTC and served on the NTC Joint Activities Board.  As Co-Director of the NTC, Mickens was responsible for reviewing and approving all payments made by the NTC.[115]

---

[112] *Id.* at 9.

[113] *Id.* at 3; Jewell Plea Agreement, *United States v. Jewell*, Case No. 2:19-cr-20146 (E.D. Mich. Apr. 2, 2019) (ECF No. 10), at 11.

[114] Mickens Information, Feb. 6, 2018 (ECF No. 61), at 4.

[115] Mickens Sentencing Mem. of the United States, Oct. 31, 2018 (ECF No. 156), at 4.

187. On April 5, 2018, Mickens pled guilty to one count of conspiracy to violate the Labor Management Relations Act. Mickens was sentenced to 12 months in prison and fined $10,000 for his role in the conspiracy.

188. Mickens admitted to helping transfer over $700,000 from FCA to Holiefield using companies controlled by Holiefield and his wife, Monica Morgan and that FCA concealed the payments using the NTC bank accounts.[116]

189. Mickens also admitted that in or around 2010, he was provided an NTC credit card that was paid for by the NTC using funds provided by FCA. Between 2012 and 2014, Mickens used his NTC credit card to make over $7,500 in personal purchases, including over $2,500 at Best Buy stores.

190. Mickens also admitted to accepting $25,000 directly from FCA as "a one-time, non-precedent setting, incentivized retirement program," on the condition that he agreed in writing not to disclose the payment to "members of the news media" or to any other third parties.[117]

**DENNIS WILLIAMS**

191. Dennis Williams was President of the UAW from 2014 to June 2018. Williams was responsible for negotiating and administering the CBAs between the UAW and FCA. In 2015, Williams served as a member of the UAW national negotiating committee responsible for the CBA between the UAW and FCA. As President, Williams was also responsible for selecting which of the Big Three automakers would be the target company for negotiations.

---

[116] Mickens Plea Agreement, Apr. 5, 2018 (ECF No. 88), at 6-7; Mickens Sentencing Mem. of the United States, Oct. 31, 2018 (ECF No. 156), at 1,7.

[117] Mickens Plea Agreement, Apr. 5, 2018 (ECF No. 88), at 8.

192.    During Williams's tenure as President, he directed or approved the improper use of over $1 million in union funds, some of which came from FCA through the NTC, in connection with UAW retreats in Palm Springs, California, including at least $570,000 prior to the 2015 CBA negotiations.[118]

193.    In 2014 or 2015, Williams directed that senior UAW officials use NTC funds to pay for travel, lavish meals and entertainment for UAW officials and their friends, family and allies, citing a need to reduce costs to the UAW budget from such expenditures because the UAW budget was under pressure.[119]

194.    Williams has yet to be formally charged in the conspiracy but he has been implicated in a wider corruption scandal at the UAW with federal investigators conducting a raid of his home in August 2019.

### F.    FCA Negotiating a Settlement with the DOJ

195.    On May 3, 2019, FCA disclosed to investors that the Company was "in discussions with the DOJ about a potential resolution of its investigation" that FCA engaged in tax fraud and a conspiracy with the UAW in violation of the Labor Relations Management (Taft-Hartley) Act.  The Company further stated that the "outcome of those discussion [with the DOJ]

---

[118] Pearson Criminal Complaint, United States v. Pearson, Case No. 2:19-mj-30488-DUTY (E.D. Mich. Sept. 12, 2019) (ECF No. 1), at 10-12, 15-17; *see also* Robert Snell, Ian Thibodeau and Daniel Howes, *UAW Presidents Gary Jones, Dennis Williams Implicated in Federal Probe*, THE DETROIT NEWS (Sept. 12, 2019) (identifying Dennis Williams as "UAW Official B" in the Pearson Criminal Complaint), https://www.detroitnews.com/story/business/autos/2019/09/12/uaw-presidents-gary-jones-dennis-williams-implicated-in-federal-probe/2302410001/; Johnson Plea Agreement, July 23, 2018 (ECF No. 112), at 10.

[119] Johnson Plea Agreement, July 23, 2018 (ECF No. 112), at 9; see also Robert Snell, *Ex-UAW Boss Dennis Williams Ok'd Using Training Center Funds, Aide Says*, THE DETROIT NEWS (July 26, 2018) (identifying Dennis Williams as the "high level UAW official referenced by Johnson), https://www.detroitnews.com/story/business/autos/2018/07/26/uaw-president-dennis-williams-conspiracy-directed-use-automaker-funds-through-training-centers/822741002/.

is uncertain; however any resolution may involve the payment of penalties and other sanctions."[120]

196.    On June 19, 2019, *The Detroit News* reported that negotiations between FCA and the DOJ had been underway since at least December and that the proposed penalties to FCA would include FCA "submitting to government oversight for up to five years, paying less than $50 million in penalties and agreeing to make broad institutional changes to emerge from a bribery scandal that has led to eight convictions, including former FCA Vice President Alphons Iacobelli."[121]   One of the DOJ's terms for settlement in the negotiation is also that FCA agrees to admit guilt in connection with the conspiracy with the UAW.[122]

197.    Additionally, the same article reported that "the ongoing corruption scandal entangling union training centers funded by all three Detroit automakers also has demonstrated that FCA executives wooed union leaders with cash, gifts and other benefits" and that the DOJ's allegation that "Fiat Chrysler and the UAW [were] co-conspirators in a still widening corruption conspiracy" is "at odds with claims the Auburn Hills automaker and labor union were victimized by rogue employees."[123]

### G.    Defendants' False and Misleading Statements

198.    During the Class Period, Defendants issued false and misleading statements concerning the 2015 CBA by failing to disclose that the CBA was affected by FCA's bribery

---

[120] *See* Interim Report, Form 6-K (filed May 3, 2019) at 54.

[121] Robert Snell, Ian Thibodeau and Daniel Howes, *Fiat Chrysler Negotiates with Feds to Resolve Corruption Probe*, THE DETROIT NEWS (June 19, 2019), https://www.detroitnews.com/story/business/autos/chrysler/2019/06/19/fiat-chrysler-negotiates-feds-resolve-corruption-probe/1489636001/.

[122] *Id*.

[123] *Id.*

scheme and that the Company secured concessions in the 2015 CBA as a result of the bribery scheme.

199.    After the DOJ filed indictments against Iacobelli and Durden in July 2017 and the market heard of the possibility of some aspects of the bribery scheme, Defendants issued a series of false and misleading statements designed to quell investor concerns regarding the scope and effects of the bribery scheme. Defendants falsely assured the market of the Company's innocence in the bribery scandal, falsely representing that FCA was a "victim" and that the Company neither knew about nor sanctioned the bribery scheme. Additionally, Defendants falsely assured the market that the bribes provided to numerous senior UAW officials, including individuals directly responsible for negotiating the 2015 CBA, did not impact the 2015 CBA negotiations.

200.    Defendants' false and misleading statements and omissions, concealed material risks to the Company that were likely to be realized upon disclosure of the full scope of the Company's bribery scheme.

### 1.    The February 29, 2016 False and Misleading Statements

201.    On February 29, 2016, FCA filed its annual report on Form 20-F for the year ended December 31, 2015 with the SEC (the "2015 20-F"). The 2015 20-F was signed by Defendant Palmer. The 2015 20-F contained signed Sarbanes-Oxley ("SOX") certifications by Defendants Marchionne and Palmer attesting to the accuracy of financial reporting, the disclosure of any material change to the Company's internal controls over financial reporting, and the disclosure of all fraud.

