UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X
                              :
IN RE:                        :
                              :        19-CV-6770 (EK)(MMH)
STELLANTIS N.V. SECURITIES    :
                              :        August 3, 2021
LITIGATION                    :
                              :        Brooklyn, New York
                              :
                              :
                              :
                              :
------------------------------X

TRANSCRIPT OF CIVIL CAUSE FOR MOTION HEARING
BEFORE THE HONORABLE MARCIA M. HENRY
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:          STEPHANIE BEIGE, ESQ.
                            PETER HARRINGTON, ESQ.
                            Bernstein Liebhard LLP
                            10 East 40th Street
                            New York, NY 10016

For the Defendant:          WILLIAM MONAHAN, ESQ.
                            Sullivan & Cromwell LLP
                            125 Broad Street
                            New York, NY 10004

Court Transcriber:          ARIA SERVICES, INC.
                            c/o Elizabeth Barron
                            102 Sparrow Ridge Road
                            Carmel, NY 10512
                            Aria@leinen.net


Proceedings recorded by electronic sound recording,
transcript produced by transcription service

THE CLERK:  For case number 19-CV-6770, In Re: Stellantis N.V. Securities Litigation, will the parties state their appearances, starting with the plaintiff.  But before that, as a reminder, pursuant to Local Civil Rule 1.8, the parties may not independently record any court proceedings.  A transcript of this proceeding may be ordered from the clerk's office.

That being said, will the parties state their appearances, starting with the plaintiff.

MS. BEIGE:  Good afternoon, your Honor. Stephanie Beige from Bernstein Liebhard for the plaintiffs.

THE COURT:  Good afternoon.

MR. HARRINGTON:  Good afternoon, your Honor. Peter Harrington from Bernstein Liebhard for the plaintiffs.

THE COURT:  Good afternoon.

MR. MONAHAN:  Hello, your Honor.  For the defendants, this is Bill Monahan from Sullivan & Cromwell.

THE COURT:  Good afternoon.  All right, is that all of the appearances?  Yes.

Mr. -- was it Harrington?

MR. HARRINGTON:  Yes, your Honor.

THE COURT:  Forgive me.  As you may have

heard, I'm recovering from the last session.  I don't think I see you here on the docket?  Are you on the docket?

MR. HARRINGTON:  It doesn't appear that I am.  I have the notice of appearance from my office filed.  Maybe it never got filed at the beginning of the case.  I honestly haven't looked in now over a year.

THE COURT:  Okay.  I would just ask that that be filed by tomorrow.

MR. HARRINGTON:  Yes, no problem.

THE COURT:  Okay, thank you.

We are on for an unopposed motion, yes, an unopposed motion hearing today.  I thought it would be beneficial to bring the parties on just to make the record fulsome.  I also apologize if there was any docketing confusion with the request for a status report.  I just think that that was inadvertently filed, so apologies.  I think it was Ms. Beige who had to file a response to that.

The motion for preliminary approval of the class action settlement, preliminary certification of the settlement class, and approval to provide notice to the class at docket number 47 was previously referred by Judge Komitee to Magistrate Judge Scanlon, who was

assigned to the case at the time.  Subsequently, the case was reassigned to me as of June of 2021.

With respect to today's conference, just a couple of procedural matters before we get to the substance.  As you heard, the proceeding is being recorded.  I would just ask that you keep yourselves muted if you're not speaking so as to not interfere with the recording or create too much background noise. I am going to start with a system of calling on people. It helps to acclimate me to your names and your voices. But most importantly, it prevents us from talking over each other, which can also make for a not very clean record or transcript.

So with that, I will first turn to Ms. Beige or Mr. Harrington, if you'd like to be heard on the motion.  Then I have -- Mr. Monahan would have an opportunity to speak as well, and then I have just a few specific questions.

MS. BEIGE:  Thank you, your Honor.  It's Stephanie Beige for the plaintiff.  As you noted, we are seeking preliminary approval of a five-million-dollar settlement and certification of the class. Before I get into the settlement and touch on the requirements of Rule 23, I first think it may be helpful for the Court if I give a little background

about the case and what it's about.

THE COURT:  Thank you.

MS. BEIGE:  Nicholas Panitza, who is the lead plaintiff in this case, filed this action on behalf of all FCA shareholders who purchased FCA stock during the class period.  Plaintiff alleges that FCA stock was artificially inflated during the class period due to false statements that the defendants made concerning a bribery scheme that was being investigated by the DOJ and that involved employees from FCA U.S. and the UAW, the auto union.

