**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE STELLANTIS N.V. SECURITIES LITIGATION | 19-CV-6770 (EK) (MMH) <br><br> <u>CLASS ACTION</u> |

**DECLARATION OF STEPHANIE M. BEIGE IN SUPPORT OF (I) LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, PLAN OF ALLOCATION AND CERTIFICATION OF SETTLEMENT CLASS AND (II) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES AND REIMBURSEMENT AWARD TO LEAD PLAINTIFF**

I, Stephanie M. Beige, hereby declare as follows:

1. I am a member of the New York Bar and appearing in this case *pro hac vice*. I am a partner at Bernstein Liebhard LLP ("Bernstein Liebhard"). My firm was appointed Lead Counsel in this Action for Lead Plaintiff and the Class ("Lead Counsel"). I have personal knowledge of the matters stated herein and, if called as a witness, I could and would competently testify thereto.[1]

2. I respectfully submit this Declaration pursuant to Rule 23 of the Federal Rules of Civil Procedure in support of: (1) Lead Plaintiff's Motion for Final Approval of Proposed Class Action Settlement, Plan of Allocation and Certification of the Settlement Class; and (2) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Expenses.

3. The parties to this Settlement are Lead Plaintiff Nicholas S. Panitza and defendants Stellantis N.V. f/k/a Fiat Chrysler Automobiles N.V. ("FCA" or the "Company"), Roland Iseli and Alessandro Baldi, as Co-Executors for the Estate of Sergio Marchionne, Michael Manley and Richard K. Palmer (collectively, the "Defendants").

---

[1] Unless otherwise indicated, all capitalized terms herein shall have the same meanings as set forth in the Stipulation and Agreement of Settlement filed with the Court on May 14, 2021 ("Stipulation") (ECF No. 50).

4. Lead Plaintiff alleges claims against Defendants on behalf of a Settlement Class defined as all persons or entities who or which purchased or otherwise acquired, on a U.S. Exchange or in a transaction in the United States, FCA or STLA common stock between February 26, 2016 and January 27, 2021, both dates inclusive (the "Class Period"). Lead Plaintiff has entered into a settlement on behalf of himself and the other Members of the Settlement Class with Defendants, which provides a recovery of $5,000,000 in cash to resolve this securities class action against Defendants (the "Settlement"). The Settlement is described in the Stipulation, previously filed with the Court. (ECF No. 50).

5. This Declaration sets forth the nature of the claims asserted, the principal proceedings in the Action, the legal services provided by Lead Counsel, the settlement negotiations between the parties, and also demonstrates why the Settlement and Plan of Allocation are fair, reasonable, adequate and in the best interests of the Settlement Class, and why Lead Counsel's application for attorneys' fees and expenses is reasonable and should be approved by the Court.

6. As explained below and in the accompanying memoranda of law, Lead Counsel and Lead Plaintiff believe that the Settlement is in the best interests of the Settlement Class. The Settlement takes into consideration the significant risks specific to this litigation. Furthermore, the Settlement is the result of arm's-length negotiations between the parties. These negotiations were conducted by experienced counsel with an understanding of the strengths and weaknesses of the claims and defenses.

## I.  PRELIMINARY STATEMENT

7. Lead Plaintiff succeeded in obtaining a recovery for the Settlement Class in the amount of $5,000,000, in cash, which has been deposited in an interest-bearing escrow account for the benefit of the Settlement Class. As set forth in the Stipulation, in exchange for this

payment, the proposed Settlement resolves all claims asserted by Lead Plaintiff and the Settlement Class in the Action and all related claims that could have been brought against the Defendants ("Released Claims").

8. The Action has been vigorously litigated from its commencement in December 2019 through the execution of the Stipulation. Lead Counsel thoroughly investigated the claims asserted in this Action and the Settlement was achieved only after Lead Counsel, *inter alia*, (i) undertook a significant factual investigation into the bribery scheme involving FCA U.S. and officials from the United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW") that were assigned to the UAW-FCA National Training Center (the "NTC") which included (i) thoroughly analyzing a wide range of evidentiary materials, including volumes of documents and evidence from the criminal proceedings relating to the United States Department of Justice (the "DOJ") investigation into the bribery scheme, including numerous indictments, informations, plea agreements, and sentencing memoranda concerning various FCA and UAW individuals implicated in the alleged scheme, as well as related investigations of the UAW by the DOJ; (ii) reviewing and analyzing public records and news reports regarding the bribery scheme, and publicly available information regarding FCA, including relevant Securities and Exchange ("SEC") filings, financial reports and press releases, and analysts' reports; (iii) researching the law relevant to Lead Plaintiff's claims and drafting and filing detailed amended complaints; (iv) researching and drafting an opposition to Defendants' motion to dismiss the first amended complaint; (v) reviewing and analyzing internal FCA documents concerning the alleged bribery scheme and the DOJ's investigation as part of the settlement negotiations; and (vi) working closely with its damages expert to analyze loss causation and damages issues. At