202.    The 2015 20-F contained the following statement regarding the Company's collective bargaining agreement with the UAW:

In October 2015, FCA US and the UAW agreed to a new four-year national collective bargaining agreement, which will expire in September 2019. The provisions of the agreement continue certain opportunities for success-based compensation upon meeting certain quality and financial performance metrics. The agreement closes the pay gap between "Traditional" and "In-progression" employees over an eight year period and will continue to provide UAW-represented employees with a simplified adjusted profit sharing plan. The adjusted profit sharing plan was effective for 2016 and was directly aligned with NAFTA profitability. The agreement included lump-sum payments in lieu of further wage increases of primarily U.S. $4,000 for "Traditional" employees and U.S. $3,000 for "In-progression" employees totaling approximately $141 million (€126 million) that was paid to UAW members on November 6, 2015.[124]

203.    The 2015 20-F also contained the following statement touting the UAW's agreement to implement the Company's use of the WCM system:

> Throughout our manufacturing operations, we have deployed WCM principles…We are the only OEM [Original Equipment Manufacturer] that is a member of the WCM Association…Concurrently with our January 2014 acquisition of the remaining 41.5% of FCA US owned by the VEBA Trust, **FCA US entered into a memorandum of understanding to supplement the existing collective bargaining agreement with the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW"), and provide for a specific commitment to the implementation of our WCM principles throughout FCA US's manufacturing facilities**, to facilitate benchmarking across all of our manufacturing plants and actively assist in the achievement of FCA US's long-term business plan. (Emphasis added).[125]

204.    The statements in ¶¶ 202-203 were false and misleading or omitted material facts when made because: (i) Defendants failed to disclose that FCA senior executives had authorized and carried out a scheme to bribe UAW officials for the purpose of obtaining concessions during the 2015 CBA process; (ii) Defendants failed to disclose that Marchionne personally participated in the bribery scheme by providing an illegal gift to Holiefield in violation of the Taft-Hartley Act; (iii) Defendants failed to disclose that FCA received concessions from the UAW in exchange for the illegal bribes, including the UAW's agreement to implement WCM and other

---

[124] *See* FCA 2015 Form 20-F (filed 2/29/16) at 130.

[125] *See id.* at 35.

terms in the CBA; (iv) Defendants failed to disclose that the labor cost advantage FCA gained in the 2015 CBA was the result of illegal bribes given to UAW officials; (v) Defendants concealed the risk that the Company would not be able to obtain similar labor concessions going forward absent the bribery; (vi) Defendants concealed the risk that without similar concessions from the UAW, the Company's margin gains in its North American segment were not sustainable; and (vii) Defendants concealed the risk that the Company would be subject to penalties and liabilities once the effects of the bribery scheme on the CBA process became known.

### 2. The February 28, 2017 Misstatements and Omissions

205. On February 28, 2017, FCA filed its annual report on Form 20-F for the year ended December 31, 2016 with the SEC (the "2016 20-F"). The 2016 20-F was signed by Defendant Palmer. The 2016 20-F contained signed SOX certifications by Defendants Marchionne and Palmer attesting to the accuracy of financial reporting, the disclosure of any material changed to the Company's internal controls over financial reporting, and the disclosure of all fraud.

206. The 2016 20-F contained the following statement regarding the Company's collective bargaining agreement with the UAW:

> In October 2015, FCA US and the UAW agreed to a new four-year national collective bargaining agreement, which will expire in September 2019. The provisions of the agreement continue certain opportunities for success-based compensation upon meeting certain quality and financial performance metrics. The agreement closes the pay gap between "Traditional" and "In-progression" employees over an eight year period and will continue to provide UAW-represented employees with a simplified adjusted profit sharing plan. The adjusted profit sharing plan was effective for 2016 and was directly aligned with NAFTA profitability. The agreement included lump-sum payments in lieu of further wage increases of primarily U.S. $4,000 for "Traditional" employees and

U.S.$3,000 for "In-progression" employees totaling approximately $141 million (€126 million) that was paid to UAW members on November 6, 2015.[126]

207. The 2016 20-F also touted the UAW's agreement to implement FCA's WCM system:

> Throughout our manufacturing operations, we have deployed WCM principles…We are the only OEM [Original Equipment Manufacturer] that is a member of the WCM Association…Concurrently with our January 2014 acquisition of the remaining 41.5% of FCA US owned by the VEBA Trust, **FCA US entered into a memorandum of understanding to supplement the existing collective bargaining agreement with the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW"), and provide for a specific commitment to the implementation of our WCM principles throughout FCA US's manufacturing facilities**, to facilitate benchmarking across all of our manufacturing plants and actively assist in the achievement of FCA US's long-term business plan. (Emphasis added).[127]

208. The statements in ¶¶ 206-207 were false and misleading or omitted material facts when made because: (i) Defendants failed to disclose that FCA senior executives had authorized and carried out a scheme to bribe UAW officials for the purpose of obtaining concessions during the 2015 CBA process; (ii) Defendants failed to disclose that Marchionne personally participated in the bribery scheme by providing an illegal gift to Holiefield in violation of the Taft-Hartley Act; (iii) Defendants failed to disclose that FCA received concessions from the UAW in exchange for the illegal bribes, including the UAW's agreement to implement WCM and other terms in the CBA; (iv) Defendants failed to disclose that the labor cost advantage FCA gained in the 2015 CBA was the result of illegal bribes given to UAW officials; (v) Defendants concealed the risk that the Company would not be able to obtain similar labor concessions going forward absent the bribery; (vi) Defendants concealed the risk that without similar concessions from the UAW, the Company's margin gains in its North American segment were not sustainable; and

---

[126] *See* FCA 2016 Form 20-F (filed 2/28/17) at 125.

[127] *See id.* at 34-35.

(vii) Defendants concealed the risk that the Company would be subject to penalties and liabilities once the effects of the bribery scheme on the CBA process became known.

### 3.    The June 26, 2017 Misstatements and Omissions

209.    On July 26, 2017, the DOJ filed an indictment against Iacobelli for participating in the bribery scheme. On the same day, Monica Morgan-Holiefield, Holiefield's widow, was also charged with conspiring with Iacobelli and others.

210.    In response to the DOJ's charges, on July 26, 2017, FCA issued the following denial:

> **FCA US and the UAW were the victims of malfeasance by certain of their respective employees that held roles at the National Training Center (NTC), an independent legal entity. These egregious acts were neither known to nor sanctioned by FCA US. Upon learning of possible malfeasance in June 2015, the Company investigated the matter and, as a result, Mr. Iacobelli and Mr. Durden were promptly separated from the Company upon FCA US obtaining credible evidence of wrongdoing**.
>
> The Company has also worked with the UAW to implement governance, auditing and structural reforms to improve the accountability and transparency of the NTC. FCA US has cooperated fully with the U.S. Attorney's office in its investigation of this matter. We remain committed to ensuring that the Company and its employees act in a manner consistent with high standards of legal compliance, ethics, integrity and quality.
>
> The Company intends to pursue all potential legal remedies against Mr. Iacobelli and any other culpable parties. As the U.S. Attorney's investigation is ongoing, the Company cannot comment further.
>
> (Emphasis added).[128]

211.    The statement in ¶ 210 was false and misleading or omitted material facts when made because: (i) Defendants were not "victims" of the bribery scheme but rather, FCA

---

[128] Press Release, FCA US LLC, *Statement in Response to Department of Justice Investigation*, PR NEWSWIRE (July 26, 2017), available at https://www.prnewswire.com/news-releases/statement-in-response-to-department-of-justice-investigation-300494808.html.

authorized and carried out the scheme for the purpose of obtaining concessions from the UAW during the 2015 CBA process; (ii) FCA benefited from the bribery scheme by obtaining concessions from the UAW in the 2015 CBA process that provided FCA with a labor cost advantage over its competitors; (iii) the participants in the bribery scheme were not limited to certain employees that were no longer with the Company, as Marchionne personally participated in the bribery scheme by providing an illegal gift to Holiefield in violation of the Taft-Hartley Act; (iv) Defendants concealed the risk that the Company would not be able to obtain similar labor concessions going forward absent the bribery; (v) Defendants concealed the risk that without similar concessions from the UAW, the Company's margin gains in its North American segment were not sustainable; and (vi) Defendants concealed the risk that the Company would be subject to penalties and liabilities once the effects of the bribery scheme on the CBA process became known.

### 4. The September 19, 2017 False and Misleading Statements

212. On September 19, 2017, *The Detroit News* reported that federal prosecutors had seized $292,000 from Hospice of Metropolitan Detroit, a fake hospice that was used to funnel cash to Morgan-Holiefield and was principally funded by Holiefield's The Leave the Light on Foundation, where FCA's Durden served as treasurer.