In short, the complaint alleges two categories of false statements:  The first category are defendants' representations that FCA was actually a victim of the bribery scheme and that it was carried out by a few rogue employees.  The second category were statements made by the defendants denying that the bribes had actually any effect whatsoever on the 2015 collective bargaining agreement FCA entered into with the UAW.

The complaint alleges that when the market learned the truth about FCA's role in the bribery scheme and the effects that it had on the CBA through two different corrective disclosures, the stock price dropped, causing lead plaintiff and the class to suffer

damages.

The first alleged corrective disclosure was on November 20th, 2019, when General Motors filed a racketeering lawsuit against FCA, where they alleged among other things that the scheme was not limited to a few rogue employees at FCA but actually was orchestrated by FCA's former CEO, Sergio Marchionne. They also alleged that FCA actually benefitted from the bribery scheme because it gained concessions in the 2015 collective bargaining agreement because of the bribes.  However, defendants denied the allegations in the GM complaint and in fact successfully moved to have that complaint dismissed.  I believe it's currently on appeal but they did get that complaint dismissed.

The second corrective disclosure occurred on the last day of the class period, when FCA announced that it had reached an agreement with the DOJ to resolve the investigation into the bribery scheme.  It agreed to plead guilty to one count of conspiracy and to pay a thirty-million-dollar fine.  Procedurally, lead plaintiff filed the first amended complaint in June of 2020 and defendants moved to dismiss the case. And in late December, 2020, after the parties had fully briefed defendants' motion to dismiss, we started to discuss the possibility of settling this case.  And

after lengthy negotiations in May, we agreed to a five-million-dollar settlement for the class.

Your Honor, we believe this is an excellent resolution for the class.  This settlement is well within the range of reasonableness for securities class actions in the Second Circuit, and it is supported by each of the seven factors listed in Rule 23(e)(2).  We go into each of these factors in detail in our papers and I can go through each of the factors again now, unless your Honor would like to ask specific questions or have me focus on particular aspects.

THE COURT:  No, you can continue.  You've already answered a couple of questions that I had.

MS. BEIGE:  Okay.

THE COURT:  So if you continue your recitations and then we hear from Mr. Monahan, because that may cover all questions.

MS. BEIGE:  Very well.  So as to the first factor, the lead plaintiff and lead counsel, we've adequately represented the class here.  Mr. Panitza, the lead plaintiff, he's actually an attorney and an investment banker.  He understands the legal issues in this case and the risks that were involved.  He reviewed all of the documents and the filings in the case, and he participated in settlement discussions

with me and with my partner.  So he's been very much involved and he has adequately represented the class here.

Lead counsel has also adequately represented the class.  This was a challenging case and it was a time-intensive case, and we have vigorously litigated it since its inception, including in the settlement negotiations.  So we believe the first factor is easily met here.

The settlement was also negotiated at arms length.  It was agreed to, as I said, after a few months of negotiations.  As part of the negotiations and the discussions, lead counsel reviewed hundreds of pages of internal documents from FCA before we would agree to the settlement.  The documents included internal FCA investigation memos, internal emails, and other internal documents pertaining to FCA's investigation of the bribery scheme.  So for sure, the negotiations here were arms length.

With respect to the third factor -- I'm sorry?

THE COURT:  I'm sorry, Ms. Beige.  Your papers indicated -- okay.  Thank you for clarifying that because my question was whether or not the scope of the review had included I guess DOJ's investigative

documents, but you're specifically referring to the documents that FCA would have maintained in the course of their own investigation.

MS. BEIGE:  Yes.  The review included both types of documents, both DOJ's investigative materials as well as internal FCA documents.

THE COURT:  Okay, thank you.  Go ahead.

MS. BEIGE:  The third factor, which is to me the most important factor, I think, or is the biggest factor at least is that the settlement itself is an excellent result when you look at the continued risks here of litigating this case.  First with respect to the settlement, it falls within what is referred to in the circuit as the range of reasonableness of recoveries.  Plaintiffs' expert -- we had a damages expert work on this case with us for the plan of allocation and in connection with the settlement negotiations.  Our expert estimated the maximum amount of potentially recoverable damages was 73 million.

So the settlement represents approximately 6.8% of the maximum estimated damages, and that is within the realm and the range of reasonableness.  In fact, the Second Circuit in the Patriot case, and I believe we cite this in our brief, recently, in October, 2020, approved a settlement of 6.1% of

recoverable damages.  It was a 6.5-million-dollar settlement and the court found that it was well within the range of a reasonable percentage of recovery.  So our percentage here of 6.8 is even higher than one that was found reasonable by the Second Circuit just last year.