3

the time the Settlement was reached, Lead Counsel had a thorough understanding of the strengths and weaknesses of the Parties' positions.

9.      In deciding to settle, Lead Plaintiff and Lead Counsel took into consideration the significant risks associated with establishing liability, as well as the duration and complexity of the legal proceedings that remained ahead. As demonstrated by the Parties' court filings, the Settlement was achieved in the face of vigorous opposition by Defendants who would have, had the Settlement not been reached, continued to raise serious arguments concerning, among other things, whether the alleged misstatements were material or false, whether there was any evidence of Defendants' scienter, and whether Lead Plaintiff could prove that the alleged fraud caused an economic loss.

10.     The Settlement was negotiated on all sides by experienced counsel with a firm understanding of the strengths and weaknesses of their clients' respective claims and defenses. The Settlement confers substantial and immediate benefits to the Settlement Class, while eliminating the risk that the Settlement Class could receive nothing. Furthermore, even if Lead Plaintiff prevailed at the motion to dismiss stage, the class certification stage, and the summary judgment stage, and then at trial, any recovery could still be years away, as Defendants would likely have appealed any adverse judgment. Thus, under the circumstances, the Settlement is in the best interests of the Settlement Class and should be approved as fair, reasonable, and adequate.

11.     Lead Counsel also respectfully submit that the Court should approve the Plan of Allocation and award attorneys' fees in the amount of 33 1/3% of the Settlement Fund, plus litigation expenses of $85,318.18, as a result of Lead Counsel's efforts in creating this tangible

and immediate benefit on behalf of the Settlement Class, and as recognition for the risks faced and overcome.

12.    To date, the Settlement Class overwhelmingly approves the Settlement. Pursuant to Magistrate Judge Marcia M. Henry's Order Preliminarily Approving the Settlement and Authorizing Dissemination of Notice dated October 15, 2021 (the "Notice Order") (ECF No. 60), 209,072 copies of the Postcard Notice were mailed or disseminated to potential Settlement Class Members and nominees. Additionally, a Summary Notice was published in *Investor's Business Daily* and transmitted over the *PR Newswire* on November 29, 2021. The notices apprised Settlement Class Members of their right to object to the Settlement, the Plan of Allocation and/or to Lead Counsel's application for attorneys' fees of up to 33 1/3% of the Settlement Fund, plus expenses of up to $100,000, and an award to Lead Plaintiff. While the time to file objections to any of the relief has not yet expired (Settlement Class Members have until January 27, 2022 to object), to date there have been no objections to the Settlement, the Plan of Allocation or the request for fees and expenses.

13.    Lead Counsel litigated this case for nearly two years on a wholly contingent basis. The fee application of 33 1/3% of the total recovery is fair and reasonable and warrants Court approval. As set forth fully in the accompanying Memorandum of Law in Support of Lead Counsel's Motion for an Award of Attorney's Fees and Expenses, and Reimbursement Award to Lead Plaintiff (the "Fee Brief"), the fee request is well within the range of fees typically awarded in actions of this type, was approved by Lead Plaintiff, and is wholly justified in light of the benefits obtained, the substantial risks undertaken, and the quality, nature and extent of the services rendered.

## II.   SUMMARY OF THE ALLEGATIONS

14.   Lead Plaintiff's allegations center on the DOJ's investigation into a multi-year bribery scheme whereby, from 2009 through 2015, certain employees at FCA U.S. engaged in a scheme to bribe UAW officials in exchange for concessions in the collective bargaining process. ¶ 66.[2] Over $10 million in bribes were made by FCA senior executives Alphons Iacobelli ("Iacobelli"), Michael Brown ("Brown"), and Jerome Durden ("Durden"), and were primarily funneled through the UAW-Chrysler joint training center – the NTC. *Id.*  Iacobelli and Durden both testified that the bribes were made in an effort to "obtain benefits, concessions, and advantages for FCA in the negotiation, implementation, and administration of the collective bargaining agreements between FCA and the UAW." ¶ 10.