213. In the same article, Marchionne falsely defended FCA, stating that the bribery scandal involving FCA employees had "nothing to do with the collective bargaining process" during UAW negotiations.[129]

---

[129] Robert Snell, *Feds: Fake Hospice Laundered Cash in FCA-UAW Scandal*, THE DETROIT NEWS (Sept. 19, 2017), https://www.detroitnews.com/story/business/autos/2017/09/19/fake-hospice-laundered-cash-fca-uaw-scandal/105799814/.

214.     The statement in ¶ 213 was false and misleading when made because: (i) Marchionne knew that FCA authorized and carried out the scheme for the purpose of obtaining concessions from the UAW during the 2015 CBA process; (ii) Marchionne, personally participated in the bribery scheme by providing an illegal gift to Holiefield in violation of the Taft-Hartley Act; (iii) Marchionne concealed the risk that the Company would not be able to obtain similar labor concessions going forward absent the bribery; (iv) Marchionne concealed the risk that without similar concessions from the UAW, the Company's margin gains in its North American segment were not sustainable; and (v) Marchionne concealed the risk that the Company would be subject to penalties and liabilities once the effects of the bribery scheme on the CBA process became known.

### 5.     The February 20, 2018 False and Misleading Statements

215.     On February 20, 2018, FCA filed the 2017 20-F with the SEC.  The 2017 20-F was signed by Defendant Palmer.  The 2017 20-F contained signed SOX certifications by Defendants Marchionne and Palmer attesting to the accuracy of financial reporting, the disclosure of any material changed to the Company's internal controls over financial reporting, and the disclosure of all fraud.

216.     The 2017 20-F contained the following statement regarding the Company's collective bargaining agreement with the UAW:

In October 2015, FCA US and the UAW agreed to a new four-year national collective bargaining agreement, which will expire in September 2019. The provisions of the agreement continue certain opportunities for success-based compensation upon meeting certain quality and financial performance metrics. The agreement closes the pay gap between "Traditional" and "In-progression" employees over an eight year period and will continue to provide UAW-represented employees with a simplified adjusted profit sharing plan. The adjusted profit sharing plan was effective for 2016 and was directly aligned with NAFTA profitability. The agreement included lump-sum payments in lieu of further wage increases of primarily U.S. $4,000 for "Traditional" employees and

U.S. $3,000 for "In-progression" employees totaling approximately $141 million (€126 million) that was paid to UAW members on November 6, 2015.[130]

217.    The 2017 20-F also contained the following update regarding the Company's use of the WCM system:

> We have deployed World Class Manufacturing ("WCM") principles throughout our manufacturing operations…We are the only OEM [Original Equipment Manufacturer] that is a member of the WCM Association…Unlike some other advanced manufacturing programs, WCM is designed to prioritize issues, focus on those incentives believed likely to yield the most significant savings and improvements, and direct resources to those initiatives.[131]

218.    The statements in ¶¶ 216-217 were false and misleading or omitted material facts when made because: (i) Defendants failed to disclose that FCA senior executives had authorized and carried out a scheme to bribe UAW officials for the purpose of obtaining concessions during the 2015 CBA process; (ii) Defendants failed to disclose that Marchionne personally participated in the bribery scheme by providing an illegal gift to Holiefield in violation of the Taft-Hartley Act; (iii) Defendants failed to disclose that FCA received concessions from the UAW in exchange for the illegal bribes, including the UAW's agreement to implement WCM and other terms in the CBA; (iv) Defendants failed to disclose that the labor cost advantage FCA gained in the 2015 CBA was the result of illegal bribes given to UAW officials; (v) Defendants concealed the risk that the Company would not be able to obtain similar labor concessions going forward absent the bribery; (vi) Defendants concealed the risk that without similar concessions from the UAW, the Company's margin gains in its North American segment were not sustainable; and (vii) Defendants concealed the risk that the Company would be subject to penalties and liabilities once the effects of the bribery scheme on the CBA process became known.

---

[130] *See* FCA 2017 Form 20-F (filed 2/20/18) at 117.

[131] *See id.* at 24.

219.   The 2017 20-F also contained the following false statements regarding the investigation into the bribery scandal:

> In connection with an on-going government investigation into matters at the UAW-Chrysler National Training Center, the U.S. Department of Justice has brought charges against a number of individuals including two former FCA US employees and individuals associated with the UAW for, among other things, tax fraud and conspiring to provide money or other things of value to a UAW officer and UAW employees while acting in the interests of FCA US, in violation of the Labor Management Relations (Taft-Hartley) Act. We believe that FCA US was a victim of these acts and we continue to cooperate with this investigation. Several putative class action lawsuits have been filed against FCA US in U.S. federal court alleging harm to UAW workers as a result of these acts. At this early stage, we are unable to reliably evaluate the likelihood that a loss will be incurred or estimate a range of possible loss.[132]

220.   The statement in ¶ 219 was false and misleading or omitted material facts when made because: (i) Defendants were not "victims" of the bribery scheme but rather, FCA authorized and carried out the scheme for the purpose of obtaining concessions from the UAW during the 2015 CBA process; (ii) FCA benefited from the bribery scheme by obtaining concessions from the UAW in the 2015 CBA process that provided FCA with a labor cost advantage over its competitors; (iii) the participants in the bribery scheme were not limited to certain employees that were no longer with the Company, as Marchionne personally participated in the bribery scheme by providing an illegal gift to Holiefield in violation of the Taft-Hartley Act; (iv) Defendants concealed the risk that the Company would not be able to obtain similar labor concessions going forward absent the bribery; (v) Defendants concealed the risk that without similar concessions from the UAW, the Company's margin gains in its North American segment were not sustainable; and (vi) Defendants concealed the risk that the Company would be subject to penalties and liabilities once the effects of the bribery scheme on the CBA process became known.

---

[132] *See id*. at 34.

### 6. The August 27, 2018 False and Misleading Statements

221. On August 27, 2018, Iacobelli was sentenced to over 5 years in federal prison for bribing UAW officials in order to obtain labor concessions from UAW leadership.

222. Following the announcement of Iacobelli's sentencing, FCA again falsely stated that the illegal scheme had nothing to do with the collective bargaining process, issuing a statement that the Company "firmly restates that it is a victim of illegal conduct by Al Iacobelli and certain other rogue individuals who formally held leadership roles at the [NTC]…the conduct of these individuals…had no impact on the collective bargaining process."[133]

223. The statement in ¶ 222 were false and misleading or omitted material facts when made because: (i) Defendants were not "victims" of the bribery scheme but rather, FCA authorized and carried out the scheme for the purpose of obtaining concessions from the UAW during the 2015 CBA process; (ii) FCA benefited from the bribery scheme by obtaining concessions from the UAW in the 2015 CBA process that provided FCA with a labor cost advantage over its competitors; (iii) the participants in the bribery scheme were not limited to certain employees that were no longer with the Company, as Marchionne personally participated in the bribery scheme by providing an illegal gift to Holiefield in violation of the Taft-Hartley Act; (iv) Defendants concealed the risk that the Company would not be able to obtain similar labor concessions going forward absent the bribery; (v) Defendants concealed the risk that without similar concessions from the UAW, the Company's margin gains in its North American segment were not sustainable; and (vi) Defendants concealed the risk that the Company would be

---

[133] *See* Tresa Baldas, *Ex-Fiat Chrysler Exec Alphons Iacobelli Gets 5 ½ Years in UAW Scandal*, DETROIT FREE PRESS (Aug. 27, 2018), http://www.freep.com/story/money/cars/chrysler/2018/08/27/fca-alphons-iacobelli-uaw-sentencing/1108849002/.

subject to penalties and liabilities once the effects of the bribery scheme on the CBA process became known.

### 7.    The February 22, 2019 False and Misleading Statements

224.    On February 22, 2019, FCA filed the 2018 20-F for the year ended December 31, 2018 with the SEC (the "2018 20-F"). The 2018 20-F was signed by Defendant Palmer. The 2018 20-F contained signed SOX certifications by Defendants Marchionne and Palmer attesting to the accuracy of financial reporting, the disclosure of any material changed to the Company's internal controls over financial reporting, and the disclosure of all fraud.