The settlement is also reasonable when you look at the risks that plaintiffs faced in continuing the case.  Defendants raised a number of arguments in their motion to dismiss, any of which could have resulted in this case being dismissed and the class members recovering nothing.

For example, there was a risk that the Court would find that lead plaintiff had not established loss causation.  Based on defendants' arguments that the first corrective disclosure in this case, which was the GM complaint, was based on information that was already in the public domain and that allegations are just that, allegations, and they are not facts and they could not serve as a corrective disclosure.  Again, I want to note that we did based our case on the GM complaint, the disclosure, and that case has now been dismissed.  So there was a significant risk with respect to loss causation and falsity.

There was also a risk with respect to

scienter and while proving scienter is difficult in any securities case, here it was particularly difficult. The only FCA senior executive that had any potential ties to the bribery scheme and to the 2015 collective bargaining agreement was FCA's former CEO, defendant Sergio Marchionne.  Sadly, defendant Marchionne passed away in 2018, so it was very unlikely that we were ever going to discover any new information pertaining to his knowledge of the scheme or his participation in the scheme.  So while we believe that defendants' motion should be denied, the risks here were real and the settlement recognizes our acknowledgment of those risks.  Further, even if we did survive the motion to dismiss, we would face the same risks at either summary judgment or trial.  So the settlement, when viewed in light of these risks and in light of the dollar value itself, is reasonable.

The settlement is also adequate because it distributes the funds equitably and efficiently to all class members.  The method that's set forth in the papers and in the preliminary -- proposed preliminary approval order for processing class members' claims is well established.  The plan of allocation, as I mentioned earlier, was developed by plaintiffs' damages experts, and it distributes the funds to class members

with recognized losses on a pro rata basis, based on when they bought or sold FCA shares.  This is a commonly-used method to allocate settlement funds in securities fraud cases when you're dealing with class members alleging that they purchased shares at inflated prices.

As to the fifth factor, the settlement is also adequate with respect to lead counsel's requested attorneys' fees.  As stated in the papers, we'll be asking for 33 1/3%, which is routinely awarded in this circuit.  The fee is reasonable when you look at the amount of work lead counsel performed and the result that we've obtained for the class.  This was a time-intensive case and we spent a significant amount of time developing the case, which centered on a very long-running bribery scheme that involved many players, many indictments, many plea agreements, as well as other related investigations of the UAW that were spun off from the original investigation into the bribery scheme.  So there was an enormous amount of public information that lead counsel had to untangle and try to understand in order to draft the amended complaint, oppose defendants' motion to dismiss, as well as engage in meaningful settlement negotiations.

With respect to the sixth factor, it is

reasonable taking into account any supplemental agreements.  We do have a supplemental agreement that is confidential here, which is customary in these cases.  The agreement allows defendants to terminate the settlement if a certain number of class numbers who, in total, have recognized losses over a certain percentage of the damages, exclude themselves.

This is customary and it doesn't weigh against the reasonableness of the settlement.  If it for some reason would be triggered, the case just picks up where it left off and we would just continue litigating.  The terms of the supplemental agreement are confidential.  We could provide them to the Court in camera if requested.

THE COURT:  That actually would be helpful because that is one of the questions that I did have, and it may be -- it may be more efficient if it were provided in camera.

MS. BEIGE:  Sure.  And I don't know if Mr. Monahan wants to add to that, as to the reason for the supplemental.  He may want to speak to that.  I don't want to speak for him.

THE COURT:  Sure.  We're absolutely going to get to Mr. Monahan.

MS. BEIGE:  Okay.  With respect to the

seventh factor, the settlement treats all class members equitably related to each other.  Everyone is being treated the same, depending on the timing of their purchases and the timing of their sales of FCA stock. Every class member who has a recognized loss will get their pro-rata share of the settlement.

There is actually nothing about this proposed settlement that weighs against granting preliminary approval.  Every aspect of it, the amount of the settlement, the proposed notice program, the plan of allocation, they're all typical of what's commonly done in these cases, and they're routinely approved by courts in this circuit.  So that's with respect to the settlement.

I can also go through claim construction because the same can be said about our request to certify the class.  Like most securities fraud class actions, the proposed settlement class here easily meets the requirements of Rule 23(a) and 23(b)(3).  The class is definitely sufficiently numerous.  Based on the number of outstanding shares of FCA during the class period, we know that there are thousands of potential class members here.  We also know that there are questions of law and fact that are common.