15.   To minimize detection of the scheme, FCA and the UAW used the NTC to funnel money to various UAW officials through false business fronts and sham charities.  ¶¶ 68-78, 167. FCA also facilitated illegal payments using credit cards and bank accounts linked to the NTC (¶¶ 68, 73, 75), and funneled funds directly to the UAW through payments known as "chargebacks," which reimbursed the UAW for salaries and benefits for employees that worked at the NTC.  ¶¶ 76-78.

16.   In September 2013, the DOJ began investigating FCA. ¶ 134. The DOJ discovered that Iacobelli was stealing NTC funds for himself, in addition to bribing UAW officials.  ¶ 135.   After the DOJ notified FCA in June 2015, FCA conducted an internal investigation and fired Iacobelli and Durden for "wrongdoing." ¶ 264.

17.   In June 2017, the DOJ began charging FCA and UAW officials for their roles in the bribery scheme. ¶ 136.

---

[2] References to the Second Amended Class Action Complaint for Violations of the Federal Securities Laws (the "SAC") are cited herein as "¶___."

18.     After the market began to learn of some aspects of the alleged scheme, Defendants issued a series of statements designed to distance FCA from the scheme. ¶ 199.  For example, Defendants represented that FCA was a "victim" of the scheme and that the scheme was perpetrated by rogue employees. *Id.* FCA also assured the market that the bribes did not impact the 2015 CBA negotiations. *Id.*

19.     On November 20, 2019, General Motors, Inc. ("GM") filed a racketeering complaint against FCA (the "GM Complaint") alleging that FCA obtained labor concessions as a result of the bribery scheme and that the scheme was not limited to the actions of a few rogue employees, but instead reached the highest levels of the Company, including FCA's former CEO, Defendant Marchionne.  ¶¶ 234-237.  Following these revelations, FCA's stock declined $0.58 per share, or 3.72%.  ¶ 239.

20.     On January 27, 2021, FCA U.S. announced an agreement with the DOJ to resolve the investigation into the bribery scheme at the NTC.  ¶ 240. As part of the settlement, FCA U.S. agreed to plead guilty to one count of conspiracy to violate the Labor Management Relations Act and to pay a $30 million fine. *Id.* FCA U.S. also agreed to implement an independent compliance monitor for three years with respect to the dissolution of the NTC, and internal controls as they relate to the trusts being implemented to replace the NTC. *Id.*

**A.     Procedural History**

21.     On December 2, 2019, a class action complaint styled *Kong_v. Fiat Chrysler Automobiles N.V., et al.*, No. 1:19-cv-06770-FB-VMS, was filed in this District and assigned to this Court on behalf of FCA investors, alleging violations of §§10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 (ECF No. 1).

22.     On January 10, 2020, a second class action complaint was filed in this District styled *Tan v. Fiat Chrysler Automobiles N.V., et al.*, No. 1:20-cv-0202-RPK-SMG.

7

23.    On January 31, 2020, Lead Plaintiff moved for consolidation of the actions and for the appointment of lead plaintiff for the class (ECF No. 13).

24.    On March 10, 2020, the Court entered an Order consolidating the actions under the caption *In re Fiat Chrysler Automobiles N.V. Securities Litigation*, No. 1:19-cv-677-EK-VMS, and appointing Nicholas S. Panitza as Lead Plaintiff and Bernstein Liebhard LLP as Lead Counsel (ECF No. 21).

25.    Both before and after the Court's March 10, 2020 Order, Lead Counsel carried out an extensive investigation into the facts and circumstances surrounding Defendants' alleged fraud. On June 1, 2020, Lead Plaintiff filed the First Amended Complaint ("FAC") (ECF No. 29).