225.    The 2018 20-F contained the following statement regarding the Company's collective bargaining agreement with the UAW:

> In October 2015, FCA US and the UAW agreed to a new four-year national collective bargaining agreement, which will expire in September 2019. The provisions of the agreement continue certain opportunities for success-based compensation upon meeting certain quality and financial performance metrics. The agreement closes the pay gap between "Traditional" and "In-progression" employees over an eight year period and will continue to provide UAW-represented employees with a simplified adjusted profit sharing plan. The adjusted profit sharing plan was effective for 2016 and was directly aligned with NAFTA profitability. The agreement included lump-sum payments in lieu of further wage increases of primarily U.S. $4,000 for "Traditional" employees and U.S.$3,000 for "In-progression" employees totaling approximately $141 million (€126 million) that was paid to UAW members on November 6, 2015.[134]

226.    The 2018 20-F contained the following statement regarding the Company's use of the WCM system:

> We have deployed World Class Manufacturing ("WCM") principles throughout our manufacturing operations…We are the only OEM [Original Equipment Manufacturer] that is a member of the WCM Association…Unlike some other advanced manufacturing programs, WCM is designed to prioritize issues, focus on those incentives believed likely

---

[134] *See* FCA 2018 Form 20-F (filed 2/20/19) at 23.

to yield the most significant savings and improvements, and direct resources to those initiatives.[135]

227.     The statements in ¶¶ 225-226 were false and misleading or omitted material facts when made because: (i) Defendants failed to disclose that FCA senior executives had authorized and carried out a scheme to bribe UAW officials for the purpose of obtaining concessions during the 2015 CBA process; (ii) Defendants failed to disclose that Marchionne personally participated in the bribery scheme by providing an illegal gift to Holiefield in violation of the Taft-Hartley Act; (iii) Defendants failed to disclose that FCA received concessions from the UAW in exchange for the illegal bribes, including the UAW's agreement to implement WCM and other terms in the CBA; (iv) Defendants failed to disclose that the labor cost advantage FCA gained in the 2015 CBA was the result of illegal bribes given to UAW officials; (v) Defendants concealed the risk that the Company would not be able to obtain similar labor concessions going forward absent the bribery; (vi) Defendants concealed the risk that without similar concessions from the UAW, the Company's margin gains in its North American segment were not sustainable; and (vii) Defendants concealed the risk that the Company would be subject to penalties and liabilities once the effects of the bribery scheme on the CBA process became known.

228.     The 2018 20-F also contained the following false statement regarding the bribery scandal:

> In connection with an on-going government investigation into matters at the UAW-Chrysler National Training Center, the U.S. Department of Justice has brought charges against a number of individuals including two former FCA US employees and individuals associated with the UAW for, among other things, tax fraud and conspiring to provide money or other things of value to a UAW officer and UAW employees while acting in the interests of FCA US, in violation of the Labor Management Relations (Taft-Hartley) Act. We continue to cooperate with this investigation. Several putative class action lawsuits have been filed against FCA US in U.S. federal court alleging harm to UAW workers as a result of these

---

[135] *See id.* at 17.

acts. At this early stage, we are unable to reliably evaluate the likelihood that a loss will be incurred or estimate a range of possible loss.[136]

229. The statement in ¶ 228 was false and misleading or omitted material facts when made because: (i) Defendants failed to disclose that FCA authorized and carried out the scheme for the purpose of obtaining concessions from the UAW during the 2015 CBA process; (ii) FCA benefited from the bribery scheme by obtaining concessions from the UAW in the 2015 CBA process that provided FCA with a labor cost advantage over its competitors; (iii) the participants in the bribery scheme were not limited to certain employees that were no longer with the Company, as Marchionne personally participated in the bribery scheme by providing an illegal gift to Holiefield in violation of the Taft-Hartley Act; (iv) Defendants concealed the risk that the Company would not be able to obtain similar labor concessions going forward absent the bribery; (v) Defendants concealed the risk that without similar concessions from the UAW, the Company's margin gains in its North American segment were not sustainable; and (vi) Defendants concealed the risk that the Company would be subject to penalties and liabilities once the effects of the bribery scheme on the CBA process became known.

230. Notably, in the 2018 20-F Defendants were no longer asserting they were victims of the bribery scheme, implicitly acknowledging the false and misleading nature of their prior statements, but still failed to disclose that FCA participated in the scheme and that their bribes influenced the 2015 CBA negotiations.

### 8. The August 23, 2019 False and Misleading Statements

231. On August 23, 2019, *S&P Global Intelligence* reported that after more than two years and eight individuals being found guilty of participating in the bribery scheme designed to

---

[136] *See id.* at 239.

influence the collective bargaining negotiations between the parties, the DOJ would be expanding its investigation into the corruption between FCA and the UAW.

232.     In response, the Company again reiterated to *S&P Global Intelligence* that it was the victim of the acts of the individuals implicated in the scandal:

> FCA US also confirms that the conduct of these individuals — for their personal enrichment and neither at the direction nor for the benefit of the company — had no impact on the collective bargaining process…Rather, the behavior involved a small number of bad actors who stole training funds entrusted to their control and co-opted other individuals who reported to them to carry out or conceal their activity over a period of several years.[137]

233.     The statement in ¶ 232 was false and misleading or omitted material facts when made because: (i) Defendants failed to disclose that FCA authorized and carried out the scheme for the purpose of obtaining concessions from the UAW during the 2015 CBA process; (ii) FCA benefited from the bribery scheme by obtaining concessions from the UAW in the 2015 CBA process that provided FCA with a labor cost advantage over its competitors; (iii) the participants in the bribery scheme were not limited to certain employees that were no longer with the Company, as Marchionne personally participated in the bribery scheme by providing an illegal gift to Holiefield in violation of the Taft-Hartley Act; (iv) Defendants concealed the risk that the Company would not be able to obtain similar labor concessions going forward absent the bribery; (v) Defendants concealed the risk that without similar concessions from the UAW, the Company's margin gains in its North American segment were not sustainable; and (vi) Defendants concealed the risk that the Company would be subject to penalties and liabilities once the effects of the bribery scheme on the CBA process became known.

---

[137] Charlsy Panzino, *Timeline: the US Investigation of Corruption at Fiat Chrysler, UAW*, S&P Global Market Intelligence (Aug. 23, 2019), available at https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/timeline-the-us-investigation-of-corruption-at-fiat-chrysler-uaw-53535153.

### H. The Truth about the Scope of FCA's Bribery Scheme and its Effects on the CBA Process is Revealed

234. On November 20, 2019, GM filed a racketeering complaint for damages in the Eastern District of Michigan against FCA claiming that "FCA was the clear sponsor of pervasive wrongdoing, paying millions of dollars in bribes to obtain benefits, concessions, and advantages in the negotiation, implementation, and administration of labor agreements over time."[138]

235. The GM Complaint disclosed previously unreported facts regarding the concessions that FCA received from the UAW. Specifically, the GM Complaint revealed new material information showing that because of the Company's bribery scheme, FCA received concessions in the 2011 and 2015 CBAs and that these concessions were denied to GM, including:

(a) Marchionne orchestrated the bribery scheme in order to obtain a wage advantage over GM and force a merger of FCA and GM, called "Operation Cylinder" (GM Complaint ¶ 100);

(b) GM sought similar concessions from the UAW as those given to FCA but was denied, including the UAW's refusal to implement "GMS," GM's equivalent of WCM (GM Complaint ¶ 75);

(c) The UAW secretly entered into a side letter with FCA whereby the UAW agreed that the 25% cap on Tier-2 workers would not be reinstated as part of the 2015 CBA (GM Complaint ¶ 78);

(d) UAW leaders did not hold FCA to contractual limits regarding the number of temporary workers the Company could hire but forced GM to adhere to the limits (GM Complaint ¶ 79);

(e) FCA was allowed to exercise control over the UAW with respect to pursuing labor grievances and health and safety issues but GM was denied this same benefit (GM Complaint ¶ 80);

---

[138] Press Release, General Motors, *General Motors Files RICO Lawsuit against Fiat Chrysler Automobiles* (Nov. 20, 2019), https://media.gm.com/media/us/en/gm/home.detail.html/content/Pages/news/us/en/2019/nov/1120-gm.html.