As I mentioned earlier in terms of the

risks, there are factual questions regarding what defendants knew about the bribery scheme and when they knew it, whether FCA gained concessions in the collective bargaining process as a result of the scheme, and these questions are the same for all class members.  Likewise, the legal issues are the same: Whether we would be able to establish scienter, whether we would be able to establish loss causation.  This is common to all class members.

Lead plaintiff's claims are also typical of the other class members.  Mr. Panitza purchased his FCA shares during the class period and he suffered damages based on the same alleged false and misleading statements as the other class members.  So he was harmed by the same course of conduct and in the exact same manner, and there's nothing different about his claims.

THE COURT:  Just to clarify --

MS. BEIGE:  Sure.

THE COURT:  Anyone who purchased the shares during the class period, the damages argument would apply to any of them no matter at what point during the period they purchased the shares.  Is that --

MS. BEIGE:  I'm sorry, I don't understand the question.  I'm sorry, your Honor.

THE COURT:  Sure.  You indicated that Mr. Panitza purchased the shares during the class period. So for any potential class member, whether they purchased the shares at the beginning of the class period or throughout the class period or on the next-to-last day of the class period, those are all included as part of the parties' claims and defenses would be typical -- in other words --

MS. BEIGE:  Yes.

THE COURT:  -- (ui) claims.

MS. BEIGE:  Yes.  The amount of damages, the amount of artificial inflation that was in the stock price at the time of the purchase may differ depending on when they purchased, but they were all harmed in the same way because the full truth about FCA's role in the bribery scheme was not yet fully disclosed.

THE COURT:  Understood.  Okay, thank you, please continue.

MS. BEIGE:  Okay.  Lead plaintiff, as I mentioned earlier, he is an adequate representative. He participated in the case and reviewed all the documents.  He commented on some of the filings and he doesn't have any conflicts with the class at all.  He did retain my firm, which is qualified to conduct this litigation.  We've been representing investors for over

25 years.  I've been representing investors for over 20.  I hate to say that on the record.  We've effectively and efficiently represented the lead plaintiff in the class throughout this case.

The last factors are 23(b)(3), the factual and legal issues that are common to the class that I mentioned earlier.  They clearly predominate over any individual issues that we just touched on.  That would be perhaps damages if someone bought at a different time during the class period.  There are numerous common factual questions, numerous common legal questions, and these questions are threshold issues and they are the same for all class members, and they clearly would predominate over any individual issues that may arise with respect to any individual class member.

Finally, resolution of the case through the class action is far superior than litigating thousands of individual cases.  So we believe the settlement class is proper here and notice should go out to the class so we can try to get the class certified and the settlement approved.  Thank you, your Honor.  I'm happy to answer any other questions.

THE COURT:  No, not just yet.

Mr. Monahan, did you want to be heard on

anything that Ms. Beige has already stated or anything else?

MR. MONAHAN:  Certainly, your Honor.  This is Bill Monahan.  I don't have anything near as much as Ms. Beige does but just a few points.  As your Honor noted at the outset, this is an unopposed motion.  The parties have agreed on a settlement subject of course to notice and court approval.  While defendants don't agree with the allegations or theories plaintiffs pled in their complaint and in fact, defendants expressly deny them as part of the settlement and defendants had moved to dismiss all of them on a variety of grounds, sometimes a settlement makes more sense than full-blown litigation.

Ultimately, we had extensive settlement negotiations over a number of months and we were able to reach a settlement with lead plaintiff and lead counsel.  We don't oppose the motion and believe that the Court should preliminarily approve the settlement so that notice can be sent to shareholders and the parties can then take the various steps necessary to advance this case toward final approval.

In terms of the supplemental agreement, of course we're happy to provide it to you in camera, your Honor.  It's a standard agreement in securities class

19

action settlements.  It's also standard for the agreement to be confidential and submitted in camera if the Court so requests.  It's something important to settling defendants because these aren't claims-made settlements.  This isn't a claims-made settlement.  In other words, defendants are agreeing to pay five million dollars irrespective of the number of claims filed by class members.

That means you could have opt-outs from the settlement and defendants are taking on the risk of those opt-outs because they're agreeing to pay the five million irrespective of the number of opt-outs.  So the supplemental agreement provides protection for settling defendants in securities class actions against a meaningful number of opt-outs from the settlement.  I hope that answer your Honor's questions on the supplemental agreement but of course, I'm happy to answer any others on that or any other topic, and that's all I had to say.