26.    The allegations in the FAC center on the DOJ's investigation into the bribery scheme at the NTC, and the effects of the scheme on the collective bargaining process and the 2015 collective bargaining agreement ("CBA") entered into between FCA and the UAW. Specifically, the FAC alleged that the Defendants misled investors by asserting that FCA was a "victim" of the bribery scheme that was carried out by former "rogue" FCA employees, when others at FCA, including FCA's former CEO, Marchionne, were not only aware of the scheme, but orchestrated it. Additionally, the FAC alleged that FCA misled investors by falsely claiming that the bribery scheme did not impact the 2015 CBA negotiated between FCA and the UAW. Lead Plaintiff alleged that the truth began to emerge on November 20, 2019, when GM filed a federal racketeering lawsuit against FCA alleging that FCA's bribery scheme corrupted the collective bargaining process and that Marchionne had orchestrated the scheme to obtain a labor cost advantage over GM in the hopes of forcing a merger.

27.     On August 21, 2020, Defendants served a motion to dismiss the FAC, along with an accompanying memorandum of law and declaration in support (ECF Nos. 31-34).

28.     On October 21, 2020, Lead Plaintiff filed his Opposition to Defendants' Motion to Dismiss (ECF No. 35).

29.     Defendants filed their Reply in Support of their Motion to Dismiss the First Amended Complaint on December 14, 2020 (ECF No. 36).

30.     In January 2021 FCA completed a merger transaction with Peugeot S.A., and changed its name to Stellantis N.V.  On January 25, 2021, the Court changed the case caption to *In re Stellantis N.V. Securities Litigation* to reflect the Company's name change (ECF No. 39).

31.     On January 27, 2021, FCA U.S. issued a press release announcing an agreement with the DOJ to resolve the investigation into FCA's former employees and the bribery scheme.

32.     On January 28, 2021, Lead Plaintiff filed a Second Amended Complaint ("SAC") to include FCA's settlement with the DOJ, extending the class period to February 26, 2016 through January 27, 2021 (the "Class Period") (ECF No. 42).

**B.      Negotiation of the Settlement and its Terms**

33.     In late December 2020, Lead Plaintiff and Defendants began exploring the possibility of a settlement. The Parties agreed that attempting to reach a resolution prior to a ruling on the motion to dismiss could be beneficial to all parties. In furtherance of these settlement discussions, Defendants agreed to provide Lead Counsel with internal FCA documents concerning FCA's internal investigation concerning the bribery scheme.

34.     Between late December 2020 and early January 2021, Defendants produced over 1,600 pages of documents related to the alleged bribery scheme, FCA's internal investigation, and the DOJ's investigation, which were reviewed by Lead Counsel.

35.     The Parties subsequently agreed to a settlement in principle to resolve the Action and continued to negotiate the terms of the Settlement as set forth in the Stipulation, which was executed by the Parties on May 14, 2021 (ECF No. 50).

**C.     Preliminary Approval of the Settlement and Mailing and Publication of Notice of the Settlement**

36.     On May 14, 2021, Lead Plaintiff filed the Unopposed Motion for Preliminary Approval of Class Action Settlement, Preliminary Certification of Settlement Class, and Approval to Provide Notice to the Class, along with Lead Plaintiff's supporting memorandum of law, and proposed notices to the Settlement Class Members (ECF Nos. 47-50). Lead Plaintiff requested that the Court approve the forms of notice, which, among other things, described the terms of the Settlement, advised Settlement Class Members of their rights in connection with the Settlement, set forth the Plan of Allocation, informed Settlement Class Members of the amount of attorneys' fees and expenses that Lead Counsel and Lead Plaintiff would request, and explained the procedure and deadline for filing a Proof of Claim and Release form (the "Proof of Claim Form") in order to be eligible to receive a payment from the Net Settlement Fund.  In addition, Lead Plaintiff requested that the Court certify the Settlement Class for settlement purposes.

37.     By Order dated October 15, 2021, Magistrate Judge Marcia M. Henry preliminarily approved the Settlement and approved the forms of notice to the Settlement Class (ECF No. 60).  Pursuant to the Preliminary Approval Order, Magistrate Henry appointed JND Legal Administration ("JND") as Claims Administrator and instructed JND to disseminate notice to the Settlement Class.

38.     Attached as Exhibit 1 is the Declaration of Luiggy Segura Regarding (A) Mailing of the Postcard Notice; (B) Publication of the Summary Notice; and (C) Report on Requests for

Exclusions Received to Date, dated January 13, 2022 ("Segura Decl."). The Segura Declaration demonstrates that the Claims Administrator has provided Notice to the Settlement Class in compliance with the Preliminary Approval Order.