(f) The UAW agreed to a side letter with FCA in 2014, allowing the FCA to use a prescription drug formulary that would benefit FCA but despite its requests, GM was denied the same formulary (GM Complaint ¶ 81);

(g) At a June 18, 2015 meeting, former UAW President Williams tried to persuade GM to agree to a merger with FCA and his presentation was "scripted" by Iacobelli (GM Complaint ¶ 89); and

(h) Before FCA was selected as the target company for the 2015 CBA, GM negotiated a tentative deal with the UAW whereby the parties agreed to a total incremental cost increase of approximately 20% less than what the UAW had proposed in its "Presidential Demand" of just under $1 billion, which the UAW represented it could "sell" to the UAW members. (GM Complaint ¶¶ 113, 115). However, as a result of pattern bargaining, FCA was able to structure the deal to force enormous costs on GM and it was more costly for GM than the agreement it had negotiated before FCA was selected target. The final deal between the UAW and GM cost GM almost $1 billion more than the deal it had reached with the UAW prior to FCA being selected target. (GM Complaint ¶ 132).

236. Prior to the filing of the GM Complaint, Defendants repeatedly denied that the FCA sanctioned or knew about that the bribes, that the Company was a "victim" of the actions of a few employees, and that the bribes did not influence the collective bargaining process. Immediately after the GM Complaint was filed, FCA issued a press release denying the allegations, calling the lawsuit "meritless."

237. The GM Complaint revealed to the market for the first time that the market had been misled about the scope and effects of the bribery scheme. The GM Complaint revealed that the bribery scheme reached the top of FCA, including Marchionne, that the Company was not the "victim" of a few rogue employees as it had previously represented to investors, and that the bribes provided to UAW officials resulted in FCA obtaining concessions which provided the Company with labor cost advantages over its competitors.

238. A November 21, 2019 BNP Paribas analyst report by Stuart Pearson (entitled *GM sues FCA: What do we know?*), referred to GM's allegation that FCA's systematic bribery was

sanctioned by Marchionne "both new and unprecedented," while stating the downside of GM Complaint is "[p]otential multi-billion [dollar] liabilities."

239. On November 20, 2019, following the revelations about Defendants' illegal conduct, FCA's stock prices fell $0.58 per share, or approximately 3.72%, to close at $15.00 per share.

240. On January 27, 2021, FCA U.S. issued a press release announcing that it reached an agreement with the DOJ to resolve the DOJ's investigation into FCA's former employees and the bribery scheme at the NTC. As part of the settlement, FCA US agreed to plead guilty to one count of conspiracy to violate the Labor Management Relations Act and to pay a $30 million fine. FCA U.S. also agreed to implement an independent compliance monitor for three years with respect to the dissolution of the NTC and internal controls as they relate to the trusts being implemented to replace the NTC.

## I.     The 2019 CBA Confirms the Falsity of Defendants' Statements

241. The 2019 CBA process further confirms that Defendants' Class Period representations regarding the bribery scheme were false and misleading in that, among other things, they concealed the risk that FCA's labor cost advantages were not sustainable.

242. FCA went from being the target in the 2015 CBA negotiations, with the ability to shape the terms of its labor agreement with the UAW (as well as GM's and Ford's CBAs through pattern bargaining), to being the last company to negotiate during the 2019 CBA process.

243. FCA UAW members were reportedly concerned about the bribery scandal during the 2019 CBA negotiations, with some in the FCA rank-and-file calling for then-UAW President Gary Jones ("Jones") to distance himself from the negotiations because of an ongoing

investigation into possible corruption by him and others at the UAW as part of the government's expanded investigation of the UAW. Jones took a leave of absence before the negotiations began and has since been charged with embezzling over $1 million in UAW funds.[139]

244. FCA was viewed as a "wildcard" during the process because "it is almost all new leadership on both sides."[140] FCA also had the least amount of leverage over its contract terms due to pattern bargaining. The GM and Ford CBAs provided clear pathways for both full-time and temporary workers to earn top salaries by the end of the four-year agreement. FCA would be disproportionally impacted by these terms because it employed a larger number of workers that would be set to earn increased wages than its rivals. At the time of the negotiations, approximately 59% of FCA's workforce was in-progression workers (f/k/a Tier-2).[141] The acceleration of in-progression employees to full-time status would also disproportionally increase FCA's labor costs because in-progression workers do not have the same benefits as full-time workers.[142]

---

[139] *Id*; Jamie L. LaReau and Phoebe Wall Howard, *UAW Authorizes Strike; Union Targets General Motors First in Contract Talks*, DETROIT FREE PRESS (Sept. 3, 2019), https://www.freep.com/story/money/cars/general-motors/2019/09/03/uaw-strike-gm/2086091001/; Ben Klayman, *Former UAW President Gary Jones Charged in U.S. Corruption Probe*, REUTERS (Mar. 5, 2020), https://www.reuters.com/article/us-usa-autos-labor-corruption/former-uaw-president-gary-jones-charged-in-u-s-corruption-probe-idUSKBN20S1WE.

[140] Charlsy Panzino, *UAW Contract Could Cost Ford More than GM; FCA Impact Unclear: Analyst*s, S&P Global Market Intelligence (Nov. 14, 2019), available at https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/uaw-contract-could-cost-ford-more-than-gm-fca-impact-unclear-analysts-55517505.

[141] Breana Noble, *Temps, Former Tier 2 Biggest Challenge for FCA in Labor Talks*, THE DETROIT NEWS (Nov. 17, 2019), https://www.detroitnews.com/story/business/autos/chrysler/2019/11/17/temporary-progression-employees-biggest-challenge-uaw-talks-fiat-chrysler/2519484001/.

[142] *Id.*

245.     On November 29, 2019, nine days after the GM Complaint was filed, a source familiar with FCA's contract negotiations suggested that FCA had lost all leverage with respect to its bargaining power, stating that Company "wants to avoid drama and will likely do so by putting its in-progression workers on a faster path to higher wages," consistent with rivals Ford and GM.   With an outsized number of in-progression workers, acquiescing to these wage increases would hurt FCA financially, but FCA privately acknowledged it "may be necessary for ratification."[143]

246.     On December 11, 2019, FCA and the UAW ratified a new CBA, which included the faster four-year path to full-time status and increased benefits for in-progression workers.[144]

247.     Following the 2019 CBA round, the CAR projected the financial impact on each of the Big Three, projecting that by the end of the CBA in 2023, FCA will go from having the lowest per vehicle labor cost among the Big Three, to the highest:[145]

---

[143] Phoebe Wall Howard, *UAW-FCA Close to Tentative Deal that Would Include $9,000 Signing Bonus, Source Says*, DETROIT FREE PRESS (Nov. 29, 2019), https://www.freep.com/story/money/cars/chrysler/2019/11/29/uaw-fca-contract-negotiations-bonus/4332228002/.

[144] Eric D. Lawrence, *UAW Workers Ratify Labor with Fiat Chrysler; Bargaining Ends for 2019*, DETROIT FREE PRESS (Dec. 11, 2019), https://www.freep.com/story/money/cars/chrysler/2019/12/11/uaw-fca-2019-contract/4400139002/.

[145] 2020 CAR Report at 13.



248. The 2019 CBA confirms that without the bribes, FCA lost its favorable treatment from UAW leadership and was no longer able to obtain the labor concessions the Company once enjoyed.

### J.    Additional Scienter and Falsity Allegations

249. As alleged herein, the Individual Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company or in their own name during the Class Period were materially false and misleading.

250. The Individual Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding FCA obtaining labor cost concessions from the UAW through the use of illegal bribes, their control over, or receipt or modification of FCA's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

251. The Individual Defendants knew or recklessly disregarded the false and misleading nature of the information that they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

### 1. Marchionne Had the Motive and Opportunity to Commit Fraud and Participated in the Fraud

252. Defendant Marchionne had the motive and opportunity to commit the alleged fraud. Marchionne wanted to force a merger with GM to fulfill his personal desire to be the CEO of the largest automaker in the world.