THE COURT:  Okay, terrific.  So yes, you covered my number one question, which was for you to confirm on the record that this is an unopposed motion. I've come to find in my time on the bench that unopposed to one party means something entirely different to another, so thank you for confirming that.

With respect to providing the agreement for in camera review, I would appreciate that, and I would just ask the parties how long they think they would need to do that.

MR. MONAHAN:  Certainly by the end of the week, your Honor, if not tomorrow, I would think, or maybe even today.  It depends on how your Honor would like us to transmit the document, I think, will probably answer the question.

THE COURT:  Here's what I would say:  Why don't we say in one week, so by Tuesday, the 10th.  Why don't we treat it the way in which we treat settlement position statements under my practice rules, which is that it gets submitted directly to chambers and is not publicly docketed.

MR. MONAHAN:  That sounds good, your Honor. We'll definitely take care of that well before a week from now.

THE COURT:  All right.  With respect to the actual notice -- so I guess I'm turning back to Ms. Beige.  We had an opportunity to actually look through it and I just wanted to point out a couple of things that may need to be updated in the actual notice document.  I think that we are looking at docket number 48, I believe, 48-3.

MS. BEIGE: 48-3? I thought they were all 50.

THE COURT: I'm sorry, 50, I'm sorry.

MS. BEIGE: Okay.

THE COURT: Yes, yes, yes. It's a little thing but because it's a notice document, we just want to make sure that this is all accurate. I'm just trying to find the exact pages. I'm hoping my trusty law clerk will direct me here because I have the documents here. Yes, 50-3. Okay, so document number 50-3, and it is -- I'm going to go by the ECF pagination if you have it.

MS. BEIGE: Yes.

THE COURT: So at the top of the page, page 15 of 23. The Court's address -- and this is repeated several times throughout the documents so this is probably a find and replace. The Court is located at Cadman Plaza East, C-a-d-m-a-n. I'm sure the auto-correct changed it to Camden as is Camden, New Jersey, but that's inaccurate.

MS. BEIGE: Okay.

THE COURT: So that's something that would need to be changed throughout the document. It's definitely there at ECF page 15, ECF page 16, and ECF page 17. I can give you the paragraph numbers if you

need that.

MS. BEIGE:  No, thank you, your Honor. We'll make those corrections.

THE COURT:  Okay.  I think then similarly, document 50-2 -- let me get the correct page number. It's page 3 of 3 in the ECF pagination.

MS. BEIGE:  Yes.

THE COURT:  It's the last paragraph, same thing with the address.  To the extent that you can review the remaining documents and just confirm that we didn't miss anything with that Camden versus Cadman --

MS. BEIGE:  Of course, your Honor.

THE COURT:  -- that would be very helpful. In addition, this motion was actually referred to me -- well, it was referred to Judge Scanlon for a report and recommendation.  And upon conferring with Judge Komitee, I think it's my understanding that I actually could just approve it myself because there's not a dispositive motion.  But it sounds like, Ms. Beige, you may be resubmitting the documents anyway.

MS. BEIGE:  Yes.

THE COURT:  Is that accurate?

MS. BEIGE:  Yes.

THE COURT:  Okay.

MS. BEIGE:  I'll make the corrections and I

can resubmit them.

THE COURT:  Okay.  I would also ask, if you're doing that, to update the caption throughout the document because it is no longer a caption with Judge Scanlon's initials, it's now my initials.  And just for clarity when the notice goes out, that would also be updated.

MS. BEIGE:  Okay.

THE COURT:  Those are all of the items that I had for today.  I'll first turn to Mr. Monahan.

Is there anything else that you wanted to add?

MR. MONAHAN:  No, your Honor.

THE COURT:  Ms. Beige or Mr. Harrington?

MS. BEIGE:  One final question, your Honor: Would you like us to update the proposed order with your name?

THE COURT:  I think you can.

MS. BEIGE:  Okay.

THE COURT:  Truthfully, that would be the fastest way for it to get to me.

MS. BEIGE:  Great, okay, we'll do that.

THE COURT:  Okay.

MS. BEIGE:  Thank you.  That was it, your Honor.

THE COURT:  All right.  If there is nothing else, I appreciate your patience earlier.  I equate it to, if we were in a courtroom, you would be sitting in the back waiting to come up to the bench, so I thank you for your patience.  And if there is nothing else for the afternoon, please be safe and we are adjourned.

MS. BEIGE:  Thank you, your Honor.

MR. MONAHAN:  Thank you, your Honor.

* * * * * * *

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

ELIZABETH BARRON                              August 18, 2021