39. In addition to mailing 209,072 Postcard Notices to potential Settlement Class Members and nominees, JND caused the Summary Notice to be published in *Investor's Business Daily* and to be transmitted over *PR Newswire*. *Id.* at ¶¶ 12, 13.

40. Lead Counsel reviewed the Summary Notice as distributed to the Settlement Class.

41. JND also maintains and posts information regarding the Settlement on a dedicated website established for the Action, www.PanitzaFiatChryslerSecLitigation.com, to provide Settlement Class Members with information about the Action, as well as downloadable copies of the Notice, Claim Form and Stipulation. *Id.* at ¶ 15.

42. Lead Counsel reviewed the Claims Administrator's website for the Action and confirmed that it was operational and provided information to the Settlement Class.

43. Pursuant to the terms of the Preliminary Approval Order, the deadline for Settlement Class Members to submit objections to the Settlement or the fee and expense application, or to request exclusion from the Settlement Class is January 27, 2022. To date, JND has not received any requests for exclusion from the Settlement Class. *Id.* at ¶ 18.

44. Lead Counsel is unaware of any objection to the Settlement or request for exclusion from the Settlement Class. Should any objections or requests for exclusion be received, Lead Plaintiff will address such in the reply papers.

## III.    FACTORS TO BE CONSIDERED IN SUPPORT OF SETTLEMENT

### A.    The Settlement Was Negotiated at Arm's-Length

45.    As set forth above, the terms of the Settlement were negotiated by the parties at arm's-length through adversarial good-faith negotiations that lasted several months.  Even after a settlement in principle was reached, the Parties took several months to negotiate and agree to the terms of the Settlement.

46.    Lead Counsel is experienced in prosecuting securities class actions and has successfully prosecuted hundreds of similar class actions in courts throughout the country.  Lead Counsel leveraged its experience and resources to assess the merits and value of the case and negotiate the Settlement.

47.    Defendants are represented by Sullivan & Cromwell LLP, a highly capable and prominent law firm that is experienced in complex securities class action litigation. Notwithstanding this opposition, Lead Counsel were able to develop a case that was sufficiently strong to persuade Defendants to settle it on terms that are favorable to the Class.

48.    The Settlement avoids the hurdles Lead Plaintiff would have to clear in proving liability and damages if the Action continued, and avoids the significant costs and risks associated with further litigation and the very real risk of no recovery at all.

49.    As a result of Lead Counsel's litigation efforts and the discussions during the Parties' settlement negotiations, Lead Counsel was able to identify issues that were critical to the outcome of this case. Lead Counsel has considered the risks of continued litigation, the likelihood of defeating Defendants' motion to dismiss, the likelihood of obtaining class certification, and the likely summary judgment motions after completion of fact and expert discovery and, if successful, the risk, expense, and length of time to prosecute the Action through trial and the inevitable subsequent appeals.

12

**B.    Defendants Raised Serious Questions that Placed the Outcome of the Action in Significant Doubt**

50.    At the time the Settlement was reached, Defendants' motion to dismiss the FAC was fully briefed.   Although Lead Plaintiff believes that the claims asserted in the FAC are meritorious, risks were shown through Defendants' motion.

51.    For example, Defendants argued that Lead Plaintiff failed to plead actionable misstatements or omissions and loss causation.   Defendants argued that the FAC failed to plead any actionable or material misstatements or omissions because, among other things: (i) FCA had no duty to disclose uncharged, unadjudicated wrongdoing; (ii) Lead Plaintiff failed to plead any facts supporting the allegations that Defendants' statements were false or misleading; and (iii) certain of FCA's statements were protected opinions under *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015).

52.    Defendants also argued that Lead Plaintiff did not plead a strong inference of scienter against any Defendant, asserting, *inter alia*, that Lead Plaintiff failed to allege that the Defendants had a motive to defraud investors, and that the scienter allegations were based on group-pleading allegations which are insufficient to plead an inference of conscious misbehavior.

53.    In addition, Defendants argued that Lead Plaintiff did not adequately plead loss causation, asserting that the GM Complaint was not a corrective disclosure under the PSLRA because: (i) allegations in a complaint cannot support loss causation as a matter of law; and (ii) the GM Complaint did not reveal any new information to the market and instead was based on information already in the public realm.