253. Marchionne made it known that GM was his next conquest after Chrysler, stating "after fixing Chrysler, let's…take General Motors and merge them together. Once and for all, let's straighten out the car industry, creating an American giant that also allows a long-term future for Fiat."[146]

254. In October 2012, Marchionne wrote to GM's CEO and proposed a merger between Fiat, Chrysler and GM, but GM rebuffed Marchionne's attempt.[147]

255. In March 2015, Marchionne wrote to GM's Board of Directors and management formally proposing a merger between GM and FCA. On April 14, 2015, GM rejected the proposal.[148]

256. On April 29, 2015, Marchionne tried to publicly exert pressure on GM by publishing a PowerPoint presentation entitled "Confessions of a Capital Junkie: An insider

---

[146] GM Complaint at ¶ 85 (quoting Tommaso Ebhardt, Sergio Marchionne, at 63-64 (2019) (translated from Italian)).

[147] GM Complaint ¶ 86.

[148] GM Complaint ¶¶ 101-102.

perspective on the cure for the industry's value-destroying addiction to capital," claiming that a GM/FCA merger would produce $5 billion in savings "with no impact on number employed."[149]

257. Marchionne publicly stated just prior to the 2015 CBA negotiations that FCA's financial models suggested that a merger between FCA and GM was "the most logical combination in the entire industry."[150]

258. On June 18, 2018, GM executives including CEO Mary Barra and its lead labor negotiator met with UAW President Williams, who "relayed and championed Marchionne's proposition."[151]

259. As CEO of FCA, Marchionne had the ability to orchestrate the fraud through Iacobelli, FCA's top executive for labor negotiations, who reported directly to Marchionne.

260. Marchionne had actual knowledge that the statements FCA issued denying FCA's role in the bribery scheme, as well as the scope of the bribery scheme and its effects on the 2015 CBA, were false and misleading because Marchionne participated in the scheme by giving a watch worth several thousand dollars to UAW Vice President Holiefield and attempting to conceal the value. Marchionne also led the 2015 CBA negotiations on behalf of FCA and received UAW's agreement to not reinstate the cap on Tier-2 workers prior to the 2015 CBA process.

---

[149] FCA, *Confessions of a Capital Junkie*: *An Insider Perspective on the Cure for the Industry's Value-Destroying Addiction to Capital* (Apr. 29, 2015), available at https://www.autonews.com/assets/PDF/CA99316430.PDF.

[150] Kristine Owram, *Fiat Chrysler, GM Merger Is Most Logical Combination in the Entire Auto Industry: Sergio Marchionne*, FINANCIAL POST (July 10, 2015), https://business.financialpost.com/news/fiat-chrysler-gm-merger-is-most-logical-combination-in-the-entire-auto-industry-sergio-marchionne.

[151] GM Complaint ¶ 106.

261.     An internal FCA email disclosed in the investigation involving a conversation between Iacobelli and "FCA-7" about an inquiry into Holiefield's use of NTC credit cards suggests that "FCA-1" (who is believed to be Marchionne), knew about the bribery scheme.   In response to the request for NTC credit card records, FCA-7 emailed Iacobelli stating "We can't provide the requested type of information to such people" and "if we tell [the UAW President and UAW President's senior assistant] that we aren't giving them shit, what are they going to do, tell [FCA-1] that we are being uncooperative?  If so, so what?"[152]

262.     Marchionne led the 2015 CBA negotiations on behalf of FCA knowing about and having participated in the bribery scheme.

263.     FCA's 2015 CBA deal terms – which Marchionne negotiated – were structured to force enormous costs on GM; the final deal between FCA and the UAW allegedly cost GM over $1 billion more than the deal GM reached with the UAW prior FCA being selected as the target company for negotiations.[153]

264.     While Marchionne's attempt to force a merger with GM was unsuccessful, he was motivated to continue to conceal FCA's bribery scheme, which included his own illegal activity, and its effects from the market.

**2.     The Individual Defendants Knew from FCA's Internal Investigation that Iacobelli and Durden Had Bribed UAW Leadership in An Attempt to Gain Labor Concessions**

265.      FCA conducted an investigation into the bribery scheme in 2015, after it was advised the government was investigating whether FCA was providing bribes to UAW officials with the purpose of corrupting the CBA process.   As a result of the investigation, FCA fired

---

[152] Iacobelli Indictment, July 26, 2017, (ECF No. 4) at 19.

[153] GM Complaint ¶132.

Iacobelli and Durden for "wrongdoing." Thus, the Individual Defendants knew that Iacobelli did not retire from FCA but rather, had engaged in illegal bribes with others at FCA for the purpose of effecting the CBA negotiations.

266. The Individual Defendants had no reasonable basis to represent that FCA was the victim of rouge employees and that the bribes did not affect the 2015 CBA negotiations.

267. Defendants Palmer and Manley knew by August 2018, the latest, that Marchionne had been questioned by the FBI regarding FCA's bribery scheme and that he lied to investigators about an illegal gift he provided to Holiefield.[154]

268. Defendants Palmer and Manley were aware by at least August 2018, of Marchionne's involvement in the bribery scheme and thus had information that directly contradicted Defendants' statements to investors that FCA was the victim of the bribery scheme, that the scheme was not sanctioned by FCA, and that the scheme was carried out by rogue employees Iacobelli and Durden. At a minimum, Palmer and Manley knew that the scheme extended beyond what the Company had been representing to the public.

### 3. The Individual Defendants Controlled the Contents of the Company's Public Statements during the Class Period

269. Because of their high-level positions, each Individual Defendant was provided with, or had access to, copies of the documents alleged herein to be false or misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to both public and material non-public information concerning the Company, the Individual Defendants knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being

---

[154] Robert Snell, *FCA Chief Failed to Disclose Gift to UAW, Sources Say*, THE DETROIT NEWS (Aug. 16, 2018), https://www.detroitnews.com/story/business/autos/chrysler/2018/08/16/sergio-marchionne-gave-expensive-watch-uaw-failed-tell-investigators-orruption/985477002/.

concealed from the public, and that the representations that were being made to investors about the scope of the bribery scheme, FCA's participation in the scheme, and the effects the scheme had on the Company's CBA negotiations with the UAW, were materially false, misleading, and or omitted material facts.

270. The Individual Defendants were responsible for the accuracy of FCA's corporate statements, and each is therefore responsible and liable for the representations contained therein or omitted therefrom. FCA knowingly or recklessly made the materially false and misleading statements and omissions of material fact alleged herein based on the fact that the Individual Defendants knew or recklessly disregarded that the Company's statements were materially false or misleading or omitted material fact at the time such statements were made. Each of these Defendants was among the most senior executives of the Company during the Class Period and a member of the Company's management, and their knowledge may be imputed to the Company.

271. Statements made by FCA and the Individual Defendants during the Class Period plausibly suggest that they had access to the disputed information. All of Defendants' material misrepresentations or omissions alleged herein explicitly pertain the scope and extent of the Company's bribery scheme and its impact on FCA's labor negotiations, and could not have been made with any reasonable basis in fact, as the Individual Defendants either personally participated in the illegal conduct as well as the labor negotiations, in the case of Marchionne, or had access to facts demonstrating that the scheme extended beyond what the Company had been telling the market.

### 4. The Fraud Impacted FCA's Core Operations

272. The fraud concerns the core of FCA's operations - the manufacturing of vehicles for sale in the U.S. market. Nearly all of FCA's Class Period revenue came from the

manufacture and sale of vehicles across the Company's global segments. During the Class Period, FCA's NAFTA segment, driven by its U.S. sales, generated close to or over 90% of the Company's EBIT.[155]

273. According to the Center for Automotive Research, labor cost is a material portion of the total cost to produce a vehicle.[156] As a result, the terms of the Company's labor agreements, particularly with the UAW, which controls access to automotive manufacturing labor in FCA's most important business segment, are of critical importance to the Company.