54.    Lead Plaintiff vigorously opposed Defendants' motion, arguing, *inter alia*, that (i) the FAC alleged numerous new facts that were revealed in the GM Complaint that established the falsity of Defendants' statements; (ii) Defendants had a duty to disclose the effects the

13

bribery scheme had on the CBA process because former FCA employees had already been charged by the DOJ for their crimes, and thus, the proposition that a company has no duty to disclose uncharged, unadjudicated wrongdoing does not apply to FCA's statements; (iii) when viewed collectively, the FAC's allegations sufficiently established scienter by adequately alleging Marchionne's motive and opportunity to commit fraud, and pleading a strong inference of scienter through Marchionne's knowledge of the bribery scheme, corporate scienter and the core operations theory; and (iv) the GM Complaint was a corrective disclosure because it revealed to the market new information concerning concessions FCA received from the UAW as a result of the bribery scheme, and a complaint can serve as a corrective disclosure when it discloses previously unknown facts to the market and the market reacts negatively to the news.

55.    Although Lead Plaintiff believes that he effectively countered Defendants' arguments in his opposition to Defendants' motion to dismiss, Defendants' arguments in their summary judgment motions would have been just as hard-fought and extensive, and Lead Plaintiff would have no guarantee of success.

56.    The risks of establishing liability and damages at trial were similarly real.  Lead Plaintiff would face the unpredictability of a lengthy and complex trial, the risk that the jury would react to evidence in unforeseen ways, and the risk that the jury would find that the challenged statements were not materially false or misleading and that no damages were caused by the Defendants' actions.  Accordingly, Lead Plaintiff faced the risk that the Defendants' arguments would find favor with a jury and result in the Settlement Class losing at trial and receiving no recovery.

**C.    The Judgement of the Parties and Reaction of the Class Provide Additional Support for Approval of the Settlement**

57.    As set forth above, the Settlement is the product of lengthy arm's-length negotiations between opposing counsel with significant experience in securities class action litigation.

58.    Lead Counsel strongly believes that the Settlement represents a highly favorable resolution for the Settlement Class under the circumstances.

59.    Further, 209,072 Postcard Notices have been mailed to potential Settlement Class Members and nominees. *See* Exhibit 1 (Segura Decl.) at ¶ 12. As of the date of this Declaration, no objections to the Settlement or the Plan of Allocation have been submitted.

**D.    The Settlement is an Excellent Result Considering the Risks of Continued Litigation**

60.    The $5,000,000 Settlement is a favorable and reasonable result, particularly when considered in view of the substantial risks and obstacles to recovery if the Action were to continue through summary judgment, to trial, and through likely post-trial motions and appeals.

61.    The Settlement recovers approximately 6.84% of the $73 million in maximum estimated damages.  This percentage is above the median settlement amount as reported by Cornerstone Research in Laarni T. Bulan *et al.*, *Securities Class Action Settlements:    2020 Review and Analysis*, which tracks and aggregates court-approved securities class action settlements. *See* Exhibit 2 attached hereto.

62.    This Settlement when viewed as a percentage of maximum recoverable damages is likely even more favorable to the Settlement Class, because Lead Plaintiff's $73 million estimate would be subject to formidable challenges.

15

## IV.    THE PLAN OF ALLOCATION

63.    Pursuant to the Notice Order and as set forth in the Postcard Notice, Summary Notice, and Notice, all Settlement Class Members who wish to participate in the distribution of the Net Settlement Fund must submit a timely and proper Proof of Claim form.  As provided in the Stipulation, after deducting all appropriate taxes, administrative costs, and attorneys' fees and expenses (as well as reimbursement of Lead Plaintiff's time and expenses), the remainder of the Settlement Fund (the "Net Settlement Fund") shall be distributed among Settlement Class Members who submit valid Proof of Claim forms according to the Plan of Allocation.

64.    If approved, the Plan of Allocation will govern how the proceeds of the Net Settlement Fund will be distributed. The proposed Plan of Allocation provides that, to qualify for payment, a claimant must be, among other things, an eligible Member of the Settlement Class and must submit a valid Proof of Claim form that provides all of the requested information. The Settlement Fund will be distributed on a pro rata basis depending on the Settlement Class Member's recognized losses. The Plan of Allocation is set forth in the Notice.

65.    The proposed Plan of Allocation was formulated after consultation with Lead Counsel's damages consultant in order to calculate an equitable method to divide the Net Settlement Fund for distribution among Settlement Class Members who submit valid claims. The proposed Plan of Allocation is designed to fairly and rationally allocate the proceeds of this Settlement among the Settlement Class.