274. By reducing its labor costs, FCA was able to increase its overall profit margins. Thus, the importance of obtaining favorable terms from the UAW, and the Company's willingness to engage in an illegal bribery scheme in order to attempt to obtain such terms, raises a strong inference of scienter that the Individual Defendants knew or recklessly disregarded that their statements about the scope of the bribery scheme, FCA's participation in the scheme, and its effects on the Company's CBA negotiations with the UAW, were materially false and misleading or omitted material facts.

### 5. The Individual Defendants' High-Level Positions Support an Inference of Scienter

275. As FCA's top executives, Defendants Marchionne, Manley and Palmer, the Company's Class Period CEOs and CFO, respectively controlled the Company's day-to-day operations and were informed of and were responsible for monitoring the Company's U.S.

---

[155] *See supra*, n. 64.

[156] Breana Noble, Temps, *Former Tier 2 Biggest Challenge For FCA in Labor Talks*, The Detroit News (Nov. 19, 2019), https://www.detroitnews.com/story/business/autos/chrysler/2019/11/17/temporary-progression-employees-biggest-challenge-uaw-talks-fiat-chrysler/2519484001/

operations, including FCA's relationship with the UAW, the labor organization responsible for producing vehicles in its most important business segment.

276.     Each Individual Defendant is also a member of FCA's Group Executive Council, which is the highest management-level decision-making body within the FCA organization and was led throughout the Class Period by either Marchionne or Manley.  The Individual Defendants also are each a member of the Board of Directors that oversees FCA US.

277.     During his time as FCA's CEO, Defendant Marchionne played an active role in the Company's relationship with the UAW, including directly negotiating with General Holiefield in 2009 regarding Fiat taking an equity interest in Chrysler and in 2014 in completing the Chrysler-Fiat merger by making a deal with the UAW VEBA Trust to acquire its remaining interest in Chrysler.  Additionally, in 2015, Marchionne took the lead in negotiating FCA's CBA with Holiefield's successor Norwood Jewell.  Marchionne also certified the Company's financial reporting filed with the SEC, which included statements about the Company's labor agreements and, at times during the Class Period, FCA's role in the bribery scheme, as well as the scope of the scheme.

278.     As CEO following Marchionne's death, Defendant Manley assumed Marchionne's responsibilities, including his place on internal committees and as an executive member of the Board of Directors. Manley had served on the Board of Directors as a non-executive member since 2014. In 2009, after Chrysler emerged from bankruptcy, Manley was appointed to Marchionne's management team and reported directly to Marchionne. Manley also certified the Company's financial reporting filed with the SEC, which included statements about the Company's labor agreements and, at times during the Class Period, FCA's role in the bribery scheme, as well as the scope of the scheme.

279.　As FCA's CFO and the CFO of FCA US, Defendant Palmer was responsible for reviewing and approving all of FCA and FCA US's financial reporting, and for signing and approving the Company's press releases filed with the SEC.  In a January 11, 2015 article, *The Detroit Free Press* referred to Palmer as "the most important executive at Fiat Chrysler Automobiles that most people – outside of the company and Wall Street – never see."[157]  As CFO of FCA US, Palmer's responsibility over financial reporting extended to financial activities at the NTC.  Therefore, the $9 million in chargebacks funneled through the NTC to the UAW would have fallen within Palmer's scope of oversight.

### K.　Presumption of Reliance: Fraud on the Market

280.　At all relevant times, the market for FCA securities was an efficient market for the following reasons, among others:  (1) the securities were listed and actively traded on the NYSE, a highly efficient market; (2) as an issuer of securities, FCA filed periodic public reports on Form 10-K and 10-Q with the SEC; (3) FCA regularly issued press releases that were carried by the national news wires, were publicly available and entered the public marketplace.

281.　As a result, the market for the securities promptly digested current info regarding FCA from all publicly available sources and reflected such information in FCA's stock price.

282.　Under these circumstances, all purchasers of FCA securities during the Class Period suffered similar injury through their purchases at artificially inflated prices and a presumption of reliance applies.

283.　Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiff is entitled to a presumption of

---

[157] Brent Snavely, *Meet Fiat Chrysler's Finance All-Star*, DETROIT FREE PRESS (Jan. 11, 2015), https://www.freep.com/story/money/cars/2015/01/11/fiat-chrysler-richard-palmer-cfo/21532273/.

reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

### L.      Loss Causation

284.      During the Class Period, FCA securities were artificially inflated due to Defendants' misleading public statements and omissions.  Because investors were unaware that Defendants' representations identified herein were false and misleading (and that Defendants failed to disclose that the labor cost advantage FCA obtained in the 2015 CBA was achieved as a result of the bribery scheme), they paid an artificially inflated price for their purchases of FCA common stock.

285.      When the false and misleading nature of Defendants' misrepresentations were disclosed and became apparent to the market, the price of FCA's common stock fell as the prior artificial inflation came out.

286.      As a result of their purchases of FCA securities during the Class Period, Lead Plaintiff and other Class members suffered economic loss, i.e., damages under the federal securities laws.

### 1.      Corrective Disclosure

287.      The truth behind Defendants' various false statements and material omissions was revealed to the market on November 20, 2019, causing Plaintiff and the Class to suffer significant losses.  The GM Complaint revealed new material information showing that because of the Company's bribery scheme, FCA received concessions in the 2011 and 2015 CBAs and that these concessions were denied to GM, including:

> (a) Marchionne orchestrated the bribery scheme in order to obtain wage advantages over GM and force a merger of FCA and GM, called "Operation Cylinder" (GM Complaint ¶ 100);

(b) GM sought similar concessions from the UAW as those given to FCA but was denied, including the UAW's refusal to implement "GMS," GM's equivalent of WCM (GM Complaint ¶ 75);

(c) The UAW secretly entered into a side letter with FCA, whereby FCA was given advanced notice that the 25% cap on Tier-2 workers would not be reinstated as part of the 2015 CBA (GM Complaint ¶ 78);

(d) UAW leaders did not hold FCA to contractual limits regarding the number of temporary workers the Company could hire but forced GM to adhere to the limits (GM Complaint ¶ 79);

(e) FCA was allowed to exercise control over the UAW with respect to pursuing labor grievances and health and safety issues but GM was denied this same benefit (GM Complaint ¶ 80);

(f) The UAW agreed to a side letter with FCA in 2014, allowing the FCA to use a prescription drug formulary that would benefit FCA but despite its requests, GM was denied the same formulary (GM Complaint ¶ 81);

(g) At a June 18, 2015, meeting between GM and former UAW President Williams, Williams tried to persuade GM to agree to a merger with FCA and his presentation was "scripted" by Iacobelli (GM Complaint ¶ 89); and

(h) Before FCA was selected as the target company for the 2015 CBA, GM negotiated a tentative deal with the UAW whereby the parties agreed to a total incremental cost increase of approximately 20% less than what UAW had proposed in its "Presidential Demand" of just under $1 billion, which the UAW represented it could "sell" to the UAW members. (GM Complaint ¶¶ 113, 115). However, as a result of pattern bargaining, FCA was able to structure the 2105 CBA to force enormous costs on GM making it more costly for GM than the agreement it had negotiated before FCA was selected target. The final deal between the UAW and GM cost GM almost $1 billion more than the deal it had reached with the UAW prior to FCA being selected target. (GM Complaint ¶ 132).

288.     The decline in the price of FCA stock and resulting losses are directly attributable to the disclosure of information and materialization of risks that were misrepresented or concealed by Defendants.  Had investors known of the material adverse information concealed by Defendants or been aware of the truth behind their material misstatements, they would not have purchased FCA stock at artificially inflated prices.

289.     The decline in the price of FCA stock after the facts in the GM Complaint came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors.

### 2.     Materialization of the Risk

290.     Alternatively, loss causation is also demonstrated because Plaintiff's and the Class's losses were foreseeable and caused by the materialization of the risk concealed by Defendants' fraudulent statements.

291.     Investors were misled by Defendants' false statements that FCA was a victim of the bribery scheme and that the bribery scheme did not impact the CBA process. Defendants' false statements served to conceal the risks of Marchionne's participation in the bribery scheme and that FCA would not be able to obtain unfair cost advantages absent the bribery scheme and thus, the Company would likely experience a decrease in its operating profits for the foreseeable future.