## V.    LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND EXPENSES ARE JUSTIFIED

66.    Despite working on this Action for two years, Lead Counsel has not received any payment for its services in prosecuting this litigation, nor has it been paid for expenses incurred in the prosecution of this Action.  The Notice provides that Lead Counsel may apply for an

16

award of attorneys' fees not to exceed 33 1/3% of the Settlement Fund, plus expenses of up to $100,000.

67. As set forth in the Fee Brief, Lead Counsel is requesting attorneys' fees of 33 1/3% of the Settlement Fund, plus expenses. The requested fee was approved by Lead Plaintiff and is well within the range of fees awarded by courts in this Circuit and courts throughout the country.

68. Lead Counsel achieved this highly favorable result for the Settlement Class at great risk and expense. Lead Counsel was unwavering in its representation of the Settlement Class and its investment of the time and resources necessary to bring this litigation to a successful conclusion. Lead Counsel's compensation for the services rendered has always been wholly contingent. The requested fee is reasonable based on the quality of Lead Counsel's work and the substantial benefit obtained for the Settlement Class.

69. The requested fee is also warranted in light of the result obtained for the Settlement Class and the obstacles that existed to obtaining any recovery. Defendants have maintained throughout the litigation that they had no liability. If the case survived Defendants' motion to dismiss, of which there was no guarantee, it would have proceeded to discovery. The difficulty in obtaining needed discovery in this Action would have been greater than in the typical securities class action because: (1) Lead Plaintiff's claims are largely dependent on establishing Defendant Marchionne's knowledge and participation in the bribery scheme; however, Marchionne passed away in 2018 and no new facts concerning his role in the scheme are likely to be discovered; and (2) many of the third-party witnesses are either being investigated or have been charged by the DOJ concerning their roles in the scheme, substantially diminishing their willingness to voluntarily provide testimony in this Action.

17

### A.      The Fee Request is Justified Under the Lodestar/Multiplier Approach

70.      For Lead Counsel's efforts on behalf of the Settlement Class, it is applying for compensation from the Settlement Fund on a percentage basis.  The percentage method is an appropriate method of compensating counsel because, among other things, it aligns the lawyers' interest in being paid a fair fee with the interest of the class in achieving the maximum recovery in the shortest amount of time required under the circumstances.  In addition, the percentage method is particularly appropriate here, given the highly favorable result that was achieved under the circumstances.

71.      Lead Counsel's compensation for the services rendered was wholly contingent on its success.  Lead Counsel dedicated 1,692.25 hours to prosecuting this Action resulting in a lodestar of $1,342,393.75. Lead Counsel's 33 1/3% fee request represents a slight multiplier of 1.24 to the aggregate lodestar, well within – and in fact at the lower end – of the range of multipliers awarded by courts in this District and in courts throughout the country.

72.      The expenses incurred in prosecuting this Action are set forth in the Declaration of Stephanie M. Beige in Support of Lead Counsel's Application for Award of Attorneys' Fees and Expenses, and Reimbursement Award to Lead Plaintiff (the "Beige Fee Decl."), attached as Exhibit 3.  Lead Counsel's expenses are reflected in the books and records maintained by the firm, and are an accurate recordation of the expenses incurred.  In total, Lead Counsel incurred expenses in the amount of $85,318.18 to successfully prosecute the Action.  I respectfully submit that all of these costs and expenses are reasonable and should be approved by the Court.

### B.      Standing and Expertise of Counsel

73.      The expertise and experience of Lead Counsel is described in Exhibit A to the Beige Fee Declaration.  Lead Counsel are experienced securities class action litigators and have years of experience litigating these types of cases, having served as lead or co-lead in some of

18

the largest securities litigations in recent history and recovering billions of dollars for shareholders.

74. Defendants are represented by very experienced counsel – Sullivan & Cromwell – who spared no effort in the defense of its clients. Defendants' counsel vigorously defended its clients, insisted they had no liability, and gave every indication that they were prepared to proceed with the litigation to trial, if necessary, if a settlement was not reached. In the face of this opposition, Lead Counsel developed its case so as to persuade Defendants to settle the case on a basis favorable to the Settlement Class under the circumstances.