292.     It was foreseeable that the exposure of Marchionne's involvement in the bribery scheme and the effects it had on the CBA process would lead to negative financial consequences for FCA, including: 1) the inability to obtain similar concessions from the UAW in the 2019 CBA; 2) the unsustainability of the Company's profit margin gains in its most important business segment; 3) criminal prosecution of Defendants and/or their employees leading to fines or penalties; and 4) civil liability and regulatory liability.

293.     The value of Plaintiff's and the Class's investments in FCA were negatively impacted when the concealed risks materialized when GM filed a racketeering lawsuit against FCA revealing that Marchionne orchestrated the bribery scheme to force a merger of FCA and

GM and that FCA obtained its labor cost advantage as a result of concessions UAW leadership granted because of the bribery scheme.

294.     The revelation that FCA depressed its labor costs through illegal bribes was significant to FCA's operations.  According to an analyst report by Wolfe Research published on a November 21, 2019, if FCA's unfair labor cost advantages, including the manipulation of contract limits on lower paid Tier-2 and temporary UAW employees, were closed, FCA's labor cost would increase between $500MM and $700MM.  Accordingly, without the labor cost concessions obtained in the 2015 CBA, the Company would not have been able to achieve the margin gains that it experienced during the Class Period.

295.     In addition, a BNP Paribas report published the same day estimated that FCA could face up to $6 billion in liability from the GM lawsuit.[158]

296.     FCA immediately issued a press release in response to the filing of the GM complaint stating that the lawsuit claims were "meritless" and that "it will defend itself vigorously."[159]

297.     After the November 20, 2019 disclosures, FCA's common stock price fell $0.58 per share, or more than 3.7% to close at $15.00 per share.

298.     The timing and the significance of the price decline in FCA securities on November 19, 2019 negates any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or

---

158 Stuart Pearson, "GM sues FCA: What do we know?," Exane BNP Paribas, Nov. 21, 2019, p. 1, available from Investext, accessed May 29, 2020.

159 Press Release, FCA, FCA: General Motors' Lawsuit without Merit (Nov. 21, 2019), https://www.fcagroup.com/en-US/media_center/fca_press_release/2019/november/Pages/general_motors_lawsuit_without_merit.aspx.

Company-specific facts unrelated to Defendants' misstatements. The economic loss, i.e. damages suffered by Lead Plaintiff and other Class members was a direct result of Defendants' misstatements and omissions and the subsequent significant decline in the value of FCA's securities when the truth about Defendants' misrepresentations was revealed.

299. On January 27, 2021, FCA U.S. issued a press release announcing that it reached an agreement with the DOJ to resolve the DOJ's investigation into FCA's former employees and the bribery scheme at the NTC. As part of the settlement, FCA US agreed to plead guilty to one count of conspiracy to violate the Labor Management Relations Act and to pay a $30 million fine. FCA U.S. also agreed to implement an independent compliance monitor for three years with respect to the dissolution of the NTC and internal controls as they relate to the trusts being implemented to replace the NTC.

300. After the January 27, 2021 announcement, FCA's common stock price fell $0.04 per share, to close at $15.00 per share.

## M.    CLASS ACTION ALLEGATIONS

301. This is a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a Class of all persons who purchased FCA securities on the open market on a U.S. stock exchange during the Class Period and were damaged thereby.

302. Excluded from the Class are (1) FCA, and its officers, directors, employees, affiliates, legal representatives, predecessors, successors and assigns, and any entity in which any of them have a controlling interest or are a parent; and (2) Defendants, their immediate families, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns, and any entity in which any of them has a controlling interest.

303.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, FCA common stock traded on the NYSE under the ticker symbol "FCAU."  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are thousands of Class members located throughout the United States.  Record owners and other members of the Class may be identified from records maintained by FCA or its transfer agents and may be notified of this action by mail or other appropriate means, using a form of notice similar to that customarily used in securities class actions.

304.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting any individual member of the Class.  The questions of law and fact common to the Class include: (1) whether Defendants violated the Exchange Act; (2) whether Defendants issued false or misleading statements; and (3) the extent to which members of the Class have sustained damages and the proper measure of any such damages.

305.     Lead Plaintiff's claims are typical of the claims of other Class members, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal securities laws as complained of herein.

306.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel that is competent and experienced in class and securities litigation.  Lead Plaintiff has no interest that is in conflict with, or otherwise antagonistic to the interests of other Class members.

307.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class individually redress the wrongs done to them.

308.     There will be no difficulty in management of this action as a class action.

## CAUSES OF ACTION

## COUNT I

## VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

309.     Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

310.     During the Class Period, Defendants carried out a plan, scheme or course of conduct which intended to and did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (ii) caused Lead Plaintiff and other Class members to purchase FCA common stock at artificially inflated prices.

311.     In furtherance of this unlawful plan, scheme or course of conduct Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business, which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for FCA common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

312.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein, which included the making of, or participation in the making of, untrue statements of material facts or omitting to state material facts necessary in order to

make the statements about FCA and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

313.    Each of the Individual Defendants' primary liability, and control person liability, arises from the following facts: (i) the Individual Defendants were high-level executives or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) the Individual Defendants, by virtue of their responsibilities as a senior officer or director of the Company, were privy to and participated in the creation, development and reporting of the Company's periodic disclosures to investors; (iii) the Individual Defendants were advised of, and had access to, other members of the Company's management team and internal financial information about FCA; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

314.    Defendants had actual knowledge of the misrepresentations or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Defendants' material misrepresentations or omissions were done knowingly or recklessly and for the purpose and effect of concealing material problems with FCA's business from the investing public and supporting the artificially inflated price of its common stock.  As demonstrated by the allegations above, Defendants, if they did not have actual knowledge of the misrepresentations or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

315.     As a result of the dissemination of the materially false or misleading information or failure to disclose material facts, as set forth above, the market price of FCA's securities was artificially inflated during the Class Period.  In ignorance of the fact that the market price of the Company's common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiff and other members of the Class acquired FCA securities at artificially high prices and were damaged thereby.

316.     At the time of Defendants' misrepresentations or omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiff and other members of the Class and the marketplace known the truth regarding FCA, which was not disclosed by Defendants, Lead Plaintiff and other members of the Class would not have purchased FCA securities, or, would not have done so at the artificially inflated prices which they paid.

317.     As a direct and proximate result of the Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their respective purchases and sales of FCA securities during the Class Period.

318.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

## VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS

319.     Lead Plaintiff repeats and realleges each and every allegation contained above as if set forth fully herein.

320.     The Individual Defendants acted as controlling persons of FCA within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in or awareness of the Company's operations or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to, and did, directly or indirectly, influence or control the decision-making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiff to be false and misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of these statements or cause the statements to be corrected.

321.     Additionally, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the conduct giving rise to the securities violations as alleged herein, and exercised the same.

322.     As set forth above, Defendants violated Section 10(b) and Rule 10b-5 by their acts or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

323. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of securities during the Class Period.

324. By virtue of the foregoing, the Individual Defendants violated Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

A. Determining that this action is a proper class action and certifying Lead Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding damages in favor of Lead Plaintiff and other Class members against Defendants, jointly and severally, for all damages sustained as a result of Defendants' violations of the Securities Exchange Act of 1934, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Lead Plaintiffs hereby demand a trial by jury.

DATED: January 28, 2021                      Respectfully submitted,

**BERNSTEIN LIEBHARD LLP**

By: /s/ Stanley D. Bernstein
Stanley D. Bernstein
Stephanie M. Beige
Peter J. Harrington
Matthew Guarnero
10 East 40th Street
New York, NY 10016
Telephone: (212) 779-1414

Facsimile:  (212) 779-3218
bernstein@bernlieb.com
beige@bernlieb.com
pharrington@bernlieb.com
mguarnero@bernlieb.com

*Lead Counsel for Lead Plaintiff and the Proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that on January 28, 2021 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List, and I hereby certify that I have mailed a paper copy of the foregoing document via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List generated by the CM/ECF system.


/s/ Stanley D. Bernstein
STANLEY D. BERNSTEIN