**C.      The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High Risk, Contingent Securities Cases**

75. This litigation was undertaken by Lead counsel on a wholly contingent basis. From the outset, Lead Counsel understood that it was embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the enormous investment of time and money the case would require. In undertaking this responsibility, Lead Counsel was obligated to ensure that sufficient attorney and paraprofessional resources were dedicated to the prosecution of this Action and that funds were available to compensate staff and the considerable costs which a case such as this requires.

76. Because of the nature of a securities litigation contingent practice, where cases are predominantly large cases lasting several years, contingent litigation firms have to pay regular overhead, in addition to advancing the expenses of the litigation, all while no recovery is assured. This Action is no different. From the outset, this Action presented a number of risks and challenges that could have prevented the Settlement Class from obtaining any recovery at all. Further, it is wrong to assume that a law firm handling complex contingent litigation always wins. Tens of thousands of hours have been expended on losing efforts.

19

77. When Lead Counsel undertook to act for Lead Plaintiff and the Settlement Class in this Action, it was with the knowledge that it would spend many hours of work against one of the best defense law firms in the country with no assurance of obtaining any compensation for its efforts. The benefits conferred on the Settlement Class by this Settlement are particularly noteworthy in that a Settlement Fund of $5 million was obtained despite the existence of substantial risks of no recovery in light of the vigorous defense mounted by Defendants, and the practical obstacles to obtaining a larger recovery after continued litigation.

## VI. LEAD PLAINTIFF'S REIMBURSEMENT PURSUANT TO THE PSLRA

78. Pursuant to the PSLRA, 15 U.S.C. § 78u-4(a)(4), Lead Plaintiff is seeking reimbursement related directly to his representation of the Settlement Class, including time reviewing pleadings, court filings, and participating in settlement. Such payments are expressly authorized and anticipated by the PSLRA.

79. As set forth in the Beige Fee Declaration (attached as Exhibit 3), Lead Plaintiff seeks an award of $3,437.50 as reimbursement for the time he dedicated to the Action.

80. The Postcard Notice, Summary Notice and Notice each informed potential Settlement Class Members that Lead Counsel would be seeking payment of expenses in an amount not to exceed $100,000, including reimbursement to the Lead Plaintiff directly related to his representation of the Settlement Class in an amount not to exceed $5,000, as authorized by the PSLRA. The aggregate amount requested, $88,755.68 (which includes $85,318.18 in litigation expenses incurred by Lead Counsel and $3,437.50 in PSLRA reimbursement to Lead Plaintiff) is below the $100,000 estimate given to the Settlement Class in the notices.

## VII. CONCLUSION

81. In view of the significant recovery to the Settlement Class, the substantial risks of this litigation, the substantial efforts of Lead Counsel, the quality of the work performed, the

contingent nature of the fee, and the standing and experience of Lead Counsel, Lead Plaintiff and Lead Counsel respectfully submit that: (a) the Settlement is fair, reasonable and adequate, and should be finally approved; (b) the Plan of Allocation represents a fair method for the distribution of the Net Settlement Fund among Settlement Class Members and should be approved; (c) the application for attorneys' fees of 33 1/3% of the Settlement Fund, plus interest, and litigation expenses in the amount of $85,318.18 should be approved, and that Lead Plaintiff be awarded $3,437.50, pursuant to the PSLRA.

## VIII.   TABLE OF EXHIBITS

82.     The following documents are true and correct copies:

| EXHIBIT | DOCUMENT |
| --- | --- |
| 1 | Declaration of Luiggy Segura Regarding (A) Mailing of the Postcard Notice; (II) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date |
| 2 | Cornerstone Research in Laarni T. Bulan et al., *Securities Class Action Settlements: 2020 Review and Analysis* |
| 3 | Declaration of Stephanie M. Beige in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Expenses, and Reimbursement Award to Lead Plaintiff |
| 4 | Compendium of unreported decisions |

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 13, 2021.

By: _____

Stephanie M. Beige

## CERTIFICATE OF SERVICE

I hereby certify that the **Declaration of Stephanie M. Beige in Support of (I) Lead Plaintiff's Motion for Final Approval of Class Action Settlement, Plan of Allocation and Certification of Settlement Class and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Expenses and Reimbursement Award to Lead Plaintiff** was filed with CM/ECF system on January 13, 2022 and was thereby served upon all parties and counsel registered therein.

/s/ Stephanie M. Beige
Stephanie M. Beige